**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LANDMARK AMERICAN INSURANCE COMPANY, | Civil Action. No: 5:24-cv-01412 |
| Plaintiff, | Hon. Gail A. Weilheimer, U.S.D.J. |
| v. | |
| NURSELECT LLC; | |
| Defendant. | |

## <u>JOINT APPENDIX OF EVIDENCE</u>

i

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Declaration of Joan M. Gilbride, in Support of Plaintiff's Motion for Summary, filed January 21, 2025…………….............. | **MSJ_00000001** |
| Exhibit 1 to Gilbride Declaration - Second amended complaint styled *Landmark American Insurance Company v. Nurselect LLC* Case No. 5:24-cv-01412, United States District Court for the Eastern District of Pennsylvania. (ECF No. 21) …………………………………………….. | **MSJ_00000005** |
| Exhibit 2 to Gilbride Declaration - Nurselect LLC's Answer to the Complaint. (ECF No.17)…………………………………………….. | **MSJ_00000173** |
| Exhibit 3 to Gilbride Declaration - Professional Liability Policy No. LHC801468 issued by Landmark to Nurselect for the Policy Period March 1, 2023 to March 1, 2024………………………………………………….. | **MSJ_00000184** |
| Exhibit 4 to Gilbride Declaration - Joinder complaint styled *Brenda L. Kling, individually and as Administratrix of the Estate of Geraldine E. Wiggins, v. Rehabilitation Center at Brethren Village, LLC, Brethren Village, Brethren Village Realty, LLC, Lori Schoener, NHA, and John Does 1-4 v. NurSelect, LLC,* Case No. CI-22-04128, …...……………………... | **MSJ_00000259** |
| Exhibit 5 to Gilbride Declaration - Initial complaint, filed in the Court of Common Pleas of Lancaster County on July 11, 2022, captioned *Brenda L. Kling, Administratrix of the Estate of Geraldine E. Wiggins v. Brethren Village, LLC, Brethren Village, Brethren Village Realty, LLC, Lori Schoener, NHA, and John Does 1-4,* Case No. CI-22-04128……………… | **MSJ_00000326** |
| Exhibit 6 to Gilbride Declaration - Transcript from the deposition of David Shelly, president of Nurselect, dated November 20, 2024………………… | **MSJ_00000368** |
| Exhibit 7 to Gilbride Declaration - Nurselect's responses to Landmark's interrogatories and document requests in this action……………………… | **MSJ_00000576** |
| Exhibit 8 to Gilbride Declaration - Staffing Agreement between Nurselect and Brethren Village……………………………………………………... | **MSJ_00000591** |
| Exhibit 9 to Gilbride Declaration - Denial letter, dated October 4, 2023, sent by KBR on behalf of Landmark to Nurselect regarding the Underlying Action. ………………………………………………………………….. | **MSJ_00000603** |
| Exhibit 10 to Gilbride Declaration - Reservation of rights letter, dated April 12, 2024, sent by KBR on behalf of Landmark to Nurselect……………… | **MSJ_00000611** |
| Exhibit 11 to Gilbride Declaration - Email from Linda Reidenbaugh at the firm Saxton & Stump to David Shelly, dated January 12, 2023….………... | **MSJ_00000619** |

ii

Exhibit 12 to Gilbride Declaration - Attorney Letter………………………   **MSJ_00000621**

Exhibit 13 to Gilbride Declaration - Email dated October 5, 2023 regarding
the claim, sent by broker for Nurselect to the undersigned and Zach Wilson
at Landmark, with several others cc'd including David
Shelly………………………………………………………………...   **MSJ_00000624**

Exhibit 14 to Gilbride Declaration - email from Ayanna McDowell to
Melissa Reilly, and emails between David Shelly and Kimberly Selemba
(attorney at Saxton & Stump) regarding Ayanna McDowell………………   **MSJ_00000629**

Declaration of Zach Wilson, in Support of Plaintiff's Motion for Summary
Judgment, filed January 21, 2025…………...............................................   **MSJ_00000633**

Exhibit 1 to Wilson Declaration –email correspondence between Zach
Wilson and David Shelly dated September 13, 2023………………………   **MSJ_00000635**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LANDMARK AMERICAN INSURANCE COMPANY, | Civil Action. No: 5:24-cv-01412 |
| Plaintiff, | Hon. Gail A. Weilheimer, U.S.D.J. |
| v. | **Declaration of Joan M. Gilbride** |
| NURSELECT LLC; | |
| Defendant. | |

Joan M. Gilbride, an attorney duly admitted to practice before the Court *pro hac vice*, declares, pursuant to 28 U.S.C. Sec. §1746, as follows:

1.      I am a partner with Kaufman Borgeest & Ryan LLP ("KBR"), attorneys for Landmark American Insurance Company ("Landmark") and as such, I am familiar with the facts set forth in this Declaration.

2.      I submit this Declaration in support of Landmark's Motion for Summary Judgment.

3.      Annexed hereto as Exhibit "1" is a true and correct copy of the second amended complaint styled *Landmark American Insurance Company v. Nurselect LLC* Case No. 5:24-cv-01412, United States District Court for the Eastern District of Pennsylvania. (ECF No. 21).

4.      Annexed hereto as Exhibit "2" is a true and correct copy of Nurselect LLC's ("Nurselect" or "Defendant") Answer to the Complaint. (ECF No. 17).

10885997

Landmark v. Nurselect MSJ_00000001

5.      Annexed hereto as Exhibit "3" is a true and correct copy of the Professional Liability Policy No. LHC801468 issued by Landmark to Nurselect for the Policy Period from March 1, 2023 to March 1, 2024.

6.      Annexed hereto as Exhibit "4" is a true and correct copy of the joinder complaint styled *Brenda L. Kling, individually and as Administratrix of the Estate of Geraldine E. Wiggins, v. Rehabilitation Center at Brethren Village, LLC, Brethren Village, Brethren Village Realty, LLC, Lori Schoener, NHA, and John Does 1-4 v. NurSelect, LLC,* Case No. CI-22-04128, filed in the Court of Common Pleas of Lancaster County, Pennsylvania and currently pending. The Joinder Complaint of Defendant, Brethren Village, against Additional Defendant, Nurselect LLC, will be referred to in these papers as "Joinder," and was filed on June 13, 2023. Attached as "exhibit A" to the Joinder is the Fourth Amended Complaint captioned *Brenda L. Kling, Administratrix of the Estate of Geraldine E. Wiggins, v. Rehabilitation Center at Brethren Village, LLC, Brethren Village, Brethren Village Realty, LLC, Lori Schoener, NHA, and John Does 1-4,* filed on December 22, 2022. The entirety of the action will be referred to as the Underlying Action.

7.      Annexed hereto as Exhibit "5" is a true and correct copy of the initial complaint, filed in the Court of Common Pleas of Lancaster County on July 11, 2022, captioned *Brenda L. Kling, Administratrix of the Estate of Geraldine E. Wiggins v. Brethren Village, LLC, Brethren Village, Brethren Village Realty, LLC, Lori Schoener, NHA, and John Does 1-4*, Case No. CI-22-04128.

10885997

Landmark v. Nurselect MSJ_00000002

8.      Annexed hereto as Exhibit "6" is a true and correct copy of the transcript from the deposition of David Shelly, president of Nurselect, dated November 20, 2024 (Relevant transcript portions are highlighted).

9.      Annexed hereto as Exhibit "7" is a true and correct copy of Defendant's written responses to Landmark's interrogatories and document requests in this action.

10.      Annexed hereto as Exhibit "8" is a true and correct copy of the staffing agreement between Nurselect and Brethren Village.

11.      Annexed hereto as Exhibit "9" is a true and correct copy of the denial letter, dated October 4, 2023, sent by KBR on behalf of Landmark to Nurselect regarding the Underlying Action.

12.      Annexed hereto as Exhibit "10" is a true and correct copy of the reservation of rights letter, dated April 12, 2024, sent by KBR on behalf of Landmark to Nurselect, stating that a defense would be provided to Nurselect under a reservation of rights, and pending the result of the present Declaratory Judgment Action.

13.      Annexed hereto as Exhibit "11" is a true and correct copy of the email from Linda Reidenbaugh at the firm Saxton & Stump to David Shelly, which contained as an attachment a letter dated January 12, 2023 addressed to David Shelly as President of Nurselect, from Attorney Kimberly Selemba at Saxton & Stump ("Attorney Letter").

14.      Annexed hereto as Exhibit "12" is a true and correct copy of the Attorney Letter.

Landmark v. Nurselect MSJ_00000003

15.    Annexed hereto as Exhibit "13" is a true and correct copy of the email dated October 5, 2023 regarding the claim, sent by broker for Nurselect to the undersigned and Zach Wilson at Landmark, with several others cc'd including David Shelly.

16.    Annexed hereto as Exhibit "14" is a true and correct copy of an email from Ayanna McDowell to Melissa Reilly dated May 12, 2021, and emails between David Shelly and Kimberly Selemba (attorney at Saxton & Stump) regarding Ayanna McDowell dated October 14, 2022.

17.    Pursuant to 28 U.S.C. Sec. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
         January 21, 2025

_____

Joan M. Gilbride

Landmark v. Nurselect MSJ_00000004

10885997

# EXHIBIT 1

Landmark v. Nurselect MSJ_00000005

# UNITED STATES DISTRCT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LANDMARK AMERICAN INSURANCE
COMPANY,

                   Plaintiff,

v.

NURSELECT LLC,

                   Defendant.

Civil Action No.: 5:24-CV-01412

**SECOND AMENDED COMPLAINT
FOR
DECLARATORY JUDGMENT**

Plaintiff, Landmark American Insurance Company ("Landmark"), by and through its attorneys Kaufman, Borgeest & Ryan, LLP, brings this Complaint against defendant, NurSelect LLC ("NurSelect"), and in support thereof states as follows:

## NATURE OF ACTION AND RELIEF SOUGHT

1.      This is an action seeking a declaratory judgment and declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

2.      Landmark seeks a judicial declaration that it is not obligated to defend or indemnify NurSelect under Professional Liability Insurance Policy issued to NurSelect, the named Insured, in connection with a joinder complaint submitted for coverage by NurSelect.

## PARTIES, JURISDICTION AND VENUE

3.      Plaintiff Landmark is a corporation duly incorporated in the State of New Hampshire, with its principal place of business in Atlanta, Georgia.

10338506

Landmark v. Nurselect MSJ_00000006

4.    Upon information and belief, Defendant NurSelect is a corporation organized and existing under and by the laws of Pennsylvania, with its principal place of business located in Reading, Pennsylvania and/or Lancaster, Pennsylvania.

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332, §2201 and §2202 because: (i) there is an actual controversy between the parties; (ii) the amount in controversy exceeds $75,000, exclusive of interest and costs; and (iii) the matter is between citizens of different states.

6.    Venue is proper under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and the Defendant resides and maintains its principal place of business in this judicial district.

### THE UNDERLYING CLAIM

7.    This action involves a coverage dispute as to the extent of any obligation owed by Landmark to NurSelect in connection with a joinder complaint pending in Pennsylvania state court, captioned *Brenda L. King, individually and as Administratrix of the Estate of Geraldine E. Wiggins, v. Rehabilitation Center at Brethren Village, LLC, Brethren Village, Brethren Village Realty, LLC, Lori Schoener, NHA, and John Does 1-4 v. NurSelect, LLC*, Case No. CI-22-04128 (the "Underlying Action"). (See Complaint filed in Underlying Action annexed hereto as Exhibit "A").

8.    The Underlying Action alleges the following three causes of action: (1) negligence, indemnification and contribution; (2) vicarious liability, indemnification, and contribution; and (3) contractual indemnification.  The Underlying Action alleges that NurSelect is liable for common law and contractual indemnification and/or contribution, vicariously liable to Ms. Wiggins' estate, jointly and severally liable with Brethren Village, and liable over Brethren Village for claims

2

Landmark v. Nurselect MSJ_00000007

asserted by Ms. Wiggins' estate and for injuries and damages alleged in originating complaint. The Underlying Action also asserts that pursuant to the supplemental staffing agreement, NurSelect is contractually obligated to indemnify and hold harmless Brethren Village for any liabilities, damages, and expenses resulting from the claims asserted by Ms. Wiggins' Estate.[1]

9.    Prior to the filing of the Underlying Action, NurSelect received an attorney letter from counsel to Brethren Village Retirement Community on January 12, 2023 (the "Attorney Letter"). (See Attorney Letter annexed hereto as Exhibit "B"). The Attorney Letter was sent via email and mail with attention to NurSelect's President (David Shelly), and advises that Brethren Village has been sued in the Pennsylvania Court of Common Pleas related to the care and treatment of one of its residents, Geraldine Wiggins, for negligence arising out of a fall sustained by Ms. Wiggins on May 12, 2021, and that Brethren Village's investigation revealed that Ayanna McDowell, CNA, who was employed by NurSelect at the relevant time, had direct involvement in Ms. Wiggins' alleged fall. The Attorney Letter discusses the "Staffing Agreement" between Brethren Village and NurSelect, with specific reference to the agreement provision for "Apportionment of Liability and Damages Indemnification," which states:

> 5.1 Apportionment of Liability. It is hereby stipulated and agreed between the [Brethren Village] and NurSelect that with respect to any claim or action arising out of the Services, each entity shall only be liable for payment of that portion of any and all liability, costs, expenses, demands, settlements or judgments resulting from negligence, actions or omissions of its own agents, officers, and employees.

(See Exhibit A at 59; Exhibit B at 1-2).

---

[1] The Underlying Action is a part of an action initiated on behalf of Ms. Wiggins Estate against a rehab facility, "Brethren Village", and in that originating action Ms. Wiggins' Estate alleges that that Ms. Wiggins died on August 28, 2021, and that Brethren Village acted negligently through its agents in the care and treatment of Ms. Wiggins beginning on April 13, 2021. Ms. Wiggins Estate further alleges that on May 12, 2021, Ms. Wiggins was left alone despite the plan of care requiring assistance and records, and obtained a head injury when she fell, which allegedly led to her death.

3

Landmark v. Nurselect MSJ_00000008

10338506

10. The Attorney Letter provides that based upon the Apportionment of Liability provision of the staffing agreement, Brethren Village will be filing a joinder complaint against NurSelect to invoke NurSelect's contractual agreement to indemnify Brethren Village for the alleged negligence, actions, or omissions of Ms. McDowell related to the care and treatment of Ms. Wiggins. The Attorney Letter also advises NurSelect to provide notice of the pending joinder against NurSelect to its liability insurance provider so that counsel can be assigned to represent NurSelect's interests. (Exhibit B at 2).

## THE POLICY AND COVERAGE CORRESPONDENCE

11. Landmark issued its Professional Liability Policy No. LHC801468 to NurSelect LLC for the Policy Period from March 1, 2023 to March 1, 2024. (See Landmark Policy annexed hereto as Exhibit "C").

12. The Policy's Medical Professional Liability Insuring Agreement provides as follows:

**Part I.** **INSURING AGREEMENT**

**A.** **Covered Services**

The Company will pay on behalf of the Insured, as shown in the Declarations, all sums that the Insured becomes legally obligated to pay as **Damages** and associated **Claim Expenses** arising out of a negligent act, error or omission, even if the **Claim** asserted is groundless, false or fraudulent, in the rendering of or failure to render professional services as described in the Business Description on the Declarations, provided that the:

1. **Claim** is first made against the Insured during the **Policy Period**, and reported to the Company no later than sixty (60) days after the end of the **Policy Period**;

2. Negligent act, error or omission took place in a covered territory;

4

10338506

Landmark v. Nurselect MSJ_00000009

3. Negligent act, error or omission took place after the **Retroactive Date** as shown in the Declarations.

(Exhibit C at LAND000035).

13. Under the terms of the Policy "Claim" is defined under the Medical Professional Liability Coverage Part as a "written demand for monetary or non-monetary relief received by the Insured during the **Policy Period**, including the service of a suit, or the institution of an arbitration proceeding." (Exhibit C at LAND000039).

14. Part I.C. of the Medical Professional Liability Coverage Part of the Policy provides the following, in relevant part:

> All Claims arising out of a single negligent act, error or omission, or a series of related negligent acts, errors or omissions by one or more Insureds shall be treated as a single Claim for all purposes of this policy. All Claims shall be deemed first made when the earliest of such Claims is first made, regardless of whether such date is before or during the Policy Period and all such Claims shall be subject to the same Each Claim Limit of Liability during that Policy Period.

(Exhibit C at LAND000036).

15. Part II.H. of the Policy provides:

> This policy does not apply to any **Claim** or **Claim Expenses**[2] based upon or arising out of:
>
> **H.** Any obligation or liability assumed by the Insured under any contract or any oral or written agreement, unless liability would have attached in the absence of such a contract or agreement, including the Insured's decision to unilaterally terminate or otherwise alter, remove or abridge any rights, benefits or obligations under any contract or agreement.

(Exhibit C at LAND000038).

16. The Policy's Professional Liability Coverage Part also includes a Notice of Claim general condition that provides:

---

[2] "Claim Expenses" is defined to include attorney fees incurred by the Company or the Insured. (Exhibit C at LAND000040).

5

10338506

Landmark v. Nurselect MSJ_00000010

The Insured must notify the Company as soon as practicable of an incident, occurrence or offense that may reasonably be expected to result in a **Claim**. Where notice to the Company of such incidents, occurrences or offenses has been acknowledged as adequate by the Company in writing, subsequent **Claims** derived from such incidents, occurrences or offenses will be deemed as first made at the time the incident, occurrence or offense giving rise to such **Claim** was first provided. The Insured also must immediately send copies to the Company of any demands, notices, summonses or legal papers received in connection with any **Claim**, and must authorize the Company to obtain records and other information.

(Exhibit C at LAND000040-41).

17.     The Underlying Action was reported to Landmark on September 12, 2023.

18.     The Attorney Letter was not reported to Landmark until September 12, 2023, with the Underlying Action.

19.     Upon inquiry by Landmark of why the Attorney Letter was not submitted earlier, NurSelect's president acknowledged the Attorney Letter was received via email, and that he did not open the email – without providing any excuse as to why. (See Email Correspondence between NurSelect and Landmark annexed hereto as Exhibit "D").

20.     On October 4, 2023, Landmark issued a coverage denial letter, advising NurSelect that the Underlying Action directly arises out of the Attorney Letter and constitutes a single Claim first made prior to the Policy Period, and thus, fails to trigger the applicable Insuring Agreement. Landmark also denied coverage for the Underlying Action based on the Policy's contract exclusion and the Policy's Notice of Claim condition. (See Landmark October 4, 2023 Coverage Letter annexed hereto as Exhibit "E").[3]

21.     Landmark also issued two other letters in response to NurSelect's contest of Landmark's coverage determination, on October 17, 2023 and February 16, 2024.

---

[3] Landmark also denied coverage under the Policy's Commercial General Liability Coverage Part, which does not appear to be in dispute.

10338506

Landmark v. Nurselect MSJ_00000011

## COUNT I – DECLARATORY JUDGENT

(Declaration that Landmark does not have a duty to defend or indemnify NurSelect for
the Underlying Action – Failure to Satisfy the Insuring Agreement)

22.    Landmark restates and incorporates all of the allegations set forth in the paragraphs

of the Complaint numbered as "1" through "21" as though set forth more fully herein at length

herein.

23.    The Policy's Professional Liability Insuring Agreement specifically requires that

a "Claim" be "first made against the Insured **during** the Policy Period." (Exhibit C at

LAND000035, emphasis added).

24.    The Policy defines "Claim" to include a "written demand for monetary or non-

monetary relief received by the Insured during the Policy Period." (Exhibit C at LAND000039).

25.    The Attorney Letter constitutes a Claim under the Policy because the Attorney

Letter states that Brethren Village intends to name NurSelect in a lawsuit, are seeking contractual

indemnity (relief) and requests NurSelect notify its insurance carrier.

26.    On January 12, 2023, NurSelect indisputably received the Attorney Letter – a

"Claim" – by email, which was 48 days prior to the inception of the Landmark Policy Period.

27.    The Underlying Action directly arises out of the Attorney Letter and thus, constitute

a single Claim made prior to the Policy Period.

28.    Landmark respectfully requests that the Court determine and declare that Landmark

has neither a duty to defend nor a duty to indemnify NurSelect in connection with the Underlying

Action since the Policy does not provide coverage for the Underlying Action because it is a Claim

first made prior to the inception of the Policy and thus, fails to trigger the applicable Insuring

Agreement under the Policy.

7

10338506

Landmark v. Nurselect MSJ_00000012

## COUNT II – DECLARATORY JUDGENT

(Declaration that Landmark does not have a duty to defend or indemnify NurSelect for the
Underlying Action – Contract Exclusion)

29.    Landmark restates and incorporates all of the allegations set forth in the paragraphs
of the Complaint numbered as "1" through "28" as though set forth more fully herein at length
herein.

30.    The Policy specifically excludes coverage for any "Claim" or "Claim Expenses"
based upon or arising out of: "[a]ny obligation or liability assumed by the Insured under any
contract or any oral or written agreement, unless liability would have attached in the absence of
such a contract or agreement." (Exhibit C at LAND000038).

31.    The Attorney Letter advised NurSelect that based upon the "Apportionment of
Liability" provision of the staffing agreement entered into between NurSelect and Brethren
Village, Brethren Village would be filing a joinder complaint against NurSelect to invoke
NurSelect's contractual agreement to indemnify Brethren Village.

32.    The Underlying Action would not have been filed but for the staffing agreement
between the parties, and thus, any liability would not have attached to NurSelect in the absence of
the contract.

33.    The Underlying Action asserts that pursuant to the staffing agreement, NurSelect is
contractually obligated to indemnify and hold harmless Brethren Village for any liabilities,
damages, and expenses resulting from the claims asserted by Ms. Wiggin's Estate.

34.    The Policy's contract exclusion (Part II.H.) wholly excludes coverage for the
Underlying Action (which is inclusive of the Attorney Letter) because the exclusion precludes
coverage for the entire Claim, as well as Claim Expenses.

8

Landmark v. Nurselect MSJ_00000013

35.    Landmark respectfully requests that the Court determine and declare that Landmark has neither a duty to defend nor a duty to indemnify NurSelect in connection with the Underlying Action because the Policy's contract exclusion wholly excludes coverage for the Underlying Action.

## COUNT III – DECLARATORY JUDGENT

(Declaration that Landmark does not have a duty to defend or indemnify NurSelect for the Underlying Action – Notice of Claim Condition)

36.    Landmark restates and incorporates all of the allegations set forth in the paragraphs of the Complaint numbered as "1" through "35" as though set forth more fully herein at length herein.

37.    The Policy specifically requires as a condition precedent to coverage that the Insured notify Landmark "as soon as practicable" of an incident, occurrence or offense that may reasonably be expected to result in a Claim" and must immediately send copies to [Landmark] of any demands, notices, summonses or legal papers received in connection with any Claim." (Exhibit C at LAND000040-41).

38.    NurSelect knew of the incident involving Ms. Wiggins as early as October 14, 2022, when Brethren Village's counsel requested Ayanna McDowell's contact information and requested Ms. McDowell's statement regarding the incident.  (See Exhibit "D").

39.    NurSelect received the Attorney Letter (a Claim as defined under the Policy) on January 12, 2023.

40.    NurSelect failed to notify Landmark as soon as practicable of the incident (in October 2022), and failed to immediately send a copy of the January 12, 2023 Attorney letter to Landmark.

9

Landmark v. Nurselect MSJ_00000014

41.     As such, NurSelect failed to fulfill a condition precedent to coverage under the Policy.

42.     Landmark respectfully requests that the Court determine and declare that Landmark has neither a duty to defend nor a duty to indemnify NurSelect in connection with the Underlying Action because the NurSelect failed to fulfill a condition precedent to coverage under the Policy.

**WHEREFORE,** Plaintiff Landmark respectfully requests that the Court enter a judgment in its favor:

(a) Adjudging and declaring that Landmark has no obligation to defend NurSelect in the Underlying Action;

(b) Adjudging and declaring that Landmark has no obligation to indemnify NurSelect in the Underlying Action; and

(c) Granting Landmark such and further relief as this Court may deem just and proper under the circumstances.

Dated:  August 9, 2024

RESPECTFULLY SUBMITTED,

**KAUFMAN BORGEEST & RYAN LLP**
By:

_____
Diana-Marie Laventure
Joan Gilbride (*pro hac vice*)
Briana Semenza (*pro hac vice*)
Sara Moriarty (*pro hac vice*)
*Attorneys for Plaintiff*
875 Third Avenue, 5th Floor
New York, New York 10022
T: (212) 980-9600
F: (212) 980-9291
dmlaventure@kbrlaw.com
jgilbride@kbrlaw.com
bsemenza@kbrlaw.com
smoriarty@kbrlaw.com

10

Landmark v. Nurselect MSJ_00000015

10338506

# EXHIBIT A

**SAXTON & STUMP**
Collin T. Keyser, Esquire
Attorney I.D. No. 307505
Kimberly A. Selemba, Esquire
Attorney I.D. No. 93535
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Phone: (717) 556-1000
ctk@saxtonstump.com
kas@saxtonstump.com

*Attorneys for Defendants, Rehabilitation Center at Brethren Village, LLC, Brethren Village, Brethren Village Realty, LLC, and Lori Schoener, NHA*

ENTERED AND FILED
PROTHONOTARY'S OFFICE
No. CI-22-04128   LANCASTER, PA
***Electronically Filed*****
Jun 13 2023 02:40PM
Ryan McMinn

| | | |
|---|---|---|
| BRENDA L. KLING, individually and as Administratrix of the Estate of GERALDINE E. WIGGINS,<br>Plaintiff<br><br>v.<br><br>REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHOENER, NHA, and JOHN DOES 1–4<br>Defendants,<br><br>v.<br><br>NURSELECT, LLC,<br>Additional Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA<br><br><br>NO: CI-22-04128<br><br>MedMal |

## NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

No. CI-22-04128

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO
PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL
SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lancaster Bar Association
Lawyer Referral Service
Telephone: 717-393-0737

Landmark v. Nurselect MSJ_00000018

No. CI-22-04128

| | |
|---|---|
| BRENDA L. KLING, individually and as Administratrix of the Estate of GERALDINE E. WIGGINS, | IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA |
| Plaintiff | |
| | NO: CI-22-04128 |
| v. | |
| | MedMal |
| REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHOENER, NHA, and JOHN DOES 1–4 | |
| Defendants, | |
| v. | |
| NURSELECT, LLC, | |
| Additional Defendant. | |

## JOINDER COMPLAINT OF DEFENDANT, BRETHREN VILLAGE, AGAINST ADDITIONAL DEFENDANT, NURSELECT, LLC

Defendant, Brethren Village, ("Joining Defendant"), by and through counsel, Saxton & Stump, files this Third-Party Joinder Complaint against Additional Defendant, NurSelect, LLC ("Additional Defendant" or "NurSelect"), pursuant to Pennsylvania Rule of Civil Procedure 2252 and, in support thereof avers as follows:

1.    Plaintiff, Brenda L. Kling, has filed a Complaint in this matter, asserting claims for negligence, vicarious liability, corporate negligence, survival, wrongful death, and breach of fiduciary duty, arising out of skilled nursing care provided to resident, Geraldine E. Wiggins ("Ms. Wiggins"), at Rehabilitation Center at Brethren Village, LLC ("Brethren Village"). A copy of Plaintiff's Fourth Amended Complaint is attached hereto, without adoption, as "Exhibit A."

No. CI-22-04128

2.      In the Fourth Amended Complaint, Plaintiff alleges that Defendants were negligent in relation to a fall that Ms. Wiggins had as she attempted to walk from the bathroom to her chair.

3.      Joining Defendant hereby incorporates the allegations of Plaintiff's Fourth Amended Complaint without admitting or denying the substance of those allegations.

## JOINDER DEFENDANT

4.      Additional Defendant NurSelect, LLC, is a health care employment agency with a principal place of business at 630 Freedom Business Center Drive, King of Prussia, PA, 19406.

5.      At the time of the alleged incident, NurSelect provided supplemental staffing to Brethren Village, pursuant to a September 22, 2020 written contract titled "Supplemental Staffing Agreement". A copy of the Supplemental Staffing Agreement is attached hereto as "Exhibit B."

## FACTUAL BACKGROUND

6.      As set forth above, Joining Defendant incorporates by reference the allegations in Plaintiff's Fourth Amended Complaint, without admitting or denying the substance of those allegations.

7.      Plaintiff claims that, on or about the morning of May 12, 2021, Ms. Wiggins fell while walking from her bathroom to her chair unattended, resulting in a laceration and a quarter-sized hematoma.

8.      On August 28, 2021, Ms. Wiggins passed away; Plaintiff alleges that "failure to thrive" was listed as the cause of death. 4th Am. Compl. ¶ 61.

9.      Plaintiff alleges that the injuries Ms. Wiggins suffered from her fall contributed to her death over 3-months later. 4th Am. Compl. ¶ 63.

2

No. CI-22-04128

10.    Ms. Wiggins was in the care of Ayanna McDowell, CNA, at the time of her fall.

11.    Ms. McDowell was employed as an agency nurse for NurSelect at the time of the incident.  She was not employed by Brethren Village.

12.    The obligations of Additional Defendant, NurSelect, LLC, under the aforementioned written Supplemental Staffing Agreement, include, but are not limited to, the timely provision of licensed and certified nursing personnel in accordance with federal, state, and local laws, rules ordinances and regulations and meeting the highest professional standards and principles.  Exhibit B, at Arts. 1.1, 1.2.

13.    The Agreement expressly provides that NurSelect personnel furnished to Brethren Village "shall not be considered employees or agents [Brethren Village] but instead shall be considered leased employees of NurSelect."  Exhibit B, at Art 3.1.

14.    Pursuant to the Supplemental Staffing Agreement, NurSelect agreed to "indemnify and hold harmless [Brethren Village] from and against any and all claims, demands, actions, settlements, or judgments, including reasonable attorneys' fees and litigation expenses, arising from. . . NurSelect Personnel's provision of the Services where such claims, demands actions, settlements, or judgments arise from the negligence or willful misconduct of NurSelect Personnel."  Exhibit B, at Art. 5.2.

## COUNT I
## NEGLIGENCE, INDEMNIFICATION AND CONTRIBUTION

15.    The foregoing paragraphs are incorporated herein by reference as if set forth herein at length.

16.    Without admitting the averments of Plaintiff's Fourth Amended Complaint, Additional Defendant, NurSelect, LLC, is solely liable to Plaintiff, jointly and severally liable with Joining Defendant, liable over Joining Defendant, or liable to Joining Defendant for

3

No. CI-22-04128

indemnification and/or contribution, for the claims asserted by Plaintiff, Brenda L. Kling, and for the injuries and damages alleged in the 4th Amended Complaint.

**WHEREFORE**, Joining Defendant Brethren Village demands judgment in its favor and against Additional Defendant, NurSelect, LLC. In the alternative, Joining Defendant Brethren Village demands that Additional Defendant, NurSelect, LLC, be held solely liable to Plaintiff, jointly and severally liable with Joining Defendant, liable over Joining Defendant, or liable to Joining Defendant for common law and contractual indemnification and/or contribution.

**COUNT II**
**VICARIOUS LIABILITY, INDEMNIFICATION, AND CONTRIBUTION**

17. The foregoing paragraphs are incorporated herein by reference as if set forth herein at length.

18. Without admitting the averments of Plaintiff's Fourth Amended Complaint, Additional Defendant, NurSelect, LLC, as the employer/principal of Ayanna McDowell, is vicariously liable to Plaintiff, jointly and severally liable with Joining Defendant, liable over Joining Defendant, or liable to Joining Defendant for indemnification and/or contribution, for the claims asserted by Plaintiff, Brenda L. Kling, and for the injuries and damages alleged in the 4th Amended Complaint.

**WHEREFORE**, Joining Defendant Brethren Village demands judgment in its favor and against Additional Defendant, NurSelect, LLC. In the alternative, Joining Defendant Brethren Village demands that Additional Defendant, NurSelect, LLC, be held vicariously liable to Plaintiff, jointly and severally liable with Joining Defendant, liable over Joining Defendant, or liable to Joining Defendant for indemnification and/or contribution.

4

Landmark v. Nurselect MSJ_00000022

No. CI-22-04128

## COUNT III
## CONTRACTUAL INDEMNIFICATION

19.    The foregoing paragraphs are incorporated herein by reference as if set forth herein at length.

20.    Without admitting the averments of Plaintiff's Fourth Amended Complaint, Additional Defendant, NurSelect, LLC, pursuant to the Supplemental Staffing Agreement, is contractually obligated to indemnify and hold harmless Joining Defendant for any liabilities, damages, and expenses resulting from the claims asserted by Plaintiff.

**WHEREFORE**, Joining Defendant Brethren Village demands judgment in its favor and against Additional Defendant, NurSelect, LLC. In the alternative, Joining Defendant Brethren Village demands that Additional Defendant, NurSelect, LLC, be held contractually liable for indemnification for any liabilities, damages, and expenses resulting from the claims asserted by Plaintiff.

Respectfully submitted,

SAXTON & STUMP

Date: June 13, 2023                    By: _____

Collin T. Keyser, Esquire
Attorney I.D. No. 307505
Kimberly A. Selemba, Esquire
Attorney I.D. No. 93535
280 Granite Run Drive, Suite 300
Lancaster, PA 17601

5

Landmark v. Nurselect MSJ_00000023

No. CI-22-04128

Phone: (717) 556-1000
Fax: (717) 441-3810
ctk@saxtonstump.com
kas@saxtonstump.com

*Attorneys for Defendants, Rehabilitation Center at
Brethren Village, LLC, Brethren Village, Brethren
Village Realty, LLC, and Lori Schoener, NHA*

6

Landmark v. Nurselect MSJ_00000024

**SAXTON & STUMP**                                    No. CI-22-04128
Collin T. Keyser, Esquire
Attorney I.D. No. 307505
Kimberly A. Selemba, Esquire
Attorney I.D. No. 93535
280 Granite Run Drive, Suite 300
Lancaster, PA  17601
Phone:  (717) 556-1000
ctk@saxtonstump.com
kas@saxtonstump.com

*Attorneys for Defendants, Rehabilitation Center
at Brethren Village, LLC, Brethren Village,
Brethren Village Realty, LLC, and Lori
Schoener, NHA*

| | |
|---|---|
| BRENDA L. KLING, individually and as Administratrix of the Estate of GERALDINE E. WIGGINS, | : IN THE COURT OF COMMON PLEAS<br>: OF LANCASTER COUNTY,<br>: PENNSYLVANIA |
| Plaintiff | :<br>: NO: CI-22-04128 |
| v. | :<br>: MedMal |
| REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHOENER, NHA, and JOHN DOES 1–4 | :<br>:<br>:<br>: |
| Defendants, | : |
| v. | : |
| NURSELECT, LLC, | :<br>: |
| Additional Defendant. | :<br>: |

## CERTIFICATE OF SERVICE

I, Collin T. Keyser, Esquire, certify that on this date, I served a certified true and correct

copy of the foregoing Third-Party Joinder Complaint upon the following counsel and parties of

record, via email and certified mail, addressed as follows:

Landmark v. Nurselect MSJ_00000025

No. CI-22-04128

Andrei Govorov, Esquire
Rosenbaum & Associates, PC
1818 Market Street, Suite 3200
Philadelphia, PA 19103
*(Attorney for Plaintiff)*
*(via email)*

Date: June 13, 2023

By: _____
Collin T. Keyser, Esquire

No. CI-22-04128

| | |
|---|---|
| BRENDA L. KLING, individually and as : | IN THE COURT OF COMMON PLEAS |
| Administratrix of the Estate of : | OF LANCASTER COUNTY, |
| GERALDINE E. WIGGINS, : | PENNSYLVANIA |
| : | |
| Plaintiff : | |
| : | NO: CI-22-04128 |
| v. : | |
| : | MedMal |
| REHABILITATION CENTER AT : | |
| BRETHREN VILLAGE, LLC, : | |
| BRETHREN VILLAGE, BRETHREN : | |
| VILLAGE REALTY, LLC, LORI : | |
| SCHOENER, NHA, and JOHN DOES1– : | |
| 4 : | |
| Defendants, : | |
| : | |
| : | |
| v. : | |
| : | |
| NURSELECT, LLC, : | |
| : | |
| Additional : | |
| Defendant. : | |

## PUBLIC ACCESS POLICY CERTIFICATION

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

SAXTON & STUMP

Date: June 13, 2023

By: _____
Collin T. Keyser, Esquire

EXHIBIT A

Landmark v. Nurselect MSJ_00000028

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed*****
Dec 22 2022 12:29PM
Ryan McMinn

**ROSENBAUM & ASSOCIATES, P.C.**
BY: ANDREI GOVOROV, ESQUIRE
Attorney ID No.: 209365
1818 Market Street, Suite 3200
Philadelphia, PA 19103
(215) 569-0200
agovorov@rosenbaumfirm.com

MAJOR-JURY
ASSESSMENT OF DAMAGES
HEARING IS REQUIRED.
JURY TRIAL DEMANDED

Attorney for Plaintiff

| | |
|---|---|
| BRENDA L. KLING, ADMINISTRATRIX :<br>of the ESTATE OF GERALDINE E. WIGGINS :<br>deceased : | LANCASTER COUNTY<br>COURT OF COMMON PLEAS |
| : | No.: CI-22-04128 |
| vs. : | |
| : | FOURTH AMENDED COMPLAINT |
| REHABILITATION CENTER at BRETHREN :<br>VILLAGE, LLC; BRETHREN VILLAGE; :<br>BRETHREN VILLAGE REALTY, LLC; :<br>LORI SCHOENER, NHA; and :<br>JOHN DOES 1-4 (Fictious Names) : | |

## CIVIL ACTION
### NOTICE

YOU HAVE BEEN SUED IN COURT. IF YOU WISH TO DEFEND AGAINST THE CLAIMS SET FORTH IN THE FOLLOWING PAGES, YOU MUST TAKE ACTION WITHIN TWENTY (20) DAYS AFTER THIS COMPLAINT AND NOTICE ARE SERVED BY ENTERING A WRITTEN APPEARANCE PERSONALLY OR BY ATTORNEY AND FILING IN WRITING WITH THE COURT YOUR DEFENSES OR OBJECTIONS TO THE CLAIMS SET FORTH AGAINST YOU. YOU ARE WARNED THAT IF YOU FAIL TO DO SO THE CASE MAY PROCEED WITHOUT YOU AND A JUDGMENT MAY BE ENTERED AGAINST YOU BY THE COURT WITHOUT FURTHER NOTICE FOR ANY MONEY CLAIMED IN THE COMPLAINT OR FOR ANY OTHER CLAIM OR RELIEF REQUESTED BY THE PLAINTIFF. YOU MAY LOSE MONEY OR PROPERTY OR OTHER RIGHTS IMPORTANT TO YOU. YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Lawyer Referral & Information Service
Lancaster County Bar Association
28 E Orange Street
Lancaster, PA 17602

### AVISO

LE HAN DEMANDADO A USTED EN LA CORTE. SI USTED QUIERE DEFENDERSE DE ESTAS DEMANDAS EXPUESTAS EN IAS PAGINAS SIGUIENTES, USTED TIENE VIENTE (20) DIAS DE PLAZO AL PARTIR DE LA FECHA DE LA DEMANDA Y LA NOTIFICACION. HACE FALTA ASENTAR UNA COMPARENCIA ESCRITA O EN PERSONA O CON UN ABOGADO Y ENTREGAR A LA CORE EN FORMA ESCRITA SUS DEFENSAS O SUS OBJECIONES A LAS DEMANDAS EN CONTRA DE SU PERSONA. SEA AVISADO QUE SI USTED NO SE DEFIENDE, LA CORTE TOMARA MEDIDAS Y PUEDE CONTINUAR LA DEMANDA EN CONTRA SUYA SIN PREVIO AVISO O NOTIFICACION. ADEMAS, LA CORTE PUEDE DECIDIR A FAVOR DEL DEMANDANTE

Y REQUIERE QUE USTED CUMPLA CON TODAS LAS PROVISIONES DE ESTA DEMANDA. USTED PUEDE PERDER DINERO O SUS PROPIEDADES U OTROS DERECHOS IMPORTANTES PARA USTED. LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

**Servicio de referencia e información de abogados**
**Colegio de Abogados del Condado de Lancaster**
**28 E Calle Naranja**
**Lancaster, Pensilvania 17602**

**ROSENBAUM & ASSOCIATES, P.C.**
BY: ANDREI GOVOROV, ESQUIRE
Attorney ID No.: 209365
1818 Market Street, Suite 3200
Philadelphia, PA 19103
(215) 569-0200
agovorov@rosenbaumfirm.com

MAJOR-JURY
ASSESSMENT OF DAMAGES
HEARING IS REQUIRED.
JURY TRIAL DEMANDED

Attorney for Plaintiff

| | |
|---|---|
| BRENDA L. KLING, ADMINISTRATRIX :<br>of the ESTATE OF GERALDINE E. WIGGINS :<br>deceased : | LANCASTER COUNTY<br>COURT OF COMMON PLEAS |
| : | No.: CI-22-04128 |
| vs. : | |
| : | FOURTH AMENDED COMPLAINT |
| REHABILITATION CENTER at BRETHREN :<br>VILLAGE, LLC; BRETHREN VILLAGE; :<br>BRETHREN VILLAGE REALTY, LLC; :<br>LORI SCHOENER, NHA; and :<br>JOHN DOES 1-4 (Fictious Names) : | |

## FOURTH AMENDED COMPLAINT

(This Fourth Amended Complaint Includes a Medical Professional Liability Action)

Plaintiff, Brenda L. Kling, Administratrix of the Estate of Geraldine E. Wiggins, deceased, by and

through their counsel, Rosenbaum & Associates, P.C., files this Fourth Amended Complaint in Civil

Action, and aver as follows:

1.     Plaintiff, Brenda L. Kling, Administratrix of the Estate of Geraldine E. Wiggins, deceased,

is an adult individual and daughter of Decedent, Geraldine E. Wiggins, residing at 19 Verbena Drive,

Lancaster, Pennsylvania 17062.

2.     Decedent, Geraldine E. Wiggins, died intestate on August 28, 2021.

3.     Plaintiff, Brenda L. Kling, were appointed Administratrix of the Estate of Geraldine E.

Wiggins, deceased, by the Register of Wills of Lancaster County, on September 23, 2021, and in this

capacity acts on behalf of the Estate, the beneficiaries of the Estate and the potential wrongful death

beneficiaries.

4.     At the time of her death, Decedent, Geraldine E. Wiggins, left surviving a daughter Brenda

L. Kling, on whose behalf this claim is, in part, is filed.

5.     Defendant, Rehabilitation Center Brethren Village, LLC, is a business corporation organized and existing under the laws of the Commonwealth of Pennsylvania, and was engaged in the business of owning, operating, managing and offering healthcare, medical services, rehabilitation and nursing care to the public at a rehabilitation and nursing home facility, Rehabilitation Center at Brethren Village, LLC, ("Brethren Village") 3001 Lititiz Pike, Lancaster, Pennsylvania. Plaintiff is asserting a professional liability claim against this Defendant.

6.     At all times material hereto, Defendant, Rehabilitation Center at Brethren Village, LLC, acted or failed to act by and through its agents, ostensible agents, servants, workmen, nurses, nurse's aides, and/or employees, physicians, the nursing home administrators and/or administrators responsible for formulating, adopting, monitoring and enforcing the policies, procedures and protocols of Brethren Village from the time Geraldine E. Wiggins was admitted to Brethren Village on April 13, 2021, including the physicians, nurses, nurses' aides, staff members and employees responsible for the care, supervision, treatment and safety of Geraldine E. Wiggins, starting on April 13, 2021, which includes those physicians, nurses, nurses' aides, staff and employees identified in the records and charts of Brethren Village, whose names cannot be discerned from the records but whose identities are known to and within the exclusive control of Defendants, as well as those physicians, nurses, nurses' aides, staff and employees whose names are not recorded in the records due to Defendants' failure to implement and utilize proper record-keeping and documentation procedures but whose identities are known to and within the exclusive control of Defendants, all of whom were then and there acting within the scope of their authority and in the course of their employment with Defendant, Rehabilitation Center at Brethren Village, LLC, and in furtherance of Defendant, Rehabilitation Center at Brethren Village, LLC's business and on behalf of Defendant, Rehabilitation Center at Brethren Village, LLC.

7.     Defendant, Brethren Village, is a business corporation organized and existing under the laws of the Commonwealth of Pennsylvania, and was engaged in the business of owning, operating, managing and offering healthcare, medical services, rehabilitation and nursing care to the public at a rehabilitation and nursing home facility, Rehabilitation Center at Brethren Village, LLC, ("Brethren

Village") 3001 Lititz Pike, Lancaster, Pennsylvania. Plaintiff is asserting a professional liability claim against this Defendant.

8. At all times material hereto, Defendant, Brethren Village, acted or failed to act by and through its agents, ostensible agents, servants, workmen, nurses, nurse's aides, and/or employees, physicians, the nursing home administrators and/or administrators responsible for formulating, adopting, monitoring and enforcing the policies, procedures and protocols of Brethren Village from the time Geraldine E. Wiggins was admitted to Brethren Village on April 13, 2021, including the physicians, nurses, nurses' aides, staff members and employees responsible for the care, supervision, treatment and safety of Geraldine E. Wiggins, starting on April 13, 2021, which includes those physicians, nurses, nurses' aides, staff and employees identified in the records and charts of Brethren Village, whose names cannot be discerned from the records but whose identities are known to and within the exclusive control of Defendants, as well as those physicians, nurses, nurses' aides, staff and employees whose names are not recorded in the records due to Defendants' failure to implement and utilize proper record-keeping and documentation procedures but whose identities are known to and within the exclusive control of Defendants, all of whom were then and there acting within the scope of their authority and in the course of their employment with Defendant, Brethren Village, and in furtherance of Defendant, Brethren Village's business and on behalf of Brethren Village.

9. Defendant, Brethren Village Realty, LLC, is a business corporation organized and existing under the laws of the Commonwealth of Pennsylvania, and was engaged in the business of owning, operating, managing and offering healthcare, medical services, rehabilitation and nursing care to the public at a rehabilitation and nursing home facility, Rehabilitation Center at Brethren Village, LLC, ("Brethren Village") 3001 Lititz Pike, Lancaster, Pennsylvania. Plaintiff is asserting a professional liability claim against this Defendant.

10. At all times material hereto, Defendant, Brethren Village Realty, LLC, acted or failed to act by and through its agents, ostensible agents, servants, workmen, nurses, nurse's aides, and/or employees, physicians, the nursing home administrators and/or administrators responsible for formulating, adopting,

monitoring and enforcing the policies, procedures and protocols of Brethren Village from the time

Geraldine E. Wiggins was admitted to Brethren Village on April 13, 2021, including the physicians, nurses,

nurses' aides, staff members and employees responsible for the care, supervision, treatment and safety of

Geraldine E. Wiggins, starting on April 13, 2021, which includes those physicians, nurses, nurses' aides,

staff and employees identified in the records and charts of Brethren Village, whose names cannot be

discerned from the records but whose identities are known to and within the exclusive control of

Defendants, as well as those physicians, nurses, nurses' aides, staff and employees whose names are not

recorded in the records due to Defendants' failure to implement and utilize proper record-keeping and

documentation procedures but whose identities are known to and within the exclusive control of

Defendants, all of whom were then and there acting within the scope of their authority and in the course of

their employment with Defendant, Brethren Village Realty, LLC, and in furtherance of Defendant, Brethren

Village Realty, LLC's business and on behalf of Brethren Village Realty, LLC.

      11.    Defendant, Lori Schoener, is an individual residing herein at 123 Race Street, Richland,

Pennsylvania 17087. Upon information and believe, at all relevant and material times herein, Lori Schoener

was the licensed Nursing Home Administrator of Rehabilitation Center at Brethren Village, LLC during

the residency of Geraldine E. Wiggins, and is therefore personally, jointly and vicariously liable, among

other things, for the acts and omissions of herself and her agents, employees, servants, contractors, staff,

and/or partners and all other Defendants, who played a role in the care provided to Geraldine E. Wiggins

and in the operation of Brethren Village.

      12.    Defendants, Joe Does 1-4 (Fictious Names) are individuals, corporations and/or other

entities whose identities, after reasonable investigation, are currently unknown, but at all times relevant

hereto owned, operated, controlled and/or managed Rehabilitation Center of Brethen Village, LLC and/or

provided medical, nursing, rehabilitation and other health care services to Geraldine E. Wiggins during her

admission to Rehabilitation Center of Brethren Village, LLC.

      13.    At all times material hereto, the Defendants individually and collectively owed duties to

the residents of Brethren Village, including Geraldine E. Wiggins.

Landmark v. Nurselect MSJ_00000034

14.     At all times relevant and material hereto the Defendants were aware of their obligations under the laws of the United States of America and of the Commonwealth of Pennsylvania with which Defendants were required to comply in providing care to Decedent including the United States Code, Pennsylvania Consolidated Statutes and the Pennsylvania Administrative Code.

15.     The Defendants, directly and/or through their respective agents, servants and/or employees, accepted the responsibility for the care of Geraldine E. Wiggins, and in so doing, undertook and/or assumed a duty to Geraldine E. Wiggins to provide a safe nursing home facility necessary for the proper practice of medicine at said rehabilitation facility and to render reasonable, competent, proper, adequate and appropriate medical care, rehabilitation and nursing care, custodial care, rehabilitation services and treatment and, to take appropriate, preventative and curative measures as well as adequately supervise, monitor, and provide timely treatment and services to Geraldine E. Wiggins, and avoid and prevent harm to her.

16.     The Defendants owed a duty to Geraldine E. Wiggins to exercise reasonable and ordinary care as a resident at Defendants' facility receiving medical, nursing, rehabilitation and other allied healthcare services. The Defendants' duties included, but were not limited to, establishing and enforcing their respective nursing home facility rules and regulations, medical staff practices, bylaws, policies, procedures, rules and regulations which mandate provision of proper medical, nursing and other healthcare provider services and/or care to the rehabilitation patients, including Geraldine E. Wiggins.   The Defendants' duties also included hiring competent medical, nursing and other allied healthcare personnel, continuing and ongoing review of said competency, maintaining the facility such that it is free from ordinary hazards and defective equipment, maintaining sufficient staffing levels, insuring that all patients receive adequate, competent and timely medical, rehabilitation and other allied health care treatment and services while a patient at their rehabilitation facility, and, establishing and enforcing policies, procedures, protocols and systems to monitor their staff to ensure that all patients are receiving proper and timely care and treatment including, but not limited to, complete and accurate resident assessments, developing, enforcing and revising individualized, resident-centered care plans, adequate supervision/monitoring, proper use of

Landmark v. Nurselect MSJ_00000035

medication, proper use of physical and/or chemical restraints, proper establishment and enforcement of procedures for medical and nursing review and/or audit of the care given to patients, proper establishment of policies, procedures, protocols and guidelines to ensure that proper medical, rehabilitation, custodial and nursing care are performed on and for patients at their facility, including Geraldine E. Wiggins.

17.     At all times relevant hereto, the Defendants, directly and/or through contractual agreement had a corporate responsibility through their respective bylaws, medical staff bylaws, rules, regulations and ongoing government functions to assure that only competent physicians, nurses and other health care providers engage in the medical, rehabilitation and nursing practice at this rehabilitation facility and other related fields of medicine on the Defendants' premises.

18.     Defendants exercised complete and total control over the healthcare, skilled nursing and custodial care of all residents of their nursing facility, including Geraldine E. Wiggins.

19.     At all times material hereto, Defendants were vertically integrated organizations / corporations that were controlled by their respective members, officers, managers, and/or board of directors who were responsible for the operation, planning, management and quality control of their Facility, Brethren Village.

20.     At all times material hereto, the control exercised over the Facility by Defendants included, inter alia: budgeting, marketing, cash management, cost control, reimbursement, setting staffing levels, maintaining and increasing census, human resource management, training, supervision and oversight of their Facility's Administrator, supervision and oversight of their Facility's Director of Nursing, supervision of staff, obtaining licensure and certification, conducting mock surveys, conducting customer satisfaction surveys and monitoring customer satisfaction, corporate and regulatory compliance, quality of care assessment, and the creation and implementation of all policy and procedure manuals used by the Facility.

21.     Defendants have failed to adequately train and/or supervise their physicians, nurses, nurses' aides and other healthcare providers which has resulted in personal harm and injury to Geraldine E. Wiggins.

22.     The provisions of OBRA (Omnibus Budget Reconciliation Act of 1987) are applicable

with regard to Geraldine E. Wiggins' condition as it existed while in the Defendants' care and during her admission at the Defendants' facility beginning on April 13, 2021.

23.     The Defendants held themselves out as a specialist in the field of rehabilitation care with the expertise necessary to maintain the health and safety of persons unable to care adequately for themselves.

24.     At all times pertinent hereto, Geraldine E. Wiggins was a patient at Rehabilitation Center of Brethren Village, LLC and was under the exclusive care and control of the Defendants, their agents, officers, servants and/or employees.

25.     The Defendants, their agents, officers, servants and/or employees failed, refused and/or neglected to perform the duties to provide reasonable and adequate health care to and for Geraldine E. Wiggins who was unable to attend to her own health, safety and well-being.

26.     The Defendants, their agents, officers, servants and/or employees negligently, carelessly and recklessly provided care and treatment to Geraldine E. Wiggins, and all of the alleged acts, omissions and occurrences herein described or performed by the Defendants, their agents, officers, servants and/or employees fell within the course and scope of their agency and employment with the Defendants and in furtherance of the Defendants' business.

27.     The Defendants provide twenty-four (24) hour a day, seven (7) day a week medical, nursing, custodial and rehabilitation care, services and assistance to its patients who have issues related to age, illness, disease, injury, convalescence and physical and mental infirmity.

28.     The Defendants are responsible for nearly all the health care needs of their residents, including but not limited to, assistance with activities of daily living, bed mobility, transfer, ambulation, personal hygiene, nutrition, hydration, restorative care, incontinence care, turning and repositioning, supervision, monitoring, safety and rehabilitation.

29.     The Defendants are responsible for ensuring that all doctor-ordered testing and medical services are performed.

30.     The Defendants are required to conduct comprehensive and accurate assessment of their

patients' functional capacity, as well as their patients' needs and risk factors.

31.    The Defendants are required to formulate and develop an individualized health "Care Plan" upon admission of each patient.

32.    The Defendants are responsible for determining patients' risk level for injury including falls.

33.    The Defendants are responsible for formulating, adopting, modifying and implementing injury prevention programs and care directives, including prevention programs for patients at risk for falls.

34.    The Defendants are responsible for ensuring that injury prevention programs, procedures and protocols are implemented, executed and performed including prevention programs and procedures to prevent falls.

35.    The Defendants are responsible for ensuring that a "Care Plan" is personalized for each patient and modified and/or revised as needs change.

36.    The Defendants are responsible for ensuring that a "Care Plan" for patients includes safety measures and interventions to prevent falls.

37.    The Defendants are responsible for ensuring that safety measures and interventions, including adequate pressure-relieving assistive devices, individualized turning and repositioning schedule, implementation of the appropriate infection control policies, procedures and techniques, hydration and nutrition protocols, adequate and timely incontinence care, hygiene services, adequate supervision and monitoring of patients with decreased mobility, safety awareness and cognition are implemented and executed.

38.    Geraldine E. Wiggins, was admitted to Rehabilitation Center at Brethren Village, LLC on April 13, 2021 with diagnoses that included ambulatory dysfunction, generalized weakness and new onset A-Fib.

39.    A "Fall Risk Assessment" was completed at time of admission and Geraldine E. Wiggins was considered at risk for falls related to a score of *"26" (a resident whose score is over 9 is at risk for falls).*

40.    The "History of Present Illness" documented Geraldine E. Wiggins' reason for admission

to Brethren Village as:

*Geraldine Wiggins is a 92 y.o. female admitted to nursing facility for ambulatory dysfunction having 2 falls at home prior to observation stay at LGH, for further PT/OT evaluation and treatment. Has had right knee pain since falls at home, XR in hospital negative for fracture. Today, states she feels a little hot and is tired, but otherwise she denies any pain, palpitation/flutter in chest, SOB, change in bowel or bladder.*

41.    The staff at Brethren Village was aware of the patient's need for assistance with

ambulation, activities of daily living and fall prevention as documented on the "Care Plan" for *"Needs staff*

*assistance for ADL's because of weakness"* and *"Has history of falls, potential for fall-related injury."*

42.    The following are some of the interventions the staff was to utilize to provide care and

prevent falls for this patient:

*\* Be aware resident unable to independently bathe, dress, move self in bed, transfer, ambulate, toilet self, perform personal hygiene measures and feed self*

*Ambulate in hallway with rolling walker and one/two assist with gaitbelt*

*Encourage and assist resident as needed to bathroom upon rising, between meals and at bedtime*

*Observe for and report any decline in ADL performance; record appropriately in the  EMR*

*One/Two assist for stand/pivot/weight bear between all support surfaces*

*Set up in bathroom at sink with supplies for grooming and bathing with assist as needed*

*My transfer status is stand and pivot Ax1 w/RW*

*Assist with ADL's, transfers and locomotion as needed, utilizing safety measures*

*Remind resident of the importance of asking for help before getting up or transferring, especially  if he/she feels lightheaded or weak*

*When finding resident attempting to transfer independently, assess for basic needs, i.e., food,  fluid, toileting, pain, boredom/anxiety*

43.    Pursuant to medical records, Brethren Village increased their staff's workload related to

Covid-19 precautions. But, despite the increase in staff workload, the staff of Brethren Village was well

aware Geraldine E. Wiggins required one staff member and her assistive device to ambulate and transfer

safely.

44.    The staff was also aware that the patient self-transferred but did not intervene or initiate additional interventions to prevent falls for this patient.

45.    The April 24, 2021 "Statement Form" documented *"when I took care of Geraldine this morning caught her in the bathroom by herself she told me she took herself and at the time I didn't see a bruise."*

46.    The patient's risk of falls was increased due to episodes of *"respiratory distress"* documented on the April 28, 2021 "MD Progress Notes" as *"Geraldine complained of shortness of breath this morning and was found to be hypoxic. Her SpO2 at the time was in the mid to high 80's and improved to the low 90s with supplemental oxygen."*

47.    On May 3, 2021, "Physician's Orders" documented *"resident wheezing"*, *"O2 sat 84%, lungs very diminished."*

48.    A May 7, 2021 "MD Progress Note" revealed the patient's increased weakness during the morning hours as:

> *Geraldine Wiggins is a 92 y.o. female seen and examined in her room on the rehabilitation unit, resting in her recliner chair. She reports she is feeling short of breath on exam. She admits to just waking up and ambulating which is when she often feels dyspnea.*
>
> *She attests to being more tired in the mornings and feeling better as the day goes on.*
>
> *Ambulatory Dysfunction: Geraldine reports therapy is going well, but that she does not feel ready to go home next week. PT reporting, she can ambulate up to 150 ft with four wheel walker and staff assistance, seems to have increased weakness and decreased functional status in the early morning. Will be discharged to personal care when appropriate, no discharge date set at this time. Continue PT/OT, continue to monitor.*

49.    Geraldine E. Wiggins demonstrated a significant cognitive decline on May 9, 2021, documented in the "Progress Notes" as *"Res has been noted by staff to have been confused today. She had woken up several times unaware of where she was or what time of day it had been. Urine has fowl odor and is dark in color. Sip & Dip initiated."*

50.    A May 10, 2021 "Progress Note" further documented *"Safety concerns: Yes. Safely*

*Concerns – note: Confusion and forgetfulness."*

51.     "Medication Administration Record" reveal a "Physician Order" dated May 10, 2021 for, *"d/c functional abilities days 1-3 every day shift until 05/12/2021."* The MAR had the days of May 10, 11, and 12 highlighted to carry out the physician's order.

52.     Despite the fact the patient required staff assist for ambulation and activities of daily living, increased confusion, increased weakness and decreased functional ability in the morning hours and ordered to have her functional abilities discontinued on May 12, the staff of Brethren Village left Geraldine E. Wiggins alone at the bathroom sink on May 12, 2021 at 7:30AM.

53.     The May 12, 2021 "Progress Note" documented the following:

*Patient on floor near at the foot of her recliner with walker in front of her and bed side table behind her. The back of her head was bleeding. We got her up off the floor and onto the chair. There was a quarter sized hematoma with small laceration to the base of the skull. Patient had been standing at the sink brushing her teeth when the CNA left her in the bathroom to take care of another patient who was having blood sugar issues. Patient then attempted to walk to the recliner to sit down and as she did she lost her balance falling backwards hitting her head on the base of the bedside table. First aid attempted with neuro and physical assessment. No other injuries noted. Pressure was applied to laceration for 15 minutes and continued to profusely bleed. MD called and order obtained to send to ER. Pressure applied for another 25 minutes until ambulance arrived to transport to LGH ER for evaluation at 0820 by MT ambulance. Denies pain. Neuro checks WNL. Daughter aware.*

54.     Geraldine E. Wiggins was left alone despite the Plan of Care revealing the patient required staff assistance, despite the medical provider documenting "increased weakness and decreased functional status in the early morning," despite her new onset of confusion, and the need for functional abilities to be temporarily discontinued.

55.     The May 12, 2021 "Incident Report" documented Geraldine E. Wiggins' "Predisposing Physiological Factors" as *"Gait Imbalance, Impaired Memory"* and her "Predisposing Situation Factor" as *"Ambulating without assist".*

56.     Geraldine E. Wiggins was transferred to Lancaster General Hospital on May 12, 2021. The Emergency Department Records reveals the following information:

- *Chief Complaint: Head Injury, Fall Evaluation*

***

*- Arrives via BLS amb from rehab center at Brethren Village after falling and striking head on corner of bedside nightstand.*

*With hematoma to posterior head.*

*ECF staff "couldn't get bleeding to stop" after holding pressure for 45 minutes.*

*EMS reports bleeding through ABD pad that was placed by them.*

*+ Plavix use.*

*Denies any abd, chest, back or neck pain.*

*HPI: patient is a 92-year-old female who presents after a fall. It was unwitnessed. She does have some mild confusion making history of present illness limited. The patient cannot tell me why she fell. She said, "I thought I can make it over to the chair."*

***

*MDM: Patient presents with occipital hematoma with mild oozing. On my exam the patient was awake and alert but pleasantly confused. She did have an occipital hematoma with a small open wound. Figure-eight suture placed by physician's assistant. Bleeding subsided. Patient noted to have a C7 fracture. Cervical collar applied. She had no neck pain. Case discussed with the trauma service who recommended imaging of her chest abdomen pelvis. I also ordered basic bloodwork. Disposition is pending their evaluation. Patient remained comfortable in the ER.*

***

*CT Angiogram Chest: Since the prior study, the patient has suffered mild superior endplate compression fractures at C7 and T1. A superior endplate compression fracture at T2 is stable. Multiple new compression fractures, most notable at the T7 level.*

57.     The May 12, 2021 "Neurosurgery Note" documented the "Impression/Plan" as *"Acute fracture C7, T1 with no significant retropulsion", "Currently oriented to person only", "No surgical intervention needed"* and *"Aspen Cervical collar OK per Dr. Hernandez."*

58.     Geraldine E. Wiggins was readmitted to Brethren Village from Lancaster General Hospital.

59.     On May 15, 201, Speech Therapy documented Geraldine E. Wiggins as *"referred by physician for speech swallow evaluation. Patient exhibiting difficulty completing meals and rotary chew for regular diet intake. The functional deficits are caused by generalized weakness, decreased range of motion from C Collar placement."*

60.     The vertebral fracture and need for a cervical collar interfered with her meal consumption.

61.     Geraldine E. Wiggins died on August 28, 2021 with failure to thrive listed at the cause of death.

62.     Decedent suffered horrific injuries as a consequence of the negligence, neglect and abuse by Defendants, and/or Defendants' real and/or ostensible servants, agents and/or employees.

63.     The negligence, neglect and abuse of Geraldine E. Wiggins by Defendants, and/or Defendants' agents and resulting injuries caused a significant decline in Decedent's clinical status and were significant contributing factors in causing Decedent's death.

64.     The severity of the negligence, neglect and abuse inflicted upon Geraldine E. Wiggins by the Defendants' mismanagement, improper under-budgeting, understaffing of the facility and lack of training and/or supervision of the facility's employees, failure to provide adequate and appropriate health care, engaging in incomplete, inconsistent and fraudulent documentation, failure to develop and implement an appropriate care plan, failure to conduct accurate patient assessment, failure to ensure the highest level of physical, mental and psychosocial functioning was attained or maintained, failure to provide appropriate monitoring, supervision, care and services caused Decedent to experience, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

65.     As a direct result of the Defendants' negligence, neglect, abuse, carelessness and recklessness herein described,  Decedent was caused to suffer serious and permanent injuries as described herein, including a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

## CONDUCT OF THE DEFENDANTS

66.     Plaintiff hereby incorporates by reference the prior paragraphs of this Fourth Amended Complaint, as if they have been more fully set forth herein.

67.     During the course of her admission, Geraldine E. Wiggins was incapable of independently providing for all of her daily care and personal needs without reliable assistance.

68.     At all relevant times, the Defendants, through their agents, servants, employees and/or representatives: (a) should have been and/or were aware of Geraldine E. Wiggins' needs and (b) represented that they could adequately care for her needs.

69.     In exchange for money, Geraldine E. Wiggins was admitted to the Defendants' care at Brethren Village to obtain such care and protection.

70.     The Defendants, upon information and belief, were controlled by a board of directors who were responsible for the operation, planning, management and quality control of Brethren Village.

71.     At all relevant times, the Defendants, individually, and/or through their agents, servants and employees, assessed the needs of Geraldine E. Wiggins and promised that they would adequately care for her needs, akin to a hospital.

72.     The Defendants were responsible for the operation, planning, management and quality control of their Facility.

73.     The control exercised over the Defendants' Facility by the Defendants, included: budgeting, marketing, cash management, cost control, reimbursement, setting staffing levels, maintaining and increasing census, human resource management, training, supervision and oversight of their Facility's administrator, supervision and oversight of their Facility's director of nursing, supervision of staff, obtaining licensure and certification, conducting mock surveys, conducting customer satisfaction surveys and monitoring customer satisfaction, corporate and regulatory compliance, quality of care assessment, and the creation and implementation of all policy and procedure manuals used by their Facility.

74.     The Defendants controlled reimbursement, quality care assessment and compliance, licensure, certification, and all financial, tax and accounting issues through control of the fiscal policies of

Landmark v. Nurselect MSJ_00000044

Brethren Village.

75.     Upon information and belief, the corporate officers of Defendants utilized survey results and quality indicators to monitor the care being provided at their nursing homes, including Brethren Village.

76.     Upon information and belief, the Defendants, including their owners, officers, directors, partners, members, managers and employees knew that Rehabilitation Center at Brethren Village, LLC has been cited by governmental units as follows:

1/23/2020: failed to assess a pressure ulcer for one of one resident's reviewed; and

8/12/2021: failed to comprehensively assess and administer medication to a wound; and timely administer wound treatment to a sacral wound for one of seven residents reviewed.

77.     As a direct and proximate result of the Defendants' acts and omissions, and their breach of the duty of care, negligence, carelessness and recklessness,  Decedent suffered: (a) severe permanent physical injuries resulting in pain, suffering, and disfigurement; (b) mental anguish, embarrassment, humiliation, degradation, emotional distress, and loss of personal dignity; (c) loss of capacity for enjoyment of life; (d) expense of otherwise unnecessary hospitalizations and medical care; and (e) death.

78.     In causing the aforesaid injuries, the Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

79.     The conduct of the Defendants was intentional, outrageous, willful and wanton, and exhibited a reckless indifference to the health, safety and well-being of Geraldine E. Wiggins.

80.     At all relevant times, the Defendants, individually, and/or through their agents, servants and employees, assessed the needs of Geraldine E. Wiggins, and promised that they would adequately care for her needs, akin to a hospital.

81.     At all relevant times, the Defendants made a conscious decision to operate and/or manage their Facility so as to maximize profits at the expense of the care required to be provided to their residents, including Geraldine E. Wiggins.

82.     In their efforts to maximize profits, the Defendants reduced staffing levels below the level necessary to provide adequate and timely care and services to their patients, including Geraldine E. Wiggins.

83.     Upon information and belief, the Defendants caused staffing levels at their Facility to be set at a level such that the personnel on duty at any given time could not and did not reasonably and timely tend to the needs of their assigned patients, including Geraldine E. Wiggins.

84.     Upon information and belief, the Defendants intentionally increased the number of sick and frail residents with greater health problems requiring more complex care.

85.     The Defendants knew that the increase in the acuity care levels of the patient population would substantially increase the need for staff, services and supplies necessary for the patient population.

86.     The Defendants failed to provide the resources necessary, including sufficient staff, services and supplies, to meet the needs of their patients, including Geraldine E. Wiggins.

87.     The Defendants negligently, carelessly and recklessly caused the healthcare providers, nurses and nurses' aides who they placed and/or staffed at their Facility to be so unqualified and/or under-trained, that the personnel on duty at any given time could not and did not reasonably and timely tend to the needs of their assigned patients, including Geraldine E. Wiggins.

88.     The aforementioned acts and omissions directly caused and/or increased the risk of the injuries and harm to Geraldine E. Wiggins and were known by the Defendants.

89.     At all relevant times, the Facility was individually owned, and/or in concert owned, possessed, managed, controlled, operated and maintained under the exclusive control of the Defendants.

90.     At all relevant times, the Defendants were operating individually or through their managers, members, partners, officers, agents, servants and employees who had actual, apparent and/or ostensible authority, and all of whom were acting within the course and scope of their employment and under the direct and exclusive control of the Defendants.

91.     The aforementioned injuries, acts and omissions were caused solely and exclusively by reason of negligence, carelessness and recklessness of the Defendants, and their agents, servants and employees and were due in no part to any act or omission to act on the part of Geraldine E. Wiggins.

92.     The Defendants exercised complete and total control over the total and complete healthcare of all the patients of their Facility, including Geraldine E. Wiggins, akin to a hospital.

### COUNT I – NEGLIGENCE
### BRENDA L. KLING, ADMINISTRATRIX OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
### v.
### REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA and JOHN DOES 1-4

93.     Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint, as though same were fully set forth at length herein.

94.     Upon accepting Geraldine E. Wiggins as a resident at their Facility, the Defendants, individually and jointly, assumed direct duties to provide her with adequate, timely and appropriate healthcare and other basic custodial services as set forth herein.

95.     The Defendants had the ultimate responsibility to ensure that the rights, safety, welfare and well-being of their residents, including Geraldine E. Wiggins, were protected.

96.     The Defendants owed a duty to provide adequate, timely and appropriate healthcare and related skilled nursing, custodial, restorative, therapy and rehabilitation care and services to their residents, including Geraldine E. Wiggins, such as reasonable caregivers would provide under similar circumstances.

97.     The Defendants each owed duty to their patients, including Geraldine E. Wiggins, to hire, train, oversee and supervise their employees to ensure that their Facility was operated, and services were provided, to their residents in a safe and reasonable matter.

98.     The Defendants each owed a duty and responsibility to furnish Geraldine E. Wiggins with appropriate, timely and competent medical, nursing and custodial care and services.

99.     The Defendants each owed and failed to fulfill the following duties and responsibilities to Geraldine E. Wiggins:

i)      The duty to use reasonable care in the maintenance of safe and adequate facility;

ii)     The duty to select, hire, train and retain only competent staff;

iii)    The duty to oversee, monitor and supervise all persons who practice nursing and/or medical healthcare within their facility;

iv)     The duty to staff their facility with sufficient and adequately trained personnel to provide the care and services required by their facility's patients;

v)      The duty to maintain sufficient staffing, funding, supplies and resources for the facility to meet the needs of their facility's patients;

vi)     The duty to formulate, adopt, oversee, revise and enforce rules, policies, procedures and protocols to ensure quality of care for all their facility's patients;

vii)    The duty to take adequate, timely and appropriate measures to correct the known problems with quality of care, as well as the known problems with the delivery of medical, nursing and custodial care and services;

viii)   The duty to keep their facility's patients free and safe from abuse and neglect;

ix)     The duty to provide safe, decent and clean environment for their facility's patients; and

x)      The duty to warn their facility's patients, as well as their families and/or responsible parties, of the Defendants' inability to provide adequate, timely, appropriate and safe care and services when the Defendants were placed on notice, knew, or should have known, of the deficiencies in providing such care and services to and for their patients.

100.    In addition to the direct acts and omissions of the Defendants, the Defendants also acted through their agents, servants, officers and employees, who were in turn acting within the course and scope of their employment, in furtherance of the Defendants' business and under the direct control and supervision of the Defendants.

101.    All of the acts alleged to have been done or not to have been done by the Defendants were done or not done by said Defendants, their agents, ostensible agents, servants, workmen and/or employees, acting in the course and scope of their employment with and on behalf of said Defendants and failed or refused to act with reasonable care in the following manner:

a.      violating their duty to provide adequate resident care, including but not limited to diagnosis, evaluation, assessment, supervision, monitoring, medication and treatment monitoring, medication and treatment to and for Geraldine E. Wiggins;

b.      failure to provide adequate supervision and monitoring to Geraldine E. Wiggins to avoid accidents;

c.  failure to keep Geraldine E. Wiggins safe from falls;

d.  failure to identify and implement adequate interventions to keep Geraldine E. Wiggins safe;

e.  failure to develop a comprehensive care plan to address Geraldine E. Wiggins' fall risk;

f.  failure to monitor the effectiveness of interventions and modify Geraldine E. Wiggins' care plan when her condition required the same;

g.  violating their duty to develop and implement a comprehensive Care Plan to prevent a fall resulting in hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and death;

h.  violating their duty to develop and implement timely interventions to prevent a fall resulting in hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and death;

i.  failure to recognize that the Decedent was at risk for falls and provide appropriate and adequate supervision and monitoring to prevent a fall resulting in hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and death;

j.  failure to recognize the Decedent's fall-risk factors and prevent a fall resulting in hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and death;

k.  failure to properly assess and document the Decedent's change in condition;

l.  failure to provide for the Decedent's well-being and keep her safe from a fall resulting in hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and death;

m.  failure to provide for the Decedent's safety and well-being;

n.  failing to make the appropriate, thorough and timely assessment of Decedent's condition;

o.  failing to seek timely medical care when Decedent's condition required same;

p.  failing to properly train and supervise Defendants' actual or ostensible employees, servants, agents or other staff or healthcare providers to monitor Decedent and to provide for her safety, welfare and general well-being;

q.  failing to properly hire, train and supervise staff, employees and healthcare providers at Defendants' facility;

r.  failing to monitor the competency, adequacy and propriety of the treatment rendered by their agents, servants and employees who provided care and treatment to Decedent while a resident at Defendants' facility;

s.   failing to maintain Defendants' duty to formulate, adopt and enforce adequate policies, procedures and protocols to ensure that their facility's patients, including Decedent, are properly supervised, assessed, monitored and receive proper and timely medical, custodial and nursing care;

t.   failing to maintain Defendants' duty to formulate, adopt and enforce adequate policies, procedures and protocols to ensure that their facility's patients, including Decedent, are properly supervised, monitored and receive proper medical, custodial and nursing care to keep her free from pressure injuries;

u.   failing to maintain Defendants' duty to formulate, adopt and enforce adequate policies, procedures and protocols to ensure that their facility's patients, including Decedent, are properly supervised, monitored and receive proper medical, custodial and nursing care to keep her free from infections and sepsis;

v.   failing to maintain Defendants' duty to formulate, adopt and enforce adequate policies, procedures and protocols to ensure that their facility's residents, including Decedent, are properly supervised, monitored and receive proper medical, custodial and nursing care to keep him free from protein-calorie malnutrition;

w.   failing to administer the facility in a manner that enabled it to use its resource effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of the facility's residents, including Decedent;

x.   failing to ensure that the Defendants used the results of its assessments to develop, review and revise Decedent's "Care Plan";

y.   failing to ensure that Defendants' facility had sufficient nursing staff to provide nursing and custodial care and services to the residents in order to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident, including Decedent;

z.   failing to maintain compliance with the governmental rules and regulation to which Defendants' delivery of care is compared as part of the survey process conducted by the Pennsylvania Department of Health;

aa.   failing to provide adequate and sufficient staffing levels at Defendants' facility;

bb.   failing to properly select, retain and monitor the competency of the medical and nursing staff, their employees, agents, servants and other healthcare providers who treated Decedent and failing to ensure such persons provided care within the applicable standards of care;

cc.   failing to keep Decedent free from neglect and abuse;

dd.   failing to take appropriate steps to remedy continuing problems at the Defendants' facility that Defendants knew, or had reason to know, were occurring with Decedent's care, which included the need to increase the number of the facility's employees, hiring skilled and trained employees, adequately train and supervise the current employees, monitoring

Landmark v. Nurselect MSJ_00000050

conduct of the employees, and adopting new or changing the existing policies, procedures and protocols to ensure care provided was provided within the appropriate community standards;

ee.  making false, fraudulent, inadequate and inconsistent notes in Decedent's chart;

ff.  failing to obtain new or modified "Physicians' Orders" when changes in Decedent's condition were recognized by Defendants' agents;

gg.  failing to accurately, timely and consistently document Decedent's needs and the care and services provided to her in response to such needs;

hh  violating Pennsylvania Statutes, Pennsylvania Administrative Regulations, as well as OBRA regulations;

ii.  grossly understaffing Defendants' facility;

jj.  failing to train the employees to recognize medical conditions/symptoms which required Decedent's transfer to the hospital;

kk.  failing to allocate adequate funds, resources and supplies and failure to implement a facility budget that provided for the necessary and sufficient funds, resources and staffing levels to enable and allow their facility to provide adequate, timely appropriate care and services to the facility's residents, including Decedent;

ll.  failure to recognize and investigate neglect and abuse occurring with the care and services provided and not provided to Decedent, and failure to report such neglect and abuse to the appropriate governmental agencies;

m.  All of the acts or failure to act constitute a deviation from the appropriate standards of care, negligence, carelessness and reckless indifference to the health, safety, welfare and well-being of Decedent;

nn.  Defendants' conduct caused harm to Decedent and increased the risk of harm to her; and

oo.  in committing the aforementioned acts and omissions, Defendants were acting negligently, carelessly and with reckless indifference to the safety, welfare and well-being of Decedent.

102.  Upon information and belief, the Defendants, including their owners, members, managers, officers, directors and partners knew of and/or were made aware of the Pennsylvania Department of Health annual and complaint survey results and placed on notice of the status of Brethren Village.

103.  At all times relevant to this lawsuit, the Defendants employed and directed physicians, nurses and other medical personnel who rendered care to Geraldine E. Wiggins.

Landmark v. Nurselect MSJ_00000051

104.    At all times relevant to this lawsuit, the Defendants owed a duty to Geraldine E. Wiggins to provide competent and qualified physicians, surgeons, nurses, nurses' aides and other medical and quasi medical personnel to render proper care to her.

105.    At all times relevant to this lawsuit, the Defendants owed Geraldine E. Wiggins a duty to operate their rehabilitation Facility in a careful and reasonable manner, under the circumstances, as would have been done by other rehabilitation facilities in and about the Pennsylvania area.

106.    At all times relevant to this lawsuit, Defendants and their agents, staff and employees, owed Geraldine E. Wiggins the duty to possess and exercise that degree of skill and knowledge ordinarily possessed and exercised by similar rehabilitation, physicians and/or nurses in and about the Pennsylvania area.

107.    At all times relevant hereto, Geraldine E. Wiggins' care was to be delivered and administered by medical staff, nursing staff and healthcare staff at the Defendants' rehabilitation Facility in a reasonably safe and prudent manner within the applicable standards of care for the community, as well as state and federal nursing home facility rules and regulations.

108.    Geraldine E. Wiggins was a resident at Defendants' rehabilitation Facility and the Defendants negligently and carelessly and in wanton and willful disregard for her health, safety and general welfare, inflicted injury upon her in failing to timely provide appropriate and necessary medical, nursing, rehabilitation and custodial care, adequate monitoring and supervision.

109.    As a direct and proximate result of the negligence, carelessness and recklessness of the Defendants, as is more fully set forth herein, Geraldine E. Wiggins experienced, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

110.    Geraldine E. Wiggins experienced severe and excruciating pain and suffering as the result of the aforesaid negligent, careless and reckless conduct of the Defendants, and Defendants' agents, and

their breach of the duty of care as set forth herein.

111.    In causing the aforesaid injuries, the Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

112.    Pennsylvania Code Chapter 28, Section 201 *et. seq.*, requires Defendants to comply with all federal, state and local regulations with regard to long-term care facilities.

113.    The Defendants violated OBRA regulations, which establish the minimum standard of care to be followed by Defendants, including but not limited to the following:

(a)    42 C.F.R. § 483.10 (a)(1) / § 483.10 the patient has a right to a dignified existence;

(b)    42 C.F.R. § 483.12 / § 483.13 (b) & (c) the patient has the right to be free from abuse, neglect, misappropriation of patient property, and exploitation as defined in this subpart;

(c)    42 C.F.R. § 483.12 (c)(1) / § 483.13(c)(2) the facility must ensure that all alleged violations involving abuse, neglect, exploitation or mistreatment, including injuries of unknown source and misappropriation of patient property, are reported immediately, but not later than 2 hours after the allegation is made, if the events that cause the allegation involve abuse or result in serious bodily injury, or not later than 24 hours if the events that cause the allegation do not involve abuse and do not result in serious bodily injury, to the Administratrices of the facility and other officials (including to the State Survey Agency and adult protective services where state law provides for jurisdiction in long-term care facilities) in accordance with State law through established procedures;

(d)    42 C.F.R. § 483.20 (2)(ii) the facility must conduct an assessment after a significant change in patient's condition;

(e)    42 C.F.R. § 483.21 (b)(b) / § 483.20(k) Comprehensive Care Plans, the facility must develop and implement a comprehensive person-centered care plan for each patient, consistent with the patient rights, that includes measurable objectives and timeframes to meet a patient's medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment;

(f)    42 C.F.R. § 483.24 / § 483.25 each patient must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well-being, consistent with the patient's comprehensive assessment and plan of care;

(g)    42 C.F.R. § 483.25 (b)(i) / (ii) / § 483.25 (c)(1)(2) Based on the comprehensive assessment of a resident, the facility must ensure that (i) A resident receives care, consistent with professional standards of practice, to prevent pressure ulcers and does not develop pressure ulcers unless the

Landmark v. Nurselect MSJ_00000053

individual's clinical condition demonstrates that they were unavoidable; and (ii) A resident with pressure ulcers receives necessary treatment and services, consistent with professional standards of practice, to promote healing, prevent infection and prevent new ulcers from developing.

(h)    42 C.F.R. § 483.25 (d)(2) / § 483.25 (h)(2) each patient receives adequate supervision and assistance devices to prevent accidents;

(i)    42 C.F.R. § 483. 35 (a) / § 483. 30(a)(1) the facility must provide services by sufficient number of each of the following types of personnel on a twenty-four (24) hour basis to provide nursing care to all patients in accordance with patient care plans; and

(j)    42 C.F.R. § 483.70 (b) / § 483.75 (b) The facility must operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility.

114.    Geraldine E. Wiggins fell within the class of persons the statutory rules, regulations and laws that were intended to protect by virtue of OBRA Regulations and the Pennsylvania Code 28 §§ 201, *et. seq.*, thus entitling Plaintiff to adopt such laws as the standard of care for measuring Defendants' conduct. Thus, Plaintiff asserts a claim for negligence *per se*, asserting that, as a matter of law, the conduct of the Defendants amounted to negligence and negligence *per se*.

115.    At all relevant times pertinent hereto, there was in full force and effect 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person", providing penal consequences for neglect of a care-dependent person for:

> *Intentionally, knowingly or recklessly causes bodily injury or serious bodily injury by failing to provide treatment, care, goods or services necessary to preserve the health, safety or welfare of a care-dependent person for whom he is responsible to provide care.*

116.    18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" expresses the fundamental public policy of the Commonwealth of Pennsylvania that older adults, like children, are not to be abused or neglected, particularly in health care facilities or by persons holding themselves out as trained professionals, and that if such neglect or abuse causes injury, either physical or mental, then such conduct is actionable.

117.    At all relevant times pertinent thereto, Geraldine E. Wiggins was a care-dependent resident at Defendants' facility and as such, fell within the class of persons 18 Pa.C.S.A. §2713 "Neglect of Care

Landmark v. Nurselect MSJ_00000054

Dependent Person" was intended to protect, and as such, entitling Plaintiff to adopt 18 Pa.C.S.A. § 2713

"Neglect of Care Dependent Person" as the standard of care for measuring the conduct of the Defendants.

118.    Furthermore, 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" is directed to

obviate the specific kind of harm which Geraldine E. Wiggins sustained, with its purpose, at least in part,

to protect the interest of a group of individuals, i.e., *care-dependent persons*, including Geraldine E.

Wiggins.

119.    Defendants, in accepting the responsibility for providing for Geraldine E. Wiggins' care,

welfare and well-being, as mentioned herein, and were negligent *per se* as they violated 18 Pa.C.S.A. §

2713 "Neglect of Care Dependent Person" in that they failed to provide treatment, care, goods and services

necessary to preserve the health, safety or welfare of Geraldine E. Wiggins, for whom they were responsible

to provide care as specifically set forth in this Fourth Amended Complaint.

120.    As a direct result of the Defendants' aforementioned negligence *per se*, Geraldine E.

Wiggins was caused to suffer serious injuries as aforesaid.

121.    The conduct of the Defendants was intentional, outrageous and willful and exhibited a

reckless indifference to the health, safety and well-being of Geraldine E. Wiggins.

122.    The conduct of the Defendants was such that an award of punitive damages is justified.

*WHEREFORE,* Plaintiff demands judgment in her favor and against the Defendants, for

compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

### COUNT II – VICARIOUS LIABILITY
### BRENDA L. KLING, ADMINISTRATRIX OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
#### v.
### REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE,
### BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA and JOHN DOES 1-4

123.    Plaintiff incorporates by reference herein the allegations contained in the receding

paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

124.    At all times relevant hereto, Defendants' agents, servants, employees and others were acting

in the scope of their employment as agents, servants or employees of Defendants' Facility.

125.    Defendants are vicariously liable for the acts, commissions or omissions, of their physicians, nurses, nurses' aides and other medical personnel and healthcare providers fully as though the aforementioned physicians, nurses, nurses' aides and other medical personnel and healthcare providers performed the acts or omissions themselves. In the alternative, the Defendants are responsible for the negligent acts or omissions of other physicians, nurses, nurses' aides and other healthcare providers who are agents, employees and/or servants of the Defendants.

126.    At all times relevant to this lawsuit, the Defendants, employed and directed physicians, nurses, nurses' aides and other medical personnel who rendered care to Geraldine E. Wiggins.

127.    At all times relevant to this lawsuit, Defendants owed a duty to Geraldine E. Wiggins to provide competent and qualified physicians, surgeons, nurses and other quasi-medical personnel to render care to her.

128.    At all times relevant to this lawsuit, the Defendants owed to Geraldine E. Wiggins the duty to operate their Facility in a careful and reasonable manner, under the circumstances, as would have been done by other similar facilities in and about the Pennsylvania area.

129.    At all times relevant to this lawsuit, the Defendants and their agents, owed Geraldine E. Wiggins the duty to possess and exercise that degree of skill and knowledge ordinarily possessed and exercised by similar facilities, physicians and/or nurses in and about the Pennsylvania area.

130.    At all times relevant to this lawsuit, Geraldine E. Wiggins' care was to be delivered and administered by the agents, servants and/or employees of the Defendants at the Defendants' Facility in a reasonably safe and prudent manner within the applicable standards of care for the community Commonwealth of Pennsylvania and federal nursing home facility rules and regulations.

131.    The Defendants breached their duties and were, therefore, negligent, careless and exhibited a reckless disregard to the health, safety, welfare and well-being of Geraldine E. Wiggins.

132.    The aforesaid breaches of duties, negligence, carelessness and recklessness of the Defendants directly and proximately caused the aforesaid injuries to Geraldine E. Wiggins, including, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion

from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

133.   In causing the aforesaid injuries, the Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

134.   The conduct of the Defendants was intentional, outrageous, willful and wanton, and exhibited a reckless indifference to the health, safety and well-being of Geraldine E. Wiggins.

135.   The conduct of the Defendants was such that an award of punitive damages is justified.

*WHEREFORE*, Plaintiff demands judgment in her favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

### COUNT III - CORPORATE LIABILITY
### BRENDA L. KLING, ADMINISTRATRIX OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
### v.
### REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE
### REALTY, LLC and JOHN DOES 1-4

136.   Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

137.   Defendants' agents, employees, and servants and others provided care and treatment to Geraldine E. Wiggins as agents, employees, servants, officers or directors of Defendants or apparent agents held out as such.

138.   At all times relevant hereto, Defendants' agents, servants, employees and others were acting in the scope of their employment as agents, servants, or employees of said Defendants.

139.   At all relevant times pertinent hereto, the corporate conduct of the Defendants was independent of the negligent conduct of the employees, and was outrageous, willful, and wanton, and exhibited a reckless indifference to the health, welfare and well-being of Decedent.

140.   Defendants, as corporate entities, are liable based on the following duties of care owed to Geraldine E. Wiggins:

a)  a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;

b)  a duty to select and retain only competent physicians;

c)  a duty to oversee all persons who practice medicine within its walls as to patient care; and,

d)  a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

141.    Defendants owed Geraldine E. Wiggins a duty concerning the care and treatment under a corporate negligence standard with regard to the policies, actions and inactions of the institution itself and are directly liable for their own negligence.

142.    Defendants and their corporate members, managers, partners, owners, and directors breached their duties and were, therefore, negligent, careless and reckless in their duties and obligations to Geraldine E. Wiggins.

143.    The aforesaid breaches of duties, corporate negligence, carelessness and recklessness of Defendants directly and proximately caused the aforesaid injuries to Decedent, including but not limited to, experience, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

144.    In causing the aforesaid injuries, Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

145.    The conduct of the Defendants was intentional, outrageous, willful and wanton and exhibited a reckless indifference to the health, safety and well-being of Geraldine E. Wiggins.

146.    The conduct of the Defendants was such that an award of punitive damages is justified.

*WHEREFORE,* Plaintiff demands judgment in her favor and against all Corporate Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

### COUNT IV -SURVIVAL CLAIM
### BRENDA L. KLING, ADMINISTRATRIX OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
#### v.
### REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE,
### BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA and JOHN DOES 1-4

147.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

148.    Plaintiff, Brenda L. Kling, Administratrix of the Estate of Geraldine E. Wiggins, deceased, also brings this action on behalf of the Estate of Geraldine E. Wiggins, deceased, under and by virtue of the Act of 1972, June 30, P.L. 508, No. 164, Section 2, eff. July 1972, as amended, 20 Pa.C.S.A. 3371, et seq., (known as the Pennsylvania Survival Act").

149.    Plaintiff, Brenda L. Kling, as daughter and Administratrix of the Estate of Geraldine E. Wiggins, deceased, is a survival claim beneficiary.

150.    Plaintiff, Brenda L. Kling, as Administratrix of the Estate of Geraldine E. Wiggins, deceased, also claims on behalf of the Estate of Geraldine E. Wiggins, deceased, all damages recoverable under the Pennsylvania Survival Act, including, but not limited to damages for the conscious pain and suffering undergone by Decedent, up to an including the time of her death, which was caused by the Defendants' breach of duties, negligence, carelessness, and recklessness.

151.    Plaintiff claim damages for the fright and mental suffering attributable to the peril leading to the physical manifestation of mental and physical injuries experience, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

152.    In causing the aforesaid injuries, the Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

153. As a result of the death of Geraldine E. Wiggins, her Estate has been deprived of the economic value of the Decedent's life during the period of her life expectancy and Plaintiff, as Administratrix of the Estate of Geraldine E. Wiggins, deceased, claim damages for pecuniary loss sustained by the Estate as a result of her death, as well as for the conscious pain and suffering undergone by Decedent, up to and including the time of her death.

154. The conduct of the Defendants was intentional, outrageous, willful, wanton and exhibited a reckless indifference to the safety, health, welfare, and well-being of Geraldine E. Wiggins.

155. The conduct of the Defendants was such that an award of punitive damages is justified.

**WHEREFORE**, Plaintiff demands judgment in her favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

### COUNT V - WRONGFUL DEATH CLAIM
### BRENDA L. KLING, ADMINISTRATRIX OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
v.
### REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE,
### BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA and JOHN DOES 1-4

156. Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

157. Plaintiff also brings this action on behalf of Decedent's estate under and by virtue of the Act of 1855 P.L. 30, as amended, Pa.R.C.P. 2202, as further amended, July 1976, 42Pa.C.S.A. 8301 (known as the "Pennsylvania Wrongful Death Act").

158. Plaintiff, Brenda L. Kling, as daughter and Administratrix of the Estate of Geraldine E. Wiggins, deceased, is a wrongful death beneficiary.

159. Plaintiff claims all damages recoverable under the Pennsylvania Wrongful Death Act, including, but not limited to damages for pecuniary loss suffered by Decedent's survivors by reason of the death of Geraldine E. Wiggins, as well as for the reimbursement for medical expenses, nursing expenses, funeral expenses, expenses of administration and other expenses incurred in connection therewith.

160.    As a result of the death of Geraldine E. Wiggins, the aforesaid survivors have been deprived of the comfort, aid, assistance, tutelage, maintenance, and companionship that they would have received from Decedent for the remainder of her natural life.

**WHEREFORE,** Plaintiff demands judgment in her favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

## COUNT VI- BREACH OF FIDUCIARY DUTY
### BRENDA L. KLING, ADMINISTRATRIX OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
### v.
### REHABILITATION CENTER OF BRETHREN VILLAGE, LLC

161.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

162.    At all times material and relevant hereto, Geraldine E. Wiggins was incapable of dealing with the facility, Brethren Village, on equal terms, and was incapable of engaging in any arm's length relationship with them.

163.    Additionally, at all times material and relevant hereto, Geraldine E. Wiggins was incapable of independently providing for her own safety, health, welfare and well-being and justifiably relied on the Facility to provide necessary care and services to attain and/or maintain her highest practicable physical, mental and psychosocial well-being.

164.    At all times material and relevant hereto, the Facility individually and/or collectively fostered and forged a relationship of special confidence and trust with Geraldine E. Wiggins by admitting her into their care on April 13, 2021, and by reserving the right to specifically determine the level of care, safety, protection, services and supplies that would be provided to Geraldine E. Wiggins.

165.    At all times material and relevant hereto, the Facility individually and/or collectively controlled and oversaw every single aspect of Geraldine E. Wiggins's existence, including her activities of daily living (ADL), custodial care, as well as skilled nursing and healthcare.

166.    At all times material and relevant hereto, the facility individually and/or collectively determined and orchestrated the most trivial as well as the most vital aspects of Geraldine E. Wiggins's

existence, from the type of clothing she wore, to when and how she received healthcare, as well as quality and quantity of food and water she could consume.

167.    As a result, Geraldine E. Wiggins was solely and entirely dependent upon the Facility's staff, employees, agents, officers and directors, to provide for her basic daily care, skilled nursing and healthcare, services, safety, protection, well-being and personal and intimate needs.

168.    Geraldine E. Wiggins reposed a special confidence into the Facility's staff, employees, agents, officers and directors to provide her with necessary care and services to attain and/or maintain her highest practicable physical, mental, and psychosocial well-being.

169.    At all times material hereto, the Facility developed a special relationship with Geraldine E. Wiggins  by virtue of the type of the care and services she required, their supposedly superior knowledge, skill and expertise, and their overmastering dominance over Geraldine E. Wiggins and by virtue of Geraldine E. Wiggins's weakness, dependence and inability to independently provide for her own safety, health, welfare and well-being and her justifiable reliance on the Facility to provide for her safety, health, welfare and well-being.

170.    In their special relationship with one another, Geraldine E. Wiggins, a vulnerable and dependent individual, did not and could not deal with the Facility on equal terms due to the Facility's overmastering dominance on one side, and due to Geraldine E. Wiggins's weakness and justifiable trust on another side.

171.    At all times material hereto, Geraldine E. Wiggins entrusted her care, treatment, as well as every single aspect of her very existence into the exclusive care, custody and control of the Facility and its staff, employees, agents, officers and directors.

172.    At all times material hereto, the aforementioned special relationship enabled the facility to occupy a position of confidence regarding Geraldine E. Wiggins requiring fidelity, loyalty and scrupulous fairness and good faith on the part of the Facility.

173.    The aforementioned special relationship further required the Facility to refrain from using its position to Geraldine E. Wiggins's detriment and the facility's own advantage.

Landmark v. Nurselect MSJ_00000062

174.   As such, and at all times material hereto, the facility, Rehabilitation Center at Brethren Village, LLC, was a fiduciary of Geraldine E. Wiggins.

175.   At all times material hereto, the Facility owed a fiduciary duty to Geraldine E. Wiggins.

176.   The Facility breached its fiduciary duty and its fiduciary obligations, as well as violated its relationship of trust and special confidence owed to Geraldine E. Wiggins  by: a) engaging in the conduct set forth in detail in the within Fourth Amended Complaint; and b) allowing revenues, profits and assets obtained from the Facility's patients as well as their payor sources for inflated, improper and unreasonable inter-company fees and transfers designed and created for the benefit of the facility's owners, parent companies, affiliates and the Defendants  herein, instead of utilizing said resources effectively and efficiently in order to maintain and/or attain the highest practicable physical, mental and psychosocial well-being of the Facility's residents, including Geraldine E. Wiggins.

177.   In their dealings with Geraldine E. Wiggins, as described herein, the Facility acted in bad faith, and used its position of trust and special confidence to their own advantage and to Geraldine E. Wiggins's detriment.

178.   In violating its fiduciary duties and obligations to Geraldine E. Wiggins, the Facility knew or should have known, that Geraldine E. Wiggins would suffer harm.

179.   The conduct of the Facility was intentional, outrageous, willful, wanton and exhibited a reckless indifference to the safety, health, welfare and well-being of Geraldine E. Wiggins.

180.   The conduct of the Facility was such, that an award of punitive damages is justified.

*WHEREFORE*, Plaintiff demands judgment in her favor and against Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

### COUNT VII – CORPORATE DEFENDANTS AIDING AND ABETTING BREACH OF FIDICUARY DUTY
### BRENDA L. KLING, ADMINISTRATRIX OF THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
### v.
### BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, JOHN DOES 1-4

181.   Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

182.   Corporate Defendants knew, or should have known, of Geraldine E. Wiggins's fiduciary relationship with the Facility, Rehabilitation Center at Brethren Village, LLC, by virtue of the type of the care and services she required, the supposedly superior knowledge, skill and expertise, and their overmastering dominance over Geraldine E. Wiggins, and by virtue of Geraldine E. Wiggins' weakness, dependence and inability to independently providing for her own safety, health, welfare and well-being and is justifiable reliance on the Facility to provide for her safety, health, welfare and well-being.

183.   Corporate Defendants knowingly participated in and provided substantial assistance and encouragement to the Facility in connection with the facility's breach of their fiduciary duties and obligations to Geraldine E. Wiggins, as set forth in detail in Count VI of this Fourth Amended Complaint.

184.   Corporate Defendants knew, or should have known, that the facility's residents, including Geraldine E. Wiggins, were incapable of independently providing for their own care, safety and well-being, and were justifiably relying on, and solely depending upon the Facility's staff, employees, agents, officers and directors to provide for the basic daily and custodial care, skilled nursing and healthcare services, safety, welfare and well-being.

185.   Additionally, Corporate Defendants knowingly assisted, encouraged, aided and abetted the Facility in its breach of fiduciary duties and obligations to the Facility's residents, including Geraldine E. Wiggins, by: a) engaging in the conduct set forth in detail in this Fourth Amended Complaint; b) exercising complete and total control over the Facility's revenues by regularly and repeatedly sweeping nearly all of the Facility's revenues into corporate account under exclusive control of the Corporate Defendants and/or their designee; c) knowingly and intentionally creating and accepting inter-company fees and transfers consisted of revenues derived from the Facility's patients and their payor sources, and designed to improperly and unjustly enrich the Corporate Defendants, instead of allowing the Facility to utilize its resources effectively and efficiently to allow the Facility's patients, including Geraldine E. Wiggins, to attain and/or maintain their highest practicable physical, mental and psychosocial well-being; d) structuring

Landmark v. Nurselect MSJ_00000064

181.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

182.    Corporate Defendants knew, or should have known, of Geraldine E. Wiggins's fiduciary relationship with the Facility, Rehabilitation Center at Brethren Village, LLC, by virtue of the type of the care and services she required, the supposedly superior knowledge, skill and expertise, and their overmastering dominance over Geraldine E. Wiggins, and by virtue of Geraldine E. Wiggins' weakness, dependence and inability to independently providing for her own safety, health, welfare and well-being and is justifiable reliance on the Facility to provide for her safety, health, welfare and well-being.

183.    Corporate Defendants knowingly participated in and provided substantial assistance and encouragement to the Facility in connection with the facility's breach of their fiduciary duties and obligations to Geraldine E. Wiggins, as set forth in detail in Count VI of this Fourth Amended Complaint.

184.    Corporate Defendants knew, or should have known, that the facility's residents, including Geraldine E. Wiggins, were incapable of independently providing for their own care, safety and well-being, and were justifiably relying on, and solely depending upon the Facility's staff, employees, agents, officers and directors to provide for the basic daily and custodial care, skilled nursing and healthcare services, safety, welfare and well-being.

185.    Additionally, Corporate Defendants knowingly assisted, encouraged, aided and abetted the Facility in its breach of fiduciary duties and obligations to the Facility's residents, including Geraldine E. Wiggins, by: a) engaging in the conduct set forth in detail in this Fourth Amended Complaint; b) exercising complete and total control over the Facility's revenues by regularly and repeatedly sweeping nearly all of the Facility's revenues into corporate account under exclusive control of the Corporate Defendants and/or their designee; c) knowingly and intentionally creating and accepting inter-company fees and transfers consisted of revenues derived from the Facility's patients and their payor sources, and designed to improperly and unjustly enrich the Corporate Defendants, instead of allowing the Facility to utilize its resources effectively and efficiently to allow the Facility's patients, including Geraldine E. Wiggins, to attain and/or maintain their highest practicable physical, mental and psychosocial well-being; d) structuring

Landmark v. Nurselect MSJ_00000065

the managing and operating business model for the Facility in such a way that constrained the Facility's ability to provide the adequate and necessary care and services to their residents, including Geraldine E. Wiggins, while simultaneously benefiting and enriching the pyramid structure corporate entities; e) overseeing, managing, and controlling the Facility's acceptance of reimbursement from residents, including Geraldine E. Wiggins, knowing that the Facility could not provide full value of the care and services to meet the care and safety needs of their residents, including Geraldine E. Wiggins; f) drafting, structuring and approving contracts between the Facility and Defendants, which the Defendants knew, or should have known, would result in diversion and depleting of the facility revenues, necessary to provide the care and services to and meet the needs of their residents, including Geraldine E. Wiggins.

186.    The aforementioned conduct of the Defendants constitutes knowing and intentional aiding and abetting the Facility's breach of their fiduciary duties and obligations to the Facility's residents, including Geraldine E. Wiggins, and subjects Corporate Defendants to liability for the injuries and harm suffered by Geraldine E. Wiggins, as aforesaid.

187.    In adding and abetting the Facility in their breach of fiduciary duties and obligations to Geraldine E. Wiggins, as aforesaid, Corportae Defendants knew, or should have known, that Geraldine E. Wiggins would suffer harm.

188.    As a result of Corporate Defendants' aiding and abetting the Facility's breach of their fiduciary duties and obligations to the Facility's residents, including Geraldine E. Wiggins, Corporate Defendants were improperly and unjustly enriched, their Facility, Rehabilitation Center at Brethren Village, LLC, was left with inadequate staff and resources to provide for the care and meet the needs of the Facility's residents, including Geraldine E. Wiggins, and Geraldine E. Wiggins suffered foreseeable and avoidable injuries set forth herein, and more specifically, experience, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

Landmark v. Nurselect MSJ_00000066

189.    The conduct of Corporate Defendants was intentional, outrageous, willful, wanton and exhibited a reckless indifference to the safety, health, welfare and well-being of Geraldine E. Wiggins.

190.    The conduct of Corporate Defendants was such, that an award of punitive damages is justified.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Corporate Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.


                                        **ROSENBAUM & ASSOCIATES, P.C.**

Dated:  December 22, 2022          BY:   /s/ *Andrei Govorov*
                                         Andrei Govorov, Esquire
                                         Counsel for Plaintiff

## VERIFICATION

I verify that the statements made in the foregoing Fourth Amended Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements therein are made subject to the penalties of 18 Pa.C.S. Section 4904, relating to unsworn falsification to authorities.


**ROSENBAUM & ASSOCIATES, P.C.**

Dated: December 22, 2022                BY:    /s/ Andrei Govorov
                                               Andrei Govorov, Esquire
                                               Counsel for Plaintiff

EXHIBIT B

Landmark v. Nurselect MSJ_00000069



SUPPLEMENTAL
STAFFING AGREEMENT

This Supplemental Staffing Agreement ("**Agreement**") is entered into the **22nd** day of September, 2020 by and between **Brethren Village Retirement Community**, with its physical address at **3001 Lititz Pike in Lititz, PA 17543 ("Client**"); and NurSelect, LLC, a Pennsylvania business with its administrative offices located at 630 Freedom Business Center Drive, Third Floor, King of Prussia, PA 19406 ("**NurSelect**").

RECITALS

A.      NurSelect is a health care employment service engaged in the business of recruiting and placing qualified nursing personnel, such as, certified nursing assistants, licensed practical nurses, and registered nurses (collectively, "**NurSelect Personnel**") on contractual assignments on a per-diem or temporary basis (the "**Services**").

B.      The Client desires NurSelect, and NurSelect agrees, upon the terms and conditions more fully set forth herein, to provide NurSelect Personnel to the Client to perform the Services.

NOW, THEREFORE, in consideration of the mutual promises contained herein, the parties hereto agree as follows:

ARTICLE I – THE SERVICES; NURSELECT PERSONNEL

1.1      Staffing; Services. Upon receipt of a request by the Client for NurSelect Personnel, and according to the availability of the requested NurSelect Personnel, NurSelect will provide the NurSelect Personnel to the Client, from time to time, at the locations requested, to provide the Services in a quantity and with the qualifications specified by the Client in said request. Services will be provided by NurSelect Personnel that (a) meet the highest professional standards and principles applicable to Services; and (b) shall be provided timely in accordance with the needs of the patient receiving the Services. Services shall be provided: (x) in accordance with federal, state and local laws, rules, ordinances and regulations; and (y) consistent with the policies and procedures of Client. Neither NurSelect, nor NurSelect Personnel shall do or omit to do anything that would jeopardize the licensure of the Client or its participation in governmental health programs, including Medicare and Medicaid.

1.2      Licensure and Certification of NurSelect Personnel. All NurSelect Personnel shall, at all times while performing the Services, have the appropriate nursing licenses, certifications and/or clinical experience, background checks, reference checks and any other certification or document required by law to provide the Services. From time to time, the Client may notify NurSelect of its need for NurSelect Personnel who possess a specialized certification and/or who have particular clinical experience to provide specialized services. Subject to the terms and conditions of this Agreement, NurSelect will provide NurSelect Personnel having the appropriate licenses, certification, and/or clinical experience required by applicable law to perform such specialized services. NurSelect shall keep and make available to the Client, upon written request by the Client, all licenses, certifications and other documentation verifying clinical experience and/or such other specification needed to furnish any of the Services. NurSelect shall comply with 28 Pa. Code Section 201.21.



Landmark v. Nurselect MSJ_00000071



3

Landmark v. Nurselect MSJ_00000072



ARTICLE II – PAYMENT FOR SERVICES



4

Landmark v. Nurselect MSJ_00000073



## ARTICLE III - STATUS OF THE PARTIES

3.1     NurSelect Employees.  It is expressly understood and agreed that all NurSelect Personnel shall not be considered employees or agents of the Client but instead shall be considered leased employees of NurSelect. Further, it is expressly understood and agreed by the parties that nothing contained in this Agreement shall be construed to create a joint venture, partnership, association or other affiliation or like relationship between the parties hereto, it being specifically agreed that their relationship is and shall remain that of independent parties to a contractual relationship as set forth in this Agreement. NurSelect shall be solely responsible for paying NurSelect Personnel and providing NurSelect Personnel with employment benefits, if any, offered by NurSelect. NurSelect shall be solely responsible for providing unemployment insurance and workers compensation benefits to NurSelect Personnel. NurSelect shall be solely responsible to handle all unemployment and workers compensation claims involving NurSelect Personnel.

3.2     No Claims for Certain Benefits.  NurSelect and its NurSelect Personnel shall not have any claim under this Agreement or otherwise against the Client for employee benefits offered by the Client to its employees, including, without limitation, vacation pay, paid sick leave, retirement benefits, social security, workers compensation, health, disability, or professional malpractice benefits of any kind. NurSelect will indemnify and hold the Client harmless from any and all claims and liability arising from claims relating to the failure of the Client to provide any such benefits to any NurSelect Personnel.

3.3     No Claims for Withholding.  The Client shall not withhold, on behalf of NurSelect or any NurSelect Personnel, any sums for income tax, unemployment insurance, social security or other withholding pursuant to any applicable law or requirement of any governmental body. NurSelect shall solely be responsible for all required withholdings from NurSelect Personnel wages and for remitting the same to the applicable governmental and other parties. NurSelect shall indemnify and hold the Client harmless from any and all claims and/or liability arising from claims relating to the Client's failure to make any such withholdings on behalf of NurSelect or any NurSelect Personnel.

5

### ARTICLE IV - INSURANCE



4.2   Proof of Insurance.  NurSelect shall, upon written request from the Client, provide to the Client certificates of insurance or other appropriate evidence of satisfaction of its obligations to maintain insurance as described in this Article. NurSelect agrees that it will notify the Client at least thirty (30) days in advance of cancellation, non-renewal, or adverse change in its insurance.

### ARTICLE V - APPORTIONMENT OF LIABILITY AND
### DAMAGES INDEMNIFICATION

5.1   Apportionment of Liability.  It is hereby stipulated and agreed between the Client and NurSelect that with respect to any claim or action arising out of the Services, each entity shall only be liable for payment of that portion of any and all liability, costs, expenses, demands, settlements or judgments resulting from negligence, actions or omissions of its own agents, officers, and employees.



### ARTICLE VI - TERM AND TERMINATION

6.1   Term.  The initial term of this Agreement shall commence on the date above first written ("**Commencement Date**") and shall continue for one (1) year from the Commencement Date ("**Term**"). Except as otherwise stated herein, the Term shall be automatically extended for one (1) additional year and so on from year to year until either NurSelect or the Client give to the other no less than thirty (30) days' written notice of termination prior to the end of the then-current Term.



6



ARTICLE VII - CONFIDENTIAL INFORMATION



ARTICLE VIII - NON-ENGAGEMENT COVENANT



7

ARTICLE IX – HEALTH INSURANCE PORTABILITY AND
ACCOUNTABILITY ACT OF 1996 PROVISIONS



8



9

Landmark V. Nurselect MSJ_00000078



ARTICLE X - OTHER TERMS AND CONDITIONS



10

Landmark v. Nurselect MSJ_00000079



IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and date first written above.

CLIENT:

By: _Davi S Rayha_

Name: _DAVID S. RAYHA NHA_

Title: _VP OPERATION/COO_

NURSELECT:

By: _D. S. Schell_

Name: _DAVID F. SHELL_

Title: _PRESIDENT_

11

| | | |
|---|---|---|
| BRENDA L. KLING, individually and as | : | IN THE COURT OF COMMON PLEAS |
| Administratrix of the Estate of | : | OF LANCASTER COUNTY, |
| GERALDINE E. WIGGINS, | : | PENNSYLVANIA |
| | : | |
| Plaintiff | : | |
| | : | NO: CI-22-04128 |
| v. | : | |
| | : | MedMal |
| REHABILITATION CENTER AT | : | |
| BRETHREN VILLAGE, LLC, | : | |
| BRETHREN VILLAGE, BRETHREN | : | |
| VILLAGE REALTY, LLC, LORI | : | |
| SCHOENER, NHA, and JOHN DOES1– | : | |
| 4 | : | |
| Defendants, | : | |
| | : | |
| v. | : | |
| | : | |
| NURSELECT, LLC, | : | |
| | : | |
| Additional | : | |
| Defendant. | : | |

## VERIFICATION

I verify that the statements made in the attached Third-Party Joinder Complaint are true and correct to the best of my knowledge, information, and belief. I understand that the statements therein are subject to the penalties of 18 Pa.C.S. § 4904.

Date: June 13 , 2023                    By: _____

John Snader, FACHE
President/CEO Brethren Village

DATE: ___8/25/23___
WRIT RE-ISSUED
ANDREW E. SPADE
PROTHONOTARY

LYCOMING CO. PA
SHERIFFS DEPT.
2023 AUG 28 AM 11:49
RECEIVED

Landmark v. Nurselect MSJ_00000082

# EXHIBIT B

Landmark v. Nurselect MSJ_00000083



4250 Crums Mill Road, Suite 201 • Harrisburg, PA 17112
P: (717) 216-5505 • F: (717) 547-1900

**Direct Dial:** (717) 941-1214
**Email:** kas@saxtonstump.com

January 12, 2023

**VIA EMAIL (dshelly@nurselectstaffing.com)**

David Shelly, President
NurSelect, LLC
640 Freedom Business Center Dr.
Third Floor
King of Prussia, PA 19406

*Re:    Brenda L. Kling, Individually and as Administratrix of the Estate of Geraldine E.
       Wiggins v. Rehabilitation Center at Brethren Village, et al.
       Case No. CI-22-04128, Lancaster County Court of Common Pleas
       Joinder of NurSelect, LLC*

Dear Mr. Shelly:

As you know from our prior communications, this law firm represents Brethren Village
Retirement Community. A lawsuit has been commenced against Brethren Village in the Court
of Common Pleas of Lancaster County related to the care and treatment of one of its residents,
Geraldine Wiggins. Specifically, the lawsuit alleges negligence arising out of a fall sustained by
Ms. Wiggins on May 12, 2021. Our investigation has revealed that Ayanna McDowell, CNA,
who was employed by NurSelect, LLC at the relevant time, had direct involvement in this
alleged fall. Upon confirming that Ayanna McDowell, CNA was an employee of NurSelect and
reviewing the contractual agreement between NurSelect and Brethren Village, our office did not
meet with Ms. McDowell.

You are aware that Brethren Village is a party to a Staffing Agreement with NurSelect
for the provision of NurSelect Personnel on contractual assignments on a per-diem or temporary
basis at Brethren Village. The Staffing Agreement contains a provision for Apportionment of
Liability and Damages Indemnification. Specifically, Section 5.1 of the Staffing Agreement
states:

5.1    <u>Apportionment of Liability.</u>    It is hereby stipulated and agreed between the Client
and NurSelect that with respect to any claim or action arising out of the Services, each
entity shall only be liable for payment of that portion of any and all liability, costs,

Landmark v. Nurselect MSJ_00000084

expenses, demands, settlements or judgments resulting from negligence, actions or omissions of its own agents, officers, and employees.

Based upon this provision, Brethren Village will be filing a joinder complaint against NurSelect to invoke NurSelect's contractual agreement to indemnify Brethren Village for the alleged negligence, actions, or omissions of Ms. McDowell related the care and treatment of Ms. Wiggins. Please provide notice of this pending joinder against NurSelect to your liability insurance provider so that counsel can be assigned to represent NurSelect's interests.

Thank you for your attention to this matter.

Sincerely,

SAXTON & STUMP

*/s/ Kimberly A. Selemba*
Kimberly A. Selemba, Esquire
Senior Counsel

cc:      John N. Snader, President/CEO, Brethren Village (via email)

Landmark v. Nurselect MSJ_00000085

# EXHIBIT C

Landmark v. Nurselect MSJ_00000086



# Professional Liability Insurance

**CLAIM OFFICE:**

**Mail claims to:**
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA  30326-1160

**Fax claims to:**
(404) 231-3755
(Attn: Claims Department)

**Email claims to:**
reportclaims@rsui.com

RSG 51029 0717

Landmark v. Nurselect MSJ_00000087



# COMMERCIAL LINES COMBINATION POLICY DECLARATIONS

## Landmark American Insurance Company
(A New Hampshire Stock Co.)
(hereinafter called "the Company")

EXECUTIVE OFFICES:      945 East Paces Ferry Road, Suite 1800, Atlanta, GA  30326-1160

**Policy Number:**      LHC801468        **RENEWAL OF:**    LHC794794 00

**Named Insured and Mailing Address:**                    **Producer Name:**

NURSELECT LLC
1829 NEW HOLLAND ROAD
SUITE 13
READING, PA 19607

**Policy Period:**    **From:**    3/1/2023      **To:**    3/1/2024      12:01 A.M. Standard Time at the Named Insured address as stated herein.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

**Business Description:**    ALLIED HEALTHCARE STAFFING AGENCY

| COVERAGE PARTS | PREMIUM |
| --- | --- |
| **Commercial General Liability** | |
| COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE | $ Included |
| **Professional Liability** | |
| MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD | $ Included |

**Total Advance Policy Premium** $ ███

**Minimum Earned Premium** $ ███

Not Subject to Audit

**Forms and Endorsements made a part of this policy at time of issue:**  Please see SCHEDULE OF ATTACHMENTS.

(Omits applicable forms and endorsements if shown in specific Coverage Form Declarations.)

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY

March 08, 2023
Date

By: 
Authorized Representative

Declarations Page 1 of 2      SubIdID#:      585559      BinderID#
                                                         Created By:      JML

RSG 50011 1020                                                                      Page 1 of 2

Landmark v. Nurselect MSJ_00000088

**DECLARATIONS**

**Policy Number:** <u>LHC801468</u>                    **Effective Date:** <u>3/1/2023</u>
                                                                                   At 12:01 A.M. Standard Time

**LIMITS OF INSURANCE:**

**CGL and Professional Liability:**

$ <u>See Aggregate Limits Below</u>            Policy Aggregate Limit

**Commercial General Liability:**

$ <u>3,000,000</u>            General Aggregate Limit (Other than Products-Completed Operations)

$ <u>3,000,000</u>            Products-Completed Operations Aggregate Limit

$ <u>1,000,000</u>            Personal and Advertising Injury Limit

$ <u>1,000,000</u>            Each Occurrence

$ <u>5,000</u>            Medical Payments (Any One Person)

$ <u>50,000</u>            Damage to Premises Rented to You

**Professional Liability:**

$ <u>1,000,000</u>            Each Claim

$ <u>3,000,000</u>            Aggregate

**DEDUCTIBLE:** <u>$ 2,500</u>            Each Claim

**RETROACTIVE DATE:**     Coverage                                Date

                                     Commercial General Liability          N/A

                                     Professional Liability                   3/1/2020

THESE DECLARATIONS ARE PART OF THE COMMON POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

**NOTICE:**
This is a claims-made and reported policy.  Please read the policy carefully and discuss the coverage afforded by the policy with your insurance agent or broker.

Declarations Page 2 of 2        SubIdID#:        585559        BinderID#
                                                                            Created By:        JML

Landmark v. Nurselect MSJ_00000089

**LANDMARK AMERICAN INSURANCE COMPANY**

| | |
|---|---|
| Policy Number: | LHC801468 |
| Insurer: | Landmark American Insurance Company |
| Named Insured: | NURSELECT LLC |

## NOTICE - DISCLOSURE OF TERRORISM PREMIUM

This Coverage Part/Policy covers certain losses caused by terrorism. In accordance with the federal Terrorism Risk Insurance Act, as amended, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act.

As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

### DISCLOSURE OF PREMIUM

The portion of your premium for the policy term attributable to coverage for terrorist acts certified under the Act is

$  0.00                              .

In any case, if the insured rejects terrorism coverage in any scheduled underlying policy, this policy is written to exclude terrorism.

### DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 80% of that portion of the amount of such insured losses that exceeds the applicable **Insurer** retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

### CAP INSURER PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

A member of Alleghany Insurance Holdings LLC

Landmark v. Nurselect MSJ_00000090

**LANDMARK AMERICAN INSURANCE COMPANY**

---

### SCHEDULE OF POLICY ATTACHMENTS AND FORMS

| Form Number | Form Title |
|---|---|
| RSG 99054 0121 | Notice - Disclosure of Terrorism Premium |
| RSG 51039 1017 | Commercial General Liability Coverage Form - Occurrence |
| RSG 51044 0722 | Medical Professional Liability Coverage Part Claims Made and Reported Basis - Broad |
| RSG 51031 0522 | Common Policy Conditions |
| ENDT-01 | Additional Insured Endorsement (Blanket) - RSG 55015 0418 |
| ENDT-02 | Communicable Disease Exclusion (CGL only) - RSG 56201 0920 |
| ENDT-03 | Cross Coverage Exclusion - Medical - Broad - RSG 56136 0319 |
| ENDT-04 | Cryptocurrency Exclusion - RSG 56216 0822 |
| ENDT-05 | Deductible Liability Insurance-Comb. Policy-Multiple Ded - RSG 94016 0916 |
| ENDT-06 | Exclusion - Correctional Medicine - RSG 56203 0321 |
| ENDT-07 | Exclusion - Designated Professional Services - RSG 56114 1118 |
| ENDT-08 | Hired and Non - owned Auto Liability |
| ENDT-09 | Minimum Retained Premium - RSG 54025 0405 |
| ENDT-10 | Nuclear Energy Liability Exclusion - RSG 56058 0903 |
| ENDT-11 | Opioid and Controlled Substance Exclusion - RSG 56191 0421 |
| ENDT-12 | Pennsylvania - Notice of Cancellation & Nonrenewal - RSG 53015 0903 |
| ENDT-13 | Pennsylvania Surplus Lines Disclosure Notice - RSG 99091 0106 |
| ENDT-14 | Service Of Suit - RSG 94022 0407 |
| ENDT-15 | State Fraud Statement - RSG 99022 1022 |
| ENDT-16 | Supplementary Coverages Endorsement (Broad) - RSG 54207 1022 |
| ENDT-17 | Violation of Consumer Protection Laws Exclusion - RSG 56121 0822 |

**Policy No.:** LHC801468

---

RSG 54081 0710

Landmark v. Nurselect MSJ_00000091

LANDMARK AMERICAN INSURANCE COMPANY

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is an Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle or defend any "claim" or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or "claim", knew that the "bodily injury" or "property damage" had occurred, in whole or in part.  If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or "claim", includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or "claim":

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

RSG 51039 1017

Page 1 of 22

Landmark v. Nurselect MSJ_00000092

**(2)** Receives a written or verbal demand or "claim" for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

  **(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

  **(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

  **(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

  **(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.  For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

Landmark v. Nurselect MSJ_00000093

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

    **(a)** Employment by the insured; or

    **(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

    **(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

        **(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use by the building's occupants or their guests;

        **(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

        **(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

    **(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

    **(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

        **(i)** Any insured; or

        **(ii)** Any person or organization for whom you may be legally responsible;

    **(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

Landmark v. Nurselect MSJ_00000094

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire"; or

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** "Claim" or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such "claim" or "suit" by or on behalf of a governmental authority.

#### g. Aircraft, Auto Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

Landmark v. Nurselect MSJ_00000095

(a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

(b) The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h.   Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i.   War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j.   Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

Landmark v. Nurselect MSJ_00000096

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media that are used with electronically controlled equipment.

Landmark v. Nurselect MSJ_00000097

**q. Asbestos**

"Bodily injury" or "property damage" for past, present or future claims arising in whole or in part either directly or indirectly, out of the manufacture, distribution, sale, re-sale, re-branding, installation, repair, removal, encapsulation, abatement, disposal of, replacement or handling of, exposure to, testing for or failure to disclose the presence of, asbestos or products containing asbestos whether or not the asbestos is or was at any time airborne as a fiber or particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever.

It is further agreed that this insurance does not apply to "bodily injury" or "property damage" including expenses for;

**(1)** The costs of clean up or removal of asbestos or products and materials containing asbestos;

**(2)** The cost of such actions as may be necessary to monitor, assess and evaluate the release or threat of asbestos or products and material containing asbestos;

**(3)** The cost of disposal of asbestos substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result; or

**(4)** The cost of compliance with any law or regulation regarding asbestos.

**r. Biological Contaminants**

Any "claim" arising out of a "biological contaminant".

"Biological contaminant" means any biological irritant or contaminant including but not limited to any form of mold, mildew, mushroom, yeast, fungus, bacteria, virus, insect, allergen and any other type of biological agent, including any substance produced by, emanating from, or arising out of such "biological contaminant".

**s. Employment Practices**

Any "claim" arising out of or in any way related to:

**(1)** Refusal to employ;

**(2)** Termination of employment;

**(3)** Coercion, demotion, performance evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment related practices, procedures, policies, acts or omissions; or

**(4)** Consequential "bodily injury" or "personal and advertising injury" as a result of **(1)** through **(3)** above.

This exclusion applies whether the Insured may be held liable as an employer or in any other capacity and to any obligation to share "damages" with or to repay someone else who must pay "damages" because of the injury.

It is further agreed that no coverage shall apply under this policy to any "claim" brought by or against any spouse, child, parent, brother or sister of the Insured or any other person.

The Company shall not have a duty to defend any "claim", "suit", arbitration or any other form of a trial court proceeding.

**t. Lead**

"Bodily injury" or "property damage" for past, present or future claims arising in whole or in part, either directly or indirectly, out of the manufacture, distribution, sale, resale, re-branding, installation, repair, removal, encapsulation, abatement, disposal of, replacement or handling of, exposure to, ingestion of or testing for, lead or products containing lead whether or not the lead is or was at any time airborne as a particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever.

Landmark v. Nurselect MSJ_00000098

It is further agreed that this insurance does not apply to "bodily injury" or "property damage" including expenses for:

**(1)** The costs of clean up or removal of lead or products and materials containing lead;

**(2)** The cost of such actions as may be necessary to monitor, assess and evaluate the release or threat of same, of lead or products and material containing lead;

**(3)** The cost of disposal of lead substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result; or

**(4)** The cost of compliance with any law or regulation regarding lead.

**u. Sexual Abuse**

Any "claims" involving the use of excessive influence or power on any individual, or the actual or alleged inappropriate physical contact or contact that is deemed by or alleged by the individual to be sexual or in any way unwelcome.

**v. Prior Knowledge**

Any alleged act, error, omission, or circumstance likely to give rise to a "claim" that an Insured had knowledge of prior to the effective date of this policy.  This exclusion includes, but is not limited to any prior "claim" or possible "claim" referenced in the Insured's application.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.  We may, at our discretion, investigate any offense and settle or defend any "claim" or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

Landmark v. Nurselect MSJ_00000099

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.  Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **15.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

Landmark v. Nurselect MSJ_00000100

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** "Claim" or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. Asbestos**

"Personal and advertising injury" for past, present or future claims arising in whole or in part either directly or indirectly, out of the manufacture, distribution, sale, resale, re-branding, installation, repair, removal, encapsulation, abatement, disposal of, replacement or handling of, exposure to, testing for or failure to disclose the presence of, asbestos or products containing asbestos whether or not the asbestos is or was at any time airborne as a fiber or particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever.

It is further agreed that this insurance does not apply to "personal and advertising injury" including expenses for:

**(1)** The costs of clean up or removal of asbestos or products and materials containing asbestos;

**(2)** The cost of such actions as may be necessary to monitor, assess and evaluate the release or threat of asbestos or products and material containing asbestos;

**(3)** The cost of disposal of asbestos substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result; or

**(4)** The cost of compliance with any law or regulation regarding asbestos.

**p. Biological Contaminants**

Any "claim" arising out of a "biological contaminant".

"Biological contaminant" means any biological irritant or contaminant including but not limited to any form of mold, mildew, mushroom, yeast, fungus, bacteria, virus, insect, allergen and any other type of biological agent, including any substance produced by, emanating from, or arising out of such "biological contaminant".

**q. Employment Practices**

Any "claim" arising out of or in any way related to:

**(1)** Refusal to employ;

**(2)** Termination of employment;

**(3)** Coercion, demotion, performance evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment related practices, procedures, policies, acts or omissions; or

**(4)** Consequential "bodily injury" or "personal and advertising injury" as a result of **(1)** through **(3)** above.

This exclusion applies whether the Insured may be held liable as an employer or in any other capacity and to any obligation to share "damages" with or to repay someone else who must pay "damages" because of the injury.

Landmark v. Nurselect MSJ_00000101

It is further agreed that no coverage shall apply under this policy to any "claim" brought by or against any spouse, child, parent, brother or sister of the Insured or any other person.

The Company shall not have a duty to defend any "claim", "suit", arbitration or any other form of a trial court proceeding.

**r.   Lead**

"Personal and advertising injury" for past, present or future claims arising in whole or in part, either directly or indirectly, out of the manufacture, distribution, sale, resale, re-branding, installation, repair, removal, encapsulation, abatement, disposal of, replacement or handling of, exposure to, ingestion of or testing for, lead or products containing lead whether or not the lead is or was at any time airborne as a particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever.

It is further agreed that this insurance does not apply to "personal and advertising injury" including expenses for:

**(1)**   The costs of clean up or removal of lead or products and materials containing lead;

**(2)**   The cost of such actions as may be necessary to monitor, assess and evaluate the release or threat of same, of lead or products and material containing lead;

**(3)**   The cost of disposal of lead substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result; or

**(4)**   The cost of compliance with any law or regulation regarding lead.

**s.   Sexual Abuse**

Any "claims" involving the use of excessive influence or power on any individual, or the actual or alleged inappropriate physical contact or contact that is deemed by or alleged by the individual to be sexual or in any way unwelcome.

**t.   Prior Knowledge**

Any alleged act, error, omission, or circumstance likely to give rise to a "claim" that an Insured had knowledge of prior to the effective date of this policy.  This exclusion includes, but is not limited to any prior "claim" or possible "claim" referenced in the Insured's application.

**u.   War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)**   War, including undeclared or civil war;

**(2)**   Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)**   Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**v.   Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

Landmark v. Nurselect MSJ_00000102

**COVERAGE C – MEDICAL PAYMENTS**

**1.   Insuring Agreement**

**a.**   We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)**   On premises you own or rent;

**(2)**   On ways next to premises you own or rent; or

**(3)**   Because of your operations;

provided that:

**(a)**   The accident takes place in the "coverage territory" and during the policy period;

**(b)**   The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)**   The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.**   We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)**   First aid administered at the time of an accident;

**(2)**   Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

**(3)**   Necessary ambulance, hospital, professional nursing and funeral services.

**2.   Exclusions**

We will not pay expenses for "bodily injury":

**a.   Any Insured**

To any insured, except "volunteer workers".

**b.   Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c.   Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d.   Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e.   Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletics contests.

**f.   Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g.   Coverage A Exclusions**

Excluded under Coverage **A.**

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

**1.**   We will pay, with respect to any occurrence we investigate or any "claim" or "suit" against an insured that we settle or defend:

**a.**   All expenses we incur.

Landmark v. Nurselect MSJ_00000103

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim" or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit".  However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" but will reduce the limits of insurance.

Landmark v. Nurselect MSJ_00000104

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

**a.** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

**b.** The conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker") or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

Landmark v. Nurselect MSJ_00000105

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** "Claims" made or "suits" brought; or

**c.** Persons or organizations making "claims" or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**b.** Damages under Coverage **B.**

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for Damages under Coverage **A** because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

Landmark v. Nurselect MSJ_00000106

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or offense which may result in a "claim". To the extent possible, notice should include:

     **(1)** How, when and where the "occurrence" or offense took place;

     **(2)** The names and addresses of any injured persons and witnesses; and

     **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

   **b.** If a "claim" is made or "suit" is brought against any insured, you must:

     **(1)** Immediately record the specifics of the "claim" or "suit" and the date received; and

     **(2)** Notify us as soon as practicable.

    You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

   **c.** You and any other involved insured must:

     **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or a "suit";

     **(2)** Authorize us to obtain records and other information;

     **(3)** Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

     **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

   **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   **b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

   **a. Primary Insurance**

    This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

   **b. Excess Insurance**

    **(1)** This insurance is excess over:

     **(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

      **(i)** That is Fire, Extended Coverage, Builders' Risk, Installation Risk or similar coverage for "your work";

      **(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

Landmark v. Nurselect MSJ_00000107

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

Premium for this coverage is computed in accordance with the Company's rules and rates.  Any premium shown as advance premium may be a deposit premium only.  If the premium is a deposit premium, at the close of each audit period, the Company will compute the earned premium for that period.  Audit premiums are due and payable upon notice.

The Company may examine and audit the Insured's books and records at any time during the policy period and within three years after the final termination of this policy, as far as they relate to the subject matter of this policy.

The first Named Insured as shown in the Declarations must keep records of information the Company will need for premium computation and upon request must send the Company copies of the information.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

Landmark v. Nurselect MSJ_00000108

**b.** Separately to each insured against whom "claim" is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 60 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V – DEFINITIONS

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Claim" is a written demand for damages because of actual or alleged "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. "Claim" includes any "suit" as defined in this Policy.

**5.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined only by actual law suits filed and maintained within the territory described in Paragraph **a.** above. This policy does not apply to "claims" pursued elsewhere.

**6.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**7.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

Landmark v. Nurselect MSJ_00000109

8. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

9. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

10. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

      Paragraph **f.** does not include that part of any contract or agreement:

      (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

      (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

         (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

         (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

      (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

11. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

12. "Loading or unloading" means the handling of property:

   a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   b. While it is in or on an aircraft, watercraft or "auto"; or

   c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

Landmark v. Nurselect MSJ_00000110

**13.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    **a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    **b.** Vehicles maintained for use solely on or next to premises you own or rent;

    **c.** Vehicles that travel on crawler treads;

    **d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

        **(1)** Power cranes, shovels, loaders, diggers or drills; or

        **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

    **e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

        **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

        **(2)** Cherry pickers and similar devices used to raise or lower workers;

    **f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

    However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

        **(1)** Equipment designed primarily for:

            **(a)** Snow removal;

            **(b)** Road maintenance, but not construction or resurfacing; or

            **(c)** Street cleaning;

        **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

        **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**14.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**15.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    **a.** False arrest, detention or imprisonment;

    **b.** Malicious prosecution;

    **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

    **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    **e.** The use of another's advertising idea in your "advertisement".

**16.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Landmark v. Nurselect MSJ_00000111

**17.** "Products-completed operations hazard":

    **a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

        **(1)** Products that are still in your physical possession; or

        **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

            **(a)** When all of the work called for in your contract has been completed.

            **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

            **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

        Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    **b.** Does not include "bodily injury" or "property damage" arising out of:

        **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

        **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

        **(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**18.** "Property damage" means:

    **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

    For the purposes of this insurance, electronic data is not tangible property.

    As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from, computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**19.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

    **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**20.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**21.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**22.** "Your product":

    **a.** Means:

        **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

Landmark v. Nurselect MSJ_00000112

    **(a)** You;

    **(b)** Others trading under your name; or

    **(c)** A person or organization whose business or assets you have acquired; and

  **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

  **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

  **(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**23.** "Your work":

**a.** Means:

  **(1)** Work or operations performed by you or on your behalf; and

  **(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

  **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

  **(2)** The providing of or failure to provide warnings or instructions.

Landmark v. Nurselect MSJ_00000113

LANDMARK AMERICAN INSURANCE COMPANY

*This Form Provides Claims-Made Coverage.*
*Please Read The Entire Form Completely.*

# MEDICAL PROFESSIONAL LIABILITY COVERAGE PART – CLAIMS MADE AND REPORTED BASIS – BROAD FORM

Throughout this document, the word "Insured" means any person or entity qualified as such under **Part I. E. Covered Persons and Entities**.  The word "Company" refers to the Company providing the insurance shown on the Declarations.

Other words and phrases that appear in **bold** have special meaning.  Refer to **Part III. Definitions**.

**Part I.    Insuring Agreement**

**A.    Covered Services**

The Company will pay on behalf of the Insured, as shown in the Declarations, all sums that the Insured becomes legally obligated to pay as **Damages** and associated **Claim Expenses** arising out of a negligent act, error or omission, even if the **Claim** asserted is groundless, false or fraudulent, in the rendering of or failure to render professional services as described in the Business Description on the Declarations, provided that the:

**1.**    **Claim** is first made against the Insured during the **Policy Period,** and reported to the Company no later than sixty (60) days after the end of the **Policy Period**;

**2.**    Negligent act, error or omission took place in a covered territory;

**3.**    Negligent act, error or omission took place after the **Retroactive Date** as shown in the Declarations.

**B.    Defense and Settlement**

The Company will have the right and duty to defend any **Claim** against an Insured seeking **Damages** to which this policy applies, even if any of the allegations of the **Claim** are groundless, false or fraudulent. The Company's right and duty to defend any **Claim** shall end when the Company's Limit of Liability has been exhausted by payment of **Damages** and/or **Claim Expenses**, or has been tendered to the Insured or to a court of competent jurisdiction.

The Company shall not settle any **Claim** without the Insured's written consent.  The Insured shall not admit any liability for or settle any **Claim** or incur any costs, charges or expenses without the written consent of the Company.

The Company shall have the right and the duty to select legal counsel for the defense of a **Claim**. In the event the Insured is entitled by law to select independent counsel to defend the **Claim**, the **Claim Expenses** or other covered costs the Company must pay to that counsel are limited to the rates the Company actually pays to counsel retained by the Company in the defense of similar **Claims** in the community where the **Claim** is being defended. The Company may exercise the right to require that such counsel have experience in defending **Claims** similar to the one pending against the Insured. The Insured agrees that such counsel will comply with the Company's litigation guidelines and reporting requirements, timely respond to the Company's requests, and provide information regarding the **Claim** when requested.

**C.    Policy Limits**

Regardless of the number of persons or entities insured or included in **Part I. E. Covered Persons and Entities,** or the number of claimants or **Claims** made against the Insured:

**1.**    The maximum liability of the Company for **Damages** resulting from each **Claim** first made against the Insured during the **Policy Period** and the Extended Reporting Period, if purchased, shall not exceed the amount shown in the Declarations as each **Claim**;

**2.**    The maximum liability of the Company for all **Damages** as a result of all **Claims** first made against

RSG 51044 0722                                                                                                    Page 1 of 8

Landmark v. Nurselect MSJ_00000114

the Insured during the **Policy Period** and the Extended Reporting Period, if purchased, shall not exceed the amount shown in the Declarations as Aggregate.

The inclusion of more than one Insured, or the making of **Claims** by more than one person or organization, does not increase the Company's Limit of Liability. All **Claims** arising out of a single negligent act, error or omission, or a series of related negligent acts, errors or omissions by one or more Insureds shall be treated as a single **Claim** for all purposes of this policy. All **Claims** shall be deemed first made when the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period** and all such **Claims** shall be subject to the same Each Claim Limit of Liability during that **Policy Period**.

**Claim Expenses** shall be paid by the Company in addition to the applicable Limits of Liability stated in the Declarations. The Company's obligation to pay **Claim Expenses** in addition to the applicable Limits of Liability as shown in the Declarations shall be limited to an additional **Claims Expense** Limits of Liability equal to the amount as shown in the Declarations as the Each Claim Limit of Liability.

The Company shall not be obligated to pay any **Claim** for **Damages** or defend any **Claim** after the Limit of Liability has been exhausted by payment of judgments, settlements, **Claim Expenses** or any combination thereof.

**D. Deductible Provisions**

The deductible amount as shown in the Declarations shall be paid by the Insured and applies to each **Claim** and includes **Damages** or **Claim Expenses,** whether or not a loss payment is made. If the deductible amount is initially paid by the Company, the Named Insured shall reimburse the amount paid within thirty (30) days, upon written request of the Company.

**E. Covered Persons and Entities**

1. Named Insured as shown in the Declarations, and if the Named Insured is an individual, his or her spouse, or domestic partner, but only with respect to the professional services rendered by or on behalf of the Named Insured;

2. Any present or former principal, partner, officer, director, member, employee or volunteer worker of the Named Insured, but only as respects professional services rendered on behalf of the Named Insured;

3. Heirs, Executors, Administrators, and in the event of an Insured's death, incapacity or bankruptcy, legal representatives of any Insured, but only with respect to professional services rendered prior to such Insured's death, incapacity or bankruptcy;

4. Any Medical Director while acting within the scope of his/her administrative and supervisory duties for the Named Insured. It is further agreed that coverage does not apply to the Medical Director while acting within his/her capacity as a Physician, Surgeon or Dentist in the treatment, or direction of the treatment, of any patient;

5. Any student enrolled in a training program, but only while acting within the scope of their duties as such and under the direct supervision of faculty members or educators of such training program;

6. Any faculty member or educator of a training program, but only while acting within the scope of their duties as such.

**F. Covered Territory**

This policy applies to covered **Claims** arising out of negligent acts, errors or omissions committed anywhere in the world. However, the policy does not provide coverage for **Claims** made against the Insured in countries where the United States of America has declared or imposed a trade embargo or sanctions, or in countries where the United States of America does not maintain diplomatic relations.

**G. Extended Reporting Period**

If the policy is not renewed for any reason, or is cancelled for any reason other than for nonpayment of premium or deductible (whether cancelled by the Company or by the Named Insured), the Named Insured as shown on the Declarations, has the right to purchase, within sixty (60) days of policy termination, an extension of the coverage granted by this policy. This reporting period extension shall

Landmark v. Nurselect MSJ_00000115

remain in force for a period of either twelve (12), twenty-four (24), or thirty-six (36) months after the policy terminates, but only for **Claims** resulting from negligent acts, errors or omissions committed before the effective date of the cancellation or nonrenewal, and otherwise covered by this policy. Increased premiums or deductibles or modifications of coverage terms or conditions upon renewal do not constitute cancellation or nonrenewal.

The premium for this Extended Reporting Period will not exceed one hundred percent (100%) for twelve months, one hundred fifty percent (150%) for twenty-four months or one hundred seventy-five percent (175%) for thirty-six months of the full annual premium set forth in the Declarations and any attached endorsements, and must be elected and paid within sixty (60) days after the effective date of the policy's termination. Such additional premium is deemed fully earned immediately upon the inception of the Extended Reporting Period.

The Extended Reporting Period is added by endorsement and, once endorsed, cannot be cancelled. The Extended Reporting Period does not reinstate or increase the Limits of Liability. The Company's Limits of Liability during the Extended Reporting Period are part of, and not in addition to, the Company's Limits of Liability stated in the Declarations.

**H. Supplementary Coverages**

It is agreed that any and all payments made for the following is included within, and shall not be in addition to, the Policy Limits as described in this Policy.

1. The Company will pay **Claim Expenses** incurred in the defense of any disciplinary proceeding or investigation against an Insured by any licensing board, disciplinary board, peer review committee, or similar entity alleging professional misconduct or violation of the rules of professional conduct, provided that the alleged misconduct or violation first occurred after the **Retroactive Date** and arises out of the Insured's performance of the Named Insured's professional services as described in the Declarations. This provision applies only to disciplinary proceedings first brought against an Insured during the **Policy Period** and reported to the Company no later than sixty (60) days after the end of **Policy Period**. The Company's obligation to defend an Insured under the provision is subject to a sub-Limit of Liability of $25,000 and applies only to **Claims Expenses** incurred with the consent of the Company. **Damages** are not covered by this provision.

   This sub-Limit of Liability is the maximum amount payable under this provision for the **Policy Period**, regardless of the number of disciplinary proceedings first commenced during the **Policy Period** or the number of Insureds subject to disciplinary proceedings. There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

2. The Company will pay reasonable expenses incurred by the Insured at the Company's request to assist in the investigation of the **Claim** or defense of the suit, including actual loss of earnings up to $500 a day for each Insured because of time off from work, subject to an aggregate amount of $5,000 for each individual Insured for each **Claim**, not to exceed an aggregate amount of $10,000 per **Policy Period**. There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

3. The Company will pay fines and penalties specified in the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and the Health Information Technology for Economic and Clinical Health Act (HITECH) as assessed against the Insured, or assessed against third parties who make a claim on the Insured for indemnification or contribution for such fines and penalties based on violations and breaches of the privacy and security provisions of HIPAA, and HITECH, and/or regulations promulgated under said statutes relating to Protected Health Information (PHI) and electronic Protected Health Information (ePHI), but only if such violations or breaches arise out of professional services as described in the Declarations or from the handling of PHI or ePHI of the Insured's own personnel.

   For the purposes of this coverage, **Claim** shall also include the notice of investigation, audit, and/or assessment of fines or penalties by the U.S. Department of Health and Human Services or the Office of Civil Rights in connection with violations of or breaches under HIPAA and/or HITECH.

   For the purposes of this coverage, **Damages** shall also include HIPAA and/or HITECH fines and

Landmark v. Nurselect MSJ_00000116

penalties.

The coverage described above is subject to a sub-Limit of Liability in an aggregate amount of $100,000. This sub-Limit of Liability is the maximum amount payable under this provision for the **Policy Period**, regardless of the number of violations and/or breaches by the Insured of the privacy and security provisions of HIPAA and HITECH and the regulations established thereunder arising from the performance of or failure to perform professional services as described in the Declarations. Any payments made under this provision are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

4. The Company will pay **Damages** or **Claims Expenses** as a result of **Claims** arising out of circumstances involving the use of excessive influence of power on any patient, or the actual or alleged inappropriate physical contact or contact that is deemed by or alleged by any patient to be sexual or in any way unwelcomed, is limited to a sub-Limit of Liability of $250,000 each claim and $500,000 in the aggregate. This sub-limit of liability is part of and not in addition to the applicable Limits of Liability as shown in the Declarations. Payment of **Damages** or **Claim Expenses** by the Company reduces the applicable Limits of Liability as shown in the Declarations.

Once the sub-Limit of Liability is exhausted, no additional coverage shall be afforded by this coverage provision and the following Exclusion will be added to the policy:

It is agreed that no coverage shall apply under this policy to any **Claim** or **Claim Expenses** arising out of or involving the use of excessive influence or power on any patient, or the actual or alleged inappropriate physical contact or contact that is deemed by or alleged by any patient to be sexual or in any way unwelcomed.

## Part II.  Exclusions

This policy does not apply to any **Claim** or **Claim Expenses** based upon or arising out of:

**A.  Personal and Advertising Liability**.

**B.**  Obligations of any Insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**C.  Bodily Injury** to any of the following:

   **1.**  Officers, directors, partners, employees or volunteer workers of the Insured arising out of and in the course of employment by the insured;

   **2.**  The spouse, child, parent, or sibling of **C. (1.)** above.

**D.**  The insolvency or bankruptcy of an Insured or of any other person, firm or organization.

**E.**  Dishonest, fraudulent, criminal, malicious, or intentional acts, errors or omissions committed by or at the direction of any Insured.

**F.**  Any business enterprise not named in the Declarations which is owned, controlled, operated or managed by any Insured.

**G.**  A **Claim** by one Insured under this policy against another Insured under this policy, unless such **Claim** arises solely out of professional services performed for that party.

**H.**  Any obligation or liability assumed by the Insured under any contract or any oral or written agreement, unless liability would have attached in the absence of such a contract or agreement, including the Insured's decision to unilaterally terminate or otherwise alter, remove or abridge any rights, benefits or obligations under any contract or agreement.

**I.**  The ownership, rental, leasing, maintenance, use (including operation, loading and unloading), or repair of any real or personal property, including **Damage** to property owned, occupied or used by, rented to or leased to an Insured.

**J.**  The rendering or failure to render professional services by the Insured as a physician, surgeon or dentist.

**K.**  The performance of any service by any Insured while under the influence of intoxicants or illegal drugs.

Landmark v. Nurselect MSJ_00000117

**L.**    The ownership, maintenance, use (including operation, loading and unloading), or entrustment to others of any aircraft, automobile, motor vehicle, mobile vehicles or watercraft owned or operated by or rented or loaned to any insured.  This exclusion includes the movement of patients in and out of any motor vehicle, aircraft, automobile or watercraft.

**M.   1.**   The actual, alleged or threatened presence, discharge, dispersal, seepage, migration, release or escape of **Pollutants** or asbestos;

**2.**   The failure to discover or disclose the existence or amount of **Pollutants** or asbestos;

**3.**   Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with **M. (1.)** or **(2.)** above;

**4.**   Any request, demand or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or, in any way respond to or assess the effects of **Pollutants** or asbestos;

**5.**   Any **Claim** or suit by or on behalf of a governmental authority for **Damages** because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or, in any way, responding to, or assessing the effect of **Pollutants** or asbestos.

**N.   1.**   Refusal to employ;

**2.**   Termination of employment;

**3.**   Coercion, demotion, performance evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, retaliation or other employment related practices, procedures, policies, acts or omissions;

**4.**   Consequential **Bodily Injury** or **Personal Injury** as a result of **N. (1.)** through **(3.)** above.

This exclusion applies whether the Insured may be held liable as an employer or in any other capacity and to any obligation to share **Damages** with or to repay someone else who must pay **Damages** because of the injury.

It is further agreed that no coverage shall apply under this policy to any **Claim** brought by or against any spouse, child, parent, brother or sister of the Insured or any other person. The Company shall not have a duty to defend any **Claim**, suit, arbitration or any other form of trial court proceeding.

**O.**    Any alleged act, error, omission, or circumstance likely to give rise to a **Claim** that an Insured had knowledge of prior to the effective date of this policy.  This exclusion includes, but is not limited to, any prior **Claim** or possible **Claim** referenced in the Insured's application.

**P.**    Infringement of copyright, patent, trademark, trade name, trade dress, service mark, title or slogan.

**Q.**    Experimental procedures and experimental products, including procedures using experimental products. Experimental procedures and products are those not approved by the United States Food and Drug Administration (FDA).

**R.**    Obstetrical procedures, including but not limited to any emergency obstetrical procedures.

## Part III. Definitions

**A.**    **Advertisement** means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**1.**   Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**2.**   Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**B.**    **Bodily Injury** means physical or mental harm, sickness or disease sustained by a person including death resulting from any of these at any time.

**C.**    **Claim** means a written demand for monetary or non-monetary relief received by the Insured during the **Policy Period**, including the service of suit, or the institution of an arbitration proceeding.  Additionally,

Landmark v. Nurselect MSJ_00000118

**Claims** that arise from an incident, occurrence or offense first reported by the Insured during the **Policy Period** and accepted by the Company in accordance with **Part IV. A. Notice of Claim** will be considered a **Claim** first made during the **Policy Period**.

**D.  Claim Expense** means expenses incurred by the Company or the Insured with the Company's consent in the investigation, adjustment, negotiation, arbitration, mediation and defense of covered **Claims**, whether paid by the Company or the Insured with the Company's consent, and includes:

   **1.**  Attorney fees;

   **2.**  Costs taxed against the Insured in any **Claim** defended by the Company;

   **3.**  Interest on the full amount of any judgment that accrues after entry of the judgment and before the Company has paid, offered to pay or deposited in court the part of the judgment that is within the applicable Limit of Liability;

   **4.**  The cost of appeal bonds or bonds to release attachments, but only for bond amounts within the available applicable policy limit and only if said **Claims** are covered by the policy;

   **5.**  Reasonable expenses incurred by the Insured at the Company's request other than:

      **a.**  Loss of earnings;

      **b.**  Salaries or other compensation paid to the Insured or any employee of the Insured.

**E.  Damages** means compensatory judgment, award or settlement, including punitive or exemplary damages, except damages for which insurance is prohibited by law.  **Damages** does not include disputes over fees, deposits, commissions or charges for goods or services.

**F.  Policy Period** means the period of time stated in the Declarations or any shorter period resulting from policy cancellation or amendment to the policy.

**G.  Personal and Advertising injury** means injury, including consequential **Bodily Injury,** arising out of one or more of the following offenses:

   **1.**  False arrest, detention or imprisonment;

   **2.**  Malicious prosecution or abuse of process;

   **3.**  Wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   **4.**  Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   **5.**  Oral or written publication, in any manner, of material that violates a person's right of privacy;

   **6.**  Use of another's advertising idea in your **Advertisement**; or

   **7.**  Infringing upon another's copyright, trade dress or slogan in your **Advertisement**.

**H.  Retroactive Date** means the date stated in the Declarations on or after which any alleged or actual negligent act, error or omission must have first taken place in order to be considered for coverage under this policy.

**I.  Pollutants** means any solid, liquid, gaseous or thermal irritant, contaminant or toxin, whether live or inanimate; including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals, metals, silica, lead, lead compounds or materials containing lead, asbestos, asbestos compounds or materials containing asbestos, radon, waste or any like substances.  Waste includes materials to be recycled, reconditioned or reclaimed.

**Part IV. General Conditions**. The following Conditions are a precedent to coverage under the Policy:

   **A.  Notice of Claim**

   The Insured must notify the Company as soon as practicable of an incident, occurrence or offense that may reasonably be expected to result in a **Claim**.  Where notice to the Company of such incidents, occurrences or offenses has been acknowledged as adequate by the Company in writing, subsequent

Landmark v. Nurselect MSJ_00000119

**Claims** derived from such incidents, occurrences or offenses will be deemed as first made at the time the incident, occurrence or offense giving rise to such **Claim** was first provided.  The Insured also must immediately send copies to the Company of any demands, notices, summonses or legal papers received in connection with any **Claim**, and must authorize the Company to obtain records and other information. Please send all claim information to:

> Attention: **Claims** Dept.
> RSUI Group, Inc.
> 945 East Paces Ferry Road, Suite 1800
> Atlanta, Georgia 30326-1160
> Or Via Email:
> reportclaims@rsui.com

**B.   Prohibition of Voluntary Payments and Settlements**

With respect to any **Claim** covered under this policy, the Insured will not make payment, admit liability, settle **Claims,** assume any obligation, agree to arbitration or any other means of resolution of any dispute, waive any rights or incur **Claim Expenses** without prior written Company approval, except at the Insured's own cost.

**C.   Cooperation**

The Insured will cooperate with the Company in the conduct of a **Claim** and, upon the Company's request, submit to examination and interrogation by the Company representative, under oath if required, and will attend hearings and trials and assist in effecting settlements, securing and giving evidence, and obtaining the attendance of witnesses.  The Insured shall further cooperate with the Company and do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment that the Insured may have, and the Company may exercise those rights in the name of the Insured.

**D.   Nonrenewal**

The Company will give the Named Insured sixty (60) days written notice prior to nonrenewal of this policy by mailing or delivering the notice to the first Named Insured's last known mailing address as shown in the Declarations.

**E.   Premium and Audit**

Premium for this coverage is computed in accordance with the Company's rules and rates.  Any premium shown as advance premium may be a deposit premium only.  If the premium is a deposit premium, at the close of each audit period, the Company will compute the earned premium for that period.  Audit premiums are due and payable upon notice.

The Company may examine and audit the Insured's books and records at any time during the **Policy Period** and within three years after the final termination of this policy, as far as they relate to the subject matter of this policy.

The first Named Insured, as shown in the Declarations, must keep records of information the Company will need for premium computation and, upon request, must send the Company copies of the information.

**F.   Authorization**

The first Named Insured listed in the Declarations agrees to act as the Named Insured with respect to giving and receiving of all notices, exercising the Extended Reporting Period option, canceling the policy, paying all premiums and deductibles and receiving any return premiums that may become due.

**G.   Subrogation**

In the event of any **Claim** under this policy, the Company will be subrogated to all the Insured's rights of recovery against any person or organization, and the Insured will execute and deliver instruments and papers and do whatever else is necessary to secure such rights.  The Insured will do nothing after the loss to prejudice such rights.

**H.   Other Insurance**

This policy will be excess over, and will not contribute with, any other existing insurance, unless such

Landmark v. Nurselect MSJ_00000120

other insurance is specifically written to be excess of this policy.

When this insurance is excess, the Company shall have no duty under this policy to defend any **Claim** or suit that any other insurer has a duty to defend.  If such other insurer refuses to defend such **Claim** or suit, the Company shall be entitled to the Insured's rights against all such insurers for any **Claim Expenses** incurred by the Company.

If it is determined that both this insurance and other insurance or self insurance apply to any **Claim** on the same basis, whether primary, excess or contingent, the Company will not be liable under this policy for a greater proportion of the **Damages** or **Claim Expenses** than the applicable Limit of Liability under the policy for such **Damages** bears to the total applicable Limit of Liability of all other insurance or self insurance, whether or not collectible against such **Claims.**

**I.   Actions Against the Insurer**

No action will be taken against the Company unless, as a condition precedent, the Insured is in full compliance with all of the terms of this policy, and until the amount of the Insured's obligations to pay shall have been finally determined, either by judgment against the Insured after actual trial, or by written agreement of the Insured, the claimant and the Company.

**J.   Coverage in Bankruptcy**

Bankruptcy or insolvency of the Insured or of the Insured's estate does not relieve the Company of its obligations under this policy.

**K.   False or Fraudulent Claims**

If an Insured knowingly makes any **Claim** that is false or fraudulent, this insurance shall become void and entitlement to coverage for all **Claims** hereunder shall be forfeited.

**L.   Application**

The Insured agrees that the statements in the application are personal representations, that they shall be deemed material and that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between the Insured and the Company, or any of its agents, relating to this insurance.  The signed application, and any attachments thereto, submitted in connection with this Policy are incorporated herein and constitute a part of this Policy.

Landmark v. Nurselect MSJ_00000121

**LANDMARK AMERICAN INSURANCE COMPANY**

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. CANCELLATION**

**1.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**2.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium or deductible; or

**b.** 60 days before the effective date of cancellation if we cancel for any other reason.

**3.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

**4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. CHANGES**

This policy contains all the agreements between you and us concerning the insurance afforded.  The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. EXAMINATION OF YOUR BOOKS AND RECORDS**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. INSPECTIONS AND SURVEYS**

We have the right but are not obligated to:

**1.** Make inspections and surveys at any time;

**2.** Give you reports on the conditions we find; and

**3.** Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections.  We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

**1.** Are safe or healthful; or

**2.** Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**E. PREMIUMS**

The first Named Insured shown in the Declarations:

RSG 51031 0522

Page 1 of 2

Landmark v. Nurselect MSJ_00000122

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F.  TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Landmark v. Nurselect MSJ_00000123



**RSUI Group, Inc.**
945 East Paces Ferry Road
Suite 1800
Atlanta, GA  30326-1160

Phone    (404) 231-2366
Fax        (404) 231-3755

ATTN:  Health Care Providers – Applicants and Policyholders

RE:        HIPAA Privacy and Security Rule Compliance

The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and associated regulations require health care providers to maintain the confidentiality of patients' protected health information ("PHI").  PHI includes, among other things, medical records and billing records relating to medical care.  As a "covered entity" under HIPAA, you are not permitted to share PHI with a "business associate" unless the business associate has provided you with a Business Associate Agreement that provides for the protection of PHI.  Although a professional liability insurer may not be deemed to be a "business associate" as defined by HIPAA, we want to assure your compliance with the regulations in the event a Business Associate Agreement is necessary.

We are committed to maintaining the confidentiality of PHI that you may provide as a part of the administration of your insurance coverage.  Enclosed you will find a Business Associate Agreement that explains how we will safeguard any PHI that you may provide to us in the process of underwriting your policy or handling a claim on your behalf.  Please review it and keep it with your professional liability policy.  You do not need to sign or return this agreement to us.  Please maintain it in your files to document our mutual obligations with respect to PHI.

If you have any questions or concerns about the Business Associate Agreement, please contact Whitney Thomas at (404)260-3795 or whitneythomas@rsui.com.

Sincerely,

Whitney Thomas
Regulatory Compliance
RSUI Group, Inc.

## BUSINESS ASSOCIATE AGREEMENT

THIS BUSINESS ASSOCIATE AGREEMENT ("Agreement") is executed by Landmark American Insurance Company, Covington Specialty Insurance Company, RSUI Indemnity Company and RSUI Group, Inc. ("Business Associate") in favor of its insured healthcare providers (the "Provider").

## RECITALS

WHEREAS, the Business Associate provides professional liability insurance to the Provider pursuant to a policy of insurance (the "Business Arrangement"), and in connection with the Business Arrangement the Provider discloses to the Business Associate certain individually identifiable protected health information ("PHI") that is subject to protection under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended from time to time.

WHEREAS, the parties desire to comply with the HIPAA standards for privacy of PHI of patients of the Provider, and to set forth the terms and conditions pursuant to which the parties will handle PHI that Business Associate receives in the course of performing its services for or on behalf of the Provider under the Business Arrangement.

NOW THEREFORE, for and in consideration of the recitals above, the benefits to Business Associate under the Business Arrangement and the mutual covenants and conditions herein contained, Business Associate agrees as follows:

## SECTION 1 – DEFINITIONS

Terms used, but not otherwise defined in the Agreement shall have the same meaning as set forth in the Standards for Privacy of Individually Identifiable Health Information (the "Privacy Rules"), 45 CFR parts 160-164, as promulgated by the United States Department of Health and Human Services ("HHS"), as amended from time to time.

## SECTION II – OBLIGATIONS AND ACTIVITIES OF BUSINESS ASSOCIATE

a. Business Associate agrees to not use or disclose PHI other than as permitted or required by this Agreement or as required by law.

b. Business Associate agrees to use appropriate safeguards to prevent use or disclosure of the PHI other than as provided for by this Agreement.

c. Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of the requirements of this Agreement.

d. Business Associate agrees to report to Provider any use or disclosure of the PHI, of which it becomes aware, and otherwise not provided for by this Agreement.

e. Business Associate shall require its agents and subcontractors that receive PHI from Business Associate or Provider to agree to the same restrictions and conditions that apply through this Agreement to Business Associate with respect to such information.

f. Business Associate agrees to make available and provide right of access to PHI held by the Business Associate that does not merely duplicate the information maintained by the Provider, to Provider at its request, or as directed by Provider, to an Individual.  Business Associate shall provide access within reasonable time and manner as specified by Provider.

g. Business Associate agrees to incorporate all amendments or corrections to PHI when notified by the Provider in writing that such information is inaccurate or incomplete. 45 CFR § 164.526

h. Business Associate agrees to make available to the Secretary of HHS (or its designee) all internal practices, books, and records relating to the use and/or disclosure of PHI received from the Provider, for purposes of determining the Provider's compliance with the Privacy Rules, subject to attorney-client and other applicable legal privileges.

i. Business Associate agrees to provide an accounting of such disclosures of PHI to Provider or, as directed by Provider, to an Individual in accordance with 45 CFR § 164.528, as amended from time to time. Business Associate shall provide such accounting within a reasonable time and manner as specified by the Provider.

j. Business Associate shall comply with all applicable requirements of the HIPAA Security Rule.

k. Business Associate shall immediately report to Covered Entity any breach of PHI, as defined by HIPAA. Business Associate shall cooperate with Covered Entity's investigation, mitigation and response efforts related to any such breach. Additionally, Business Associate shall be responsible for any costs, liabilities, damages, expenses, and attorney's fees incurred by Covered Entity related to such breach.

l. In the event Business Associate undertakes any of Covered Entity's duties under HIPAA, Business Associate shall comply with all HIPAA regulations applicable to Covered Entity in the discharge of such duties.

## 2.1  PERMITTED USES AND DISCLOSURES OF PHI BY BUSINESS ASSOCIATE

a. Business Associate, its agents and employees, may use or disclose PHI as necessary to perform its duties under the Business Arrangement and only as allowed by the terms of the Business Arrangement, this Agreement, or as required or allowed by law.

b. Business Associate may also use and/or disclose PHI as necessary for the proper management and administration of Business Associate, and to carry out the legal responsibilities of Business Associate.

c. Business Associate agrees that it will not use or disclose PHI in a manner that violates or would violate the Privacy Rules, or the minimum necessary policies and procedures of the Provider that are communicated to Business Associate.

d. Business Associate may use PHI to report violations of the law to appropriate Federal and State authorities, consistent with 45 CFR § 164.502(j)(1).

## SECTION III – OBLIGATIONS OF THE PROVIDER

a. Provider shall notify Business Associate of any limitation(s) in the Provider's notice of privacy practices in accordance with 45 CFR § 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of PHI.

b. Provider shall notify Business Associate, in writing and in a timely manner, of any restrictions or other arrangement to which the Provider has agreed with an individual in accordance with 45 CFR § 164.522, to the extent that such changes may affect Business Associate's use or disclosure of PHI hereunder; provided however, that the Provider will not agree to, and Business Associate will not be required to comply with, any restriction that is inconsistent with the purpose or terms of the Business Arrangement.

Landmark v. Nurselect MSJ_00000126

## 3.1  PERMISSIBLE REQUESTS BY PROVIDER

Provider shall not request Business Associate to use and/or disclose PHI in any manner that would not be permissible under the Privacy Rule if done by Provider; provided however, that the Business Associate will use or disclose PHI for management and administrative activities of the Business Associate as outlined in Section 2.1.

## SECTION IV – TERM AND TERMINATION

## 4.1  TERM AND TERMINATION

This Agreement shall remain in effect for the entire term of the Business Arrangement, or until terminated as set forth herein.  This Agreement will automatically terminate without further action of the parties upon the termination or expiration of the Business Arrangement, subject to the following:

The Provider acknowledges and agrees that, due to the nature of the Business Arrangement, the Business Associate must have the ability to receive PHI from the Provider for as long as the Business Arrangement is in place, and that the Business Associate must have the ability to receive PHI from the Provider for the duration of any defense obligations arising under the Business Arrangement.  Thus, the Provider acknowledges and agrees that termination of this Agreement is not feasible as long as the Business Arrangement is in place, or as long as Business Associate has any defense obligations arising under the Business Arrangement.  Accordingly, any other provision in this Agreement notwithstanding, the parties agree that (a) any notice of termination of this Agreement will also serve as notice of termination of the Business Arrangement, (b) the termination of this Agreement will under no circumstances be effective until the termination of the Business Arrangement is effective, and (c) this Agreement may not be terminated and will remain in effect as long as Business Associate has any defense obligations arising under the Business Arrangement.

## 4.2  TERMINATION FOR MATERIAL BREACH

Subject to Section 4.1, upon Provider's knowledge of a material breach by Business Associate, Provider shall either:

   a. Provide an opportunity for Business Associate to cure the breach or end the violation and terminate this Agreement and the Business Arrangement if Business Associate does not cure the breach or end the violation within a reasonable time specified by the Provider;

   b. Immediately terminate this Agreement and the Business Arrangement if the Business Associate has breached a material term of this Agreement and cure is not possible; or

   c. If neither termination nor cure is feasible, Provider shall report the violation to the Secretary of HHS.

## 4.3  RETURN/DESTRUCTION OF PHI

Except as provided in Section 4.4, upon termination of the Business Arrangement (and any ongoing defense obligations, if applicable), for any reason, Business Associate will, if feasible, return or destroy PHI received from, or created or received by it on behalf of the Provider that Business Associate maintains in any form, including any backup tapes.  Business Associate shall retain no copies of such information.  Business Associate further agrees to use its best efforts to recover PHI in the possession of subcontractors or agents.

**4.4  NO FEASIBLE OR PRACTICAL RETURN/DESTRUCTION OF PHI**

Business Associate has determined that returning or destroying PHI is infeasible for ongoing defense obligations (if applicable), state regulatory requirements imposed upon professional liability insurers, such as reporting, review, and audit requirements, and carrying out any necessary business responsibility of the Business Associate.  This serves as Business Associate's notification to Provider of the conditions that make return or destruction infeasible.  Business Associate shall extend the protections of this Agreement to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

**SECTION V – MISCELLANEOUS**

a.  <u>Regulatory References</u> – A reference in this Agreement to a section of the Privacy Rule means the section as in effect or as amended.

b.  <u>Amendment</u> – The parties recognize that this Agreement may need to be modified from time to time and agree to take such action as is necessary to amend this Agreement for Provider to comply with federal and state law including, but not limited to the requirements of the Privacy Rule and HIPAA.

c.  <u>Survival</u> – The respective rights and obligations of Business Associate under Section 4.3 of this Agreement shall survive the termination of this Agreement.

d.  <u>Notices</u> – All notices and other communications required or permitted pursuant to this Agreement shall be in writing, addressed to the party at the party's regular business address. All notices and other communications shall be sent by overnight courier or sent by registered or certified mail, return receipt requested.

e.  <u>Interpretation</u> – Any ambiguity in this Agreement shall be resolved to permit Provider to comply with HIPAA and the Privacy Rules.

BUSINESS ASSOCIATE:

Signed:

Michael Wayman
Senior Vice President
RSUI Group, Inc.

Address for Notice:

RSUI Group, Inc.
945 East Paces Ferry Road
Suite 1800
Atlanta, GA  30326-1160

Landmark v. Nurselect MSJ_00000128

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# ADDITIONAL INSURED ENDORSEMENT (BLANKET)

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD**

1.   In consideration of the premium charged, the following is added as an Additional Insured, but solely with regard to professional services rendered or that should have been rendered by the Named Insured:

Any person or organization to whom or to which the Named Insured is obligated by virtue of a written contract or by the issuance or existence of a written permit, to provide insurance such as is afforded by this policy.

2.   It is also agreed that the policy does not apply to:

a.   **Claims** by an Additional Insured against the Named Insured;

b.   **Claims** that include allegation or facts indicating sole liability on the part of an Additional Insured.

All other terms and conditions of this policy remain unchanged.

This endorsement effective    3/1/2023
Forms part of Policy Number    LHC801468
Issued to    NURSELECT LLC
by   Landmark American Insurance Company

Endorsement No.:    01

RSG 55015 0418

Landmark v. Nurselect MSJ_00000129

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# COMMUNICABLE DISEASE EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**A.** The following exclusion is added to Paragraph **2. Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Communicable Disease**

"Bodily injury" or "property damage" arising out of the actual or alleged transmission of a "communicable disease".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**a.** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a "communicable disease";

**b.** Testing for a "communicable disease";

**c.** Failure to prevent the spread of the disease; or

**d.** Failure to report the disease to authorities.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Communicable Disease**

"Personal and advertising injury" arising out of the actual or alleged transmission of a "communicable disease".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**a.** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a "communicable disease";

**b.** Testing for a "communicable disease";

**c.** Failure to prevent the spread of the disease; or

**d.** Failure to report the disease to authorities.

**C.** For the purposes of this exclusion:

"Communicable disease" means any illness or disease caused by an infectious agent or its toxins, including but not limited to any bacteria, virus, mold, mildew, fungi, or parasite, that occurs through the direct or indirect transmission of the infectious agent or its product.

This endorsement effective     3/1/2023
Forms part of Policy Number     LHC801468
Issued to     NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:     02

RSG 56201 0920

Landmark v. Nurselect MSJ_00000130

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# CROSS COVERAGE EXCLUSION – MEDICAL BROAD FORM

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

The Medical Professional Liability coverage and the Commercial General Liability coverage provided in this Policy are mutually exclusive.

It is agreed that any claim, damages, Supplementary Payments, or any amounts covered under the Commercial General Liability Coverage Form Claims Made RSG 51030 shall not also be covered under the Medical Professional Liability Coverage Part Claims Made and Reported Basis-Broad-RSG 51044.

It is further agreed that any **Claim**, **Damages**, or **Claim Expenses** or any amounts covered under the Medical Professional Liability Coverage Part Claims Made and Reported Basis-Broad-RSG 51044 shall not also be covered under the Commercial General Liability Coverage Form Claims Made RSG 51030.  Whenever any **Claim** is determined to be covered, either wholly or in part, by the Medical Professional Liability Coverage Part Claims Made and Reported Basis-Broad-RSG 51044, the Commercial General Liability Coverage Form shall not apply and the maximum liability of the Company shall not exceed the Professional Liability Each Claim limit of liability shown in the Declarations.

All other terms and conditions of this policy remain unchanged.

This endorsement effective     3/1/2023
Forms part of Policy Number     LHC801468
Issued to     NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:     03

RSG 56136 0319

Landmark v. Nurselect MSJ_00000131

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# CRYPTOCURRENCY EXCLUSION

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

1. In consideration of the premium charged, it is agreed that no coverage shall apply under this policy to any **Claim** and/or **Claim Expenses** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving **Cryptocurrency** or any **Cryptocurrency Offering**.

2. It is agreed that the following definitions are added to **Part III. Definitions**:

   A. **Cryptocurrency** means any actual or purported electronic, computer derived, digital or virtual instrument, asset, currency, token, coin, unit of account, store of value, funds, or medium of exchange using encryption techniques, methodologies, or technology, including blockchain or similar mechanisms, to secure, verify and/or validate the transfer of such electronic, computer derived, digital or virtual instrument, asset, currency, unit of account, store of value, funds, or medium of exchange between one or more parties.

   B. **Cryptocurrency Offering** means any direct, indirect, actual, alleged, attempted, or proposed purchase or sale, or offer to purchase or sell, any **Cryptocurrency** issued or created by, or in connection with the Insured.

All other terms and conditions of this policy remain unchanged.

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to      NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:      04

RSG 56216 0822

Landmark v. Nurselect MSJ_00000132

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# DEDUCTIBLE LIABILITY INSURANCE (COMBINATION POLICY – MULTIPLE DEDUCTIBLES)

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**SCHEDULE**

| Coverage | Amount and Basis of Deductible |
| --- | --- |
| | PER CLAIM      or      PER OCCURRENCE |

1) Bodily Injury Liability
      OR
2) Property Damage Liability
      OR
3) Personal and Advertising Injury Liability
      OR
4) Bodily Injury Liability, Property Damage Liability, Personal and Advertising Injury Liability      $ 2,500

**APPLICATION OF ENDORSEMENT** (Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all "Bodily Injury", "Property Damage" and "Personal and Advertising Injury" Liability, however caused):

1. Our obligation under the Bodily Injury Liability, Property Damage Liability, and Personal and Advertising Injury Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages.

2. The deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above.  The deductible amount stated in the Schedule above applies as follows:

   A. PER CLAIM BASIS.  If the deductible amount indicated in the Schedule above is on a per claim basis, that deductible applies as follows:

      1) Under Bodily Injury Liability coverage, to all damages sustained by any one person because of "Bodily Injury";

      2) Under Property Damage Liability Coverage, to all damages sustained by any one person because of "Property Damage";

This endorsement effective      3/1/2023
Forms part of Policy Number      LHC801468
Issued to      NURSELECT LLC
by      Landmark American Insurance Company

Endorsement No.:      05

RSG 94016 0916

Page 1 of 2

Landmark v. Nurselect MSJ_00000133

3) Under Personal and Advertising Injury Liability Coverage, to all damages sustained by any one person because of "Personal and Advertising Injury".

4) Under Bodily Injury Liability, Property Damage Liability, and Personal and Advertising Injury Liability Coverages Combined, to all damages sustained by any one person because of:

   a) "Bodily Injury";

   b) "Property Damage";

   c) "Personal and Advertising Injury".

If damages are claimed for care, loss of services or death resulting at any time from "Bodily Injury", a separate deductible amount will be applied to each person making a claim for such damages.

With respects to "Property Damage" and "Personal and Advertising Injury" Liability, person includes an organization.

B. PER OCCURRENCE BASIS.  If the deductible amount indicated in the Schedule above is on a "per occurrence" basis, that deductible amount applies as follows:

1) Under Bodily Injury Liability Coverage, to all damages because of "Bodily Injury";

2) Under Property Damage Liability Coverage, to all damages because of "Property Damage";

3) Under Personal and Advertising Injury Liability Coverage, to all damages sustained by any one person because of "Personal and Advertising Injury".

4) Under Bodily Injury Liability, Property Damage Liability, and Personal and Advertising Injury Liability Coverages Combined, to all damages sustained by any one person because of:

   a) "Bodily Injury";

   b) "Property Damage";

   c) "Personal and Advertising Injury".

3. The terms of this insurance, including those with respect to:

   a) Our right and duty to defend any "suits" seeking those damages; and

   b) Your duties in the event of any "occurrence", claim, or "suit"

   apply irrespective of the application of the deductible amount.

4. We may pay any part of all of the deductible amount to effect settlement of any claims or "suit" and upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

5. When used in this endorsement, damages includes any payments made under the Supplementary Payments provisions of this policy.

6. If you do not promptly reimburse us for any deductible amount owned, then any cost incurred by us in collection of the deductible amount will be added and applied in addition to the applicable deductible amount without limitation.  These costs include, but are not limited to, collection agency fees, attorney's fees and interest.

All other terms and conditions of this policy remain unchanged.

RSG 94016 0916

Landmark v. Nurselect MSJ_00000134

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – CORRECTIONAL MEDICINE

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD**

In consideration of the premium charged, it is agreed no coverage shall apply under this policy to any **Claim** and/or **Claim Expenses** based upon, arising out of, or in any way involving the rendering of or failure to render services of a professional nature, including healthcare services and medical services, by the Insured or by any person or organization for whose acts, errors or omissions the Insured is legally responsible, in a correctional facility or center, detention center, jail, penal institution, prison, remand center, reformatory, or any similar center, facility, or institution.

All other terms and conditions of this policy remain unchanged.

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to      NURSELECT LLC
by      Landmark American Insurance Company

Endorsement No.:      06

RSG 56203 0321

Landmark v. Nurselect MSJ_00000135

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy. Please Read It Carefully.*

# EXCLUSION – DESIGNATED PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

SCHEDULE

| **Description Of Professional Services:** |
|---|
| ALLIED HEALTHCARE STAFFING AGENCY |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any professional services shown in the Schedule, the following exclusion is added to Paragraph **2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability**:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" due to the rendering of or failure to render any professional service.

All other terms and conditions of this policy remain unchanged.

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to      NURSELECT LLC
by      Landmark American Insurance Company

Endorsement No.:      07

RSG 56114 1118

Landmark v. Nurselect MSJ_00000136

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# HIRED AND NON-OWNED AUTO LIABILITY

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

In consideration of an additional premium of $Included, it is hereby understood and agreed that the policy is amended as follows:

**A.** The declarations page is amended to include the following under **Commercial General Liability** in the **LIMITS OF INSURANCE** section:

| $1,000,000 | Hired Auto and Non-Owned Auto Liability Each Occurrence |
|---|---|
| $1,000,000 | Hired Auto and Non-Owned Auto Liability Aggregate |

**B.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A.** applies, **SECTION II – WHO IS AN INSURED** is deleted and replaced with the following:

**1.** Each of the following is an insured to the extent set forth below.

    **a.** You.

    **b.** Any other person using a "hired auto" with your permission.

    **c.** With respect to a "non-owned auto", any partner or "executive officer" of yours, but only while such "non-owned auto" is being used in your business.

    **d.** Any other person or organization, but only with respect to their liability because of acts or omissions of an insured under paragraphs **a.**, **b.** or **c.** above.

**2.** None of the following is an insured:

    **a.** Any partner or "executive officer" with respect to any "auto" owned by such partner or officer or a member of his or her household;

    **b.** The owner or lessee (of whom you are a sub-lessee) of a "hired auto" or the owner of a "non-owned auto" or any agent or "employee" of any such owner or lessee; or

    **c.** Any person or organization with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**C.** **SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, is amended by the addition of the following:

Hired Auto and Non-Owned Auto Liability:  The insurance provided under **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, shall apply to "bodily injury" and "property damage" arising out of the:

**1.** maintenance or use of a "hired auto" by you or your "employees" in the course of your business; or

**2.** use of a "non-owned auto" by any person other than you in the course of your business.

**D.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, the definition of "insured contract" in **SECTION VI – DEFINITIONS**, is deleted and replaced with the following:

This endorsement effective     3/1/2023
Forms part of Policy Number     LHC801468
Issued to     NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:     08

RSG 54105 0713

Page 1 of 2

Landmark v. Nurselect MSJ_00000137

"Insured contract" means that part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

**E.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, **SECTION V – DEFINITIONS** is amended by the addition of the following:

"Hired auto" means any "auto" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent, or borrow from any of your "employees", your partners, your "executive officers", or "volunteer workers", or members of their households.

"Non-owned auto" means any "auto" you do not own, lease, hire, rent or borrow which is used in connection with your business. This includes "autos" owned by your "employees", your partners, your "executive officers", or "volunteer workers", or members of their households, but only while used in your business.

**F.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, subparagraph **g.** of paragraph **2.**, **Exclusions** of **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** (Section I – Coverages) is deleted and replaced as follows:

**g.** any "claim" based upon or arising out of "bodily injury" or "property damage" arising out of the ownership, maintenance, operation, use or entrustment to others or loading or unloading of:

**(1)** any aircraft or watercraft owned or operated by or rented or loaned to any Insured; or

**(2)** any other aircraft or watercraft operated by any person in the course of his/her employment or activities on behalf of the Named Insured.

**G.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, subparagraph **j.** of paragraph **2.**, **Exclusions** of **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** (Section I – Coverages) is deleted and replaced as follows:

**j.** any "claim" based upon or arising out of "property damage" to:

**(1)** property owned or being transported by or rented or loaned to the Insured; or

**(2)** property in the care, custody or control of the Insured.

**H.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, subparagraph **c.** of paragraph **2.**, **EXCLUSIONS OF COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** (Section I – coverages) is deleted.

**I.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, **SECTION III – LIMITS OF INSURANCE** is amended by the addition of the following:

The Hired Auto and Non-Owned Auto Liability Each Occurrence limit shown in paragraph **A.** of this endorsement is the most we will pay for damages because of all "bodily injury" and "property damage" with respect to Hired Auto and Non-Owned Auto Liability arising out of any one "occurrence".

The Hired Auto and Non-Owned Auto Liability Aggregate limit shown in paragraph **A.** of this endorsement is the most we will pay because of all "bodily injury" and "property damage" with respect to all Hired Auto and Non-Owned Auto Liability.

**J.** Paragraph **2.** of **SECTION III – LIMITS OF INSURANCE** is deleted and replaced by the following:

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A** including Hired Auto and Non-Owned Auto Liability, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**b.** Damages under Coverage **B**.

**K.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, paragraph **4. Other Insurance** in **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS** is deleted and replaced with the following:

This insurance is excess over any primary insurance covering any "hired auto" or any "non-owned auto".

---

RSG 54105 0713

Landmark v. Nurselect MSJ_00000138

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# MINIMUM RETAINED PREMIUM

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

In the event of cancellation of this policy by the Insured, return premium shall be computed at .90 of the pro rata unearned policy premium, subject however to a retention by the company of not less than $5,625.00.

Nothing in this endorsement is deemed to affect the Company's cancellation rights which remain as indicated in the coverage form.

It is further agreed that return premium may be allowed on a pro rata basis if cancelled for non payment of premium or deductible, subject however to retention by the company of the minimum retained premium as shown above.

All other terms and conditions of this policy remain unchanged.

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to      NURSELECT LLC
by      Landmark American Insurance Company

Endorsement No.:      09

RSG 54025 0405

Landmark v. Nurselect MSJ_00000139

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# NUCLEAR ENERGY LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

**This policy does not apply;**

**a.   Under any Liability Coverage,** to bodily injury or property damage;

(1)   with respect to which an Insured under the policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, or Nuclear Insurance Associates of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2)   resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization;

**b.   Under any Medical Payments Coverage** or any Supplemental Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization;

**c.   Under any Liability Coverage** to bodily injury or property damage resulting from the hazardous properties of nuclear material, if:

(1)   the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an insured, or (b) has been discharged or dispersed therefrom;

(2)   the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(3)   the bodily injury or property damage arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion (3) applies only to property damage to such nuclear facility and any property thereat;

**d.   As used in this Endorsement:**

(1)   "Hazardous properties" include radioactive, toxic, or explosive properties;

(2)   "Nuclear material" means source material, special nuclear material or byproduct material;

(3)   "Source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

(4)   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor,

This endorsement effective       3/1/2023
Forms part of Policy Number     LHC801468
Issued to       NURSELECT LLC
by      Landmark American Insurance Company

Endorsement No.:       10

Landmark v. Nurselect MSJ_00000140

(5) "Waste" means any waste material (a) containing byproduct material and (b) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (6), (a) or (b) thereof;

(6) "Nuclear facility" means:

(a) any nuclear reactor;

(b) any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing spent fuel, or (iii) handling, processing, or packaging waste;

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste; and includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations;

(7) "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

(8) "Property damage" includes all forms of radioactive contamination of property.

All other terms and conditions of this policy remain unchanged.

Landmark v. Nurselect MSJ_00000141

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# OPIOID AND CONTROLLED SUBSTANCE EXCLUSION

This endorsement modifies insurance provided under the following:

### All Coverages without Limitation

In consideration of the premium charged, it is agreed that this Policy will not be triggered or apply and will provide no coverage for indemnity, defense, supplemental or any other exposure where **Claims**, suits, occurrences or demands of any sort, without limitation, against any Insured are:

1. Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

   a. Any actual or alleged abuse, misuse, illicit use, overuse, addiction, dependency, unlawful distribution, or diversion of any **Controlled Substance**;

   b. Any supervision, instruction, training, education, recommendation, or guideline given, or which should have been given, in connection with any **Controlled Substance**; or

   c. Inadequate or inaccurate evaluation, control or reporting of, or the failure to evaluate, control or report, the conduct or suspected conduct described in paragraph **1.a.** above.

2. Brought by or on behalf of any state, municipality or other governmental entity or agency seeking damages, fines, penalties or any other type of relief, whether monetary or not, arising from or in any way related to any Insured manufacturing, selling, distributing, or dispensing **Controlled Substances**.

For the purposes of this exclusion, **Controlled Substances** shall mean:

a. any opioid or narcotic drug, narcotic medication, or narcotic substance of any type, nature or kind, including, but not limited to, buprenorphine, codeine, fentanyl, hydrocodone, morphine, oxymorphone, tapentadol, oxycontin, hydromorphone, medperidine, methadone, oxycodone, or naloxone;

b. any substance that is a controlled substance defined by or included in the Schedules of the Controlled Substance Act of the United States of America (21 U.S.C. § 801 et seq.) or any other judicial, statutory, regulatory or other legal measure of any nation, province, state, municipality or other governmental division or subdivision; or

c. any substance that is in the future labelled or determined to be any of the substances described in **a.** or **b.** of this definition.

This exclusion applies even if the **Claims** or suits against any Insured allege negligence, including but not limited to negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by any Insured.

This exclusion also applies to any **Claim** or suit by or on behalf of any individual or entity seeking certification at any time as a class action, whether or not such action is actually certified, arising from or in any way related to any Insured manufacturing, selling, distributing, or dispensing **Controlled Substances**.

However, this exclusion shall not apply to any **Claim** by or on behalf of a patient, arising out of an actual or alleged negligent act, error or omission by the Insured in the prescribing, administering, or dispensing of a **Controlled Substance** for its intended use, or in providing counseling or treatment related to any **Controlled Substance**.

All other terms and conditions of this policy remain unchanged.

This endorsement effective      3/1/2023
Forms part of Policy Number    LHC801468
Issued to     NURSELECT LLC
by    Landmark American Insurance Company

Endorsement No.:      11

RSG 56191 0421

Landmark v. Nurselect MSJ_00000142

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# PENNSYLVANIA – NOTICE OF CANCELLATION AND NON-RENEWAL AMENDMENT

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

**The Notice of Cancellation and non-renewal clause as contained in this policy is deleted and replaced as follows:**

The Named Insured may cancel this policy by mailing or delivering to the Company advance notice of cancellation.

The Company may cancel this policy by:

A.  CANCELLATION OF POLICIES IN EFFECT FOR  SIXTY (60) DAYS OR LESS:

   If this policy has been in effect for sixty (60) days or less, the Company may cancel this policy for any reason, by mailing thirty (30) days advance notice of cancellation to the Named Insured.

B.  CANCELLATION OF POLICIES IN EFFECT FOR MORE THAN SIXTY (60) DAYS:

   If this policy has been in effect more than sixty (60) days or more, or is a renewal policy to Landmark American Insurance Company, the Company may cancel this policy only for one or more of the following reasons by mailing the following number of day advance notice to the Named Insured:

| REASON FOR CANCELLATION | NUMBER OF DAYS ADVANCE NOTICE TO BE PROVIDED NAMED INSURED |
|---|---|
| Non-payment of premium (failure to pay a premium when due) | Fifteen (15) days |
| If the Named Insured makes a material misrepresentation that effects the insurability of risk | Fifteen (15) days |
| A substantial change in the risk covered by this policy | Sixty (60 days |
| If the Company loses its reinsurance for this policy | Sixty (60) days |
| If the Named Insured does not comply with policy terms, conditions or duties | Sixty (60) days |
| Any other reason approved the by Insurance Commissioner | Sixty (60) days |

> **This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions, or concealment of facts material to the acceptance of the risk or to the hazard assumed by the Company**

C.  NOTICE OF NON-RENEWAL:

   In the event that the Company decides to non-renew this policy, The Company will mail at least sixty (60)

This endorsement effective     3/1/2023
Forms part of Policy Number    LHC801468
Issued to      NURSELECT LLC
by    Landmark American Insurance Company

Endorsement No.:      12

Landmark v. Nurselect MSJ_00000143

days advance written notice of non-renewal to the Named Insured.

D.  NOTICE OF INCREASE IN PREMIUM – RENEWAL:

If the Company offers renewal terms with an increase in premium, the Company will provide the Named Insured with thirty (30) days advance notice.

The cancellation or non-renewal notice will be mailed via registered or first class mail to the Named Insured at the mailing address stated in the Declarations.  The cancellation or non-renewal notice will state the effective date of the cancellation as well as the reason(s) for cancellation or non-renewal and the policy will terminate on that date.

If coverage is cancelled by the Company, the earned premium shall be computed pro-rata.  If coverage is cancelled by the Insured, the earned premium shall be computed short rate.

All other terms and conditions of this policy remain unchanged.

Landmark v. Nurselect MSJ_00000144

# *IMPORTANT NOTICE*

## PENNSYLVANIA SURPLUS LINES DISCLOSURE NOTICE

**The insurer which has issued this insurance is not licensed by the Pennsylvania Insurance Department and is subject to limited regulation. This insurance is NOT covered by the Pennsylvania Insurance Guaranty Association.**

RSG 99091 0106

Landmark v. Nurselect MSJ_00000145

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# SERVICE OF SUIT

This endorsement modifies insurance provided under the following:

**ALL COVERAGE PARTS**

In the event of our failure to pay any amount claimed to be due, we, at your request, will submit to the jurisdiction of any court of competent jurisdiction within the United States of America.  Nothing in this condition constitutes or should be understood to constitute a waiver of our rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court or seek a transfer of a case to another Court as permitted by the laws of the United States or of any state in the United States, moreover, this endorsement is not an agreement that the law of a particular jurisdiction applies to any dispute under the policy.

Service of process in such suit may be made upon the Senior Claims Officer of RSUI Group, Inc. 945 East Paces Ferry Road, Suite 1800, Atlanta, GA  30326-1160, or his designee. In any suit instituted against any one of them upon this contract, we will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above named is authorized and directed to accept service of process on our behalf in any such suit and/or upon your request to give a written undertaking to you that we will enter a general appearance upon our behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States of America, which makes provision therefore, we hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for the purpose in the statute, or his successor or successors in office, as our true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by you or on your behalf or any beneficiary hereunder arising out of  this contract of insurance, and we hereby designate the above named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

All other terms and conditions of the policy remain unchanged

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to      NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:      14

RSG 94022 0407

Landmark v. Nurselect MSJ_00000146

LANDMARK AMERICAN INSURANCE COMPANY

# State Fraud Statements

(Signature Required for New York Only)

### ARKANSAS, LOUISIANA, RHODE ISLAND, TEXAS AND WEST VIRGINIA FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

### ALASKA FRAUD STATEMENT

A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

### ALABAMA FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

### ARIZONA FRAUD STATEMENT

For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

### CALIFORNIA FRAUD STATEMENT

For your protection, California law requires that you be made aware of the following: Any person who knowingly presents false or fraudulent information to obtain or amend insurance coverage or to make a claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

### COLORADO FRAUD STATEMENT

It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance within the department of regulatory agencies.

### DELAWARE FRAUD STATEMENT

Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

### DISTRICT OF COLUMBIA FRAUD STATEMENT

**WARNING:** It is a crime to provide false, or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

### FLORIDA FRAUD STATEMENT

Any person who knowingly and with intent to injure, defraud or deceive any insurer, files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

A member of Alleghany Insurance Holdings LLC

Landmark v. Nurselect MSJ_00000147

## HAWAII FRAUD STATEMENT

For your protection, Hawaii law requires you to be informed that any person who presents a fraudulent claim for payment of a loss or benefit is guilty of a crime punishable by fines or imprisonment, or both.

## IDAHO FRAUD STATEMENT

Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

## INDIANA FRAUD STATEMENT

Any person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

## KANSAS FRAUD STATEMENT

An act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto.

## KENTUCKY FRAUD STATEMENT

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

## MAINE FRAUD STATEMENT

It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

## MARYLAND FRAUD STATEMENT

Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

## MINNESOTA FRAUD STATEMENT

Any person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

## NEW HAMPSHIRE FRAUD STATEMENT

Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

## NEW JERSEY FRAUD STATEMENT

Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

RSG 99022 1022

Landmark v. Nurselect MSJ_00000148

### NEW MEXICO FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

### OHIO FRAUD STATEMENT

Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

### OKLAHOMA FRAUD STATEMENT

**WARNING:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

### OREGON FRAUD STATEMENT

Any person who knowingly files a claim containing a false or deceptive statement for payment of a loss or benefit or knowingly presents materially false information in an application for insurance may be guilty of a crime and may be subject to fines and confinement in prison.

### PENNSYLVANIA FRAUD STATEMENT

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

### PUERTO RICO FRAUD STATEMENT

Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances be present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

### TENNESSEE, VIRGINIA, AND WASHINGTON FRAUD STATEMENT

It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

A member of Alleghany Insurance Holdings LLC
Landmark v. Nurselect MSJ_00000149

**SIGNATURE REQUIRED – NEW YORK ONLY**

**NEW YORK FRAUD STATEMENT**

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

| LHC801468 | NURSELECT LLC |
|---|---|
| Policy Number | Insured/Applicant/Claimant (Legal Entity) |

_____
By (Authorized Representative) - Printed Name

_____
By (Authorized Representative) - Signature

_____
Title

_____
Date

Landmark v. Nurselect MSJ_00000150

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# SUPPLEMENTARY COVERAGES ENDORSEMENT

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD**

In consideration of the premium charged, it is agreed that:

1. **Part I. Insuring Agreements, H. Supplementary Coverages** is amended to include:

   1. The Company will pay **Damages** or **Claims Expenses** as a result of **Claims** arising out of an insured's professional services performed during the rendering of emergency medical treatment without remuneration, at the scene of an accident, medical crisis or disaster.  This coverage is subject to a sub-Limit of Liability in an aggregate amount of $25,000.  There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

   2. The Company will reimburse the Insured for **Evacuation Expenses** actually incurred in connection with an **Evacuation** which first takes place during the **Policy Period** and which is reported to the Company as soon as practicable, but in no event later than thirty (30) days after you first incur **Evacuation Expenses** for which coverage will be requested.  You are not required to obtain the Company's prior written approval or consent before incurring any **Evacuation Expenses**.

      This coverage is subject to a sub-Limit of Liability in an aggregate amount of $25,000.  There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

      No coverage will be available for **Evacuation Expenses** arising out of any:

      a. strike or bomb threat, unless the **Evacuation** was ordered by a civil authority;

      b. false fire alarm or planned evacuation drill;

      c. vacating of one or more residents because of their individual medical condition;

      d. nuclear reaction, radiation, or any radioactive contamination, however caused;

      e. seizure or destruction of property by order of a governmental authority, provided that this exclusion shall not apply to an order of evacuation by a governmental authority due to a condition described above; or

      f. war, including undeclared or civil war, warlike action by a military force, insurrection, rebellion, or revolution.

   3. The Company will pay up to $500 for loss that is due to **Property Damage** to your patient's tangible property if resulting directly from or during the performance of professional services as described in the Declarations.  The Company will make these payments regardless of fault.  These payments will not exceed $5,000 for all such losses resulting from all professional services, regardless of the number of patients whose tangible property is injured.  There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

   4. The Company will reimburse the Insured for **Legal/Media Expenses** actually incurred in connection with a **Legal Defense Proceeding** first brought against an Insured and reported during the **Policy Period** that occurred after the Policy's **Retroactive Date** and that arises out of the Insured's performance of professional services as described in the Declarations.

This endorsement effective     3/1/2023
Forms part of Policy Number     LHC801468
Issued to      NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:     16

Landmark v. Nurselect MSJ_00000151

This coverage is subject to a sub-Limit of Liability in an aggregate amount of $25,000. There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

2. The following Definitions are in addition to Policy Definitions contained in **Part III.** and apply only to this endorsement:

    **A.** **Evacuation** means the removal of all or the majority of patients from one or more of your locations or facilities in response to an actual or threatened, natural or man-made condition that is unexpected and unforeseen and causes the patients of such location or facility to be in imminent danger of loss of life or physical harm.

    Such condition must be in the form of an emergency or sudden crisis requiring immediate action, and not the result of a latent or hidden condition at the location or facility.

    **B.** **Evacuation Expenses** means reasonable costs and expenses actually incurred by you in connection with the **Evacuation**, including the costs associated with transporting and lodging patients who have been evacuated. **Evacuation Expenses** shall not include any remuneration, salaries, overhead, fees, or benefit expenses of the Named Insured or any Insured.

    **C.** **Property Damage** means:

        **1.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

        **2.** Loss of use of tangible property of others that is not physically injured. All such loss of use shall be deemed to occur at the time of the accident, including continuous or repeated exposure to substantially the same general harmful conditions that caused it.

    For the purposes of this coverage, electronic data is not tangible property.

    As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

    **D.** **Legal Defense Proceeding** means:

        **1.** A hearing or disciplinary action against an Insured before a state or other licensing board or governmental regulatory body;

        **2.** A civil or criminal proceeding in which the Insured is not a defendant but has been ordered to offer deposition testimony regarding treatment rendered to a patient;

        **3.** A civil or criminal proceeding in which the Insured is not a party but has received a subpoena for record production regarding treatment rendered to a patient; or

        **4.** A HIPAA proceeding.

    **E.** **Legal/Media Expenses** means reasonable fees and costs of attorneys, experts and consultants incurred by the Insured in the investigation and defense of a **Legal Defense Proceeding**. **Legal/Media Expenses** also includes reasonable costs incurred by the Insured in the management of public relations with respect to a **Legal Defense Proceeding**, including reasonable fees and costs of third-party media consultants. Solely with respect to a HIPAA proceeding, **Legal/Media Expenses** shall include civil fines and penalties resulting from any HIPAA proceeding. **Legal/Media Expenses** shall not include any remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of an Insured.

All other terms and conditions of this policy remain unchanged.

Landmark v. Nurselect MSJ_00000152

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# VIOLATION OF CONSUMER PROTECTION LAWS EXCLUSION

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

This insurance does not apply to any **Claim** based upon or arising directly, or indirectly, out of any actual or alleged violation of any federal, state or local consumer protection law(s), statute, ordinance or regulation including, but not limited to, the following:

1. The False Claims Act (FCA), including any amendment of or addition to such law;

2. The Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank), including any amendment of or addition to such law;

3. The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA);

4. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

5. The Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (CAN-SPAM Act), including any amendment of or addition to such law;

6. That addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information;

7. Any communication, distribution, publication, sending or transmission via telephone, telephone facsimile machine, computer or other telephonic or electronic devices, including claims asserted under the common law;

8. **Claims** brought by any state or federal government agency, or any person or entity on their behalf, including qui tam **claims**, seeking to enforce any consumer protection law; or

9. Actual or alleged violation of any laws, regulations or guidelines relating to the accessibility of the Insured's website.

10. Any biometric privacy law or any such similar law or statute anywhere in the world that governs or relates to the collection, use, safeguarding, handling, storage, retention or destruction of biometric identifiers, biometric data or biometric information of any kind, including but not limited to retina or iris scans, fingerprints, voiceprints, or scans of hand or face geometry.

All other terms and conditions of this policy remain unchanged.

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to      NURSELECT LLC
by      Landmark American Insurance Company

Endorsement No.:      17

RSG 56121 0822

Landmark v. Nurselect MSJ_00000153

| | |
|---|---|
| **RSUI Group, Inc.**<br>945 East Paces Ferry Road, Suite 1800<br>Atlanta, GA 30326-1160 | **HOME HEALTH CARE, NURSE REGISTRY, INFUSION THERAPY OR OTHER MEDICAL STAFFING SUPPLEMENTAL APPLICATION** |

1. Name of Applicant: _____

2. Type of Firm (check all that apply):  ☐ Home Health Care   ☐ Infusion Therapy   ☐ Visiting Nurse Agency

   ☐ Nurse Registry   ☐ Other Medical Staffing (specify): _____

3. Date Established: _____

4. Location(s) where services are provided (total must be 100%)   _____% Home   _____% Hospice

   _____% Nursing Home   _____%Assisted Living Facility   _____% Hospital   _____%Clinic/Doctors Office

   _____% Adult Day Care   _____% Correctional Facility   _____% Other Facility (specify):

5. Do you provide any of the following services:

   Pediatric Care? Describe: _____   Yes ☐   No ☐

   Pediatric Ventilator/Trach Care? Describe: _____   Yes ☐   No ☐

   Live-In Care? Describe: _____   Yes ☐   No ☐

6. Employees/Independent Contractors – Annual Staffing:

| Type of Employee/Independent Contractor | No. Full-Time | No. Part-Time | Billable hours Per Year |
|---|---|---|---|
| Employed Registered Nurse | _____ | _____ | _____ |
| Contracted Registered Nurse | _____ | _____ | _____ |
| Employed Licensed Practical Nurse | _____ | _____ | _____ |
| Contracted Licensed Practical Nurse | _____ | _____ | _____ |
| Employed Certified Nurse Assistant | _____ | _____ | _____ |
| Contracted Certified Nurse Assistant | _____ | _____ | _____ |
| Employed Nurse Practitioner/Physician Assistant | _____ | _____ | _____ |
| Contracted Nurse Practitioner/Physician Assistant | _____ | _____ | _____ |
| Employed Companion/Home Health Aide | _____ | _____ | _____ |
| Contracted Companion/Home Health Aide | _____ | _____ | _____ |
| Employed Social Worker | _____ | _____ | _____ |
| Contracted Social Worker | _____ | _____ | _____ |
| Employed Physical Therapist | _____ | _____ | _____ |
| Contracted Physical Therapist | _____ | _____ | _____ |
| Employed Other Medical (specify) | _____ | _____ | _____ |
| Contracted Other Medical (specify) | _____ | _____ | _____ |

7. Please provide a copy of the applicant's credentialing procedures and background check procedures.

8. Are drug, alcohol and sexual abuse screening or testing conducted? (Please provide full details)   Yes ☐   No ☐

Landmark v. Nurselect MSJ_00000154

9.   Are criminal background checks conducted in all states? (Please provide full details)     Yes ☐     No ☐

10.  Anticipated payroll amount for the next 12 months: _____

11.  Does the Applicant warrant that all employed and contracted physicians, surgeons and dentists     Yes ☐     No ☐

maintain their own medical malpractice professional liability insurance coverage and confirm with a certificate of insurance or

declarations page? If No, please provide details.


**REPRESENTATIONS**

I understand that the information submitted herein becomes a part of my professional liability application and is subject to the same warranty and conditions.

Must be signed and dated by an Owner, Partner or Principal as duly authorized on behalf of the Applicant.

_____

Signature of the Applicant                           Title                           Date

RSG 50062 0222                                                              Page 2 of 2

Landmark v. Nurselect MSJ_00000155

| RSUI Group, Inc.<br>945 East Paces Ferry Road, Suite 1800<br>Atlanta, GA  30326-1160 | RENEWAL APPLICATION FOR MISCELLANEOUS<br>MEDICAL PROFESSIONAL LIABILITY INSURANCE<br>(CLAIMS-MADE FORM) |
|---|---|

## General Applicant Information

1.  Name of Applicant:  _____

    _____

2.  Any changes in Address?        ☐ Yes  ☐ No (if yes, please complete the below)

    Principal Address:  _____

    _____

3.  City: _____  County: _____  State: _____  Zip Code: _____

    Website:  _____

## Applicant Practice

4.  Any change in the applicant's professional activities for which coverage is desired? (if yes, please describe below)  ☐ Yes  ☐ No

    _____

    _____

5.    Does the Applicant provide any Correctional Medicine Services?                                 ☐ Yes  ☐ No

6.  In what states is the Applicant registered and licensed to practice?  _____

    _____

7.  During the past 12 months, has the applicant acquired or been acquired by another company?  ☐ Yes  ☐ No
    If yes please describe below

    _____

    _____

8.  State sources and amounts of total revenue:

| Source | Amount Last Policy Year | This Policy Year |
|---|---|---|
| a. Charitable Contributions | $ _____ | $ _____ |
| b. Government Funding | $ _____ | $ _____ |
| c. Fee for Services | $ _____ | $ _____ |
| d. _____ | $ _____ | $ _____ |
| e. _____ | $ _____ | $ _____ |
| TOTAL GROSS REVENUE: | $ _____ | $ _____ |

9.  Number of patient encounters last 12 months (_____) and/or patient tests carried out (_____).
    (NOTE: "Patient encounters" refers to number of *visits* – not number of patients.)

10.  Number of estimated patient encounters the next 12 months (_____) and/or patient tests carried out (_____).
    (NOTE: "Patient encounters" refers to number of *visits* – not number of patients.)

RSG 50090 0222                                                                 Page 1 of 3

Landmark v. Nurselect MSJ_00000156

11. If applicant has a training school, complete the following.

| Specify profession for which students are being trained | Max No. of students per session | No. of sessions per year | % of time involved in clinical setting | Number of students | Qualifications of faculty (eg. MD, RN, PhD) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

12. List the number and type of employees, volunteers or independent contractors, their billable hours, and whether or not they carry individual medical malpractice coverage for their services on behalf of the entity.

| | Employees | Volunteers | Independent Contractors | Billable Hours | Insured on own Med Mal Policy |
|---|---|---|---|---|---|
| Aestheticians | | | | | ☐ Yes ☐ No |
| Chiropractors | | | | | ☐ Yes ☐ No |
| Dieticians | | | | | ☐ Yes ☐ No |
| EMT's | | | | | ☐ Yes ☐ No |
| Laboratory Technicians | | | | | ☐ Yes ☐ No |
| Nurse, Aides | | | | | ☐ Yes ☐ No |
| Nurse Anesthetists | | | | | ☐ Yes ☐ No |
| Nurses, Licensed Practical | | | | | ☐ Yes ☐ No |
| Nurse Midwives | | | | | ☐ Yes ☐ No |
| Nurse Practitioner | | | | | ☐ Yes ☐ No |
| Nurse, Registered | | | | | ☐ Yes ☐ No |
| Opticians | | | | | ☐ Yes ☐ No |
| Optometrists | | | | | ☐ Yes ☐ No |
| Paramedics | | | | | ☐ Yes ☐ No |
| Perfusionists | | | | | ☐ Yes ☐ No |
| Pharmacists | | | | | ☐ Yes ☐ No |
| Pharmacy Technicians | | | | | ☐ Yes ☐ No |
| Physical/Occupational/Speech Therapists | | | | | ☐ Yes ☐ No |
| Physical/Occupational/Speech Therapist Assistants | | | | | ☐ Yes ☐ No |
| Physician's Assistants | | | | | ☐ Yes ☐ No |
| Physicians – Minor Surgery | | | | | ☐ Yes ☐ No |
| Physicians – No Surgery | | | | | ☐ Yes ☐ No |
| Psychologists | | | | | ☐ Yes ☐ No |
| Respiratory Therapists | | | | | ☐ Yes ☐ No |
| Social Workers | | | | | ☐ Yes ☐ No |
| Other: _____ | | | | | ☐ Yes ☐ No |

RSG 50090 0222

Landmark v. Nurselect MSJ_00000157

13. Does the applicant maintain any beds for overnight occupancy? (If yes, total number): _____

   What is the average length of stay? _____

14. Does the Applicant warrant that all employed and contracted physicians, surgeons and dentists maintain
    their own medical malpractice professional liability insurance coverage and confirm with a certificate of
    insurance or declarations page?                                                      ☐ Yes ☐ No
    If no, please attached explanation.

## Applicant History

15. Is the applicant currently insured under a Commercial General Liability Policy?      ☐ Yes ☐ No
    If yes, please give details:

| Insurance Company | Type of Coverage | Limits BI | Limits PD | From | To |
|---|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ | _____ |

16. In the past twelve (12) months, has any professional liability claim or suit been made against the Applicant or any of
    its predecessor firms? Please complete the **Claim Supplement** and provide currently valued company loss runs   ☐ Yes ☐ No
    If "Yes", how many? _____

17. Have all matters in Question 15. been reported to RSUI or to the Applicant's former or current insurer(s) or to the former
    Insurer of any predecessor firm or former insurer of a current member of the Firm?   ☐ Yes ☐ No

18. Has any principal, owner, partner or employee for whom coverage is sought been the subject of a disciplinary complaint
    made to any court, administrative agency or regulatory body? (If "yes", provide full details and documentation)   ☐ Yes ☐ No

## Representations

The Applicant declares that the above statement and representations are true and correct, and that no facts have been suppressed or misstated. All written statements and materials furnished to the Company, in conjunction with this application will be incorporated by reference into this application and made part hereof.

This application does not bind the Applicant to buy, or the Company to issue the insurance, but it is agreed that this form shall be the basis of the contract should a policy be issued, and it will be attached to and made part of the policy. The undersigned Applicant declares that if the information supplied on this application changes between the dates of this application and the time when the policy is issued, the Applicant will immediately notify the company of such changes, and the Company may withdraw or modify any outstanding quotations and/or authorization or agreement to bind the insurance.

_____      _____    _____
Signature of the Insured, Owner, Partner or Principal            Title                          Date

_____
Producer

RSG 50090 0222                                                                    Page 3 of 3

Landmark v. Nurselect MSJ_00000158

Your policy has been signed on our behalf by our President and by our Secretary.  However, your policy will not be binding on us unless it is also countersigned by one of our duly authorized agents.

President

**RSUI Indemnity Company**
**Landmark American Insurance Company**
**Covington Specialty Insurance Company**

Secretary

**RSUI Indemnity Company**
**Landmark American Insurance Company**
**Covington Specialty Insurance Company**

A member of Alleghany Insurance Holdings LLC

Landmark v. Nurselect MSJ_00000160

# EXHIBIT D

# Wilson, Zach

**From:**            David Shelly <dshelly@nurselectstaffing.com>
**Sent:**            Wednesday, September 13, 2023 4:10:23 PM
**To:**              Wilson, Zach <zwilson@rsui.com>;Anthony Viola <anthonyviola@libertyins.com>
**Cc:**              Steve Pcsolar <stevepcsolar@libertyins.com>
**Subject:**         Re: Claim # 7030187058 Nurse Select Staffing


Hi Zach,

The email was only discovered after receiving the complaint yesterday - during a search of the employee's name to pull all email correspondences together. The email was previously unread.


Sincerely,

David Shelly, President
NurSelect, LLC
1829 New Holland Road
Suite 13
Reading, PA 19607
Tel. (800) 484-8572
Fax (484) 214-0055
www.nurselectstaffing.com



Disclaimer: The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

**From:** Wilson, Zach <zwilson@rsui.com>
**Sent:** Wednesday, September 13, 2023 3:57 PM
**To:** David Shelly <dshelly@nurselectstaffing.com>; Anthony Viola <anthonyviola@libertyins.com>
**Cc:** Steve Pcsolar <stevepcsolar@libertyins.com>
**Subject:** RE: Claim # 7030187058 Nurse Select Staffing


Thank you David.

I see that the mailing address on the 1/12/23 letter is incorrect, but your email address appears correct. Was it sent to your email at that time? Is there a particular reason it was not discovered until yesterday?


Zach Wilson
Chief Claims Specialist
Professional Liability Claims
RSUI Group, Inc.

Landmark v. Nurselect MSJ_00000163

M: 470-487-6009
zwilson@rsui.com

---

**From:** David Shelly <dshelly@nurselectstaffing.com>
**Sent:** Wednesday, September 13, 2023 1:39 PM
**To:** Wilson, Zach <zwilson@rsui.com>; Anthony Viola <anthonyviola@libertyins.com>
**Cc:** Steve Pcsolar <stevepcsolar@libertyins.com>
**Subject:** Re: Claim # 7030187058 Nurse Select Staffing

Hi Zach,

The complaint was served yesterday, September 12, 2023 around 10:30am. On the back of the complaint there is a date of 8/25/23 that says "writ re-issued" by the prothonotary and a date of 8/28/23 when it was received by the Sheriff Dept. of Lancaster County.

Ayanna McDowell was employed by NurSelect as a W2 employee at the time of the incident. She was terminated from our employment September of 2021 as a result of excessive absenteeism.

Prior communications were as follows:
October 14, 2022 - received a phone call from Kimberly Selemba (Saxton Stump) requesting Ayanna's contact information. (Provided this to her via email)

October 14,2022 - received email requesting Ayanna's statement regarding the incident (provided this to her via email).

They appear to have had the wrong mailing address for the notice of pending joinder dated Jan. 12, 2023. This was only discovered in my email after we received the official complaint yesterday.

I will send the above mentioned written correspondences in a separate email. Please let me know if you need anything else.

Sincerely,

David Shelly, President
NurSelect, LLC
1829 New Holland Road
Suite 13
Reading, PA 19607
Tel. (800) 484-8572
Fax (484) 214-0055
www.nurselectstaffing.com

Landmark v. Nurselect MSJ_00000164

# EXHIBIT E

Landmark v. Nurselect MSJ_00000165



KAUFMAN BORGEEST & RYAN LLP

300 SUMMIT LAKE DRIVE, VALHALLA, NY 10595
TEL 914.449.1000 • FAX 914.449.1100 • WWW.KBRLAW.COM

October 4, 2023

JOAN M. GILBRIDE
DIRECT: 212.994.6517
JGILBRIDE@KBRLAW.COM

BRIANA A. SEMENZA
DIRECT: 914.449.1011
BSEMENZA@KBRLAW.COM

<u>VIA EMAIL ONLY</u>

David Shelly
NurSelect LLC
1829 New Holland Road, Suite 13
Reading, Pa 19607
dshelly@nurseselectstaffing.com

| Re: | Named Insured | : | NurSelect LLC |
|---|---|---|---|
| | Matter | : | *Estate of Geraldine E. Wiggins* |
| | Policy No. | : | LHC801468 (March 1, 2023 to March 1, 2024) |
| | RSUI File No. | : | 7030187058 |
| | KBR File No. | : | 810.750 |

Dear Mr. Shelly:

This firm has been retained to advise and assist RSUI Indemnity Company ("RSUI), which is the authorized representative on behalf of Landmark American Insurance Company ("Landmark"). Landmark issued the above referenced Professional Liability Policy to NurSelect LLC ("NurSelect").

We are directing this letter to your attention as the representative of all Insureds under the captioned Policy with respect to insurance coverage matters. If you are not acting on behalf of the Insureds, please direct a copy of this letter to the appropriate party and advise us immediately of that party's identity. Please direct all future communications intended for Landmark with respect to coverage for these matters to the undersigned.

Landmark further acknowledges receipt of the above referenced third party complaint filed on June 13, 2023, in the Pennsylvania Court of Common Pleas, Lancaster County. The purpose of this letter is to explain the operation of the captioned policy in connection with this matter. As detailed below, and based on the information currently available to it, Landmark has determined that coverage is not available. The basis for Landmark's conclusion is detailed in this letter. To the extent the Insureds have additional information Landmark should consider, Landmark is willing to reevaluate its coverage determination.

NEW YORK            NEW JERSEY            CONNECTICUT            CALIFORNIA

9402374

Landmark v. Nurselect MSJ_00000166

*NurSelect LLC*
Page 2

Please be aware that nothing in this letter is intended to waive any rights Landmark may have under the Landmark Policy, at law or in equity, all of which are expressly reserved. If you have any questions about anything in this letter, we would be more than happy to respond to those questions to the best of our ability.

THE SUBMITTED MATTER

On January 12, 2023, counsel to Brethren Village Retirement Community sent a letter to NurSelect, LLC (via email and mail), advising that Brethren Village has been sued in the Court of Common Pleas related to the care and treatment of one of its residents, Geraldine Wiggins (the "Attorney Letter"). The Attorney Letter advises that Brethren Village is being sued for negligence arising out of a fall sustained by Ms. Wiggins on May 12, 2021, and that Brethren Village's investigation revealed that Ayanna McDowell, CNA, who was employed by NurSelect at the relevant time, had direct involvement in Ms. Wiggins' alleged fall. The Attorney Letter discusses the "Staffing Agreement" between Brethren Village and NurSelect, with specific reference to the agreement provision for "Apportionment of Liability and Damages Indemnification," which states:

> 5.1 <u>Apportionment of Liability</u>. It is hereby stipulated and agreed between the [Brethren Village] and NurSelect that with respect to any claim or action arising out of the Services, each entity shall only be liable for payment of that portion of any and all liability, costs, expenses, demands, settlements or judgments resulting from negligence, actions or omissions of its own agents, officers, and employees.

The Attorney Letter advises that based upon the foregoing provision, Brethren Village will be filing a joinder complaint against NurSelect to invoke NurSelect's contractual agreement to indemnify Brethren Village for the alleged negligence, actions, or omissions of Ms. McDowell related to the care and treatment of Ms. Wiggins. The Attorney Letter also advises NurSelect to provide notice of the pending joinder against NurSelect to its liability insurance provider so that counsel can be assigned to represent NurSelect's interests.

It is Landmark's understanding that NurSelect received the Attorney Letter via email on January 12, 2023.

On June 13, 2023, a joinder complaint was filed against NurSelect in the Pennsylvania Court of Common Pleas in Lancaster County, captioned *Brenda L. King, individually and as Administratrix of the Estate of Geraldine E. Wiggins, v. Rehabilitation Center at Brethren Village, LLC, Brethren Village, Brethren Village Realty, LLC, Lori Schoener, NHA, and John Does 1-4 v. NurSelect, LLC*, Case No. CI-22-04128 (the "Joinder Complaint").[1] The Joinder Complaint alleges the following three causes of action: (1) negligence, indemnification and contribution; (2) vicarious liability, indemnification, and contribution; and (3) contractual indemnification. The Joinder Complaint alleges that NurSelect is liable for common law and contractual indemnification and/or contribution, vicariously liable to Ms. Wiggins' estate, jointly and severally liable with Brethren Village, and liable over Brethren Village for claims asserted by Ms. Wiggins' estate and for injuries and damages alleged in originating complaint. The Joinder complaint also asserts that pursuant to the supplemental staffing agreement, NurSelect is contractually

---

[1] The fourth amended complaint (pre-joinder) alleges that Decedent Wiggins died on August 28, 2021, and that defendant Brethren Village acted negligently through its agents in the care and treatment of Ms. Wiggins beginning on April 13, 2021. On May 12, 2021, Ms. Wiggins was left alone despite the plan of care requiring assistance and records, and obtained a head injury when she fell, which allegedly led to her death.

KAUFMAN BORGEEST & RYAN LLP

9402374

obligated to indemnify and hold harmless Brethren Village for any liabilities, damages, and expenses resulting from the claims asserted by Ms. Wiggins' Estate.

It is Landmark's understanding that NurSelect was served with the Joinder Complaint and reported the Joinder Complaint to Landmark on September 12, 2023.

<u>THE POLICY</u>

Landmark issued its Professional Liability Policy No. LHC801468 to NurSelect LLC reflecting a Policy Period of March 1, 2023 to March 1, 2024 (the "Policy"). The Policy's General Liability Coverage Part is subject to a $1 million Limit of Liability per Claim and $3 million in the aggregate. The Policy's Commercial General Liability Coverage Part is subject to a $1 million Limit of Liability per Occurrence and $3 million in the aggregate.

Pursuant to the Cross Coverage Exclusion Endorsement, the Policy only affords coverage under either the General Liability Coverage part or the Professional Liability Coverage part, not both.

<u>COVERAGE DETERMINATION</u>

*Medical Professional Liability Coverage*

Part 1 of the Medical Professional Liability Coverage part provides the following:

> The Company will pay on behalf of the Insured, as shown in the Declarations, all sums that the Insured becomes legally obligated to pay as **Damages** and associated **Claim Expenses** arising out of a negligent act, error or omission, even if the **Claim** asserted is groundless, false or fraudulent, in the rendering of or failure to render professional services as described in the Business Description on the Declarations, provided that the:
>
> 1. **Claim** is first made against the Insured during the **Policy Period,** and reported to the Company no later than sixty (60) days after the end of the **Policy Period**;
> 2. Negligent act, error or omission took place in a covered territory;
> 3. Negligent act, error or omission took place after the **Retroactive Date** as shown in the Declarations.

Section III.C. of Medical Professional Liability Coverage part defines Claim to include a "Claim means a written demand for monetary or non-monetary relief received by the Insured during the Policy Period, including the service of suit, or the institution of an arbitration proceeding." The Attorney Letter qualifies as a Claim since the Attorney Letter states that Brethren Village intends to name the insured as a defendant in the suit, are seeking contractual indemnity (relief) and request NurSelect notify its insurance carrier. It is Landmark's understanding and Mr. Shelly has acknowledged that he received the Attorney Letter on January 12, 2023, via email, but he did not open the email. The Medical Professional Liability Coverage part requires that Claims be first made against the Insured during the March 1, 2023 to March 1, 2024 Policy Period. The Attorney Letter is a Claim made against the Insured that was first made on January 12, 2023, 48 days before the inception of the Policy Period, as it was received by the Insured on January 12, 2023.

Pursuant to Section C. of the Medical Professional Liability Coverage part, all "Claims arising out of a single negligent act, error or omission, or a series of related negligent acts, errors or omissions by one or more Insureds shall be treated as a single Claim for all purposes of this

KAUFMAN BORGEEST & RYAN LLP

9402374

Landmark v. Nurselect MSJ_00000168

*NurSelect LLC*
Page 4

policy." Section C also provides that all "Claims shall be deemed first made when the earliest of such Claims is first made, regardless of whether such date is before or during the Policy Period." The Joinder Complaint and the Attorney letter arise out of the same exact facts and allegations – the contractual indemnification and vicarious liability of NurSelect arising out of Ms. Wiggins' fall at Brethren Village. Accordingly, the Joinder Complaint and the Attorney Letter are a single Claim first made on January 12, 2023.[2] As such, coverage for the Submitted Matter is denied as a Claim first made prior to the inception of the Policy Period, failing to trigger the applicable Insuring Agreement.

The Professional Liability Coverage excludes coverage for any Claim or Claim Expenses based upon or arising out of:

> Any obligation or liability assumed by the Insured under any contract or any oral or written agreement, unless liability would have attached in the absence of such a contract or agreement, including the Insured's decision to unilaterally terminate or otherwise alter, remove or abridge any rights, benefits or obligations under any contract or agreement.

This exclusion also acts to wholly exclude coverage for the Submitted Matter based on the contract NurSelect has with Brethren Village.

Moreover, the Professional Liability Coverage part includes a Notice of Claim general condition that provides:

> The Insured must notify the Company *as soon as practicable* of an incident, occurrence or offense that may reasonably be expected to result in a **Claim**. Where notice to the Company of such incidents, occurrences or offenses has been acknowledged as adequate by the Company in writing, subsequent **Claims** derived from such incidents, occurrences or offenses will be deemed as first made at the time the incident, occurrence or offense giving rise to such **Claim** was first provided. *The Insured also must immediately send copies to the Company of any demands, notices, summonses or legal papers received in connection with any **Claim**, and must authorize the Company to obtain records and other information.*

It is Landmark's understanding that NurSelect was aware of the incident involving Ms. Wiggins as early as October 14, 2022, when Brethren Village's counsel requested Ayanna McDowell's contact information and requested Ms. McDowell's statement regarding the incident. NurSelect failed to notify Landmark as soon as practicable of the incident (in October 2022), and failed to immediately send a copy of the January 12, 2023 Attorney Letter to Landmark. As such, NurSelect failed to fulfill the foregoing condition of the Policy, resulting in another basis for a denial of coverage for the Submitted Matter.

*Commercial General Liability Coverage*

The General Liability Coverage A Insuring Agreement provides:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured

---

[2] The Attorney Letter and the Joinder Complaint will collectively be referred to herein as the "Submitted Matter".

KAUFMAN BORGEEST & RYAN LLP

Landmark v. Nurselect MSJ_00000169

against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle or defend any "claim" or "suit" that may result. But:

1.  The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and
2.  Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

Section 2. of the Commercial General Liability coverage part provides the following, in relevant part:

> This Insurance does not apply to:
>
> *        *        *
>
> **v. Prior Knowledge**
> Any alleged act, error, omission, or circumstance likely to give rise to a "claim" that an Insured had knowledge of prior to the effective date of this policy. This exclusion includes, but is not limited to any prior "claim" or possible "claim" referenced in the Insured's application.

Based on NurSelect's own admission, NurSelect was aware on October 14, 2022, of the "Occurrence" that occurred with Ms. Wiggins as it involved Ayanna McDowell (NurSelect's employee) because Ayanna McDowell's statement was requested, so NurSelect had prior knowledge of the incident and this possible claim. NurSelect also had prior knowledge of a "claim" when it received the January 12, 2023 Attorney Letter. Accordingly, coverage is wholly excluded under the Commercial General Liability part of the Policy based on the prior knowledge exclusion.

Section IV.2. of the Commercial General Liability conditions provides that in the event of occurrence, offense, claim or suit, the insured:

a.  [] must see to it that we are notified as soon as practicable of an "occurrence" or offense which may result in a "claim". To the extent possible, notice should include:
    1.  How, when and where the "occurrence" or offense took place;
    2.  The names and addresses of any injured persons and witnesses; and
    3.  The nature and location of any injury or damage arising out of the "occurrence" or offense.
b.  If a "claim" is made or "suit" is brought against any insured, you must:
    1.  Immediately record the specifics of the "claim" or "suit" and the date received; and
    2.  Notify us as soon as practicable.
    You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.
c.  You and any other involved insured must:
    1.  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or a "suit";…..

NurSelect failed to comply with its duties under Section IV.2. of the Commercial General Liability part of the Policy when it failed to immediately send Landmark a copy of the January 12, 2023 Attorney Letter, which provided notice of a "claim". It also appears that NurSelect should have advised Landmark of the occurrence, when it first learned of it on October 14, 2022. As such, coverage is denied under the Commercial General Liability Coverage part of the Policy.

KAUFMAN BORGEEST & RYAN LLP

9402374

*NurSelect LLC*
Page 6

Section 2.b. of the Commercial General Liability Coverage part exclusions provides the following:

>This Insurance does not apply to:
>
>*        *        *
>
>**b. Contractual Liability**
>"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
>a.  That the insured would have in the absence of the contract or agreement; or
>b.  Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:
>>a.  Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and
>>b.  Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

Landmark reserves it rights to further exclude coverage based on the contractual indemnity exclusion in light of the "Staffing Agreement" entered into between NurSelect and Brethren Village.

Landmark also notes that NurSelect signed a Policy application on January 26, 2023, and checked no in response to the following question: "In the past twelve (12) months, has any professional liability claim or suit been made against the Applicant or any of its predecessor firms?". The application contains the following representations clause:

>The Applicant declares that the above statement and representations are true and correct, and that no facts have been suppressed or misstated. All written statements and materials furnished to the Company, in conjunction with this application will be incorporated by reference into this application and made part hereof…is agreed that this form shall be the basis of the contract should a policy be issued, and it will be attached to and made part of the policy.

At the time NurSelect signed the application on January 26, 2023, NurSelect knew about the Ms. Wiggins' incident and received the January 12, 2023 letter. Accordingly, it appears the application may have contained a misrepresentation. Landmark expressly reserves its rights in this regard.

<u>CONCLUSION</u>

In conclusion, the Policy does not afford coverage for the captioned matter. Landmark remains willing to reconsider its denial of coverage for this matter if warranted by additional information provided by the Insured. If nothing further is received by Landmark from the Insured in the next thirty days, Landmark will presume the Insured accept this coverage determination and Landmark will close its file.

KAUFMAN BORGEEST & RYAN LLP

9402374

Landmark v. Nurselect MSJ_00000171

*NurSelect LLC*
Page 7

This letter is not intended to be an exhaustive recitation of all potentially applicable terms, conditions, exclusions or endorsements of the Policy. Nothing in this letter is intended to, or does, waive any of Landmark's rights, privileges or defenses under the Policy, at law or in equity, all of which are expressly reserved. Landmark expressly reserves the right to alter, supplement, and modify this coverage statement as other and additional information may become available. Landmark's coverage determination is necessarily based upon information that has been made available to it at this point. If you have any other information that Landmark should consider, please let us know.

If you have any questions, please feel free to contact us.


Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Joan Gilbride
Briana Semenza

cc:       (via email only)

          zwilson@rsui.com

Landmark v. Nurselect MSJ_00000172

# EXHIBIT 2

Landmark v. Nurselect MSJ_00000173

# IN THE UNITED STATES DISTRICT COURT
## FOR THE  EASTERN DISTRICT OF PENNSYLVANIA
### CIVIL DIVISION

**LANDMARK AMERICAN
INSURANCE COMPANY,**

        **PLAINTIFF,**

        **v.**

**NURSELECT, LLC.,**

        **DEFENDANT.**

**Civil Action No.  5:24-CV-01412**

**Electronically Filed**

## DEFENDANT'S ANSWER WITH AFFIRMATIVE
## DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT

AND NOW, comes Defendant, Nurselect, LLC, by and through its counsel,

Dickie, McCamey & Chilcote, P.C., by Bryon R. Kaster, Esquire, and responds to the

corresponding paragraphs of Plaintiff's First Amended Complaint as follows:

1.     The allegations set forth in this paragraph are a conclusion of law to

which no response is required.

2.     Defendant lacks knowledge or information sufficient to form a belief

about the truth of the allegation.

3.     Defendant lacks knowledge or information sufficient to form a belief

about the truth of the allegation.

4.     The allegations contained herein are admitted.

1

5.      Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegation relating to the jurisdiction of this Court.

6.      Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegation relating to the proper venue.

7.      Plaintiff initiated this lawsuit, so Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegation concerning what "[t]his action involves…."

8.       The allegations set forth herein refer to allegations set forth in the Complaint filed in the Underlying Action, which is a document that speaks for itself.

9.      It is specifically denied that Defendant "received" the referenced letter.  As for the allegations regarding how the letter was "sent", Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations.  While this paragraph includes references to a letter and agreement, which are documents that speak for themselves, because Defendant did not receive the letter on January 12, 2023, Defendant denies that it advised Defendant as alleged.

10.    While this paragraph includes references to a letter, which is a document that speak for itself, because Defendant did not receive the letter on January 12, 2023, Defendant denies that it "advises" Defendant as alleged.

Landmark v. Nurselect MSJ_00000175

11.     This paragraph includes references to a document that speak for itself.  By way of further response, the allegations are admitted.

12.     This paragraph includes references to a document that speak for itself.  By way of further response, the allegations are admitted.

13.     This paragraph includes references to a document that speak for itself.  By way of further response, the allegations are admitted.

14.     This paragraph includes references to a document that speak for itself.  By way of further response, the allegations are admitted.

15.     This paragraph includes references to a document that speak for itself.  By way of further response, the allegations are admitted.

16.     This paragraph includes references to a document that speak for itself.  By way of further response, the allegations are admitted.

17.     It is admitted that Defendant provided Landmark with notice of the Underlying Action on or about September 12, 2023.

18.     It is admitted that Defendant reported the Attorney Letter to Landmark on or about September 12, 2023.

19.     This paragraph includes references an e-mail communication that speak for itself.   By way of further response, the allegations are denied.  It is specifically denied that it was "acknowledged" that "the Attorney Letter was received by e-mail."  The September 13, 2023 e-mail communication states: "The

email was only discovered after receiving the complaint yesterday – during a search of the employee's name to pull all email correspondences together. The email was previously unread."

20. This paragraph includes references a letter, which is a document that speak for itself.

21. This paragraph includes references letters, which are documents that speak for themselves.

### COUNT I – DECLARATORY JUDGMENT

22. Defendant hereby restates and incorporates all of its responses to the preceding allegations as though set forth more fully herein at length.

23. This paragraph includes references to a document that speak for itself. By way of further response, the allegations are admitted.

24. This paragraph includes references to a document that speak for itself. By way of further response, the allegations are admitted.

25. Denied. It is specifically denied that the letter constitutes a "Claim." It is specifically denied that the letter was received by Defendant, as the mailing address on the letter was incorrect and the e-mail was not received by Defendant until September 12, 2023, after Defendant received the complaint the Underlying Action.

Landmark v. Nurselect MSJ_00000177

26.     Denied.  It is specifically denied that the letter was "indisputably received" by Defendant on January 12, 2023, as the mailing address on the letter was incorrect and the e-mail was not received by Defendant until September 12, 2023, after Defendant received the complaint the Underlying Action.

27.     Denied.  The allegations are specifically denied.

28.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegation relating to Landmark's request for relief. However, Defendant respectfully requests that this Honorable Court determine and declare, pursuant to the Policy, that Landmark does owe Defendant a duty of defense and indemnity in the Underlying Action.

## COUNT II – DECLARATORY JUDGMENT

29.     Defendant hereby restates and incorporates all of its responses to the preceding allegations as though set forth more fully herein at length.

30.     This paragraph includes references to a document that speak for itself.   By way of further response, the allegations are admitted.

31.     While this paragraph includes references to a letter, which is a document that speak for itself, because Defendant did not receive the letter on January 12, 2023, Defendant denies that it "advised" Defendant as alleged.

32.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegation relating to why the Underlying Action was filed.

33.     Denied.  By way of further response, the "Underlying Action" has been defined in the Complaint at paragraph 7 as the lawsuit filed by Brenda L King that is pending in state court to which Defendant has been joined.  The pleadings in that case; i.e., the Underlying Action, include many assertions that are not fairly summarized in this paragraph of the Complaint and, thus, the allegations set forth herein are specifically denied.

34.     Denied.  It is specifically denied that the Policy's contract exclusion "wholly excludes coverage for the Underlying Action...."

35.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegation relating to Landmark's request for relief. However, Defendant respectfully requests that this Honorable Court determine and declare, pursuant to the Policy, that Landmark does owe Defendant a duty of defense and indemnity in the Underlying Action.

## COUNT III – DECLARATORY JUDGMENT

36.     Defendant hereby restates and incorporates all of its responses to the preceding allegations as though set forth more fully herein at length.

37.     This paragraph includes references to a document that speak for itself.   By way of further response, the allegations are admitted.

38.     Denied as stated.  It is admitted only that Defendant was contacted on October 14, 2022 by an attorney requesting Ms. McDowell's statement, as well as

Ms. McDowell's contact information. By way of further response, Ms. McDowell's employment had been terminated as of September of 2021.

39. It is specifically denied that Defendant "received the Attorney Letter" on January 12, 2023.

40. Denied. It is specifically denied that Defendant "failed to notify Landmark as soon as practicable of the incident." It is specifically denied that Defendant "failed to immediately send a copy of the January 12, 2023 Attorney letter to Landmark."

41. Denied. It is specifically denied that Defendant "failed to fulfill a condition precedent of coverage under the Policy."

42. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegation relating to Landmark's request for relief. However, Defendant respectfully requests that this Honorable Court determine and declare, pursuant to the Policy, that Landmark does owe Defendant a duty of defense and indemnity in the Underlying Action.

WHEREFORE, Defendant, NurSelect LLC, respectfully requests that this Honorable Court enter judgment in its favor and against Plaintiff.

## AFFIRMATIVE DEFENSES

1.      Defendant hereby restates and incorporates all of its responses to the preceding allegations as though set forth more fully herein at length.

2.      Defendant hereby asserts estoppel as an affirmative defense.

3.      Defendant hereby asserts waiver as an affirmative defense.

4.      Defendant hereby asserts the clear and unambiguous terms of the referenced policy of insurance as a defense.

5.      Plaintiff's claims are based upon a faulty interpretation of Pennsylvania law.

6.      Defendant provided timely notice of any and all claims.

7.      Defendant satisfied any and all duties and obligations owed by Defendant to Plaintiff under the applicable policy of insurance and under the applicable law.

8.      Plaintiff owes Defendant a duty of defense and indemnity, as well as any and all additional relief as this Honorable Court may deem proper.

WHEREFORE, Defendant, NurSelect LLC, respectfully requests that this Honorable Court enter judgment in its favor and against Plaintiff.

Respectfully submitted,

**DICKIE, McCAMEY & CHILCOTE, P.C.**

Date: June 28, 2024                By:    */s/ Bryon R. Kaster*
                                   Bryon R. Kaster
                                   Attorney I.D. No. 91707
                                   300 Corporate Center Drive
                                   Suite 103-D
                                   Camp Hill, PA  17011-9927
                                   717-731-4800
                                   BKaster@dmclaw.com
                                   *Attorney for Defendant, Nurselect, LLC*

Landmark v. Nurselect MSJ_00000182

## CERTIFICATE OF SERVICE

AND NOW, this 28th day of June, 2024, I, Bryon R. Kaster, hereby certify that the foregoing ***Answer with Affirmative Defenses to Plaintiff's Amended Complaint*** has been electronically filed and is available for viewing and downloading from the ECF system by the undersigned counsel of record. Accordingly, service has been effectuated pursuant to I.R.5.7.


Date: June 28, 2024                    By:   /s/ *Bryon R. Kaster*
                                            _____

Landmark v. Nurselect MSJ_00000183

# EXHIBIT 3

Landmark v. Nurselect MSJ_00000184



# Professional Liability Insurance

### CLAIM OFFICE:

**Mail claims to:**
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA  30326-1160

**Fax claims to:**
(404) 231-3755
(Attn: Claims Department)

**Email claims to:**
reportclaims@rsui.com



# COMMERCIAL LINES COMBINATION POLICY DECLARATIONS

## Landmark American Insurance Company
### (A New Hampshire Stock Co.)
### (hereinafter called "the Company")

**EXECUTIVE OFFICES:**    945 East Paces Ferry Road, Suite 1800, Atlanta, GA  30326-1160

**Policy Number:**    LHC801468        **RENEWAL OF:**    LHC794794 00

**Named Insured and Mailing Address:**                **Producer Name:**

NURSELECT LLC
1829 NEW HOLLAND ROAD
SUITE 13
READING, PA 19607

**Policy Period:**    **From:**    3/1/2023        **To:**    3/1/2024        12:01 A.M. Standard Time at the Named Insured address as stated herein.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

**Business Description:**    ALLIED HEALTHCARE STAFFING AGENCY

| COVERAGE PARTS | PREMIUM |
|---|---|
| **Commercial General Liability** | |
| COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE | $ Included |
| **Professional Liability** | |
| MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD | $ Included |
| **Total Advance Policy Premium** | $ ▉▉▉ |
| **Minimum Earned Premium** | $ ▉▉▉ |
| Not Subject to Audit | |

**Forms and Endorsements made a part of this policy at time of issue:**   Please see SCHEDULE OF ATTACHMENTS.

(Omits applicable forms and endorsements if shown in specific Coverage Form Declarations.)

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY

March 08, 2023
**Date**

By: _____
**Authorized Representative**

Declarations Page 1 of 2        SubIdID#:        585559        BinderID#
                                                              Created By:    JML

RSG 50011 1020                                                                **Page 1 of 2**

Landmark v. Nurselect MSJ_00000186                LAND000009

**DECLARATIONS**

| | |
|---|---|
| **Policy Number:**    **LHC801468** | **Effective Date:**    **3/1/2023** |
| | At 12:01 A.M. Standard Time |

**LIMITS OF INSURANCE:**

**CGL and Professional Liability:**

$   See Aggregate Limits Below      Policy Aggregate Limit

**Commercial General Liability:**

$   3,000,000      General Aggregate Limit (Other than Products-Completed Operations)

$   3,000,000      Products-Completed Operations Aggregate Limit

$   1,000,000      Personal and Advertising Injury Limit

$   1,000,000      Each Occurrence

$   5,000      Medical Payments (Any One Person)

$   50,000      Damage to Premises Rented to You

**Professional Liability:**

$   1,000,000      Each Claim

$   3,000,000      Aggregate

**DEDUCTIBLE:**    $ 2,500      Each Claim

| **RETROACTIVE DATE:** | Coverage | Date |
|---|---|---|
| | Commercial General Liability | N/A |
| | Professional Liability | 3/1/2020 |

THESE DECLARATIONS ARE PART OF THE COMMON POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

**NOTICE:**

This is a claims-made and reported policy. Please read the policy carefully and discuss the coverage afforded by the policy with your insurance agent or broker.

Declarations Page 2 of 2      SubIdID#:    585559      BinderID#
Created By:    JML

Landmark v. Nurselect MSJ_00000187

LAND000010

**LANDMARK AMERICAN INSURANCE COMPANY**

| | |
|---|---|
| Policy Number: | LHC801468 |
| Insurer: | Landmark American Insurance Company |
| Named Insured: | NURSELECT LLC |

## NOTICE - DISCLOSURE OF TERRORISM PREMIUM

This Coverage Part/Policy covers certain losses caused by terrorism. In accordance with the federal Terrorism Risk Insurance Act, as amended, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act.

As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

### DISCLOSURE OF PREMIUM

The portion of your premium for the policy term attributable to coverage for terrorist acts certified under the Act is
$  0.00                             .

In any case, if the insured rejects terrorism coverage in any scheduled underlying policy, this policy is written to exclude terrorism.

### DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 80% of that portion of the amount of such insured losses that exceeds the applicable **Insurer** retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

### CAP INSURER PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**LANDMARK AMERICAN INSURANCE COMPANY**

## SCHEDULE OF POLICY ATTACHMENTS AND FORMS

| Form Number | Form Title |
| --- | --- |
| RSG 99054 0121 | Notice - Disclosure of Terrorism Premium |
| RSG 51039 1017 | Commercial General Liability Coverage Form - Occurrence |
| RSG 51044 0722 | Medical Professional Liability Coverage Part Claims Made and Reported Basis - Broad |
| RSG 51031 0522 | Common Policy Conditions |
| ENDT-01 | Additional Insured Endorsement (Blanket) - RSG 55015 0418 |
| ENDT-02 | Communicable Disease Exclusion (CGL only) - RSG 56201 0920 |
| ENDT-03 | Cross Coverage Exclusion - Medical - Broad - RSG 56136 0319 |
| ENDT-04 | Cryptocurrency Exclusion - RSG 56216 0822 |
| ENDT-05 | Deductible Liability Insurance-Comb. Policy-Multiple Ded - RSG 94016 0916 |
| ENDT-06 | Exclusion - Correctional Medicine - RSG 56203 0321 |
| ENDT-07 | Exclusion - Designated Professional Services - RSG 56114 1118 |
| ENDT-08 | Hired and Non - owned Auto Liability |
| ENDT-09 | Minimum Retained Premium - RSG 54025 0405 |
| ENDT-10 | Nuclear Energy Liability Exclusion - RSG 56058 0903 |
| ENDT-11 | Opioid and Controlled Substance Exclusion - RSG 56191 0421 |
| ENDT-12 | Pennsylvania - Notice of Cancellation & Nonrenewal - RSG 53015 0903 |
| ENDT-13 | Pennsylvania Surplus Lines Disclosure Notice - RSG 99091 0106 |
| ENDT-14 | Service Of Suit - RSG 94022 0407 |
| ENDT-15 | State Fraud Statement - RSG 99022 1022 |
| ENDT-16 | Supplementary Coverages Endorsement (Broad) - RSG 54207 1022 |
| ENDT-17 | Violation of Consumer Protection Laws Exclusion - RSG 56121 0822 |

**Policy No.:**  LHC801468

RSG 54081 0710

Landmark v. Nurselect MSJ_00000189

**LANDMARK AMERICAN INSURANCE COMPANY**

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is an Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

### COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

   **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle or defend any "claim" or "suit" that may result. But:

      **(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

      **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

   **b.** This insurance applies to "bodily injury" and "property damage" only if:

      **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

      **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or "claim", knew that the "bodily injury" or "property damage" had occurred, in whole or in part.  If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   **c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or "claim", includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   **d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or "claim":

      **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

Landmark v. Nurselect MSJ_00000190

LAND000013

**(2)** Receives a written or verbal demand or "claim" for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

Landmark v. Nurselect MSJ_00000191

LAND000014

**d.  Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e.  Employer's Liability**

"Bodily injury" to:

**(1)**  An "employee" of the insured arising out of and in the course of:

    **(a)**  Employment by the insured; or

    **(b)**  Performing duties related to the conduct of the insured's business; or

**(2)**  The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies:

**(1)**  Whether the insured may be liable as an employer or in any other capacity; and

**(2)**  To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f.  Pollution**

**(1)**  "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

    **(a)**  At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

        **(i)**  "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use by the building's occupants or their guests;

        **(ii)**  "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

        **(iii)**  "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

    **(b)**  At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

    **(c)**  Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

        **(i)**  Any insured; or

        **(ii)**  Any person or organization for whom you may be legally responsible;

    **(d)**  At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

Landmark v. Nurselect MSJ_00000192

LAND000015

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire"; or

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** "Claim" or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such "claim" or "suit" by or on behalf of a governmental authority.

**g.  Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

Landmark v. Nurselect MSJ_00000193

LAND000016

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

Landmark v. Nurselect MSJ_00000194

LAND000017

**k.  Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l.  Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.  Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.  Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o.  Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p.  Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

Landmark v. Nurselect MSJ_00000195

LAND000018

**q. Asbestos**

"Bodily injury" or "property damage" for past, present or future claims arising in whole or in part either directly or indirectly, out of the manufacture, distribution, sale, re-sale, re-branding, installation, repair, removal, encapsulation, abatement, disposal of, replacement or handling of, exposure to, testing for or failure to disclose the presence of, asbestos or products containing asbestos whether or not the asbestos is or was at any time airborne as a fiber or particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever.

It is further agreed that this insurance does not apply to "bodily injury" or "property damage" including expenses for;

**(1)** The costs of clean up or removal of asbestos or products and materials containing asbestos;

**(2)** The cost of such actions as may be necessary to monitor, assess and evaluate the release or threat of asbestos or products and material containing asbestos;

**(3)** The cost of disposal of asbestos substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result; or

**(4)** The cost of compliance with any law or regulation regarding asbestos.

**r. Biological Contaminants**

Any "claim" arising out of a "biological contaminant".

"Biological contaminant" means any biological irritant or contaminant including but not limited to any form of mold, mildew, mushroom, yeast, fungus, bacteria, virus, insect, allergen and any other type of biological agent, including any substance produced by, emanating from, or arising out of such "biological contaminant".

**s. Employment Practices**

Any "claim" arising out of or in any way related to:

**(1)** Refusal to employ;

**(2)** Termination of employment;

**(3)** Coercion, demotion, performance evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment related practices, procedures, policies, acts or omissions; or

**(4)** Consequential "bodily injury" or "personal and advertising injury" as a result of **(1)** through **(3)** above.

This exclusion applies whether the Insured may be held liable as an employer or in any other capacity and to any obligation to share "damages" with or to repay someone else who must pay "damages" because of the injury.

It is further agreed that no coverage shall apply under this policy to any "claim" brought by or against any spouse, child, parent, brother or sister of the Insured or any other person.

The Company shall not have a duty to defend any "claim", "suit", arbitration or any other form of a trial court proceeding.

**t. Lead**

"Bodily injury" or "property damage" for past, present or future claims arising in whole or in part, either directly or indirectly, out of the manufacture, distribution, sale, resale, re-branding, installation, repair, removal, encapsulation, abatement, disposal of, replacement or handling of, exposure to, ingestion of or testing for, lead or products containing lead whether or not the lead is or was at any time airborne as a particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever.

Landmark v. Nurselect MSJ_00000196

LAND000019

It is further agreed that this insurance does not apply to "bodily injury" or "property damage" including expenses for:

**(1)** The costs of clean up or removal of lead or products and materials containing lead;

**(2)** The cost of such actions as may be necessary to monitor, assess and evaluate the release or threat of same, of lead or products and material containing lead;

**(3)** The cost of disposal of lead substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result; or

**(4)** The cost of compliance with any law or regulation regarding lead.

**u.  Sexual Abuse**

Any "claims" involving the use of excessive influence or power on any individual, or the actual or alleged inappropriate physical contact or contact that is deemed by or alleged by the individual to be sexual or in any way unwelcome.

**v.  Prior Knowledge**

Any alleged act, error, omission, or circumstance likely to give rise to a "claim" that an Insured had knowledge of prior to the effective date of this policy.  This exclusion includes, but is not limited to any prior "claim" or possible "claim" referenced in the Insured's application.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner.  A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

**1.  Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.  We may, at our discretion, investigate any offense and settle or defend any "claim" or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

**2.  Exclusions**

This insurance does not apply to:

**a.  Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b.  Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

Landmark v. Nurselect MSJ_00000197

LAND000020

**c.  Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d.  Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e.  Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f.  Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g.  Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h.  Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i.  Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.  Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j.  Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)**  Advertising, broadcasting, publishing or telecasting;

**(2)**  Designing or determining content of web sites for others; or

**(3)**  An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **15.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k.  Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l.  Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

Landmark v. Nurselect MSJ_00000198

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** "Claim" or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. Asbestos**

"Personal and advertising injury" for past, present or future claims arising in whole or in part either directly or indirectly, out of the manufacture, distribution, sale, resale, re-branding, installation, repair, removal, encapsulation, abatement, disposal of, replacement or handling of, exposure to, testing for or failure to disclose the presence of, asbestos or products containing asbestos whether or not the asbestos is or was at any time airborne as a fiber or particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever.

It is further agreed that this insurance does not apply to "personal and advertising injury" including expenses for:

**(1)** The costs of clean up or removal of asbestos or products and materials containing asbestos;

**(2)** The cost of such actions as may be necessary to monitor, assess and evaluate the release or threat of asbestos or products and material containing asbestos;

**(3)** The cost of disposal of asbestos substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result; or

**(4)** The cost of compliance with any law or regulation regarding asbestos.

**p. Biological Contaminants**

Any "claim" arising out of a "biological contaminant".

"Biological contaminant" means any biological irritant or contaminant including but not limited to any form of mold, mildew, mushroom, yeast, fungus, bacteria, virus, insect, allergen and any other type of biological agent, including any substance produced by, emanating from, or arising out of such "biological contaminant".

**q. Employment Practices**

Any "claim" arising out of or in any way related to:

**(1)** Refusal to employ;

**(2)** Termination of employment;

**(3)** Coercion, demotion, performance evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment related practices, procedures, policies, acts or omissions; or

**(4)** Consequential "bodily injury" or "personal and advertising injury" as a result of **(1)** through **(3)** above.

This exclusion applies whether the Insured may be held liable as an employer or in any other capacity and to any obligation to share "damages" with or to repay someone else who must pay "damages" because of the injury.

Landmark v. Nurselect MSJ_00000199

It is further agreed that no coverage shall apply under this policy to any "claim" brought by or against any spouse, child, parent, brother or sister of the Insured or any other person.

The Company shall not have a duty to defend any "claim", "suit", arbitration or any other form of a trial court proceeding.

**r.    Lead**

"Personal and advertising injury" for past, present or future claims arising in whole or in part, either directly or indirectly, out of the manufacture, distribution, sale, resale, re-branding, installation, repair, removal, encapsulation, abatement, disposal of, replacement or handling of, exposure to, ingestion of or testing for, lead or products containing lead whether or not the lead is or was at any time airborne as a particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever.

It is further agreed that this insurance does not apply to "personal and advertising injury" including expenses for:

**(1)** The costs of clean up or removal of lead or products and materials containing lead;

**(2)** The cost of such actions as may be necessary to monitor, assess and evaluate the release or threat of same, of lead or products and material containing lead;

**(3)** The cost of disposal of lead substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result; or

**(4)** The cost of compliance with any law or regulation regarding lead.

**s.    Sexual Abuse**

Any "claims" involving the use of excessive influence or power on any individual, or the actual or alleged inappropriate physical contact or contact that is deemed by or alleged by the individual to be sexual or in any way unwelcome.

**t.    Prior Knowledge**

Any alleged act, error, omission, or circumstance likely to give rise to a "claim" that an Insured had knowledge of prior to the effective date of this policy.  This exclusion includes, but is not limited to any prior "claim" or possible "claim" referenced in the Insured's application.

**u.    War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**v.    Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

Landmark v. Nurselect MSJ_00000200

**COVERAGE C – MEDICAL PAYMENTS**

**1. Insuring Agreement**

    **a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

        **(1)** On premises you own or rent;

        **(2)** On ways next to premises you own or rent; or

        **(3)** Because of your operations;

        provided that:

            **(a)** The accident takes place in the "coverage territory" and during the policy period;

            **(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

            **(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

    **b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

        **(1)** First aid administered at the time of an accident;

        **(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

        **(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

    **a. Any Insured**

    To any insured, except "volunteer workers".

    **b. Hired Person**

    To a person hired to do work for or on behalf of any insured or a tenant of any insured.

    **c. Injury On Normally Occupied Premises**

    To a person injured on that part of premises you own or rent that the person normally occupies.

    **d. Workers' Compensation And Similar Laws**

    To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

    **e. Athletics Activities**

    To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletics contests.

    **f. Products-Completed Operations Hazard**

    Included within the "products-completed operations hazard".

    **g. Coverage A Exclusions**

    Excluded under Coverage **A.**

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

**1.** We will pay, with respect to any occurrence we investigate or any "claim" or "suit" against an insured that we settle or defend:

    **a.** All expenses we incur.

Landmark v. Nurselect MSJ_00000201

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim" or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" but will reduce the limits of insurance.

Landmark v. Nurselect MSJ_00000202

LAND000025

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

**a.** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

**b.** The conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker") or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

Landmark v. Nurselect MSJ_00000203

LAND000026

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** "Claims" made or "suits" brought; or

**c.** Persons or organizations making "claims" or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**b.** Damages under Coverage **B**.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for Damages under Coverage **A** because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

### 1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

---

RSG 51039 1017

Page 15 of 22

Landmark v. Nurselect MSJ_00000204

LAND000027

**2.  Duties In The Event Of Occurrence, Offense, Claim Or Suit**

    **a.**  You must see to it that we are notified as soon as practicable of an "occurrence" or offense which may result in a "claim". To the extent possible, notice should include:

        **(1)**  How, when and where the "occurrence" or offense took place;

        **(2)**  The names and addresses of any injured persons and witnesses; and

        **(3)**  The nature and location of any injury or damage arising out of the "occurrence" or offense.

    **b.**  If a "claim" is made or "suit" is brought against any insured, you must:

        **(1)**  Immediately record the specifics of the "claim" or "suit" and the date received; and

        **(2)**  Notify us as soon as practicable.

    You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

    **c.**  You and any other involved insured must:

        **(1)**  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or a "suit";

        **(2)**  Authorize us to obtain records and other information;

        **(3)**  Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

        **(4)**  Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

    **d.**  No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3.  Legal Action Against Us**

No person or organization has a right under this Coverage Part:

    **a.**  To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

    **b.**  To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4.  Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

    **a.  Primary Insurance**

    This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

    **b.  Excess Insurance**

        **(1)**  This insurance is excess over:

           **(a)**  Any of the other insurance, whether primary, excess, contingent or on any other basis:

               **(i)**  That is Fire, Extended Coverage, Builders' Risk, Installation Risk or similar coverage for "your work";

               **(ii)**  That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

Landmark v. Nurselect MSJ_00000205

LAND000028

      **(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

      **(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

    **(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

  **(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

  **(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

    **(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

    **(b)** The total of all deductible and self-insured amounts under all that other insurance.

  **(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c.  Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5.  Premium Audit**

Premium for this coverage is computed in accordance with the Company's rules and rates.  Any premium shown as advance premium may be a deposit premium only.  If the premium is a deposit premium, at the close of each audit period, the Company will compute the earned premium for that period.  Audit premiums are due and payable upon notice.

The Company may examine and audit the Insured's books and records at any time during the policy period and within three years after the final termination of this policy, as far as they relate to the subject matter of this policy.

The first Named Insured as shown in the Declarations must keep records of information the Company will need for premium computation and upon request must send the Company copies of the information.

**6.  Representations**

By accepting this policy, you agree:

**a.**  The statements in the Declarations are accurate and complete;

**b.**  Those statements are based upon representations you made to us; and

**c.**  We have issued this policy in reliance upon your representations.

**7.  Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.**  As if each Named Insured were the only Named Insured; and

Landmark v. Nurselect MSJ_00000206

LAND000029

**b.** Separately to each insured against whom "claim" is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 60 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

    **a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

    **b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

    **a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

    **b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

    However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Claim" is a written demand for damages because of actual or alleged "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. "Claim" includes any "suit" as defined in this Policy.

5. "Coverage territory" means:

    **a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

    **b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

    **c.** All other parts of the world if the injury or damage arises out of:

        **(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

        **(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

        **(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

    provided the insured's responsibility to pay damages is determined only by actual law suits filed and maintained within the territory described in Paragraph **a.** above. This policy does not apply to "claims" pursued elsewhere.

6. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

7. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

Landmark v. Nurselect MSJ_00000207

8. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

9. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

10. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph f. does not include that part of any contract or agreement:

   (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

   (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

      (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

      (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

11. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

12. "Loading or unloading" means the handling of property:

   a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   b. While it is in or on an aircraft, watercraft or "auto"; or

   c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

Landmark v. Nurselect MSJ_00000208
LAND000031

**13.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    **a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    **b.** Vehicles maintained for use solely on or next to premises you own or rent;

    **c.** Vehicles that travel on crawler treads;

    **d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

        **(1)** Power cranes, shovels, loaders, diggers or drills; or

        **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

    **e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

        **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

        **(2)** Cherry pickers and similar devices used to raise or lower workers;

    **f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

    However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

        **(1)** Equipment designed primarily for:

            **(a)** Snow removal;

            **(b)** Road maintenance, but not construction or resurfacing; or

            **(c)** Street cleaning;

        **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

        **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**14.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**15.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    **a.** False arrest, detention or imprisonment;

    **b.** Malicious prosecution;

    **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

    **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    **e.** The use of another's advertising idea in your "advertisement".

**16.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Landmark v. Nurselect MSJ_00000209

LAND000032

**17.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**18.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from, computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**19.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**20.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**21.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**22.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

Landmark v. Nurselect MSJ_00000210

LAND000033

       **(a)** You;

       **(b)** Others trading under your name; or

       **(c)** A person or organization whose business or assets you have acquired; and

    **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    **(2)** The providing of or failure to provide warnings or instructions.

  **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**23.** "Your work":

  **a.** Means:

    **(1)** Work or operations performed by you or on your behalf; and

    **(2)** Materials, parts or equipment furnished in connection with such work or operations.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

    **(2)** The providing of or failure to provide warnings or instructions.

Landmark v. Nurselect MSJ_00000211

LAND000034

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Form Provides Claims-Made Coverage.*
*Please Read The Entire Form Completely.*

# MEDICAL PROFESSIONAL LIABILITY COVERAGE PART – CLAIMS MADE AND REPORTED BASIS – BROAD FORM

Throughout this document, the word "Insured" means any person or entity qualified as such under **Part I. E. Covered Persons and Entities**. The word "Company" refers to the Company providing the insurance shown on the Declarations.

Other words and phrases that appear in **bold** have special meaning. Refer to **Part III. Definitions**.

**Part I.  Insuring Agreement**

**A.  Covered Services**

The Company will pay on behalf of the Insured, as shown in the Declarations, all sums that the Insured becomes legally obligated to pay as **Damages** and associated **Claim Expenses** arising out of a negligent act, error or omission, even if the **Claim** asserted is groundless, false or fraudulent, in the rendering of or failure to render professional services as described in the Business Description on the Declarations, provided that the:

  **1.**  **Claim** is first made against the Insured during the **Policy Period,** and reported to the Company no later than sixty (60) days after the end of the **Policy Period**;

  **2.**  Negligent act, error or omission took place in a covered territory;

  **3.**  Negligent act, error or omission took place after the **Retroactive Date** as shown in the Declarations.

**B.  Defense and Settlement**

The Company will have the right and duty to defend any **Claim** against an Insured seeking **Damages** to which this policy applies, even if any of the allegations of the **Claim** are groundless, false or fraudulent. The Company's right and duty to defend any **Claim** shall end when the Company's Limit of Liability has been exhausted by payment of **Damages** and/or **Claim Expenses**, or has been tendered to the Insured or to a court of competent jurisdiction.

The Company shall not settle any **Claim** without the Insured's written consent. The Insured shall not admit any liability for or settle any **Claim** or incur any costs, charges or expenses without the written consent of the Company.

The Company shall have the right and the duty to select legal counsel for the defense of a **Claim**. In the event the Insured is entitled by law to select independent counsel to defend the **Claim**, the **Claim Expenses** or other covered costs the Company must pay to that counsel are limited to the rates the Company actually pays to counsel retained by the Company in the defense of similar **Claims** in the community where the **Claim** is being defended. The Company may exercise the right to require that such counsel have experience in defending **Claims** similar to the one pending against the Insured. The Insured agrees that such counsel will comply with the Company's litigation guidelines and reporting requirements, timely respond to the Company's requests, and provide information regarding the **Claim** when requested.

**C.  Policy Limits**

Regardless of the number of persons or entities insured or included in **Part I. E. Covered Persons and Entities,** or the number of claimants or **Claims** made against the Insured:

  **1.**  The maximum liability of the Company for **Damages** resulting from each **Claim** first made against the Insured during the **Policy Period** and the Extended Reporting Period, if purchased, shall not exceed the amount shown in the Declarations as each **Claim**;

  **2.**  The maximum liability of the Company for all **Damages** as a result of all **Claims** first made against

Landmark v. Nurselect MSJ_00000212                                    LAND000035

the Insured during the **Policy Period** and the Extended Reporting Period, if purchased, shall not exceed the amount shown in the Declarations as Aggregate.

The inclusion of more than one Insured, or the making of **Claims** by more than one person or organization, does not increase the Company's Limit of Liability.  All **Claims** arising out of a single negligent act, error or omission, or a series of related negligent acts, errors or omissions by one or more Insureds shall be treated as a single **Claim** for all purposes of this policy.  All **Claims** shall be deemed first made when the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period** and all such **Claims** shall be subject to the same Each Claim Limit of Liability during that **Policy Period**.

**Claim Expenses** shall be paid by the Company in addition to the applicable Limits of Liability stated in the Declarations.  The Company's obligation to pay **Claim Expenses** in addition to the applicable Limits of Liability as shown in the Declarations shall be limited to an additional **Claims Expense** Limits of Liability equal to the amount as shown in the Declarations as the Each Claim Limit of Liability.

The Company shall not be obligated to pay any **Claim** for **Damages** or defend any **Claim** after the Limit of Liability has been exhausted by payment of judgments, settlements, **Claim Expenses** or any combination thereof.

**D.  Deductible Provisions**

The deductible amount as shown in the Declarations shall be paid by the Insured and applies to each **Claim** and includes **Damages** or **Claim Expenses,** whether or not a loss payment is made.  If the deductible amount is initially paid by the Company, the Named Insured shall reimburse the amount paid within thirty (30) days, upon written request of the Company.

**E.  Covered Persons and Entities**

1.  Named Insured as shown in the Declarations, and if the Named Insured is an individual, his or her spouse, or domestic partner, but only with respect to the professional services rendered by or on behalf of the Named Insured;

2.  Any present or former principal, partner, officer, director, member, employee or volunteer worker of the Named Insured, but only as respects professional services rendered on behalf of the Named Insured;

3.  Heirs, Executors, Administrators, and in the event of an Insured's death, incapacity or bankruptcy, legal representatives of any Insured, but only with respect to professional services rendered prior to such Insured's death, incapacity or bankruptcy;

4.  Any Medical Director while acting within the scope of his/her administrative and supervisory duties for the Named Insured.  It is further agreed that coverage does not apply to the Medical Director while acting within his/her capacity as a Physician, Surgeon or Dentist in the treatment, or direction of the treatment, of any patient;

5.  Any student enrolled in a training program, but only while acting within the scope of their duties as such and under the direct supervision of faculty members or educators of such training program;

6.  Any faculty member or educator of a training program, but only while acting within the scope of their duties as such.

**F.  Covered Territory**

This policy applies to covered **Claims** arising out of negligent acts, errors or omissions committed anywhere in the world.  However, the policy does not provide coverage for **Claims** made against the Insured in countries where the United States of America has declared or imposed a trade embargo or sanctions, or in countries where the United States of America does not maintain diplomatic relations.

**G.  Extended Reporting Period**

If the policy is not renewed for any reason, or is cancelled for any reason other than for nonpayment of premium or deductible (whether cancelled by the Company or by the Named Insured), the Named Insured as shown on the Declarations, has the right to purchase, within sixty (60) days of policy termination, an extension of the coverage granted by this policy.  This reporting period extension shall

Landmark v. Nurselect MSJ_00000213

LAND000036

remain in force for a period of either twelve (12), twenty-four (24), or thirty-six (36) months after the policy terminates, but only for **Claims** resulting from negligent acts, errors or omissions committed before the effective date of the cancellation or nonrenewal, and otherwise covered by this policy.  Increased premiums or deductibles or modifications of coverage terms or conditions upon renewal do not constitute cancellation or nonrenewal.

The premium for this Extended Reporting Period will not exceed one hundred percent (100%) for twelve months, one hundred fifty percent (150%) for twenty-four months or one hundred seventy-five percent (175%) for thirty-six months of the full annual premium set forth in the Declarations and any attached endorsements, and must be elected and paid within sixty (60) days after the effective date of the policy's termination. Such additional premium is deemed fully earned immediately upon the inception of the Extended Reporting Period.

The Extended Reporting Period is added by endorsement and, once endorsed, cannot be cancelled.  The Extended Reporting Period does not reinstate or increase the Limits of Liability.  The Company's Limits of Liability during the Extended Reporting Period are part of, and not in addition to, the Company's Limits of Liability stated in the Declarations.

**H.  Supplementary Coverages**

It is agreed that any and all payments made for the following is included within, and shall not be in addition to, the Policy Limits as described in this Policy.

**1.**  The Company will pay **Claim Expenses** incurred in the defense of any disciplinary proceeding or investigation against an Insured by any licensing board, disciplinary board, peer review committee, or similar entity alleging professional misconduct or violation of the rules of professional conduct, provided that the alleged misconduct or violation first occurred after the **Retroactive Date** and arises out of the Insured's performance of the Named Insured's professional services as described in the Declarations.  This provision applies only to disciplinary proceedings first brought against an Insured during the **Policy Period** and reported to the Company no later than sixty (60) days after the end of **Policy Period**.  The Company's obligation to defend an Insured under the provision is subject to a sub-Limit of Liability of $25,000 and applies only to **Claims Expenses** incurred with the consent of the Company.  **Damages** are not covered by this provision.

This sub-Limit of Liability is the maximum amount payable under this provision for the **Policy Period**, regardless of the number of disciplinary proceedings first commenced during the **Policy Period** or the number of Insureds subject to disciplinary proceedings.  There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

**2.**  The Company will pay reasonable expenses incurred by the Insured at the Company's request to assist in the investigation of the **Claim** or defense of the suit, including actual loss of earnings up to $500 a day for each Insured because of time off from work, subject to an aggregate amount of $5,000 for each individual Insured for each **Claim**, not to exceed an aggregate amount of $10,000 per **Policy Period**.  There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

**3.**  The Company will pay fines and penalties specified in the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and the Health Information Technology for Economic and Clinical Health Act (HITECH) as assessed against the Insured, or assessed against third parties who make a claim on the Insured for indemnification or contribution for such fines and penalties based on violations and breaches of the privacy and security provisions of HIPAA, and HITECH, and/or regulations promulgated under said statutes relating to Protected Health Information (PHI) and electronic Protected Health Information (ePHI), but only if such violations or breaches arise out of professional services as described in the Declarations or from the handling of PHI or ePHI of the Insured's own personnel.

For the purposes of this coverage, **Claim** shall also include the notice of investigation, audit, and/or assessment of fines or penalties by the U.S. Department of Health and Human Services or the Office of Civil Rights in connection with violations of or breaches under HIPAA and/or HITECH.

For the purposes of this coverage, **Damages** shall also include HIPAA and/or HITECH fines and

Landmark v. Nurselect MSJ_00000214

penalties.

The coverage described above is subject to a sub-Limit of Liability in an aggregate amount of $100,000. This sub-Limit of Liability is the maximum amount payable under this provision for the **Policy Period**, regardless of the number of violations and/or breaches by the Insured of the privacy and security provisions of HIPAA and HITECH and the regulations established thereunder arising from the performance of or failure to perform professional services as described in the Declarations. Any payments made under this provision are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

4.   The Company will pay **Damages** or **Claims Expenses** as a result of **Claims** arising out of circumstances involving the use of excessive influence of power on any patient, or the actual or alleged inappropriate physical contact or contact that is deemed by or alleged by any patient to be sexual or in any way unwelcomed, is limited to a sub-Limit of Liability of $250,000 each claim and $500,000 in the aggregate. This sub-limit of liability is part of and not in addition to the applicable Limits of Liability as shown in the Declarations. Payment of **Damages** or **Claim Expenses** by the Company reduces the applicable Limits of Liability as shown in the Declarations.

Once the sub-Limit of Liability is exhausted, no additional coverage shall be afforded by this coverage provision and the following Exclusion will be added to the policy:

It is agreed that no coverage shall apply under this policy to any **Claim** or **Claim Expenses** arising out of or involving the use of excessive influence or power on any patient, or the actual or alleged inappropriate physical contact or contact that is deemed by or alleged by any patient to be sexual or in any way unwelcomed.

## Part II.  Exclusions

This policy does not apply to any **Claim** or **Claim Expenses** based upon or arising out of:

**A.   Personal and Advertising Liability**.

**B.**   Obligations of any Insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**C.   Bodily Injury** to any of the following:

1.   Officers, directors, partners, employees or volunteer workers of the Insured arising out of and in the course of employment by the insured;

2.   The spouse, child, parent, or sibling of **C. (1.)** above.

**D.**   The insolvency or bankruptcy of an Insured or of any other person, firm or organization.

**E.**   Dishonest, fraudulent, criminal, malicious, or intentional acts, errors or omissions committed by or at the direction of any Insured.

**F.**   Any business enterprise not named in the Declarations which is owned, controlled, operated or managed by any Insured.

**G.**   A **Claim** by one Insured under this policy against another Insured under this policy, unless such **Claim** arises solely out of professional services performed for that party.

**H.**   Any obligation or liability assumed by the Insured under any contract or any oral or written agreement, unless liability would have attached in the absence of such a contract or agreement, including the Insured's decision to unilaterally terminate or otherwise alter, remove or abridge any rights, benefits or obligations under any contract or agreement.

**I.**   The ownership, rental, leasing, maintenance, use (including operation, loading and unloading), or repair of any real or personal property, including **Damage** to property owned, occupied or used by, rented to or leased to an Insured.

**J.**   The rendering or failure to render professional services by the Insured as a physician, surgeon or dentist.

**K.**   The performance of any service by any Insured while under the influence of intoxicants or illegal drugs.

Landmark v. Nurselect MSJ_00000215

LAND000038

**L.**  The ownership, maintenance, use (including operation, loading and unloading), or entrustment to others of any aircraft, automobile, motor vehicle, mobile vehicles or watercraft owned or operated by or rented or loaned to any insured.  This exclusion includes the movement of patients in and out of any motor vehicle, aircraft, automobile or watercraft.

**M.  1.**  The actual, alleged or threatened presence, discharge, dispersal, seepage, migration, release or escape of **Pollutants** or asbestos;

**2.**  The failure to discover or disclose the existence or amount of **Pollutants** or asbestos;

**3.**  Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with **M. (1.)** or **(2.)** above;

**4.**  Any request, demand or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or, in any way respond to or assess the effects of **Pollutants** or asbestos;

**5.**  Any **Claim** or suit by or on behalf of a governmental authority for **Damages** because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or, in any way, responding to, or assessing the effect of **Pollutants** or asbestos.

**N.  1.**  Refusal to employ;

**2.**  Termination of employment;

**3.**  Coercion, demotion, performance evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, retaliation or other employment related practices, procedures, policies, acts or omissions;

**4.**  Consequential **Bodily Injury** or **Personal Injury** as a result of **N. (1.)** through **(3.)** above.

This exclusion applies whether the Insured may be held liable as an employer or in any other capacity and to any obligation to share **Damages** with or to repay someone else who must pay **Damages** because of the injury.

It is further agreed that no coverage shall apply under this policy to any **Claim** brought by or against any spouse, child, parent, brother or sister of the Insured or any other person. The Company shall not have a duty to defend any **Claim**, suit, arbitration or any other form of trial court proceeding.

**O.**  Any alleged act, error, omission, or circumstance likely to give rise to a **Claim** that an Insured had knowledge of prior to the effective date of this policy.  This exclusion includes, but is not limited to, any prior **Claim** or possible **Claim** referenced in the Insured's application.

**P.**  Infringement of copyright, patent, trademark, trade name, trade dress, service mark, title or slogan.

**Q.**  Experimental procedures and experimental products, including procedures using experimental products. Experimental procedures and products are those not approved by the United States Food and Drug Administration (FDA).

**R.**  Obstetrical procedures, including but not limited to any emergency obstetrical procedures.

## Part III. Definitions

**A.  Advertisement** means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**1.**  Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**2.**  Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**B.  Bodily Injury** means physical or mental harm, sickness or disease sustained by a person including death resulting from any of these at any time.

**C.  Claim** means a written demand for monetary or non-monetary relief received by the Insured during the **Policy Period**, including the service of suit, or the institution of an arbitration proceeding.  Additionally,

Landmark v. Nurselect MSJ_00000216

LAND000039

**Claims** that arise from an incident, occurrence or offense first reported by the Insured during the **Policy Period** and accepted by the Company in accordance with **Part IV. A. Notice of Claim** will be considered a **Claim** first made during the **Policy Period**.

**D.  Claim Expense** means expenses incurred by the Company or the Insured with the Company's consent in the investigation, adjustment, negotiation, arbitration, mediation and defense of covered **Claims**, whether paid by the Company or the Insured with the Company's consent, and includes:

**1.**  Attorney fees;

**2.**  Costs taxed against the Insured in any **Claim** defended by the Company;

**3.**  Interest on the full amount of any judgment that accrues after entry of the judgment and before the Company has paid, offered to pay or deposited in court the part of the judgment that is within the applicable Limit of Liability;

**4.**  The cost of appeal bonds or bonds to release attachments, but only for bond amounts within the available applicable policy limit and only if said **Claims** are covered by the policy;

**5.**  Reasonable expenses incurred by the Insured at the Company's request other than:

**a.**  Loss of earnings;

**b.**  Salaries or other compensation paid to the Insured or any employee of the Insured.

**E.  Damages** means compensatory judgment, award or settlement, including punitive or exemplary damages, except damages for which insurance is prohibited by law.  **Damages** does not include disputes over fees, deposits, commissions or charges for goods or services.

**F.  Policy Period** means the period of time stated in the Declarations or any shorter period resulting from policy cancellation or amendment to the policy.

**G.  Personal and Advertising injury** means injury, including consequential **Bodily Injury,** arising out of one or more of the following offenses:

**1.**  False arrest, detention or imprisonment;

**2.**  Malicious prosecution or abuse of process;

**3.**  Wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**4.**  Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**5.**  Oral or written publication, in any manner, of material that violates a person's right of privacy;

**6.**  Use of another's advertising idea in your **Advertisement**; or

**7.**  Infringing upon another's copyright, trade dress or slogan in your **Advertisement**.

**H.  Retroactive Date** means the date stated in the Declarations on or after which any alleged or actual negligent act, error or omission must have first taken place in order to be considered for coverage under this policy.

**I.  Pollutants** means any solid, liquid, gaseous or thermal irritant, contaminant or toxin, whether live or inanimate; including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals, metals, silica, lead, lead compounds or materials containing lead, asbestos, asbestos compounds or materials containing asbestos, radon, waste or any like substances.  Waste includes materials to be recycled, reconditioned or reclaimed.

**Part IV. General Conditions**. The following Conditions are a precedent to coverage under the Policy:

**A.  Notice of Claim**

The Insured must notify the Company as soon as practicable of an incident, occurrence or offense that may reasonably be expected to result in a **Claim**.  Where notice to the Company of such incidents, occurrences or offenses has been acknowledged as adequate by the Company in writing, subsequent

Landmark v. Nurselect MSJ_00000217

LAND000040

**Claims** derived from such incidents, occurrences or offenses will be deemed as first made at the time the incident, occurrence or offense giving rise to such **Claim** was first provided.  The Insured also must immediately send copies to the Company of any demands, notices, summonses or legal papers received in connection with any **Claim**, and must authorize the Company to obtain records and other information. Please send all claim information to:

> Attention: **Claims** Dept.
> RSUI Group, Inc.
> 945 East Paces Ferry Road, Suite 1800
> Atlanta, Georgia 30326-1160
> Or Via Email:
> reportclaims@rsui.com

**B.  Prohibition of Voluntary Payments and Settlements**

With respect to any **Claim** covered under this policy, the Insured will not make payment, admit liability, settle **Claims,** assume any obligation, agree to arbitration or any other means of resolution of any dispute, waive any rights or incur **Claim Expenses** without prior written Company approval, except at the Insured's own cost.

**C.  Cooperation**

The Insured will cooperate with the Company in the conduct of a **Claim** and, upon the Company's request, submit to examination and interrogation by the Company representative, under oath if required, and will attend hearings and trials and assist in effecting settlements, securing and giving evidence, and obtaining the attendance of witnesses.  The Insured shall further cooperate with the Company and do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment that the Insured may have, and the Company may exercise those rights in the name of the Insured.

**D.  Nonrenewal**

The Company will give the Named Insured sixty (60) days written notice prior to nonrenewal of this policy by mailing or delivering the notice to the first Named Insured's last known mailing address as shown in the Declarations.

**E.  Premium and Audit**

Premium for this coverage is computed in accordance with the Company's rules and rates.  Any premium shown as advance premium may be a deposit premium only.  If the premium is a deposit premium, at the close of each audit period, the Company will compute the earned premium for that period.  Audit premiums are due and payable upon notice.

The Company may examine and audit the Insured's books and records at any time during the **Policy Period** and within three years after the final termination of this policy, as far as they relate to the subject matter of this policy.

The first Named Insured, as shown in the Declarations, must keep records of information the Company will need for premium computation and, upon request, must send the Company copies of the information.

**F.  Authorization**

The first Named Insured listed in the Declarations agrees to act as the Named Insured with respect to giving and receiving of all notices, exercising the Extended Reporting Period option, canceling the policy, paying all premiums and deductibles and receiving any return premiums that may become due.

**G.  Subrogation**

In the event of any **Claim** under this policy, the Company will be subrogated to all the Insured's rights of recovery against any person or organization, and the Insured will execute and deliver instruments and papers and do whatever else is necessary to secure such rights.  The Insured will do nothing after the loss to prejudice such rights.

**H.  Other Insurance**

This policy will be excess over, and will not contribute with, any other existing insurance, unless such

Landmark v. Nurselect MSJ_00000218

LAND000041

other insurance is specifically written to be excess of this policy.

When this insurance is excess, the Company shall have no duty under this policy to defend any **Claim** or suit that any other insurer has a duty to defend.  If such other insurer refuses to defend such **Claim** or suit, the Company shall be entitled to the Insured's rights against all such insurers for any **Claim Expenses** incurred by the Company.

If it is determined that both this insurance and other insurance or self insurance apply to any **Claim** on the same basis, whether primary, excess or contingent, the Company will not be liable under this policy for a greater proportion of the **Damages** or **Claim Expenses** than the applicable Limit of Liability under the policy for such **Damages** bears to the total applicable Limit of Liability of all other insurance or self insurance, whether or not collectible against such **Claims.**

**I.   Actions Against the Insurer**

No action will be taken against the Company unless, as a condition precedent, the Insured is in full compliance with all of the terms of this policy, and until the amount of the Insured's obligations to pay shall have been finally determined, either by judgment against the Insured after actual trial, or by written agreement of the Insured, the claimant and the Company.

**J.   Coverage in Bankruptcy**

Bankruptcy or insolvency of the Insured or of the Insured's estate does not relieve the Company of its obligations under this policy.

**K.   False or Fraudulent Claims**

If an Insured knowingly makes any **Claim** that is false or fraudulent, this insurance shall become void and entitlement to coverage for all **Claims** hereunder shall be forfeited.

**L.   Application**

The Insured agrees that the statements in the application are personal representations, that they shall be deemed material and that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between the Insured and the Company, or any of its agents, relating to this insurance.  The signed application, and any attachments thereto, submitted in connection with this Policy are incorporated herein and constitute a part of this Policy.

Landmark v. Nurselect MSJ_00000219

LAND000042

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   **a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium or deductible; or

   **b.** 60 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. CHANGES**

This policy contains all the agreements between you and us concerning the insurance afforded.  The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. EXAMINATION OF YOUR BOOKS AND RECORDS**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. INSPECTIONS AND SURVEYS**

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections.  We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**E. PREMIUMS**

The first Named Insured shown in the Declarations:

Landmark v. Nurselect MSJ_00000220

LAND000043

1. Is responsible for the payment of all premiums; and
2. Will be the payee for any return premiums we pay.

**F.  TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Landmark v. Nurselect MSJ_00000221

LAND000044



**RSUI Group, Inc.**
945 East Paces Ferry Road
Suite 1800
Atlanta, GA  30326-1160

Phone    (404) 231-2366
Fax      (404) 231-3755

ATTN:  Health Care Providers – Applicants and Policyholders

RE:      HIPAA Privacy and Security Rule Compliance

The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and associated regulations require health care providers to maintain the confidentiality of patients' protected health information ("PHI").  PHI includes, among other things, medical records and billing records relating to medical care.  As a "covered entity" under HIPAA, you are not permitted to share PHI with a "business associate" unless the business associate has provided you with a Business Associate Agreement that provides for the protection of PHI.  Although a professional liability insurer may not be deemed to be a "business associate" as defined by HIPAA, we want to assure your compliance with the regulations in the event a Business Associate Agreement is necessary.

We are committed to maintaining the confidentiality of PHI that you may provide as a part of the administration of your insurance coverage.  Enclosed you will find a Business Associate Agreement that explains how we will safeguard any PHI that you may provide to us in the process of underwriting your policy or handling a claim on your behalf.  Please review it and keep it with your professional liability policy.  You do not need to sign or return this agreement to us.  Please maintain it in your files to document our mutual obligations with respect to PHI.

If you have any questions or concerns about the Business Associate Agreement, please contact Whitney Thomas at (404)260-3795 or whitneythomas@rsui.com.

Sincerely,

Whitney Thomas
Regulatory Compliance
RSUI Group, Inc.

RSUI Indemnity Company
Landmark American Insurance Company
Covington Specialty Insurance Company

Landmark v. Nurselect MSJ_00000222

*A member of Alleghany Capital Holdings LLC*

LAND000045

**BUSINESS ASSOCIATE AGREEMENT**

THIS BUSINESS ASSOCIATE AGREEMENT ("Agreement") is executed by Landmark American Insurance Company, Covington Specialty Insurance Company, RSUI Indemnity Company and RSUI Group, Inc. ("Business Associate") in favor of its insured healthcare providers (the "Provider").

**RECITALS**

WHEREAS, the Business Associate provides professional liability insurance to the Provider pursuant to a policy of insurance (the "Business Arrangement"), and in connection with the Business Arrangement the Provider discloses to the Business Associate certain individually identifiable protected health information ("PHI") that is subject to protection under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended from time to time.

WHEREAS, the parties desire to comply with the HIPAA standards for privacy of PHI of patients of the Provider, and to set forth the terms and conditions pursuant to which the parties will handle PHI that Business Associate receives in the course of performing its services for or on behalf of the Provider under the Business Arrangement.

NOW THEREFORE, for and in consideration of the recitals above, the benefits to Business Associate under the Business Arrangement and the mutual covenants and conditions herein contained, Business Associate agrees as follows:

**SECTION 1 – DEFINITIONS**

Terms used, but not otherwise defined in the Agreement shall have the same meaning as set forth in the Standards for Privacy of Individually Identifiable Health Information (the "Privacy Rules"), 45 CFR parts 160-164, as promulgated by the United States Department of Health and Human Services ("HHS"), as amended from time to time.

**SECTION II – OBLIGATIONS AND ACTIVITIES OF BUSINESS ASSOCIATE**

a.  Business Associate agrees to not use or disclose PHI other than as permitted or required by this Agreement or as required by law.

b.  Business Associate agrees to use appropriate safeguards to prevent use or disclosure of the PHI other than as provided for by this Agreement.

c.  Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of the requirements of this Agreement.

d.  Business Associate agrees to report to Provider any use or disclosure of the PHI, of which it becomes aware, and otherwise not provided for by this Agreement.

e.  Business Associate shall require its agents and subcontractors that receive PHI from Business Associate or Provider to agree to the same restrictions and conditions that apply through this Agreement to Business Associate with respect to such information.

f.  Business Associate agrees to make available and provide right of access to PHI held by the Business Associate that does not merely duplicate the information maintained by the Provider, to Provider at its request, or as directed by Provider, to an Individual.  Business Associate shall provide access within reasonable time and manner as specified by Provider.

Landmark v. Nurselect MSJ_00000223

g.  Business Associate agrees to incorporate all amendments or corrections to PHI when notified by the Provider in writing that such information is inaccurate or incomplete.  45 CFR § 164.526

h.  Business Associate agrees to make available to the Secretary of HHS (or its designee) all internal practices, books, and records relating to the use and/or disclosure of PHI received from the Provider, for purposes of determining the Provider's compliance with the Privacy Rules, subject to attorney-client and other applicable legal privileges.

i.  Business Associate agrees to provide an accounting of such disclosures of PHI to Provider or, as directed by Provider, to an Individual in accordance with 45 CFR § 164.528, as amended from time to time.  Business Associate shall provide such accounting within a reasonable time and manner as specified by the Provider.

j.  Business Associate shall comply with all applicable requirements of the HIPAA Security Rule.

k.  Business Associate shall immediately report to Covered Entity any breach of PHI, as defined by HIPAA.  Business Associate shall cooperate with Covered Entity's investigation, mitigation and response efforts related to any such breach.  Additionally, Business Associate shall be responsible for any costs, liabilities, damages, expenses, and attorney's fees incurred by Covered Entity related to such breach.

l.  In the event Business Associate undertakes any of Covered Entity's duties under HIPAA, Business Associate shall comply with all HIPAA regulations applicable to Covered Entity in the discharge of such duties.

## 2.1  PERMITTED USES AND DISCLOSURES OF PHI BY BUSINESS ASSOCIATE

a.  Business Associate, its agents and employees, may use or disclose PHI as necessary to perform its duties under the Business Arrangement and only as allowed by the terms of the Business Arrangement, this Agreement, or as required or allowed by law.

b.  Business Associate may also use and/or disclose PHI as necessary for the proper management and administration of Business Associate, and to carry out the legal responsibilities of Business Associate.

c.  Business Associate agrees that it will not use or disclose PHI in a manner that violates or would violate the Privacy Rules, or the minimum necessary policies and procedures of the Provider that are communicated to Business Associate.

d.  Business Associate may use PHI to report violations of the law to appropriate Federal and State authorities, consistent with 45 CFR § 164.502(j)(1).

## SECTION III – OBLIGATIONS OF THE PROVIDER

a.  Provider shall notify Business Associate of any limitation(s) in the Provider's notice of privacy practices in accordance with 45 CFR § 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of PHI.

b.  Provider shall notify Business Associate, in writing and in a timely manner, of any restrictions or other arrangement to which the Provider has agreed with an individual in accordance with 45 CFR § 164.522, to the extent that such changes may affect Business Associate's use or disclosure of PHI hereunder; provided however, that the Provider will not agree to, and Business Associate will not be required to comply with, any restriction that is inconsistent with the purpose or terms of the Business Arrangement.

## 3.1  PERMISSIBLE REQUESTS BY PROVIDER

Provider shall not request Business Associate to use and/or disclose PHI in any manner that would not be permissible under the Privacy Rule if done by Provider; provided however, that the Business Associate will use or disclose PHI for management and administrative activities of the Business Associate as outlined in Section 2.1.

## SECTION IV – TERM AND TERMINATION

## 4.1  TERM AND TERMINATION

This Agreement shall remain in effect for the entire term of the Business Arrangement, or until terminated as set forth herein.  This Agreement will automatically terminate without further action of the parties upon the termination or expiration of the Business Arrangement, subject to the following:

The Provider acknowledges and agrees that, due to the nature of the Business Arrangement, the Business Associate must have the ability to receive PHI from the Provider for as long as the Business Arrangement is in place, and that the Business Associate must have the ability to receive PHI from the Provider for the duration of any defense obligations arising under the Business Arrangement.  Thus, the Provider acknowledges and agrees that termination of this Agreement is not feasible as long as the Business Arrangement is in place, or as long as Business Associate has any defense obligations arising under the Business Arrangement.  Accordingly, any other provision in this Agreement notwithstanding, the parties agree that (a) any notice of termination of this Agreement will also serve as notice of termination of the Business Arrangement, (b) the termination of this Agreement will under no circumstances be effective until the termination of the Business Arrangement is effective, and (c) this Agreement may not be terminated and will remain in effect as long as Business Associate has any defense obligations arising under the Business Arrangement.

## 4.2  TERMINATION FOR MATERIAL BREACH

Subject to Section 4.1, upon Provider's knowledge of a material breach by Business Associate, Provider shall either:

a.  Provide an opportunity for Business Associate to cure the breach or end the violation and terminate this Agreement and the Business Arrangement if Business Associate does not cure the breach or end the violation within a reasonable time specified by the Provider;

b.  Immediately terminate this Agreement and the Business Arrangement if the Business Associate has breached a material term of this Agreement and cure is not possible; or

c.  If neither termination nor cure is feasible, Provider shall report the violation to the Secretary of HHS.

## 4.3  RETURN/DESTRUCTION OF PHI

Except as provided in Section 4.4, upon termination of the Business Arrangement (and any ongoing defense obligations, if applicable), for any reason, Business Associate will, if feasible, return or destroy PHI received from, or created or received by it on behalf of the Provider that Business Associate maintains in any form, including any backup tapes.  Business Associate shall retain no copies of such information.  Business Associate further agrees to use its best efforts to recover PHI in the possession of subcontractors or agents.

**4.4  NO FEASIBLE OR PRACTICAL RETURN/DESTRUCTION OF PHI**

Business Associate has determined that returning or destroying PHI is infeasible for ongoing defense obligations (if applicable), state regulatory requirements imposed upon professional liability insurers, such as reporting, review, and audit requirements, and carrying out any necessary business responsibility of the Business Associate.  This serves as Business Associate's notification to Provider of the conditions that make return or destruction infeasible.  Business Associate shall extend the protections of this Agreement to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

**SECTION V – MISCELLANEOUS**

a.  <u>Regulatory References</u> – A reference in this Agreement to a section of the Privacy Rule means the section as in effect or as amended.

b.  <u>Amendment</u> – The parties recognize that this Agreement may need to be modified from time to time and agree to take such action as is necessary to amend this Agreement for Provider to comply with federal and state law including, but not limited to the requirements of the Privacy Rule and HIPAA.

c.  <u>Survival</u> – The respective rights and obligations of Business Associate under Section 4.3 of this Agreement shall survive the termination of this Agreement.

d.  <u>Notices</u> – All notices and other communications required or permitted pursuant to this Agreement shall be in writing, addressed to the party at the party's regular business address. All notices and other communications shall be sent by overnight courier or sent by registered or certified mail, return receipt requested.

e.  <u>Interpretation</u> – Any ambiguity in this Agreement shall be resolved to permit Provider to comply with HIPAA and the Privacy Rules.

BUSINESS ASSOCIATE:

Signed:

Michael Wayman
Senior Vice President
RSUI Group, Inc.

Address for Notice:

RSUI Group, Inc.
945 East Paces Ferry Road
Suite 1800
Atlanta, GA  30326-1160

Landmark v. Nurselect MSJ_00000226

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# ADDITIONAL INSURED ENDORSEMENT (BLANKET)

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD**

1.  In consideration of the premium charged, the following is added as an Additional Insured, but solely with regard to professional services rendered or that should have been rendered by the Named Insured:

    Any person or organization to whom or to which the Named Insured is obligated by virtue of a written contract or by the issuance or existence of a written permit, to provide insurance such as is afforded by this policy.

2.  It is also agreed that the policy does not apply to:

    a.  **Claims** by an Additional Insured against the Named Insured;

    b.  **Claims** that include allegation or facts indicating sole liability on the part of an Additional Insured.

All other terms and conditions of this policy remain unchanged.

This endorsement effective    3/1/2023
Forms part of Policy Number    LHC801468
Issued to    NURSELECT LLC
by    Landmark American Insurance Company

Endorsement No.:    01

Landmark v. Nurselect MSJ_00000227

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# COMMUNICABLE DISEASE EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**A.** The following exclusion is added to Paragraph **2. Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

    **2.  Exclusions**

        This insurance does not apply to:

        **Communicable Disease**

        "Bodily injury" or "property damage" arising out of the actual or alleged transmission of a "communicable disease".

        This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

        **a.**  Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a "communicable disease";

        **b.**  Testing for a "communicable disease";

        **c.**  Failure to prevent the spread of the disease; or

        **d.**  Failure to report the disease to authorities.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

    **2.  Exclusions**

        This insurance does not apply to:

        **Communicable Disease**

        "Personal and advertising injury" arising out of the actual or alleged transmission of a "communicable disease".

        This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

        **a.**  Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a "communicable disease";

        **b.**  Testing for a "communicable disease";

        **c.**  Failure to prevent the spread of the disease; or

        **d.**  Failure to report the disease to authorities.

**C.** For the purposes of this exclusion:

    "Communicable disease" means any illness or disease caused by an infectious agent or its toxins, including but not limited to any bacteria, virus, mold, mildew, fungi, or parasite, that occurs through the direct or indirect transmission of the infectious agent or its product.

This endorsement effective     3/1/2023
Forms part of Policy Number     LHC801468
Issued to     NURSELECT LLC
by     Landmark American Insurance Company

                           Endorsement No.:     02

RSG 56201 0920

Landmark v. Nurselect MSJ_00000228

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

## CROSS COVERAGE EXCLUSION – MEDICAL BROAD FORM

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

The Medical Professional Liability coverage and the Commercial General Liability coverage provided in this Policy are mutually exclusive.

It is agreed that any claim, damages, Supplementary Payments, or any amounts covered under the Commercial General Liability Coverage Form Claims Made RSG 51030 shall not also be covered under the Medical Professional Liability Coverage Part Claims Made and Reported Basis-Broad-RSG 51044.

It is further agreed that any **Claim**, **Damages**, or **Claim Expenses** or any amounts covered under the Medical Professional Liability Coverage Part Claims Made and Reported Basis-Broad-RSG 51044 shall not also be covered under the Commercial General Liability Coverage Form Claims Made RSG 51030.  Whenever any **Claim** is determined to be covered, either wholly or in part, by the Medical Professional Liability Coverage Part Claims Made and Reported Basis-Broad-RSG 51044, the Commercial General Liability Coverage Form shall not apply and the maximum liability of the Company shall not exceed the Professional Liability Each Claim limit of liability shown in the Declarations.

All other terms and conditions of this policy remain unchanged.

This endorsement effective     3/1/2023
Forms part of Policy Number     LHC801468
Issued to     NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:     03

RSG 56136 0319

Landmark v. Nurselect MSJ_00000229

LAND000052

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# CRYPTOCURRENCY EXCLUSION

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

1. In consideration of the premium charged, it is agreed that no coverage shall apply under this policy to any **Claim** and/or **Claim Expenses** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving **Cryptocurrency** or any **Cryptocurrency Offering**.

2. It is agreed that the following definitions are added to **Part III. Definitions**:

   A. **Cryptocurrency** means any actual or purported electronic, computer derived, digital or virtual instrument, asset, currency, token, coin, unit of account, store of value, funds, or medium of exchange using encryption techniques, methodologies, or technology, including blockchain or similar mechanisms, to secure, verify and/or validate the transfer of such electronic, computer derived, digital or virtual instrument, asset, currency, unit of account, store of value, funds, or medium of exchange between one or more parties.

   B. **Cryptocurrency Offering** means any direct, indirect, actual, alleged, attempted, or proposed purchase or sale, or offer to purchase or sell, any **Cryptocurrency** issued or created by, or in connection with the Insured.

All other terms and conditions of this policy remain unchanged.

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to       NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:      04

Landmark v. Nurselect MSJ_00000230

LAND000053

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# DEDUCTIBLE LIABILITY INSURANCE (COMBINATION POLICY – MULTIPLE DEDUCTIBLES)

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**SCHEDULE**

| Coverage | Amount and Basis of Deductible | |
|---|---|---|
| | **PER CLAIM** or | **PER OCCURRENCE** |
| 1)  Bodily Injury Liability | | |
| OR | | |
| 2)  Property Damage Liability | | |
| OR | | |
| 3)  Personal and Advertising Injury Liability | | |
| OR | | |
| 4)  Bodily Injury Liability, Property Damage Liability, Personal and Advertising Injury Liability | $ 2,500 | |

**APPLICATION OF ENDORSEMENT** (Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all "Bodily Injury", "Property Damage" and "Personal and Advertising Injury" Liability, however caused):

1.  Our obligation under the Bodily Injury Liability, Property Damage Liability, and Personal and Advertising Injury Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages.

2.  The deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above.  The deductible amount stated in the Schedule above applies as follows:

   A.  PER CLAIM BASIS.  If the deductible amount indicated in the Schedule above is on a per claim basis, that deductible applies as follows:

      1)  Under Bodily Injury Liability coverage, to all damages sustained by any one person because of "Bodily Injury";

      2)  Under Property Damage Liability Coverage, to all damages sustained by any one person because of "Property Damage";

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to      NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:      05

Landmark v. Nurselect MSJ_00000231

3) Under Personal and Advertising Injury Liability Coverage, to all damages sustained by any one person because of "Personal and Advertising Injury".

4) Under Bodily Injury Liability, Property Damage Liability, and Personal and Advertising Injury Liability Coverages Combined, to all damages sustained by any one person because of:

   a) "Bodily Injury";

   b) "Property Damage";

   c) "Personal and Advertising Injury".

If damages are claimed for care, loss of services or death resulting at any time from "Bodily Injury", a separate deductible amount will be applied to each person making a claim for such damages.

With respects to "Property Damage" and "Personal and Advertising Injury" Liability, person includes an organization.

B. PER OCCURRENCE BASIS.  If the deductible amount indicated in the Schedule above is on a "per occurrence" basis, that deductible amount applies as follows:

1) Under Bodily Injury Liability Coverage, to all damages because of "Bodily Injury";

2) Under Property Damage Liability Coverage, to all damages because of "Property Damage";

3) Under Personal and Advertising Injury Liability Coverage, to all damages sustained by any one person because of "Personal and Advertising Injury".

4) Under Bodily Injury Liability, Property Damage Liability, and Personal and Advertising Injury Liability Coverages Combined, to all damages sustained by any one person because of:

   a) "Bodily Injury";

   b) "Property Damage";

   c) "Personal and Advertising Injury".

3. The terms of this insurance, including those with respect to:

   a) Our right and duty to defend any "suits" seeking those damages; and

   b) Your duties in the event of any "occurrence", claim, or "suit"

   apply irrespective of the application of the deductible amount.

4. We may pay any part of all of the deductible amount to effect settlement of any claims or "suit" and upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

5. When used in this endorsement, damages includes any payments made under the Supplementary Payments provisions of this policy.

6. If you do not promptly reimburse us for any deductible amount owned, then any cost incurred by us in collection of the deductible amount will be added and applied in addition to the applicable deductible amount without limitation.  These costs include, but are not limited to, collection agency fees, attorney's fees and interest.

All other terms and conditions of this policy remain unchanged.

Landmark v. Nurselect MSJ_00000232

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – CORRECTIONAL MEDICINE

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD**

In consideration of the premium charged, it is agreed no coverage shall apply under this policy to any **Claim** and/or **Claim Expenses** based upon, arising out of, or in any way involving the rendering of or failure to render services of a professional nature, including healthcare services and medical services, by the Insured or by any person or organization for whose acts, errors or omissions the Insured is legally responsible, in a correctional facility or center, detention center, jail, penal institution, prison, remand center, reformatory, or any similar center, facility, or institution.

All other terms and conditions of this policy remain unchanged.

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to     NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:      06

RSG 56203 0321

Landmark v. Nurselect MSJ_00000233

LAND000056

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – DESIGNATED PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

SCHEDULE

| Description Of Professional Services: |
|---|
| ALLIED HEALTHCARE STAFFING AGENCY |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any professional services shown in the Schedule, the following exclusion is added to Paragraph **2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability**:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" due to the rendering of or failure to render any professional service.

All other terms and conditions of this policy remain unchanged.

This endorsement effective      3/1/2023
Forms part of Policy Number      LHC801468
Issued to      NURSELECT LLC
by      Landmark American Insurance Company

Endorsement No.:      07

RSG 56114 1118

Landmark v. Nurselect MSJ_00000234

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# HIRED AND NON-OWNED AUTO LIABILITY

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

In consideration of an additional premium of $Included, it is hereby understood and agreed that the policy is amended as follows:

**A.** The declarations page is amended to include the following under **Commercial General Liability** in the **LIMITS OF INSURANCE** section:

> $1,000,000                          Hired Auto and Non-Owned Auto Liability Each Occurrence
>
> $1,000,000                          Hired Auto and Non-Owned Auto Liability Aggregate

**B.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A.** applies, **SECTION II – WHO IS AN INSURED** is deleted and replaced with the following:

   **1.** Each of the following is an insured to the extent set forth below.

   **a.** You.

   **b.** Any other person using a "hired auto" with your permission.

   **c.** With respect to a "non-owned auto", any partner or "executive officer" of yours, but only while such "non-owned auto" is being used in your business.

   **d.** Any other person or organization, but only with respect to their liability because of acts or omissions of an insured under paragraphs **a., b.** or **c.** above.

   **2.** None of the following is an insured:

   **a.** Any partner or "executive officer" with respect to any "auto" owned by such partner or officer or a member of his or her household;

   **b.** The owner or lessee (of whom you are a sub-lessee) of a "hired auto" or the owner of a "non-owned auto" or any agent or "employee" of any such owner or lessee; or

   **c.** Any person or organization with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**C.** **SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, is amended by the addition of the following:

Hired Auto and Non-Owned Auto Liability:  The insurance provided under **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, shall apply to "bodily injury" and "property damage" arising out of the:

   **1.** maintenance or use of a "hired auto" by you or your "employees" in the course of your business; or

   **2.** use of a "non-owned auto" by any person other than you in the course of your business.

**D.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, the definition of "insured contract" in **SECTION VI – DEFINITIONS**, is deleted and replaced with the following:

This endorsement effective     3/1/2023
Forms part of Policy Number     LHC801468
Issued to     NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:     08

RSG 54105 0713

Landmark v. Nurselect MSJ_00000235

LAND000058

"Insured contract" means that part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto".  However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

**E.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, **SECTION V – DEFINITIONS** is amended by the addition of the following:

"Hired auto" means any "auto" you lease, hire, rent or borrow.  This does not include any "auto" you lease, hire, rent, or borrow from any of your "employees", your partners, your "executive officers", or "volunteer workers", or members of their households.

"Non-owned auto" means any "auto" you do not own, lease, hire, rent or borrow which is used in connection with your business.  This includes "autos" owned by your "employees", your partners, your "executive officers", or "volunteer workers", or members of their households, but only while used in your business.

**F.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, subparagraph **g.** of paragraph **2.**, **Exclusions** of **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** (Section I – Coverages) is deleted and replaced as follows:

**g.** any "claim" based upon or arising out of "bodily injury" or "property damage" arising out of the ownership, maintenance, operation, use or entrustment to others or loading or unloading of:

**(1)** any aircraft or watercraft owned or operated by or rented or loaned to any Insured; or

**(2)** any other aircraft or watercraft operated by any person in the course of his/her employment or activities on behalf of the Named Insured.

**G.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, subparagraph **j.** of paragraph **2.**, **Exclusions** of **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** (Section I – Coverages) is deleted and replaced as follows:

**j.** any "claim" based upon or arising out of "property damage" to:

**(1)** property owned or being transported by or rented or loaned to the Insured; or

**(2)** property in the care, custody or control of the Insured.

**H.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, subparagraph **c.** of paragraph **2.**, **EXCLUSIONS OF COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** (Section I – coverages) is deleted.

**I.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, **SECTION III – LIMITS OF INSURANCE** is amended by the addition of the following:

The Hired Auto and Non-Owned Auto Liability Each Occurrence limit shown in paragraph **A.** of this endorsement is the most we will pay for damages because of all "bodily injury" and "property damage" with respect to Hired Auto and Non-Owned Auto Liability arising out of any one "occurrence".

The Hired Auto and Non-Owned Auto Liability Aggregate limit shown in paragraph **A.** of this endorsement is the most we will pay because of all "bodily injury" and "property damage" with respect to all Hired Auto and Non-Owned Auto Liability.

**J.** Paragraph **2.** of **SECTION III – LIMITS OF INSURANCE** is deleted and replaced by the following:

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A** including Hired Auto and Non-Owned Auto Liability, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**b.** Damages under Coverage **B**.

**K.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, paragraph **4. Other Insurance** in **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS** is deleted and replaced with the following:

This insurance is excess over any primary insurance covering any "hired auto" or any "non-owned auto".

Landmark v. Nurselect MSJ_00000236

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# MINIMUM RETAINED PREMIUM

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

In the event of cancellation of this policy by the Insured, return premium shall be computed at .90 of the pro rata unearned policy premium, subject however to a retention by the company of not less than $5,625.00.

Nothing in this endorsement is deemed to affect the Company's cancellation rights which remain as indicated in the coverage form.

It is further agreed that return premium may be allowed on a pro rata basis if cancelled for non payment of premium or deductible, subject however to retention by the company of the minimum retained premium as shown above.

All other terms and conditions of this policy remain unchanged.

This endorsement effective     3/1/2023
Forms part of Policy Number    LHC801468
Issued to     NURSELECT LLC
by    Landmark American Insurance Company

Endorsement No.:    09

RSG 54025 0405

Landmark v. Nurselect MSJ_00000237

LAND000060

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# NUCLEAR ENERGY LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

**This policy does not apply;**

**a.  Under any Liability Coverage,** to bodily injury or property damage;

(1)  with respect to which an Insured under the policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, or Nuclear Insurance Associates of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2)  resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization;

**b.  Under any Medical Payments Coverage** or any Supplemental Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization;

**c.  Under any Liability Coverage** to bodily injury or property damage resulting from the hazardous properties of nuclear material, if:

(1)  the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an insured, or (b) has been discharged or dispersed therefrom;

(2)  the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(3)  the bodily injury or property damage arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion (3) applies only to property damage to such nuclear facility and any property thereat;

**d.  As used in this Endorsement:**

(1)  "Hazardous properties" include radioactive, toxic, or explosive properties;

(2)  "Nuclear material" means source material, special nuclear material or byproduct material;

(3)  "Source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

(4)  "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor,

This endorsement effective     3/1/2023
Forms part of Policy Number     LHC801468
Issued to     NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:     10

Landmark v. Nurselect MSJ_00000238

(5) "Waste" means any waste material (a) containing byproduct material and (b) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (6), (a) or (b) thereof;

(6) "Nuclear facility" means:

 (a) any nuclear reactor;

 (b) any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing spent fuel, or (iii) handling, processing, or packaging waste;

 (c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

 (d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste; and includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations;

(7) "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

(8) "Property damage" includes all forms of radioactive contamination of property.

All other terms and conditions of this policy remain unchanged.

Landmark v. Nurselect MSJ_00000239

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# OPIOID AND CONTROLLED SUBSTANCE EXCLUSION

This endorsement modifies insurance provided under the following:

**All Coverages without Limitation**

In consideration of the premium charged, it is agreed that this Policy will not be triggered or apply and will provide no coverage for indemnity, defense, supplemental or any other exposure where **Claims**, suits, occurrences or demands of any sort, without limitation, against any Insured are:

1. Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

    **a.** Any actual or alleged abuse, misuse, illicit use, overuse, addiction, dependency, unlawful distribution, or diversion of any **Controlled Substance**;

    **b.** Any supervision, instruction, training, education, recommendation, or guideline given, or which should have been given, in connection with any **Controlled Substance**; or

    **c.** Inadequate or inaccurate evaluation, control or reporting of, or the failure to evaluate, control or report, the conduct or suspected conduct described in paragraph **1.a.** above.

2. Brought by or on behalf of any state, municipality or other governmental entity or agency seeking damages, fines, penalties or any other type of relief, whether monetary or not, arising from or in any way related to any Insured manufacturing, selling, distributing, or dispensing **Controlled Substances**.

For the purposes of this exclusion, **Controlled Substances** shall mean:

**a.** any opioid or narcotic drug, narcotic medication, or narcotic substance of any type, nature or kind, including, but not limited to, buprenorphine, codeine, fentanyl, hydrocodone, morphine, oxymorphone, tapentadol, oxycontin, hydromorphone, medperidine, methadone, oxycodone, or naloxone;

**b.** any substance that is a controlled substance defined by or included in the Schedules of the Controlled Substance Act of the United States of America (21 U.S.C. § 801 et seq.) or any other judicial, statutory, regulatory or other legal measure of any nation, province, state, municipality or other governmental division or subdivision; or

**c.** any substance that is in the future labelled or determined to be any of the substances described in **a.** or **b.** of this definition.

This exclusion applies even if the **Claims** or suits against any Insured allege negligence, including but not limited to negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by any Insured.

This exclusion also applies to any **Claim** or suit by or on behalf of any individual or entity seeking certification at any time as a class action, whether or not such action is actually certified, arising from or in any way related to any Insured manufacturing, selling, distributing, or dispensing **Controlled Substances**.

However, this exclusion shall not apply to any **Claim** by or on behalf of a patient, arising out of an actual or alleged negligent act, error or omission by the Insured in the prescribing, administering, or dispensing of a **Controlled Substance** for its intended use, or in providing counseling or treatment related to any **Controlled Substance**.

All other terms and conditions of this policy remain unchanged.

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to      NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:      11

RSG 56191 0421

Landmark v. Nurselect MSJ_00000240

LAND000063

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# PENNSYLVANIA – NOTICE OF CANCELLATION AND NON-RENEWAL AMENDMENT

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

**The Notice of Cancellation and non-renewal clause as contained in this policy is deleted and replaced as follows:**

The Named Insured may cancel this policy by mailing or delivering to the Company advance notice of cancellation.

The Company may cancel this policy by:

A.  CANCELLATION OF POLICIES IN EFFECT FOR  SIXTY (60) DAYS OR LESS:

If this policy has been in effect for sixty (60) days or less, the Company may cancel this policy for any reason, by mailing thirty (30) days advance notice of cancellation to the Named Insured.

B.  CANCELLATION OF POLICIES IN EFFECT FOR MORE THAN SIXTY (60) DAYS:

If this policy has been in effect more than sixty (60) days or more, or is a renewal policy to Landmark American Insurance Company, the Company may cancel this policy only for one or more of the following reasons by mailing the following number of day advance notice to the Named Insured:

| REASON FOR CANCELLATION | NUMBER OF DAYS ADVANCE NOTICE TO BE PROVIDED NAMED INSURED |
|---|---|
| Non-payment of premium (failure to pay a premium when due) | Fifteen (15) days |
| If the Named Insured makes a material misrepresentation that effects the insurability of risk | Fifteen (15) days |
| A substantial change in the risk covered by this policy | Sixty (60 days |
| If the Company loses its reinsurance for this policy | Sixty (60) days |
| If the Named Insured does not comply with policy terms, conditions or duties | Sixty (60) days |
| Any other reason approved the by Insurance Commissioner | Sixty (60) days |

**This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions, or concealment of facts material to the acceptance of the risk or to the hazard assumed by the Company**

C.  NOTICE OF NON-RENEWAL:

In the event that the Company decides to non-renew this policy, The Company will mail at least sixty (60)

This endorsement effective     3/1/2023
Forms part of Policy Number    LHC801468
Issued to     NURSELECT LLC
by    Landmark American Insurance Company

Endorsement No.:     12

Landmark v. Nurselect MSJ_00000241

days advance written notice of non-renewal to the Named Insured.

D.  NOTICE OF INCREASE IN PREMIUM – RENEWAL:

If the Company offers renewal terms with an increase in premium, the Company will provide the Named Insured with thirty (30) days advance notice.

The cancellation or non-renewal notice will be mailed via registered or first class mail to the Named Insured at the mailing address stated in the Declarations.  The cancellation or non-renewal notice will state the effective date of the cancellation as well as the reason(s) for cancellation or non-renewal and the policy will terminate on that date.

If coverage is cancelled by the Company, the earned premium shall be computed pro-rata.   If coverage is cancelled by the Insured, the earned premium shall be computed short rate.

All other terms and conditions of this policy remain unchanged.

Landmark v. Nurselect MSJ_00000242

# *IMPORTANT NOTICE*

**PENNSYLVANIA SURPLUS LINES DISCLOSURE NOTICE**

**The insurer which has issued this insurance is not licensed by the Pennsylvania Insurance Department and is subject to limited regulation. This insurance is NOT covered by the Pennsylvania Insurance Guaranty Association.**

Landmark v. Nurselect MSJ_00000243

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# SERVICE OF SUIT

This endorsement modifies insurance provided under the following:

**ALL COVERAGE PARTS**

In the event of our failure to pay any amount claimed to be due, we, at your request, will submit to the jurisdiction of any court of competent jurisdiction within the United States of America.  Nothing in this condition constitutes or should be understood to constitute a waiver of our rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court or seek a transfer of a case to another Court as permitted by the laws of the United States or of any state in the United States, moreover, this endorsement is not an agreement that the law of a particular jurisdiction applies to any dispute under the policy.

Service of process in such suit may be made upon the Senior Claims Officer of RSUI Group, Inc. 945 East Paces Ferry Road, Suite 1800, Atlanta, GA  30326-1160, or his designee. In any suit instituted against any one of them upon this contract, we will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above named is authorized and directed to accept service of process on our behalf in any such suit and/or upon your request to give a written undertaking to you that we will enter a general appearance upon our behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States of America, which makes provision therefore, we hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for the purpose in the statute, or his successor or successors in office, as our true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by you or on your behalf or any beneficiary hereunder arising out of  this contract of insurance, and we hereby designate the above named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

All other terms and conditions of the policy remain unchanged

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to      NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:      14

RSG 94022 0407

Landmark v. Nurselect MSJ_00000244

LAND000067

**LANDMARK AMERICAN INSURANCE COMPANY**

# State Fraud Statements

(Signature Required for New York Only)

### ARKANSAS, LOUISIANA, RHODE ISLAND, TEXAS AND WEST VIRGINIA FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

### ALASKA FRAUD STATEMENT

A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

### ALABAMA FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

### ARIZONA FRAUD STATEMENT

For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

### CALIFORNIA FRAUD STATEMENT

For your protection, California law requires that you be made aware of the following: Any person who knowingly presents false or fraudulent information to obtain or amend insurance coverage or to make a claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

### COLORADO FRAUD STATEMENT

It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance within the department of regulatory agencies.

### DELAWARE FRAUD STATEMENT

Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

### DISTRICT OF COLUMBIA FRAUD STATEMENT

**WARNING:** It is a crime to provide false, or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

### FLORIDA FRAUD STATEMENT

Any person who knowingly and with intent to injure, defraud or deceive any insurer, files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

A member of Alleghany Insurance Holdings LLC

Landmark v. Nurselect MSJ_00000245

### HAWAII FRAUD STATEMENT

For your protection, Hawaii law requires you to be informed that any person who presents a fraudulent claim for payment of a loss or benefit is guilty of a crime punishable by fines or imprisonment, or both.

### IDAHO FRAUD STATEMENT

Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

### INDIANA FRAUD STATEMENT

Any person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

### KANSAS FRAUD STATEMENT

An act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto.

### KENTUCKY FRAUD STATEMENT

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

### MAINE FRAUD STATEMENT

It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

### MARYLAND FRAUD STATEMENT

Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

### MINNESOTA FRAUD STATEMENT

Any person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

### NEW HAMPSHIRE FRAUD STATEMENT

Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

### NEW JERSEY FRAUD STATEMENT

Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

A member of Alleghany Insurance Holdings LLC
Landmark v. Nurselect MSJ_00000246

### NEW MEXICO FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

### OHIO FRAUD STATEMENT

Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

### OKLAHOMA FRAUD STATEMENT

**WARNING:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

### OREGON FRAUD STATEMENT

Any person who knowingly files a claim containing a false or deceptive statement for payment of a loss or benefit or knowingly presents materially false information in an application for insurance may be guilty of a crime and may be subject to fines and confinement in prison.

### PENNSYLVANIA FRAUD STATEMENT

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

### PUERTO RICO FRAUD STATEMENT

Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances be present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

### TENNESSEE, VIRGINIA, AND WASHINGTON FRAUD STATEMENT

It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

A member of Alleghany Insurance Holdings LLC
Landmark v. Nurselect MSJ_00000247

**SIGNATURE REQUIRED – NEW YORK ONLY**

**NEW YORK FRAUD STATEMENT**

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

| LHC801468 | NURSELECT LLC |
|---|---|
| Policy Number | Insured/Applicant/Claimant (Legal Entity) |

_____

By (Authorized Representative) - Printed Name

_____

By (Authorized Representative) - Signature

_____

Title

_____

Date

A member of Alleghany Insurance Holdings LLC

Landmark v. Nurselect MSJ_00000248

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# SUPPLEMENTARY COVERAGES ENDORSEMENT

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD**

In consideration of the premium charged, it is agreed that:

1. **Part I. Insuring Agreements, H. Supplementary Coverages** is amended to include:

   1. The Company will pay **Damages** or **Claims Expenses** as a result of **Claims** arising out of an insured's professional services performed during the rendering of emergency medical treatment without remuneration, at the scene of an accident, medical crisis or disaster.  This coverage is subject to a sub-Limit of Liability in an aggregate amount of $25,000.  There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

   2. The Company will reimburse the Insured for **Evacuation Expenses** actually incurred in connection with an **Evacuation** which first takes place during the **Policy Period** and which is reported to the Company as soon as practicable, but in no event later than thirty (30) days after you first incur **Evacuation Expenses** for which coverage will be requested.  You are not required to obtain the Company's prior written approval or consent before incurring any **Evacuation Expenses**.

      This coverage is subject to a sub-Limit of Liability in an aggregate amount of $25,000.  There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

      No coverage will be available for **Evacuation Expenses** arising out of any:

      a. strike or bomb threat, unless the **Evacuation** was ordered by a civil authority;

      b. false fire alarm or planned evacuation drill;

      c. vacating of one or more residents because of their individual medical condition;

      d. nuclear reaction, radiation, or any radioactive contamination, however caused;

      e. seizure or destruction of property by order of a governmental authority, provided that this exclusion shall not apply to an order of evacuation by a governmental authority due to a condition described above; or

      f. war, including undeclared or civil war, warlike action by a military force, insurrection, rebellion, or revolution.

   3. The Company will pay up to $500 for loss that is due to **Property Damage** to your patient's tangible property if resulting directly from or during the performance of professional services as described in the Declarations.  The Company will make these payments regardless of fault.  These payments will not exceed $5,000 for all such losses resulting from all professional services, regardless of the number of patients whose tangible property is injured.  There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

   4. The Company will reimburse the Insured for **Legal/Media Expenses** actually incurred in connection with a **Legal Defense Proceeding** first brought against an Insured and reported during the **Policy Period** that occurred after the Policy's **Retroactive Date** and that arises out of the Insured's performance of professional services as described in the Declarations.

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to      NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:      16

Landmark v. Nurselect MSJ_00000249

This coverage is subject to a sub-Limit of Liability in an aggregate amount of $25,000. There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

2. The following Definitions are in addition to Policy Definitions contained in **Part III.** and apply only to this endorsement:

   A. **Evacuation** means the removal of all or the majority of patients from one or more of your locations or facilities in response to an actual or threatened, natural or man-made condition that is unexpected and unforeseen and causes the patients of such location or facility to be in imminent danger of loss of life or physical harm.

   Such condition must be in the form of an emergency or sudden crisis requiring immediate action, and not the result of a latent or hidden condition at the location or facility.

   B. **Evacuation Expenses** means reasonable costs and expenses actually incurred by you in connection with the **Evacuation**, including the costs associated with transporting and lodging patients who have been evacuated. **Evacuation Expenses** shall not include any remuneration, salaries, overhead, fees, or benefit expenses of the Named Insured or any Insured.

   C. **Property Damage** means:

      1. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

      2. Loss of use of tangible property of others that is not physically injured. All such loss of use shall be deemed to occur at the time of the accident, including continuous or repeated exposure to substantially the same general harmful conditions that caused it.

   For the purposes of this coverage, electronic data is not tangible property.

   As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

   D. **Legal Defense Proceeding** means:

      1. A hearing or disciplinary action against an Insured before a state or other licensing board or governmental regulatory body;

      2. A civil or criminal proceeding in which the Insured is not a defendant but has been ordered to offer deposition testimony regarding treatment rendered to a patient;

      3. A civil or criminal proceeding in which the Insured is not a party but has received a subpoena for record production regarding treatment rendered to a patient; or

      4. A HIPAA proceeding.

   E. **Legal/Media Expenses** means reasonable fees and costs of attorneys, experts and consultants incurred by the Insured in the investigation and defense of a **Legal Defense Proceeding**. **Legal/Media Expenses** also includes reasonable costs incurred by the Insured in the management of public relations with respect to a **Legal Defense Proceeding**, including reasonable fees and costs of third-party media consultants. Solely with respect to a HIPAA proceeding, **Legal/Media Expenses** shall include civil fines and penalties resulting from any HIPAA proceeding. **Legal/Media Expenses** shall not include any remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of an Insured.

All other terms and conditions of this policy remain unchanged.

Landmark v. Nurselect MSJ_00000250

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# VIOLATION OF CONSUMER PROTECTION LAWS EXCLUSION

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

This insurance does not apply to any **Claim** based upon or arising directly, or indirectly, out of any actual or alleged violation of any federal, state or local consumer protection law(s), statute, ordinance or regulation including, but not limited to, the following:

1. The False Claims Act (FCA), including any amendment of or addition to such law;

2. The Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank), including any amendment of or addition to such law;

3. The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA);

4. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

5. The Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (CAN-SPAM Act), including any amendment of or addition to such law;

6. That addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information;

7. Any communication, distribution, publication, sending or transmission via telephone, telephone facsimile machine, computer or other telephonic or electronic devices, including claims asserted under the common law;

8. **Claims** brought by any state or federal government agency, or any person or entity on their behalf, including qui tam **claims**, seeking to enforce any consumer protection law; or

9. Actual or alleged violation of any laws, regulations or guidelines relating to the accessibility of the Insured's website.

10. Any biometric privacy law or any such similar law or statute anywhere in the world that governs or relates to the collection, use, safeguarding, handling, storage, retention or destruction of biometric identifiers, biometric data or biometric information of any kind, including but not limited to retina or iris scans, fingerprints, voiceprints, or scans of hand or face geometry.

All other terms and conditions of this policy remain unchanged.

This endorsement effective     3/1/2023
Forms part of Policy Number     LHC801468
Issued to     NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:     17

Landmark v. Nurselect MSJ_00000251

| RSUI Group, Inc.<br>945 East Paces Ferry Road, Suite 1800<br>Atlanta, GA 30326-1160 | HOME HEALTH CARE, NURSE REGISTRY, INFUSION THERAPY OR OTHER MEDICAL STAFFING SUPPLEMENTAL APPLICATION |
|---|---|

1. Name of Applicant: _____

2. Type of Firm (check all that apply):  ☐ Home Health Care  ☐ Infusion Therapy  ☐ Visiting Nurse Agency

   ☐ Nurse Registry  ☐ Other Medical Staffing (specify): _____

3. Date Established: _____

4. Location(s) where services are provided (total must be 100%)  _____% Home  _____% Hospice

   _____% Nursing Home  _____%Assisted Living Facility  _____% Hospital  _____%Clinic/Doctors Office

   _____% Adult Day Care  _____% Correctional Facility  _____% Other Facility (specify):

5. Do you provide any of the following services:

   Pediatric Care? Describe: _____  Yes ☐  No ☐

   Pediatric Ventilator/Trach Care? Describe: _____  Yes ☐  No ☐

   Live-In Care? Describe: _____  Yes ☐  No ☐

6. Employees/Independent Contractors – Annual Staffing:

| Type of Employee/Independent Contractor | No. Full-Time | No. Part-Time | Billable hours Per Year |
|---|---|---|---|
| Employed Registered Nurse | _____ | _____ | _____ |
| Contracted Registered Nurse | _____ | _____ | _____ |
| Employed Licensed Practical Nurse | _____ | _____ | _____ |
| Contracted Licensed Practical Nurse | _____ | _____ | _____ |
| Employed Certified Nurse Assistant | _____ | _____ | _____ |
| Contracted Certified Nurse Assistant | _____ | _____ | _____ |
| Employed Nurse Practitioner/Physician Assistant | _____ | _____ | _____ |
| Contracted Nurse Practitioner/Physician Assistant | _____ | _____ | _____ |
| Employed Companion/Home Health Aide | _____ | _____ | _____ |
| Contracted Companion/Home Health Aide | _____ | _____ | _____ |
| Employed Social Worker | _____ | _____ | _____ |
| Contracted Social Worker | _____ | _____ | _____ |
| Employed Physical Therapist | _____ | _____ | _____ |
| Contracted Physical Therapist | _____ | _____ | _____ |
| Employed Other Medical (specify) | _____ | _____ | _____ |
| Contracted Other Medical (specify) | _____ | _____ | _____ |

7. Please provide a copy of the applicant's credentialing procedures and background check procedures.

8. Are drug, alcohol and sexual abuse screening or testing conducted? (Please provide full details)  Yes ☐  No ☐

RSG 50062 0222

Landmark v. Nurselect MSJ_00000252

9.   Are criminal background checks conducted in all states? (Please provide full details)      Yes ☐      No ☐

10.  Anticipated payroll amount for the next 12 months: _____

11.  Does the Applicant warrant that all employed and contracted physicians, surgeons and dentists      Yes ☐      No ☐

maintain their own medical malpractice professional liability insurance coverage and confirm with a certificate of insurance or

declarations page? If No, please provide details.


**REPRESENTATIONS**

I understand that the information submitted herein becomes a part of my professional liability application and is subject to the same warranty and conditions.
Must be signed and dated by an Owner, Partner or Principal as duly authorized on behalf of the Applicant.

_____

     Signature of the Applicant                          Title                    Date

RSG 50062 0222

Landmark v. Nurselect MSJ_00000253

LAND000076

| **RSUI Group, Inc.**<br>945 East Paces Ferry Road, Suite 1800<br>Atlanta, GA  30326-1160 | **RENEWAL APPLICATION FOR MISCELLANEOUS MEDICAL PROFESSIONAL LIABILITY INSURANCE (CLAIMS-MADE FORM)** |
|---|---|

## General Applicant Information

1. Name of Applicant: _____

   _____

2. Any changes in Address?    ☐ Yes ☐ No (if yes, please complete the below)

   Principal Address: _____

   _____

3. City: _____ County: _____ State: _____ Zip Code: _____

   Website: _____

## Applicant Practice

4. Any change in the applicant's professional activities for which coverage is desired? (if yes, please describe below)    ☐ Yes ☐ No

   _____

   _____

5. Does the Applicant provide any Correctional Medicine Services?    ☐ Yes ☐ No

6. In what states is the Applicant registered and licensed to practice? _____

   _____

7. During the past 12 months, has the applicant acquired or been acquired by another company?    ☐ Yes ☐ No
   If yes please describe below

   _____

   _____

8. State sources and amounts of total revenue:

   | Source | Amount Last Policy Year | This Policy Year |
   |---|---|---|
   | a. Charitable Contributions | $ _____ | $ _____ |
   | b. Government Funding | $ _____ | $ _____ |
   | c. Fee for Services | $ _____ | $ _____ |
   | d. _____ | $ _____ | $ _____ |
   | e. _____ | $ _____ | $ _____ |
   | TOTAL GROSS REVENUE: | $ _____ | $ _____ |

9. Number of patient encounters last 12 months (_____) and/or patient tests carried out (_____).
   (NOTE: "Patient encounters" refers to number of *visits* – not number of patients.)

10. Number of estimated patient encounters the next 12 months (_____) and/or patient tests carried out (_____).
    (NOTE: "Patient encounters" refers to number of *visits* – not number of patients.)

Landmark v. Nurselect MSJ_00000254

11. If applicant has a training school, complete the following.

| Specify profession for which students are being trained | Max No. of students per session | No. of sessions per year | % of time involved in clinical setting | Number of students | Qualifications of faculty (eg. MD, RN, PhD) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

12. List the number and type of employees, volunteers or independent contractors, their billable hours, and whether or not they carry individual medical malpractice coverage for their services on behalf of the entity.

| | Employees | Volunteers | Independent Contractors | Billable Hours | Insured on own Med Mal Policy |
|---|---|---|---|---|---|
| Aestheticians | | | | | ☐ Yes ☐ No |
| Chiropractors | | | | | ☐ Yes ☐ No |
| Dieticians | | | | | ☐ Yes ☐ No |
| EMT's | | | | | ☐ Yes ☐ No |
| Laboratory Technicians | | | | | ☐ Yes ☐ No |
| Nurse, Aides | | | | | ☐ Yes ☐ No |
| Nurse Anesthetists | | | | | ☐ Yes ☐ No |
| Nurses, Licensed Practical | | | | | ☐ Yes ☐ No |
| Nurse Midwives | | | | | ☐ Yes ☐ No |
| Nurse Practitioner | | | | | ☐ Yes ☐ No |
| Nurse, Registered | | | | | ☐ Yes ☐ No |
| Opticians | | | | | ☐ Yes ☐ No |
| Optometrists | | | | | ☐ Yes ☐ No |
| Paramedics | | | | | ☐ Yes ☐ No |
| Perfusionists | | | | | ☐ Yes ☐ No |
| Pharmacists | | | | | ☐ Yes ☐ No |
| Pharmacy Technicians | | | | | ☐ Yes ☐ No |
| Physical/Occupational/Speech Therapists | | | | | ☐ Yes ☐ No |
| Physical/Occupational/Speech Therapist Assistants | | | | | ☐ Yes ☐ No |
| Physician's Assistants | | | | | ☐ Yes ☐ No |
| Physicians – Minor Surgery | | | | | ☐ Yes ☐ No |
| Physicians – No Surgery | | | | | ☐ Yes ☐ No |
| Psychologists | | | | | ☐ Yes ☐ No |
| Respiratory Therapists | | | | | ☐ Yes ☐ No |
| Social Workers | | | | | ☐ Yes ☐ No |
| Other: _____ | | | | | ☐ Yes ☐ No |

RSG 50090 0222

Landmark v. Nurselect MSJ_00000255

13. Does the applicant maintain any beds for overnight occupancy? (If yes, total number): _____

    What is the average length of stay? _____

14. Does the Applicant warrant that all employed and contracted physicians, surgeons and dentists maintain their own medical malpractice professional liability insurance coverage and confirm with a certificate of insurance or declarations page?　　☐ Yes ☐ No
If no, please attached explanation.

## Applicant History

15. Is the applicant currently insured under a Commercial General Liability Policy?　　☐ Yes ☐ No
If yes, please give details:

| Insurance Company | Type of Coverage | Limits BI | Limits PD | From | To |
|---|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ | _____ |

16. In the past twelve (12) months, has any professional liability claim or suit been made against the Applicant or any of its predecessor firms? Please complete the **Claim Supplement** and provide currently valued company loss runs　　☐ Yes ☐ No
If "Yes", how many? _____

17. Have all matters in Question 15. been reported to RSUI or to the Applicant's former or current insurer(s) or to the former Insurer of any predecessor firm or former insurer of a current member of the Firm?　　☐ Yes ☐ No

18. Has any principal, owner, partner or employee for whom coverage is sought been the subject of a disciplinary complaint made to any court, administrative agency or regulatory body? (If "yes", provide full details and documentation)　　☐ Yes ☐ No

## Representations

The Applicant declares that the above statement and representations are true and correct, and that no facts have been suppressed or misstated. All written statements and materials furnished to the Company, in conjunction with this application will be incorporated by reference into this application and made part hereof.

This application does not bind the Applicant to buy, or the Company to issue the insurance, but it is agreed that this form shall be the basis of the contract should a policy be issued, and it will be attached to and made part of the policy. The undersigned Applicant declares that if the information supplied on this application changes between the dates of this application and the time when the policy is issued, the Applicant will immediately notify the company of such changes, and the Company may withdraw or modify any outstanding quotations and/or authorization or agreement to bind the insurance.

_____    _____    _____
Signature of the Insured, Owner, Partner or Principal　　　　　　　　Title　　　　　　　　　　　Date

_____
Producer

RSG 50090 0222

Your policy has been signed on our behalf by our President and by our Secretary.  However, your policy will not be binding on us unless it is also countersigned by one of our duly authorized agents.

President

**RSUI Indemnity Company**
**Landmark American Insurance Company**
**Covington Specialty Insurance Company**

Secretary

**RSUI Indemnity Company**
**Landmark American Insurance Company**
**Covington Specialty Insurance Company**

Landmark v. Nurselect MSJ_00000257

LAND000080



A member of Alleghany Insurance Holdings LLC

EXHIBIT 4

Landmark v. Nurselect MSJ_00000259

**SAXTON & STUMP**
Collin T. Keyser, Esquire
Attorney I.D. No. 307505
Kimberly A. Selemba, Esquire
Attorney I.D. No. 93535
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Phone: (717) 556-1000
ctk@saxtonstump.com
kas@saxtonstump.com

*Attorneys for Defendants, Rehabilitation Center
at Brethren Village, LLC, Brethren Village,
Brethren Village Realty, LLC, and Lori
Schoener, NHA*

ENTERED AND FILED
PROTHONOTARY'S OFFICE
No. CI-22-04128    LANCASTER, PA
***Electronically Filed*****
Jun 13 2023 02:40PM
Ryan McMinn

| | | |
|---|---|---|
| BRENDA L. KLING, individually and as Administratrix of the Estate of GERALDINE E. WIGGINS, | : | IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA |
| Plaintiff | : | |
| v. | : | |
| | : | NO: CI-22-04128 |
| REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHOENER, NHA, and JOHN DOES 1–4 | : | MedMal |
| Defendants, | : | |
| v. | : | |
| NURSELECT, LLC, | : | |
| Additional Defendant. | : | |

## NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

No. CI-22-04128

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO
PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL
SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lancaster Bar Association
Lawyer Referral Service
Telephone: 717-393-0737

Landmark v. Nurselect MSJ_00000261

No. CI-22-04128

| | |
|---|---|
| BRENDA L. KLING, individually and as Administratrix of the Estate of GERALDINE E. WIGGINS, | IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA |
| Plaintiff | |
| v. | NO: CI-22-04128 |
| | MedMal |
| REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHOENER, NHA, and JOHN DOES 1–4 | |
| Defendants, | |
| v. | |
| NURSELECT, LLC, | |
| Additional Defendant. | |

## JOINDER COMPLAINT OF DEFENDANT, BRETHREN VILLAGE, AGAINST ADDITIONAL DEFENDANT, NURSELECT, LLC

Defendant, Brethren Village, ("Joining Defendant"), by and through counsel, Saxton & Stump, files this Third-Party Joinder Complaint against Additional Defendant, NurSelect, LLC ("Additional Defendant" or "NurSelect"), pursuant to Pennsylvania Rule of Civil Procedure 2252 and, in support thereof avers as follows:

1.     Plaintiff, Brenda L. Kling, has filed a Complaint in this matter, asserting claims for negligence, vicarious liability, corporate negligence, survival, wrongful death, and breach of fiduciary duty, arising out of skilled nursing care provided to resident, Geraldine E. Wiggins ("Ms. Wiggins"), at Rehabilitation Center at Brethren Village, LLC ("Brethren Village"). A copy of Plaintiff's Fourth Amended Complaint is attached hereto, without adoption, as "Exhibit A."

No. CI-22-04128

2.      In the Fourth Amended Complaint, Plaintiff alleges that Defendants were negligent in relation to a fall that Ms. Wiggins had as she attempted to walk from the bathroom to her chair.

3.      Joining Defendant hereby incorporates the allegations of Plaintiff's Fourth Amended Complaint without admitting or denying the substance of those allegations.

### JOINDER DEFENDANT

4.      Additional Defendant NurSelect, LLC, is a health care employment agency with a principal place of business at 630 Freedom Business Center Drive, King of Prussia, PA, 19406.

5.      At the time of the alleged incident, NurSelect provided supplemental staffing to Brethren Village, pursuant to a September 22, 2020 written contract titled "Supplemental Staffing Agreement". A copy of the Supplemental Staffing Agreement is attached hereto as "Exhibit B."

### FACTUAL BACKGROUND

6.      As set forth above, Joining Defendant incorporates by reference the allegations in Plaintiff's Fourth Amended Complaint, without admitting or denying the substance of those allegations.

7.      Plaintiff claims that, on or about the morning of May 12, 2021, Ms. Wiggins fell while walking from her bathroom to her chair unattended, resulting in a laceration and a quarter-sized hematoma.

8.      On August 28, 2021, Ms. Wiggins passed away; Plaintiff alleges that "failure to thrive" was listed as the cause of death. 4th Am. Compl. ¶ 61.

9.      Plaintiff alleges that the injuries Ms. Wiggins suffered from her fall contributed to her death over 3-months later. 4th Am. Compl. ¶ 63.

2

Landmark v. Nurselect MSJ_00000263

No. CI-22-04128

10.    Ms. Wiggins was in the care of Ayanna McDowell, CNA, at the time of her fall.

11.    Ms. McDowell was employed as an agency nurse for NurSelect at the time of the incident. She was not employed by Brethren Village.

12.    The obligations of Additional Defendant, NurSelect, LLC, under the aforementioned written Supplemental Staffing Agreement, include, but are not limited to, the timely provision of licensed and certified nursing personnel in accordance with federal, state, and local laws, rules ordinances and regulations and meeting the highest professional standards and principles. Exhibit B, at Arts. 1.1, 1.2.

13.    The Agreement expressly provides that NurSelect personnel furnished to Brethren Village "shall not be considered employees or agents [Brethren Village] but instead shall be considered leased employees of NurSelect." Exhibit B, at Art 3.1.

14.    Pursuant to the Supplemental Staffing Agreement, NurSelect agreed to "indemnify and hold harmless [Brethren Village] from and against any and all claims, demands, actions, settlements, or judgments, including reasonable attorneys' fees and litigation expenses, arising from. . . NurSelect Personnel's provision of the Services where such claims, demands actions, settlements, or judgments arise from the negligence or willful misconduct of NurSelect Personnel." Exhibit B, at Art. 5.2.

## COUNT I
## NEGLIGENCE, INDEMNIFICATION AND CONTRIBUTION

15.    The foregoing paragraphs are incorporated herein by reference as if set forth herein at length.

16.    Without admitting the averments of Plaintiff's Fourth Amended Complaint, Additional Defendant, NurSelect, LLC, is solely liable to Plaintiff, jointly and severally liable with Joining Defendant, liable over Joining Defendant, or liable to Joining Defendant for

3

No. CI-22-04128

indemnification and/or contribution, for the claims asserted by Plaintiff, Brenda L. Kling, and for the injuries and damages alleged in the 4th Amended Complaint.

**WHEREFORE**, Joining Defendant Brethren Village demands judgment in its favor and against Additional Defendant, NurSelect, LLC.  In the alternative, Joining Defendant Brethren Village demands that Additional Defendant, NurSelect, LLC, be held solely liable to Plaintiff, jointly and severally liable with Joining Defendant, liable over Joining Defendant, or liable to Joining Defendant for common law and contractual indemnification and/or contribution.

## COUNT II
## VICARIOUS LIABILITY, INDEMNIFICATION, AND CONTRIBUTION

17.    The foregoing paragraphs are incorporated herein by reference as if set forth herein at length.

18.    Without admitting the averments of Plaintiff's Fourth Amended Complaint, Additional Defendant, NurSelect, LLC, as the employer/principal of Ayanna McDowell, is vicariously liable to Plaintiff, jointly and severally liable with Joining Defendant, liable over Joining Defendant, or liable to Joining Defendant for indemnification and/or contribution, for the claims asserted by Plaintiff, Brenda L. Kling, and for the injuries and damages alleged in the 4th Amended Complaint.

**WHEREFORE**, Joining Defendant Brethren Village demands judgment in its favor and against Additional Defendant, NurSelect, LLC.  In the alternative, Joining Defendant Brethren Village demands that Additional Defendant, NurSelect, LLC, be held vicariously liable to Plaintiff, jointly and severally liable with Joining Defendant, liable over Joining Defendant, or liable to Joining Defendant for indemnification and/or contribution.

4

Landmark v. Nurselect MSJ_00000265

No. CI-22-04128

## COUNT III
## CONTRACTUAL INDEMNIFICATION

19.     The foregoing paragraphs are incorporated herein by reference as if set forth herein at length.

20.     Without admitting the averments of Plaintiff's Fourth Amended Complaint, Additional Defendant, NurSelect, LLC, pursuant to the Supplemental Staffing Agreement, is contractually obligated to indemnify and hold harmless Joining Defendant for any liabilities, damages, and expenses resulting from the claims asserted by Plaintiff.

**WHEREFORE**, Joining Defendant Brethren Village demands judgment in its favor and against Additional Defendant, NurSelect, LLC.  In the alternative, Joining Defendant Brethren Village demands that Additional Defendant, NurSelect, LLC, be held contractually liable for indemnification for any liabilities, damages, and expenses resulting from the claims asserted by Plaintiff.

Respectfully submitted,

SAXTON & STUMP

Date:  June 13, 2023

By: _____

       Collin T. Keyser, Esquire
       Attorney I.D. No. 307505
       Kimberly A. Selemba, Esquire
       Attorney I.D. No. 93535
       280 Granite Run Drive, Suite 300
       Lancaster, PA  17601

5

No. CI-22-04128

Phone: (717) 556-1000
Fax: (717) 441-3810
ctk@saxtonstump.com
kas@saxtonstump.com

*Attorneys for Defendants, Rehabilitation Center at Brethren Village, LLC, Brethren Village, Brethren Village Realty, LLC, and Lori Schoener, NHA*

6

Landmark v. Nurselect MSJ_00000267

**SAXTON & STUMP**                                              No. CI-22-04128
Collin T. Keyser, Esquire
Attorney I.D. No. 307505
Kimberly A. Selemba, Esquire
Attorney I.D. No. 93535
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Phone: (717) 556-1000
ctk@saxtonstump.com
kas@saxtonstump.com

*Attorneys for Defendants, Rehabilitation Center*
*at Brethren Village, LLC, Brethren Village,*
*Brethren Village Realty, LLC, and Lori*
*Schoener, NHA*

| | |
|---|---|
| BRENDA L. KLING, individually and as Administratrix of the Estate of GERALDINE E. WIGGINS, | : IN THE COURT OF COMMON PLEAS<br>: OF LANCASTER COUNTY,<br>: PENNSYLVANIA |
| Plaintiff | :<br>: NO: CI-22-04128 |
| v. | :<br>: MedMal |
| REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHOENER, NHA, and JOHN DOES1–4 | :<br>:<br>:<br>:<br>: |
| Defendants, | :<br>: |
| v. | :<br>: |
| NURSELECT, LLC, | :<br>: |
| Additional Defendant. | :<br>: |

## CERTIFICATE OF SERVICE

I, Collin T. Keyser, Esquire, certify that on this date, I served a certified true and correct

copy of the foregoing Third-Party Joinder Complaint upon the following counsel and parties of

record, via email and certified mail, addressed as follows:

No. CI-22-04128

Andrei Govorov, Esquire
Rosenbaum & Associates, PC
1818 Market Street, Suite 3200
Philadelphia, PA 19103
*(Attorney for Plaintiff)*
*(via email)*

Date: June 13, 2023

By: _____

Collin T. Keyser, Esquire

No. CI-22-04128

| | |
|---|---|
| BRENDA L. KLING, individually and as : | IN THE COURT OF COMMON PLEAS |
| Administratrix of the Estate of : | OF LANCASTER COUNTY, |
| GERALDINE E. WIGGINS, : | PENNSYLVANIA |
| : | |
| Plaintiff : | |
| : | NO: CI-22-04128 |
| v. : | |
| : | MedMal |
| REHABILITATION CENTER AT : | |
| BRETHREN VILLAGE, LLC, : | |
| BRETHREN VILLAGE, BRETHREN : | |
| VILLAGE REALTY, LLC, LORI : | |
| SCHOENER, NHA, and JOHN DOES1– : | |
| 4 : | |
| Defendants, : | |
| : | |
| v. : | |
| : | |
| NURSELECT, LLC, : | |
| : | |
| Additional : | |
| Defendant. : | |

## PUBLIC ACCESS POLICY CERTIFICATION

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

SAXTON & STUMP

*Collin T. Keyser*

Date: June 13, 2023

By: _____
　　　Collin T. Keyser, Esquire

Landmark v. Nurselect MSJ_00000270

EXHIBIT A

Landmark v. Nurselect MSJ_00000271

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed*****
Dec 22 2022 12:29PM
Ryan McMinn

**ROSENBAUM & ASSOCIATES, P.C.**
BY: ANDREI GOVOROV, ESQUIRE
Attorney ID No.: 209365
1818 Market Street, Suite 3200
Philadelphia, PA 19103
(215) 569-0200
agovorov@rosenbaumfirm.com

MAJOR-JURY
ASSESSMENT OF DAMAGES
HEARING IS REQUIRED.
JURY TRIAL DEMANDED

Attorney for Plaintiff

| | | |
|---|---|---|
| BRENDA L. KLING, ADMINISTRATRIX | : | LANCASTER COUNTY |
| of the ESTATE OF GERALDINE E. WIGGINS | : | COURT OF COMMON PLEAS |
| deceased | : | |
| | : | No.: CI-22-04128 |
| vs. | : | |
| | : | FOURTH AMENDED COMPLAINT |
| REHABILITATION CENTER at BRETHREN | : | |
| VILLAGE, LLC; BRETHREN VILLAGE; | : | |
| BRETHREN VILLAGE REALTY, LLC; | : | |
| LORI SCHOENER, NHA; and | : | |
| JOHN DOES 1-4 (Fictious Names) | : | |

## CIVIL ACTION
### NOTICE

YOU HAVE BEEN SUED IN COURT. IF YOU WISH TO DEFEND AGAINST THE CLAIMS SET FORTH IN THE FOLLOWING PAGES, YOU MUST TAKE ACTION WITHIN TWENTY (20) DAYS AFTER THIS COMPLAINT AND NOTICE ARE SERVED BY ENTERING A WRITTEN APPEARANCE PERSONALLY OR BY ATTORNEY AND FILING IN WRITING WITH THE COURT YOUR DEFENSES OR OBJECTIONS TO THE CLAIMS SET FORTH AGAINST YOU. YOU ARE WARNED THAT IF YOU FAIL TO DO SO THE CASE MAY PROCEED WITHOUT YOU AND A JUDGMENT MAY BE ENTERED AGAINST YOU BY THE COURT WITHOUT FURTHER NOTICE FOR ANY MONEY CLAIMED IN THE COMPLAINT OR FOR ANY OTHER CLAIM OR RELIEF REQUESTED BY THE PLAINTIFF. YOU MAY LOSE MONEY OR PROPERTY OR OTHER RIGHTS IMPORTANT TO YOU. YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Lawyer Referral & Information Service
Lancaster County Bar Association
28 E Orange Street
Lancaster, PA 17602

### AVISO

LE HAN DEMANDADO A USTED EN LA CORTE. SI USTED QUIERE DEFENDERSE DE ESTAS DEMANDAS EXPUESTAS EN IAS PAGINAS SIGUIENTES, USTED TIENE VIENTE (20) DIAS DE PLAZO AL PARTIR DE LA FECHA DE LA DEMANDA Y LA NOTIFICACION. HACE FALTA ASENTAR UNA COMPARENCIA ESCRITA O EN PERSONA O CON UN ABOGADO Y ENTREGAR A LA CORE EN FORMA ESCRITA SUS DEFENSAS O SUS OBJECIONES A LAS DEMANDAS EN CONTRA DE SU PERSONA. SEA AVISADO QUE SI USTED NO SE DEFIENDE, LA CORTE TOMARA MEDIDAS Y PUEDE CONTINUAR LA DEMANDA EN CONTRA SUYA SIN PREVIO AVISO O NOTIFICACION. ADEMAS, LA CORTE PUEDE DECIDIR A FAVOR DEL DEMANDANTE

Y REQUIERE QUE USTED CUMPLA CON TODAS LAS PROVISIONES DE ESTA DEMANDA. USTED PUEDE PERDER DINERO O SUS PROPIEDADES U OTROS DERECHOS IMPORTANTES PARA USTED. LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

**Servicio de referencia e información de abogados**
**Colegio de Abogados del Condado de Lancaster**
**28 E Calle Naranja**
**Lancaster, Pensilvania 17602**

Landmark v. Nurselect MSJ_00000273

**ROSENBAUM & ASSOCIATES, P.C.**
BY: ANDREI GOVOROV, ESQUIRE
Attorney ID No.: 209365
1818 Market Street, Suite 3200
Philadelphia, PA 19103
(215) 569-0200
agovorov@rosenbaumfirm.com

MAJOR-JURY
ASSESSMENT OF DAMAGES
HEARING IS REQUIRED.
JURY TRIAL DEMANDED

Attorney for Plaintiff

| | |
|---|---|
| BRENDA L. KLING, ADMINISTRATRIX : <br> of the ESTATE OF GERALDINE E. WIGGINS : <br> deceased : <br> : <br> vs. : <br> : <br> REHABILITATION CENTER at BRETHREN : <br> VILLAGE, LLC; BRETHREN VILLAGE; : <br> BRETHREN VILLAGE REALTY, LLC; : <br> LORI SCHOENER, NHA; and : <br> JOHN DOES 1-4 (Fictious Names) : | LANCASTER COUNTY <br> COURT OF COMMON PLEAS <br><br> No.: CI-22-04128 <br><br> FOURTH AMENDED COMPLAINT |

## FOURTH AMENDED COMPLAINT
(This Fourth Amended Complaint Includes a Medical Professional Liability Action)

Plaintiff, Brenda L. Kling, Administratrix of the Estate of Geraldine E. Wiggins, deceased, by and through their counsel, Rosenbaum & Associates, P.C., files this Fourth Amended Complaint in Civil Action, and aver as follows:

1.    Plaintiff, Brenda L. Kling, Administratrix of the Estate of Geraldine E. Wiggins, deceased, is an adult individual and daughter of Decedent, Geraldine E. Wiggins, residing at 19 Verbena Drive, Lancaster, Pennsylvania 17062.

2.    Decedent, Geraldine E. Wiggins, died intestate on August 28, 2021.

3.    Plaintiff, Brenda L. Kling, were appointed Administratrix of the Estate of Geraldine E. Wiggins, deceased, by the Register of Wills of Lancaster County, on September 23, 2021, and in this capacity acts on behalf of the Estate, the beneficiaries of the Estate and the potential wrongful death beneficiaries.

4.    At the time of her death, Decedent, Geraldine E. Wiggins, left surviving a daughter Brenda L. Kling, on whose behalf this claim is, in part, is filed.

Landmark v. Nurselect MSJ_00000274

5.     Defendant, Rehabilitation Center Brethren Village, LLC, is a business corporation organized and existing under the laws of the Commonwealth of Pennsylvania, and was engaged in the business of owning, operating, managing and offering healthcare, medical services, rehabilitation and nursing care to the public at a rehabilitation and nursing home facility, Rehabilitation Center at Brethren Village, LLC, ("Brethren Village") 3001 Lititz Pike, Lancaster, Pennsylvania. Plaintiff is asserting a professional liability claim against this Defendant.

6.     At all times material hereto, Defendant, Rehabilitation Center at Brethren Village, LLC, acted or failed to act by and through its agents, ostensible agents, servants, workmen, nurses, nurse's aides, and/or employees, physicians, the nursing home administrators and/or administrators responsible for formulating, adopting, monitoring and enforcing the policies, procedures and protocols of Brethren Village from the time Geraldine E. Wiggins was admitted to Brethren Village on April 13, 2021, including the physicians, nurses, nurses' aides, staff members and employees responsible for the care, supervision, treatment and safety of Geraldine E. Wiggins, starting on April 13, 2021, which includes those physicians, nurses, nurses' aides, staff and employees identified in the records and charts of Brethren Village, whose names cannot be discerned from the records but whose identities are known to and within the exclusive control of Defendants, as well as those physicians, nurses, nurses' aides, staff and employees whose names are not recorded in the records due to Defendants' failure to implement and utilize proper record-keeping and documentation procedures but whose identities are known to and within the exclusive control of Defendants, all of whom were then and there acting within the scope of their authority and in the course of their employment with Defendant, Rehabilitation Center at Brethren Village, LLC, and in furtherance of Defendant, Rehabilitation Center at Brethren Village, LLC's business and on behalf of Defendant, Rehabilitation Center at Brethren Village, LLC.

7.     Defendant, Brethren Village, is a business corporation organized and existing under the laws of the Commonwealth of Pennsylvania, and was engaged in the business of owning, operating, managing and offering healthcare, medical services, rehabilitation and nursing care to the public at a rehabilitation and nursing home facility, Rehabilitation Center at Brethren Village, LLC, ("Brethren

Landmark v. Nurselect MSJ_00000275

Village") 3001 Lititz Pike, Lancaster, Pennsylvania. Plaintiff is asserting a professional liability claim against this Defendant.

8.    At all times material hereto, Defendant, Brethren Village, acted or failed to act by and through its agents, ostensible agents, servants, workmen, nurses, nurse's aides, and/or employees, physicians, the nursing home administrators and/or administrators responsible for formulating, adopting, monitoring and enforcing the policies, procedures and protocols of Brethren Village from the time Geraldine E. Wiggins was admitted to Brethren Village on April 13, 2021, including the physicians, nurses, nurses' aides, staff members and employees responsible for the care, supervision, treatment and safety of Geraldine E. Wiggins, starting on April 13, 2021, which includes those physicians, nurses, nurses' aides, staff and employees identified in the records and charts of Brethren Village, whose names cannot be discerned from the records but whose identities are known to and within the exclusive control of Defendants, as well as those physicians, nurses, nurses' aides, staff and employees whose names are not recorded in the records due to Defendants' failure to implement and utilize proper record-keeping and documentation procedures but whose identities are known to and within the exclusive control of Defendants, all of whom were then and there acting within the scope of their authority and in the course of their employment with Defendant, Brethren Village, and in furtherance of Defendant, Brethren Village's business and on behalf of Brethren Village.

9.    Defendant, Brethren Village Realty, LLC, is a business corporation organized and existing under the laws of the Commonwealth of Pennsylvania, and was engaged in the business of owning, operating, managing and offering healthcare, medical services, rehabilitation and nursing care to the public at a rehabilitation and nursing home facility, Rehabilitation Center at Brethren Village, LLC, ("Brethren Village") 3001 Lititz Pike, Lancaster, Pennsylvania. Plaintiff is asserting a professional liability claim against this Defendant.

10.    At all times material hereto, Defendant, Brethren Village Realty, LLC, acted or failed to act by and through its agents, ostensible agents, servants, workmen, nurses, nurse's aides, and/or employees, physicians, the nursing home administrators and/or administrators responsible for formulating, adopting,

monitoring and enforcing the policies, procedures and protocols of Brethren Village from the time Geraldine E. Wiggins was admitted to Brethren Village on April 13, 2021, including the physicians, nurses, nurses' aides, staff members and employees responsible for the care, supervision, treatment and safety of Geraldine E. Wiggins, starting on April 13, 2021, which includes those physicians, nurses, nurses' aides, staff and employees identified in the records and charts of Brethren Village, whose names cannot be discerned from the records but whose identities are known to and within the exclusive control of Defendants, as well as those physicians, nurses, nurses' aides, staff and employees whose names are not recorded in the records due to Defendants' failure to implement and utilize proper record-keeping and documentation procedures but whose identities are known to and within the exclusive control of Defendants, all of whom were then and there acting within the scope of their authority and in the course of their employment with Defendant, Brethren Village Realty, LLC, and in furtherance of Defendant, Brethren Village Realty, LLC's business and on behalf of Brethren Village Realty, LLC.

11. Defendant, Lori Schoener, is an individual residing herein at 123 Race Street, Richland, Pennsylvania 17087. Upon information and believe, at all relevant and material times herein, Lori Schoener was the licensed Nursing Home Administrator of Rehabilitation Center at Brethren Village, LLC during the residency of Geraldine E. Wiggins, and is therefore personally, jointly and vicariously liable, among other things, for the acts and omissions of herself and her agents, employees, servants, contractors, staff, and/or partners and all other Defendants, who played a role in the care provided to Geraldine E. Wiggins and in the operation of Brethren Village.

12. Defendants, Joe Does 1-4 (Fictious Names) are individuals, corporations and/or other entities whose identities, after reasonable investigation, are currently unknown, but at all times relevant hereto owned, operated, controlled and/or managed Rehabilitation Center of Brethen Village, LLC and/or provided medical, nursing, rehabilitation and other health care services to Geraldine E. Wiggins during her admission to Rehabilitation Center of Brethren Village, LLC.

13. At all times material hereto, the Defendants individually and collectively owed duties to the residents of Brethren Village, including Geraldine E. Wiggins.

14.    At all times relevant and material hereto the Defendants were aware of their obligations under the laws of the United States of America and of the Commonwealth of Pennsylvania with which Defendants were required to comply in providing care to Decedent including the United States Code, Pennsylvania Consolidated Statutes and the Pennsylvania Administrative Code.

15.    The Defendants, directly and/or through their respective agents, servants and/or employees, accepted the responsibility for the care of Geraldine E. Wiggins, and in so doing, undertook and/or assumed a duty to Geraldine E. Wiggins to provide a safe nursing home facility necessary for the proper practice of medicine at said rehabilitation facility and to render reasonable, competent, proper, adequate and appropriate medical care, rehabilitation and nursing care, custodial care, rehabilitation services and treatment and, to take appropriate, preventative and curative measures as well as adequately supervise, monitor, and provide timely treatment and services to Geraldine E. Wiggins, and avoid and prevent harm to her.

16.    The Defendants owed a duty to Geraldine E. Wiggins to exercise reasonable and ordinary care as a resident at Defendants' facility receiving medical, nursing, rehabilitation and other allied healthcare services. The Defendants' duties included, but were not limited to, establishing and enforcing their respective nursing home facility rules and regulations, medical staff practices, bylaws, policies, procedures, rules and regulations which mandate provision of proper medical, nursing and other healthcare provider services and/or care to the rehabilitation patients, including Geraldine E. Wiggins.  The Defendants' duties also included hiring competent medical, nursing and other allied healthcare personnel, continuing and ongoing review of said competency, maintaining the facility such that it is free from ordinary hazards and defective equipment, maintaining sufficient staffing levels, insuring that all patients receive adequate, competent and timely medical, rehabilitation and other allied health care treatment and services while a patient at their rehabilitation facility, and, establishing and enforcing policies, procedures, protocols and systems to monitor their staff to ensure that all patients are receiving proper and timely care and treatment including, but not limited to, complete and accurate resident assessments, developing, enforcing and revising individualized, resident-centered care plans, adequate supervision/monitoring, proper use of

medication, proper use of physical and/or chemical restraints, proper establishment and enforcement of procedures for medical and nursing review and/or audit of the care given to patients, proper establishment of policies, procedures, protocols and guidelines to ensure that proper medical, rehabilitation, custodial and nursing care are performed on and for patients at their facility, including Geraldine E. Wiggins.

17.     At all times relevant hereto, the Defendants, directly and/or through contractual agreement had a corporate responsibility through their respective bylaws, medical staff bylaws, rules, regulations and ongoing government functions to assure that only competent physicians, nurses and other health care providers engage in the medical, rehabilitation and nursing practice at this rehabilitation facility and other related fields of medicine on the Defendants' premises.

18.     Defendants exercised complete and total control over the healthcare, skilled nursing and custodial care of all residents of their nursing facility, including Geraldine E. Wiggins.

19.     At all times material hereto, Defendants were vertically integrated organizations / corporations that were controlled by their respective members, officers, managers, and/or board of directors who were responsible for the operation, planning, management and quality control of their Facility, Brethren Village.

20.     At all times material hereto, the control exercised over the Facility by Defendants included, inter alia: budgeting, marketing, cash management, cost control, reimbursement, setting staffing levels, maintaining and increasing census, human resource management, training, supervision and oversight of their Facility's Administrator, supervision and oversight of their Facility's Director of Nursing, supervision of staff, obtaining licensure and certification, conducting mock surveys, conducting customer satisfaction surveys and monitoring customer satisfaction, corporate and regulatory compliance, quality of care assessment, and the creation and implementation of all policy and procedure manuals used by the Facility.

21.     Defendants have failed to adequately train and/or supervise their physicians, nurses, nurses' aides and other healthcare providers which has resulted in personal harm and injury to Geraldine E. Wiggins.

22.     The provisions of OBRA (Omnibus Budget Reconciliation Act of 1987) are applicable

Landmark v. Nurselect MSJ_00000279

with regard to Geraldine E. Wiggins' condition as it existed while in the Defendants' care and during her admission at the Defendants' facility beginning on April 13, 2021.

23.    The Defendants held themselves out as a specialist in the field of rehabilitation care with the expertise necessary to maintain the health and safety of persons unable to care adequately for themselves.

24.    At all times pertinent hereto, Geraldine E. Wiggins was a patient at Rehabilitation Center of Brethren Village, LLC and was under the exclusive care and control of the Defendants, their agents, officers, servants and/or employees.

25.    The Defendants, their agents, officers, servants and/or employees failed, refused and/or neglected to perform the duties to provide reasonable and adequate health care to and for Geraldine E. Wiggins who was unable to attend to her own health, safety and well-being.

26.    The Defendants, their agents, officers, servants and/or employees negligently, carelessly and recklessly provided care and treatment to Geraldine E. Wiggins, and all of the alleged acts, omissions and occurrences herein described or performed by the Defendants, their agents, officers, servants and/or employees fell within the course and scope of their agency and employment with the Defendants and in furtherance of the Defendants' business.

27.    The Defendants provide twenty-four (24) hour a day, seven (7) day a week medical, nursing, custodial and rehabilitation care, services and assistance to its patients who have issues related to age, illness, disease, injury, convalescence and physical and mental infirmity.

28.    The Defendants are responsible for nearly all the health care needs of their residents, including but not limited to, assistance with activities of daily living, bed mobility, transfer, ambulation, personal hygiene, nutrition, hydration, restorative care, incontinence care, turning and repositioning, supervision, monitoring, safety and rehabilitation.

29.    The Defendants are responsible for ensuring that all doctor-ordered testing and medical services are performed.

30.    The Defendants are required to conduct comprehensive and accurate assessment of their

patients' functional capacity, as well as their patients' needs and risk factors.

31.    The Defendants are required to formulate and develop an individualized health "Care Plan" upon admission of each patient.

32.    The Defendants are responsible for determining patients' risk level for injury including falls.

33.    The Defendants are responsible for formulating, adopting, modifying and implementing injury prevention programs and care directives, including prevention programs for patients at risk for falls.

34.    The Defendants are responsible for ensuring that injury prevention programs, procedures and protocols are implemented, executed and performed including prevention programs and procedures to prevent falls.

35.    The Defendants are responsible for ensuring that a "Care Plan" is personalized for each patient and modified and/or revised as needs change.

36.    The Defendants are responsible for ensuring that a "Care Plan" for patients includes safety measures and interventions to prevent falls.

37.    The Defendants are responsible for ensuring that safety measures and interventions, including adequate pressure-relieving assistive devices, individualized turning and repositioning schedule, implementation of the appropriate infection control policies, procedures and techniques, hydration and nutrition protocols, adequate and timely incontinence care, hygiene services, adequate supervision and monitoring of patients with decreased mobility, safety awareness and cognition are implemented and executed.

38.    Geraldine E. Wiggins, was admitted to Rehabilitation Center at Brethren Village, LLC on April 13, 2021 with diagnoses that included ambulatory dysfunction, generalized weakness and new onset A-Fib.

39.    A "Fall Risk Assessment" was completed at time of admission and Geraldine E. Wiggins was considered at risk for falls related to a score of "26" (a resident whose score is over 9 is at risk for falls).

40.     The "History of Present Illness" documented Geraldine E. Wiggins' reason for admission to Brethren Village as:

> Geraldine Wiggins is a 92 y.o. female admitted to nursing facility for ambulatory dysfunction having 2 falls at home prior to observation stay at LGH, for further PT/OT evaluation and treatment. Has had right knee pain since falls at home, XR in hospital negative for fracture. Today, states she feels a little hot and is tired, but otherwise she denies any pain, palpitation/flutter in chest, SOB, change in bowel or bladder.

41.     The staff at Brethren Village was aware of the patient's need for assistance with ambulation, activities of daily living and fall prevention as documented on the "Care Plan" for *"Needs staff assistance for ADL's because of weakness"* and *"Has history of falls, potential for fall-related injury."*

42.     The following are some of the interventions the staff was to utilize to provide care and prevent falls for this patient:

> \* Be aware resident unable to independently bathe, dress, move self in bed, transfer, ambulate, toilet self, perform personal hygiene measures and feed self
>
> Ambulate in hallway with rolling walker and one/two assist with gaitbelt
>
> Encourage and assist resident as needed to bathroom upon rising, between meals and at bedtime
>
> Observe for and report any decline in ADL performance; record appropriately in the EMR
>
> One/Two assist for stand/pivot/weight bear between all support surfaces
>
> Set up in bathroom at sink with supplies for grooming and bathing with assist as needed
>
> My transfer status is stand and pivot Ax1 w/RW
>
> Assist with ADL's, transfers and locomotion as needed, utilizing safety measures
>
> Remind resident of the importance of asking for help before getting up or transferring, especially if he/she feels lightheaded or weak
>
> When finding resident attempting to transfer independently, assess for basic needs, i.e., food, fluid, toileting, pain, boredom/anxiety

43.     Pursuant to medical records, Brethren Village increased their staff's workload related to Covid-19 precautions. But, despite the increase in staff workload, the staff of Brethren Village was well aware Geraldine E. Wiggins required one staff member and her assistive device to ambulate and transfer

Landmark v. Nurselect MSJ_00000282

safely.

44.    The staff was also aware that the patient self-transferred but did not intervene or initiate additional interventions to prevent falls for this patient.

45.    The April 24, 2021 "Statement Form" documented *"when I took care of Geraldine this morning caught her in the bathroom by herself she told me she took herself and at the time I didn't see a bruise."*

46.    The patient's risk of falls was increased due to episodes of *"respiratory distress"* documented on the April 28, 2021 "MD Progress Notes" as *"Geraldine complained of shortness of breath this morning and was found to be hypoxic. Her SpO2 at the time was in the mid to high 80's and improved to the low 90s with supplemental oxygen."*

47.    On May 3, 2021, "Physician's Orders" documented *"resident wheezing"*, *"O2 sat 84%, lungs very diminished."*

48.    A May 7, 2021 "MD Progress Note" revealed the patient's increased weakness during the morning hours as:

> *Geraldine Wiggins is a 92 y.o. female seen and examined in her room on the rehabilitation unit, resting in her recliner chair. She reports she is feeling short of breath on exam. She admits to just waking up and ambulating which is when she often feels dyspnea.*
>
> *She attests to being more tired in the mornings and feeling better as the day goes on.*
>
> *Ambulatory Dysfunction: Geraldine reports therapy is going well, but that she does not feel ready to go home next week. PT reporting, she can ambulate up to 150 ft with four wheel walker and staff assistance, seems to have increased weakness and decreased functional status in the early morning. Will be discharged to personal care when appropriate, no discharge date set at this time. Continue PT/OT, continue to monitor.*

49.    Geraldine E. Wiggins demonstrated a significant cognitive decline on May 9, 2021, documented in the "Progress Notes" as *"Res has been noted by staff to have been confused today. She had woken up several times unaware of where she was or what time of day it had been. Urine has fowl odor and is dark in color. Sip & Dip initiated."*

50.    A May 10, 2021 "Progress Note" further documented *"Safety concerns: Yes. Safely*

*Concerns – note: Confusion and forgetfulness."*

51.    "Medication Administration Record" reveal a "Physician Order" dated May 10, 2021 for,

*"d/c functional abilities days 1-3 every day shift until 05/12/2021."* The MAR had the days of May 10, 11,

and 12 highlighted to carry out the physician's order.

52.    Despite the fact the patient required staff assist for ambulation and activities of daily living,

increased confusion, increased weakness and decreased functional ability in the morning hours and ordered

to have her functional abilities discontinued on May 12, the staff of Brethren Village left Geraldine E.

Wiggins alone at the bathroom sink on May 12, 2021 at 7:30AM.

53.    The May 12, 2021 "Progress Note" documented the following:

*Patient on floor near at the foot of her recliner with walker in front of her and bed side
table behind her. The back of her head was bleeding. We got her up off the floor and onto
the chair. There was a quarter sized hematoma with small laceration to the base of the
skull. Patient had been standing at the sink brushing her teeth when the CNA left her in
the bathroom to take care of another patient who was having blood sugar issues. Patient
then attempted to walk to the recliner to sit down and as she did she lost her balance falling
backwards hitting her head on the base of the bedside table. First aid attempted with neuro
and physical assessment. No other injuries noted. Pressure was applied to laceration for
15 minutes and continued to profusely bleed. MD called and order obtained to send to ER.
Pressure applied for another 25 minutes until ambulance arrived to transport to LGH ER
for evaluation at 0820 by MT ambulance. Denies pain. Neuro checks WNL. Daughter
aware.*

54.    Geraldine E. Wiggins was left alone despite the Plan of Care revealing the patient required

staff assistance, despite the medical provider documenting "increased weakness and decreased functional

status in the early morning," despite her new onset of confusion, and the need for functional abilities to be

temporarily discontinued.

55.    The May 12, 2021 "Incident Report" documented Geraldine E. Wiggins' "Predisposing

Physiological Factors" as *"Gait Imbalance, Impaired Memory"* and her "Predisposing Situation Factor" as

*"Ambulating without assist".*

56.    Geraldine E. Wiggins was transferred to Lancaster General Hospital on May 12, 2021. The

Emergency Department Records reveals the following information:

    *- Chief Complaint:  Head Injury, Fall Evaluation*

Landmark v. Nurselect MSJ_00000284

\*\*\*

- *Arrives via BLS amb from rehab center at Brethren Village after falling and striking head on corner of bedside nightstand.*

*With hematoma to posterior head.*

*ECF staff "couldn't get bleeding to stop" after holding pressure for 45 minutes.*

*EMS reports bleeding through ABD pad that was placed by them.*

*+ Plavix use.*

*Denies any abd, chest, back or neck pain.*

*HPI: patient is a 92-year-old female who presents after a fall. It was unwitnessed. She does have some mild confusion making history of present illness limited. The patient cannot tell me why she fell. She said, "I thought I can make it over to the chair."*

\*\*\*

*MDM: Patient presents with occipital hematoma with mild oozing. On my exam the patient was awake and alert but pleasantly confused. She did have an occipital hematoma with a small open wound. Figure-eight suture placed by physician's assistant. Bleeding subsided. Patient noted to have a C7 fracture. Cervical collar applied. She had no neck pain. Case discussed with the trauma service who recommended imaging of her chest abdomen pelvis. I also ordered basic bloodwork. Disposition is pending their evaluation. Patient remained comfortable in the ER.*

\*\*\*

*CT Angiogram Chest: Since the prior study, the patient has suffered mild superior endplate compression fractures at C7 and T1. A superior endplate compression fracture at T2 is stable. Multiple new compression fractures, most notable at the T7 level.*

57.    The May 12, 2021 "Neurosurgery Note" documented the "Impression/Plan" as *"Acute fracture C7, T1 with no significant retropulsion"*, *"Currently oriented to person only"*, *"No surgical intervention needed"* and *"Aspen Cervical collar OK per Dr. Hernandez."*

58.    Geraldine E. Wiggins was readmitted to Brethren Village from Lancaster General Hospital.

59.    On May 15, 201, Speech Therapy documented Geraldine E. Wiggins as *"referred by physician for speech swallow evaluation. Patient exhibiting difficulty completing meals and rotary chew for regular diet intake. The functional deficits are caused by generalized weakness, decreased range of motion from C Collar placement."*

Landmark v. Nurselect MSJ_00000285

60.     The vertebral fracture and need for a cervical collar interfered with her meal consumption.

61.     Geraldine E. Wiggins died on August 28, 2021 with failure to thrive listed at the cause of death.

62.     Decedent suffered horrific injuries as a consequence of the negligence, neglect and abuse by Defendants, and/or Defendants' real and/or ostensible servants, agents and/or employees.

63.     The negligence, neglect and abuse of Geraldine E. Wiggins by Defendants, and/or Defendants' agents and resulting injuries caused a significant decline in Decedent's clinical status and were significant contributing factors in causing Decedent's death.

64.     The severity of the negligence, neglect and abuse inflicted upon Geraldine E. Wiggins by the Defendants' mismanagement, improper under-budgeting, understaffing of the facility and lack of training and/or supervision of the facility's employees, failure to provide adequate and appropriate health care, engaging in incomplete, inconsistent and fraudulent documentation, failure to develop and implement an appropriate care plan, failure to conduct accurate patient assessment, failure to ensure the highest level of physical, mental and psychosocial functioning was attained or maintained, failure to provide appropriate monitoring, supervision, care and services caused Decedent to experience, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

65.     As a direct result of the Defendants' negligence, neglect, abuse, carelessness and recklessness herein described,  Decedent was caused to suffer serious and permanent injuries as described herein, including a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

## CONDUCT OF THE DEFENDANTS

66.     Plaintiff hereby incorporates by reference the prior paragraphs of this Fourth Amended Complaint, as if they have been more fully set forth herein.

67.     During the course of her admission, Geraldine E. Wiggins was incapable of independently providing for all of her daily care and personal needs without reliable assistance.

68.     At all relevant times, the Defendants, through their agents, servants, employees and/or representatives: (a) should have been and/or were aware of Geraldine E. Wiggins' needs and (b) represented that they could adequately care for her needs.

69.     In exchange for money, Geraldine E. Wiggins was admitted to the Defendants' care at Brethren Village to obtain such care and protection.

70.     The Defendants, upon information and belief, were controlled by a board of directors who were responsible for the operation, planning, management and quality control of Brethren Village.

71.     At all relevant times, the Defendants, individually, and/or through their agents, servants and employees, assessed the needs of Geraldine E. Wiggins and promised that they would adequately care for her needs, akin to a hospital.

72.     The Defendants were responsible for the operation, planning, management and quality control of their Facility.

73.     The control exercised over the Defendants' Facility by the Defendants, included: budgeting, marketing, cash management, cost control, reimbursement, setting staffing levels, maintaining and increasing census, human resource management, training, supervision and oversight of their Facility's administrator, supervision and oversight of their Facility's director of nursing, supervision of staff, obtaining licensure and certification, conducting mock surveys, conducting customer satisfaction surveys and monitoring customer satisfaction, corporate and regulatory compliance, quality of care assessment, and the creation and implementation of all policy and procedure manuals used by their Facility.

74.     The Defendants controlled reimbursement, quality care assessment and compliance, licensure, certification, and all financial, tax and accounting issues through control of the fiscal policies of

Brethren Village.

75.     Upon information and belief, the corporate officers of Defendants utilized survey results and quality indicators to monitor the care being provided at their nursing homes, including Brethren Village.

76.     Upon information and belief, the Defendants, including their owners, officers, directors, partners, members, managers and employees knew that Rehabilitation Center at Brethren Village, LLC has been cited by governmental units as follows:

1/23/2020: failed to assess a pressure ulcer for one of one resident's reviewed; and

8/12/2021: failed to comprehensively assess and administer medication to a wound; and timely administer wound treatment to a sacral wound for one of seven residents reviewed.

77.     As a direct and proximate result of the Defendants' acts and omissions, and their breach of the duty of care, negligence, carelessness and recklessness,   Decedent suffered: (a) severe permanent physical injuries resulting in pain, suffering, and disfigurement; (b) mental anguish, embarrassment, humiliation, degradation, emotional distress, and loss of personal dignity; (c) loss of capacity for enjoyment of life; (d) expense of otherwise unnecessary hospitalizations and medical care; and (e) death.

78.     In causing the aforesaid injuries, the Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

79.     The conduct of the Defendants was intentional, outrageous, willful and wanton, and exhibited a reckless indifference to the health, safety and well-being of Geraldine E. Wiggins.

80.     At all relevant times, the Defendants, individually, and/or through their agents, servants and employees, assessed the needs of Geraldine E. Wiggins, and promised that they would adequately care for her needs, akin to a hospital.

81.     At all relevant times, the Defendants made a conscious decision to operate and/or manage their Facility so as to maximize profits at the expense of the care required to be provided to their residents, including Geraldine E. Wiggins.

82.    In their efforts to maximize profits, the Defendants reduced staffing levels below the level necessary to provide adequate and timely care and services to their patients, including Geraldine E. Wiggins.

83.    Upon information and belief, the Defendants caused staffing levels at their Facility to be set at a level such that the personnel on duty at any given time could not and did not reasonably and timely tend to the needs of their assigned patients, including Geraldine E. Wiggins.

84.    Upon information and belief, the Defendants intentionally increased the number of sick and frail residents with greater health problems requiring more complex care.

85.    The Defendants knew that the increase in the acuity care levels of the patient population would substantially increase the need for staff, services and supplies necessary for the patient population.

86.    The Defendants failed to provide the resources necessary, including sufficient staff, services and supplies, to meet the needs of their patients, including Geraldine E. Wiggins.

87.    The Defendants negligently, carelessly and recklessly caused the healthcare providers, nurses and nurses' aides who they placed and/or staffed at their Facility to be so unqualified and/or under-trained, that the personnel on duty at any given time could not and did not reasonably and timely tend to the needs of their assigned patients, including Geraldine E. Wiggins.

88.    The aforementioned acts and omissions directly caused and/or increased the risk of the injuries and harm to Geraldine E. Wiggins and were known by the Defendants.

89.    At all relevant times, the Facility was individually owned, and/or in concert owned, possessed, managed, controlled, operated and maintained under the exclusive control of the Defendants.

90.    At all relevant times, the Defendants were operating individually or through their managers, members, partners, officers, agents, servants and employees who had actual, apparent and/or ostensible authority, and all of whom were acting within the course and scope of their employment and under the direct and exclusive control of the Defendants.

91.    The aforementioned injuries, acts and omissions were caused solely and exclusively by reason of negligence, carelessness and recklessness of the Defendants, and their agents, servants and employees and were due in no part to any act or omission to act on the part of Geraldine E. Wiggins.

92.    The Defendants exercised complete and total control over the total and complete healthcare of all the patients of their Facility, including Geraldine E. Wiggins, akin to a hospital.

### COUNT I – NEGLIGENCE
### BRENDA L. KLING, ADMINISTRATRIX OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
### v.
### REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA and JOHN DOES 1-4

93.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint, as though same were fully set forth at length herein.

94.    Upon accepting Geraldine E. Wiggins as a resident at their Facility, the Defendants, individually and jointly, assumed direct duties to provide her with adequate, timely and appropriate healthcare and other basic custodial services as set forth herein.

95.    The Defendants had the ultimate responsibility to ensure that the rights, safety, welfare and well-being of their residents, including Geraldine E. Wiggins, were protected.

96.    The Defendants owed a duty to provide adequate, timely and appropriate healthcare and related skilled nursing, custodial, restorative, therapy and rehabilitation care and services to their residents, including Geraldine E. Wiggins, such as reasonable caregivers would provide under similar circumstances.

97.    The Defendants each owed duty to their patients, including Geraldine E. Wiggins, to hire, train, oversee and supervise their employees to ensure that their Facility was operated, and services were provided, to their residents in a safe and reasonable matter.

98.    The Defendants each owed a duty and responsibility to furnish Geraldine E. Wiggins with appropriate, timely and competent medical, nursing and custodial care and services.

99.    The Defendants each owed and failed to fulfill the following duties and responsibilities to Geraldine E. Wiggins:

i)      The duty to use reasonable care in the maintenance of safe and adequate facility;

ii)     The duty to select, hire, train and retain only competent staff;

iii)    The duty to oversee, monitor and supervise all persons who practice nursing and/or medical healthcare within their facility;

iv)     The duty to staff their facility with sufficient and adequately trained personnel to provide the care and services required by their facility's patients;

v)      The duty to maintain sufficient staffing, funding, supplies and resources for the facility to meet the needs of their facility's patients;

vi)     The duty to formulate, adopt, oversee, revise and enforce rules, policies, procedures and protocols to ensure quality of care for all their facility's patients;

vii)    The duty to take adequate, timely and appropriate measures to correct the known problems with quality of care, as well as the known problems with the delivery of medical, nursing and custodial care and services;

viii)   The duty to keep their facility's patients free and safe from abuse and neglect;

ix)     The duty to provide safe, decent and clean environment for their facility's patients; and

x)      The duty to warn their facility's patients, as well as their families and/or responsible parties, of the Defendants' inability to provide adequate, timely, appropriate and safe care and services when the Defendants were placed on notice, knew, or should have known, of the deficiencies in providing such care and services to and for their patients.

100.    In addition to the direct acts and omissions of the Defendants, the Defendants also acted through their agents, servants, officers and employees, who were in turn acting within the course and scope of their employment, in furtherance of the Defendants' business and under the direct control and supervision of the Defendants.

101.    All of the acts alleged to have been done or not to have been done by the Defendants were done or not done by said Defendants, their agents, ostensible agents, servants, workmen and/or employees, acting in the course and scope of their employment with and on behalf of said Defendants and failed or refused to act with reasonable care in the following manner:

a.   violating their duty to provide adequate resident care, including but not limited to diagnosis, evaluation, assessment, supervision, monitoring, medication and treatment monitoring, medication and treatment to and for Geraldine E. Wiggins;

b.   failure to provide adequate supervision and monitoring to Geraldine E. Wiggins to avoid accidents;

c.  failure to keep Geraldine E. Wiggins safe from falls;

d.  failure to identify and implement adequate interventions to keep Geraldine E. Wiggins safe;

e.  failure to develop a comprehensive care plan to address Geraldine E. Wiggins' fall risk;

f.  failure to monitor the effectiveness of interventions and modify Geraldine E. Wiggins' care plan when her condition required the same;

g.  violating their duty to develop and implement a comprehensive Care Plan to prevent a fall resulting in hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and death;

h.  violating their duty to develop and implement timely interventions to prevent a fall resulting in hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and death;

i.  failure to recognize that the Decedent was at risk for falls and provide appropriate and adequate supervision and monitoring to prevent a fall resulting in hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and death;

j.  failure to recognize the Decedent's fall-risk factors and prevent a fall resulting in hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and death;

k.  failure to properly assess and document the Decedent's change in condition;

l.  failure to provide for the Decedent's well-being and keep her safe from a fall resulting in hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and death;

m.  failure to provide for the Decedent's safety and well-being;

n.  failing to make the appropriate, thorough and timely assessment of Decedent's condition;

o.  failing to seek timely medical care when Decedent's condition required same;

p.  failing to properly train and supervise Defendants' actual or ostensible employees, servants, agents or other staff or healthcare providers to monitor Decedent and to provide for her safety, welfare and general well-being;

q.  failing to properly hire, train and supervise staff, employees and healthcare providers at Defendants' facility;

r.  failing to monitor the competency, adequacy and propriety of the treatment rendered by their agents, servants and employees who provided care and treatment to Decedent while a resident at Defendants' facility;

s.    failing to maintain Defendants' duty to formulate, adopt and enforce adequate policies, procedures and protocols to ensure that their facility's patients, including Decedent, are properly supervised, assessed, monitored and receive proper and timely medical, custodial and nursing care;

t.    failing to maintain Defendants' duty to formulate, adopt and enforce adequate policies, procedures and protocols to ensure that their facility's patients, including Decedent, are properly supervised, monitored and receive proper medical, custodial and nursing care to keep her free from pressure injuries;

u.    failing to maintain Defendants' duty to formulate, adopt and enforce adequate policies, procedures and protocols to ensure that their facility's patients, including Decedent, are properly supervised, monitored and receive proper medical, custodial and nursing care to keep her free from infections and sepsis;

v.    failing to maintain Defendants' duty to formulate, adopt and enforce adequate policies, procedures and protocols to ensure that their facility's residents, including Decedent, are properly supervised, monitored and receive proper medical, custodial and nursing care to keep him free from protein-calorie malnutrition;

w.    failing to administer the facility in a manner that enabled it to use its resource effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of the facility's residents, including Decedent;

x.    failing to ensure that the Defendants used the results of its assessments to develop, review and revise Decedent's "Care Plan";

y.    failing to ensure that Defendants' facility had sufficient nursing staff to provide nursing and custodial care and services to the residents in order to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident, including Decedent;

z.    failing to maintain compliance with the governmental rules and regulation to which Defendants' delivery of care is compared as part of the survey process conducted by the Pennsylvania Department of Health;

aa.    failing to provide adequate and sufficient staffing levels at Defendants' facility;

bb.    failing to properly select, retain and monitor the competency of the medical and nursing staff, their employees, agents, servants and other healthcare providers who treated Decedent and failing to ensure such persons provided care within the applicable standards of care;

cc.    failing to keep Decedent free from neglect and abuse;

dd.    failing to take appropriate steps to remedy continuing problems at the Defendants' facility that Defendants knew, or had reason to know, were occurring with Decedent's care, which included the need to increase the number of the facility's employees, hiring skilled and trained employees, adequately train and supervise the current employees, monitoring

conduct of the employees, and adopting new or changing the existing policies, procedures and protocols to ensure care provided was provided within the appropriate community standards;

ee.    making false, fraudulent, inadequate and inconsistent notes in Decedent's chart;

ff.    failing to obtain new or modified "Physicians' Orders" when changes in Decedent's condition were recognized by Defendants' agents;

gg.    failing to accurately, timely and consistently document Decedent's needs and the care and services provided to her in response to such needs;

hh    violating Pennsylvania Statutes, Pennsylvania Administrative Regulations, as well as OBRA regulations;

ii.    grossly understaffing Defendants' facility;

jj.    failing to train the employees to recognize medical conditions/symptoms which required Decedent's transfer to the hospital;

kk.    failing to allocate adequate funds, resources and supplies and failure to implement a facility budget that provided for the necessary and sufficient funds, resources and staffing levels to enable and allow their facility to provide adequate, timely appropriate care and services to the facility's residents, including Decedent;

ll.    failure to recognize and investigate neglect and abuse occurring with the care and services provided and not provided to Decedent, and failure to report such neglect and abuse to the appropriate governmental agencies;

m.    All of the acts or failure to act constitute a deviation from the appropriate standards of care, negligence, carelessness and reckless indifference to the health, safety, welfare and well-being of Decedent;

nn.    Defendants' conduct caused harm to Decedent and increased the risk of harm to her; and

oo.    in committing the aforementioned acts and omissions, Defendants were acting negligently, carelessly and with reckless indifference to the safety, welfare and well-being of Decedent.

102.    Upon information and belief, the Defendants, including their owners, members, managers, officers, directors and partners knew of and/or were made aware of the Pennsylvania Department of Health annual and complaint survey results and placed on notice of the status of Brethren Village.

103.    At all times relevant to this lawsuit, the Defendants employed and directed physicians, nurses and other medical personnel who rendered care to Geraldine E. Wiggins.

104.    At all times relevant to this lawsuit, the Defendants owed a duty to Geraldine E. Wiggins to provide competent and qualified physicians, surgeons, nurses, nurses' aides and other medical and quasi medical personnel to render proper care to her.

105.    At all times relevant to this lawsuit, the Defendants owed Geraldine E. Wiggins a duty to operate their rehabilitation Facility in a careful and reasonable manner, under the circumstances, as would have been done by other rehabilitation facilities in and about the Pennsylvania area.

106.    At all times relevant to this lawsuit, Defendants and their agents, staff and employees, owed Geraldine E. Wiggins the duty to possess and exercise that degree of skill and knowledge ordinarily possessed and exercised by similar rehabilitation, physicians and/or nurses in and about the Pennsylvania area.

107.    At all times relevant hereto, Geraldine E. Wiggins' care was to be delivered and administered by medical staff, nursing staff and healthcare staff at the Defendants' rehabilitation Facility in a reasonably safe and prudent manner within the applicable standards of care for the community, as well as state and federal nursing home facility rules and regulations.

108.    Geraldine E. Wiggins was a resident at Defendants' rehabilitation Facility and the Defendants negligently and carelessly and in wanton and willful disregard for her health, safety and general welfare, inflicted injury upon her in failing to timely provide appropriate and necessary medical, nursing, rehabilitation and custodial care, adequate monitoring and supervision.

109.    As a direct and proximate result of the negligence, carelessness and recklessness of the Defendants, as is more fully set forth herein, Geraldine E. Wiggins experienced, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

110.    Geraldine E. Wiggins experienced severe and excruciating pain and suffering as the result of the aforesaid negligent, careless and reckless conduct of the Defendants, and Defendants' agents, and

their breach of the duty of care as set forth herein.

111.    In causing the aforesaid injuries, the Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

112.    Pennsylvania Code Chapter 28, Section 201 *et. seq.*, requires Defendants to comply with all federal, state and local regulations with regard to long-term care facilities.

113.    The Defendants violated OBRA regulations, which establish the minimum standard of care to be followed by Defendants, including but not limited to the following:

(a)    42 C.F.R. § 483.10 (a)(1) / § 483.10 the patient has a right to a dignified existence;

(b)    42 C.F.R. § 483.12 / § 483.13 (b) & (c) the patient has the right to be free from abuse, neglect, misappropriation of patient property, and exploitation as defined in this subpart;

(c)    42 C.F.R. § 483.12 (c)(1) / § 483.13(c)(2) the facility must ensure that all alleged violations involving abuse, neglect, exploitation or mistreatment, including injuries of unknown source and misappropriation of patient property, are reported immediately, but not later than 2 hours after the allegation is made, if the events that cause the allegation involve abuse or result in serious bodily injury, or not later than 24 hours if the events that cause the allegation do not involve abuse and do not result in serious bodily injury, to the Administratrices of the facility and other officials (including to the State Survey Agency and adult protective services where state law provides for jurisdiction in long-term care facilities) in accordance with State law through established procedures;

(d)    42 C.F.R. § 483.20 (2)(ii) the facility must conduct an assessment after a significant change in patient's condition;

(e)    42 C.F.R. § 483.21 (b)(b) / § 483.20(k) Comprehensive Care Plans, the facility must develop and implement a comprehensive person-centered care plan for each patient, consistent with the patient rights, that includes measurable objectives and timeframes to meet a patient's medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment;

(f)    42 C.F.R. § 483.24 / § 483.25 each patient must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well-being, consistent with the patient's comprehensive assessment and plan of care;

(g)    42 C.F.R. § 483.25 (b)(i) / (ii) / § 483.25 (c)(1)(2) Based on the comprehensive assessment of a resident, the facility must ensure that (i) A resident receives care, consistent with professional standards of practice, to prevent pressure ulcers and does not develop pressure ulcers unless the

Landmark v. Nurselect MSJ_00000296

individual's clinical condition demonstrates that they were unavoidable; and (ii) A resident with pressure ulcers receives necessary treatment and services, consistent with professional standards of practice, to promote healing, prevent infection and prevent new ulcers from developing.

(h)     42 C.F.R. § 483.25 (d)(2) / § 483.25 (h)(2) each patient receives adequate supervision and assistance devices to prevent accidents;

(i)     42 C.F.R. § 483. 35 (a) / § 483. 30(a)(1) the facility must provide services by sufficient number of each of the following types of personnel on a twenty-four (24) hour basis to provide nursing care to all patients in accordance with patient care plans; and

(j)     42 C.F.R. § 483.70 (b) / § 483.75 (b) The facility must operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility.

114.    Geraldine E. Wiggins fell within the class of persons the statutory rules, regulations and laws that were intended to protect by virtue of OBRA Regulations and the Pennsylvania Code 28 §§ 201, *et. seq.*, thus entitling Plaintiff to adopt such laws as the standard of care for measuring Defendants' conduct. Thus, Plaintiff asserts a claim for negligence *per se*, asserting that, as a matter of law, the conduct of the Defendants amounted to negligence and negligence *per se*.

115.    At all relevant times pertinent hereto, there was in full force and effect 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person", providing penal consequences for neglect of a care-dependent person for:

> *Intentionally, knowingly or recklessly causes bodily injury or serious bodily injury by failing to provide treatment, care, goods or services necessary to preserve the health, safety or welfare of a care-dependent person for whom he is responsible to provide care.*

116.    18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" expresses the fundamental public policy of the Commonwealth of Pennsylvania that older adults, like children, are not to be abused or neglected, particularly in health care facilities or by persons holding themselves out as trained professionals, and that if such neglect or abuse causes injury, either physical or mental, then such conduct is actionable.

117.    At all relevant times pertinent thereto, Geraldine E. Wiggins was a care-dependent resident at Defendants' facility and as such, fell within the class of persons 18 Pa.C.S.A. §2713 "Neglect of Care

Landmark v. Nurselect MSJ_00000297

Dependent Person" was intended to protect, and as such, entitling Plaintiff to adopt 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" as the standard of care for measuring the conduct of the Defendants.

118.    Furthermore, 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" is directed to obviate the specific kind of harm which Geraldine E. Wiggins sustained, with its purpose, at least in part, to protect the interest of a group of individuals, i.e., *care-dependent persons*, including Geraldine E. Wiggins.

119.    Defendants, in accepting the responsibility for providing for Geraldine E. Wiggins' care, welfare and well-being, as mentioned herein, and were negligent *per se* as they violated 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" in that they failed to provide treatment, care, goods and services necessary to preserve the health, safety or welfare of Geraldine E. Wiggins, for whom they were responsible to provide care as specifically set forth in this Fourth Amended Complaint.

120.    As a direct result of the Defendants' aforementioned negligence *per se*, Geraldine E. Wiggins was caused to suffer serious injuries as aforesaid.

121.    The conduct of the Defendants was intentional, outrageous and willful and exhibited a reckless indifference to the health, safety and well-being of Geraldine E. Wiggins.

122.    The conduct of the Defendants was such that an award of punitive damages is justified.

*WHEREFORE*, Plaintiff demands judgment in her favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

**COUNT II – VICARIOUS LIABILITY**
**BRENDA L. KLING, ADMINISTRATRIX OF**
**THE ESTATE OF GERALDINE E. WIGGINS, DECEASED**
**v.**
**REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE,**
**BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA and JOHN DOES 1-4**

123.    Plaintiff incorporates by reference herein the allegations contained in the receding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

124.    At all times relevant hereto, Defendants' agents, servants, employees and others were acting in the scope of their employment as agents, servants or employees of Defendants' Facility.

Landmark V. Nurselect MSJ_00000298

125.    Defendants are vicariously liable for the acts, commissions or omissions, of their physicians, nurses, nurses' aides and other medical personnel and healthcare providers fully as though the aforementioned physicians, nurses, nurses' aides and other medical personnel and healthcare providers performed the acts or omissions themselves. In the alternative, the Defendants are responsible for the negligent acts or omissions of other physicians, nurses, nurses' aides and other healthcare providers who are agents, employees and/or servants of the Defendants.

126.    At all times relevant to this lawsuit, the Defendants, employed and directed physicians, nurses, nurses' aides and other medical personnel who rendered care to Geraldine E. Wiggins.

127.    At all times relevant to this lawsuit, Defendants owed a duty to Geraldine E. Wiggins to provide competent and qualified physicians, surgeons, nurses and other quasi-medical personnel to render care to her.

128.    At all times relevant to this lawsuit, the Defendants owed to Geraldine E. Wiggins the duty to operate their Facility in a careful and reasonable manner, under the circumstances, as would have been done by other similar facilities in and about the Pennsylvania area.

129.    At all times relevant to this lawsuit, the Defendants and their agents, owed Geraldine E. Wiggins the duty to possess and exercise that degree of skill and knowledge ordinarily possessed and exercised by similar facilities, physicians and/or nurses in and about the Pennsylvania area.

130.    At all times relevant to this lawsuit, Geraldine E. Wiggins' care was to be delivered and administered by the agents, servants and/or employees of the Defendants at the Defendants' Facility in a reasonably safe and prudent manner within the applicable standards of care for the community Commonwealth of Pennsylvania and federal nursing home facility rules and regulations.

131.    The Defendants breached their duties and were, therefore, negligent, careless and exhibited a reckless disregard to the health, safety, welfare and well-being of Geraldine E. Wiggins.

132.    The aforesaid breaches of duties, negligence, carelessness and recklessness of the Defendants directly and proximately caused the aforesaid injuries to Geraldine E. Wiggins, including, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion

from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

133.    In causing the aforesaid injuries, the Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

134.    The conduct of the Defendants was intentional, outrageous, willful and wanton, and exhibited a reckless indifference to the health, safety and well-being of Geraldine E. Wiggins.

135.    The conduct of the Defendants was such that an award of punitive damages is justified.

*WHEREFORE*, Plaintiff demands judgment in her favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

<u>COUNT III - CORPORATE LIABILITY</u>
**BRENDA L. KLING, ADMINISTRATRIX OF**
**THE ESTATE OF GERALDINE E. WIGGINS, DECEASED**
v.
**REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE**
**REALTY, LLC and JOHN DOES 1-4**

136.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

137.    Defendants' agents, employees, and servants and others provided care and treatment to Geraldine E. Wiggins as agents, employees, servants, officers or directors of Defendants or apparent agents held out as such.

138.    At all times relevant hereto, Defendants' agents, servants, employees and others were acting in the scope of their employment as agents, servants, or employees of said Defendants.

139.    At all relevant times pertinent hereto, the corporate conduct of the Defendants was independent of the negligent conduct of the employees, and was outrageous, willful, and wanton, and exhibited a reckless indifference to the health, welfare and well-being of Decedent.

140.    Defendants, as corporate entities, are liable based on the following duties of care owed to Geraldine E. Wiggins:

Landmark v. Nurselect MSJ_00000300

a)  a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;

b)  a duty to select and retain only competent physicians;

c)  a duty to oversee all persons who practice medicine within its walls as to patient care; and,

d)  a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

141.  Defendants owed Geraldine E. Wiggins a duty concerning the care and treatment under a corporate negligence standard with regard to the policies, actions and inactions of the institution itself and are directly liable for their own negligence.

142.  Defendants and their corporate members, managers, partners, owners, and directors breached their duties and were, therefore, negligent, careless and reckless in their duties and obligations to Geraldine E. Wiggins.

143.  The aforesaid breaches of duties, corporate negligence, carelessness and recklessness of Defendants directly and proximately caused the aforesaid injuries to Decedent, including but not limited to, experience, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

144.  In causing the aforesaid injuries, Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

145.  The conduct of the Defendants was intentional, outrageous, willful and wanton and exhibited a reckless indifference to the health, safety and well-being of Geraldine E. Wiggins.

146.  The conduct of the Defendants was such that an award of punitive damages is justified.

**WHEREFORE,** Plaintiff demands judgment in her favor and against all Corporate Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

## COUNT IV -SURVIVAL CLAIM
### BRENDA L. KLING, ADMINISTRATRIX OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
#### v.
### REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA and JOHN DOES 1-4

147.   Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

148.   Plaintiff, Brenda L. Kling, Administratrix of the Estate of Geraldine E. Wiggins, deceased, also brings this action on behalf of the Estate of Geraldine E. Wiggins, deceased, under and by virtue of the Act of 1972, June 30, P.L. 508, No. 164, Section 2, eff. July 1972, as amended, 20 Pa.C.S.A. 3371, et seq., (known as the Pennsylvania Survival Act").

149.   Plaintiff, Brenda L. Kling, as daughter and Administratrix of the Estate of Geraldine E. Wiggins, deceased, is a survival claim beneficiary.

150.   Plaintiff, Brenda L. Kling, as Administratrix of the Estate of Geraldine E. Wiggins, deceased, also claims on behalf of the Estate of Geraldine E. Wiggins, deceased, all damages recoverable under the Pennsylvania Survival Act, including, but not limited to damages for the conscious pain and suffering undergone by Decedent, up to an including the time of her death, which was caused by the Defendants' breach of duties, negligence, carelessness, and recklessness.

151.   Plaintiff claim damages for the fright and mental suffering attributable to the peril leading to the physical manifestation of mental and physical injuries experience, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

152.   In causing the aforesaid injuries, the Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

Landmark v. Nurselect MSJ_00000302

153.    As a result of the death of Geraldine E. Wiggins, her Estate has been deprived of the economic value of the Decedent's life during the period of her life expectancy and Plaintiff, as Administratrix of the Estate of Geraldine E. Wiggins, deceased, claim damages for pecuniary loss sustained by the Estate as a result of her death, as well as for the conscious pain and suffering undergone by Decedent, up to and including the time of her death.

154.    The conduct of the Defendants was intentional, outrageous, willful, wanton and exhibited a reckless indifference to the safety, health, welfare, and well-being of Geraldine E. Wiggins.

155.    The conduct of the Defendants was such that an award of punitive damages is justified.

**WHEREFORE**, Plaintiff demands judgment in her favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

## COUNT V - WRONGFUL DEATH CLAIM
### BRENDA L. KLING, ADMINISTRATRIX OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
v.
### REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA and JOHN DOES 1-4

156.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

157.    Plaintiff also brings this action on behalf of Decedent's estate under and by virtue of the Act of 1855 P.L. 30, as amended, Pa.R.C.P. 2202, as further amended, July 1976, 42Pa.C.S.A. 8301 (known as the "Pennsylvania Wrongful Death Act").

158.    Plaintiff, Brenda L. Kling, as daughter and Administratrix of the Estate of Geraldine E. Wiggins, deceased, is a wrongful death beneficiary.

159.    Plaintiff claims all damages recoverable under the Pennsylvania Wrongful Death Act, including, but not limited to damages for pecuniary loss suffered by Decedent's survivors by reason of the death of Geraldine E. Wiggins, as well as for the reimbursement for medical expenses, nursing expenses, funeral expenses, expenses of administration and other expenses incurred in connection therewith.

160.    As a result of the death of Geraldine E. Wiggins, the aforesaid survivors have been deprived of the comfort, aid, assistance, tutelage, maintenance, and companionship that they would have received from Decedent for the remainder of her natural life.

**WHEREFORE,** Plaintiff demands judgment in her favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

### COUNT VI- BREACH OF FIDUCIARY DUTY
### BRENDA L. KLING, ADMINISTRATRIX OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
### v.
### REHABILITATION CENTER OF BRETHREN VILLAGE, LLC

161.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

162.    At all times material and relevant hereto, Geraldine E. Wiggins was incapable of dealing with the facility, Brethren Village, on equal terms, and was incapable of engaging in any arm's length relationship with them.

163.    Additionally, at all times material and relevant hereto, Geraldine E. Wiggins was incapable of independently providing for her own safety, health, welfare and well-being and justifiably relied on the Facility to provide necessary care and services to attain and/or maintain her highest practicable physical, mental and psychosocial well-being.

164.    At all times material and relevant hereto, the Facility individually and/or collectively fostered and forged a relationship of special confidence and trust with Geraldine E. Wiggins by admitting her into their care on April 13, 2021, and by reserving the right to specifically determine the level of care, safety, protection, services and supplies that would be provided to Geraldine E. Wiggins.

165.    At all times material and relevant hereto, the Facility individually and/or collectively controlled and oversaw every single aspect of Geraldine E. Wiggins's existence, including her activities of daily living (ADL), custodial care, as well as skilled nursing and healthcare.

166.    At all times material and relevant hereto, the facility individually and/or collectively determined and orchestrated the most trivial as well as the most vital aspects of Geraldine E. Wiggins's

existence, from the type of clothing she wore, to when and how she received healthcare, as well as quality and quantity of food and water she could consume.

167.    As a result, Geraldine E. Wiggins was solely and entirely dependent upon the Facility's staff, employees, agents, officers and directors, to provide for her basic daily care, skilled nursing and healthcare, services, safety, protection, well-being and personal and intimate needs.

168.    Geraldine E. Wiggins reposed a special confidence into the Facility's staff, employees, agents, officers and directors to provide her with necessary care and services to attain and/or maintain her highest practicable physical, mental, and psychosocial well-being.

169.    At all times material hereto, the Facility developed a special relationship with Geraldine E. Wiggins  by virtue of the type of the care and services she required, their supposedly superior knowledge, skill and expertise, and their overmastering dominance over Geraldine E. Wiggins and by virtue of Geraldine E. Wiggins's weakness, dependence and inability to independently provide for her own safety, health, welfare and well-being and her justifiable reliance on the Facility to provide for her safety, health, welfare and well-being.

170.    In their special relationship with one another, Geraldine E. Wiggins, a vulnerable and dependent individual, did not and could not deal with the Facility on equal terms due to the Facility's overmastering dominance on one side, and due to Geraldine E. Wiggins's weakness and justifiable trust on another side.

171.    At all times material hereto, Geraldine E. Wiggins entrusted her care, treatment, as well as every single aspect of her very existence into the exclusive care, custody and control of the Facility and its staff, employees, agents, officers and directors.

172.    At all times material hereto, the aforementioned special relationship enabled the facility to occupy a position of confidence regarding Geraldine E. Wiggins requiring fidelity, loyalty and scrupulous fairness and good faith on the part of the Facility.

173.    The aforementioned special relationship further required the Facility to refrain from using its position to Geraldine E. Wiggins's detriment and the facility's own advantage.

Landmark v. Nurselect MSJ_00000305

174. As such, and at all times material hereto, the facility, Rehabilitation Center at Brethren Village, LLC, was a fiduciary of Geraldine E. Wiggins.

175. At all times material hereto, the Facility owed a fiduciary duty to Geraldine E. Wiggins.

176. The Facility breached its fiduciary duty and its fiduciary obligations, as well as violated its relationship of trust and special confidence owed to Geraldine E. Wiggins by: a) engaging in the conduct set forth in detail in the within Fourth Amended Complaint; and b) allowing revenues, profits and assets obtained from the Facility's patients as well as their payor sources for inflated, improper and unreasonable inter-company fees and transfers designed and created for the benefit of the facility's owners, parent companies, affiliates and the Defendants herein, instead of utilizing said resources effectively and efficiently in order to maintain and/or attain the highest practicable physical, mental and psychosocial well-being of the Facility's residents, including Geraldine E. Wiggins.

177. In their dealings with Geraldine E. Wiggins, as described herein, the Facility acted in bad faith, and used its position of trust and special confidence to their own advantage and to Geraldine E. Wiggins's detriment.

178. In violating its fiduciary duties and obligations to Geraldine E. Wiggins, the Facility knew or should have known, that Geraldine E. Wiggins would suffer harm.

179. The conduct of the Facility was intentional, outrageous, willful, wanton and exhibited a reckless indifference to the safety, health, welfare and well-being of Geraldine E. Wiggins.

180. The conduct of the Facility was such, that an award of punitive damages is justified.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

## COUNT VII – CORPORATE DEFENDANTS AIDING AND ABETTING BREACH OF FIDICUARY DUTY
### BRENDA L. KLING, ADMINISTRATRIX OF THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
v.
### BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, JOHN DOES 1-4

Landmark v. Nurselect MSJ_00000306

181.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

182.    Corporate Defendants knew, or should have known, of Geraldine E. Wiggins's fiduciary relationship with the Facility, Rehabilitation Center at Brethren Village, LLC, by virtue of the type of the care and services she required, the supposedly superior knowledge, skill and expertise, and their overmastering dominance over Geraldine E. Wiggins, and by virtue of Geraldine E. Wiggins' weakness, dependence and inability to independently providing for her own safety, health, welfare and well-being and is justifiable reliance on the Facility to provide for her safety, health, welfare and well-being.

183.    Corporate Defendants knowingly participated in and provided substantial assistance and encouragement to the Facility in connection with the facility's breach of their fiduciary duties and obligations to Geraldine E. Wiggins, as set forth in detail in Count VI of this Fourth Amended Complaint.

184.    Corporate Defendants knew, or should have known, that the facility's residents, including Geraldine E. Wiggins, were incapable of independently providing for their own care, safety and well-being, and were justifiably relying on, and solely depending upon the Facility's staff, employees, agents, officers and directors to provide for the basic daily and custodial care, skilled nursing and healthcare services, safety, welfare and well-being.

185.    Additionally, Corporate Defendants knowingly assisted, encouraged, aided and abetted the Facility in its breach of fiduciary duties and obligations to the Facility's residents, including Geraldine E. Wiggins, by: a) engaging in the conduct set forth in detail in this Fourth Amended Complaint; b) exercising complete and total control over the Facility's revenues by regularly and repeatedly sweeping nearly all of the Facility's revenues into corporate account under exclusive control of the Corporate Defendants and/or their designee; c) knowingly and intentionally creating and accepting inter-company fees and transfers consisted of revenues derived from the Facility's patients and their payor sources, and designed to improperly and unjustly enrich the Corporate Defendants, instead of allowing the Facility to utilize its resources effectively and efficiently to allow the Facility's patients, including Geraldine E. Wiggins, to attain and/or maintain their highest practicable physical, mental and psychosocial well-being; d) structuring

Landmark v. Nurselect MSJ_00000307

181.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

182.    Corporate Defendants knew, or should have known, of Geraldine E. Wiggins's fiduciary relationship with the Facility, Rehabilitation Center at Brethren Village, LLC, by virtue of the type of the care and services she required, the supposedly superior knowledge, skill and expertise, and their overmastering dominance over Geraldine E. Wiggins, and by virtue of Geraldine E. Wiggins' weakness, dependence and inability to independently providing for her own safety, health, welfare and well-being and is justifiable reliance on the Facility to provide for her safety, health, welfare and well-being.

183.    Corporate Defendants knowingly participated in and provided substantial assistance and encouragement to the Facility in connection with the facility's breach of their fiduciary duties and obligations to Geraldine E. Wiggins, as set forth in detail in Count VI of this Fourth Amended Complaint.

184.    Corporate Defendants knew, or should have known, that the facility's residents, including Geraldine E. Wiggins, were incapable of independently providing for their own care, safety and well-being, and were justifiably relying on, and solely depending upon the Facility's staff, employees, agents, officers and directors to provide for the basic daily and custodial care, skilled nursing and healthcare services, safety, welfare and well-being.

185.    Additionally, Corporate Defendants knowingly assisted, encouraged, aided and abetted the Facility in its breach of fiduciary duties and obligations to the Facility's residents, including Geraldine E. Wiggins, by: a) engaging in the conduct set forth in detail in this Fourth Amended Complaint; b) exercising complete and total control over the Facility's revenues by regularly and repeatedly sweeping nearly all of the Facility's revenues into corporate account under exclusive control of the Corporate Defendants and/or their designee; c) knowingly and intentionally creating and accepting inter-company fees and transfers consisted of revenues derived from the Facility's patients and their payor sources, and designed to improperly and unjustly enrich the Corporate Defendants, instead of allowing the Facility to utilize its resources effectively and efficiently to allow the Facility's patients, including Geraldine E. Wiggins, to attain and/or maintain their highest practicable physical, mental and psychosocial well-being; d) structuring

Landmark v. Nurselect MSJ_00000308

the managing and operating business model for the Facility in such a way that constrained the Facility's ability to provide the adequate and necessary care and services to their residents, including Geraldine E. Wiggins, while simultaneously benefiting and enriching the pyramid structure corporate entities; e) overseeing, managing, and controlling the Facility's acceptance of reimbursement from residents, including Geraldine E. Wiggins, knowing that the Facility could not provide full value of the care and services to meet the care and safety needs of their residents, including Geraldine E. Wiggins; f) drafting, structuring and approving contracts between the Facility and Defendants, which the Defendants knew, or should have known, would result in diversion and depleting of the facility revenues, necessary to provide the care and services to and meet the needs of their residents, including Geraldine E. Wiggins.

186.    The aforementioned conduct of the Defendants constitutes knowing and intentional aiding and abetting the Facility's breach of their fiduciary duties and obligations to the Facility's residents, including Geraldine E. Wiggins, and subjects Corporate Defendants to liability for the injuries and harm suffered by Geraldine E. Wiggins, as aforesaid.

187.    In adding and abetting the Facility in their breach of fiduciary duties and obligations to Geraldine E. Wiggins, as aforesaid, Corportae Defendants knew, or should have known, that Geraldine E. Wiggins would suffer harm.

188.    As a result of Corporate Defendants' aiding and abetting the Facility's breach of their fiduciary duties and obligations to the Facility's residents, including Geraldine E. Wiggins, Corporate Defendants were improperly and unjustly enriched, their Facility, Rehabilitation Center at Brethren Village, LLC, was left with inadequate staff and resources to provide for the care and meet the needs of the Facility's residents, including Geraldine E. Wiggins, and Geraldine E. Wiggins suffered foreseeable and avoidable injuries set forth herein, and more specifically, experience, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

189.    The conduct of Corporate Defendants was intentional, outrageous, willful, wanton and exhibited a reckless indifference to the safety, health, welfare and well-being of Geraldine E. Wiggins.

190.    The conduct of Corporate Defendants was such, that an award of punitive damages is justified.

*WHEREFORE,* Plaintiff demands judgment in her favor and against Corporate Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

**ROSENBAUM & ASSOCIATES, P.C.**

Dated:  December 22, 2022              BY:    /s/ *Andrei Govorov*
                                              Andrei Govorov, Esquire
                                              Counsel for Plaintiff

## VERIFICATION

I verify that the statements made in the foregoing Fourth Amended Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements therein are made subject to the penalties of 18 Pa.C.S. Section 4904, relating to unsworn falsification to authorities.

ROSENBAUM & ASSOCIATES, P.C.

Dated: December 22, 2022            BY:   /s/ Andrei Govorov____
                                          Andrei Govorov, Esquire
                                          Counsel for Plaintiff

Landmark v. Nurselect MSJ_00000311

EXHIBIT B

Landmark v. Nurselect MSJ_00000312



**SUPPLEMENTAL
STAFFING AGREEMENT**

This Supplemental Staffing Agreement ("**Agreement**") is entered into the **22nd** day of **September, 2020** by and between **Brethren Village Retirement Community**, with its physical address at **3001 Lititz Pike in Lititz, PA 17543** ("**Client**"); and NurSelect, LLC, a Pennsylvania business with its administrative offices located at 630 Freedom Business Center Drive, Third Floor, King of Prussia, PA 19406 ("**NurSelect**").

## RECITALS

A.     NurSelect is a health care employment service engaged in the business of recruiting and placing qualified nursing personnel, such as, certified nursing assistants, licensed practical nurses, and registered nurses (collectively, "**NurSelect Personnel**") on contractual assignments on a per-diem or temporary basis (the "**Services**").

B.     The Client desires NurSelect, and NurSelect agrees, upon the terms and conditions more fully set forth herein, to provide NurSelect Personnel to the Client to perform the Services.

NOW, THEREFORE, in consideration of the mutual promises contained herein, the parties hereto agree as follows:

## ARTICLE I – THE SERVICES; NURSELECT PERSONNEL

1.1     Staffing; Services. Upon receipt of a request by the Client for NurSelect Personnel, and according to the availability of the requested NurSelect Personnel, NurSelect will provide the NurSelect Personnel to the Client, from time to time, at the locations requested, to provide the Services in a quantity and with the qualifications specified by the Client in said request. Services will be provided by NurSelect Personnel that (a) meet the highest professional standards and principles applicable to Services; and (b) shall be provided timely in accordance with the needs of the patient receiving the Services. Services shall be provided: (x) in accordance with federal, state and local laws, rules, ordinances and regulations; and (y) consistent with the policies and procedures of Client. Neither NurSelect, nor NurSelect Personnel shall do or omit to do anything that would jeopardize the licensure of the Client or its participation in governmental health programs, including Medicare and Medicaid.

1.2     Licensure and Certification of NurSelect Personnel. All NurSelect Personnel shall, at all times while performing the Services, have the appropriate nursing licenses, certifications and/or clinical experience, background checks, reference checks and any other certification or document required by law to provide the Services. From time to time, the Client may notify NurSelect of its need for NurSelect Personnel who possess a specialized certification and/or who have particular clinical experience to provide specialized services. Subject to the terms and conditions of this Agreement, NurSelect will provide NurSelect Personnel having the appropriate licenses, certification, and/or clinical experience required by applicable law to perform such specialized services. NurSelect shall keep and make available to the Client, upon written request by the Client, all licenses, certifications and other documentation verifying clinical experience and/or such other specification needed to furnish any of the Services. NurSelect shall comply with 28 Pa. Code Section 201.21.



2

Landmark v. Nurselect MSJ_00000314



3

Landmark v. Nurselect MSJ_00000315



ARTICLE II – PAYMENT FOR SERVICES



4

Landmark v. Nurselect MSJ_00000316



### ARTICLE III - STATUS OF THE PARTIES

3.1    NurSelect Employees. It is expressly understood and agreed that all NurSelect Personnel shall not be considered employees or agents of the Client but instead shall be considered leased employees of NurSelect. Further, it is expressly understood and agreed by the parties that nothing contained in this Agreement shall be construed to create a joint venture, partnership, association or other affiliation or like relationship between the parties hereto, it being specifically agreed that their relationship is and shall remain that of independent parties to a contractual relationship as set forth in this Agreement. NurSelect shall be solely responsible for paying NurSelect Personnel and providing NurSelect Personnel with employment benefits, if any, offered by NurSelect. NurSelect shall be solely responsible for providing unemployment insurance and workers compensation benefits to NurSelect Personnel. NurSelect shall be solely responsible to handle all unemployment and workers compensation claims involving NurSelect Personnel.

3.2    No Claims for Certain Benefits. NurSelect and its NurSelect Personnel shall not have any claim under this Agreement or otherwise against the Client for employee benefits offered by the Client to its employees, including, without limitation, vacation pay, paid sick leave, retirement benefits, social security, workers compensation, health, disability, or professional malpractice benefits of any kind. NurSelect will indemnify and hold the Client harmless from any and all claims and liability arising from claims relating to the failure of the Client to provide any such benefits to any NurSelect Personnel.

3.3    No Claims for Withholding. The Client shall not withhold, on behalf of NurSelect or any NurSelect Personnel, any sums for income tax, unemployment insurance, social security or other withholding pursuant to any applicable law or requirement of any governmental body. NurSelect shall solely be responsible for all required withholdings from NurSelect Personnel wages and for remitting the same to the applicable governmental and other parties. NurSelect shall indemnify and hold the Client harmless from any and all claims and/or liability arising from claims relating to the Client's failure to make any such withholdings on behalf of NurSelect or any NurSelect Personnel.

5

### ARTICLE IV - INSURANCE



4.2    Proof of Insurance.  NurSelect shall, upon written request from the Client, provide to the Client certificates of insurance or other appropriate evidence of satisfaction of its obligations to maintain insurance as described in this Article. NurSelect agrees that it will notify the Client at least thirty (30) days in advance of cancellation, non-renewal, or adverse change in its insurance.

### ARTICLE V - APPORTIONMENT OF LIABILITY AND DAMAGES INDEMNIFICATION

5.1    Apportionment of Liability.  It is hereby stipulated and agreed between the Client and NurSelect that with respect to any claim or action arising out of the Services, each entity shall only be liable for payment of that portion of any and all liability, costs, expenses, demands, settlements or judgments resulting from negligence, actions or omissions of its own agents, officers, and employees.



### ARTICLE VI - TERM AND TERMINATION

6.1    Term.  The initial term of this Agreement shall commence on the date above first written ("**Commencement Date**") and shall continue for one (1) year from the Commencement Date ("**Term**"). Except as otherwise stated herein, the Term shall be automatically extended for one (1) additional year and so on from year to year until either NurSelect or the Client give to the other no less than thirty (30) days' written notice of termination prior to the end of the then-current Term.



6



ARTICLE VII - CONFIDENTIAL INFORMATION



ARTICLE VIII - NON-ENGAGEMENT COVENANT



7

ARTICLE IX – HEALTH INSURANCE PORTABILITY AND
ACCOUNTABILITY ACT OF 1996 PROVISIONS



8



9

Landmark v. Nurselect MSJ_00000321



ARTICLE X - OTHER TERMS AND CONDITIONS



10

Landmark v. Nurselect MSJ_00000322



IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and date first written above.

CLIENT:

By: _Davd S Rughe_

Name: _DAVID S. RAYHA  NHA_

Title: _VP OPERATION/COO_

NURSELECT:

By: _D. J. Shr_

Name: _DAVID F. SHCIRI_

Title: _PRESIDENT_

11

| | |
|---|---|
| BRENDA L. KLING, individually and as | : IN THE COURT OF COMMON PLEAS |
| Administratrix of the Estate of | : OF LANCASTER COUNTY, |
| GERALDINE E. WIGGINS, | : PENNSYLVANIA |
| | : |
| Plaintiff | : |
| | : NO: CI-22-04128 |
| v. | : |
| | : MedMal |
| REHABILITATION CENTER AT | : |
| BRETHREN VILLAGE, LLC, | : |
| BRETHREN VILLAGE, BRETHREN | : |
| VILLAGE REALTY, LLC, LORI | : |
| SCHOENER, NHA, and JOHN DOES 1– | : |
| 4 | : |
| Defendants, | : |
| | : |
| v. | : |
| | : |
| NURSELECT, LLC, | : |
| | : |
| Additional | : |
| Defendant. | : |

## VERIFICATION

I verify that the statements made in the attached Third-Party Joinder Complaint are true and correct to the best of my knowledge, information, and belief. I understand that the statements therein are subject to the penalties of 18 Pa.C.S. § 4904.

Date: June 13 , 2023           By: _____

                                John Snader, FACHE
                                President/CEO Brethren Village

Landmark V. Nurselect MSJ_00000324

DATE: ___8|25|23___
WRIT RE-ISSUED
ANDREW E. SPADE
PROTHONOTARY

LYCMC CO.'PA
SHERIFF'S DEPT.
2023 AUG 28  AM 11:49

RECEIVED

Landmark v. Nurselect MSJ_00000325

# EXHIBIT 5

Landmark v. Nurselect MSJ_00000326

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

ROSENBAUM & ASSOCIATES, P.C.
BY: ANDREI GOVOROV, ESQUIRE
Attorney ID No.: 209365
1818 Market Street - Suite 3200
Philadelphia, PA 19103
(215) 569-0200
agovorov@rosenbaumfirm.com

MAJOR-JURY
ASSESSMENT OF DAMAGES
HEARING IS REQUIRED.

_____
Attorney for Plaintiff

BRENDA L. KLING, ADMINISTRATRIX      :
of the ESTATE OF GERALDINE E. WIGGINS :
deceased                             :
19 Verbena Drive                     :
Lancaster, Pennsylvania 17062        :
                                     :
            vs.                      :
                                     :
REHABILITATION CENTER at BRETHREN    :
VILLAGE, LLC                         :
3001 Lititz Pike                     :
Lititz, Pennsylvania 17543           :
                                     :
And                                  :
                                     :
BRETHREN VILLAGE                     :
3001 Lititz Pike                     :
Lititz, Pennsylvania 17543           :
                                     :
And                                  :
                                     :
BRETHREN VILLAGE REALTY, LLC         :
3001 Lititz Pike                     :
Lititz, Pennsylvania 17543           :
                                     :
And                                  :
                                     :
LORI SCHOENER, NHA                   :
123 Race Street                      :
Richland, Pennsylvania 17087         :
                                     :
And                                  :
                                     :
JOHN DOES 1-4 (Fictious Names)       :

LANCASTER COUNTY
COURT OF COMMON PLEAS

No.: _____

## CI-22-04128

### CIVIL ACTION
### NOTICE

7-12-2022
#/98.75
RMD

YOU HAVE BEEN SUED IN COURT. IF YOU WISH TO DEFEND AGAINST THE CLAIMS SET
FORTH IN THE FOLLOWING PAGES, YOU MUST TAKE ACTION WITHIN TWENTY (20) DAYS
AFTER THIS COMPLAINT AND NOTICE ARE SERVED BY ENTERING A WRITTEN APPEARANCE
PERSONALLY OR BY ATTORNEY AND FILING IN WRITING WITH THE COURT YOUR DEFENSES
OR OBJECTIONS TO THE CLAIMS SET FORTH AGAINST YOU. YOU ARE WARNED THAT IF YOU

ACH 678 0787B
veeph
152432

Landmark v. Nurselect MSJ_00000327

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

FAIL TO DO SO THE CASE MAY PROCEED WITHOUT YOU AND A JUDGMENT MAY BE ENTERED AGAINST YOU BY THE COURT WITHOUT FURTHER NOTICE FOR ANY MONEY CLAIMED IN THE COMPLAINT OR FOR ANY OTHER CLAIM OR RELIEF REQUESTED BY THE PLAINTIFF. YOU MAY LOSE MONEY OR PROPERTY OR OTHER RIGHTS IMPORTANT TO YOU. YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

**Lawyer Referral & Information Service**
**Lancaster County Bar Association**
**28 E Orange Street**
**Lancaster, PA 17602**

**CI-22-04128**

## AVISO

LE HAN DEMANDADO A USTED EN LA CORTE. SI USTED QUIERE DEFENDERSE DE ESTAS DEMANDAS EXPUESTAS EN IAS PAGINAS SIGUIENTES, USTED TIENE VIENTE (20) DIAS DE PLAZO AL PARTIR DE LA FECHA DE LA DEMANDA Y LA NOTIFICACION. HACE FALTA ASENTAR UNA COMPARENCIA ESCRITA O EN PERSONA O CON UN ABOGADO Y ENTREGAR A LA CORE EN FORMA ESCRITA SUS DEFENSAS O SUS OBJECIONES A LAS DEMANDAS EN CONTRA DE SU PERSONA. SEA AVISADO QUE SI USTED NO SE DEFIENDE, LA CORTE TOMARA MEDIDAS Y PUEDE CONTINUAR LA DEMANDA EN CONTRA SUYA SIN PREVIO AVISO O NOTIFICACION. ADEMAS, LA CORTE PUEDE DECIDIR A FAVOR DEL DEMANDANTE Y REQUIERE QUE USTED CUMPLA CON TODAS LAS PROVISIONES DE ESTA DEMANDA. USTED PUEDE PERDER DINERO O SUS PROPIEDADES U OTROS DERECHOS IMPORTANTES PARA USTED. LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

**Servicio de referencia e información de abogados**
**Colegio de Abogados del Condado de Lancaster**
**28 E Calle Naranja**
**Lancaster, Pensilvania 17602**

Landmark v. Nurselect MSJ_00000328

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

**ROSENBAUM & ASSOCIATES, P.C.**
BY: Andrei Govorov, Esquire
Attorney I.D. No.: 209365
1818 MARKET STREET – SUITE 3200
PHILADELPHIA, PA 19103
(215) 569-0200
agovorov@rosenbaumfirm.com

MAJOR-JURY
ASSESSMENT OF DAMAGES
HEARING IS REQUIRED

ATTORNEY FOR PLAINTIFF(S)

| | |
|---|---|
| BRENDA L. KLING, ADMINISTRATRIX<br>of the ESTATE OF GERALDINE E. WIGGINS<br>deceased<br>19 Verbena Drive<br>Lancaster, Pennsylvania 17062 | LANCASTER COUNTY<br>COURT OF COMMON PLEAS<br><br>No.: _____ |

<span style="color:red">**CI-22-04128**</span>

vs.

REHABILITATION CENTER at BRETHREN
VILLAGE, LLC
3001 Lititz Pike
Lititz, Pennsylvania 17543

And

BRETHREN VILLAGE
3001 Lititz Pike
Lititz, Pennsylvania 17543

And

BRETHREN VILLAGE REALTY, LLC
3001 Lititz Pike
Lititz, Pennsylvania 17543

And

LORI SCHOENER, NHA
3001 Lititz Pike
Lititz, Pennsylvania 17087

And

JOHN DOES 1-4 (Fictious Names)

## COMPLAINT

Plaintiff, Brenda L. Kling, Administratrix of the Estate of Geraldine E. Wiggins, deceased, by and through their counsel, Rosenbaum & Associates, P.C., file this Complaint in Civil Action, and aver as follows:

Landmark v. Nurselect MSJ_00000329

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

1.      Plaintiff, Brenda L. Kling, Administratrix of the Estate of Geraldine E. Wiggins, deceased, is an adult individual and daughter of Decedent, Geraldine E. Wiggins, residing herein at 19 Verbena Drive, Lancaster, PA 17602.

2.      Decedent, Geraldine E. Wiggins, died intestate on August 28, 2021.

3.      Plaintiff, Brenda L. Kling, were appointed Administratrix of the Estate of Geraldine E. Wiggins, deceased, by the Register of Wills of Lancaster County, on September 23, 2021, and in this capacity acts on behalf of the Estate, the beneficiaries of the Estate and the potential wrongful death beneficiaries.

**CI-22-04128**

4.      At the time of her death, Decedent, Geraldine E. Wiggins, left surviving a daughter Brenda L. Kling, on whose behalf this claim is, in part, is filed.

5.      Defendant, Rehabilitation Center Brethren Village, LLC, is a business corporation organized and existing under the laws of the Commonwealth of Pennsylvania, and was engaged in the business of owning, operating, managing and offering healthcare, medical services, rehabilitation and nursing care to the public at a rehabilitation and nursing home facility, Rehabilitation Center at Brethren Village, LLC, ("Brethren Village") 3001 Lititz Pike, Lancaster, Pennsylvania. Plaintiff is asserting a professional liability claim against this Defendant.

6.      At all times material hereto, Defendant, Rehabilitation Center at Brethren Village, LLC, acted or failed to act by and through its agents, ostensible agents, servants, workmen, nurses, nurse's aides, and/or employees, physicians, the nursing home administrators and/or administrators responsible for formulating, adopting, monitoring and enforcing the policies, procedures and protocols of Brethren Village from the time Geraldine E. Wiggins was admitted to Brethren Village on April 13, 2021, including the physicians, nurses, nurses' aides, staff members and employees responsible for the care, supervision, treatment and safety of Geraldine E. Wiggins, starting on April 13, 2021, which includes those physicians, nurses, nurses' aides, staff and employees identified in the records and charts of Brethren Village, whose names cannot be discerned from the records but whose identities are known to and within the exclusive control of Defendants, as well as those physicians, nurses, nurses' aides, staff and employees whose names

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

are not recorded in the records due to Defendants' failure to implement and utilize proper record-keeping and documentation procedures but whose identities are known to and within the exclusive control of Defendants, all of whom were then and there acting within the scope of their authority and in the course of their employment with Defendant, Rehabilitation Center at Brethren Village, LLC, and in furtherance of Defendant, Rehabilitation Center at Brethren Village, LLC's business and on behalf of Defendant, Rehabilitation Center at Brethren Village, LLC.

**CI-22-04128**

7.    Defendant, Brethren Village, is a business corporation organized and existing under the laws of the Commonwealth of Pennsylvania, and was engaged in the business of owning, operating, managing and offering healthcare, medical services, rehabilitation and nursing care to the public at a rehabilitation and nursing home facility, Rehabilitation Center at Brethren Village, LLC, ("Brethren Village") 3001 Lititz Pike, Lancaster, Pennsylvania.  Plaintiff is asserting a professional liability claim against this Defendant.

8.    At all times material hereto, Defendant, Brethren Village, acted or failed to act by and through its agents, ostensible agents, servants, workmen, nurses, nurse's aides, and/or employees, physicians, the nursing home administrators and/or administrators responsible for formulating, adopting, monitoring and enforcing the policies, procedures and protocols of  Brethren Village from the time Geraldine E. Wiggins was admitted to Brethren Village on April 13, 2021,  including the physicians, nurses, nurses' aides, staff members and employees responsible for the care, supervision, treatment and safety of Geraldine E. Wiggins, starting on April 13, 2021, which includes those physicians, nurses, nurses' aides, staff and employees identified in the records and charts of Brethren Village, whose names cannot be discerned from the records but whose identities are known to and within the exclusive control of Defendants, as well as those physicians, nurses, nurses' aides, staff and employees whose names are not recorded in the records due to Defendants' failure to implement and utilize proper record-keeping and documentation procedures but whose identities are known to and within the exclusive control of Defendants, all of whom were then and there acting within the scope of their authority and in the course of

Landmark v. Nurselect MSJ_00000331

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

their employment with Defendant, Brethren Village, and in furtherance of Defendant, Brethren Village's business and on behalf of Brethren Village.

    9.    Defendant, Brethren Village Realty, LLC, is a business corporation organized and existing under the laws of the Commonwealth of Pennsylvania, and was engaged in the business of owning, operating, managing and offering healthcare, medical services, rehabilitation and nursing care to the public at a rehabilitation and nursing home facility, Rehabilitation Center at Brethren Village, LLC, ("Brethren Village") 3001 Lititz Pike, Lancaster, Pennsylvania.  Plaintiff is asserting a professional liability claim against this Defendant.

**CI-22-04128**

    10.    At all times material hereto, Defendant, Brethren Village Realty, LLC, acted or failed to act by and through its agents, ostensible agents, servants, workmen, nurses, nurse's aides, and/or employees, physicians, the nursing home administrators and/or administrators responsible for formulating, adopting, monitoring and enforcing the policies, procedures and protocols of Brethren Village from the time Geraldine E. Wiggins was admitted to Brethren Village on April 13, 2021, including the physicians, nurses, nurses' aides, staff members and employees responsible for the care, supervision, treatment and safety of Geraldine E. Wiggins, starting on April 13, 2021, which includes those physicians, nurses, nurses' aides, staff and employees identified in the records and charts of Brethren Village, whose names cannot be discerned from the records but whose identities are known to and within the exclusive control of Defendants, as well as those physicians, nurses, nurses' aides, staff and employees whose names are not recorded in the records due to Defendants' failure to implement and utilize proper record-keeping and documentation procedures but whose identities are known to and within the exclusive control of Defendants, all of whom were then and there acting within the scope of their authority and in the course of their employment with Defendant, Brethren Village Realty, LLC, and in furtherance of Defendant, Brethren Village Realty, LLC's business and on behalf of Brethren Village Realty, LLC.

    11.    Defendant, Lori Schoener, NHA, is an individual with a principal place of business at 3001 Lititz Pike, Lititz, Pennsylvania 17543.  At all times material hereto, Defendant, Lori Schoener, was engaged in the business of owing, operating, managing and controlling nursing homes, including

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

Rehabilitation Center at Brethren Village, LLC, during the Decedent's residency. Defendant, Lori Schoener, was at all time materials and relevant hereto, the employer, supervisor and/or partner of all other Defendants listed herein, and is therefore personally, jointly and vicariously liable, among other things, for the acts and omissions of herself and her agents, employees, servants, contractors, staff, and/or partners and all other Defendants, all of whom played a role in the operation of Rehabilitation Center at Brethren Village, LLC and the care provided to the Decedent.

**CI-22-04128**

12.    Defendants, Joe Does 1-4 (Fictious Names) are individuals, corporations and/or other entities whose identities, after reasonable investigation, are currently unknown, but at all times relevant hereto owned, operated, controlled and/or managed Rehabilitation Center of Brethren Village, LLC and/or provided medical, nursing, rehabilitation and other health care services to Geraldine E. Wiggins during her admission to Rehabilitation Center of Brethren Village, LLC.

13.    At all times material hereto, the Defendants individually and collectively owed duties to the residents of Brethren Village, including Geraldine E. Wiggins.

14.    At all times relevant and material hereto the Defendants were aware of their obligations under the laws of the United States of America and of the Commonwealth of Pennsylvania with which Defendants were required to comply in providing care to Decedent including the United States Code, Pennsylvania Consolidated Statutes and the Pennsylvania Administrative Code.

15.    The Defendants, directly and/or through their respective agents, servants and/or employees, accepted the responsibility for the care of Geraldine E. Wiggins, and in so doing, undertook and/or assumed a duty to Geraldine E. Wiggins to provide a safe nursing home facility necessary for the proper practice of medicine at said rehabilitation facility and to render reasonable, competent, proper, adequate and appropriate medical care, rehabilitation and nursing care, custodial care, rehabilitation services and treatment and, to take appropriate, preventative and curative measures as well as adequately supervise, monitor, and provide timely treatment and services to Geraldine E. Wiggins, and avoid and prevent harm to her.

16.    The Defendants owed a duty to Geraldine E. Wiggins to exercise reasonable and ordinary

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

care as a resident at Defendants' facility receiving medical, nursing, rehabilitation and other allied healthcare services. The Defendants' duties included, but were not limited to, establishing and enforcing their respective nursing home facility rules and regulations, medical staff practices, bylaws, policies, procedures, rules and regulations which mandate provision of proper medical, nursing and other healthcare provider services and/or care to the rehabilitation patients, including Geraldine E. Wiggins. The Defendants' duties also included hiring competent medical, nursing and other allied healthcare personnel, continuing and ongoing review of said competency, maintaining the facility such that it is free from ordinary hazards and defective equipment, maintaining sufficient staffing levels, insuring that all patients receive adequate, competent and timely medical, rehabilitation and other allied health care treatment and services while a patient at their rehabilitation facility, and, establishing and enforcing policies, procedures, protocols and systems to monitor their staff **to** ensure that all patients are receiving proper and timely care and treatment including, but not limited to, complete and accurate resident assessments, developing, enforcing and revising individualized, resident-centered care plans, adequate supervision/monitoring, proper use of medication, proper use of physical and/or chemical restraints, proper establishment and enforcement of procedures for medical and nursing review and/or audit of the care given to patients, proper establishment of policies, procedures, protocols and guidelines to ensure that proper medical, rehabilitation, custodial and nursing care are performed on and for patients at their facility, including Geraldine E. Wiggins.

<span style="color:red">**CI-22-04128**</span>

   17. At all times relevant hereto, the Defendants, directly and/or through contractual agreement had a corporate responsibility through their respective bylaws, medical staff bylaws, rules, regulations and ongoing government functions to assure that only competent physicians, nurses and other health care providers engage in the medical, rehabilitation and nursing practice at this rehabilitation facility and other related fields of medicine on the Defendants' premises.

   18. Defendants have failed to adequately train and/or supervise their physicians, nurses, nurses' aides and other healthcare providers which has resulted in personal harm and injury to Geraldine E. Wiggins.

   19. The provisions of OBRA (Omnibus Budget Reconciliation Act of 1987) are applicable

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

with regard to Geraldine E. Wiggins' condition as it existed while in the Defendants' care and during her admission at the Defendants' facility beginning on April 13, 2021.

20.   The Defendants held themselves out as a specialist in the field of rehabilitation care with the expertise necessary to maintain the health and safety of persons unable to care adequately for themselves.

21.   At all times pertinent hereto, Geraldine E. Wiggins was a patient at Rehabilitation Center of Brethren Village, LLC and was under the exclusive care and control of the Defendants, their agents, officers, servants and/or employees.

**CI-22-04128**

22.   The Defendants, their agents, officers, servants and/or employees failed, refused and/or neglected to perform the duties to provide reasonable and adequate health care to and for Geraldine E. Wiggins who was unable to attend to her own health, safety and well-being.

23.   The Defendants, their agents, officers, servants and/or employees negligently, carelessly and recklessly provided care and treatment to Geraldine E. Wiggins, and all of the alleged acts, omissions and occurrences herein described or performed by the Defendants, their agents, officers, servants and/or employees fell within the course and scope of their agency and employment with the Defendants and in furtherance of the Defendants' business.

24.   The Defendants provide twenty-four (24) hour a day, seven (7) day a week medical, nursing, custodial and rehabilitation care, services and assistance to its patients who have issues related to age, illness, disease, injury, convalescence and physical and mental infirmity.

25.   The Defendants are responsible for nearly all the health care needs of their residents, including but not limited to, assistance with activities of daily living, bed mobility, transfer, ambulation, personal hygiene, nutrition, hydration, restorative care, incontinence care, turning and repositioning, supervision, monitoring, safety and rehabilitation.

26.   The Defendants are responsible for ensuring that all doctor-ordered testing and medical services are performed.

27.   The Defendants are required to conduct comprehensive and accurate assessment of their

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

patients' functional capacity, as well as their patients' needs and risk factors.

28.    The Defendants are required to formulate and develop an individualized health "Care Plan" upon admission of each patient.

29.    The Defendants are responsible for determining patients' risk level for injury including falls.

30.    The Defendants are responsible for formulating, adopting, modifying and implementing injury prevention programs and care directives, including prevention programs for patients at risk for falls.

**CI-22-04128**

31.    The Defendants are responsible for ensuring that injury prevention programs, procedures and protocols are implemented, executed and performed including prevention programs and procedures to prevent falls.

32.    The Defendants are responsible for ensuring that a "Care Plan" is personalized for each patient and modified and/or revised as needs change.

33.    The Defendants are responsible for ensuring that a "Care Plan" for patients includes safety measures and interventions to prevent falls.

34.    The Defendants are responsible for ensuring that safety measures and interventions, including adequate pressure-relieving assistive devices, individualized turning and repositioning schedule, implementation of the appropriate infection control policies, procedures and techniques, hydration and nutrition protocols, adequate and timely incontinence care, hygiene services, adequate supervision and monitoring of patients with decreased mobility, safety awareness and cognition are implemented and executed.

35.    Geraldine E. Wiggins, was admitted to Rehabilitation Center at Brethren Village, LLC on April 13, 2021 with diagnoses that included ambulatory dysfunction, generalized weakness and new onset A-Fib.

36.    A "Fall Risk Assessment" was completed at time of admission and Geraldine E. Wiggins was considered at risk for falls related to a score of "*26" (a resident whose score is over 9 is at risk for falls).*

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

37.     The "History of Present Illness" documented Geraldine E. Wiggins' reason for admission

to Brethren Village as:

> *Geraldine Wiggins is a 92 y.o. female admitted to nursing facility for ambulatory dysfunction having 2 falls at home prior to observation stay at LGH, for further PT/OT evaluation and treatment.  Has had right knee pain since falls at home, XR in hospital negative for fracture.  Today, states she feels a little hot and is tired, but otherwise she denies any pain, palpitation/flutter in chest, SOB, change in bowel or bladder.*

39.     The staff at Brethren Village was aware of the patient's need for assistance with ambulation,

activities of daily living and fall prevention as documented on the "Care Plan" for *"Needs staff assistance*

*for ADL's because of weakness"* and *"Has history of falls, potential for fall-related injury."*

**CI-22-04128**

40.     The following are some of the interventions the staff was to utilize to provide care and

prevent falls for this patient:

> *\* Be aware resident unable to independently bathe, dress, move self in bed, transfer, ambulate, toilet self, perform personal hygiene measures and feed self*
>
> *Ambulate in hallway with rolling walker and one/two assist with gaitbelt*
>
> *Encourage and assist resident as needed to bathroom upon rising, between meals and at bedtime*
>
> *Observe for and report any decline in ADL performance; record appropriately in the  EMR*
>
> *One/Two assist for stand/pivot/weight bear between all support surfaces*
>
> *Set up in bathroom at sink with supplies for grooming and bathing with assist as needed*
>
> *My transfer status is stand and pivot Ax1 w/RW*
>
> *Assist with ADL's, transfers and locomotion as needed, utilizing safety measures*
>
> *Remind resident of the importance of asking for help before getting up or transferring, especially   if he/she feels lightheaded or weak*
>
> *When finding resident attempting to transfer independently, assess for basic needs, i.e., food,  fluid, toileting, pain, boredom/anxiety*

40.     Pursuant to medical records, Brethren Village increased their staff's workload related to

Covid-19 precautions.  But, despite the increase in staff workload, the staff of Brethren Village was well

aware Geraldine E. Wiggins required one staff member and her assistive device to ambulate and transfer

Landmark v. Nurselect MSJ_00000337

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

safely.

41.    The staff was also aware that the patient self-transferred but did not intervene or initiate additional interventions to prevent falls for this patient.

42.    The April 24, 2021 "Statement Form" documented *"when I took care of Geraldine this morning caught her in the bathroom by herself she told me she took herself and at the time I didn't see a bruise."*

43.    The patient's risk of falls was increased due to episodes of *"respiratory distress"*

**CI-22-04128**

documented on the April 28, 2021 "MD Progress Notes" as *"Geraldine complained of shortness of breath this morning and was found to be hypoxic. Her SpO2 at the time was in the mid to high 80's and improved to the low 90s with supplemental oxygen."*

44.    On May 3, 2021, "Physician's Orders" documented *"resident wheezing"*, *"O2 sat 84%, lungs very diminished."*

45.    A May 7, 2021 "MD Progress Note" revealed the patient's increased weakness during the morning hours as:

> *Geraldine Wiggins is a 92 y.o. female seen and examined in her room on the rehabilitation unit, resting in her recliner chair. She reports she is feeling short of breath on exam. She admits to just waking up and ambulating which is when she often feels dyspnea.*
>
> *She attests to being more tired in the mornings and feeling better as the day goes on.*
>
> *Ambulatory Dysfunction: Geraldine reports therapy is going well, but that she does not feel ready to go home next week. PT reporting, she can ambulate up to 150 ft with four wheel walker and staff assistance, seems to have increased weakness and decreased functional status in the early morning. Will be discharged to personal care when appropriate, no discharge date set at this time. Continue PT/OT, continue to monitor.*

46.    Geraldine E. Wiggins demonstrated a significant cognitive decline on May 9, 2021, documented in the "Progress Notes" as *"Res has been noted by staff to have been confused today. She had woken up several times unaware of where she was or what time of day it had been. Urine has fowl odor and is dark in color. Sip & dip initiated."*

47.    A May 10, 2021 "Progress Note" further documented *"Safety concerns: Yes. Safely*

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

*Concerns – note:  Confusion and forgetfulness."*

48.     "Medication Administration Record" reveal a "Physician Order" dated May 10, 2021 for,

*"d/c functional abilities days 1-3 every day shift until 05/12/2021."*  The MAR had the days of May 10, 11,

and 12 highlighted to carry out the physician's order.

49.     Despite the fact the patient required staff assist for ambulation and activities of daily living,

increased confusion, increased weakness and decreased functional ability in the morning hours and ordered

to have her functional abilities discontinued on May 12, the staff of Brethren Village left Geraldine E.

**CI-22-04128**

Wiggins alone at the bathroom sink on May 12, 2021 at 7:30AM.

50.     The May 12, 2021 "Progress Note" documented the following:

*Patient on floor near at the foot of her recliner with walker in front of her and bed side
table behind her.  The back of her head was bleeding.  We got her up off the floor and onto
the chair.  There was a quarter sized hematoma with small laceration to the base of the
skull.  Patient had been standing at the sink brushing her teeth when the CNA left her in
the bathroom to take care of another patient who was having blood sugar issues.  Patient
then attempted to walk to the recliner to sit down and as she did she lost her balance falling
backwards hitting her head on the base of the bedside table. First aid attempted with neuro
and physical assessment. No other injuries noted.  Pressure was applied to laceration for
15 minutes and continued to profusely bleed.  MD called and order obtained to send to ER.
Pressure applied for another 25 minutes until ambulance arrived to transport to LGH ER
for evaluation at 0820 by MT ambulance.  Denies pain.  Neuro checks WNL.  Daughter
aware.*

51.     Geraldine E. Wiggins was left alone despite the Plan of Care revealing the patient required

staff assistance, despite the medical provider documenting "increased weakness and decreased functional

status in the early morning," despite her new onset of confusion, and the need for functional abilities to be

temporarily discontinued.

52.     The May 12, 2021 "Incident Report" documented Geraldine E. Wiggins' "Predisposing

Physiological Factors" as *"Gait Imbalance, Impaired Memory"* and her "Predisposing Situation Factor" as

*"Ambulating without assist"*.

53.     Geraldine E. Wiggins was transferred to Lancaster General Hospital on May 12, 2021.  The

Emergency Department Records reveals the following information:

- *Chief Complaint:  Head Injury, Fall Evaluation*

Landmark v. Nurselect MSJ_00000339

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

***

- *Arrives via BLS amb from rehab center at Brethren Village after falling and striking head on corner of bedside nightstand.*

*With hematoma to posterior head.*

*ECF staff "couldn't get bleeding to stop" after holding pressure for 45 minutes.*

*EMS reports bleeding through ABD pad that was placed by them.*

*+ Plavix use.*

**CI-22-04128**

*Denies any abd, chest, back or neck pain.*

*HPI: patient is a 92-year-old female who presents after a fall. It was unwitnessed. She does have some mild confusion making history of present illness limited. The patient cannot tell me why she fell. She said, "I thought I can make it over to the chair."*

***

*MDM: Patient presents with occipital hematoma with mild oozing. On my exam the patient was awake and alert but pleasantly confused. She did have an occipital hematoma with a small open wound. Figure-eight suture placed by physician's assistant. Bleeding subsided. Patient noted to have a C7 fracture. Cervical collar applied. She had no neck pain. Case discussed with the trauma service who recommended imaging of her chest abdomen pelvis. I also ordered basic bloodwork. Disposition is pending their evaluation. Patient remained comfortable in the ER.*

***

*CT Angiogram Chest: Since the prior study, the patient has suffered mild superior endplate compression fractures at C7 and T1. A superior endplate compression fracture at T2 is stable. Multiple new compression fractures, most notable at the T7 level.*

54.    The May 12, 2021 "Neurosurgery Note" documented the "Impression/Plan" as *"Acute fracture C7, T1 with no significant retropulsion"*, *"Currently oriented to person only"*, *"No surgical intervention needed"* and *"Aspen Cervical collar OK per Dr. Hernandez."*

55.    Geraldine E. Wiggins was readmitted to Brethren Village from Lancaster General Hospital.

56.    On May 15, 201, Speech Therapy documented Geraldine E. Wiggins as *"referred by physician for speech swallow evaluation. Patient exhibiting difficulty completing meals and rotary chew for regular diet intake. The functional deficits are caused by generalized weakness, decreased range of motion from C Collar placement."*

Landmark v. Nurselect MSJ_00000340

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

56.    The vertebral fracture and need for a cervical collar interfered with her meal consumption.

57.    Geraldine E. Wiggins died on August 28, 2021 with failure to thrive listed at the cause of death.

58.    Decedent suffered horrific injuries as a consequence of the negligence, neglect and abuse by Defendants, and/or Defendants' real and/or ostensible servants, agents and/or employees.

59.    The negligence, neglect and abuse of Geraldine E. Wiggins by Defendants, and/or Defendants' agents and resulting injuries caused a significant decline in Decedent's clinical status and were significant contributing factors in causing Decedent's death.

**CI-22-04128**

60.    The severity of the negligence, neglect and abuse inflicted upon Geraldine E. Wiggins by the Defendants' mismanagement, improper under-budgeting, understaffing of the facility and lack of training and/or supervision of the facility's employees, failure to provide adequate and appropriate health care, engaging in incomplete, inconsistent and fraudulent documentation, failure to develop and implement an appropriate care plan, failure to conduct accurate patient assessment, failure to ensure the highest level of physical, mental and psychosocial functioning was attained or maintained, failure to provide appropriate monitoring, supervision, care and services caused Decedent to experience, a fall, hematoma to skull, head laceration, C7 and T1 fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

61.    As a direct result of the Defendants' negligence, neglect, abuse, carelessness and recklessness herein described,  Decedent was caused to suffer serious and permanent injuries as described herein, including a fall, hematoma to skull, head laceration, C7 and T1 fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

## CONDUCT OF THE DEFENDANTS

62.      Plaintiff hereby incorporates by reference the prior paragraphs as if they have been more fully set forth herein.

63.      During the course of her admission, Geraldine E. Wiggins was incapable of independently providing for all of her daily care and personal needs without reliable assistance.

64.      At all relevant times, the Defendants, through their agents, servants, employees and/or representatives: (a) should have been and/or were aware of Geraldine E. Wiggins' needs and (b) represented that they could adequately care for her needs.

**CI-22-04128**

65.      In exchange for money, Geraldine E. Wiggins was admitted to the Defendants' care at Yeadon Rehabilitation and Nursing Center to obtain such care and protection.

66.      The Defendants, upon information and belief, were controlled by a board of directors who were responsible for the operation, planning, management and quality control of Brethren Village.

67.      At all relevant times, the Defendants, individually, and/or through their agents, servants and employees, assessed the needs of Geraldine E. Wiggins and promised that they would adequately care for her needs, akin to a hospital.

68.      The Defendants were responsible for the operation, planning, management and quality control of their facility.

69.      The control exercised over the Defendants' facility by the Defendants, included: budgeting, marketing, human resource management, training, staffing and the creation and implementation of all policy and procedure manuals used by Brethren Village.

70.      The Defendants controlled reimbursement, quality care assessment and compliance, licensure, certification, and all financial, tax and accounting issues through control of the fiscal policies of Brethren Village.

71.      Upon information and belief, the corporate officers of Defendants utilized survey results and quality indicators to monitor the care being provided at their nursing homes, including Brethren Village.

72.      Upon information and belief, the Defendants, including their owners, officers, directors,

Landmark v. Nurselect MSJ_00000342

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

partners, members, managers and employees knew that Rehabilitation Center at Brethren Village, LLC has

been cited by governmental units as follows:

1/23/2020: failed to assess a pressure ulcer for one of one residents reviewed; and

8/12/2021: failed to comprehensively assess and administer medication to a wound; and timely

administer wound treatment to a sacral wound for one of seven residents reviewed.

73.    As a direct and proximate result of the Defendants' acts and omissions, and their breach of

the duty of care, negligence, carelessness and recklessness,  Decedent suffered: (a) severe permanent **CI-22-04128**

physical injuries resulting in pain, suffering, and disfigurement; (b) mental anguish, embarrassment,

humiliation, degradation, emotional distress, and loss of personal dignity; (c) loss of capacity for enjoyment

of life; (d) expense of otherwise unnecessary hospitalizations and medical care; and (e) death.

74.    In causing the aforesaid injuries, the Defendants knew, or should have known, that

Geraldine E. Wiggins would suffer such harm.

75.    The conduct of the Defendants was intentional, outrageous, willful and wanton, and

exhibited a reckless indifference to the health, safety and well-being of Geraldine E. Wiggins.

76.    At all relevant times, the Defendants, individually, and/or through their agents, servants

and employees, assessed the needs of Geraldine E. Wiggins, and promised that they would adequately care

for her needs, akin to a hospital.

77.    At all relevant times, the Defendants made a conscious decision to operate and/or manage

their facility so as to maximize profits at the expense of the care required to be provided to their patients,

including Geraldine E. Wiggins.

78.    In their efforts to maximize profits, the Defendants reduced staffing levels below the level

necessary to provide adequate and timely care and services to their patients, including Geraldine E.

Wiggins.

79.    Upon information and belief, the Defendants caused staffing levels at their facility to be

set at a level such that the personnel on duty at any given time could not and did not reasonably and timely

tend to the needs of their assigned patients, including Geraldine E. Wiggins.

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

80.    Upon information and belief, the Defendants intentionally increased the number of sick and frail residents with greater health problems requiring more complex care.

81.    The Defendants knew that the increase in the acuity care levels of the patient population would substantially increase the need for staff, services and supplies necessary for the patient population.

82.    The Defendants failed to provide the resources necessary, including sufficient staff, services and supplies, to meet the needs of their patients, including Geraldine E. Wiggins.

83.    The Defendants negligently, carelessly and recklessly caused the healthcare providers, nurses and nurses' aides who they placed and/or staffed at their facility to be so unqualified and/or under-trained, that the personnel on duty at any given time could not and did not reasonably and timely tend to the needs of their assigned patients, including Geraldine E. Wiggins.

CI-22-04128

84.    The aforementioned acts and omissions directly caused and/or increased the risk of the injuries and harm to Geraldine E. Wiggins and were known by the Defendants.

85.    At all relevant times, the facility was individually owned, and/or in concert owned, possessed, managed, controlled, operated and maintained under the exclusive control of the Defendants.

86.    At all relevant times, the Defendants were operating individually or through their managers, members, partners, officers, agents, servants and employees who had actual, apparent and/or ostensible authority, and all of whom were acting within the course and scope of their employment and under the direct and exclusive control of the Defendants.

87.    The aforementioned injuries, acts and omissions were caused solely and exclusively by reason of negligence, carelessness and recklessness of the Defendants, and their agents, servants and employees and were due in no part to any act or omission to act on the part of Geraldine E. Wiggins.

88.    The Defendants exercised complete and total control over the total and complete healthcare of all the patients of their facility, including Geraldine E. Wiggins, akin to a hospital.

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

**COUNT I – NEGLIGENCE**
**BRENDA L. KLING, ADMINISTRATRICES OF**
**THE ESTATE OF GERALDINE E. WIGGINS, DECEASED**
**v.**
**REHABLITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE,**
**BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA and JOHN DOES 1-4**

89.    Plaintiff incorporate by reference herein the allegations contained in the preceding paragraphs of this Complaint, as though same were fully set forth at length herein.

90.    Upon accepting Geraldine E. Wiggins as a patient at their facility, the Defendants individually and jointly, assumed direct duties to provide her with adequate, timely and appropriate healthcare and other basic custodial services as set forth herein.

91.    The Defendants had the ultimate responsibility to ensuing that the rights, safety, welfare and well-being of their patients, including Geraldine E. Wiggins, were protected.

92.    The Defendants owed a duty to provide adequate, timely and appropriate healthcare and related skilled nursing, custodial, restorative, therapy and rehabilitation care and services to their patients, including Geraldine E. Wiggins, such as reasonable caregivers would provide under similar circumstances.

93.    The Defendants each owed duty to their patients, including Geraldine E. Wiggins, to hire, train, oversee and supervise their employees to ensure that its facility was operated, and services were provided, to their patients in a safe and reasonable matter.

94.    The Defendants each owed a duty and responsibility to furnish Geraldine E. Wiggins with appropriate, timely and competent medical, nursing and custodial care and services.

95.    The Defendants each owed and failed to fulfill the following duties and responsibilities to Geraldine E. Wiggins:

i)    The duty to use reasonable care in the maintenance of safe and adequate facility;

ii)    The duty to select, hire, train and retain only competent staff;

iii)    The duty to oversee, monitor and supervise all persons who practice nursing and/or medical healthcare within their facility;

iv)    The duty to staff their facility with sufficient and adequately trained personnel to provide the care and services required by their facility's patients;

Landmark v. Nurselect MSJ_00000345

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

v)     The duty to maintain sufficient staffing, funding, supplies and resources for the facility to meet the needs of their facility's patients;

vi)     The duty to formulate, adopt, oversee, revise and enforce rules, policies, procedures and protocols to ensure quality of care for all their facility's patients;

vii)     The duty to take adequate, timely and appropriate measures to correct the known problems with quality of care, as well as the known problems with the delivery of medical, nursing and custodial care and services;

viii)     The duty to keep their facility's patients free and safe from abuse and neglect;

ix)     The duty to provide safe, decent and clean environment for their facility's patients; and **CI-22-04128**

x)     The duty to warn their facility's patients, as well as their families and/or responsible parties, of the Defendants' inability to provide adequate, timely, appropriate and safe care and services when the Defendants were placed on notice, knew, or should have known, of the deficiencies in providing such care and services to and for their patients.

96.     In addition to the direct acts and omissions of the Defendants, the Defendants also acted through their agents, servants, officers and employees, who were in turn acting within the course and scope of their employment, in furtherance of the Defendants' business and under the direct control and supervision of the Defendants.

97.     All of the acts alleged to have been done or not to have been done by the Defendants were done or not done by said Defendants, their agents, ostensible agents, servants, workmen and/or employees, acting in the course and scope of their employment with and on behalf of said Defendants and failed or refused to act with reasonable care in the following manner:

a.     violating their duty to provide adequate resident care, including but not limited to diagnosis, evaluation, assessment, supervision, monitoring, medication and treatment monitoring, medication and treatment to and for Geraldine E. Wiggins;

b.     failing to accurately assess and recognize Decedent's risk falls;

c.     failing to order, implement and utilize necessary fall prevention initiatives;

d.     implementing ineffective fall precautions for a cognitively impaired resident;

e.     allowing Decedent to self-transfer;

f.     failing to order, implement and utilize initiatives to prevent Decent from unsupervised self-transfers;

g.     failing to discontinue functional abilities;

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

h.   leaving Decedent standing unsupervised in the bathroom;

i.   failing to supervise Decedent to prevent falls;

j.   failing to monitor Decedent to prevent falls;

k.   failing to provide for Decedent's safety, welfare and well-being to keep her free from falls;

l.   failing to prevent Decedent from falls;

m.  causing Decedent to sustain traumatic head injuries;

n.   causing Decedent to sustain hematoma to her head;

o.   causing decedent to sustain laceration to her head;

p.   causing Decedent to require stitches to head laceration;

q.   causing Decedent to sustain C7 and T1 spinal fractures;

r.   causing Decedent's to require a cervical collar;

s.   failing to accurately assess and recognize Decedent's risk of functional deficits related to use of cervical collar;

t.   failing to order implement and utilize a "Care Plan" to ensure adequate nutritional intake;

u.   failing to ensure Decedent maintained adequate nutritional intake while utilizing cervical collar;

v.   failing to order, implement and utilize nutritional supplements;

w.   failing to encourage nutritional intake;

x.   causing Decedent to experience weight loss;

y.   causing decedent to experience failure to thrive;

z.   failing to make the appropriate, thorough and timely assessment of Decedent's condition;

aa.  failing to seek timely medical care when Decedent's condition required same;

bb.  failing to properly train and supervise Defendant's actual or ostensible employees, servants, agents or other staff or healthcare providers to monitor Decedent and to provide for her safety, welfare and general well-being;

cc.  failure to properly hirs, train and supervise staff, employees and healthcare providers at Defendant's facility;

dd.  failing to monitor the competency, adequacy and propriety of the treatment rendered by their

**CI-22-04128**

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

agents, servants and employees provided care and treatment to Decedent while a patient at Defendants' facility;

ee. failing to maintain Defendants' duty to formulate, adopt and enforce adequate policies procedures and protocols to ensure that their facility's patients, including Decedent, are properly supervised, assessed, monitored and receive proper and timely medical custodial and nursing care;

ff. failing to maintain Defendants' duty to formulate, adopt and enforce adequate policies, procedures and protocols to ensure that their facility's patients, including Decedent, are properly supervised, monitored and receive proper medical, custodial and nursing care to keep her free from falls;

**CI-22-04128**

gg. failing to administer the facility in a manner that enabled it to use its resource effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of the facility's patients, including Decedent;

hh. failing to ensure that the Defendants used the results of its assessments to develop, review and revise Decedent's "Care Plan";

ii. failing to ensure that Defendants' facility had sufficient nursing staff to provide nursing and custodial care and services to the patients in order to attain or maintain the highest practicable, physical, mental and psychosocial well-being of each patient including Decedent;

jj. failing to maintain compliance with the governmental rules and regulation to which Defendants' delivery of care is compare as part of the survey process conducted by the Pennsylvania Department of Health;

kk. failing to make the appropriate, thorough and timely assessment of Decedent's condition;

ll. failing to properly select, retain and monitor the competency of the medical and nursing staff, their employees, agents, servants and other healthcare providers who treated Decedent and failing to ensure such persons provided care within the applicable standards of care;

mm. failing to keep Decedent free from neglect and abuse;

nn. failing to take appropriate steps to remedy continuing problems at the Defendants' facility that Defendants knew, or had reason to know, were occurring ; with Decedent's care, which included the need to increase the number of the facility's employees, hiring skilled and trained employees, adequately train and supervise the current employees, monitoring conduct of the employees, and adopting new or changing the existing policies, procedures and protocols to ensure care provided was provided within the appropriate community standards;

oo. making false, fraudulent, inadequate and inconsistent notes in Decedent's chart;

pp. failing to obtain new or modified "Physicians' Orders" when changes in Decedent's condition were recognized by Defendants' agents;

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

qq.   failing to accurately, timely and consistently document Decedent's needs and the care and services provided to her in response to such needs;

rr.   violating Pennsylvania Statutes, Pennsylvania Administrative Regulations, as well as OBRA regulations;

ss.   grossly understaffing Defendants' facility;

tt.   failing to train the employees to recognize medical conditions/symptoms which required Decedent's transfer to the hospital ;

uu.   failing to allocate adequate funds, resources and supplies and failure to implement a facility budge that provided for the necessary and sufficient funds, resources and staffing levels to enable and allow their facility to provide adequate, timely appropriate care and services to the facility's residents, including Decedent;

vv.   failure to recognize and investigate neglect and abuse occurring with the care and services provided and not provided to Decedent, and failure to report such neglect and abuse to the appropriate governmental agencies;

ww.   all of the acts or failure to act constitute a deviation from the appropriate standards of care, negligence, carelessness and reckless indifference to the health, safety, welfare and well-being of Decedent;

xx.   Defendants' conduct caused harm to Decedent and increased the risk of harm to her; and

yy.   in committing the aforementioned acts and omissions, Defendants were acting negligently, carelessly and with reckless indifference to the safety, welfare and well-being of Decedent.

98.   Upon information and belief, the Defendants, including their owners, members, managers, officers, directors and partners knew of and/or were made aware of the Pennsylvania Department of Health annual and complaint survey results and placed on notice of the status of their Rehabilitation Center, Brethren Village.

99.   At all times relevant to this lawsuit, the Defendants employed and directed physicians, nurses and other medical personnel who rendered care to Geraldine E. Wiggins.

100.   At all times relevant to this lawsuit, the Defendants owed a duty to Geraldine E. Wiggins to provide competent and qualified physicians, surgeons, nurses, nurses' aides and other medical and quasi medical personnel to render proper care to her.

101.   At all times relevant to this lawsuit, the Defendants owed Geraldine E. Wiggins a duty to operate their rehabilitation facility in a careful and reasonable manner, under the circumstances, as would

CI-22-04128

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

have been done by other rehabilitation facilities in and about the Pennsylvania area.

102.    At all times relevant to this lawsuit, Defendants and their agents, staff and employees, owed Geraldine E. Wiggins the duty to possess and exercise that degree of skill and knowledge ordinarily possessed and exercised by similar rehabilitation, physicians and/or nurses in and about the Pennsylvania area.

103.    At all times relevant hereto, Geraldine E. Wiggins' care was to be delivered and administered by medical staff, nursing staff and healthcare staff at the Defendants' rehabilitation facility in a reasonably safe and prudent manner within the applicable standards of care for the community, as well as state and federal nursing home facility rules and regulations.

**CI-22-04128**

104.    Geraldine E. Wiggins was a resident at Defendants' rehabilitation facility and the Defendants negligently and carelessly and in wanton and willful disregard for her health, safety and general welfare, inflicted injury upon her in failing to timely provide appropriate and necessary medical, nursing, rehabilitation and custodial care, adequate monitoring and supervision.

105.    As a direct and proximate result of the negligence, carelessness and recklessness of the Defendants, as is more fully set forth herein, Geraldine E. Wiggins experienced, a fall, hematoma to skull, head laceration, C7 and T1 fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

106.    Geraldine E. Wiggins experienced severe and excruciating pain and suffering as the result of the aforesaid negligent, careless and reckless conduct of the Defendants, and Defendants' agents, and their breach of the duty of care as set forth herein.

107.    In causing the aforesaid injuries, the Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

108.    Pennsylvania Code Chapter 28, Section 201 *et. seq.*, requires Defendants comply with all federal, state and local regulations with regard to long-term care facilities.

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

109.    The Defendants violated OBRA regulations, which establish the minimum standard of care

to be followed by Defendants, including but not limited to the following:

(a)    42 C.F.R. § 483.10 (a)(1) / § 483.10 the patient has a right to a dignified existence;

(b)    42 C.F.R. § 483.12 / § 483.13 (b) & (c) the patient has the right to be free from abuse, neglect, misappropriation of patient property, and exploitation as defined in this subpart;

(c)    42 C.F.R. § 483.12 (c)(1) / § 483.13(c)(2) the facility must ensure that all alleged violations involving abuse, neglect, exploitation or mistreatment, including injuries of unknown source and misappropriation of patient property, are reported immediately, but not later than 2 hours after the allegation is made, if the events that cause the allegation involve abuse or result in serious bodily injury, or not later than 24 hours if the events that cause the allegation do not involve abuse and do not result in serious bodily injury, to the Administratrices of the facility and other officials (including to the State Survey Agency and adult protective services where state law provides for jurisdiction in long-term care facilities) in accordance with State law through established procedures;

(d)    42 C.F.R. § 483.20 (2)(ii) the facility must conduct an assessment after a significant change in patient's condition;

(e)    42 C.F.R. § 483.21 (b)(b) / § 483.20(k) Comprehensive Care Plans, the facility must develop and implement a comprehensive person-centered care plan for each patient, consistent with the patient rights, that includes measurable objectives and timeframes to meet a patient's medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment;

(f)    42 C.F.R. § 483.24 / § 483.25 each patient must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well-being, consistent with the patient's comprehensive assessment and plan of care;

(g)    42 C.F.R. § 483.25 (b)(i) / (ii) / § 483.25 (c)(1)(2) Based on the comprehensive assessment of a resident, the facility must ensure that (i) A resident receives care, consistent with professional standards of practice, to prevent pressure ulcers and does not develop pressure ulcers unless the individual's clinical condition demonstrates that they were unavoidable; and (ii) A resident with pressure ulcers receives necessary treatment and services, consistent with professional standards of practice, to promote healing, prevent infection and prevent new ulcers from developing.

(h)    42 C.F.R. § 483.25 (d)(2) / § 483.25 (h)(2) each patient receives adequate supervision and assistance devices to prevent accidents;

(i)    42 C.F.R. § 483. 35 (a) / § 483. 30(a)(1) the facility must provide services by sufficient number of each of the following types of personnel on a twenty-four (24)

CT-22-04128

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

hour basis to provide nursing care to all patients in accordance with patient care plans; and

(j)    42 C.F.R. § 483.70 (b) / § 483.75 (b) The facility must operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility.

110.    Geraldine E. Wiggins fell within the class of persons the statutory rules, regulations and laws that were intended to protect by virtue of OBRA Regulations and the Pennsylvania Code 28 §§ 201, *et. seq.*, thus entitling Plaintiff to adopt such laws as the standard of care for measuring Defendants' conduct. **CI-22-04128** Thus, Plaintiff assert a claim for negligence *per se*, asserting that, as a matter of law, the conduct of the Defendants amounted to negligence and negligence *per se*.

111.    At all relevant times pertinent hereto, there was in full force and effect 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person", providing penal consequences for neglect of a care-dependent person for:

> *Intentionally, knowingly or recklessly causes bodily injury or serious bodily injury by failing to provide treatment, care, goods or services necessary to preserve the health, safety or welfare of a care-dependent person for whom he is responsible to provide care.*

112.    18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" expresses the fundamental public policy of the Commonwealth of Pennsylvania that older adults, like children, are not to be abused or neglected, particularly in health care facilities or by persons holding themselves out as trained professionals, and that if such neglect or abuse causes injury, either physical or mental, then such conduct is actionable.

113.    At all relevant times pertinent thereto, Geraldine E. Wiggins was a care-dependent resident at Defendants' facility and as such, fell within the class of persons 18 Pa.C.S.A. §2713 "Neglect of Care Dependent Person" was intended to protect, and as such, entitling Plaintiff to adopt 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" as the standard of care for measuring the conduct of the Defendants.

114.    Furthermore, 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" is directed to obviate the specific kind of harm which Geraldine E. Wiggins sustained, with its purpose, at least in part, to protect the interest of a group of individuals, i.e., *care-dependent persons*, including Geraldine E.

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

Wiggins.

115.    Defendants, in accepting the responsibility for providing for Geraldine E. Wiggins' care, welfare and well-being, as mentioned herein, and were negligent *per se* as they violated 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" in that they failed to provide treatment, care, goods and services necessary to preserve the health, safety or welfare of Geraldine E. Wiggins, for whom they were responsible to provide care as specifically set forth in this Complaint.

**CI-22-04128**

116.    The conduct of the Defendants was intentional, outrageous and willful and exhibited a reckless indifference to the health, safety and well-being of Geraldine E. Wiggins.

117.    The conduct of the Defendants was such that an award of punitive damages is justified.

***WHEREFORE***, Plaintiff demand judgment in their favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.


### COUNT II – VICARIOUS LIABILITY
### BRENDA L. KLING, ADMINISTRATRICES OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
### v.
### REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA and JOHN DOES 1-4

118.    Plaintiff incorporate by reference herein the allegations contained in the receding paragraphs of this Complaint as though same were fully set forth at length herein.

119.    At all times relevant hereto, Defendants' agents, servants, employees and others were acting in the scope of their employment as agents, servants or employees of Defendants' nursing and rehabilitation facility.

120.    Defendants are vicariously liable for the acts, commissions or omissions, of their physicians, nurses, nurses' aides and other medical personnel and healthcare providers fully as though the aforementioned physicians, nurses, nurses' aides and other medical personnel and healthcare providers performed the acts or omissions themselves. In the alternative, the Defendants are responsible for the

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

negligent acts or omissions of other physicians, nurses, nurses' aides and other healthcare providers who are agents, employees and/or servants of the Defendants.

121.    At all times relevant to this lawsuit, the Defendants, employed and directed physicians, nurses, nurses' aides and other medical personnel who rendered care to Geraldine E. Wiggins.

122.    At all times relevant to this lawsuit, Defendants owed a duty to Geraldine E. Wiggins to provide competent and qualified physicians, surgeons, nurses and other quasi-medical personnel to render care to her.

**CI-22-04128**

123.    At all times relevant to this lawsuit, the Defendants owed to Geraldine E. Wiggins the duty to operate their facility in a careful and reasonable manner, under the circumstances, as would have been done by other similar facilities in and about the Pennsylvania area.

124.    At all times relevant to this lawsuit, the Defendants and their agents, owed Geraldine E. Wiggins the duty to possess and exercise that degree of skill and knowledge ordinarily possessed and exercised by similar facilities, physicians and/or nurses in and about the Pennsylvania area.

125.    At all times relevant to this lawsuit, Geraldine E. Wiggins' care was to be delivered and administered by the agents, servants and/or employees of the Defendants at the Defendants' facility in a reasonably safe and prudent manner within the applicable standards of care for the community Commonwealth of Pennsylvania and federal nursing home facility rules and regulations.

126.    The Defendants breached their duties and were, therefore, negligent, careless and exhibited a reckless disregard to the health, safety, welfare and well-being of Geraldine E. Wiggins.

127.    The aforesaid breaches of duties, negligence, carelessness and recklessness of the Defendants directly and proximately caused the aforesaid injuries to Geraldine E. Wiggins, including, a fall, hematoma to skull, head laceration, C7 and T1 fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

128.    In causing the aforesaid injuries, the Defendants knew, or should have known, that

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

Geraldine E. Wiggins would suffer such harm.

129.    The conduct of the Defendants was intentional, outrageous, willful and wanton, and exhibited a reckless indifference to the health, safety and well-being of Geraldine E. Wiggins.

130.    The conduct of the Defendants was such that an award of punitive damages is justified.

**WHEREFORE,** Plaintiff demand judgment in their favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

**CI-22-04128**

### COUNT III - CORPORATE LIABILITY
### BRENDA L. KLING, ADMINISTRATRICES OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
### v.
### REHABLITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE
### REALTY, LLC and JOHN DOES 1-4

131.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Complaint as though same were fully set forth at length herein.

132.    Defendants' agents, employees, and servants and others provided care and treatment to Geraldine E. Wiggins as agents, employees, servants, officers or directors of Defendants or apparent agents held out as such.

133.    At all times relevant hereto, Defendants' agents, servants, employees and others were acting in the scope of their employment as agents, servants, or employees of said Defendants.

134.    At all relevant times pertinent hereto, the corporate conduct of the Defendants was independent of the negligent conduct of the employees, and was outrageous, willful, and wanton, and exhibited a reckless indifference to the health, welfare and well-being of Decedent.

135.    Defendants, as corporate entities, are liable based on the following duties of care owed to Geraldine E. Wiggins:

    a)      a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;

    b)      a duty to select and retain only competent physicians;

    c)      a duty to oversee all persons who practice medicine within its walls as to patient care; and,

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

    d)    a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

136.    Defendants owed Geraldine E. Wiggins a duty concerning the care and treatment under a corporate negligence standard with regard to the policies, actions and inactions of the institution itself and are directly liable for their own negligence.

137.    Defendants and their corporate members, managers, partners, owners, and directors breached their duties and were, therefore, negligent, careless and reckless in their duties and obligations to Geraldine E. Wiggins.

**CI-22-04128**

138.    The aforesaid breaches of duties, corporate negligence, carelessness and recklessness of Defendants directly and proximately caused the aforesaid injuries to Decedent, including but not limited to, experience, a fall, hematoma to skull, head laceration, C7 and T1 fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

139.    In causing the aforesaid injuries, Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

140.    The conduct of the Defendants was intentional, outrageous, willful and wanton and exhibited a reckless indifference to the health, safety and well-being of Geraldine E. Wiggins.

141.    The conduct of the Defendants was such that an award of punitive damages is justified.

***WHEREFORE,*** Plaintiff demand judgment in their favor and against all Corporate Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

## COUNT IV -SURVIVAL CLAIM
## BRENDA L. KLING, ADMINISTRATRICES OF
## THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
v.
## REHABLITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA and JOHN DOES 1-4

142.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Complaint as though same were fully set forth at length herein.

143.    Plaintiff, Brenda L. Kling, Administratrix of the Estate of Geraldine E. Wiggins, deceased **CI-22-04128** also brings this action on behalf of the Estate of Geraldine E. Wiggins, deceased, under and by virtue of the Act of 1972, June 30, P.L. 508, No. 164, Section 2, eff. July 1972, as amended, 20 Pa.C.S.A. 3371, et seq., (known as the Pennsylvania Survival Act").

144.    Plaintiff, Brenda L. Kling, as daughter and Administratrix of the Estate of Geraldine E. Wiggins, deceased, is a survival claim beneficiary.

145.    Plaintiff, Brenda L. Kling, as Administratrix of the Estate of Geraldine E. Wiggins, deceased, also claims on behalf of the Estate of Geraldine E. Wiggins, deceased, all damages recoverable under the Pennsylvania Survival Act, including, but not limited to damages for the conscious pain and suffering undergone by Decedent, up to an including the time of her death, which was caused by the Defendants' breach of duties, negligence, carelessness, and recklessness.

146.    Plaintiff claim damages for the fright and mental suffering attributable to the peril leading to the physical manifestation of mental and physical injuries experience, a fall, hematoma to skull, head laceration, C7 and T1 fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

147.    In causing the aforesaid injuries, the Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

148.    As a result of the death of Geraldine E. Wiggins, her Estate has been deprived of the economic value of the Decedent's life during the period of her life expectancy and Plaintiff, as Administratrix of the Estate of Geraldine E. Wiggins, deceased, claim damages for pecuniary loss sustained by the Estate as a result of her death, as well as for the conscious pain and suffering undergone by Decedent, up to and including the time of her death.

149.    The conduct of the Defendants was intentional, outrageous, willful, wanton and exhibited a reckless indifference to the safety, health, welfare, and well-being of Geraldine E. Wiggins.

**CI-22-04128**

150.    The conduct of the Defendants was such that an award of punitive damages is justified.

**WHEREFORE**, Plaintiff demand judgment in their favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

### COUNT V - WRONGFUL DEATH CLAIM
### BRENDA L. KLING, ADMINISTRATRICES OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
### v.
### REHABLITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA and JOHN DOES 1-4

151.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Complaint as though same were fully set forth at length herein.

152.    Plaintiff also brings this action on behalf of Decedent's estate under and by virtue of the Act of 1855 P.L. 30, as amended, Pa.R.C.P. 2202, as further amended, July 1976, 42Pa.C.S.A. 8301 (known as the "Pennsylvania Wrongful Death Act").

153.    Plaintiff, Brenda L. Kling, as daughter and Administratrix of the Estate of Geraldine E. Wiggins, deceased, is a wrongful death beneficiary.

154.    Plaintiff claims all damages recoverable under the Pennsylvania Wrongful Death Act, including, but not limited to damages for pecuniary loss suffered by Decedent's survivors by reason of the death of Geraldine E. Wiggins, as well as for the reimbursement for medical expenses, nursing expenses, funeral expenses, expenses of administration and other expenses incurred in connection therewith.

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

155.    As a result of the death of Geraldine E. Wiggins, the aforesaid survivors have been deprived of the comfort, aid, assistance, tutelage, maintenance, and companionship that they would have received from Decedent for the remainder of her natural life.

**WHEREFORE,** Plaintiff demand judgment in their favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

### COUNT IV- BREACH OF FIDUCIARY DUTY
### BRENDA L. KLING, ADMINISTRATRICES OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
### v.
### REHABILITATION CENTER OF BRETHEN VILLAGE, LLC

**CI-22-04128**

156.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Complaint as though same were fully set forth at length herein.

157.    At all times material and relevant hereto, Geraldine E. Wiggins was incapable of dealing with the facility, Brethren Village, on equal terms, and was incapable of engaging in any arm's length relationship with them.

158.    Additionally, at all times material and relevant hereto, Geraldine E. Wiggins was incapable of independently providing for her own safety, health, welfare and well-being and justifiably relied on the facility to provide necessary care and services to attain and/or maintain her highest practicable physical, mental and psychosocial well-being.

159.    At all times material and relevant hereto, the facility individually and/or collectively fostered and forged a relationship of special confidence and trust with Geraldine E. Wiggins by admitting her into their care on April 13, 2021, and by reserving the right to specifically determine the level of care, safety, protection, services and supplies that would be provided to Geraldine E. Wiggins.

160.    At all times material and relevant hereto, the facility individually and/or collectively controlled and oversaw every single aspect of Geraldine E. Wiggins's existence, including her activities of daily living (ADL), custodial care, as well as skilled nursing and healthcare.

161.    At all times material and relevant hereto, the facility individually and/or collectively determined and orchestrated the most trivial as well as the most vital aspects of Geraldine E. Wiggins's

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

existence, from the type of clothing she wore, to when and how she received healthcare, as well as quality and quantity of food and water she could consume.

162.    As a result, Geraldine E. Wiggins was solely and entirely dependent upon the facility's staff, employees, agents, officers and directors, to provide for her basic daily care, skilled nursing and healthcare, services, safety, protection, well-being and personal and intimate needs.

163.    Geraldine E. Wiggins reposed a special confidence into the facility's staff, employees, agents, officers and directors to provide her with necessary care and services to attain and/or maintain her highest practicable physical, mental, and psychosocial well-being.

**CI-22-04128**

164.    At all times material hereto, the facility developed a special relationship with Geraldine E. Wiggins  by virtue of the type of the care and services she required, their supposedly superior knowledge, skill and expertise, and their overmastering dominance over Geraldine E. Wiggins and by virtue of Geraldine E. Wiggins's weakness, dependence and inability to independently provide for her own safety, health, welfare and well-being and her justifiable reliance on the facility to provide for her safety, health, welfare and well-being.

165.    In their special relationship with one another, Geraldine E. Wiggins, a vulnerable and dependent individual, did not and could not deal with the facility on equal terms due to the facility's overmastering dominance on one side, and due to Geraldine E. Wiggins's weakness and justifiable trust on another side.

166.    At all times material hereto, Geraldine E. Wiggins entrusted her care, treatment, as well as every single aspect of her very existence into the exclusive care, custody and control of the facility and its staff, employees, agents, officers and directors.

167.    At all times material hereto, the aforementioned special relationship enabled the facility to occupy a position of confidence regarding Geraldine E. Wiggins requiring fidelity, loyalty and scrupulous fairness and good faith on the part of the facility.

168.    The aforementioned special relationship further required the facility to refrain from using its position to Geraldine E. Wiggins's detriment and the facility's own advantage.

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

169.     As such, and at all times material hereto, the facility, Rehabilitation Center at Brethren

Village, LLC, was a fiduciary of Geraldine E. Wiggins.

170.     At all times material hereto, the facility owed a fiduciary duty to Geraldine E. Wiggins.

171.     The facility breached its fiduciary duty and its fiduciary obligations, as well as violated its

relationship of trust and special confidence owed to Geraldine E. Wiggins by: a) engaging in the conduct

set forth in detail in the within Complaint; and b) allowing revenues, profits and assets obtained from the

facility's patients as well as their payor sources for inflated, improper and unreasonable inter-company fees

and transfers designed and created for the benefit of the facility's owners, parent companies, affiliates and

the Defendants herein, instead of utilizing said resources effectively and efficiently in order to maintain

and/or attain the highest practicable physical, mental and psychosocial well-being of the facility's patients,

including Geraldine E. Wiggins.

172.     In their dealings with Geraldine E. Wiggins, as described herein, the facility acted in bad

faith, and used its position of trust and special confidence to their own advantage and to Geraldine E.

Wiggins's detriment.

173.     In violating its fiduciary duties and obligations to Geraldine E. Wiggins, the facility knew

or should have known, that Geraldine E. Wiggins would suffer harm.

174.     The conduct of the facility was intentional, outrageous, willful, wanton and exhibited a

reckless indifference to the safety, health, welfare and well-being of Geraldine E. Wiggins.

175.     The conduct of the facility was such, that an award of punitive damages is justified.

*WHEREFORE*, Plaintiff demand judgment in their favor and against Defendants, for

compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

**COUNT V – CORPORATE DEFENDANTS AIDING and ABETTING BREACH OF
FIDICUARY DUTY
BRENDA L. KLING, ADMINISTRATRICES OF
THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
v.
BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA
and JOHN DOES 1-4**

CI-22-04128

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

176.   Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Complaint as though same were fully set forth at length herein.

177.   The Defendants knew, or should have known, of Geraldine E. Wiggins's fiduciary relationship with the facility, Rehabilitation Center at Brethren Village, LLC, by virtue of the type of the care and services she required, the supposedly superior knowledge, skill and expertise, and their overmastering dominance over Geraldine E. Wiggins, and by virtue of Geraldine E. Wiggins' weakness, dependence and inability to independently providing for her own safety, health, welfare and well-being and is justifiable reliance on the facility to provide for her safety, health, welfare and well-being.

**CI-22-04128**

178.   The Defendants knowingly participated in and provided substantial assistance and encouragement to the facility in connection with the facility's breach of their fiduciary duties and obligations to Geraldine E. Wiggins, as set forth in detail in Count IV of this Complaint.

179.   The Defendants knew, or should have known, that the facility's patients, including Geraldine E. Wiggins, were incapable of independently providing for their own care, safety and well-being, and were justifiably relying on, and solely depending upon the facility's staff, employees, agents, officers and directors to provide for the basic daily and custodial care, skilled nursing and healthcare services, safety, welfare and well-being.

180.   Additionally, the Defendants knowingly assisted, encouraged, aided and abetted the facility in its breach of fiduciary duties and obligations to the facility's patients, including Geraldine E. Wiggins, by: a) engaging in the conduct set forth in detail in this Complaint; b) exercising complete and total control over the facility's revenues by regularly and repeatedly sweeping nearly all of the facility's revenues into corporate account under exclusive control of the Corporate Defendants and/or their designee; c) knowingly and intentionally creating and accepting inter-company fees and transfers consisted of revenues derived from the facility's patients and their payor sources, and designed to improperly and unjustly enrich the Corporate Defendants, instead of allowing the facility to utilize its resources effectively and efficiently to allow the facility's patients, including Geraldine E. Wiggins, to attain and/or maintain their highest practicable physical, mental and psychosocial well-being; d) structuring the managing and operating

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

business model for the facility in such a way that constrained the facility's ability to provide the adequate and necessary care and services to their patients, including Geraldine E. Wiggins, while simultaneously benefiting and enriching the pyramid structure corporate entities; e) overseeing, managing, and controlling the facility's acceptance of reimbursement from patients, including Geraldine E. Wiggins, knowing that the facility could not provide full value of the care and services to meet the care and safety needs of their patients, including Geraldine E. Wiggins; f) drafting, structuring and approving contracts between the facility and Defendants, which the Defendants knew, or should have known, would result in diversion and depleting of the facility revenues, necessary to provide the care and services to and meet the needs of their residents, including Geraldine E. Wiggins.

CI-22-04128

181.    The aforementioned conduct of the Defendants constitutes knowing and intentional aiding and abetting the facility's breach of their fiduciary duties and obligations to the facility patients, including Geraldine E. Wiggins, and subjects the Defendants to liability for the injuries and harm suffered by Geraldine E. Wiggins, as aforesaid.

182.    In adding and abetting the facility in their breach of fiduciary duties and obligations to Geraldine E. Wiggins, as aforesaid, the Defendants knew, or should have known, that Geraldine E. Wiggins would suffer harm.

183.    As a result of the Defendants' aiding and abetting the facility's breach of their fiduciary duties and obligations to the facility residents, including Geraldine E. Wiggins, the Defendants were improperly and unjustly enriched, their facility, Rehabilitation Center at Brethren Village, LLC, was left with inadequate staff and resources to provide for the care and meet the needs of the facility's patients, including Geraldine E. Wiggins, and Geraldine E. Wiggins suffered foreseeable and avoidable injuries set forth herein, and more specifically, experience, a fall, hematoma to skull, head laceration, C7 and T1 fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

Landmark v. Nurselect MSJ_00000363

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

184. The conduct of the Defendants was intentional, outrageous, willful, wanton and exhibited a reckless indifference to the safety, health, welfare and well-being of Geraldine E. Wiggins.

185. The conduct of the Defendants was such, that an award of punitive damages is justified.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

CI-22-04128

ROSENBAUM & ASSOCIATES, P.C.

Dated: 6/27/2022                    BY:    /s/ Andrei Govorov
                                           Andrei Govorov, Esquire
                                           Counsel for Plaintiff

**ENTERED AND FILED**
**PROTHONOTARY'S OFFICE**
**LANCASTER, PA**
**\*\*\*Electronically Filed\*\*\***
**Jul 11 2022 12:21PM**
**Ricci M. Dehl**

## VERIFICATION

I verify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements therein are made subject to the penalties of 18 Pa.C.S. Section 4904, relating to unsworn falsification to authorities.

_Brenda L. Kling_  **CI-22-04128**

Brenda L. Kling, Administratrix of the
the Estate of Geraldine E. Wiggins, Deceased

Dated: 6-29-22

Landmark v. Nurselect MSJ_00000365

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

**CI-22-04128**

Submitted by: Rosenbaum & Associates, PC

Signature: /s/ Andrei Govorov

Name: Andrei Govorov, Esquire

Attorney No. (if applicable): 209365

Rev. 7/2018

Landmark v. Nurselect MSJ_00000366

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Jul 11 2022 12:21PM
Ricci M. Dehl

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

_____ Lancaster _____ **County**

| For Prothonotary Use Only: |
| Docket No: |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

Lead Plaintiff's Name: Brenda L. Kling, Adm. of Estate of Geraldine E. Wiggins,

Lead Defendant's Name: Rehabilitation Center at Brethren Village, LLC

**CI-22-04128**

**Are money damages requested?** ☒ Yes  ☐ No

Dollar Amount Requested: (check one)
- ☐ within arbitration limits
- ☒ outside arbitration limits

**Is this a *Class Action Suit*?** ☐ Yes  ☒ No

**Is this an *MDJ Appeal*?** ☐ Yes  ☒ No

Name of Plaintiff/Appellant's Attorney: Andrei Govorov, Esquire

☐ Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**SECTION B**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** (*do not include Mass Tort*)
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability (*does not include mass tort*)
- ☐ Slander/Libel/ Defamation
- ☐ Other:

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other:

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☒ Other Professional:

Nursing Home Negligence

**CONTRACT** (*do not include Judgments*)
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other
- _____
- _____
- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
- _____
- _____
- ☐ Other:

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other:

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other
- _____
- _____
- ☐ Zoning Board
- ☐ Other:

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other:

*Updated 1/1/2011*

Landmark v. Nurselect MSJ_00000367

# EXHIBIT 6

Landmark v. Nurselect MSJ_00000368

Page 1

1

2   IN THE UNITED STATES DISTRICT COURT FOR THE
    EASTERN DISTRICT OF PENNSYLVANIA

3   -----------------------------------------X

    LANDMARK AMERICAN INSURANCE COMPANY,

4

                             Plaintiff,

5

            -against-      Civil Action No.:

6                          5:24-cv-01412-JMG

7   NURSELECT LLC,

8                             Defendant.

    -----------------------------------------X

9

10                    DATE: November 20, 2024

11                    TIME: 9:06 a.m.

12

13

14          VIDEOCONFERENCE DEPOSITION of

15   the Defendant, NURSELECT LLC, by a witness,

16   DAVID SHELLY, taken by the respective

17   parties, held via Zoom, before Nicole

18   Veltri, RPR, CRR, a Notary Public of the

19   State of New York.

20

21

22

23

24

25    Job No. CS7022807

Landmark v. Nurselect MSJ_00000369

Page 2

```
1
2  A P P E A R A N C E S:
3
4  KAUFMAN, BORGEEST & RYAN, LLP
     Attorneys for the Plaintiff
5  200 Summit Lake Drive, 1st Floor
     Valhalla, New York 10595
6  BY: SARAH MORIARTY, ESQ.
       JOAN GILBRIDE, ESQ.
7
8
   DICKIE McCAMEY & CHILCOTE PC
9  Attorneys for the Defendant
     2578 Interstate Drive, Suite 105
10 Harrisburg, Pennsylvania 17110
     BY: BRYON KASTER, ESQ.
11
12
13
            *    *    *
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1           D. SHELLY
2  D A V I D   S H E L L Y, called as a
3  witness, having been first duly sworn by a
4  Notary Public of the State of New York, was
5  examined and testified as follows:
6  EXAMINATION BY
7  MS. MORIARTY:
8      Q.   Please state your name for the
9  record.
10     A.   David Shelly.
11     Q.   What is your address?
12     A.   815 Sycamore Road in Mohnton,
13 M-O-H-N-T-O-N, Pennsylvania 19540.
14     Q.   Good morning, Mr. Shelly.  Good
15 morning, Mr. Kaster.
16     A.   Good morning.
17     Q.   As you probably know, myself
18 and Ms. Gilbride are here as counsel for
19 Landmark American Insurance Company.  I'll
20 refer to them as Landmark, and we're here
21 today asking questions about an insurance
22 claim made by NurSelect in connection with
23 an underlying lawsuit; and that lawsuit,
24 for the record, is Brenda L. Quinn,
25 individually, and as administratrix of the
```

Page 4

```
1           D. SHELLY
2  estate of Geraldine E. Wiggins versus
3  Rehabilitation Center at Brethren Village,
4  et al, versus NurSelect LLC.
5          And so when I refer to the word
6  underlying action, I'm referring to that
7  entire action; and when I refer to the term
8  joinder, I'm referring to a NurSelect was
9  named as a third-party defendant in this
10 action by -- in that action by Brethren
11 Village.
12         Do you understand?
13     A.   I do.
14     Q.   All right.  Is that okay?  If
15 you have questions about what I'm referring
16 to, feel free to ask along the way.
17     A.   Sure.
18     Q.   All right.  And then I'll go
19 ahead and mark the Complaints in that
20 underlying action, which as I sent to
21 Mr. Kaster yesterday, includes the Fourth
22 Amended Complaint as well as the Joinder
23 Complaint collectively.  And that will be
24 marked as Exhibit 1.
25         (Whereupon, Plaintiff's Exhibit
```

Page 5

```
1           D. SHELLY
2      1 Fourth Amended Complaint and
3      Joinder Complaint were marked for
4      identification as of this date.)
5      Q.   All right.  And now,
6  Mr. Shelly, have you been deposed before?
7      A.   No.
8      Q.   All right.  So I'll go over
9  some basic, just some basic housekeeping
10 and just ground rules before we get started
11 today.
12         First, have you taken any
13 medication that can alter your ability to
14 answer my questions today?
15     A.   No.
16     Q.   All right.  And so especially
17 because we're virtual today, it's important
18 that you give verbal answers.  Try to
19 refrain from doing, like, head nods and
20 things like that so that the court reporter
21 can hear you and transcribe accurately.  I
22 know it's easy to forget; but I might just
23 remind you, you know, say yes or no, not
24 head nod.
25     A.   Sure.
```

2 (Pages 2 - 5)

Landmark v. Nurselect MSJ_00000370

Page 6

D. SHELLY

1
2    Q.    Let me know if you don't
3    understand any question.  I'll do my best
4    to rephrase it.  Sometimes I can talk fast.
5    If you need me to slow down, let me know.
6    You can't hear or anything like that, just
7    let me know.
8            On that same line, if you need
9    a break, feel free to ask for one.  I only
10   ask that if there's a question pending,
11   that you finish answering it before we take
12   a break.
13           All right.  And now because we
14   are virtual today, which we, the parties,
15   previously agreed to over email, we will be
16   using the share screen function on Zoom to
17   show you documents; and so you have the
18   ability to look at those documents on your
19   screen.  You can -- if you want to look at
20   a particular part of the document or a
21   particular document to help you, you know,
22   refresh your recollection, feel free to ask
23   and I'll share that document, zoom into
24   different portions.  So just feel free to
25   speak up and ask if you need that or if you

Page 7

D. SHELLY

1
2    want that.
3    A.    Sure.
4    Q.    All right.  So we'll just get
5    into it now.
6            What did you do to prepare for
7    today's deposition?
8    A.    Not much.  I reviewed some of
9    the emails that were sent from Attorney
10   Kaster.
11   Q.    All right.  And did you speak
12   with anyone to prepare for today's
13   deposition?
14   A.    No.
15       MR. KASTER:  Just to clarify,
16   other than me as his attorney?
17       MS. MORIARTY:  Sure.  Well,
18   yes.
19   Q.    Did you speak with your
20   attorney in preparation for today's
21   deposition?
22       MR. KASTER:  I'm going to --
23   A.    Yeah.  We met last week.
24   Q.    All right.  Did you speak with
25   any employees of NurSelect ahead of today's

Page 8

D. SHELLY

1
2    deposition to prepare?
3    A.    No.
4    Q.    All right.  And do you have any
5    documents in front of you today?
6    A.    Actually, let me amend that
7    last -- my wife is also part of the
8    company.  We talked about it briefly.  I
9    don't know if that matters.
10   Q.    Sure.  What is your wife's role
11   in the company?
12   A.    She works in the human
13   resources.  She helps credential our
14   nurses.
15   Q.    Sorry, I didn't catch that.
16   Could you just repeat?
17   A.    She helps credential our
18   nurses.
19   Q.    Oh, okay.  Got it.  All right.
20           And so do you have any
21   documents with you or in front of you
22   today?
23   A.    I don't.  They're on my
24   computer.
25   Q.    All right.  Okay.

Page 9

D. SHELLY

1
2            And so are you currently
3    employed?
4    A.    Yes.
5    Q.    And is that at NurSelect?
6    A.    Yes.
7    Q.    You're still the president of
8    NurSelect, right?
9    A.    Yes.
10   Q.    All right.  When did you first
11   start working there?
12   A.    I started the company in May of
13   2020.
14   Q.    Oh, so you founded the company?
15   A.    Yes.
16   Q.    Can you briefly describe what
17   NurSelect is, what they do?
18   A.    We hire CNAs, LPNs, and RNs and
19   contract with nursing homes; and they
20   request a nurse from us, and we send a
21   nurse to them to help with whatever they
22   need.
23   Q.    All right.  Can you briefly
24   describe your responsibilities as the
25   president of NurSelect?

3 (Pages 6 - 9)

Page 10

D. SHELLY

1
2    A.   Oh, I run the company, all
3  aspects of the company.
4        MS. GILBRIDE:  It's a little
5  hard to hear.
6        MS. MORIARTY:  Yes.
7  Mr. Shelly, I might just ask you to
8  speak up because I'm getting a little
9  bit of feedback.
10        THE WITNESS:  Sure.
11    Q.   Okay.  So can you just describe
12 a typical day as president of NurSelect,
13 what your duties entail?
14    A.   Sure.  We -- well, I help with
15 hiring.  I help with marketing.  I help
16 with recruiting.  I help with billing and
17 payroll.  I help with scheduling.
18    Q.   All right.
19    A.   I take calls.  That's about it.
20    Q.   All right.  So -- obviously
21 this case is regarding an insurance claim.
22    Can you describe how insurance
23 claims are typically handled at NurSelect?
24    A.   We work through a broker,
25 Liberty, in Pittsburgh, Pennsylvania; so

Page 11

D. SHELLY

1
2  basically, I talk with two gentlemen there.
3  I speak with Jason and Steve, and they
4  pretty much take care of everything for me.
5    Q.   What was your broker for the
6  claim at issue here?
7    A.   The same, Liberty.
8    Q.   Liberty, okay.
9    A.   Yes.
10    Q.   How are notices of lawsuits
11 typically handled at NurSelect?
12    A.   I had one experience.  We had a
13 Complaint dropped off at a different office
14 from where I work.
15    Q.   I'm so sorry.  I didn't catch
16 that.  Can I just ask you --
17    A.   Maybe repeat the question.  I'm
18 not sure.
19    Q.   Sure.  Sorry.  There's some lag
20 on my computer.  That's why.
21        Okay.  How are notices of
22 lawsuits typically handled by NurSelect?
23    A.   I said I've had one experience
24 with this, and this is this particular
25 lawsuit.

Page 12

D. SHELLY

1
2    Q.   Okay.
3    A.   Yeah.  I mean, we were served
4  with the Complaint at a different office,
5  and then I guess Bryon had mentioned that
6  Landmark had filed a suit against us so --
7    Q.   Can you just elaborate on what
8  you mean by different office?  Where was
9  the Complaint served?
10    A.   The Complaint was served to our
11 Lancaster office.
12    Q.   And just to clarify, by
13 Complaint, are you referring to the
14 underlying action, the Wiggins versus
15 Brethren Village versus NurSelect?
16    A.   Yes.
17    Q.   Okay.  So that was at your
18 Lancaster office, right?
19    A.   Yes.
20    Q.   And when was NurSelect served
21 with that?
22    A.   On September 12th, 2023.
23    Q.   Okay.  And that's the only
24 lawsuit that NurSelect has been named as a
25 party in?

Page 13

D. SHELLY

1
2    A.   Other than the Landmark
3  lawsuit, yes.
4    Q.   Oh, of course.  Other than the
5  lawsuit we're here for today?
6    A.   Mm-hmm.
7    Q.   Where did you work prior to
8  founding NurSelect?
9    A.   I had a company called
10 Pro-Stat.  We were a home care agency.
11    Q.   And what was your role at that
12 agency?
13    A.   Owner and chief operating
14 officer.
15    Q.   And did you have any experience
16 with lawsuits at that agency?
17    A.   Yeah.  We had one lawsuit with
18 that company.
19    Q.   And that was one lawsuit where
20 the agency was named as a party and served?
21    A.   Yes.
22    Q.   All right.  So you mentioned
23 that NurSelect was served at the Lancaster
24 office.
25        Could you provide the address

4 (Pages 10 - 13)

Landmark v. Nurselect MSJ_00000372

Page 14

D. SHELLY

1
2 of that office?
3    A.   Yes.  It's 255 Butler Avenue,
4 Suite 202, 202 or 201 -- 202, Lancaster
5 17601.
6    Q.   All right.  And how many
7 offices does NurSelect have?
8    A.   Two.
9    Q.   Okay.  Just the two.
10    A.   Yes.
11    Q.   And where is the other office?
12    A.   It's in Reading; and the
13 address is 1829 New Holland Avenue,
14 Suite 13, Reading 19607.
15    Q.   All right.  Has NurSelect ever
16 had any other offices or other addresses?
17    A.   Yes.
18    Q.   Okay.  I might ask more on that
19 later, just to keep things moving
20 because, you know, I don't want to keep you
21 here all day if we don't have to.  We'll
22 try to get this done.  All right.
23         So going back to the underlying
24 action.  You mentioned being served.  When
25 did you first become aware of the

Page 15

D. SHELLY

1
2 underlying action?
3    A.   On September 12th, 2023.
4    Q.   And just to clarify, were you
5 aware of the underlying action before
6 NurSelect was named?
7    A.   No.
8    Q.   All right.  Did anyone from the
9 estate of Geraldine Wiggins including
10 attorneys for that estate ever reach out to
11 you?
12    A.   At one point before we were
13 named, yes.
14    Q.   Okay.  Can you -- well, when
15 was that?
16    A.   That was -- oh, boy.  Maybe
17 Octoberish.  Was that October 19th?  So on
18 October 19th, Marissa, my wife, had sent an
19 email to Lori Schoener, the nursing home
20 administrator for Brethren Village
21 informing her that an attorney reached out
22 asking for a copy of Ayanna's statement,
23 the CNA, who was involved in that, the
24 incident.  A-Y-A-N-N-A.
25    Q.   And what year was that?

Page 16

D. SHELLY

1
2    A.   That was October 10th, 2022, --
3 or October 19th, 2022.
4    Q.   Okay.  And as you mentioned,
5 your wife runs HR; is that right?
6    A.   Mm-hmm -- yes.
7    Q.   Okay.  And I think you said the
8 name Lori Schoener?
9    A.   Correct.
10    Q.   Who's Lori Schoener?
11    A.   She's the nursing home
12 administrator for Brethren Village.
13    Q.   Okay.  And so Lori Schoener
14 reached out directly to NurSelect HR to ask
15 for information about Ayanna?
16    A.   No.  No.  There was just an
17 email outgoing from Marissa's account to
18 Lori Schoener informing her that an
19 attorney reached out for a copy of Ayanna's
20 statement, and Marissa wanted to make sure
21 it was okay that we sent that statement to
22 this lawyer.
23    Q.   Okay.  And is Marissa your
24 wife?
25    A.   Yes.

Page 17

D. SHELLY

1
2    Q.   Okay.  What's her last name?
3    A.   Shelly, S-H-E-L-L-Y.
4    Q.   Got it.  And had that
5 statement, in fact, sent?
6    A.   Yes.
7    Q.   Who was the statement sent to?
8    A.   To Saxton Stump.  That was
9 Kimberly at Saxton Stump.
10    Q.   All right.  So who do you
11 understand that Saxton Stump is?
12    A.   At the time just an attorney
13 that was working with Brethren Village.
14    Q.   Okay.  So you understood that
15 Kimberly from Saxton Stump was representing
16 Brethren Village?
17    A.   Yes.
18    Q.   Did you know why Brethren
19 Village had an attorney at that time?
20    A.   No, I didn't.  I mean, I just
21 assumed that may be they were being
22 investigated or whatever.  Maybe they
23 wanted a copy.  I'm not sure.
24    Q.   Okay.  Were you aware at that
25 point of the underlying lawsuit?

5 (Pages 14 - 17)

Landmark v. Nurselect MSJ_00000373

Page 18

```
              D. SHELLY
 1
 2    A.   No.
 3    Q.   The Wiggins' action.
 4    A.   No.
 5    Q.   Okay.  Were you aware at that
 6  point of the -- actually, let me backtrack
 7  just a bit here.  Excuse me.
 8         All right.  Were you aware of
 9  the allegation in the underlying action?
10  And I'll -- you know what, I'll pull up a
11  visual for this.  I'm pulling up what we
12  marked as Exhibit 1.  Sorry.  I'm just
13  pulling up, and then I'll share my screen.
14  Zoom in.  So bear with me when I click
15  share, here we go.  Share.
16         All right.  Does everybody see
17  the screen I have up?
18    A.   Yes.
19    Q.   All right.  Okay.  So this is
20  Exhibit 1 and now I'm scrolling to PDF
21  page 25 of Exhibit 1.  And I'll direct your
22  attention to paragraph number 53, which
23  says May 12, 2021, progress note documented
24  the following, and then I'll go down a few
25  sentences.  Patient had been standing at
```

Page 19

```
              D. SHELLY
 1
 2  the sink brushing her teeth when the CNA
 3  left her in the bathroom to take care of
 4  another patient who was having blood sugar
 5  issues.  Patient attempted to walk to the
 6  recliner to sit down, lost her balance
 7  rolling backwards, hit her head on the base
 8  of the bedside table.
 9         And then I'll just scroll.  I'm
10  going to scroll back up to PDF page five,
11  which is the Joinder Complaint and then
12  Paragraph 10 right at the top.  Ms. Wiggins
13  was in the care of Ayanna McDowell, CNA, at
14  the time of her fall.
15         And so my question is,
16  Mr. Shelly, were you aware of those
17  allegations at the time that Brethren
18  Village attorneys reached out for the
19  statement?
20    A.   At that point, we just had the
21  statement from the employee.
22    Q.   Sorry.  Did you hear me,
23  Mr. Shelly?
24    A.   Yes.  At that point we just had
25  the statement from the employee.
```

Page 20

```
              D. SHELLY
 1
 2    Q.   Okay.
 3    A.   We weren't notified by the
 4  client of any of this.
 5    Q.   Were you aware that Ms. Wiggins
 6  had been injured?
 7    A.   Yes.
 8    Q.   Okay.  So I'm going to go back.
 9  I'm going to go back to May 12th, 2021.
10         Was NurSelect notified of the
11  injury when it happened?
12    A.   I'm not -- I received -- no.
13  By the employee, most likely I received an
14  email on the same day from a staffing
15  manager that we had with Ayanna's statement
16  attached.
17    Q.   Okay.  Who is that staffing
18  manager?
19    A.   Her name is Missy Reilly,
20  R-E-I-L-L-Y.
21    Q.   Did NurSelect ask for that
22  statement?
23    A.   I don't know.  I don't know the
24  answer to that.  Missy is no longer with
25  the company.
```

Page 21

```
              D. SHELLY
 1
 2    Q.   Where does Missy work now?  Do
 3  you know?
 4    A.   I don't know.  No.
 5    Q.   Can you just clarify for us
 6  what was Missy's role at NurSelect or
 7  title?
 8    A.   She was a staffing coordinator.
 9  She staffed the nurses.
10    Q.   I understand.  So you received
11  that email with the statement on May 12,
12  2021.
13         Did I understand?
14    A.   Correct.  That's correct.
15    Q.   What did you do upon receiving
16  that statement over email?
17    A.   At that point just read it and
18  asked if -- I don't know what I would have
19  said.  I kept the statement.  We put it in
20  our file.
21    Q.   Put that in Ayanna's file?
22    A.   Yes.
23    Q.   Did anybody else reach out to
24  you in 2021 regarding that injury?
25    A.   Not to me.
```

6 (Pages 18 - 21)

D. SHELLY

1
2    Q.   Did anyone reach out to anyone
3 else at NurSelect in 2021 about that
4 injury?
5    A.   Not that I'm aware of.
6    Q.   Sure.  So at the time, where
7 was Missy staffed, what location?
8    A.   She was in our Hershey office
9 at that time, or she's still at home.  It's
10 right around the time we opened another
11 office.  Either she was working from home,
12 or she was at an office in Hershey.
13    Q.   I understand.  And was she
14 direct contact with Brethren Village?
15    A.   She does have direct contact.
16 She did have direct contact with Brethren
17 Village.
18    Q.   Okay.  Was she charged with
19 staffing the nurses at Brethren Village?
20    A.   That's correct.
21    Q.   Do you know who at Brethren
22 Village that she was in contact with?
23    A.   Yes.
24    Q.   Who is that?
25    A.   Her name is Jenny.  I don't

D. SHELLY

1
2 know of her -- Wills or Wells.  Maybe
3 Wills.
4    Q.   And what was Ms. Wills' role,
5 if you know?
6    A.   I think she was just a staffing
7 coordinator there.
8    Q.   Got it.  Okay.
9        And was there anyone else from
10 NurSelect staffed at Brethren Village at
11 that time?
12    A.   Yes.
13    Q.   Approximately how many nurses
14 or medical staff?
15    A.   I don't know.  I'm not sure.
16 More than Ayanna.
17    Q.   Was it more than five?
18    A.   I don't know.
19    Q.   Okay.
20    A.   I can find out.  I can pull
21 that information up.
22    Q.   All right.  We can move on for
23 now.
24        Did NurSelect take any other
25 actions to investigate Ms. McDowell's

D. SHELLY

1
2 involvement with the Wiggins' injury?
3    A.   No.
4    Q.   Did you forward the statement
5 to anyone at that time?
6    A.   No.  Not that I have any emails
7 for.
8    Q.   Sure.  And are you aware if HR
9 or anyone else at NurSelect forwarded the
10 email to anyone?
11    A.   No.  Just October 19th I think
12 was when he forwarded it to the attorney.
13    Q.   All right.  So you know what,
14 so we'll move on then to October -- to the
15 October forwards that you are referring to.
16 Okay.  So I'm just going to -- I'm going to
17 pull up another document and share my
18 screen again.  Okay.
19        So right now I'm pulling up
20 emails; and, Mr. Kaster, just so you're
21 aware and for the record, I'm pulling these
22 from the same folder that I sent to you
23 yesterday.
24    A.   Understood.
25    Q.   And this is the same email that

D. SHELLY

1
2 was produced by NurSelect in this case.  So
3 I will mark these as Exhibit 2.  As you can
4 see here, we have a scan of an email,
5 subject line: Re: Ayanna McDowell, David
6 Shelly, and then the other address is
7 KAS@SaxtonStump.Com.
8        Mr. Shelly, do you recognize
9 this email?
10    A.   It's an email that I would have
11 written, yes.
12    Q.   All right.  And then I'll
13 scroll down.  We have another email in the
14 same -- other emails in the same chain it
15 looks like dated October 14, 2022,
16 October 20, 2022, and then scrolling
17 farther to PDF page three, we have an email
18 from Ayanna McDowell to Melissa Reilly
19 dated May 12th of 2021.
20    A.   Okay.
21    Q.   And so on this May 12, 2021,
22 email, is this the statement that you've
23 been referring to?
24    A.   Yes.
25    Q.   By Ayanna?

7 (Pages 22 - 25)

Landmark v. Nurselect MSJ_00000375

Page 26

D. SHELLY

1
2    A.   Yes.
3    Q.   And this is the only statement,
4 only copy of it?
5    A.   Yes.  Well, that's the email
6 that she sent.  That's the only copy I
7 have.
8    Q.   Understood.  All right.  So
9 these are all collectively Exhibit 2.
10       (Whereupon, Plaintiff's Exhibit
11       2 emails produced by NurSelect was
12       marked for identification as of this
13       date.)
14    Q.   All right.  Let's get some more
15 detail on Ayanna.
16       What was Ayanna McDowell's
17 title or role?
18    A.   She was certified nursing
19 assistant.
20    Q.   And when did she start working
21 at NurSelect or with NurSelect?
22    A.   I don't have the date on hand.
23    Q.   Oh, that's okay.
24       Was she assigned by NurSelect
25 to Brethren Village on May 12th of 2021?

Page 27

D. SHELLY

1
2    A.   Yes.  Yes, she was.
3    Q.   And did you read this statement
4 on -- of 2021?
5    A.   Yes.
6    Q.   So I'll scroll up.  Okay.  So
7 scrolling up, PDF page two, we have the
8 email to you from Kimberly A. Selemba.
9       Is that the Kimberly from
10 Saxton Stump who you were referring to
11 before?
12    A.   Yes.
13    Q.   Did you speak with Kimberly
14 Selemba prior to sending this email?
15    A.   I don't recall talking to her.
16    Q.   Do you know if anyone else at
17 NurSelect talked to her or anyone else at
18 Saxton Stump prior to this email?
19    A.   As far as I know, only Marissa
20 spoke with Kimberly on the phone.
21    Q.   Do you know when that
22 conversation occurred?
23    A.   I mean, I have jotted down
24 10/19 is when Marissa reached out to Lori.
25 I obviously forgot about this other email,

Page 28

D. SHELLY

1
2 so it would have been either on or before
3 the 19th of October.
4    Q.   Understood.
5    A.   2022.
6    Q.   Do you know if Marissa and Lori
7 exchanged any emails regarding Ms. Wiggins
8 or the underlying action?
9    A.   Not that I'm aware of.
10    Q.   Did NurSelect perform any
11 searches for those emails?
12    A.   Yes.
13    Q.   And you found nothing or
14 NurSelect found nothing?
15    A.   Not that I -- yeah.  I mean,
16 this one slipped by me, the 14th of October
17 email; but whatever -- I mean, whatever
18 emails we had were given to -- published
19 for you guys.
20    Q.   Do you know why Ms. Selemba was
21 asking for the McDowell statement?
22    A.   I didn't.
23    Q.   Did you ask Ms. Selemba why she
24 needed it?
25    A.   I didn't.

Page 29

D. SHELLY

1
2    Q.   And did Ms. Selemba tell you
3 that there was an ongoing lawsuit?
4    A.   She didn't.
5    Q.   Did you ask Marissa about the
6 context of any of her conversations with
7 Selemba or with Lori Schoener?
8    A.   I mean, I would have been in
9 the room with her at the time.  I did not
10 ask her about it though.
11    Q.   Okay.  Do you recall those
12 conversations if you heard them?
13    A.   No, I don't.
14    Q.   How often -- let me rephrase
15 that.
16       How often does NurSelect
17 receive statements from their nursing
18 staff?
19    A.   Somewhat, somewhat frequently
20 for different reasons.
21    Q.   What are some of those reasons?
22    A.   The last one we received was
23 our computer wasn't fastened to the med
24 cart so the nurse took it over a hump and
25 it knocked the computer off and --

8 (Pages 26 - 29)

Page 30

D. SHELLY

1
2      (Reporter clarification.)
3      A.   The computer hopped off the med
4  cart and hit the floor and damaged the back
5  of the computer.  So she sent a statement
6  along with the picture of the damaged
7  computer.
8      Q.   All right.  So you received
9  statements regarding damages or different
10  injuries; is that --
11      A.   Yes.  Employee injuries,
12  correct.
13      Q.   Employee injuries.  And what
14  about patient injuries?
15      A.   Not -- I mean, I don't know if
16  we had any other patient injuries here.  I
17  mean, there's -- you know, we've -- I'm
18  sure we have.  I'm sure we have received
19  patient injury or report with the reference
20  of a patient injury.
21      Q.   And what do you typically do
22  when you receive a report regarding a
23  patient injury?
24      A.   Typically we reach out to the
25  facility and ask them for a copy of the

Page 32

D. SHELLY

1
2  information?  Is it the nurse --
3      Q.   I'll rephrase my question.
4      What steps does NurSelect
5  generally take when NurSelect becomes aware
6  that a patient had been injured?
7      A.   We typically reach out to the
8  facility and try to acquire an incident
9  report or some kind of statement from the
10  facility of what happened.
11      Q.   And then what do you do next?
12      A.   Depends on what the statement
13  says.
14      Q.   And so I'll bring it back to
15  the Wiggins incident.
16      Is there a reason that you did
17  not take additional steps after receiving
18  Ayanna McDowell's statement?
19      A.   I didn't see anything in the
20  statement that I thought was any relation
21  to our services at Brethren Village.  I
22  didn't see it necessary to.
23      Q.   I'll scroll to the statement
24  just so we have a visual here.
25      A.   Sure.

Page 31

D. SHELLY

1
2  incident report or a statement.
3      Q.   And do you take any steps after
4  reviewing additional reports and
5  statements?
6      A.   At this point?
7      Q.   At any point generally.
8      A.   As of current, absolutely.  We
9  report everything to the insurance company.
10  So prior to -- I'm sorry, repeat the
11  question again.  I kind of went off on it.
12      Q.   Oh, that's fine.
13      So what does NurSelect
14  generally do upon receiving incident
15  reports of patient injury?
16      A.   We typically don't get incident
17  reports.  That's one of the issues.
18      Q.   So I'll be more -- I'll
19  rephrase then.
20      What does NurSelect generally
21  do when receiving any information on
22  whether it be a report or a statement or a
23  phone call that a patient was injured when
24  NurSelect staff member --
25      A.   Who's reaching out for that

Page 33

D. SHELLY

1
2      Q.   And were you aware of what the
3  extent of the injury was when you received
4  the statement?
5      A.   She -- I mean, the -- no.  In
6  looking at the statement, it appeared that
7  she was pulled away from this resident,
8  that there was another aide in the room.
9  This resident had fallen, and she came back
10  and found that the resident had fallen; and
11  the resident did have a little -- I think
12  she mentioned blood on her -- yeah.  She
13  had bleeding.  So she had informed the
14  supervisor as she should have.
15      Q.   Understood.  And so were you
16  aware of what the care plan of the patient
17  was, of Ms. Wiggins?
18      A.   No.
19      Q.   Did you or anyone else from
20  NurSelect take any steps to investigate
21  what the care plan was at that -- after you
22  received the statement?
23      A.   Other than -- I don't know if I
24  reached out and asked if anybody reached
25  out and asked for a copy of the incident

Veritext Legal Solutions

Landmark v. Nurselect MSJ_00000377

D. SHELLY

1
2  report.  I don't know the answer to that;
3  but, no, we don't have anything to do with
4  the care that's provided in the nursing
5  homes.
6      Q.   So does NurSelect have an
7  incident report in your files?
8      A.   Not from the facility, just a
9  statement from the -- from Ayanna.
10     Q.   Are you -- sure.
11          Are you aware if there was an
12  incident report at Brethren Village?
13     A.   I wouldn't.  I'm not aware of
14  that, no.
15     Q.   And are you aware if anyone
16  from NurSelect asked for an incident report
17  upon review of the statement?
18     A.   I'm not aware.
19     Q.   All right.  So did you receive
20  any other communications about Ms. Wiggins
21  or the underlying action before -- before
22  the dates of these email, October 14, 2022?
23  Sorry.  What was that?  I think the audio
24  cut out.
25     A.   No.  Sorry.

D. SHELLY

1
2      Q.   Got it.  All right.  So now I'm
3  going to pull up another document.  Here we
4  go.  Okay.  Everyone can see this.  So I'm
5  pulling up what's the title supplemental
6  staffing agreement, and at the top it says
7  NurSelect.  I'll refer -- and this we'll
8  mark as Exhibit 3.
9          (Whereupon, Plaintiff's Exhibit
10          3 supplemental staffing agreement was
11          marked for identification as of this
12          date.)
13     Q.   And so, Mr. Shelly, were you
14  aware of this staffing agreement?
15     A.   Yes.
16     Q.   At the time of the incident?
17     A.   At the time, yes.
18     Q.   And was this staffing agreement
19  in effect at the time of the incident,
20  May 12th, 2021?
21     A.   Yes.
22     Q.   All right.  And I'm just going
23  to scroll to the bottom, which is PDF
24  page 11 and also marked as page 11.
25          Is this your signature?

D. SHELLY

1
2      A.   Yes.
3      Q.   And is this an agreement
4  between Brethren Village and NurSelect?
5      A.   Yes.
6      Q.   And do you -- are you aware
7  if -- actually, let me rephrase that.  You
8  were discussing Ms. Selemba from Saxton
9  Stump in your correspondences with her.
10          Do you recall if Ms. Selemba
11  brought up this staffing agreement on the
12  phone or otherwise when asking for the
13  statement?
14     A.   No.
15     Q.   All right.  I'm just going to
16  scroll to page six of this agreement and
17  I'll just point to Article 5, apportionment
18  of liability and damages indemnification.
19          And were you aware of this
20  provision?
21     A.   Yes.
22     Q.   And did you have any concern
23  that Brethren Village would invoke this
24  provision due to the injuries of
25  Ms. Wiggins?

D. SHELLY

1
2      A.   No.
3      Q.   Why not?
4      A.   I didn't see a reason why, why
5  they would.
6      Q.   And that's based just solely on
7  the statement, right?
8      A.   Yes, yes.
9      Q.   All right.  So I'll keep it
10  moving here.
11          I'm going to pull up some other
12  emails here.  Here we go.  Okay.  Can
13  everyone see this one?  I think so.  All
14  right.  And this is just -- my name is only
15  on this because I converted it to a PDF,
16  but you can ignore my name.  All right.
17          So we have an email, it says
18  from action, sorry, I'll scroll -- all
19  right.  Scrolling to PDF page three, we
20  have an email, it says from
21  LindaRidenbaughLLR@SaxtonStump.com sent
22  January 12, 2023, to David Shelly at
23  NurSelect staffing and then we have a few
24  people CCed including Kimberly Selemba.
25  And then the subject line here is Brenda L.

Page 38

D. SHELLY

1
2 King, individually and as administratrix of
3 the estate of Geraldine Wiggins versus
4 Rehabilitation Center at Brethren Village,
5 et al.
6         So we'll mark this as
7 Exhibit 4.
8         (Whereupon, Plaintiff's Exhibit
9         4 email was marked for identification
10        as of this date.)
11    Q.   And, Mr. Shelly, do you recall
12 this email?
13    A.   Not at the time; but, yes, I've
14 seen this email.
15    Q.   You've seen this email.  And
16 that is your email address, correct?
17    A.   Yes.
18    Q.   Okay.  When did you see this
19 email in your -- actually, let me backtrack
20 a bit.
21        Did you -- was this email in
22 your inbox, your regular inbox?
23    A.   I don't know.  I'm not sure.
24    Q.   When did you first see this
25 email?

Page 39

D. SHELLY

1
2    A.   On September 12, 2023.
3    Q.   Did you see -- and I'll be --
4 I'll try to be more specific.  Just bear
5 with me here.
6         Did you see the email without
7 opening it prior to September 12, 2023?
8    A.   No.
9    Q.   So can you just elaborate on
10 why you did not read this email until
11 September 12, 2023?
12    A.   It went unnoticed.
13    Q.   So did you find it on
14 September 12, 2023?
15    A.   Well, obviously I was in a bit
16 of a panic; so I did a search and
17 searched -- I had everybody do a search of
18 their emails to find anything we could on
19 this particular incident.
20    Q.   And --
21    A.   And I came across -- yeah, I
22 came across the unread email.  That popped
23 up; and when I clicked on it, obviously I
24 was horrified to see this.
25    Q.   And why did you and your staff

Page 40

D. SHELLY

1
2 perform a search?
3    A.   Because we were served with a
4 Complaint.
5    Q.   And what search terms did you
6 run?
7    A.   I'm not sure.  Obviously the
8 employee's name.
9    Q.   And when you were served with
10 the Complaint, was there any other
11 correspondence with that Complaint?
12    A.   I'm sorry, can you repeat the
13 question?
14    Q.   Sure.  When you were served
15 with the Complaint, was there other
16 correspondence or cover letter along with
17 that complaint?
18    A.   It was physically served to the
19 office.
20    Q.   Right.  And was there anything
21 with that physical copy such as a letter on
22 top?
23    A.   Oh, I don't know.  I don't
24 recall.
25    Q.   Okay.  All right.  So I am

Page 41

D. SHELLY

1
2 going to pull up -- sorry, bear with me for
3 a moment here.
4         MS. MORIARTY:  Actually, you
5         know what, we've been going for about
6         50 minutes.  Would everyone want to
7         take a five at this point?
8         THE WITNESS:  Sure.
9         MR. KASTER:  I'm fine going
10        unless, Dave, you need a break.
11        THE WITNESS:  I'm good.  I'm
12        good.
13        MS. MORIARTY:  Okay.  We'll
14        keep going.  We'll keep going.  All
15        right.
16    Q.   Okay.  So I'm going to pull up
17 another email here.  All right so ignore my
18 name at the top there.  Okay.
19        MS. MORIARTY:  And we'll mark
20        this -- actually, Ms. Veltri, would
21        you mind just letting me know what
22        number exhibit we're on?
23        COURT REPORTER:  Exhibit 5.
24        MS. MORIARTY:  Okay.  Great.
25        (Whereupon, Plaintiff's Exhibit

11 (Pages 38 - 41)

Landmark v. Nurselect MSJ_00000379

D. SHELLY

1
2  5 email from Anthony Viola was marked
3  for identification as of this date.)
4       MS. MORIARTY:  So I'm pulling
5  up another email here.  This is from
6  Anthony Viola at Liberty Insurance
7  dated October 5, 2023.  And it's sent
8  to Joan Gilbride, who is next to me,
9  Zach Wilson at RSUI, which I will
10  represent RSUI is Landmark.  And
11  then, Mr. Shelly, you are CCed along
12  with some others from Liberty with
13  the subject line Wiggins versus
14  NurSelect.
15  Q.   Do you recognize this email?
16  A.   Yes.
17  Q.   All right.  And, again, we'll
18  mark this one as Exhibit 5.  All right.  So
19  scrolling to the body of this email, okay.
20  So I'm going to -- yes.  So this is letting
21  me highlight -- get the task bar away from
22  there.  Okay.
23       So turning your attention to
24  the highlighted portion here, it reads:
25  The email was sent by Ms. Linda

D. SHELLY

1
2  Reidenbaugh, paralegal with Saxton & Stump,
3  Attorneys at Law, not recognizing the
4  sender and/or email address, Mr. David
5  Shelly did not open the email from
6  Ms. Linda Reidenbaugh.  As a matter of
7  fact, it was not until the insured was
8  served with the lawsuit in September that
9  included a cover letter referencing the
10  January 12, 2023, correspondence that
11  Mr. Selly [sic] discovered the unopened
12  email.
13       So, sorry.  I'll backtrack a
14  bit.  Who is Anthony Viola?
15  A.   He is one of the employees at
16  Liberty Insurance.
17  Q.   And did you speak directly with
18  Mr. Viola at any point?
19  A.   I don't -- no.  I don't believe
20  I did, but I can't answer for sure.
21  Q.   Sure.  Did you speak with
22  anyone at Liberty generally?
23  A.   Yes.
24  Q.   Okay.  And do you recall
25  reading this email?

D. SHELLY

1
2  A.   Yes.
3  Q.   All right.  And so then
4  directing your attention back to the
5  highlighted portion which we just read, it
6  says:  Not recognizing the sender and/or
7  email address, Mr. David Shelly did not
8  open the email from Ms. Linda Reidenbaugh.
9       So did you ignore the email or
10  miss the email because you did not
11  recognize the sender?
12  A.   I don't know.  I don't recall
13  receiving the email so I don't -- I'm not
14  sure if I saw the name and ignored it or
15  just never even saw it.
16  Q.   Okay.  So do you recall having
17  discussions with Liberty regarding the
18  email?
19  A.   Regarding the email that I
20  missed?
21  Q.   Yes.
22  A.   Oh.  I would've definitely told
23  them that I received this email, yeah.
24  Q.   And so just to make sure that I
25  understand correctly, you don't recall

D. SHELLY

1
2  whether you saw an email and missed it
3  versus whether you did not see it at all?
4  A.   That email was brand new to me
5  when I searched.  That email was completely
6  undiscovered.
7  Q.   What do you mean when you say
8  discover?
9  A.   Saw.  I mean, if -- obviously
10  if I would have known what the contents
11  were or recognized a name or something
12  would have drawn my attention over that
13  email, I would have definitely opened that
14  email.
15  Q.   Understood.  And I know -- let
16  me try to clarify a bit here because I know
17  with emails you often -- you have your home
18  screen and you see a list of opened and
19  unopened emails with just the subject line
20  typically maybe first few words.
21       And so when you say discover,
22  are you referring to actually opening the
23  email?
24  A.   No.  Just seeing -- just if
25  it's an email, I see that it looks like I

12 (Pages 42 - 45)

Landmark v. Nurselect MSJ_00000380

Page 46

D. SHELLY

2 should open.  I open the email.  Obviously
3 I didn't see this email or think that it
4 should be opened or whatever.  For whatever
5 reason, it wasn't opened.  I can't tell you
6 why.
7     Q.    Okay.  So you don't open all of
8 your emails?
9     A.    I don't, no.
10    Q.    All right.  So now I'm going to
11 switch -- all right.  I'll switch to
12 another letter here which we'll mark as
13 Exhibit 6.
14        (Whereupon, Plaintiff's Exhibit
15        6 letter dated January 12, 2023, was
16        marked for identification as of this
17        date.)
18    Q.    All right.  So this is a letter
19 dated January 12, 2023, addressed to you
20 via your email.
21    A.    Mm-hmm.
22    Q.    And addressed to NurSelect.
23        And can you tell me on the
24 screen if the address to NurSelect, is that
25 the correct address to any --

Page 47

1        D. SHELLY
2    A.    It is not.
3    Q.    -- NurSelect office?
4    A.    No.
5    Q.    So that address on this letter
6 is 640 Business Center Drive, Third Floor,
7 King of Prussia, Pennsylvania?
8    A.    Yes.
9    Q.    Did NurSelect ever have an
10 office in King of Prussia?
11    A.    Yes.
12    Q.    And what was the NurSelect King
13 of Prussia address at that time?
14    A.    630 Freedom Business Center.
15    Q.    Understand.  Did NurSelect ever
16 receive this letter in the mail, --
17    A.    No.
18    Q.    -- regular mail?  Okay.
19    A.    No.
20    Q.    Does NurSelect still have an
21 address at that King of Prussia address
22 that you just said?
23    A.    No.
24    Q.    When did NurSelect leave that
25 address?

Page 48

1        D. SHELLY
2    A.    Mail was still forwarded.  Are
3 we talking about the mail or just the
4 physical address?  It was --
5    Q.    The physical address.  When you
6 were there, when did NurSelect leave the
7 physical address?
8    A.    I don't know when I cancelled
9 that contract.  It's like a Regus -- we
10 opened it during COVID so we figured we'll
11 just do, like, a Regus type shared space.
12 So I'm not sure when we actually cancelled
13 that contract.  We still have the mail
14 being forwarded up until recently if not
15 still currently from that address to us.
16    Q.    All right.  And what address is
17 it forwarded to, which --
18    A.    1829 New Holland Road,
19 Suite 13, Reading.
20    Q.    Oh, yes.  You had put that on
21 the record earlier.
22    A.    Yes.
23    Q.    So I'll refer to that as the
24 Reading address.
25    A.    Sure.

Page 49

1        D. SHELLY
2    Q.    Did the Reading address ever
3 receive this letter at any point?
4    A.    No.
5    Q.    Okay.  So when did you first
6 read this letter?
7    A.    September 12, 2023.
8    Q.    And just for the record, this
9 letter was an attachment to the email from
10 Linda Reidenbaugh, correct?
11    A.    Yes.
12    Q.    So you read this letter when
13 you first opened the email?
14    A.    That's correct, yes.
15    Q.    So what did you do upon reading
16 the letter?
17    A.    Called Liberty Insurance.
18 Actually, we may have -- I may have even
19 called Liberty before.  I'm sure I would
20 have called them again when I read this
21 letter.
22    Q.    Did you read this letter after
23 reading the suit that you were --
24    A.    No, no.  Actually we were en
25 route to pick up the suit when we conducted

13 (Pages 46 - 49)

Landmark v. Nurselect MSJ_00000381

Page 50

D. SHELLY

1
2 the search of emails and that's when I came
3 across this.
4     Q.   So when you say you were en
5 route, where were you in route from?
6     A.   From the Reading office to the
7 Lancaster office.
8     Q.   Okay.  And the -- just to
9 clarify, the Lancaster office is where the
10 suit was served?
11     A.   That's correct.
12     Q.   And that was an September 12,
13 2023?
14     A.   Yes.
15     Q.   And so just to get the timeline
16 down, when were you aware -- when did you
17 become aware that the suit was going to be
18 served?
19     A.   When the suit was going to be
20 served?  I only found out after it was
21 served.
22     Q.   Okay.  So who accepted the suit
23 for NurSelect?
24     A.   We had two employees in the
25 Lancaster office at that point.

Page 51

D. SHELLY

1
2     Q.   Okay.  And did they call you
3 upon receiving this suit?
4     A.   Yes.
5     Q.   And who was -- sorry.  Let me
6 rephrase.
7          So you -- did I understand
8 directly that you had yourself and staff
9 running some search terms prior to
10 reviewing the suit?
11     A.   En route.  We were notified of
12 the suit en route.  I asked I think just --
13 I don't know who I asked.  I asked one or
14 more employees to do a search to see if we
15 had any information on Ayanna.
16     Q.   Got it.  And did one of your
17 employees read the suit and inform you that
18 Ayanna was --
19     A.   Yes.  The person who received
20 the suit.  I asked her to read as much of
21 the suit as she could to me at that point.
22     Q.   Okay.  Understood.  All right.
23 So going into this letter specifically --
24 sorry, highlighting mistake.
25          Okay.  So this letter states,

Page 52

D. SHELLY

1
2 highlighted portion here in the first
3 paragraph:  Our investigation has revealed
4 that Ayanna McDowell, CNA, who is employed
5 by NurSelect LLC at the relevant time, had
6 direct involvement in this alleged fall.
7 Upon confirming that Ayanna and McDowell,
8 CNA, was an employee of NurSelect and
9 reviewing contractual agreement between
10 NurSelect and Brethren Village, our office
11 did not meet with Ms. McDowell.
12          So were you aware that Saxton
13 Stump, as attorneys for Brethren Village,
14 had been investigating the involvement of
15 McDowell?
16     A.   To be honest, I didn't
17 understand the relationship between Saxton
18 Stump and Brethren Village at the time.  I
19 didn't understand their relationship.
20     Q.   What did -- who did you
21 understand Saxton Stump to be?
22     A.   Just a personal attorney of
23 Brethren Village.  Legal counsel, I'm
24 not -- I'm not sure.  I mean, nothing
25 crossed my mind of who Saxton Stump was

Page 53

D. SHELLY

1
2 with Brethren Village.
3     Q.   Okay.  So were you aware at
4 this point and this point being -- sorry.
5 I'll backtrack.
6          When you were served with the
7 suit or right -- just prior to being served
8 with the suit, were you aware that there
9 was an ongoing suit between Brethren
10 Village and the Wiggins' estate?
11     A.   No.
12     Q.   So the first time you became
13 aware of that was when NurSelect was
14 served?
15     A.   That's correct.
16     Q.   And so, again, this letter --
17 I'll scroll up.  You have January 12, 2023.
18 And then the email as well, I'm pulling up
19 here Exhibit 5, I believe, also dated
20 January 12, 2023.
21          Did you receive any other
22 communications, email, phone calls, or any
23 kind of communications from Saxton Stump
24 after January 12, 2023?
25     A.   No.

14 (Pages 50 - 53)

D. SHELLY

1
2    Q.   And backtracking a bit, you
3  mentioned you ran a search -- I believe you
4  mentioned --
5    A.   Actually, let me clarify that.
6  In between January 12, 2023, and
7  September 12, 2023?
8    Q.   Yes.
9    A.   Okay.  Then no, I did not.
10    Q.   So your answer is no, okay.
11        All right.  So then
12  backtracking a bit.  You mentioned you had
13  email searches run.
14        Do you recall if you found
15  anything else in those email searches
16  regarding the Wiggins' incident?
17    A.   No.  I mean, I would have seen
18  the statement.  She had a bunch of shift
19  confirmations and obviously this one --
20  this one took first place.  This one stole
21  the show.
22    Q.   Okay.  Bear with me for a
23  minute here.  Okay.  So I'm just going to
24  briefly pull up -- I believe -- I think
25  we're on Exhibit 7.  So we'll mark this as

D. SHELLY

1
2  Exhibit 7.
3        (Whereupon, Plaintiff's Exhibit
4        7 insurance policy was marked for
5        identification as of this date.)
6    Q.   And we have a document stating
7  professional liability insurance and I'll
8  just scroll.
9        So very quickly, Mr. Shelly, do
10  you recognize this document?
11    A.   Yes.
12    Q.   And I will represent to you
13  that -- that myself and Mr. Kaster, we have
14  so stipulated that this is a true and
15  correct copy of the insurance policy at
16  issue in this case.  All right.  So turning
17  to what's been Bates stamped as LAND9, and
18  I'll just direct your attention, we have
19  policy period from 3/1/2023 to 3/1/2024.
20        Mr. Shelly, were you involved
21  in applying for this policy of insurance
22  for NurSelect?
23    A.   Yes, yes.
24    Q.   And were you the one who filled
25  out the application for the insurance?

D. SHELLY

1
2    A.   Yes.
3    Q.   All right.  So I'm going to
4  pull up -- and this will be Exhibit 8,
5  policy application.
6        (Whereupon, Plaintiff's Exhibit
7        8 policy application was marked for
8        identification as of this date.)
9    Q.   Do you recognize this document?
10    A.   Yes.
11    Q.   And do you recognize this to be
12  the policy application for the insurance
13  policy at issue in this current action?
14    A.   Yes.
15    Q.   All right.  So I'm going to
16  scroll.  I'm on PDF or page two of two on
17  the PDF.  Well, PDF page two.  Sorry.  PDF
18  page two.
19        Is this your signature?
20    A.   Yes.
21    Q.   And then I'll scroll down to
22  the other part of the application titled:
23  Renewal Application for Miscellaneous
24  Medical Professional Liability Insurance
25  and I'm scrolling to -- all right.  We have

D. SHELLY

1
2  question number 16 which says:  In the past
3  12 months has any professional liability
4  claim or suit been made against the
5  applicant or any of its predecessor firms
6  and you clicked no.
7        And do you recall answering
8  that question?
9    A.   I mean, I don't recall it; but
10  I did, yes.
11    Q.   Sure.  And is this your
12  signature again at the bottom under the
13  representation paragraph?
14    A.   Yes.
15    Q.   And it's dated 1/26/2023?
16    A.   Correct.
17    Q.   And this date, excuse me, let
18  me backtrack.
19        And so as of 1/26/2023, you
20  still had not read the email which I'll
21  pull up again dated January 12, 2023?
22    A.   That's correct.
23        MS. MORIARTY:  All right.  So I
24      think at this point, let's maybe take
25      a ten.  I'm going to review my notes;

15 (Pages 54 - 57)

Landmark v. Nurselect MSJ_00000383

D. SHELLY

1          D. SHELLY
2      but I don't think we'll be too much
3      longer.  Sound good?
4          THE WITNESS:  Yup.
5          (Whereupon, a short recess was
6      taken.)
7      Q.   All right.  So, Mr. Shelly,
8  could you just describe for me the business
9  relationship with Brethren Village and
10  NurSelect?
11      A.   Yes.  So we're a supplemental
12  staffing firm; so we have a supplemental
13  staffing agreement with -- so they have
14  holes in their schedule or holes in their,
15  I guess, the nurse schedule.  And they
16  reach out to us to help fill those holes,
17  so if they had a CNA call off --
18      Q.   Understood.
19      A.   Does that make sense?
20      Q.   Sure.  And just to clarify,
21  Brethren Village, is that a nursing home
22  facility?
23      A.   It is, yes.
24      Q.   All right.  And when did
25  NurSelect begin their relationship with

1          D. SHELLY
2  Brethren Village?
3      A.   I don't know offhand.  Whatever
4  the date was on the staffing agreement
5  would have been the first relationship.
6      Q.   All right.  And just forgive me
7  if you already answered this, but when did
8  you start NurSelect?
9      A.   I formed it in March of 2019,
10  but didn't start staff -- didn't actually
11  work it until I believe it was either March
12  or May of 2020.
13      Q.   All right.  And then you had
14  mentioned you were at a different agency
15  before starting NurSelect?
16      A.   Yes.
17      Q.   How long were you with that
18  agency?
19      A.   2008 until 2019 so 11 years --
20  no, nine years, nine years.
21      Q.   Sorry to cut you off.  Sure.
22          Can you just describe briefly
23  what that agency was?
24      A.   It was another staffing agency
25  similar to NurSelect.  And it was also a

1          D. SHELLY
2  home care agency.  We provided home care
3  services.
4      Q.   Okay.  All right.  So I am
5  going to -- sorry.  Let me just pull up --
6  one of my tabs disappeared.  Sorry.  One
7  moment.  Here they are, okay.  Go back to
8  share screen.  Here we go.  Share.  Okay.
9  All right.  So I'm pulling up Exhibit 8.
10  I'm pulling back up Exhibit 8, the policy
11  application.  All right.  So I just wanted
12  to clarify a couple things here.
13          So this is dated, your
14  signature on this application here is dated
15  1/26/2023?
16      A.   Yes.
17      Q.   But then flipping back to --
18  and here we have the email again that
19  contained as attachment that attorney
20  letter date January 12 of 2023.
21          And so when you signed the
22  policy application on January 26, 2023,
23  that email had been received by your inbox,
24  right?
25          MR. KASTER:  Objection to the

1          D. SHELLY
2      form of the question.  Could you
3      define the word received?
4      Q.   That email was present in the
5  inbox, correct?
6      A.   I don't recall seeing it so --
7      Q.   I'm sorry.  I didn't catch
8  that.  Would you mind repeating?
9      A.   I didn't see it.  I didn't
10  notice.
11      Q.   Understood.  But it was, in
12  fact, present?
13      A.   I would assume it was present,
14  yes.
15      Q.   All right.  All right.  I
16  think -- I think we're all set here.  I
17  think that's everything I have for you
18  today.  Thank you so much for taking time
19  out of your day, Mr. Shelly.
20          THE WITNESS:  Sure.  Thank you.
21          MR. KASTER:  I have some
22      questions to follow up on.
23          MS. MORIARTY:  All right.
24  EXAMINATION BY
25  MR. KASTER:

16 (Pages 58 - 61)

D. SHELLY

1
2    Q.   Mr. Shelly, I just want to make
3  sure I'm understanding some things.
4         Regardless of whether or not
5  that email -- and we're talking about the
6  one that was sent by Mrs. Reidenbaugh on
7  January 12, 2023.  Regardless of whether or
8  not it was present in the inbox, you were
9  not aware of that email and had no
10  knowledge of its existence until
11  September 12, 2023; is that correct?
12    A.   That's correct.
13    Q.   And you had no knowledge of a
14  lawsuit pending against Brethren Village
15  until September 12th, 2023; is that
16  correct?
17    A.   That's correct, yeah.
18    Q.   And you had no knowledge of any
19  claims by Brethren Village against
20  NurSelect until September 12, 2023; is that
21  correct?
22         MS. MORIARTY:  Objection.
23    A.   That's correct.
24    Q.   And we were shown a statement
25  of Ayanna McDowell; and in reading that

D. SHELLY

1
2  statement, did you -- when you read it, did
3  you believe that amounted to a claim or a
4  possible claim against NurSelect?
5    A.   No.
6    Q.   When you eventually became
7  aware of the January 12th, 2023, email, was
8  there any electronic receipt associated
9  with that email?  Was there any notice that
10  was accompanying that saying that you
11  opened it?
12    A.   Not that I can tell, no.
13    Q.   I think they're called return
14  receipts?  Was there any return receipt
15  with it to your knowledge?
16    A.   No.  I didn't have to do
17  anything.  I just opened it up.
18    Q.   Okay.  And are there emails
19  that you -- that will end up in your inbox
20  that you aren't even aware are there on a
21  daily basis?
22    A.   Yes.  Yes.
23    Q.   Sorry.  I'm just making sure
24  I -- all right.  I think that's all the
25  questions I have.  Thank you.

D. SHELLY

1
2    A.   Thanks.
3         MS. MORIARTY:  All right.  If
4  you wouldn't mind -- can you hear me?
5         THE WITNESS:  Yes.
6         MS. MORIARTY:  Okay.  Sorry.
7  Can we just take two minutes and then
8  I'm just going to review my notes
9  briefly one more time, if that's all
10  right.
11         THE WITNESS:  That's fine with
12  me.  Yup.
13         MS. MORIARTY:  All right.
14         (Whereupon, a short recess was
15  taken.)
16  EXAMINATION BY
17  MS. MORIARTY:
18    Q.   Just another few questions for
19  you, Mr. Shelly.  I'm gong to share my
20  screen again.  Okay.  Here we go.  All
21  right.  So I pulled back up, I believe this
22  is Exhibit 2.  And we have PDF page -- I
23  think PDF page three.  Statement of Ayanna
24  McDowell.
25         And as we said, you received

D. SHELLY

1
2  this on May 12th of 2021, right?
3    A.   Yes.
4    Q.   And you did, in fact, read this
5  on May 12th of 2021?
6    A.   Most likely.  I don't recall.
7    Q.   Or shortly thereafter, but you
8  didn't --
9    A.   Yes, yes, yes.
10    Q.   Okay.  So we're just going to
11  go through briefly.  And I'll start at the
12  last sentence:  And then I've seen she was
13  bleeding and told the supervisor.
14         So you knew that there was a
15  patient who was injured to the point of
16  bleeding, right?
17    A.   Yes.
18    Q.   And did you -- you also knew
19  that this patient was elderly, right?
20    A.   She was in a nursing home so,
21  yes.
22    Q.   So you assumed at that point
23  that we were dealing with an elderly -- an
24  elderly patient?
25    A.   Yes.

17 (Pages 62 - 65)

Page 66

```
1           D. SHELLY
2      Q.   And you did also know that
3  Ayanna McDowell was a NurSelect employee,
4  right?
5      A.   Yes.
6      Q.   And then upon reading this
7  statement, you also knew that Ayanna had
8  left Ms. Wiggins alone, right?
9      A.   I had known that she was sent
10 away by the nurse.
11     Q.   So you had known that
12 Ms. McDowell had left the room which
13 Geraldine Wiggins was in?
14     A.   Yes.
15     Q.   And then Ms. Wiggins was
16 injured to the point of bleeding after
17 that?
18     A.   Yes.
19     Q.   And yet as you sit here today,
20 you did not think upon reading this
21 statement that there was any chance that
22 this could result in any liability for
23 NurSelect, right?
24     A.   That's correct.
25          MR. KASTER:  Objection.  Asked
```

Page 67

```
1           D. SHELLY
2  and answered.
3          MS. MORIARTY:  All right.  I
4  don't think I have anything else, and
5  so with that, I think we can wrap it
6  up.  Thank you, again, Mr. Shelly.
7          THE WITNESS:  Thank you.
8          MS. MORIARTY:  And have a good
9  day everybody.
10         MR. KASTER:  I'll order an
11 email copy only if possible.
12         (Whereupon, at 10:40 a.m. the
13 Examination of this witness was
14 concluded.)
15
16        ∘    ∘    ∘    ∘
17
18
19
20
21
22
23
24
25
```

Page 68

```
1
2        E X H I B I T S
3
4  PLAINTIFF'S EXHIBITS
5
6  EXHIBIT EXHIBIT                PAGE
7  NUMBER  DESCRIPTION
8  1     Fourth Amended Complaint      4
9        and Joinder Complaint
10 2     Emails produced by          26
11       NurSelect
12 3     Supplemental staffing       35
13       agreement
14 4     Email                       38
15 5     Email from Anthony Viola      42
16 6     Letter dated January 12,     46
17       2023,
18 7     Insurance policy            55
19 8     Policy application          56
20
21
22
23
24
25
```

Page 69

```
1
2        I N D E X
3
4  EXAMINATION BY                 PAGE
5  MS. MORIARTY                    3
6  MR. KASTER                     61
7  MS. MORIARTY                   64
8
9
10 INFORMATION AND/OR DOCUMENTS REQUESTED
11
12 INFORMATION AND/OR DOCUMENTS       PAGE
13 NONE
14
15    QUESTIONS MARKED FOR RULINGS
16
17 QUESTION          PAGE   LINE
18 NONE
19
20
21
22
23
24
25
```

18 (Pages 66 - 69)

Page 70

1
2        C E R T I F I C A T E
3
4  STATE OF NEW YORK      )
                   : SS.:
5  COUNTY OF SUFFOLK      )
6
7
8        I, NICOLE VELTRI, RPR, CRR, a Notary
9  Public for and within the State of New
10  York, do hereby certify:
11        That the witness whose examination is
12  hereinbefore set forth was duly sworn and
13  that such examination is a true record of
14  the testimony given by that witness.
15        I further certify that I am not
16  related to any of the parties to this
17  action by blood or by marriage and that I
18  am in no way interested in the outcome of
19  this matter.
20        IN WITNESS WHEREOF, I have hereunto
21  set my hand this 20th day of November 2024.
22
23

24        NICOLE VELTRI, RPR, CRR
25

19 (Page 70)

Landmark v. Nurselect MSJ_00000387

**[& - absolutely]**                                                                                          Page 1

| **&** |
| --- |
| **&**   2:4,8 43:2 |

| **0** |
| --- |
| **01412**   1:6 |

| **1** |
| --- |
| **1**   4:24 5:2 |
| 18:12,20,21 |
| 68:8 |
| **1/26/2023** |
| 57:15,19 60:15 |
| **10**   19:12 |
| **10/19**   27:24 |
| **105**   2:9 |
| **10595**   2:5 |
| **10:40**   67:12 |
| **10th**   16:2 |
| **11**   35:24,24 |
| 59:19 |
| **12**   18:23 21:11 |
| 25:21 37:22 |
| 39:2,7,11,14 |
| 43:10 46:15,19 |
| 49:7 50:12 |
| 53:17,20,24 |
| 54:6,7 57:3,21 |
| 60:20 62:7,11 |
| 62:20 68:16 |
| **12th**   12:22 15:3 |
| 20:9 25:19 |
| 26:25 35:20 |
| 62:15 63:7 |
| 65:2,5 |

| **13**   14:14 48:19 |
| --- |
| **14**   25:15 34:22 |
| **14th**   28:16 |
| **16**   57:2 |
| **17110**   2:10 |
| **17601**   14:5 |
| **1829**   14:13 |
| 48:18 |
| **19540**   3:13 |
| **19607**   14:14 |
| **19900**   70:23 |
| **19th**   15:17,18 |
| 16:3 24:11 |
| 28:3 |
| **1st**   2:5 |

| **2** |
| --- |
| **2**   25:3 26:9,11 |
| 64:22 68:10 |
| **20**   1:10 25:16 |
| **200**   2:5 |
| **2008**   59:19 |
| **201**   14:4 |
| **2019**   59:9,19 |
| **202**   14:4,4,4 |
| **2020**   9:13 |
| 59:12 |
| **2021**   18:23 |
| 20:9 21:12,24 |
| 22:3 25:19,21 |
| 26:25 27:4 |
| 35:20 65:2,5 |
| **2022**   16:2,3 |
| 25:15,16 28:5 |

| 34:22 |
| --- |
| **2023**   12:22 |
| 15:3 37:22 |
| 39:2,7,11,14 |
| 42:7 43:10 |
| 46:15,19 49:7 |
| 50:13 53:17,20 |
| 53:24 54:6,7 |
| 57:21 60:20,22 |
| 62:7,11,15,20 |
| 63:7 68:17 |
| **2024**   1:10 |
| 70:21 |
| **20th**   70:21 |
| **25**   18:21 |
| **255**   14:3 |
| **2578**   2:9 |
| **26**   60:22 68:10 |

| **3** |
| --- |
| **3**   35:8,10 68:12 |
| 69:5 |
| **3/1/2023**   55:19 |
| **3/1/2024**   55:19 |
| **35**   68:12 |
| **38**   68:14 |

| **4** |
| --- |
| **4**   38:7,9 68:8 |
| 68:14 |
| **42**   68:15 |
| **46**   68:16 |

| **5** |
| --- |
| **5**   36:17 41:23 |
| 42:2,7,18 |
| 53:19 68:15 |
| **50**   41:6 |
| **53**   18:22 |
| **55**   68:18 |
| **56**   68:19 |
| **5:24**   1:6 |

| **6** |
| --- |
| **6**   46:13,15 |
| 68:16 |
| **61**   69:6 |
| **630**   47:14 |
| **64**   69:7 |
| **640**   47:6 |

| **7** |
| --- |
| **7**   54:25 55:2,4 |
| 68:18 |

| **8** |
| --- |
| **8**   56:4,7 60:9 |
| 60:10 68:19 |
| **815**   3:12 |

| **9** |
| --- |
| **9:06**   1:11 |

| **a** |
| --- |
| **a.m.**   1:11 67:12 |
| **ability**   5:13 |
| 6:18 |
| **absolutely**   31:8 |

Landmark v. Nurselect MSJ_00000388

accepted 50:22
accompanying
  63:10
account 16:17
accurately 5:21
acquire 32:8
action 1:5 4:6,7
  4:10,10,20
  12:14 14:24
  15:2,5 18:3,9
  28:8 34:21
  37:18 56:13
  70:17
actions 23:25
actually 8:6
  18:6 36:7
  38:19 41:4,20
  45:22 48:12
  49:18,24 54:5
  59:10
additional 31:4
  32:17
address 3:11
  13:25 14:13
  25:6 38:16
  43:4 44:7
  46:24,25 47:5
  47:13,21,21,25
  48:4,5,7,15,16
  48:24 49:2
addressed
  46:19,22
addresses
  14:16

administrator
  15:20 16:12
administratrix
  3:25 38:2
agency 13:10
  13:12,16,20
  59:14,18,23,24
  60:2
agreed 6:15
agreement 35:6
  35:10,14,18
  36:3,11,16
  52:9 58:13
  59:4 68:13
ahead 4:19
  7:25
aide 33:8
al 4:4 38:5
allegation 18:9
allegations
  19:17
alleged 52:6
alter 5:13
amend 8:6
amended 4:22
  5:2 68:8
american 1:3
  3:19
amounted 63:3
answer 5:14
  20:24 34:2
  43:20 54:10
answered 59:7
  67:2

answering 6:11
  57:7
answers 5:18
anthony 42:2,6
  43:14 68:15
anybody 21:23
  33:24
appeared 33:6
applicant 57:5
application
  55:25 56:5,7
  56:12,22,23
  60:11,14,22
  68:19
applying 55:21
apportionment
  36:17
approximately
  23:13
article 36:17
asked 21:18
  33:24,25 34:16
  51:12,13,13,20
  66:25
asking 3:21
  15:22 28:21
  36:12
aspects 10:3
assigned 26:24
assistant 26:19
associated 63:8
assume 61:13
assumed 17:21
  65:22

attached 20:16
attachment
  49:9 60:19
attempted 19:5
attention 18:22
  42:23 44:4
  45:12 55:18
attorney 7:9,16
  7:20 15:21
  16:19 17:12,19
  24:12 52:22
  60:19
attorneys 2:4,9
  15:10 19:18
  43:3 52:13
audio 34:23
avenue 14:3,13
aware 14:25
  15:5 17:24
  18:5,8 19:16
  20:5 22:5 24:8
  24:21 28:9
  32:5 33:2,16
  34:11,13,15,18
  35:14 36:6,19
  50:16,17 52:12
  53:3,8,13 62:9
  63:7,20
ayanna 16:15
  19:13 23:16
  25:5,18,25
  26:15,16 32:18
  34:9 51:15,18
  52:4,7 62:25

Landmark v. Nurselect MSJ_00000389

64:23 66:3,7
**ayanna's**  15:22
  16:19 20:15
  21:21

**b**

**b**  68:2
**back**  14:23
  19:10 20:8,9
  30:4 32:14
  33:9 44:4 60:7
  60:10,17 64:21
**backtrack**  18:6
  38:19 43:13
  53:5 57:18
**backtracking**
  54:2,12
**backwards**
  19:7
**balance**  19:6
**bar**  42:21
**base**  19:7
**based**  37:6
**basic**  5:9,9
**basically**  11:2
**basis**  63:21
**bates**  55:17
**bathroom**  19:3
**bear**  18:14 39:4
  41:2 54:22
**bedside**  19:8
**believe**  43:19
  53:19 54:3,24
  59:11 63:3

64:21
**best**  6:3
**billing**  10:16
**bit**  10:9 18:7
  38:20 39:15
  43:14 45:16
  54:2,12
**bleeding**  33:13
  65:13,16 66:16
**blood**  19:4
  33:12 70:17
**body**  42:19
**borgeest**  2:4
**bottom**  35:23
  57:12
**boy**  15:16
**brand**  45:4
**break**  6:9,12
  41:10
**brenda**  3:24
  37:25
**brethren**  4:3,10
  12:15 15:20
  16:12 17:13,16
  17:18 19:17
  22:14,16,19,21
  23:10 26:25
  32:21 34:12
  36:4,23 38:4
  52:10,13,18,23
  53:2,9 58:9,21
  59:2 62:14,19
**briefly**  8:8 9:16
  9:23 54:24

59:22 64:9
  65:11
**bring**  32:14
**broker**  10:24
  11:5
**brought**  36:11
**brushing**  19:2
**bryon**  2:10
  12:5
**bunch**  54:18
**business**  47:6
  47:14 58:8
**butler**  14:3

**c**

**c**  2:2 70:2,2
**call**  31:23 51:2
  58:17
**called**  3:2 13:9
  49:17,19,20
  63:13
**calls**  10:19
  53:22
**cancelled**  48:8
  48:12
**care**  11:4 13:10
  19:3,13 33:16
  33:21 34:4
  60:2,2
**cart**  29:24 30:4
**case**  10:21 25:2
  55:16
**catch**  8:15
  11:15 61:7

**cced**  37:24
  42:11
**center**  4:3 38:4
  47:6,14
**certified**  26:18
**certify**  70:10,15
**chain**  25:14
**chance**  66:21
**charged**  22:18
**chief**  13:13
**chilcote**  2:8
**civil**  1:5
**claim**  3:22
  10:21 11:6
  57:4 63:3,4
**claims**  10:23
  62:19
**clarification**
  30:2
**clarify**  7:15
  12:12 15:4
  21:5 45:16
  50:9 54:5
  58:20 60:12
**click**  18:14
**clicked**  39:23
  57:6
**client**  20:4
**cna**  15:23 19:2
  19:13 52:4,8
  58:17
**cnas**  9:18
**collectively**
  4:23 26:9

Landmark v. Nurselect MSJ_00000390

| | | | |
|---|---|---|---|
| **communicati...** 34:20 53:22,23 | **contained** 60:19 | **corresponden...** 36:9 | 27:1 28:1 29:1 30:1 31:1 32:1 |
| **company** 1:3 3:19 8:8,11 9:12,14 10:2,3 13:9,18 20:25 31:9 | **contents** 45:10 **context** 29:6 **contract** 9:19 48:9,13 **contractual** 52:9 | **counsel** 3:18 52:23 **county** 70:5 **couple** 60:12 **course** 13:4 **court** 1:2 5:20 | 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 |
| **complaint** 4:22 4:23 5:2,3 11:13 12:4,9 12:10,13 19:11 40:4,10,11,15 40:17 68:8,9 | **conversation** 27:22 **conversations** 29:6,12 **converted** 37:15 | 41:23 **cover** 40:16 43:9 **covid** 48:10 **credential** 8:13 8:17 | 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 69:2 |
| **complaints** 4:19 | **coordinator** 21:8 23:7 | **crossed** 52:25 **crr** 1:18 70:8 | **daily** 63:21 **damaged** 30:4 |
| **completely** 45:5 | **copy** 15:22 16:19 17:23 | 70:24 **cs7022807** 1:25 | 30:6 **damages** 30:9 |
| **computer** 8:24 11:20 29:23,25 30:3,5,7 | 26:4,6 30:25 33:25 40:21 55:15 67:11 | **current** 31:8 56:13 **currently** 9:2 | 36:18 **date** 1:10 5:4 26:13,22 35:12 |
| **concern** 36:22 **concluded** 67:14 | **correct** 16:9 21:14,14 22:20 30:12 38:16 | 48:15 **cut** 34:24 59:21 **cv** 1:6 | 38:10 42:3 46:17 55:5 56:8 57:17 |
| **conducted** 49:25 | 46:25 49:10,14 50:11 53:15 | **d** | 59:4 60:20 **dated** 25:15,19 |
| **confirmations** 54:19 | 55:15 57:16,22 61:5 62:11,12 | **d** 3:1,2,2 4:1 5:1 6:1 7:1 8:1 | 42:7 46:15,19 53:19 57:15,21 |
| **confirming** 52:7 | 62:16,17,21,23 66:24 | 9:1 10:1 11:1 12:1 13:1 14:1 | 60:13,14 68:16 **dates** 34:22 |
| **connection** 3:22 | **correctly** 44:25 **corresponden...** | 15:1 16:1 17:1 18:1 19:1 20:1 | **dave** 41:10 **david** 1:16 3:10 |
| **contact** 22:14 22:15,16,22 | 40:11,16 43:10 | 21:1 22:1 23:1 24:1 25:1 26:1 | 25:5 37:22 43:4 44:7 |

Landmark v. Nurselect MSJ_00000391

| | | | |
|---|---|---|---|
| **day**  10:12<br>14:21 20:14<br>61:19 67:9<br>70:21<br>**dealing**  65:23<br>**defendant**  1:8<br>1:15 2:9 4:9<br>**define**  61:3<br>**definitely**  44:22<br>45:13<br>**depends**  32:12<br>**deposed**  5:6<br>**deposition**  1:14<br>7:7,13,21 8:2<br>**describe**  9:16<br>9:24 10:11,22<br>58:8 59:22<br>**description**<br>68:7<br>**detail**  26:15<br>**dickie**  2:8<br>**different**  6:24<br>11:13 12:4,8<br>29:20 30:9<br>59:14<br>**direct**  18:21<br>22:14,15,16<br>52:6 55:18<br>**directing**  44:4<br>**directly**  16:14<br>43:17 51:8<br>**disappeared**<br>60:6 | **discover**  45:8<br>45:21<br>**discovered**<br>43:11<br>**discussing**  36:8<br>**discussions**<br>44:17<br>**district**  1:2,2<br>**document**  6:20<br>6:21,23 24:17<br>35:3 55:6,10<br>56:9<br>**documented**<br>18:23<br>**documents**<br>6:17,18 8:5,21<br>69:10,12<br>**doing**  5:19<br>**drawn**  45:12<br>**drive**  2:5,9 47:6<br>**dropped**  11:13<br>**due**  36:24<br>**duly**  3:3 70:12<br>**duties**  10:13<br><br>**e**<br><br>**e**  2:2,2 3:2 4:2<br>17:3 20:20<br>68:2 69:2 70:2<br>70:2<br>**earlier**  48:21<br>**eastern**  1:2<br>**easy**  5:22 | **effect**  35:19<br>**either**  22:11<br>28:2 59:11<br>**elaborate**  12:7<br>39:9<br>**elderly**  65:19<br>65:23,24<br>**electronic**  63:8<br>**email**  6:15<br>15:19 16:17<br>20:14 21:11,16<br>24:10,25 25:4<br>25:9,10,13,17<br>25:22 26:5<br>27:8,14,18,25<br>28:17 34:22<br>37:17,20 38:9<br>38:12,14,15,16<br>38:19,21,25<br>39:6,10,22<br>41:17 42:2,5<br>42:15,19,25<br>43:4,5,12,25<br>44:7,8,9,10,13<br>44:18,19,23<br>45:2,4,5,13,14<br>45:23,25 46:2<br>46:3,20 49:9<br>49:13 53:18,22<br>54:13,15 57:20<br>60:18,23 61:4<br>62:5,9 63:7,9<br>67:11 68:14,15 | **emails**  7:9 24:6<br>24:20 25:14<br>26:11 28:7,11<br>28:18 37:12<br>39:18 45:17,19<br>46:8 50:2<br>63:18 68:10<br>**employed**  9:3<br>52:4<br>**employee**  19:21<br>19:25 20:13<br>30:11,13 52:8<br>66:3<br>**employee's**<br>40:8<br>**employees**  7:25<br>43:15 50:24<br>51:14,17<br>**en**  49:24 50:4<br>51:11,12<br>**entail**  10:13<br>**entire**  4:7<br>**especially**  5:16<br>**esq**  2:6,6,10<br>**estate**  4:2 15:9<br>15:10 38:3<br>53:10<br>**et**  4:4 38:5<br>**eventually**  63:6<br>**everybody**<br>18:16 39:17<br>67:9<br>**examination**<br>3:6 61:24 |

Landmark v. Nurselect MSJ_00000392

64:16 67:13
69:4 70:11,13
**examined** 3:5
**exchanged** 28:7
**excuse** 18:7
57:17
**exhibit** 4:24,25
18:12,20,21
25:3 26:9,10
35:8,9 38:7,8
41:22,23,25
42:18 46:13,14
53:19 54:25
55:2,3 56:4,6
60:9,10 64:22
68:6,6
**exhibits** 68:4
**existence** 62:10
**experience**
11:12,23 13:15
**extent** 33:3

**f**

**f** 70:2
**facility** 30:25
32:8,10 34:8
58:22
**fact** 17:5 43:7
61:12 65:4
**fall** 19:14 52:6
**fallen** 33:9,10
**far** 27:19
**farther** 25:17

**fast** 6:4
**fastened** 29:23
**feedback** 10:9
**feel** 4:16 6:9,22
6:24
**figured** 48:10
**file** 21:20,21
**filed** 12:6
**files** 34:7
**fill** 58:16
**filled** 55:24
**find** 23:20
39:13,18
**fine** 31:12 41:9
64:11
**finish** 6:11
**firm** 58:12
**firms** 57:5
**first** 3:3 5:12
9:10 14:25
38:24 45:20
49:5,13 52:2
53:12 54:20
59:5
**five** 19:10
23:17 41:7
**flipping** 60:17
**floor** 2:5 30:4
47:6
**folder** 24:22
**follow** 61:22
**following** 18:24
**follows** 3:5

**forget** 5:22
**forgive** 59:6
**forgot** 27:25
**form** 61:2
**formed** 59:9
**forth** 70:12
**forward** 24:4
**forwarded** 24:9
24:12 48:2,14
48:17
**forwards** 24:15
**found** 28:13,14
33:10 50:20
54:14
**founded** 9:14
**founding** 13:8
**fourth** 4:21 5:2
68:8
**free** 4:16 6:9,22
6:24
**freedom** 47:14
**frequently**
29:19
**front** 8:5,21
**function** 6:16
**further** 70:15

**g**

**generally** 31:7
31:14,20 32:5
43:22
**gentlemen** 11:2
**geraldine** 4:2
15:9 38:3

66:13
**getting** 10:8
**gilbride** 2:6
3:18 10:4 42:8
**give** 5:18
**given** 28:18
70:14
**go** 4:18 5:8
18:15,24 20:8
20:9 35:4
37:12 60:7,8
64:20 65:11
**going** 7:22
14:23 19:10
20:8,9 24:16
24:16 35:3,22
36:15 37:11
41:2,5,9,14,14
41:16 42:20
46:10 50:17,19
51:23 54:23
56:3,15 57:25
60:5 64:8
65:10
**gong** 64:19
**good** 3:14,14
3:16 41:11,12
58:3 67:8
**great** 41:24
**ground** 5:10
**guess** 12:5
58:15
**guys** 28:19

Landmark v. Nurselect MSJ_00000393

| h | | | |
|---|---|---|---|
| **h** 3:2,13 17:3 68:2 | **highlighting** 51:24 | **ignore** 37:16 41:17 44:9 | 36:24 |
| **hand** 26:22 70:21 | **hire** 9:18 | **ignored** 44:14 | **injury** 20:11 21:24 22:4 |
| **handled** 10:23 11:11,22 | **hiring** 10:15 | **important** 5:17 | 24:2 30:19,20 30:23 31:15 |
| **happened** 20:11 32:10 | **hit** 19:7 30:4 | **inbox** 38:22,22 60:23 61:5 | 33:3 |
| **hard** 10:5 | **hmm** 13:6 16:6 46:21 | 62:8 63:19 | **insurance** 1:3 3:19,21 10:21 |
| **harrisburg** 2:10 | **holes** 58:14,14 58:16 | **incident** 15:24 31:2,14,16 | 10:22 31:9 42:6 43:16 |
| **head** 5:19,24 19:7 | **holland** 14:13 48:18 | 32:8,15 33:25 34:7,12,16 | 49:17 55:4,7 55:15,21,25 |
| **hear** 5:21 6:6 10:5 19:22 64:4 | **home** 13:10 15:19 16:11 22:9,11 45:17 | 35:16,19 39:19 54:16 | 56:12,24 68:18 |
| **heard** 29:12 | 58:21 60:2,2 65:20 | **included** 43:9 | **insured** 43:7 |
| **held** 1:17 | **homes** 9:19 34:5 | **includes** 4:21 | **interested** 70:18 |
| **help** 6:21 9:21 10:14,15,15,16 10:17 58:16 | **honest** 52:16 | **including** 15:9 37:24 | **interstate** 2:9 |
| **helps** 8:13,17 | **hopped** 30:3 | **indemnificati...** 36:18 | **investigate** 23:25 33:20 |
| **hereinbefore** 70:12 | **horrified** 39:24 | **individually** 3:25 38:2 | **investigated** 17:22 |
| **hereunto** 70:20 | **housekeeping** 5:9 | **inform** 51:17 | **investigating** 52:14 |
| **hershey** 22:8 22:12 | **hr** 16:5,14 24:8 | **information** 16:15 23:21 31:21 32:2 | **investigation** 52:3 |
| **highlight** 42:21 | **human** 8:12 | 51:15 69:10,12 | **invoke** 36:23 |
| **highlighted** 42:24 44:5 52:2 | **hump** 29:24 | **informed** 33:13 | **involved** 15:23 55:20 |
| | **i** | **informing** 15:21 16:18 | **involvement** 24:2 52:6,14 |
| | **identification** 5:4 26:12 35:11 38:9 42:3 46:16 55:5 56:8 | **injured** 20:6 31:23 32:6 65:15 66:16 | **issue** 11:6 55:16 56:13 |
| | | **injuries** 30:10 30:11,13,14,16 | **issues** 19:5 31:17 |

Landmark v. Nurselect MSJ_00000394

| j |
|---|

**january** 37:22
43:10 46:15,19
53:17,20,24
54:6 57:21
60:20,22 62:7
63:7 68:16
**jason** 11:3
**jenny** 22:25
**jmg** 1:6
**joan** 2:6 42:8
**job** 1:25
**joinder** 4:8,22
5:3 19:11 68:9
**jotted** 27:23

| k |
|---|

**kas** 25:7
**kaster** 2:10
3:15 4:21 7:10
7:15,22 24:20
41:9 55:13
60:25 61:21,25
66:25 67:10
69:6
**kaufman** 2:4
**keep** 14:19,20
37:9 41:14,14
**kept** 21:19
**kimberly** 17:9
17:15 27:8,9
27:13,20 37:24
**kind** 31:11 32:9
53:23

**king** 38:2 47:7
47:10,12,21
**knew** 65:14,18
66:7
**knocked** 29:25
**know** 3:17 5:22
5:23 6:2,5,7,21
8:9 14:20
17:18 18:10
20:23,23 21:3
21:4,18 22:21
23:2,5,15,18
24:13 27:16,19
27:21 28:6,20
30:15,17 33:23
34:2 38:23
40:23 41:5,21
44:12 45:15,16
48:8 51:13
59:3 66:2
**knowledge**
62:10,13,18
63:15
**known** 45:10
66:9,11

| l |
|---|

**l** 3:2,2,24 17:3
17:3 20:20,20
37:25
**lag** 11:19
**lake** 2:5
**lancaster** 12:11
12:18 13:23

14:4 50:7,9,25
**land9** 55:17
**landmark** 1:3
3:19,20 12:6
13:2 42:10
**law** 43:3
**lawsuit** 3:23,23
11:25 12:24
13:3,5,17,19
17:25 29:3
43:8 62:14
**lawsuits** 11:10
11:22 13:16
**lawyer** 16:22
**leave** 47:24
48:6
**left** 19:3 66:8
66:12
**legal** 52:23
**letter** 40:16,21
43:9 46:12,15
46:18 47:5,16
49:3,6,9,12,16
49:21,22 51:23
51:25 53:16
60:20 68:16
**letting** 41:21
42:20
**liability** 36:18
55:7 56:24
57:3 66:22
**liberty** 10:25
11:7,8 42:6,12
43:16,22 44:17

49:17,19
**likely** 20:13
65:6
**linda** 42:25
43:6 44:8
49:10
**lindaridenba...**
37:21
**line** 6:8 25:5
37:25 42:13
45:19 69:17
**list** 45:18
**little** 10:4,8
33:11
**llc** 1:7,15 4:4
52:5
**llp** 2:4
**location** 22:7
**long** 59:17
**longer** 20:24
58:3
**look** 6:18,19
**looking** 33:6
**looks** 25:15
45:25
**lori** 15:19 16:8
16:10,13,18
27:24 28:6
29:7
**lost** 19:6
**lpns** 9:18

Landmark v. Nurselect MSJ_00000395

| m | | | |
|---|---|---|---|
| **m**  3:13 | **matters**  8:9 | **minute**  54:23 | **name**  3:8 16:8 |
| **made**  3:22 57:4 | **mccamey**  2:8 | **minutes**  41:6 | 17:2 20:19 |
| **mail**  47:16,18 | **mcdowell** | 64:7 | 22:25 37:14,16 |
| 48:2,3,13 | 19:13 25:5,18 | **miscellaneous** | 40:8 41:18 |
| **make**  16:20 | 28:21 52:4,7 | 56:23 | 44:14 45:11 |
| 44:24 58:19 | 52:11,15 62:25 | **missed**  44:20 | **named**  4:9 |
| 62:2 | 64:24 66:3,12 | 45:2 | 12:24 13:20 |
| **making**  63:23 | **mcdowell's** | **missy**  20:19,24 | 15:6,13 |
| **manager**  20:15 | 23:25 26:16 | 21:2 22:7 | **necessary** |
| 20:18 | 32:18 | **missy's**  21:6 | 32:22 |
| **march**  59:9,11 | **mean**  12:3,8 | **mistake**  51:24 | **need**  6:5,8,25 |
| **marissa**  15:18 | 17:20 27:23 | **mm**  13:6 16:6 | 9:22 41:10 |
| 16:20,23 27:19 | 28:15,17 29:8 | 46:21 | **needed**  28:24 |
| 27:24 28:6 | 30:15,17 33:5 | **mohnton**  3:12 | **never**  44:15 |
| 29:5 | 45:7,9 52:24 | **moment**  41:3 | **new**  1:19 2:5 |
| **marissa's**  16:17 | 54:17 57:9 | 60:7 | 3:4 14:13 45:4 |
| **mark**  4:19 25:3 | **med**  29:23 30:3 | **months**  57:3 | 48:18 70:4,9 |
| 35:8 38:6 | **medical**  23:14 | **moriarty**  2:6 | **nicole**  1:17 70:8 |
| 41:19 42:18 | 56:24 | 3:7 7:17 10:6 | 70:24 |
| 46:12 54:25 | **medication** | 41:4,13,19,24 | **nine**  59:20,20 |
| **marked**  4:24 | 5:13 | 42:4 57:23 | **nod**  5:24 |
| 5:3 18:12 | **meet**  52:11 | 61:23 62:22 | **nods**  5:19 |
| 26:12 35:11,24 | **melissa**  25:18 | 64:3,6,13,17 | **notary**  1:18 3:4 |
| 38:9 42:2 | **member**  31:24 | 67:3,8 69:5,7 | 70:8 |
| 46:16 55:4 | **mentioned**  12:5 | **morning**  3:14 | **note**  18:23 |
| 56:7 69:15 | 13:22 14:24 | 3:15,16 | **notes**  57:25 |
| **marketing** | 16:4 33:12 | **move**  23:22 | 64:8 |
| 10:15 | 54:3,4,12 | 24:14 | **notice**  61:10 |
| **marriage**  70:17 | 59:14 | **moving**  14:19 | 63:9 |
| **matter**  43:6 | **met**  7:23 | 37:10 | **notices**  11:10 |
| 70:19 | **mind**  41:21 | | 11:21 |
| | 52:25 61:8 | **n** | **notified**  20:3 |
| | 64:4 | **n**  2:2 3:13,13 | 20:10 51:11 |
| | | 15:24,24 69:2 | |

Landmark v. Nurselect MSJ_00000396

**november** 1:10
70:21
**number** 18:22
41:22 57:2
68:7
**nurse** 9:20,21
29:24 32:2
58:15 66:10
**nurselect** 1:7
1:15 3:22 4:4,8
7:25 9:5,8,17
9:25 10:12,23
11:11,22 12:15
12:20,24 13:8
13:23 14:7,15
15:6 16:14
20:10,21 21:6
22:3 23:10,24
24:9 25:2
26:11,21,21,24
27:17 28:10,14
29:16 31:13,20
31:24 32:4,5
33:20 34:6,16
35:7 36:4
37:23 42:14
46:22,24 47:3
47:9,12,15,20
47:24 48:6
50:23 52:5,8
52:10 53:13
55:22 58:10,25
59:8,15,25
62:20 63:4

66:3,23 68:11
**nurses** 8:14,18
21:9 22:19
23:13
**nursing** 9:19
15:19 16:11
26:18 29:17
34:4 58:21
65:20

**o**

**o** 3:13,13
**objection** 60:25
62:22 66:25
**obviously**
10:20 27:25
39:15,23 40:7
45:9 46:2
54:19
**occurred** 27:22
**october** 15:17
15:18 16:2,3
24:11,14,15
25:15,16 28:3
28:16 34:22
42:7
**octoberish**
15:17
**offhand** 59:3
**office** 11:13
12:4,8,11,18
13:24 14:2,11
22:8,11,12
40:19 47:3,10

50:6,7,9,25
52:10
**officer** 13:14
**offices** 14:7,16
**oh** 8:19 9:14
10:2 13:4
15:16 26:23
31:12 40:23
44:22 48:20
**okay** 4:14 8:19
8:25 10:11
11:8,21 12:2
12:17,23 14:9
14:18 15:14
16:4,7,13,21,23
17:2,14,24
18:5,19 20:2,8
20:17 22:18
23:8,19 24:16
24:18 25:20
26:23 27:6
29:11 35:4
37:12 38:18
40:25 41:13,16
41:18,24 42:19
42:22 43:24
44:16 46:7
47:18 49:5
50:8,22 51:2
51:22,25 53:3
54:9,10,22,23
60:4,7,8 63:18
64:6,20 65:10

**ongoing** 29:3
53:9
**open** 43:5 44:8
46:2,2,7
**opened** 22:10
45:13,18 46:4
46:5 48:10
49:13 63:11,17
**opening** 39:7
45:22
**operating**
13:13
**order** 67:10
**outcome** 70:18
**outgoing** 16:17
**owner** 13:13

**p**

**p** 2:2,2
**page** 18:21
19:10 25:17
27:7 35:24,24
36:16 37:19
56:16,17,18
64:22,23 68:6
69:4,12,17
**panic** 39:16
**paragraph**
18:22 19:12
52:3 57:13
**paralegal** 43:2
**part** 6:20 8:7
56:22

Landmark v. Nurselect MSJ_00000397

particular 6:20
6:21 11:24
39:19
parties 1:17
6:14 70:16
party 4:9 12:25
13:20
past 57:2
patient 18:25
19:4,5 30:14
30:16,19,20,23
31:15,23 32:6
33:16 65:15,19
65:24
payroll 10:17
pc 2:8
pdf 18:20 19:10
25:17 27:7
35:23 37:15,19
56:16,17,17,17
64:22,23
pending 6:10
62:14
pennsylvania
1:2 2:10 3:13
10:25 47:7
people 37:24
perform 28:10
40:2
period 55:19
person 51:19
personal 52:22
phone 27:20
31:23 36:12

53:22
physical 40:21
48:4,5,7
physically
40:18
pick 49:25
picture 30:6
pittsburgh
10:25
place 54:20
plaintiff 1:4 2:4
plaintiff's 4:25
26:10 35:9
38:8 41:25
46:14 55:3
56:6 68:4
plan 33:16,21
please 3:8
point 15:12
17:25 18:6
19:20,24 21:17
31:6,7 36:17
41:7 43:18
49:3 50:25
51:21 53:4,4
57:24 65:15,22
66:16
policy 55:4,15
55:19,21 56:5
56:7,12,13
60:10,22 68:18
68:19
popped 39:22

portion 42:24
44:5 52:2
portions 6:24
possible 63:4
67:11
predecessor
57:5
preparation
7:20
prepare 7:6,12
8:2
present 61:4,12
61:13 62:8
president 9:7
9:25 10:12
pretty 11:4
previously 6:15
prior 13:7
27:14,18 31:10
39:7 51:9 53:7
pro 13:10
probably 3:17
produced 25:2
26:11 68:10
professional
55:7 56:24
57:3
progress 18:23
provide 13:25
provided 34:4
60:2
provision 36:20
36:24

prussia 47:7,10
47:13,21
public 1:18 3:4
70:9
published
28:18
pull 18:10
23:20 24:17
35:3 37:11
41:2,16 54:24
56:4 57:21
60:5
pulled 33:7
64:21
pulling 18:11
18:13 24:19,21
35:5 42:4
53:18 60:9,10
put 21:19,21
48:20

**q**

question 6:3,10
11:17 19:15
31:11 32:3
40:13 57:2,8
61:2 69:17
questions 3:21
4:15 5:14
61:22 63:25
64:18 69:15
quickly 55:9
quinn 3:24

Landmark v. Nurselect MSJ_00000398

| r | receipt 63:8,14 | refer 3:20 4:5,7 | remind 5:23 |
|---|---|---|---|
| **r** 2:2 20:20 70:2 | **receipts** 63:14 | 35:7 48:23 | **renewal** 56:23 |
| **ran** 54:3 | **receive** 29:17 | **reference** 30:19 | **repeat** 8:16 |
| **reach** 15:10 | 30:22 34:19 | **referencing** | 11:17 31:10 |
| 21:23 22:2 | 47:16 49:3 | 43:9 | 40:12 |
| 30:24 32:7 | 53:21 | **referring** 4:6,8 | **repeating** 61:8 |
| 58:16 | **received** 20:12 | 4:15 12:13 | **rephrase** 6:4 |
| **reached** 15:21 | 20:13 21:10 | 24:15 25:23 | 29:14 31:19 |
| 16:14,19 19:18 | 29:22 30:8,18 | 27:10 45:22 | 32:3 36:7 51:6 |
| 27:24 33:24,24 | 33:3,22 44:23 | **refrain** 5:19 | **report** 30:19,22 |
| **reaching** 31:25 | 51:19 60:23 | **refresh** 6:22 | 31:2,9,22 32:9 |
| **read** 21:17 27:3 | 61:3 64:25 | **regarding** | 34:2,7,12,16 |
| 39:10 44:5 | **receiving** 21:15 | 10:21 21:24 | **reporter** 5:20 |
| 49:6,12,20,22 | 31:14,21 32:17 | 28:7 30:9,22 | 30:2 41:23 |
| 51:17,20 57:20 | 44:13 51:3 | 44:17,19 54:16 | **reports** 31:4,15 |
| 63:2 65:4 | **recently** 48:14 | **regardless** 62:4 | 31:17 |
| **reading** 14:12 | **recess** 58:5 | 62:7 | **represent** |
| 14:14 43:25 | 64:14 | **regular** 38:22 | 42:10 55:12 |
| 48:19,24 49:2 | **recliner** 19:6 | 47:18 | **representation** |
| 49:15,23 50:6 | **recognize** 25:8 | **regus** 48:9,11 | 57:13 |
| 62:25 66:6,20 | 42:15 44:11 | **rehabilitation** | **representing** |
| **reads** 42:24 | 55:10 56:9,11 | 4:3 38:4 | 17:15 |
| **reason** 32:16 | **recognized** | **reidenbaugh** | **request** 9:20 |
| 37:4 46:5 | 45:11 | 43:2,6 44:8 | **requested** |
| **reasons** 29:20 | **recognizing** | 49:10 62:6 | 69:10 |
| 29:21 | 43:3 44:6 | **reilly** 20:19 | **resident** 33:7,9 |
| **recall** 27:15 | **recollection** | 25:18 | 33:10,11 |
| 29:11 36:10 | 6:22 | **related** 70:16 | **resources** 8:13 |
| 38:11 40:24 | **record** 3:9,24 | **relation** 32:20 | **respective** 1:16 |
| 43:24 44:12,16 | 24:21 48:21 | **relationship** | **responsibilities** |
| 44:25 54:14 | 49:8 70:13 | 52:17,19 58:9 | 9:24 |
| 57:7,9 61:6 | **recruiting** | 58:25 59:5 | **result** 66:22 |
| 65:6 | 10:16 | **relevant** 52:5 | **return** 63:13,14 |

Landmark v. Nurselect MSJ_00000399

| | | | |
|---|---|---|---|
| **revealed** 52:3 | 65:2,16,19 | 43:2 52:12,17 | **search** 39:16,17 |
| **review** 34:17 | 66:4,8,23 67:3 | 52:21,25 53:23 | 40:2,5 50:2 |
| 57:25 64:8 | **rns** 9:18 | **saxtonstump....** | 51:9,14 54:3 |
| **reviewed** 7:8 | **road** 3:12 | 37:21 | **searched** 39:17 |
| **reviewing** 31:4 | 48:18 | **saxtonstump....** | 45:5 |
| 51:10 52:9 | **role** 8:10 13:11 | 25:7 | **searches** 28:11 |
| **right** 4:14,18 | 21:6 23:4 | **saying** 63:10 | 54:13,15 |
| 5:5,8,16 6:13 | 26:17 | **says** 18:23 | **see** 18:16 25:4 |
| 7:4,11,24 8:4 | **rolling** 19:7 | 32:13 35:6 | 32:19,22 35:4 |
| 8:19,25 9:8,10 | **room** 29:9 33:8 | 37:17,20 44:6 | 37:4,13 38:18 |
| 9:23 10:18,20 | 66:12 | 57:2 | 38:24 39:3,6 |
| 12:18 13:22 | **route** 49:25 | **scan** 25:4 | 39:24 45:3,18 |
| 14:6,15,22 | 50:5,5 51:11 | **schedule** 58:14 | 45:25 46:3 |
| 15:8 16:5 | 51:12 | 58:15 | 51:14 61:9 |
| 17:10 18:8,16 | **rpr** 1:18 70:8 | **scheduling** | **seeing** 45:24 |
| 18:19 19:12 | 70:24 | 10:17 | 61:6 |
| 22:10 23:22 | **rsui** 42:9,10 | **schoener** 15:19 | **seen** 38:14,15 |
| 24:13,19 25:12 | **rules** 5:10 | 16:8,10,13,18 | 54:17 65:12 |
| 26:8,14 30:8 | **rulings** 69:15 | 29:7 | **selemba** 27:8 |
| 34:19 35:2,22 | **run** 10:2 40:6 | **screen** 6:16,19 | 27:14 28:20,23 |
| 36:15 37:7,9 | 54:13 | 18:13,17 24:18 | 29:2,7 36:8,10 |
| 37:14,16,19 | **running** 51:9 | 45:18 46:24 | 37:24 |
| 40:20,25 41:15 | **runs** 16:5 | 60:8 64:20 | **selly** 43:11 |
| 41:17 42:17,18 | **ryan** 2:4 | **scroll** 19:9,10 | **send** 9:20 |
| 44:3 46:10,11 | **s** | 25:13 27:6 | **sender** 43:4 |
| 46:18 48:16 | | 32:23 35:23 | 44:6,11 |
| 51:22 53:7 | **s** 2:2 3:2 17:3 | 36:16 37:18 | **sending** 27:14 |
| 54:11 55:16 | 68:2 | 53:17 55:8 | **sense** 58:19 |
| 56:3,15,25 | **sarah** 2:6 | 56:16,21 | **sent** 4:20 7:9 |
| 57:23 58:7,24 | **saw** 44:14,15 | **scrolling** 18:20 | 15:18 16:21 |
| 59:6,13 60:4,9 | 45:2,9 | 25:16 27:7 | 17:5,7 24:22 |
| 60:11,24 61:15 | **saxton** 17:8,9 | 37:19 42:19 | 26:6 30:5 |
| 61:15,23 63:24 | 17:11,15 27:10 | 56:25 | 37:21 42:7,25 |
| 64:3,10,13,21 | 27:18 36:8 | | 62:6 66:9 |

Landmark v. Nurselect MSJ_00000400

| | | | |
|---|---|---|---|
| **sentence** 65:12 | 26:1 27:1 28:1 | **sit** 19:6 66:19 | **staffing** 20:14 |
| **sentences** 18:25 | 29:1 30:1 31:1 | **six** 36:16 | 20:17 21:8 |
| **september** | 32:1 33:1 34:1 | **slipped** 28:16 | 22:19 23:6 |
| 12:22 15:3 | 35:1,13 36:1 | **slow** 6:5 | 35:6,10,14,18 |
| 39:2,7,11,14 | 37:1,22 38:1 | **solely** 37:6 | 36:11 37:23 |
| 43:8 49:7 | 38:11 39:1 | **somewhat** | 58:12,13 59:4 |
| 50:12 54:7 | 40:1 41:1 42:1 | 29:19,19 | 59:24 68:12 |
| 62:11,15,20 | 42:11 43:1,5 | **sorry** 8:15 | **stamped** 55:17 |
| **served** 12:3,9 | 44:1,7 45:1 | 11:15,19 18:12 | **standing** 18:25 |
| 12:10,20 13:20 | 46:1 47:1 48:1 | 19:22 31:10 | **start** 9:11 |
| 13:23 14:24 | 49:1 50:1 51:1 | 34:23,25 37:18 | 26:20 59:8,10 |
| 40:3,9,14,18 | 52:1 53:1 54:1 | 40:12 41:2 | 65:11 |
| 43:8 50:10,18 | 55:1,9,20 56:1 | 43:13 51:5,24 | **started** 5:10 |
| 50:20,21 53:6 | 57:1 58:1,7 | 53:4 56:17 | 9:12 |
| 53:7,14 | 59:1 60:1 61:1 | 59:21 60:5,6 | **starting** 59:15 |
| **services** 32:21 | 61:19 62:1,2 | 61:7 63:23 | **stat** 13:10 |
| 60:3 | 63:1 64:1,19 | 64:6 | **state** 1:19 3:4,8 |
| **set** 61:16 70:12 | 65:1 66:1 67:1 | **sound** 58:3 | 70:4,9 |
| 70:21 | 67:6 | **space** 48:11 | **statement** |
| **share** 6:16,23 | **shift** 54:18 | **speak** 6:25 7:11 | 15:22 16:20,21 |
| 18:13,15,15 | **short** 58:5 | 7:19,24 10:8 | 17:5,7 19:19 |
| 24:17 60:8,8 | 64:14 | 11:3 27:13 | 19:21,25 20:15 |
| 64:19 | **shortly** 65:7 | 43:17,21 | 20:22 21:11,16 |
| **shared** 48:11 | **show** 6:17 | **specific** 39:4 | 21:19 24:4 |
| **shelly** 1:16 3:1 | 54:21 | **specifically** | 25:22 26:3 |
| 3:10,14 4:1 5:1 | **shown** 62:24 | 51:23 | 27:3 28:21 |
| 5:6 6:1 7:1 8:1 | **sic** 43:11 | **spoke** 27:20 | 30:5 31:2,22 |
| 9:1 10:1,7 11:1 | **signature** 35:25 | **ss** 70:4 | 32:9,12,18,20 |
| 12:1 13:1 14:1 | 56:19 57:12 | **staff** 23:14 | 32:23 33:4,6 |
| 15:1 16:1 17:1 | 60:14 70:23 | 29:18 31:24 | 33:22 34:9,17 |
| 17:3 18:1 19:1 | **signed** 60:21 | 39:25 51:8 | 36:13 37:7 |
| 19:16,23 20:1 | **similar** 59:25 | 59:10 | 54:18 62:24 |
| 21:1 22:1 23:1 | **sink** 19:2 | **staffed** 21:9 | 63:2 64:23 |
| 24:1 25:1,6,8 | | 22:7 23:10 | 66:7,21 |

Landmark v. Nurselect MSJ_00000401

statements
  29:17 30:9
  31:5
states  1:2 51:25
stating  55:6
steps  31:3 32:4
  32:17 33:20
steve  11:3
stipulated
  55:14
stole  54:20
stump  17:8,9
  17:11,15 27:10
  27:18 36:9
  43:2 52:13,18
  52:21,25 53:23
subject  25:5
  37:25 42:13
  45:19
suffolk  70:5
sugar  19:4
suit  12:6 49:23
  49:25 50:10,17
  50:19,22 51:3
  51:10,12,17,20
  51:21 53:7,8,9
  57:4
suite  2:9 14:4
  14:14 48:19
summit  2:5
supervisor
  33:14 65:13
supplemental
  35:5,10 58:11

58:12 68:12
sure  4:17 5:25
  7:3,17 8:10
  10:10,14 11:18
  11:19 16:20
  17:23 22:6
  23:15 24:8
  30:18,18 32:25
  34:10 38:23
  40:7,14 41:8
  43:20,21 44:14
  44:24 48:12,25
  49:19 52:24
  57:11 58:20
  59:21 61:20
  62:3 63:23
switch  46:11,11
sworn  3:3
  70:12
sycamore  3:12

**t**

t  3:13 68:2 70:2
  70:2
table  19:8
tabs  60:6
take  6:11 10:19
  11:4 19:3
  23:24 31:3
  32:5,17 33:20
  41:7 57:24
  64:7
taken  1:16 5:12
  58:6 64:15

talk  6:4 11:2
talked  8:8
  27:17
talking  27:15
  48:3 62:5
task  42:21
teeth  19:2
tell  29:2 46:5
  46:23 63:12
ten  57:25
term  4:7
terms  40:5 51:9
testified  3:5
testimony
  70:14
thank  61:18,20
  63:25 67:6,7
thanks  64:2
things  5:20
  14:19 60:12
  62:3
think  16:7 23:6
  24:11 33:11
  34:23 37:13
  46:3 51:12
  54:24 57:24
  58:2 61:16,16
  61:17 63:13,24
  64:23 66:20
  67:4,5
third  4:9 47:6
thought  32:20
three  25:17
  37:19 64:23

time  1:11 17:12
  17:19 19:14,17
  22:6,9,10
  23:11 24:5
  29:9 35:16,17
  35:19 38:13
  47:13 52:5,18
  53:12 61:18
  64:9
timeline  50:15
title  21:7 26:17
  35:5
titled  56:22
today  3:21 5:11
  5:14,17 6:14
  8:5,22 13:5
  61:18 66:19
today's  7:7,12
  7:20,25
told  44:22
  65:13
took  29:24
  54:20
top  19:12 35:6
  40:22 41:18
transcribe  5:21
true  55:14
  70:13
try  5:18 14:22
  32:8 39:4
  45:16
turning  42:23
  55:16

Landmark v. Nurselect MSJ_00000402

**two** 11:2 14:8,9
  27:7 50:24
  56:16,16,17,18
  64:7
**type** 48:11
**typical** 10:12
**typically** 10:23
  11:11,22 30:21
  30:24 31:16
  32:7 45:20

**u**

**under** 57:12
**underlying**
  3:23 4:6,20
  12:14 14:23
  15:2,5 17:25
  18:9 28:8
  34:21
**understand**
  4:12 6:3 17:11
  21:10,13 22:13
  44:25 47:15
  51:7 52:17,19
  52:21
**understanding**
  62:3
**understood**
  17:14 24:24
  26:8 28:4
  33:15 45:15
  51:22 58:18
  61:11

**undiscovered**
  45:6
**united** 1:2
**unnoticed**
  39:12
**unopened**
  43:11 45:19
**unread** 39:22
**using** 6:16

**v**

**v** 3:2
**valhalla** 2:5
**veltri** 1:18
  41:20 70:8,24
**verbal** 5:18
**versus** 4:2,4
  12:14,15 38:3
  42:13 45:3
**videoconfere...**
  1:14
**village** 4:3,11
  12:15 15:20
  16:12 17:13,16
  17:19 19:18
  22:14,17,19,22
  23:10 26:25
  32:21 34:12
  36:4,23 38:4
  52:10,13,18,23
  53:2,10 58:9
  58:21 59:2
  62:14,19

**viola** 42:2,6
  43:14,18 68:15
**virtual** 5:17
  6:14
**visual** 18:11
  32:24

**w**

**walk** 19:5
**want** 6:19 7:2
  14:20 41:6
  62:2
**wanted** 16:20
  17:23 60:11
**way** 4:16 70:18
**we've** 30:17
  41:5
**week** 7:23
**wells** 23:2
**went** 31:11
  39:12
**whereof** 70:20
**wife** 8:7 15:18
  16:5,24
**wife's** 8:10
**wiggins** 4:2
  12:14 15:9
  18:3 19:12
  20:5 24:2 28:7
  32:15 33:17
  34:20 36:25
  38:3 42:13
  53:10 54:16
  66:8,13,15

**wills** 23:2,3,4
**wilson** 42:9
**witness** 1:15
  3:3 10:10 41:8
  41:11 58:4
  61:20 64:5,11
  67:7,13 70:11
  70:14,20
**word** 4:5 61:3
**words** 45:20
**work** 10:24
  11:14 13:7
  21:2 59:11
**working** 9:11
  17:13 22:11
  26:20
**works** 8:12
**would've** 44:22
**wrap** 67:5
**written** 25:11

**x**

**x** 1:3,8 68:2
  69:2

**y**

**y** 3:2 15:24
  17:3 20:20
**yeah** 7:23 12:3
  13:17 28:15
  33:12 39:21
  44:23 62:17
**year** 15:25
**years** 59:19,20
  59:20

Landmark v. Nurselect MSJ_00000403

| | |
|---|---|
| **yesterday**  4:21 | |
|   24:23 | |
| **york**  1:19 2:5 | |
|   3:4 70:4,10 | |
| **yup**  58:4 64:12 | |
| **z** | |
| **zach**  42:9 | |
| **zoom**  1:17 6:16 | |
|   6:23 18:14 | |

Landmark v. Nurselect MSJ_00000404

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

ENTERED AND FILED
PROTHONOTARY'S OFFICE
No. CI-22-04128
LANCASTER, PA
****Electronically Filed****
Jun 13 2023 02:40PM
Ryan McMinn

**SAXTON & STUMP**
Collin T. Keyser, Esquire
Attorney I.D. No. 307505
Kimberly A. Selemba, Esquire
Attorney I.D. No. 93535
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Phone: (717) 556-1000
ctk@saxtonstump.com
kas@saxtonstump.com

*Attorneys for Defendants, Rehabilitation Center*
*at Brethren Village, LLC, Brethren Village,*
*Brethren Village Realty, LLC, and Lori*
*Schoener, NHA*

| | |
|---|---|
| BRENDA L. KLING, individually and as Administratrix of the Estate of GERALDINE E. WIGGINS, **Plaintiff** | IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA |
| v. | NO: CI-22-04128 |
| REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHOENER, NHA, and JOHN DOES 1–4, **Defendants.** | MedMal |
| v. | |
| NURSELECT, LLC, **Additional Defendant.** | |

### NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

Landmark v. Nurselect MSJ_00000408

**EXHIBIT**
1 11/20/24

No. CI-22-04128

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO
PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL
SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lancaster Bar Association
Lawyer Referral Service
Telephone: 717-393-0737

Landmark v. Nurselect MSJ_00000409

No. CI-22-04128

| | |
|---|---|
| BRENDA L. KLING, individually and as Administratrix of the Estate of GERALDINE E. WIGGINS, | : IN THE COURT OF COMMON PLEAS<br>: OF LANCASTER COUNTY,<br>: PENNSYLVANIA |
| Plaintiff | : |
| v. | : NO: CI-22-04128 |
| REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHOENER, NHA, and JOHN DOES1–4 | : MedMal |
| Defendants, | : |
| v. | : |
| NURSELECT, LLC, | : |
| Additional Defendant. | : |

## JOINDER COMPLAINT OF DEFENDANT, BRETHREN VILLAGE, AGAINST ADDITIONAL DEFENDANT, NURSELECT, LLC

Defendant, Brethren Village, ("Joining Defendant"), by and through counsel, Saxton & Stump, files this Third-Party Joinder Complaint against Additional Defendant, NurSelect, LLC ("Additional Defendant" or "NurSelect"), pursuant to Pennsylvania Rule of Civil Procedure 2252 and, in support thereof avers as follows:

1.    Plaintiff, Brenda L. Kling, has filed a Complaint in this matter, asserting claims for negligence, vicarious liability, corporate negligence, survival, wrongful death, and breach of fiduciary duty, arising out of skilled nursing care provided to resident, Geraldine E. Wiggins ("Ms. Wiggins"), at Rehabilitation Center at Brethren Village, LLC ("Brethren Village"). A copy of Plaintiff's Fourth Amended Complaint is attached hereto, without adoption, as "Exhibit A."

No. CI-22-04128

2.      In the Fourth Amended Complaint, Plaintiff alleges that Defendants were negligent in relation to a fall that Ms. Wiggins had as she attempted to walk from the bathroom to her chair.

3.      Joining Defendant hereby incorporates the allegations of Plaintiff's Fourth Amended Complaint without admitting or denying the substance of those allegations.

## JOINDER DEFENDANT

4.      Additional Defendant NurSelect, LLC, is a health care employment agency with a principal place of business at 630 Freedom Business Center Drive, King of Prussia, PA, 19406.

5.      At the time of the alleged incident, NurSelect provided supplemental staffing to Brethren Village, pursuant to a September 22, 2020 written contract titled "Supplemental Staffing Agreement". A copy of the Supplemental Staffing Agreement is attached hereto as "Exhibit B."

## FACTUAL BACKGROUND

6.      As set forth above, Joining Defendant incorporates by reference the allegations in Plaintiff's Fourth Amended Complaint, without admitting or denying the substance of those allegations.

7.      Plaintiff claims that, on or about the morning of May 12, 2021, Ms. Wiggins fell while walking from her bathroom to her chair unattended, resulting in a laceration and a quarter-sized hematoma.

8.      On August 28, 2021, Ms. Wiggins passed away; Plaintiff alleges that "failure to thrive" was listed as the cause of death. 4th Am. Compl. ¶ 61.

9.      Plaintiff alleges that the injuries Ms. Wiggins suffered from her fall contributed to her death over 3-months later. 4th Am. Compl. ¶ 63.

2

No. CI-22-04128

10.     Ms. Wiggins was in the care of Ayanna McDowell, CNA, at the time of her fall.

11.     Ms. McDowell was employed as an agency nurse for NurSelect at the time of the incident. She was not employed by Brethren Village.

12.     The obligations of Additional Defendant, NurSelect, LLC, under the aforementioned written Supplemental Staffing Agreement, include, but are not limited to, the timely provision of licensed and certified nursing personnel in accordance with federal, state, and local laws, rules ordinances and regulations and meeting the highest professional standards and principles. Exhibit B, at Arts. 1.1, 1.2.

13.     The Agreement expressly provides that NurSelect personnel furnished to Brethren Village "shall not be considered employees or agents [Brethren Village] but instead shall be considered leased employees of NurSelect." Exhibit B, at Art 3.1.

14.     Pursuant to the Supplemental Staffing Agreement, NurSelect agreed to "indemnify and hold harmless [Brethren Village] from and against any and all claims, demands, actions, settlements, or judgments, including reasonable attorneys' fees and litigation expenses, arising from. . . NurSelect Personnel's provision of the Services where such claims, demands actions, settlements, or judgments arise from the negligence or willful misconduct of NurSelect Personnel." Exhibit B, at Art. 5.2.

### COUNT I
### NEGLIGENCE, INDEMNIFICATION AND CONTRIBUTION

15.     The foregoing paragraphs are incorporated herein by reference as if set forth herein at length.

16.     Without admitting the averments of Plaintiff's Fourth Amended Complaint, Additional Defendant, NurSelect, LLC, is solely liable to Plaintiff, jointly and severally liable with Joining Defendant, liable over Joining Defendant, or liable to Joining Defendant for

3

No. CI-22-04128

indemnification and/or contribution, for the claims asserted by Plaintiff, Brenda L. Kling, and for the injuries and damages alleged in the 4th Amended Complaint.

**WHEREFORE**, Joining Defendant Brethren Village demands judgment in its favor and against Additional Defendant, NurSelect, LLC. In the alternative, Joining Defendant Brethren Village demands that Additional Defendant, NurSelect, LLC, be held solely liable to Plaintiff, jointly and severally liable with Joining Defendant, liable over Joining Defendant, or liable to Joining Defendant for common law and contractual indemnification and/or contribution.

## COUNT II
## VICARIOUS LIABILITY, INDEMNIFICATION, AND CONTRIBUTION

17.     The foregoing paragraphs are incorporated herein by reference as if set forth herein at length.

18.     Without admitting the averments of Plaintiff's Fourth Amended Complaint, Additional Defendant, NurSelect, LLC, as the employer/principal of Ayanna McDowell, is vicariously liable to Plaintiff, jointly and severally liable with Joining Defendant, liable over Joining Defendant, or liable to Joining Defendant for indemnification and/or contribution, for the claims asserted by Plaintiff, Brenda L. Kling, and for the injuries and damages alleged in the 4th Amended Complaint.

**WHEREFORE**, Joining Defendant Brethren Village demands judgment in its favor and against Additional Defendant, NurSelect, LLC. In the alternative, Joining Defendant Brethren Village demands that Additional Defendant, NurSelect, LLC, be held vicariously liable to Plaintiff, jointly and severally liable with Joining Defendant, liable over Joining Defendant, or liable to Joining Defendant for indemnification and/or contribution.

4

Landmark v. Nurselect MSJ_00000413

No. CI-22-04128

## COUNT III
## CONTRACTUAL INDEMNIFICATION

19.     The foregoing paragraphs are incorporated herein by reference as if set forth herein at length.

20.     Without admitting the averments of Plaintiff's Fourth Amended Complaint, Additional Defendant, NurSelect, LLC, pursuant to the Supplemental Staffing Agreement, is contractually obligated to indemnify and hold harmless Joining Defendant for any liabilities, damages, and expenses resulting from the claims asserted by Plaintiff.

**WHEREFORE**, Joining Defendant Brethren Village demands judgment in its favor and against Additional Defendant, NurSelect, LLC.  In the alternative, Joining Defendant Brethren Village demands that Additional Defendant, NurSelect, LLC, be held contractually liable for indemnification for any liabilities, damages, and expenses resulting from the claims asserted by Plaintiff.

Respectfully submitted,

SAXTON & STUMP

Date:  June 13, 2023

By: _____

Collin T. Keyser, Esquire
Attorney I.D. No. 307505
Kimberly A. Selemba, Esquire
Attorney I.D. No. 93535
280 Granite Run Drive, Suite 300
Lancaster, PA  17601

5

Landmark v. Nurselect MSJ_00000414

No. CI-22-04128

Phone:  (717) 556-1000
Fax:  (717) 441-3810
ctk@saxtonstump.com
kas@saxtonstump.com

*Attorneys for Defendants, Rehabilitation Center at
Brethren Village, LLC, Brethren Village, Brethren
Village Realty, LLC, and Lori Schoener, NHA*

6

Landmark V. Nurselect MSJ_00000415

**SAXTON & STUMP**                                              No. CI-22-04128
Collin T. Keyser, Esquire
Attorney I.D. No. 307505
Kimberly A. Selemba, Esquire
Attorney I.D. No. 93535
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Phone: (717) 556-1000
ctk@saxtonstump.com
kas@saxtonstump.com

*Attorneys for Defendants, Rehabilitation Center
at Brethren Village, LLC, Brethren Village,
Brethren Village Realty, LLC, and Lori
Schoener, NHA*

| | |
|---|---|
| BRENDA L. KLING, individually and as : Administratrix of the Estate of GERALDINE E. WIGGINS, | IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA |
| Plaintiff : | |
| : | NO: CI-22-04128 |
| v. : | MedMal |
| : | |
| REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHOENER, NHA, and JOHN DOES1– 4 : | |
| Defendants, : | |
| : | |
| v. : | |
| NURSELECT, LLC, : | |
| Additional : Defendant. | |

## CERTIFICATE OF SERVICE

I, Collin T. Keyser, Esquire, certify that on this date, I served a certified true and correct

copy of the foregoing Third-Party Joinder Complaint upon the following counsel and parties of

record, via email and certified mail, addressed as follows:

Landmark v. Nurselect MSJ_00000416

No. CI-22-04128

Andrei Govorov, Esquire
Rosenbaum & Associates, PC
1818 Market Street, Suite 3200
Philadelphia, PA 19103
*(Attorney for Plaintiff)*
(via email)

Date: June 13, 2023

By: _____
Collin T. Keyser, Esquire

No. CI-22-04128

| | |
|---|---|
| BRENDA L. KLING, individually and as : | IN THE COURT OF COMMON PLEAS |
| Administratrix of the Estate of : | OF LANCASTER COUNTY, |
| GERALDINE E. WIGGINS, : | PENNSYLVANIA |
| : | |
| Plaintiff : | |
| : | NO: CI-22-04128 |
| v. : | |
| : | MedMal |
| REHABILITATION CENTER AT : | |
| BRETHREN VILLAGE, LLC, : | |
| BRETHREN VILLAGE, BRETHREN : | |
| VILLAGE REALTY, LLC, LORI : | |
| SCHOENER, NHA, and JOHN DOES1– : | |
| 4 : | |
| Defendants, : | |
| : | |
| v. : | |
| : | |
| NURSELECT, LLC, : | |
| : | |
| Additional : | |
| Defendant. : | |

## PUBLIC ACCESS POLICY CERTIFICATION

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

SAXTON & STUMP

Date: June 13, 2023

By: _____
                Collin T. Keyser, Esquire

EXHIBIT A

Landmark v. Nurselect MSJ_00000419

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed*****
Dec 22 2022 12:29PM
Ryan McMinn

**ROSENBAUM & ASSOCIATES, P.C.**
BY: ANDREI GOVOROV, ESQUIRE
Attorney ID No.: 209365
1818 Market Street, Suite 3200
Philadelphia, PA 19103
(215) 569-0200
agovorov@rosenbaumfirm.com

MAJOR-JURY
ASSESSMENT OF DAMAGES
HEARING IS REQUIRED.
JURY TRIAL DEMANDED

Attorney for Plaintiff

| | | |
|---|---|---|
| BRENDA L. KLING, ADMINISTRATRIX | : | LANCASTER COUNTY |
| of the ESTATE OF GERALDINE E. WIGGINS | : | COURT OF COMMON PLEAS |
| deceased | : | |
| | : | No.: CI-22-04128 |
| vs. | : | |
| | : | FOURTH AMENDED COMPLAINT |
| REHABILITATION CENTER at BRETHREN | : | |
| VILLAGE, LLC; BRETHREN VILLAGE; | : | |
| BRETHREN VILLAGE REALTY, LLC; | : | |
| LORI SCHOENER, NHA; and | : | |
| JOHN DOES 1-4 (Fictious Names) | : | |

## CIVIL ACTION
### NOTICE

YOU HAVE BEEN SUED IN COURT.  IF YOU WISH TO DEFEND AGAINST THE CLAIMS SET FORTH IN THE FOLLOWING PAGES, YOU MUST TAKE ACTION WITHIN TWENTY (20) DAYS AFTER THIS COMPLAINT AND NOTICE ARE SERVED BY ENTERING A WRITTEN APPEARANCE PERSONALLY OR BY ATTORNEY AND FILING IN WRITING WITH THE COURT YOUR DEFENSES OR OBJECTIONS TO THE CLAIMS SET FORTH AGAINST YOU.  YOU ARE WARNED THAT IF YOU FAIL TO DO SO THE CASE MAY PROCEED WITHOUT YOU AND A JUDGMENT MAY BE ENTERED AGAINST YOU BY THE COURT WITHOUT FURTHER NOTICE FOR ANY MONEY CLAIMED IN THE COMPLAINT OR FOR ANY OTHER CLAIM OR RELIEF REQUESTED BY THE PLAINTIFF.  YOU MAY LOSE MONEY OR PROPERTY OR OTHER RIGHTS IMPORTANT TO YOU.  YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

**Lawyer Referral & Information Service**
**Lancaster County Bar Association**
**28 E Orange Street**
**Lancaster, PA 17602**

### AVISO

LE HAN DEMANDADO A USTED EN LA CORTE. SI USTED QUIERE DEFENDERSE DE ESTAS DEMANDAS EXPUESTAS EN IAS PAGINAS SIGUIENTES, USTED TIENE VIENTE (20) DIAS DE PLAZO AL PARTIR DE LA FECHA DE LA DEMANDA Y LA NOTIFICACION. HACE FALTA ASENTAR UNA COMPARENCIA ESCRITA O EN PERSONA O CON UN ABOGADO Y ENTREGAR A LA CORE EN FORMA ESCRITA SUS DEFENSAS O SUS OBJECIONES A LAS DEMANDAS EN CONTRA DE SU PERSONA. SEA AVISADO QUE SI USTED NO SE DEFIENDE, LA CORTE TOMARA MEDIDAS Y PUEDE CONTINUAR LA DEMANDA EN CONTRA SUYA SIN PREVIO AVISO O NOTIFICACION. ADEMAS, LA CORTE PUEDE DECIDIR A FAVOR DEL DEMANDANTE

Y REQUIERE QUE USTED CUMPLA CON TODAS LAS PROVISIONES DE ESTA DEMANDA. USTED PUEDE PERDER DINERO O SUS PROPIEDADES U OTROS DERECHOS IMPORTANTES PARA USTED. LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

Servicio de referencia e información de abogados
Colegio de Abogados del Condado de Lancaster
28 E Calle Naranja
Lancaster, Pensilvania 17602

Landmark v. Nurselect MSJ_00000421

**ROSENBAUM & ASSOCIATES, P.C.**
BY: ANDREI GOVOROV, ESQUIRE
Attorney ID No.: 209365
1818 Market Street, Suite 3200
Philadelphia, PA 19103
(215) 569-0200
agovorov@rosenbaumfirm.com

MAJOR-JURY
ASSESSMENT OF DAMAGES
HEARING IS REQUIRED.
JURY TRIAL DEMANDED

Attorney for Plaintiff

| | |
|---|---|
| BRENDA L. KLING, ADMINISTRATRIX : <br> of the ESTATE OF GERALDINE E. WIGGINS : <br> deceased | LANCASTER COUNTY <br> COURT OF COMMON PLEAS |
| : | |
| vs.               : | No.: CI-22-04128 |
| : | |
| REHABILITATION CENTER at BRETHREN : <br> VILLAGE, LLC; BRETHREN VILLAGE; <br> BRETHREN VILLAGE REALTY, LLC; <br> LORI SCHOENER, NHA; and <br> JOHN DOES 1-4 (Fictious Names) : | FOURTH AMENDED COMPLAINT |

## FOURTH AMENDED COMPLAINT

(This Fourth Amended Complaint Includes a Medical Professional Liability Action)

Plaintiff, Brenda L. Kling, Administratrix of the Estate of Geraldine E. Wiggins, deceased, by and through their counsel, Rosenbaum & Associates, P.C., files this Fourth Amended Complaint in Civil Action, and aver as follows:

1.  Plaintiff, Brenda L. Kling, Administratrix of the Estate of Geraldine E. Wiggins, deceased, is an adult individual and daughter of Decedent, Geraldine E. Wiggins, residing at 19 Verbena Drive, Lancaster, Pennsylvania 17062.

2.  Decedent, Geraldine E. Wiggins, died intestate on August 28, 2021.

3.  Plaintiff, Brenda L. Kling, were appointed Administratrix of the Estate of Geraldine E. Wiggins, deceased, by the Register of Wills of Lancaster County, on September 23, 2021, and in this capacity acts on behalf of the Estate, the beneficiaries of the Estate and the potential wrongful death beneficiaries.

4.  At the time of her death, Decedent, Geraldine E. Wiggins, left surviving a daughter Brenda L. Kling, on whose behalf this claim is, in part, is filed.

5.     Defendant, Rehabilitation Center Brethren Village, LLC, is a business corporation organized and existing under the laws of the Commonwealth of Pennsylvania, and was engaged in the business of owning, operating, managing and offering healthcare, medical services, rehabilitation and nursing care to the public at a rehabilitation and nursing home facility, Rehabilitation Center at Brethren Village, LLC, ("Brethren Village") 3001 Lititiz Pike, Lancaster, Pennsylvania.  Plaintiff is asserting a professional liability claim against this Defendant.

6.     At all times material hereto, Defendant, Rehabilitation Center at Brethren Village, LLC, acted or failed to act by and through its agents, ostensible agents, servants, workmen, nurses, nurse's aides, and/or employees, physicians, the nursing home administrators and/or administrators responsible for formulating, adopting, monitoring and enforcing the policies, procedures and protocols of Brethren Village from the time Geraldine E. Wiggins was admitted to Brethren Village on April 13, 2021,  including the physicians, nurses, nurses' aides, staff members and employees responsible for the care, supervision, treatment and safety of Geraldine E. Wiggins, starting on April 13, 2021, which includes those physicians, nurses, nurses' aides, staff and employees identified in the records and charts of Brethren Village, whose names cannot be discerned from the records but whose identities are known to and within the exclusive control of Defendants, as well as those physicians, nurses, nurses' aides, staff and employees whose names are not recorded in the records due to Defendants' failure to implement and utilize proper record-keeping and documentation procedures but whose identities are known to and within the exclusive control of Defendants, all of whom were then and there acting within the scope of their authority and in the course of their employment with Defendant, Rehabilitation Center at Brethren Village, LLC, and in furtherance of Defendant, Rehabilitation Center at Brethren Village, LLC's business and on behalf of Defendant, Rehabilitation Center at Brethren Village, LLC.

7.     Defendant, Brethren Village, is a business corporation organized and existing under the laws of the Commonwealth of Pennsylvania, and was engaged in the business of owning, operating, managing and offering healthcare, medical services, rehabilitation and nursing care to the public at a rehabilitation and nursing home facility, Rehabilitation Center at Brethren Village, LLC, ("Brethren

Landmark v. Nurselect MSJ_00000423

Village") 3001 Lititiz Pike, Lancaster, Pennsylvania. Plaintiff is asserting a professional liability claim against this Defendant.

8.    At all times material hereto, Defendant, Brethren Village, acted or failed to act by and through its agents, ostensible agents, servants, workmen, nurses, nurse's aides, and/or employees, physicians, the nursing home administrators and/or administrators responsible for formulating, adopting, monitoring and enforcing the policies, procedures and protocols of Brethren Village from the time Geraldine E. Wiggins was admitted to Brethren Village on April 13, 2021, including the physicians, nurses, nurses' aides, staff members and employees responsible for the care, supervision, treatment and safety of Geraldine E. Wiggins, starting on April 13, 2021, which includes those physicians, nurses, nurses' aides, staff and employees identified in the records and charts of Brethren Village, whose names cannot be discerned from the records but whose identities are known to and within the exclusive control of Defendants, as well as those physicians, nurses, nurses' aides, staff and employees whose names are not recorded in the records due to Defendants' failure to implement and utilize proper record-keeping and documentation procedures but whose identities are known to and within the exclusive control of Defendants, all of whom were then and there acting within the scope of their authority and in the course of their employment with Defendant, Brethren Village, and in furtherance of Defendant, Brethren Village's business and on behalf of Brethren Village.

9.    Defendant, Brethren Village Realty, LLC, is a business corporation organized and existing under the laws of the Commonwealth of Pennsylvania, and was engaged in the business of owning, operating, managing and offering healthcare, medical services, rehabilitation and nursing care to the public at a rehabilitation and nursing home facility, Rehabilitation Center at Brethren Village, LLC, ("Brethren Village") 3001 Lititiz Pike, Lancaster, Pennsylvania. Plaintiff is asserting a professional liability claim against this Defendant.

10.    At all times material hereto, Defendant, Brethren Village Realty, LLC, acted or failed to act by and through its agents, ostensible agents, servants, workmen, nurses, nurse's aides, and/or employees, physicians, the nursing home administrators and/or administrators responsible for formulating, adopting,

Landmark v. Nurselect MSJ_00000424

monitoring and enforcing the policies, procedures and protocols of Brethren Village from the time

Geraldine E. Wiggins was admitted to Brethren Village on April 13, 2021, including the physicians, nurses,

nurses' aides, staff members and employees responsible for the care, supervision, treatment and safety of

Geraldine E. Wiggins, starting on April 13, 2021, which includes those physicians, nurses, nurses' aides,

staff and employees identified in the records and charts of Brethren Village, whose names cannot be

discerned from the records but whose identities are known to and within the exclusive control of

Defendants, as well as those physicians, nurses, nurses' aides, staff and employees whose names are not

recorded in the records due to Defendants' failure to implement and utilize proper record-keeping and

documentation procedures but whose identities are known to and within the exclusive control of

Defendants, all of whom were then and there acting within the scope of their authority and in the course of

their employment with Defendant, Brethren Village Realty, LLC, and in furtherance of Defendant, Brethren

Village Realty, LLC's business and on behalf of Brethren Village Realty, LLC.

     11.    Defendant, Lori Schoener, is an individual residing herein at 123 Race Street, Richland,

Pennsylvania 17087. Upon information and believe, at all relevant and material times herein, Lori Schoener

was the licensed Nursing Home Administrator of Rehabilitation Center at Brethren Village, LLC during

the residency of Geraldine E. Wiggins, and is therefore personally, jointly and vicariously liable, among

other things, for the acts and omissions of herself and her agents, employees, servants, contractors, staff,

and/or partners and all other Defendants, who played a role in the care provided to Geraldine E. Wiggins

and in the operation of Brethren Village.

     12.    Defendants, Joe Does 1-4 (Fictious Names) are individuals, corporations and/or other

entities whose identities, after reasonable investigation, are currently unknown, but at all times relevant

hereto owned, operated, controlled and/or managed Rehabilitation Center of Brethen Village, LLC and/or

provided medical, nursing, rehabilitation and other health care services to Geraldine E. Wiggins during her

admission to Rehabilitation Center of Brethren Village, LLC.

     13.    At all times material hereto, the Defendants individually and collectively owed duties to

the residents of Brethren Village, including Geraldine E. Wiggins.

Landmark v. Nurselect MSJ_00000425

14.    At all times relevant and material hereto the Defendants were aware of their obligations under the laws of the United States of America and of the Commonwealth of Pennsylvania with which Defendants were required to comply in providing care to Decedent including the United States Code, Pennsylvania Consolidated Statutes and the Pennsylvania Administrative Code.

15.    The Defendants, directly and/or through their respective agents, servants and/or employees, accepted the responsibility for the care of Geraldine E. Wiggins, and in so doing, undertook and/or assumed a duty to Geraldine E. Wiggins to provide a safe nursing home facility necessary for the proper practice of medicine at said rehabilitation facility and to render reasonable, competent, proper, adequate and appropriate medical care, rehabilitation and nursing care, custodial care, rehabilitation services and treatment and, to take appropriate, preventative and curative measures as well as adequately supervise, monitor, and provide timely treatment and services to Geraldine E. Wiggins, and avoid and prevent harm to her.

16.    The Defendants owed a duty to Geraldine E. Wiggins to exercise reasonable and ordinary care as a resident at Defendants' facility receiving medical, nursing, rehabilitation and other allied healthcare services. The Defendants' duties included, but were not limited to, establishing and enforcing their respective nursing home facility rules and regulations, medical staff practices, bylaws, policies, procedures, rules and regulations which mandate provision of proper medical, nursing and other healthcare provider services and/or care to the rehabilitation patients, including Geraldine E. Wiggins. The Defendants' duties also included hiring competent medical, nursing and other allied healthcare personnel, continuing and ongoing review of said competency, maintaining the facility such that it is free from ordinary hazards and defective equipment, maintaining sufficient staffing levels, insuring that all patients receive adequate, competent and timely medical, rehabilitation and other allied health care treatment and services while a patient at their rehabilitation facility, and, establishing and enforcing policies, procedures, protocols and systems to monitor their staff to ensure that all patients are receiving proper and timely care and treatment including, but not limited to, complete and accurate resident assessments, developing, enforcing and revising individualized, resident-centered care plans, adequate supervision/monitoring, proper use of

Landmark v. Nurselect MSJ_00000426

medication, proper use of physical and/or chemical restraints, proper establishment and enforcement of procedures for medical and nursing review and/or audit of the care given to patients, proper establishment of policies, procedures, protocols and guidelines to ensure that proper medical, rehabilitation, custodial and nursing care are performed on and for patients at their facility, including Geraldine E. Wiggins.

17.    At all times relevant hereto, the Defendants, directly and/or through contractual agreement had a corporate responsibility through their respective bylaws, medical staff bylaws, rules, regulations and ongoing government functions to assure that only competent physicians, nurses and other health care providers engage in the medical, rehabilitation and nursing practice at this rehabilitation facility and other related fields of medicine on the Defendants' premises.

18.    Defendants exercised complete and total control over the healthcare, skilled nursing and custodial care of all residents of their nursing facility, including Geraldine E. Wiggins.

19.    At all times material hereto, Defendants were vertically integrated organizations / corporations that were controlled by their respective members, officers, managers, and/or board of directors who were responsible for the operation, planning, management and quality control of their Facility, Brethren Village.

20.    At all times material hereto, the control exercised over the Facility by Defendants included, inter alia: budgeting, marketing, cash management, cost control, reimbursement, setting staffing levels, maintaining and increasing census, human resource management, training, supervision and oversight of their Facility's Administrator, supervision and oversight of their Facility's Director of Nursing, supervision of staff, obtaining licensure and certification, conducting mock surveys, conducting customer satisfaction surveys and monitoring customer satisfaction, corporate and regulatory compliance, quality of care assessment, and the creation and implementation of all policy and procedure manuals used by the Facility.

21.    Defendants have failed to adequately train and/or supervise their physicians, nurses, nurses' aides and other healthcare providers which has resulted in personal harm and injury to Geraldine E. Wiggins.

22.    The provisions of OBRA (Omnibus Budget Reconciliation Act of 1987) are applicable

Landmark v. Nurselect MSJ_00000427

with regard to Geraldine E. Wiggins' condition as it existed while in the Defendants' care and during her admission at the Defendants' facility beginning on April 13, 2021.

23.    The Defendants held themselves out as a specialist in the field of rehabilitation care with the expertise necessary to maintain the health and safety of persons unable to care adequately for themselves.

24.    At all times pertinent hereto, Geraldine E. Wiggins was a patient at Rehabilitation Center of Brethren Village, LLC and was under the exclusive care and control of the Defendants, their agents, officers, servants and/or employees.

25.    The Defendants, their agents, officers, servants and/or employees failed, refused and/or neglected to perform the duties to provide reasonable and adequate health care to and for Geraldine E. Wiggins who was unable to attend to her own health, safety and well-being.

26.    The Defendants, their agents, officers, servants and/or employees negligently, carelessly and recklessly provided care and treatment to Geraldine E. Wiggins, and all of the alleged acts, omissions and occurrences herein described or performed by the Defendants, their agents, officers, servants and/or employees fell within the course and scope of their agency and employment with the Defendants and in furtherance of the Defendants' business.

27.    The Defendants provide twenty-four (24) hour a day, seven (7) day a week medical, nursing, custodial and rehabilitation care, services and assistance to its patients who have issues related to age, illness, disease, injury, convalescence and physical and mental infirmity.

28.    The Defendants are responsible for nearly all the health care needs of their residents, including but not limited to, assistance with activities of daily living, bed mobility, transfer, ambulation, personal hygiene, nutrition, hydration, restorative care, incontinence care, turning and repositioning, supervision, monitoring, safety and rehabilitation.

29.    The Defendants are responsible for ensuring that all doctor-ordered testing and medical services are performed.

30.    The Defendants are required to conduct comprehensive and accurate assessment of their

Landmark v. Nurselect MSJ_00000428

patients' functional capacity, as well as their patients' needs and risk factors.

31.    The Defendants are required to formulate and develop an individualized health "Care Plan" upon admission of each patient.

32.    The Defendants are responsible for determining patients' risk level for injury including falls.

33.    The Defendants are responsible for formulating, adopting, modifying and implementing injury prevention programs and care directives, including prevention programs for patients at risk for falls.

34.    The Defendants are responsible for ensuring that injury prevention programs, procedures and protocols are implemented, executed and performed including prevention programs and procedures to prevent falls.

35.    The Defendants are responsible for ensuring that a "Care Plan" is personalized for each patient and modified and/or revised as needs change.

36.    The Defendants are responsible for ensuring that a "Care Plan" for patients includes safety measures and interventions to prevent falls.

37.    The Defendants are responsible for ensuring that safety measures and interventions, including adequate pressure-relieving assistive devices, individualized turning and repositioning schedule, implementation of the appropriate infection control policies, procedures and techniques, hydration and nutrition protocols, adequate and timely incontinence care, hygiene services, adequate supervision and monitoring of patients with decreased mobility, safety awareness and cognition are implemented and executed.

38.    Geraldine E. Wiggins, was admitted to Rehabilitation Center at Brethren Village, LLC on April 13, 2021 with diagnoses that included ambulatory dysfunction, generalized weakness and new onset A-Fib.

39.    A "Fall Risk Assessment" was completed at time of admission and Geraldine E. Wiggins was considered at risk for falls related to a score of "26" *(a resident whose score is over 9 is at risk for falls).*

40.    The "History of Present Illness" documented Geraldine E. Wiggins' reason for admission

to Brethren Village as:

> *Geraldine Wiggins is a 92 y.o. female admitted to nursing facility for ambulatory*
> *dysfunction having 2 falls at home prior to observation stay at LGH, for further PT/OT*
> *evaluation and treatment. Has had right knee pain since falls at home, XR in hospital*
> *negative for fracture. Today, states she feels a little hot and is tired, but otherwise she*
> *denies any pain, palpitation/flutter in chest, SOB, change in bowel or bladder.*

41.    The staff at Brethren Village was aware of the patient's need for assistance with

ambulation, activities of daily living and fall prevention as documented on the "Care Plan" for *"Needs staff*

*assistance for ADL's because of weakness"* and *"Has history of falls, potential for fall-related injury."*

42.    The following are some of the interventions the staff was to utilize to provide care and

prevent falls for this patient:

> *\* Be aware resident unable to independently bathe, dress, move self in bed, transfer,*
> *ambulate, toilet self, perform personal hygiene measures and feed self*
>
> *Ambulate in hallway with rolling walker and one/two assist with gaitbelt*
>
> *Encourage and assist resident as needed to bathroom upon rising, between meals and at*
> *bedtime*
>
> *Observe for and report any decline in ADL performance; record appropriately in the EMR*
>
> *One/Two assist for stand/pivot/weight bear between all support surfaces*
>
> *Set up in bathroom at sink with supplies for grooming and bathing with assist as needed*
>
> *My transfer status is stand and pivot Ax1 w/RW*
>
> *Assist with ADL's, transfers and locomotion as needed, utilizing safety measures*
>
> *Remind resident of the importance of asking for help before getting up or transferring,*
> *especially  if he/she feels lightheaded or weak*
>
> *When finding resident attempting to transfer independently, assess for basic needs, i.e.,*
> *food,  fluid, toileting, pain, boredom/anxiety*

43.    Pursuant to medical records, Brethren Village increased their staff's workload related to

Covid-19 precautions. But, despite the increase in staff workload, the staff of Brethren Village was well

aware Geraldine E. Wiggins required one staff member and her assistive device to ambulate and transfer

Landmark v. Nurselect MSJ_00000430

safely.

44.    The staff was also aware that the patient self-transferred but did not intervene or initiate additional interventions to prevent falls for this patient.

45.    The April 24, 2021 "Statement Form" documented *"when I took care of Geraldine this morning caught her in the bathroom by herself she told me she took herself and at the time I didn't see a bruise."*

46.    The patient's risk of falls was increased due to episodes of *"respiratory distress"* documented on the April 28, 2021 "MD Progress Notes" as *"Geraldine complained of shortness of breath this morning and was found to be hypoxic. Her SpO2 at the time was in the mid to high 80's and improved to the low 90s with supplemental oxygen."*

47.    On May 3, 2021, "Physician's Orders" documented *"resident wheezing"*, *"O2 sat 84%, lungs very diminished."*

48.    A May 7, 2021 "MD Progress Note" revealed the patient's increased weakness during the morning hours as:

> *Geraldine Wiggins is a 92 y.o. female seen and examined in her room on the rehabilitation unit, resting in her recliner chair. She reports she is feeling short of breath on exam. She admits to just waking up and ambulating which is when she often feels dyspnea.*
>
> *She attests to being more tired in the mornings and feeling better as the day goes on.*
>
> *Ambulatory Dysfunction: Geraldine reports therapy is going well, but that she does not feel ready to go home next week. PT reporting, she can ambulate up to 150 ft with four wheel walker and staff assistance, seems to have increased weakness and decreased functional status in the early morning. Will be discharged to personal care when appropriate, no discharge date set at this time. Continue PT/OT, continue to monitor.*

49.    Geraldine E. Wiggins demonstrated a significant cognitive decline on May 9, 2021, documented in the "Progress Notes" as *"Res has been noted by staff to have been confused today. She had woken up several times unaware of where she was or what time of day it had been. Urine has fowl odor and is dark in color. Sip & Dip initiated."*

50.    A May 10, 2021 "Progress Note" further documented *"Safety concerns: Yes. Safely*

Landmark v. Nurselect MSJ_00000431

*Concerns – note: Confusion and forgetfulness."*

51.    "Medication Administration Record" reveal a "Physician Order" dated May 10, 2021 for,

*"d/c functional abilities days 1-3 every day shift until 05/12/2021."* The MAR had the days of May 10, 11,

and 12 highlighted to carry out the physician's order.

52.    Despite the fact the patient required staff assist for ambulation and activities of daily living,

increased confusion, increased weakness and decreased functional ability in the morning hours and ordered

to have her functional abilities discontinued on May 12, the staff of Brethren Village left Geraldine E.

Wiggins alone at the bathroom sink on May 12, 2021 at 7:30AM.

53.    The May 12, 2021 "Progress Note" documented the following:

*Patient on floor near at the foot of her recliner with walker in front of her and bed side
table behind her. The back of her head was bleeding. We got her up off the floor and onto
the chair. There was a quarter sized hematoma with small laceration to the base of the
skull. Patient had been standing at the sink brushing her teeth when the CNA left her in
the bathroom to take care of another patient who was having blood sugar issues. Patient
then attempted to walk to the recliner to sit down and as she did she lost her balance falling
backwards hitting her head on the base of the bedside table. First aid attempted with neuro
and physical assessment. No other injuries noted. Pressure was applied to laceration for
15 minutes and continued to profusely bleed. MD called and order obtained to send to ER.
Pressure applied for another 25 minutes until ambulance arrived to transport to LGH ER
for evaluation at 0820 by MT ambulance. Denies pain. Neuro checks WNL. Daughter
aware.*

54.    Geraldine E. Wiggins was left alone despite the Plan of Care revealing the patient required

staff assistance, despite the medical provider documenting "increased weakness and decreased functional

status in the early morning," despite her new onset of confusion, and the need for functional abilities to be

temporarily discontinued.

55.    The May 12, 2021 "Incident Report" documented Geraldine E. Wiggins' "Predisposing

Physiological Factors" as *"Gait Imbalance, Impaired Memory"* and her "Predisposing Situation Factor" as

*"Ambulating without assist"*.

56.    Geraldine E. Wiggins was transferred to Lancaster General Hospital on May 12, 2021. The

Emergency Department Records reveals the following information:

    - *Chief Complaint: Head Injury, Fall Evaluation*

\*\*\*

*- Arrives via BLS amb from rehab center at Brethren Village after falling and striking head on corner of bedside nightstand.*

*With hematoma to posterior head.*

*ECF staff "couldn't get bleeding to stop" after holding pressure for 45 minutes.*

*EMS reports bleeding through ABD pad that was placed by them.*

*+ Plavix use.*

*Denies any abd, chest, back or neck pain.*

*HPI: patient is a 92-year-old female who presents after a fall. It was unwitnessed. She does have some mild confusion making history of present illness limited. The patient cannot tell me why she fell. She said, "I thought I can make it over to the chair."*

\*\*\*

*MDM: Patient presents with occipital hematoma with mild oozing. On my exam the patient was awake and alert but pleasantly confused. She did have an occipital hematoma with a small open wound. Figure-eight suture placed by physician's assistant. Bleeding subsided. Patient noted to have a C7 fracture. Cervical collar applied. She had no neck pain. Case discussed with the trauma service who recommended imaging of her chest abdomen pelvis. I also ordered basic bloodwork. Disposition is pending their evaluation. Patient remained comfortable in the ER.*

\*\*\*

*CT Angiogram Chest: Since the prior study, the patient has suffered mild superior endplate compression fractures at C7 and T1. A superior endplate compression fracture at T2 is stable. Multiple new compression fractures, most notable at the T7 level.*

57.    The May 12, 2021 "Neurosurgery Note" documented the "Impression/Plan" as *"Acute fracture C7, T1 with no significant retropulsion"*, *"Currently oriented to person only"*, *"No surgical intervention needed"* and *"Aspen Cervical collar OK per Dr. Hernandez."*

58.    Geraldine E. Wiggins was readmitted to Brethren Village from Lancaster General Hospital.

59.    On May 15, 201, Speech Therapy documented Geraldine E. Wiggins as *"referred by physician for speech swallow evaluation. Patient exhibiting difficulty completing meals and rotary chew for regular diet intake. The functional deficits are caused by generalized weakness, decreased range of motion from C Collar placement."*

60.    The vertebral fracture and need for a cervical collar interfered with her meal consumption.

61.    Geraldine E. Wiggins died on August 28, 2021 with failure to thrive listed at the cause of death.

62.    Decedent suffered horrific injuries as a consequence of the negligence, neglect and abuse by Defendants, and/or Defendants' real and/or ostensible servants, agents and/or employees.

63.    The negligence, neglect and abuse of Geraldine E. Wiggins by Defendants, and/or Defendants' agents and resulting injuries caused a significant decline in Decedent's clinical status and were significant contributing factors in causing Decedent's death.

64.    The severity of the negligence, neglect and abuse inflicted upon Geraldine E. Wiggins by the Defendants' mismanagement, improper under-budgeting, understaffing of the facility and lack of training and/or supervision of the facility's employees, failure to provide adequate and appropriate health care, engaging in incomplete, inconsistent and fraudulent documentation, failure to develop and implement an appropriate care plan, failure to conduct accurate patient assessment, failure to ensure the highest level of physical, mental and psychosocial functioning was attained or maintained, failure to provide appropriate monitoring, supervision, care and services caused Decedent to experience, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

65.    As a direct result of the Defendants' negligence, neglect, abuse, carelessness and recklessness herein described,  Decedent was caused to suffer serious and permanent injuries as described herein, including a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

### CONDUCT OF THE DEFENDANTS

66.    Plaintiff hereby incorporates by reference the prior paragraphs of this Fourth Amended Complaint, as if they have been more fully set forth herein.

67.    During the course of her admission, Geraldine E. Wiggins was incapable of independently providing for all of her daily care and personal needs without reliable assistance.

68.    At all relevant times, the Defendants, through their agents, servants, employees and/or representatives: (a) should have been and/or were aware of Geraldine E. Wiggins' needs and (b) represented that they could adequately care for her needs.

69.    In exchange for money, Geraldine E. Wiggins was admitted to the Defendants' care at Brethren Village to obtain such care and protection.

70.    The Defendants, upon information and belief, were controlled by a board of directors who were responsible for the operation, planning, management and quality control of Brethren Village.

71.    At all relevant times, the Defendants, individually, and/or through their agents, servants and employees, assessed the needs of Geraldine E. Wiggins and promised that they would adequately care for her needs, akin to a hospital.

72.    The Defendants were responsible for the operation, planning, management and quality control of their Facility.

73.    The control exercised over the Defendants' Facility by the Defendants, included: budgeting, marketing, cash management, cost control, reimbursement, setting staffing levels, maintaining and increasing census, human resource management, training, supervision and oversight of their Facility's administrator, supervision and oversight of their Facility's director of nursing, supervision of staff, obtaining licensure and certification, conducting mock surveys, conducting customer satisfaction surveys and monitoring customer satisfaction, corporate and regulatory compliance, quality of care assessment, and the creation and implementation of all policy and procedure manuals used by their Facility.

74.    The Defendants controlled reimbursement, quality care assessment and compliance, licensure, certification, and all financial, tax and accounting issues through control of the fiscal policies of

Brethren Village.

75.    Upon information and belief, the corporate officers of Defendants utilized survey results and quality indicators to monitor the care being provided at their nursing homes, including Brethren Village.

76.    Upon information and belief, the Defendants, including their owners, officers, directors, partners, members, managers and employees knew that Rehabilitation Center at Brethren Village, LLC has been cited by governmental units as follows:

1/23/2020: failed to assess a pressure ulcer for one of one resident's reviewed; and

8/12/2021: failed to comprehensively assess and administer medication to a wound; and timely administer wound treatment to a sacral wound for one of seven residents reviewed.

77.    As a direct and proximate result of the Defendants' acts and omissions, and their breach of the duty of care, negligence, carelessness and recklessness,  Decedent suffered: (a) severe permanent physical injuries resulting in pain, suffering, and disfigurement; (b) mental anguish, embarrassment, humiliation, degradation, emotional distress, and loss of personal dignity; (c) loss of capacity for enjoyment of life; (d) expense of otherwise unnecessary hospitalizations and medical care; and (e) death.

78.    In causing the aforesaid injuries, the Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

79.    The conduct of the Defendants was intentional, outrageous, willful and wanton, and exhibited a reckless indifference to the health, safety and well-being of Geraldine E. Wiggins.

80.    At all relevant times, the Defendants, individually, and/or through their agents, servants and employees, assessed the needs of Geraldine E. Wiggins, and promised that they would adequately care for her needs, akin to a hospital.

81.    At all relevant times, the Defendants made a conscious decision to operate and/or manage their Facility so as to maximize profits at the expense of the care required to be provided to their residents, including Geraldine E. Wiggins.

82.    In their efforts to maximize profits, the Defendants reduced staffing levels below the level necessary to provide adequate and timely care and services to their patients, including Geraldine E. Wiggins.

83.    Upon information and belief, the Defendants caused staffing levels at their Facility to be set at a level such that the personnel on duty at any given time could not and did not reasonably and timely tend to the needs of their assigned patients, including Geraldine E. Wiggins.

84.    Upon information and belief, the Defendants intentionally increased the number of sick and frail residents with greater health problems requiring more complex care.

85.    The Defendants knew that the increase in the acuity care levels of the patient population would substantially increase the need for staff, services and supplies necessary for the patient population.

86.    The Defendants failed to provide the resources necessary, including sufficient staff, services and supplies, to meet the needs of their patients, including Geraldine E. Wiggins.

87.    The Defendants negligently, carelessly and recklessly caused the healthcare providers, nurses and nurses' aides who they placed and/or staffed at their Facility to be so unqualified and/or under-trained, that the personnel on duty at any given time could not and did not reasonably and timely tend to the needs of their assigned patients, including Geraldine E. Wiggins.

88.    The aforementioned acts and omissions directly caused and/or increased the risk of the injuries and harm to Geraldine E. Wiggins and were known by the Defendants.

89.    At all relevant times, the Facility was individually owned, and/or in concert owned, possessed, managed, controlled, operated and maintained under the exclusive control of the Defendants.

90.    At all relevant times, the Defendants were operating individually or through their managers, members, partners, officers, agents, servants and employees who had actual, apparent and/or ostensible authority, and all of whom were acting within the course and scope of their employment and under the direct and exclusive control of the Defendants.

91.    The aforementioned injuries, acts and omissions were caused solely and exclusively by reason of negligence, carelessness and recklessness of the Defendants, and their agents, servants and employees and were due in no part to any act or omission to act on the part of Geraldine E. Wiggins.

92.    The Defendants exercised complete and total control over the total and complete healthcare of all the patients of their Facility, including Geraldine E. Wiggins, akin to a hospital.

### COUNT I – NEGLIGENCE
### BRENDA L. KLING, ADMINISTRATRIX OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
### v.
### REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA and JOHN DOES 1-4

93.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint, as though same were fully set forth at length herein.

94.    Upon accepting Geraldine E. Wiggins as a resident at their Facility, the Defendants, individually and jointly, assumed direct duties to provide her with adequate, timely and appropriate healthcare and other basic custodial services as set forth herein.

95.    The Defendants had the ultimate responsibility to ensure that the rights, safety, welfare and well-being of their residents, including Geraldine E. Wiggins, were protected.

96.    The Defendants owed a duty to provide adequate, timely and appropriate healthcare and related skilled nursing, custodial, restorative, therapy and rehabilitation care and services to their residents, including Geraldine E. Wiggins, such as reasonable caregivers would provide under similar circumstances.

97.    The Defendants each owed duty to their patients, including Geraldine E. Wiggins, to hire, train, oversee and supervise their employees to ensure that their Facility was operated, and services were provided, to their residents in a safe and reasonable matter.

98.    The Defendants each owed a duty and responsibility to furnish Geraldine E. Wiggins with appropriate, timely and competent medical, nursing and custodial care and services.

99.    The Defendants each owed and failed to fulfill the following duties and responsibilities to Geraldine E. Wiggins:

Landmark v. Nurselect MSJ_00000438

i)    The duty to use reasonable care in the maintenance of safe and adequate facility;

ii)    The duty to select, hire, train and retain only competent staff;

iii)    The duty to oversee, monitor and supervise all persons who practice nursing and/or medical healthcare within their facility;

iv)    The duty to staff their facility with sufficient and adequately trained personnel to provide the care and services required by their facility's patients;

v)    The duty to maintain sufficient staffing, funding, supplies and resources for the facility to meet the needs of their facility's patients;

vi)    The duty to formulate, adopt, oversee, revise and enforce rules, policies, procedures and protocols to ensure quality of care for all their facility's patients;

vii)    The duty to take adequate, timely and appropriate measures to correct the known problems with quality of care, as well as the known problems with the delivery of medical, nursing and custodial care and services;

viii)    The duty to keep their facility's patients free and safe from abuse and neglect;

ix)    The duty to provide safe, decent and clean environment for their facility's patients; and

x)    The duty to warn their facility's patients, as well as their families and/or responsible parties, of the Defendants' inability to provide adequate, timely, appropriate and safe care and services when the Defendants were placed on notice, knew, or should have known, of the deficiencies in providing such care and services to and for their patients.

100.    In addition to the direct acts and omissions of the Defendants, the Defendants also acted through their agents, servants, officers and employees, who were in turn acting within the course and scope of their employment, in furtherance of the Defendants' business and under the direct control and supervision of the Defendants.

101.    All of the acts alleged to have been done or not to have been done by the Defendants were done or not done by said Defendants, their agents, ostensible agents, servants, workmen and/or employees, acting in the course and scope of their employment with and on behalf of said Defendants and failed or refused to act with reasonable care in the following manner:

a.    violating their duty to provide adequate resident care, including but not limited to diagnosis, evaluation, assessment, supervision, monitoring, medication and treatment monitoring, medication and treatment to and for Geraldine E. Wiggins;

b.    failure to provide adequate supervision and monitoring to Geraldine E. Wiggins to avoid accidents;

c.  failure to keep Geraldine E. Wiggins safe from falls;

d.  failure to identify and implement adequate interventions to keep Geraldine E. Wiggins safe;

e.  failure to develop a comprehensive care plan to address Geraldine E. Wiggins' fall risk;

f.  failure to monitor the effectiveness of interventions and modify Geraldine E. Wiggins' care plan when her condition required the same;

g.  violating their duty to develop and implement a comprehensive Care Plan to prevent a fall resulting in hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and death;

h.  violating their duty to develop and implement timely interventions to prevent a fall resulting in hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and death;

i.  failure to recognize that the Decedent was at risk for falls and provide appropriate and adequate supervision and monitoring to prevent a fall resulting in hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and death;

j.  failure to recognize the Decedent's fall-risk factors and prevent a fall resulting in hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and death;

k.  failure to properly assess and document the Decedent's change in condition;

l.  failure to provide for the Decedent's well-being and keep her safe from a fall resulting in hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and death;

m.  failure to provide for the Decedent's safety and well-being;

n.  failing to make the appropriate, thorough and timely assessment of Decedent's condition;

o.  failing to seek timely medical care when Decedent's condition required same;

p.  failing to properly train and supervise Defendants' actual or ostensible employees, servants, agents or other staff or healthcare providers to monitor Decedent and to provide for her safety, welfare and general well-being;

q.  failing to properly hire, train and supervise staff, employees and healthcare providers at Defendants' facility;

r.  failing to monitor the competency, adequacy and propriety of the treatment rendered by their agents, servants and employees who provided care and treatment to Decedent while a resident at Defendants' facility;

Landmark v. Nurselect MSJ_00000440

s. failing to maintain Defendants' duty to formulate, adopt and enforce adequate policies, procedures and protocols to ensure that their facility's patients, including Decedent, are properly supervised, assessed, monitored and receive proper and timely medical, custodial and nursing care;

t. failing to maintain Defendants' duty to formulate, adopt and enforce adequate policies, procedures and protocols to ensure that their facility's patients, including Decedent, are properly supervised, monitored and receive proper medical, custodial and nursing care to keep her free from pressure injuries;

u. failing to maintain Defendants' duty to formulate, adopt and enforce adequate policies, procedures and protocols to ensure that their facility's patients, including Decedent, are properly supervised, monitored and receive proper medical, custodial and nursing care to keep her free from infections and sepsis;

v. failing to maintain Defendants' duty to formulate, adopt and enforce adequate policies, procedures and protocols to ensure that their facility's residents, including Decedent, are properly supervised, monitored and receive proper medical, custodial and nursing care to keep him free from protein-calorie malnutrition;

w. failing to administer the facility in a manner that enabled it to use its resource effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of the facility's residents, including Decedent;

x. failing to ensure that the Defendants used the results of its assessments to develop, review and revise Decedent's "Care Plan";

y. failing to ensure that Defendants' facility had sufficient nursing staff to provide nursing and custodial care and services to the residents in order to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident, including Decedent;

z. failing to maintain compliance with the governmental rules and regulation to which Defendants' delivery of care is compared as part of the survey process conducted by the Pennsylvania Department of Health;

aa. failing to provide adequate and sufficient staffing levels at Defendants' facility;

bb. failing to properly select, retain and monitor the competency of the medical and nursing staff, their employees, agents, servants and other healthcare providers who treated Decedent and failing to ensure such persons provided care within the applicable standards of care;

cc. failing to keep Decedent free from neglect and abuse;

dd. failing to take appropriate steps to remedy continuing problems at the Defendants' facility that Defendants knew, or had reason to know, were occurring with Decedent's care, which included the need to increase the number of the facility's employees, hiring skilled and trained employees, adequately train and supervise the current employees, monitoring

conduct of the employees, and adopting new or changing the existing policies, procedures and protocols to ensure care provided was provided within the appropriate community standards;

ee.  making false, fraudulent, inadequate and inconsistent notes in Decedent's chart;

ff.  failing to obtain new or modified "Physicians' Orders" when changes in Decedent's condition were recognized by Defendants' agents;

gg.  failing to accurately, timely and consistently document Decedent's needs and the care and services provided to her in response to such needs;

hh  violating Pennsylvania Statutes, Pennsylvania Administrative Regulations, as well as OBRA regulations;

ii.  grossly understaffing Defendants' facility;

jj.  failing to train the employees to recognize medical conditions/symptoms which required Decedent's transfer to the hospital;

kk.  failing to allocate adequate funds, resources and supplies and failure to implement a facility budget that provided for the necessary and sufficient funds, resources and staffing levels to enable and allow their facility to provide adequate, timely appropriate care and services to the facility's residents, including Decedent;

ll.  failure to recognize and investigate neglect and abuse occurring with the care and services provided and not provided to Decedent, and failure to report such neglect and abuse to the appropriate governmental agencies;

m.  All of the acts or failure to act constitute a deviation from the appropriate standards of care, negligence, carelessness and reckless indifference to the health, safety, welfare and well-being of Decedent;

nn.  Defendants' conduct caused harm to Decedent and increased the risk of harm to her; and

oo.  in committing the aforementioned acts and omissions, Defendants were acting negligently, carelessly and with reckless indifference to the safety, welfare and well-being of Decedent.

102.  Upon information and belief, the Defendants, including their owners, members, managers, officers, directors and partners knew of and/or were made aware of the Pennsylvania Department of Health annual and complaint survey results and placed on notice of the status of Brethren Village.

103.  At all times relevant to this lawsuit, the Defendants employed and directed physicians, nurses and other medical personnel who rendered care to Geraldine E. Wiggins.

Landmark v. Nurselect MSJ_00000442

104.    At all times relevant to this lawsuit, the Defendants owed a duty to Geraldine E. Wiggins to provide competent and qualified physicians, surgeons, nurses, nurses' aides and other medical and quasi medical personnel to render proper care to her.

105.    At all times relevant to this lawsuit, the Defendants owed Geraldine E. Wiggins a duty to operate their rehabilitation Facility in a careful and reasonable manner, under the circumstances, as would have been done by other rehabilitation facilities in and about the Pennsylvania area.

106.    At all times relevant to this lawsuit, Defendants and their agents, staff and employees, owed Geraldine E. Wiggins the duty to possess and exercise that degree of skill and knowledge ordinarily possessed and exercised by similar rehabilitation, physicians and/or nurses in and about the Pennsylvania area.

107.    At all times relevant hereto, Geraldine E. Wiggins' care was to be delivered and administered by medical staff, nursing staff and healthcare staff at the Defendants' rehabilitation Facility in a reasonably safe and prudent manner within the applicable standards of care for the community, as well as state and federal nursing home facility rules and regulations.

108.    Geraldine E. Wiggins was a resident at Defendants' rehabilitation Facility and the Defendants negligently and carelessly and in wanton and willful disregard for her health, safety and general welfare, inflicted injury upon her in failing to timely provide appropriate and necessary medical, nursing, rehabilitation and custodial care, adequate monitoring and supervision.

109.    As a direct and proximate result of the negligence, carelessness and recklessness of the Defendants, as is more fully set forth herein, Geraldine E. Wiggins experienced, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

110.    Geraldine E. Wiggins experienced severe and excruciating pain and suffering as the result of the aforesaid negligent, careless and reckless conduct of the Defendants, and Defendants' agents, and

Landmark v. Nurselect MSJ_00000443

their breach of the duty of care as set forth herein.

111.    In causing the aforesaid injuries, the Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

112.    Pennsylvania Code Chapter 28, Section 201 *et. seq.*, requires Defendants to comply with all federal, state and local regulations with regard to long-term care facilities.

113.    The Defendants violated OBRA regulations, which establish the minimum standard of care to be followed by Defendants, including but not limited to the following:

(a)    42 C.F.R. § 483.10 (a)(1) / § 483.10 the patient has a right to a dignified existence;

(b)    42 C.F.R. § 483.12 / § 483.13 (b) & (c) the patient has the right to be free from abuse, neglect, misappropriation of patient property, and exploitation as defined in this subpart;

(c)    42 C.F.R. § 483.12 (c)(1) / § 483.13(c)(2) the facility must ensure that all alleged violations involving abuse, neglect, exploitation or mistreatment, including injuries of unknown source and misappropriation of patient property, are reported immediately, but not later than 2 hours after the allegation is made, if the events that cause the allegation involve abuse or result in serious bodily injury, or not later than 24 hours if the events that cause the allegation do not involve abuse and do not result in serious bodily injury, to the Administratrices of the facility and other officials (including to the State Survey Agency and adult protective services where state law provides for jurisdiction in long-term care facilities) in accordance with State law through established procedures;

(d)    42 C.F.R. § 483.20 (2)(ii) the facility must conduct an assessment after a significant change in patient's condition;

(e)    42 C.F.R. § 483.21 (b)(b) / § 483.20(k) Comprehensive Care Plans, the facility must develop and implement a comprehensive person-centered care plan for each patient, consistent with the patient rights, that includes measurable objectives and timeframes to meet a patient's medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment;

(f)    42 C.F.R. § 483.24 / § 483.25 each patient must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well-being, consistent with the patient's comprehensive assessment and plan of care;

(g)    42 C.F.R. § 483.25 (b)(i) / (ii) / § 483.25 (c)(1)(2) Based on the comprehensive assessment of a resident, the facility must ensure that (i) A resident receives care, consistent with professional standards of practice, to prevent pressure ulcers and does not develop pressure ulcers unless the

Landmark v. Nurselect MSJ_00000444

individual's clinical condition demonstrates that they were unavoidable; and (ii) A resident with pressure ulcers receives necessary treatment and services, consistent with professional standards of practice, to promote healing, prevent infection and prevent new ulcers from developing.

(h)     42 C.F.R. § 483.25 (d)(2) / § 483.25 (h)(2) each patient receives adequate supervision and assistance devices to prevent accidents;

(i)     42 C.F.R. § 483. 35 (a) / § 483. 30(a)(1) the facility must provide services by sufficient number of each of the following types of personnel on a twenty-four (24) hour basis to provide nursing care to all patients in accordance with patient care plans; and

(j)     42 C.F.R. § 483.70 (b) / § 483.75 (b) The facility must operate and provide services in compliance with all applicable Federal, State, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility.

114.     Geraldine E. Wiggins fell within the class of persons the statutory rules, regulations and laws that were intended to protect by virtue of OBRA Regulations and the Pennsylvania Code 28 §§ 201, *et. seq.*, thus entitling Plaintiff to adopt such laws as the standard of care for measuring Defendants' conduct. Thus, Plaintiff asserts a claim for negligence *per se*, asserting that, as a matter of law, the conduct of the Defendants amounted to negligence and negligence *per se*.

115.     At all relevant times pertinent hereto, there was in full force and effect 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person", providing penal consequences for neglect of a care-dependent person for:

> *Intentionally, knowingly or recklessly causes bodily injury or serious bodily injury by failing to provide treatment, care, goods or services necessary to preserve the health, safety or welfare of a care-dependent person for whom he is responsible to provide care.*

116.     18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" expresses the fundamental public policy of the Commonwealth of Pennsylvania that older adults, like children, are not to be abused or neglected, particularly in health care facilities or by persons holding themselves out as trained professionals, and that if such neglect or abuse causes injury, either physical or mental, then such conduct is actionable.

117.     At all relevant times pertinent thereto, Geraldine E. Wiggins was a care-dependent resident at Defendants' facility and as such, fell within the class of persons 18 Pa.C.S.A. §2713 "Neglect of Care

Landmark v. Nurselect MSJ_00000445

Dependent Person" was intended to protect, and as such, entitling Plaintiff to adopt 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" as the standard of care for measuring the conduct of the Defendants.

118.    Furthermore, 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" is directed to obviate the specific kind of harm which Geraldine E. Wiggins sustained, with its purpose, at least in part, to protect the interest of a group of individuals, i.e., *care-dependent persons*, including Geraldine E. Wiggins.

119.    Defendants, in accepting the responsibility for providing for Geraldine E. Wiggins' care, welfare and well-being, as mentioned herein, and were negligent *per se* as they violated 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" in that they failed to provide treatment, care, goods and services necessary to preserve the health, safety or welfare of Geraldine E. Wiggins, for whom they were responsible to provide care as specifically set forth in this Fourth Amended Complaint.

120.    As a direct result of the Defendants' aforementioned negligence *per se*, Geraldine E. Wiggins was caused to suffer serious injuries as aforesaid.

121.    The conduct of the Defendants was intentional, outrageous and willful and exhibited a reckless indifference to the health, safety and well-being of Geraldine E. Wiggins.

122.    The conduct of the Defendants was such that an award of punitive damages is justified.

*WHEREFORE*, Plaintiff demands judgment in her favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

### COUNT II – VICARIOUS LIABILITY
### BRENDA L. KLING, ADMINISTRATRIX OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
### v.
### REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA and JOHN DOES 1-4

123.    Plaintiff incorporates by reference herein the allegations contained in the receding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

124.    At all times relevant hereto, Defendants' agents, servants, employees and others were acting in the scope of their employment as agents, servants or employees of Defendants' Facility.

125.    Defendants are vicariously liable for the acts, commissions or omissions, of their physicians, nurses, nurses' aides and other medical personnel and healthcare providers fully as though the aforementioned physicians, nurses, nurses' aides and other medical personnel and healthcare providers performed the acts or omissions themselves. In the alternative, the Defendants are responsible for the negligent acts or omissions of other physicians, nurses, nurses' aides and other healthcare providers who are agents, employees and/or servants of the Defendants.

126.    At all times relevant to this lawsuit, the Defendants, employed and directed physicians, nurses, nurses' aides and other medical personnel who rendered care to Geraldine E. Wiggins.

127.    At all times relevant to this lawsuit, Defendants owed a duty to Geraldine E. Wiggins to provide competent and qualified physicians, surgeons, nurses and other quasi-medical personnel to render care to her.

128.    At all times relevant to this lawsuit, the Defendants owed to Geraldine E. Wiggins the duty to operate their Facility in a careful and reasonable manner, under the circumstances, as would have been done by other similar facilities in and about the Pennsylvania area.

129.    At all times relevant to this lawsuit, the Defendants and their agents, owed Geraldine E. Wiggins the duty to possess and exercise that degree of skill and knowledge ordinarily possessed and exercised by similar facilities, physicians and/or nurses in and about the Pennsylvania area.

130.    At all times relevant to this lawsuit, Geraldine E. Wiggins' care was to be delivered and administered by the agents, servants and/or employees of the Defendants at the Defendants' Facility in a reasonably safe and prudent manner within the applicable standards of care for the community Commonwealth of Pennsylvania and federal nursing home facility rules and regulations.

131.    The Defendants breached their duties and were, therefore, negligent, careless and exhibited a reckless disregard to the health, safety, welfare and well-being of Geraldine E. Wiggins.

132.    The aforesaid breaches of duties, negligence, carelessness and recklessness of the Defendants directly and proximately caused the aforesaid injuries to Geraldine E. Wiggins, including, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion

from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

133.    In causing the aforesaid injuries, the Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

134.    The conduct of the Defendants was intentional, outrageous, willful and wanton, and exhibited a reckless indifference to the health, safety and well-being of Geraldine E. Wiggins.

135.    The conduct of the Defendants was such that an award of punitive damages is justified.

*WHEREFORE*, Plaintiff demands judgment in her favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

### COUNT III - CORPORATE LIABILITY
### BRENDA L. KLING, ADMINISTRATRIX OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
### v.
### REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE REALTY, LLC and JOHN DOES 1-4

136.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

137.    Defendants' agents, employees, and servants and others provided care and treatment to Geraldine E. Wiggins as agents, employees, servants, officers or directors of Defendants or apparent agents held out as such.

138.    At all times relevant hereto, Defendants' agents, servants, employees and others were acting in the scope of their employment as agents, servants, or employees of said Defendants.

139.    At all relevant times pertinent hereto, the corporate conduct of the Defendants was independent of the negligent conduct of the employees, and was outrageous, willful, and wanton, and exhibited a reckless indifference to the health, welfare and well-being of Decedent.

140.    Defendants, as corporate entities, are liable based on the following duties of care owed to Geraldine E. Wiggins:

Landmark v. Nurselect MSJ_00000448

a)    a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;

b)    a duty to select and retain only competent physicians;

c)    a duty to oversee all persons who practice medicine within its walls as to patient care; and,

d)    a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

141.    Defendants owed Geraldine E. Wiggins a duty concerning the care and treatment under a corporate negligence standard with regard to the policies, actions and inactions of the institution itself and are directly liable for their own negligence.

142.    Defendants and their corporate members, managers, partners, owners, and directors breached their duties and were, therefore, negligent, careless and reckless in their duties and obligations to Geraldine E. Wiggins.

143.    The aforesaid breaches of duties, corporate negligence, carelessness and recklessness of Defendants directly and proximately caused the aforesaid injuries to Decedent, including but not limited to, experience, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

144.    In causing the aforesaid injuries, Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

145.    The conduct of the Defendants was intentional, outrageous, willful and wanton and exhibited a reckless indifference to the health, safety and well-being of Geraldine E. Wiggins.

146.    The conduct of the Defendants was such that an award of punitive damages is justified.

*WHEREFORE,* Plaintiff demands judgment in her favor and against all Corporate Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

## COUNT IV -SURVIVAL CLAIM
## BRENDA L. KLING, ADMINISTRATRIX OF
## THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
### v.
## REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE,
## BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA and JOHN DOES 1-4

147.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

148.    Plaintiff, Brenda L. Kling, Administratrix of the Estate of Geraldine E. Wiggins, deceased, also brings this action on behalf of the Estate of Geraldine E. Wiggins, deceased, under and by virtue of the Act of 1972, June 30, P.L. 508, No. 164, Section 2, eff. July 1972, as amended, 20 Pa.C.S.A. 3371, et seq., (known as the Pennsylvania Survival Act").

149.    Plaintiff, Brenda L. Kling, as daughter and Administratrix of the Estate of Geraldine E. Wiggins, deceased, is a survival claim beneficiary.

150.    Plaintiff, Brenda L. Kling, as Administratrix of the Estate of Geraldine E. Wiggins, deceased, also claims on behalf of the Estate of Geraldine E. Wiggins, deceased, all damages recoverable under the Pennsylvania Survival Act, including, but not limited to damages for the conscious pain and suffering undergone by Decedent, up to an including the time of her death, which was caused by the Defendants' breach of duties, negligence, carelessness, and recklessness.

151.    Plaintiff claim damages for the fright and mental suffering attributable to the peril leading to the physical manifestation of mental and physical injuries experience, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

152.    In causing the aforesaid injuries, the Defendants knew, or should have known, that Geraldine E. Wiggins would suffer such harm.

153.    As a result of the death of Geraldine E. Wiggins, her Estate has been deprived of the economic value of the Decedent's life during the period of her life expectancy and Plaintiff, as Administratrix of the Estate of Geraldine E. Wiggins, deceased, claim damages for pecuniary loss sustained by the Estate as a result of her death, as well as for the conscious pain and suffering undergone by Decedent, up to and including the time of her death.

154.    The conduct of the Defendants was intentional, outrageous, willful, wanton and exhibited a reckless indifference to the safety, health, welfare, and well-being of Geraldine E. Wiggins.

155.    The conduct of the Defendants was such that an award of punitive damages is justified.

**WHEREFORE,** Plaintiff demands judgment in her favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

### COUNT V - WRONGFUL DEATH CLAIM
### BRENDA L. KLING, ADMINISTRATRIX OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
### v.
### REHABILITATION CENTER AT BRETHREN VILLAGE, LLC, BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, LORI SCHNOENER, NHA and JOHN DOES 1-4

156.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

157.    Plaintiff also brings this action on behalf of Decedent's estate under and by virtue of the Act of 1855 P.L. 30, as amended, Pa.R.C.P. 2202, as further amended, July 1976, 42Pa.C.S.A. 8301 (known as the "Pennsylvania Wrongful Death Act").

158.    Plaintiff, Brenda L. Kling, as daughter and Administratrix of the Estate of Geraldine E. Wiggins, deceased, is a wrongful death beneficiary.

159.    Plaintiff claims all damages recoverable under the Pennsylvania Wrongful Death Act, including, but not limited to damages for pecuniary loss suffered by Decedent's survivors by reason of the death of Geraldine E. Wiggins, as well as for the reimbursement for medical expenses, nursing expenses, funeral expenses, expenses of administration and other expenses incurred in connection therewith.

160.    As a result of the death of Geraldine E. Wiggins, the aforesaid survivors have been deprived of the comfort, aid, assistance, tutelage, maintenance, and companionship that they would have received from Decedent for the remainder of her natural life.

**WHEREFORE,** Plaintiff demands judgment in her favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

**COUNT VI- BREACH OF FIDUCIARY DUTY**
**BRENDA L. KLING, ADMINISTRATRIX OF**
**THE ESTATE OF GERALDINE E. WIGGINS, DECEASED**
v.
**REHABILITATION CENTER OF BRETHREN VILLAGE, LLC**

161.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

162.    At all times material and relevant hereto, Geraldine E. Wiggins was incapable of dealing with the facility, Brethren Village, on equal terms, and was incapable of engaging in any arm's length relationship with them.

163.    Additionally, at all times material and relevant hereto, Geraldine E. Wiggins was incapable of independently providing for her own safety, health, welfare and well-being and justifiably relied on the Facility to provide necessary care and services to attain and/or maintain her highest practicable physical, mental and psychosocial well-being.

164.    At all times material and relevant hereto, the Facility individually and/or collectively fostered and forged a relationship of special confidence and trust with Geraldine E. Wiggins by admitting her into their care on April 13, 2021, and by reserving the right to specifically determine the level of care, safety, protection, services and supplies that would be provided to Geraldine E. Wiggins.

165.    At all times material and relevant hereto, the Facility individually and/or collectively controlled and oversaw every single aspect of Geraldine E. Wiggins's existence, including her activities of daily living (ADL), custodial care, as well as skilled nursing and healthcare.

166.    At all times material and relevant hereto, the facility individually and/or collectively determined and orchestrated the most trivial as well as the most vital aspects of Geraldine E. Wiggins's

Landmark v. Nurselect MSJ_00000452

existence, from the type of clothing she wore, to when and how she received healthcare, as well as quality and quantity of food and water she could consume.

167.    As a result, Geraldine E. Wiggins was solely and entirely dependent upon the Facility's staff, employees, agents, officers and directors, to provide for her basic daily care, skilled nursing and healthcare, services, safety, protection, well-being and personal and intimate needs.

168.    Geraldine E. Wiggins reposed a special confidence into the Facility's staff, employees, agents, officers and directors to provide her with necessary care and services to attain and/or maintain her highest practicable physical, mental, and psychosocial well-being.

169.    At all times material hereto, the Facility developed a special relationship with Geraldine E. Wiggins  by virtue of the type of the care and services she required, their supposedly superior knowledge, skill and expertise, and their overmastering dominance over Geraldine E. Wiggins and by virtue of Geraldine E. Wiggins's weakness, dependence and inability to independently provide for her own safety, health, welfare and well-being and her justifiable reliance on the Facility to provide for her safety, health, welfare and well-being.

170.    In their special relationship with one another, Geraldine E. Wiggins, a vulnerable and dependent individual, did not and could not deal with the Facility on equal terms due to the Facility's overmastering dominance on one side, and due to Geraldine E. Wiggins's weakness and justifiable trust on another side.

171.    At all times material hereto, Geraldine E. Wiggins entrusted her care, treatment, as well as every single aspect of her very existence into the exclusive care, custody and control of the Facility and its staff, employees, agents, officers and directors.

172.    At all times material hereto, the aforementioned special relationship enabled the facility to occupy a position of confidence regarding Geraldine E. Wiggins requiring fidelity, loyalty and scrupulous fairness and good faith on the part of the Facility.

173.    The aforementioned special relationship further required the Facility to refrain from using its position to Geraldine E. Wiggins's detriment and the facility's own advantage.

Landmark v. Nurselect MSJ_00000453

174.    As such, and at all times material hereto, the facility, Rehabilitation Center at Brethren Village, LLC, was a fiduciary of Geraldine E. Wiggins.

175.    At all times material hereto, the Facility owed a fiduciary duty to Geraldine E. Wiggins.

176.    The Facility breached its fiduciary duty and its fiduciary obligations, as well as violated its relationship of trust and special confidence owed to Geraldine E. Wiggins by: a) engaging in the conduct set forth in detail in the within Fourth Amended Complaint; and b) allowing revenues, profits and assets obtained from the Facility's patients as well as their payor sources for inflated, improper and unreasonable inter-company fees and transfers designed and created for the benefit of the facility's owners, parent companies, affiliates and the Defendants herein, instead of utilizing said resources effectively and efficiently in order to maintain and/or attain the highest practicable physical, mental and psychosocial well-being of the Facility's residents, including Geraldine E. Wiggins.

177.    In their dealings with Geraldine E. Wiggins, as described herein, the Facility acted in bad faith, and used its position of trust and special confidence to their own advantage and to Geraldine E. Wiggins's detriment.

178.    In violating its fiduciary duties and obligations to Geraldine E. Wiggins, the Facility knew or should have known, that Geraldine E. Wiggins would suffer harm.

179.    The conduct of the Facility was intentional, outrageous, willful, wanton and exhibited a reckless indifference to the safety, health, welfare and well-being of Geraldine E. Wiggins.

180.    The conduct of the Facility was such, that an award of punitive damages is justified.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

## COUNT VII – CORPORATE DEFENDANTS AIDING AND ABETTING BREACH OF FIDICUARY DUTY
### BRENDA L. KLING, ADMINISTRATRIX OF
### THE ESTATE OF GERALDINE E. WIGGINS, DECEASED
v.
### BRETHREN VILLAGE, BRETHREN VILLAGE REALTY, LLC, JOHN DOES 1-4

Landmark v. Nurselect MSJ_00000454

181.   Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

182.   Corporate Defendants knew, or should have known, of Geraldine E. Wiggins's fiduciary relationship with the Facility, Rehabilitation Center at Brethren Village, LLC, by virtue of the type of the care and services she required, the supposedly superior knowledge, skill and expertise, and their overmastering dominance over Geraldine E. Wiggins, and by virtue of Geraldine E. Wiggins' weakness, dependence and inability to independently providing for her own safety, health, welfare and well-being and is justifiable reliance on the Facility to provide for her safety, health, welfare and well-being.

183.   Corporate Defendants knowingly participated in and provided substantial assistance and encouragement to the Facility in connection with the facility's breach of their fiduciary duties and obligations to Geraldine E. Wiggins, as set forth in detail in Count VI of this Fourth Amended Complaint.

184.   Corporate Defendants knew, or should have known, that the facility's residents, including Geraldine E. Wiggins, were incapable of independently providing for their own care, safety and well-being, and were justifiably relying on, and solely depending upon the Facility's staff, employees, agents, officers and directors to provide for the basic daily and custodial care, skilled nursing and healthcare services, safety, welfare and well-being.

185.   Additionally, Corporate Defendants knowingly assisted, encouraged, aided and abetted the Facility in its breach of fiduciary duties and obligations to the Facility's residents, including Geraldine E. Wiggins, by: a) engaging in the conduct set forth in detail in this Fourth Amended Complaint; b) exercising complete and total control over the Facility's revenues by regularly and repeatedly sweeping nearly all of the Facility's revenues into corporate account under exclusive control of the Corporate Defendants and/or their designee; c) knowingly and intentionally creating and accepting inter-company fees and transfers consisted of revenues derived from the Facility's patients and their payor sources, and designed to improperly and unjustly enrich the Corporate Defendants, instead of allowing the Facility to utilize its resources effectively and efficiently to allow the Facility's patients, including Geraldine E. Wiggins, to attain and/or maintain their highest practicable physical, mental and psychosocial well-being; d) structuring

181.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Fourth Amended Complaint as though same were fully set forth at length herein.

182.    Corporate Defendants knew, or should have known, of Geraldine E. Wiggins's fiduciary relationship with the Facility, Rehabilitation Center at Brethren Village, LLC, by virtue of the type of the care and services she required, the supposedly superior knowledge, skill and expertise, and their overmastering dominance over Geraldine E. Wiggins, and by virtue of Geraldine E. Wiggins' weakness, dependence and inability to independently providing for her own safety, health, welfare and well-being and is justifiable reliance on the Facility to provide for her safety, health, welfare and well-being.

183.    Corporate Defendants knowingly participated in and provided substantial assistance and encouragement to the Facility in connection with the facility's breach of their fiduciary duties and obligations to Geraldine E. Wiggins, as set forth in detail in Count VI of this Fourth Amended Complaint.

184.    Corporate Defendants knew, or should have known, that the facility's residents, including Geraldine E. Wiggins, were incapable of independently providing for their own care, safety and well-being, and were justifiably relying on, and solely depending upon the Facility's staff, employees, agents, officers and directors to provide for the basic daily and custodial care, skilled nursing and healthcare services, safety, welfare and well-being.

185.    Additionally, Corporate Defendants knowingly assisted, encouraged, aided and abetted the Facility in its breach of fiduciary duties and obligations to the Facility's residents, including Geraldine E. Wiggins, by: a) engaging in the conduct set forth in detail in this Fourth Amended Complaint; b) exercising complete and total control over the Facility's revenues by regularly and repeatedly sweeping nearly all of the Facility's revenues into corporate account under exclusive control of the Corporate Defendants and/or their designee; c) knowingly and intentionally creating and accepting inter-company fees and transfers consisted of revenues derived from the Facility's patients and their payor sources, and designed to improperly and unjustly enrich the Corporate Defendants, instead of allowing the Facility to utilize its resources effectively and efficiently to allow the Facility's patients, including Geraldine E. Wiggins, to attain and/or maintain their highest practicable physical, mental and psychosocial well-being; d) structuring

the managing and operating business model for the Facility in such a way that constrained the Facility's ability to provide the adequate and necessary care and services to their residents, including Geraldine E. Wiggins, while simultaneously benefiting and enriching the pyramid structure corporate entities; e) overseeing, managing, and controlling the Facility's acceptance of reimbursement from residents, including Geraldine E. Wiggins, knowing that the Facility could not provide full value of the care and services to meet the care and safety needs of their residents, including Geraldine E. Wiggins; f) drafting, structuring and approving contracts between the Facility and Defendants, which the Defendants knew, or should have known, would result in diversion and depleting of the facility revenues, necessary to provide the care and services to and meet the needs of their residents, including Geraldine E. Wiggins.

186.    The aforementioned conduct of the Defendants constitutes knowing and intentional aiding and abetting the Facility's breach of their fiduciary duties and obligations to the Facility's residents, including Geraldine E. Wiggins, and subjects Corporate Defendants to liability for the injuries and harm suffered by Geraldine E. Wiggins, as aforesaid.

187.    In adding and abetting the Facility in their breach of fiduciary duties and obligations to Geraldine E. Wiggins, as aforesaid, Corportae Defendants knew, or should have known, that Geraldine E. Wiggins would suffer harm.

188.    As a result of Corporate Defendants' aiding and abetting the Facility's breach of their fiduciary duties and obligations to the Facility's residents, including Geraldine E. Wiggins, Corporate Defendants were improperly and unjustly enriched, their Facility, Rehabilitation Center at Brethren Village, LLC, was left with inadequate staff and resources to provide for the care and meet the needs of the Facility's residents, including Geraldine E. Wiggins, and Geraldine E. Wiggins suffered foreseeable and avoidable injuries set forth herein, and more specifically, experience, a fall, hematoma to skull, head laceration, fractures, functional deficits related to decrease range of motion from cervical collar, failure to thrive, severe pain and suffering, loss of enjoyment of life, scaring and disfigurement, loss of life's pleasures, medical expenses and related costs, embarrassment, humiliation, anxiety, depression and permanent physical, bodily and emotional injuries and death.

189.    The conduct of Corporate Defendants was intentional, outrageous, willful, wanton and exhibited a reckless indifference to the safety, health, welfare and well-being of Geraldine E. Wiggins.

190.    The conduct of Corporate Defendants was such, that an award of punitive damages is justified.

*WHEREFORE,* Plaintiff demands judgment in her favor and against Corporate Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

ROSENBAUM & ASSOCIATES, P.C.

Dated:  December 22, 2022                BY:    /s/ *Andrei Govorov*
                                                Andrei Govorov, Esquire
                                                Counsel for Plaintiff

Landmark v. Nurselect MSJ_00000458

## VERIFICATION

I verify that the statements made in the foregoing Fourth Amended Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements therein are made subject to the penalties of 18 Pa.C.S. Section 4904, relating to unsworn falsification to authorities.

**ROSENBAUM & ASSOCIATES, P.C.**

Dated: December 22, 2022          **BY:**   /s/ Andrei Govorov
                                              Andrei Govorov, Esquire
                                              Counsel for Plaintiff

Landmark v. Nurselect MSJ_00000459

EXHIBIT B

Landmark v. Nurselect MSJ_00000460



## SUPPLEMENTAL
## STAFFING AGREEMENT

This Supplemental Staffing Agreement ("**Agreement**") is entered into the **22nd** day of **September, 2020** by and between **Brethren Village Retirement Community**, with its physical address at **3001 Lititz Pike** in **Lititz, PA 17543** ("**Client**"); and NurSelect, LLC, a Pennsylvania business with its administrative offices located at 630 Freedom Business Center Drive, Third Floor, King of Prussia, PA 19406 ("**NurSelect**").

### RECITALS

A.    NurSelect is a health care employment service engaged in the business of recruiting and placing qualified nursing personnel, such as, certified nursing assistants, licensed practical nurses, and registered nurses (collectively, "**NurSelect Personnel**") on contractual assignments on a per-diem or temporary basis (the "**Services**").

B.    The Client desires NurSelect, and NurSelect agrees, upon the terms and conditions more fully set forth herein, to provide NurSelect Personnel to the Client to perform the Services.

NOW, THEREFORE, in consideration of the mutual promises contained herein, the parties hereto agree as follows:

### ARTICLE I – THE SERVICES; NURSELECT PERSONNEL

1.1    Staffing; Services.  Upon receipt of a request by the Client for NurSelect Personnel, and according to the availability of the requested NurSelect Personnel, NurSelect will provide the NurSelect Personnel to the Client, from time to time, at the locations requested, to provide the Services in a quantity and with the qualifications specified by the Client in said request. Services will be provided by NurSelect Personnel that (a) meet the highest professional standards and principles applicable to Services; and (b) shall be provided timely in accordance with the needs of the patient receiving the Services. Services shall be provided: (x) in accordance with federal, state and local laws, rules, ordinances and regulations; and (y) consistent with the policies and procedures of Client. Neither NurSelect, nor NurSelect Personnel shall do or omit to do anything that would jeopardize the licensure of the Client or its participation in governmental health programs, including Medicare and Medicaid.

1.2    Licensure and Certification of NurSelect Personnel.  All NurSelect Personnel shall, at all times while performing the Services, have the appropriate nursing licenses, certifications and/or clinical experience, background checks, reference checks and any other certification or document required by law to provide the Services. From time to time, the Client may notify NurSelect of its need for NurSelect Personnel who possess a specialized certification and/or who have particular clinical experience to provide specialized services. Subject to the terms and conditions of this Agreement, NurSelect will provide NurSelect Personnel having the appropriate licenses, certification, and/or clinical experience required by applicable law to perform such specialized services. NurSelect shall keep and make available to the Client, upon written request by the Client, all licenses, certifications and other documentation verifying clinical experience and/or such other specification needed to furnish any of the Services. NurSelect shall comply with 28 Pa. Code Section 201.21.



2



3

Landmark v. Nurselect MSJ_00000463



ARTICLE II – PAYMENT FOR SERVICES



4

Landmark v. Nurselect MSJ_00000464



### ARTICLE III – STATUS OF THE PARTIES

3.1     NurSelect Employees.  It is expressly understood and agreed that all NurSelect Personnel shall not be considered employees or agents of the Client but instead shall be considered leased employees of NurSelect. Further, it is expressly understood and agreed by the parties that nothing contained in this Agreement shall be construed to create a joint venture, partnership, association or other affiliation or like relationship between the parties hereto, it being specifically agreed that their relationship is and shall remain that of independent parties to a contractual relationship as set forth in this Agreement. NurSelect shall be solely responsible for paying NurSelect Personnel and providing NurSelect Personnel with employment benefits, if any, offered by NurSelect. NurSelect shall be solely responsible for providing unemployment insurance and workers compensation benefits to NurSelect Personnel. NurSelect shall be solely responsible to handle all unemployment and workers compensation claims involving NurSelect Personnel.

3.2     No Claims for Certain Benefits.  NurSelect and its NurSelect Personnel shall not have any claim under this Agreement or otherwise against the Client for employee benefits offered by the Client to its employees, including, without limitation, vacation pay, paid sick leave, retirement benefits, social security, workers compensation, health, disability, or professional malpractice benefits of any kind. NurSelect will indemnify and hold the Client harmless from any and all claims and liability arising from claims relating to the failure of the Client to provide any such benefits to any NurSelect Personnel.

3.3     No Claims for Withholding.  The Client shall not withhold, on behalf of NurSelect or any NurSelect Personnel, any sums for income tax, unemployment insurance, social security or other withholding pursuant to any applicable law or requirement of any governmental body. NurSelect shall solely be responsible for all required withholdings from NurSelect Personnel wages and for remitting the same to the applicable governmental and other parties. NurSelect shall indemnify and hold the Client harmless from any and all claims and/or liability arising from claims relating to the Client's failure to make any such withholdings on behalf of NurSelect or any NurSelect Personnel.

5

## ARTICLE IV - INSURANCE



4.2    Proof of Insurance.  NurSelect shall, upon written request from the Client, provide to the Client certificates of insurance or other appropriate evidence of satisfaction of its obligations to maintain insurance as described in this Article. NurSelect agrees that it will notify the Client at least thirty (30) days in advance of cancellation, non-renewal, or adverse change in its insurance.

## ARTICLE V - APPORTIONMENT OF LIABILITY AND
## DAMAGES INDEMNIFICATION

5.1    Apportionment of Liability.  It is hereby stipulated and agreed between the Client and NurSelect that with respect to any claim or action arising out of the Services, each entity shall only be liable for payment of that portion of any and all liability, costs, expenses, demands, settlements or judgments resulting from negligence, actions or omissions of its own agents, officers, and employees.



## ARTICLE VI - TERM AND TERMINATION

6.1    Term.  The initial term of this Agreement shall commence on the date above first written ("Commencement Date") and shall continue for one (1) year from the Commencement Date ("Term"). Except as otherwise stated herein, the Term shall be automatically extended for one (1) additional year and so on from year to year until either NurSelect or the Client give to the other no less than thirty (30) days' written notice of termination prior to the end of the then-current Term.



6



ARTICLE VII - CONFIDENTIAL INFORMATION



ARTICLE VIII - NON-ENGAGEMENT COVENANT



7

Landmark v. Nurselect MSJ_00000467



## ARTICLE IX – HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996 PROVISIONS



8

Landmark v. Nurselect MSJ_00000468



9

Landmark v. Nurselect MSJ_00000469



ARTICLE X - OTHER TERMS AND CONDITIONS



10

Landmark v. Nurselect MSJ_00000470



IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and date first written above.

CLIENT:

By: _David S. Rayha_
Name: _DAVID A. RAYHA  NHA_
Title: _VP OPERATION/COO_

NURSELECT:

By: _David E. Shc..._
Name: _DAVID E.SHC (...)_
Title: _PRESIDENT_

11

Landmark V. Nurselect MSJ_00000471

| | |
|---|---|
| BRENDA L. KLING, individually and as | : IN THE COURT OF COMMON PLEAS |
| Administratrix of the Estate of | : OF LANCASTER COUNTY, |
| GERALDINE E. WIGGINS, | : PENNSYLVANIA |
| | : |
| Plaintiff | : |
| | : NO: CI-22-04128 |
| v. | : |
| | : MedMal |
| REHABILITATION CENTER AT | : |
| BRETHREN VILLAGE, LLC, | : |
| BRETHREN VILLAGE, BRETHREN | : |
| VILLAGE REALTY, LLC, LORI | : |
| SCHOENER, NHA, and JOHN DOES1– | : |
| 4 | : |
| Defendants, | : |
| | : |
| v. | : |
| | : |
| NURSELECT, LLC, | : |
| | : |
| Additional | : |
| Defendant. | : |

## VERIFICATION

I verify that the statements made in the attached Third-Party Joinder Complaint are true

and correct to the best of my knowledge, information, and belief.  I understand that the

statements therein are subject to the penalties of 18 Pa.C.S. § 4904.

Date: June 13 , 2023                       By: _____

John Snader, FACHE
President/CEO Brethren Village

Landmark V. Nurselect MSJ_00000472

DATE: ___8/25/23___
WRIT RE-ISSUED
ANDREW E. SPADE
PROTHONOTARY

LYWC(O\, bV
2.ME\ ED ED D\ED
2023 AUG 28 AM 11:49

RECEIVED

Landmark v. Nurselect MSJ_00000473

**RE: Ayanna McDowell**

David Shelly
kas@saxtonstump.com
Fri, Oct 14, 2022, 3:09 PM

Hi Kim, here is the last known contact information we have on file for Ayanna. Please let me know if you need anything else. Thank you.

Cell:       267-836-2086
Email:      ayannamcdowell@aol.com
Address:    2836 Lincoln Hwy, E-2, Ronks, PA 17572

Sincerely,

David Shelly, President
**NurSelect, LLC**
630 Freedom Business Center Dr.
Third Floor
King of Prussia, PA 19406
Main: (800) 484-8572
Direct: (484) 663-4374
Fax (484) 214-0055
nurselectstaffing.com



CONFIDENTIALITY NOTICE: The content of this message and any files transmitted with it is a confidential and proprietary business communication, which is solely for the use of the intended recipient(s). Any use, distribution, duplication or disclosure by any other person or entity is strictly prohibited. If you are not an intended recipient or this has been received in error, please notify the sender and immediately delete all copies of this communication.

Kimberly A. Selemba

1 / 2

EXHIBIT
2 11/20/24

David Shelly
Fri, Oct 14, 2022, 3:14 PM

Thank you, Dave. Can you also please send over the statement that Ayanna prepared?

Thanks again,
Kim

David Shelly
Kimberly A. Selemba
Thu, Oct 20, 2022, 12:41 PM
AM Statement[196247].pdf

Hi Kim, please find the requested statement attached. Thanks.

Sincerely,

David Shelly, President
**NurSelect, LLC**
630 Freedom Business Center Dr.
Third Floor
King of Prussia, PA 19406
Main: (800) 484-8572
Direct: (484) 663-4374
Fax (484) 214-0055
nurselectstaffing.com



CONFIDENTIALITY NOTICE: The content of this message and any files transmitted with it is a confidential and proprietary business communication, which is solely for the use of the intended recipient(s). Any use, distribution, duplication or disclosure by any other person or entity is strictly prohibited. If you are not an intended recipient or this has been received in error, please notify the sender and immediately delete all copies of this communication.

3 Emails

Landmark v. Nurselect MSJ_00000475

**From:** AYANNA MCDOWELL
**Sent:** Wednesday, May 12, 2021 4:10 PM
**To:** Melissa Reilly
**Subject:** Statement

I walked in and got report from the aide of her telling me the resident was on the toilet. I went to check her because the other aide was in the resident room assisting her getting dress. So I washed up the resident and set her up to brush her teeth and was going to be right back just was gonna answer his bell and he needed to use the urinal. So when I gave him the urinal I said ring the bell when you're done. As I went over to the aide cause she was still in the resident room. I said we need to get Johanna up when you're done. So when I was bout to go back in Geraldine room the nurse Derrick asked me to go get the resident down the hall up and he was putting his breakfast order in and his sugar was low. So after I did what the nurse asked me to do I walked back to Geraldine room and that's when I seen the aide picking her up and putting her in the chair and I walked in asking what happen she said she rang for help. And then I seen she was bleeding and told the supervisor

Sent from my iPhone

2 / 2

Landmark v. Nurselect MSJ_00000476



**SUPPLEMENTAL**
**STAFFING AGREEMENT**

This Supplemental Staffing Agreement ("**Agreement**") is entered into the **22nd** day of **September, 2020** by and between **Brethren Village Retirement Community**, with its physical address at **3001 Lititz Pike** in **Lititz, PA 17543** ("**Client**"); and NurSelect, LLC, a Pennsylvania business with its administrative offices located at 630 Freedom Business Center Drive, Third Floor, King of Prussia, PA 19406 ("**NurSelect**").

RECITALS

A.    NurSelect is a health care employment service engaged in the business of recruiting and placing qualified nursing personnel, such as, certified nursing assistants, licensed practical nurses, and registered nurses (collectively, "**NurSelect Personnel**") on contractual assignments on a per-diem or temporary basis (the "**Services**").

B.    The Client desires NurSelect, and NurSelect agrees, upon the terms and conditions more fully set forth herein, to provide NurSelect Personnel to the Client to perform the Services.

NOW, THEREFORE, in consideration of the mutual promises contained herein, the parties hereto agree as follows:

ARTICLE I – THE SERVICES; NURSELECT PERSONNEL

1.1    Staffing; Services.  Upon receipt of a request by the Client for NurSelect Personnel, and according to the availability of the requested NurSelect Personnel, NurSelect will provide the NurSelect Personnel to the Client, from time to time, at the locations requested, to provide the Services in a quantity and with the qualifications specified by the Client in said request. Services will be provided by NurSelect Personnel that (a) meet the highest professional standards and principles applicable to Services; and (b) shall be provided timely in accordance with the needs of the patient receiving the Services. Services shall be provided: (x) in accordance with federal, state and local laws, rules, ordinances and regulations; and (y) consistent with the policies and procedures of Client. Neither NurSelect, nor NurSelect Personnel shall do or omit to do anything that would jeopardize the licensure of the Client or its participation in governmental health programs, including Medicare and Medicaid.

1.2    Licensure and Certification of NurSelect Personnel.  All NurSelect Personnel shall, at all times while performing the Services, have the appropriate nursing licenses, certifications and/or clinical experience, background checks, reference checks and any other certification or document required by law to provide the Services. From time to time, the Client may notify NurSelect of its need for NurSelect Personnel who possess a specialized certification and/or who have particular clinical experience to provide specialized services. Subject to the terms and conditions of this Agreement, NurSelect will provide NurSelect Personnel having the appropriate licenses, certification, and/or clinical experience required by applicable law to perform such specialized services. NurSelect shall keep and make available to the Client, upon written request by the Client, all licenses, certifications and other documentation verifying clinical experience and/or such other specification needed to furnish any of the Services. NurSelect shall comply with 28 Pa. Code Section 201.21.

Landmark v. Nurselect MSJ_00000477

**EXHIBIT**

3 11/20/24

1.3    Immigration Documentation. NurSelect Personnel shall have proper documentation required for compliance with applicable immigration laws. NurSelect shall make available to the Client, upon written request, copies of such documentation.

1.4    Immunizations. NurSelect shall ensure that NurSelect Personnel are in compliance with the following immunization requirements: (a)    immunization for tetanus; (b) demonstration of a negative skin test or chest x-ray for tuberculosis; (c)    factual documentation of immunizations for measles, mumps, rubella and chicken pox; (d) immunization for Hepatitis B; and (e) certification for education on the blood borne pathogens standard and the TB standard. NurSelect shall make available to the Client, upon written request, copies of documentation evidencing compliance with the foregoing.

1.5    Criminal Background Checks. NurSelect conducts criminal background checks of all its employees prior to their employment with NurSelect. All NurSelect Personnel provided to the Client shall have passed a criminal background check satisfactory to the Client, and shall not have a criminal record which includes, but is not limited to, felony convictions or convictions for any crime involving moral turpitude, physical or sexual abuse, drug abuse or any other crime which would render NurSelect Personnel unfit for the Client's purposes. NurSelect shall provide the Client with copies of all criminal background checks for NurSelect Personnel upon written request.

1.6    HIPAA/Confidentiality Agreement. NurSelect will obtain require all NurSelect Personnel to execute and be bound by a HIPAA/Confidentiality Agreement and a Business Associate Agreement to endure all NurSelect Personnel observe the confidentiality and HIPAA provisions set forth in this Agreement. NurSelect will provide copies of such Agreements to Client upon request.

1.7    Anti-Kickback; Government Health Programs. NurSelect represents and warrants that it and its employees have not engage in, and during the Term, shall not engage in, any activities prohibited under the federal anti-kickback statute (Social Security Act Section 1128B, 42 U.S.C. Sections 1320a-7, 1320a-7a, 1320a-7b). NurSelect represents and warrants that it and its employees have not been excluded from the Medicare, Medicaid and/or other federal healthcare programs. In the event NurSelect or its employees is under investigation by the United States Department of Health and Human Services' Office of Inspector General for a claim or action that could result in the exclusion of NurSelect or its employees from the Medicare, Medicaid or other governmental health program, NurSelect shall promptly inform the Client but only after receiving sufficient information to substantiate the fact of the investigation.

1.8    Review of Documentation by the Client. The Client shall review documentation on the above requirements prior to the start date for NurSelect Personnel. In the event the Client is not satisfied with the said documentation, Client shall immediately inform NurSelect.

1.9    Compliance with the Client's Policies. The Client shall make available and explain to all NurSelect Personnel all applicable rules, regulations, procedures and policies pursuant to the Client's organization and operation of the Client, including, without limitation, rules, regulations, procedures and policies adopted by the Client's medical staff and nursing department (collectively, the "**Policies**"). The Client shall also be responsible to ensure that all NurSelect Personnel are promptly made aware of any updates or changes to the Policies. NurSelect Personnel providing the Services under this Agreement shall materially observe all Policies.

2

Landmark v. Nurselect MSJ_00000478

1.10    Replacement of NurSelect Personnel.  If at any time the Client is dissatisfied with the service provided by any NurSelect Personnel, the Client shall notify NurSelect of its dissatisfaction, at which time, and upon receipt of such notice, NurSelect will make commercially reasonable efforts to promptly provide a replacement.

1.11    Meetings, Orientation and Training.  The Client may, from time to time, require that the NurSelect Personnel attend staff meetings, receive training and/or undergo orientation related to the particular Services requested by the Client. NurSelect will bill the Client for the time NurSelect Personnel spend in staff or other Client meetings, and for time spent receiving training and orientation. Training and/or orientation shall be provided to the NurSelect Personnel at no cost to NurSelect, including, without limitation, the cost of any instructors in providing training.

1.12    Record Maintenance.  NurSelect Personnel shall provide accurate and complete written documentation on individual patient charts, including treatment and progress notes, in accordance with the Client's requirements, the requirements of applicable federal and state governmental agencies and the requirements of third-party reimbursement sources such as insurers. NurSelect Personnel shall maintain accurate records of Services provided to the Client's patients in accordance with accepted professional standards and practices and the requirements of the Client.

1.13    Exclusion Checks.  NurSelect shall, monthly during the term, check the Pennsylvania Medi-Check List maintained by the Pennsylvania Department of Public Welfare, the list of Excluded Individuals/Entities maintained by the Office of the Inspector General of the federal Department of Health and Human Services and the Excluded Parties List System maintained by the General Services Administration, to ensure that neither NurSelect, nor any NurSelect Personnel is included in any of the abovementioned lists. To the extent any NurSelect Personnel has worked in a state other than the Commonwealth of Pennsylvania, NurSelect will check state Medicaid exclusion databases (to the extent available) for such states where NurSelect Personnel worked. In the event NurSelect or any NurSelect Personnel are listed on any of the abovementioned lists, NurSelect will immediately notify the Client and remove such person or persons from providing Services to the Client.

1.14    Client Responsibilities.

        a.      Client will properly supervise NurSelect Personnel and shall be solely responsible for its business operations and practices, products, services and intellectual property.

        b.      Client will properly supervise, control and safeguard its premises, processes and systems, and shall not: (i) permit NurSelect Personnel to operate any vehicle or mobile equipment while providing Services; (ii) entrust with, or place NurSelect Personnel in charge of, unattended premises or facilities, cash, checks, keys, credit cards, merchandise or confidential or trade secret information, negotiable instruments or other valuables without NurSelect's express written consent, or unless otherwise set forth in the job description provided to NurSelect for particular Services to be provided by NurSelect Personnel.

        c.      Client shall provide NurSelect Personnel with a safe work environment and shall provide NurSelect Personnel with appropriate information, training and safety equipment with respect to any hazardous substances or conditions to which NurSelect Personnel may be exposed at the Client in connection with Services.

3

Landmark v. Nurselect MSJ_00000479

     d.     Client shall not alter, modify or otherwise change the job description for any NurSelect Personnel without first informing NurSelect and receiving NurSelect's written approval.

     e.     Client shall be solely responsible for billing its patients and/or their insurers or other third-party reimbursement sources for Services provided to such patients by NurSelect Personnel. NurSelect is not responsible for Client's inability to obtain payment in full or in part from its patients and/or their insurers or other third-party reimbursement sources.

     f.     Client shall have primary responsibility for maintaining all patient records. To the extent reasonably necessary to accomplish Services, Client shall make available to NurSelect Personnel all patient records necessary for the proper evaluation and treatment of its patients.

     g.     Client shall have the ultimate responsibility of ensuring that all Services provided hereunder: (i) shall meet applicable professional standards and principles; and (ii) be provided in a timely manner.

## ARTICLE II – PAYMENT FOR SERVICES

2.1    Invoices. NurSelect shall provide invoices to the Client on a weekly basis for the Services provided by NurSelect Personnel. The Client shall be billed at the hourly rates set forth in the Fee Schedule, attached hereto as **Exhibit A** and incorporated herein by reference. Invoices shall contain the following information: (i) the names of NurSelect Personnel providing Services; (ii) total applicable charges; (iii) dates and times worked by NurSelect Personnel; and (iv) such other information as the Client may reasonably request.

2.2    Payment for Services. The Client shall pay NurSelect for the Services of the NurSelect Personnel as reflected on such invoice within thirty (30) days of its receipt of said invoice. If payment is not received within such time, NurSelect reserves the right to add interest in the amount of one- and one-half percent (1.5%) per month to all outstanding balances remaining unpaid. In the event that payment for any invoice is not received within thirty (30) days of the date of such invoice, NurSelect may elect to terminate this Agreement immediately, without notice to the Client. Termination by NurSelect pursuant to this Section shall not relieve the Client of any obligation to pay any outstanding invoices. The Client agrees to pay all reasonable collection fees, including attorney and court fees, related to unpaid and uncured outstanding balances.

2.3    Rate Changes. NurSelect may, upon sixty (60) days' written notice to the Client, change the rates for the Services as set forth on Exhibit A. Said rate change shall become effective beginning on the sixty-first (61st) day after the said notice is provided to the Client.

2.4    Signatures of the Client's Personnel. The Client agrees and certifies that the signature of any of the Client's agents or employees on time slips of NurSelect Personnel is understood to be authorized by the Client and is binding upon the Client. The signature of any of the Client's agents or employees on any time slip conclusively certifies the Client's satisfaction with the Services performed and confirmation of the total number of hours worked.

4

Landmark v. Nurselect MSJ_00000480

2.5     Cancellation of Shifts.   The Client agrees to notify NurSelect of all cancellations of shifts of NurSelect Personnel within a minimum of two (2) hours prior to the start of the scheduled shift of the affected NurSelect Personnel. If the Client fails to notify NurSelect of a shift cancellation within two (2) hours, the Client agrees to pay NurSelect the sum of two (2) hours' pay per NurSelect Personnel that was scheduled to work the cancelled shift at the applicable rate set forth in Exhibit A.

2.6     Holidays.   NurSelect observes the following holidays: New Year's Day, Easter Sunday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Eve (2nd shift, only), Christmas Day and New Year's Eve (2nd shift, only). NurSelect will bill the Client 150% of the regular rate for all hours worked by NurSelect Personnel during any of the aforementioned holidays. For avoidance of confusion, holidays for night shift workers (typically from 11:00 PM to 7:00 AM) begin at 11:00 PM on the day immediately preceding the holiday.

2.7     Overtime.   NurSelect Personnel are presumed to be non-exempt from laws requiring premium pay for overtime, holiday work or weekend work. In the event the Client requires NurSelect Personnel to work during holidays, overtime or weekends, and to the extent that federal or state law requires a premium to be paid to such NurSelect Personnel, NurSelect will invoice the Client at such premium for such time worked. By way of example, when federal or state law requires payment of 150% of the regular wage rate for work exceeding 40 hours per week, NurSelect will invoice the Client for 150% of its rate set forth on Exhibit A for such work exceeding 40 hours per week.

## ARTICLE III - STATUS OF THE PARTIES

3.1     NurSelect Employees.   It is expressly understood and agreed that all NurSelect Personnel shall not be considered employees or agents of the Client but instead shall be considered leased employees of NurSelect. Further, it is expressly understood and agreed by the parties that nothing contained in this Agreement shall be construed to create a joint venture, partnership, association or other affiliation or like relationship between the parties hereto, it being specifically agreed that their relationship is and shall remain that of independent parties to a contractual relationship as set forth in this Agreement. NurSelect shall be solely responsible for paying NurSelect Personnel and providing NurSelect Personnel with employment benefits, if any, offered by NurSelect. NurSelect shall be solely responsible for providing unemployment insurance and workers compensation benefits to NurSelect Personnel. NurSelect shall be solely responsible to handle all unemployment and workers compensation claims involving NurSelect Personnel.

3.2     No Claims for Certain Benefits.   NurSelect and its NurSelect Personnel shall not have any claim under this Agreement or otherwise against the Client for employee benefits offered by the Client to its employees, including, without limitation, vacation pay, paid sick leave, retirement benefits, social security, workers compensation, health, disability, or professional malpractice benefits of any kind. NurSelect will indemnify and hold the Client harmless from any and all claims and liability arising from claims relating to the failure of the Client to provide any such benefits to any NurSelect Personnel.

3.3     No Claims for Withholding.   The Client shall not withhold, on behalf of NurSelect or any NurSelect Personnel, any sums for income tax, unemployment insurance, social security or other withholding pursuant to any applicable law or requirement of any governmental body. NurSelect shall solely be responsible for all required withholdings from NurSelect Personnel wages and for remitting the same to the applicable governmental and other parties. NurSelect shall indemnify and hold the Client harmless from any and all claims and/or liability arising from claims relating to the Client's failure to make any such withholdings on behalf of NurSelect or any NurSelect Personnel.

Landmark v. Nurselect MSJ_00000481

## ARTICLE IV - INSURANCE

4.1     Insurance.  NurSelect will purchase and maintain: (a) comprehensive general and professional liability insurance coverage with minimum limits of $1,000,000 per occurrence and $3,000,000; and (b) workers compensation insurance providing at least the minimum amount of coverage required by the Commonwealth of Pennsylvania. All policies shall be on a claim made basis and shall be placed with insurers licensed to do business in Pennsylvania.

4.2     Proof of Insurance.  NurSelect shall, upon written request from the Client, provide to the Client certificates of insurance or other appropriate evidence of satisfaction of its obligations to maintain insurance as described in this Article. NurSelect agrees that it will notify the Client at least thirty (30) days in advance of cancellation, non-renewal, or adverse change in its insurance.

## ARTICLE V - APPORTIONMENT OF LIABILITY AND DAMAGES INDEMNIFICATION

5.1     Apportionment of Liability.  It is hereby stipulated and agreed between the Client and NurSelect that with respect to any claim or action arising out of the Services, each entity shall only be liable for payment of that portion of any and all liability, costs, expenses, demands, settlements or judgments resulting from negligence, actions or omissions of its own agents, officers, and employees.

5.2     Indemnification of Client.  NurSelect agrees to indemnify and hold harmless the Client from and against any and all claims, demands, actions, settlements, or judgments, including reasonable attorneys' fees and litigation expenses, arising from: (a) NurSelect's breach of this Agreement; and (b) NurSelect Personnel's provision of the Services where such claims, demands, actions, settlements, or judgments arise from the negligence or willful misconduct of the NurSelect Personnel.

5.3     Indemnification of NurSelect.  The Client agrees to indemnify and hold harmless NurSelect from and against any and all claims, demands, actions, settlements, or judgments, including reasonable attorneys' fees and litigation expenses where such claims, demands, actions, settlements, or judgments arise from the negligence or willful misconduct of the Client, its directors, officers, agents or employees.

## ARTICLE VI - TERM AND TERMINATION

6.1     Term.  The initial term of this Agreement shall commence on the date above first written ("**Commencement Date**") and shall continue for one (1) year from the Commencement Date ("**Term**"). Except as otherwise stated herein, the Term shall be automatically extended for one (1) additional year and so on from year to year until either NurSelect or the Client give to the other no less than thirty (30) days' written notice of termination prior to the end of the then-current Term.

6.2     Termination for Specific Breaches.  Except as expressly provided elsewhere in this Agreement, in the event either party shall fail to satisfy its obligations under this Agreement, this Agreement may be terminated at the discretion of the non-breaching party by providing the breaching party with thirty (30) days' written notice notifying the breaching party of its breach and providing it with the opportunity to cure said breach ("**Termination Notice**"). If the breaching party fails to cure said breach within thirty (30) days of the Termination Notice, then this Agreement may, at the option of the non-breaching party, be terminated without any further notice from the non-breaching party on the thirty-first (31st) day after the date of the Termination Notice.

6

Landmark v. Nurselect MSJ_00000482

6.3     Survival of Obligations. Upon termination of this Agreement pursuant to the terms of this Article, neither party shall have any further obligation hereunder except for: (a) obligations accruing prior to the date of termination, and (b) obligations, promises, or covenants contained herein which are expressly made to extend beyond the date of termination. All indemnification obligations set forth herein shall survive the termination of this Agreement.

## ARTICLE VII - CONFIDENTIAL INFORMATION

7.1     Non-disclosure of NurSelect's Confidential Information. NurSelect deems its methods and modes of operation, its performance hereunder, this Agreement and its client information to be confidential information ("**NurSelect's Confidential Information**"). The Client agrees not to disclose NurSelect's Confidential Information to outside parties except as required by law, and the Client shall disclose NurSelect's Confidential Information to Client personnel only on an as-needed basis with notice to the Client personnel of its confidential nature.

7.2     Non-disclosure of the Client's Confidential Information. The Client deems its methods and modes of operation, its performance hereunder, this Agreement and its patient information to be confidential information ("**Client's Confidential Information**"). NurSelect agrees not to disclose Client's Confidential Information to outside parties except as required by law and subject to the provisions of Article IX, and NurSelect shall disclose Client's Confidential Information to NurSelect Personnel only on an as-needed basis and with notice to such NurSelect Personnel of its confidential nature. Information obtained by NurSelect Personnel during the course of providing Services shall not be imputed to NurSelect. The Client shall require NurSelect Personnel to execute a confidentiality agreement between the Client and NurSelect Personnel to address the non-disclosure of the Client's Confidential Information by NurSelect Personnel.

## ARTICLE VIII - NON-ENGAGEMENT COVENANT

8.1     Non-Solicitation of the Client's Employees. During the Term of this Agreement and for a period of one (1) year after its termination, NurSelect agrees it will not knowingly or directly solicit or encourage any of the Client's employees to discontinue their employment with the Client. NurSelect and the Client agree that any remedy at law for the breach of this Article shall be inadequate and that, in connection with such breach, the Client will be entitled, in addition to any other remedies, to temporary and permanent injunctive relief.

8.2     Non-Solicitation of NurSelect Employees. During the Term of this Agreement and for a period of one (1) year after its termination, the Client agrees it will not knowingly, directly or indirectly, solicit or encourage any NurSelect Personnel to discontinue his or her employment with NurSelect. The Client and NurSelect agree that any remedy at law for the breach of this Article shall be inadequate and that, in connection with such breach, NurSelect will be entitled, in addition to any other remedies, to temporary and permanent injunctive relief.

8.3     Employment of NurSelect Employees with Consent. Notwithstanding anything to the contrary herein, during the Term of this Agreement and for a period of one (1) year after its termination, the Client may hire any NurSelect Personnel with the prior written consent of NurSelect as either a "temporary-to-permanent" hire or as a "direct placement". If such consent is granted, the Client agrees to pay NurSelect the applicable amount set forth on the fee schedule attached hereto as Exhibit A within thirty (30) days from the date on which such NurSelect Personnel accepts employment with the Client.

7

Landmark v. Nurselect MSJ_00000483

## ARTICLE IX – HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996 PROVISIONS

9.1     Definitions.

a.      "Disclose" and "Disclosure" shall mean, with respect to Protected Health Information (defined herein), the release, transfer, provision of access to, or divulging in any other manner of Protected Health Information outside of NurSelect's internal operations.

b.      "Protected Health Information" or "PHI" shall mean information, including demographic information, that (i) relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; (ii) identifies the individual (or for which there is a reasonable basis for believing that the information can be used to identify the individual); and (iii) is received by NurSelect from or on behalf of the Client, or is created by NurSelect in the performance of this Agreement, or is made accessible to NurSelect by the Client.

c.      "Use" or "Uses" shall mean, with respect to Protected Health Information, the sharing, employment, application, utilization, examination, or analysis of Protected Health Information within NurSelect's internal operations.

d.      "Privacy Regulations" shall mean the Health Insurance Portability and Accountability Act of 1996, and regulations promulgated thereunder, including the Standards for Privacy of Individually Identifiable Health Information at 45 Code of Federal Regulations Parts 160 and 164.

9.2     Obligations of NurSelect.  NurSelect shall not Use or Disclose PHI for any purpose except as provided in this Article.  NurSelect:

a.      shall Use and Disclose PHI as necessary or appropriate to perform the Services, as provided in this Article;

b.      shall Disclose PHI to the Client upon request; and

c.      may, as necessary for the proper management and administration of its business or to carry out its legal responsibilities:

i.      Use PHI; and

ii.     Disclose PHI if the Disclosure is required by applicable law, or NurSelect obtains reasonable assurance from the person or entity to whom the information is Disclosed that the PHI will be held confidentially and Used or Disclosed only as required by law or for the purpose for which it was Disclosed to the person or entity, and such person or entity agrees to notify NurSelect of any instances of which the person or entity is or becomes aware in which the confidentiality of the PHI has been breached.

9.3     Adequate Safeguards for PHI.  NurSelect warrants that it shall implement and maintain appropriate safeguards to prevent the Use or Disclosure of PHI in any manner other than as permitted by this Article.

8

Landmark v. Nurselect MSJ_00000484

9.4     Reporting Non-Permitted Uses or Disclosure. In the event that any Use or Disclosure is made by NurSelect, its employees, representatives, agents, or subcontractors that is not specifically permitted by this Article, NurSelect shall report such Use or Disclosure to the Client. The initial report shall be made by telephone call to such employee or agent of the Client as the Client may designate (the "Privacy Officer") within forty-eight (48) hours from the time NurSelect becomes aware of any non-permitted Use or Disclosure, followed by a full written report to the Privacy Officer no later than ten (10) business days from the date NurSelect became aware of the non-permitted Use or Disclosure.

9.5     Availability of Internal Practices, Books, and Records to Government Agencies. NurSelect agrees to make its internal practices, books, and records relating to the Use and Disclosure of PHI available to the Secretary of the Federal Department of Health and Human Services for purposes of determining the Client's compliance with the Privacy Regulations. NurSelect shall immediately notify the Client of any requests made by the Secretary and provide the Client with copies of any documents produced in response to any such request.

9.6     Access to and Amendment of PHI. NurSelect shall: (a) make the PHI specified by the Client available to the individual(s) identified by the Client as being entitled to access and copy such PHI; and (b) make PHI available to the Client for the purpose of amendment and incorporation of such amendments into PHI, in compliance with applicable law. NurSelect shall provide such access and incorporate such amendments in compliance with applicable law within the time and in the manner specified by the Client.

9.7     Accounting of Disclosures. Upon the Client's request, NurSelect shall provide to the Client an accounting of each Disclosure of PHI made by NurSelect or its employees, agents, representatives, or subcontractors. Any accounting provided by NurSelect under this Paragraph shall include:

    a.      the date of the Disclosure;

    b.      the name and address, if known, of the person or entity receiving the PHI;

    c.      a brief description of the PHI disclosed; and

    d.      a brief statement of the purpose of the Disclosure.

For each Disclosure that could require an accounting pursuant to this Paragraph, NurSelect shall document the information specified in (a) through (d) above, and shall retain securely such documentation for six (6) years from the date of such Disclosure.

9.8     Termination Upon Breach of this Article. Notwithstanding anything herein to the contrary, in the event of a breach of the provisions of this Article by NurSelect, the Client shall have the right to terminate this Agreement immediately and without penalty upon delivery of written notice to NurSelect. NurSelect's obligations under this Article shall survive the termination or expiration of this Agreement. Additionally, termination by the Client pursuant to this Section shall not relieve the Client of any obligation to pay any outstanding invoices, including those relating to work performed by NurSelect before its receipt of the Client's notice of termination hereunder.

9.9     Disposition of PHI. Upon termination of this Agreement, NurSelect shall either return or destroy, in accordance with any instructions by the Client, all PHI in the possession or control of NurSelect or its agents and subcontractors, with the exception of any information retained pursuant to the accounting of

9

Disclosures provisions of Section 9.7 herein. If such return or destruction of PHI is not feasible, NurSelect may retain PHI provided that NurSelect (a) continues to comply with the provisions of this Article for as long as it retains PHI, and (b) limits further Uses and Disclosures of PHI to those purposes that make the return or destruction of PHI infeasible.

9.10    Use of Subcontractors and Agents.  NurSelect shall require each of its agents and subcontractors that receive PHI from NurSelect to execute a written agreement obligating the agent or subcontractor to comply with all the terms of this Article.

9.11    Relationship to Other Provisions.  In the event that any provision of this Article is contrary to any provision elsewhere in this Agreement, the provisions of this Article shall control.

## ARTICLE X - OTHER TERMS AND CONDITIONS

10.1    Cooperation.  The parties hereto agree to provide reasonable cooperation to each other and to provide reasonable assistance to each other in connection with the investigation and resolution of any complaints, claims, actions or proceedings that may be brought by or against NurSelect Personnel in connection with this Agreement and the provision of Services hereunder.

10.2    Non-Discrimination.  All Services provided under this Agreement shall be provided without regard to the race, religion, ancestry, color, creed, sex, age, disability, handicap status, payor source or national origin of the patient requiring such Services. NurSelect and NurSelect Personnel shall comply with all applicable laws prohibiting discrimination.

10.3    Elder Justice Act.  By signing this Agreement, NurSelect acknowledges its receipt of the Notice for Covered Individuals of Reporting Obligations under the Elder Justice Act, which is incorporated herein by reference. NurSelect shall be responsible to provide such Notice to all NurSelect Personnel.

10.4    Modification.  This Agreement evidences the entire Agreement between the parties hereto and, except as expressly provided herein, may not be changed, altered, or modified in any manner unless such change is agreed to in writing by both the Client and NurSelect.

10.5    Choice of Law.  This Agreement has been executed and delivered in, and shall be interpreted, construed, and enforced pursuant to and in accordance with, the laws and in the courts of the Commonwealth of the Pennsylvania, without regard to its conflict of law's provisions.

10.6    Non-Waiver.  The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provisions herein.

10.7    Force Majeure.  Neither party shall be held responsible for any delay or failure in performance under this Agreement arising out of causes beyond its control or without its fault or negligence. Such causes may include, but are not limited to, fires, strikes, acts of God, acts of terrorism or national disasters.

10.8    Severability.  If any term or provision of this Agreement shall to any extent be deemed to be invalid or unenforceable, the remaining terms and provisions of the Agreement shall not be affected thereby, but each term and provision of the Agreement shall be valid and enforced to the fullest extent permitted by law.

10

Landmark v. Nurselect MSJ_00000486

10.9    Assignment.  This Agreement is for the provision of personal, professional services and may not be assigned or transferred by either party without the prior written consent of the other.

10.10    Entire Agreement. This Agreement supersedes all previous contracts and constitutes the entire Agreement between the parties. Oral statements or prior written material not specifically incorporated herein shall be of no force and effect and no changes in or additions to this Agreement shall be recognized unless incorporated herein by amendment and executed by the parties hereto, such amendment(s) to be effective on the date stipulated therein.

10.11    Counterparts; Signature by Facsimile and E-mail Transmission.  This Agreement and any amendment, restatement, or termination of any provision of this Agreement, may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.  Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all of the parties hereto.  A party's transmission by facsimile or by e-mail transmission of an Adobe Portable Document Format (also known as a PDF file) of a copy of this Agreement duly executed by that party shall constitute effective delivery by that party of an executed copy of this Agreement to the party receiving the transmission. A party that has delivered this Agreement by facsimile or e-mail transmission shall forthwith deliver an originally executed copy to the other party or parties.

10.12    Electronic Signatures.  Any signature, whether it be electronic, digital or a .pdf copy of a manual signature, is intended to authenticate this Assignment and have the same effect as a manual or original signature.


        IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and date first written above.


CLIENT:                                                    NURSELECT:

By: _David S Rayha_____                    By: _D=Dr_____

Name: _DAVID S. RAYHA  NHA__        Name: _DAVID E. SHEFF___

Title: _VP OPERATION/COO___            Title: _PRESIDENT_____


11

Landmark v. Nurselect MSJ_00000487

**Sara Moriarty**

| | |
|---|---|
| **From:** | Kaster, Bryon <BKaster@dmclaw.com> |
| **Sent:** | Friday, November 8, 2024 3:34 PM |
| **To:** | Sara Moriarty |
| **Cc:** | Stabley, Michelle |
| **Subject:** | FW: Brenda L. Kling, Individually and as Administratrix of the Estate of Geraldine E. Wiggins v. Rehabilitation Center at Brethren Village, et al. |
| **Attachments:** | L. - David Shelly - President.pdf |

Sara,

Below is the original January 12, 2023 e-mail to Mr. Shelly with attachment.  I am sending it to you unaltered and in its original format, including Mr. Shelly's e-mail to me forwarding the at issue e-mail.  In doing so, we are expressly not waiving privilege and are certain that we have not done so because the email from Mr. Kelly to me does not including any confidential information.  We are producing this in this format so that you can review it in its original format and so that there can be no claim that we altered the document.  In the event that you believe that production of the forwarding e-mail in this format constitutes waiver of the attorney-client privilege, you should not review it, delete the e-mail, and immediately advise me of your position.  Again, we are confident that we have not waived privilege.

We will have the formal discovery responses to you later today or early next week, but we do not expect to be producing any additional documents, as the discoverable documents provided today are the entirety of the documentation presently known to us that is responsive to your discovery requests.

If you have any questions, please let me know.
Bryon


**Bryon R. Kaster, Esquire**
Shareholder
717-731-4800 Office
888-811-7144 Fax
BKaster@dmclaw.com | Bio/vCard



NOTICE: You have received an e-mail from BKaster@dmclaw.com. The e-mail message and all attachments transmitted with it are intended solely for the use of the intended recipient and may contain legally privileged and confidential information. If you are not the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying, or other use of the message or its attachments is strictly prohibited. If you have received a message in error, please notify the sender immediately by replying to the message and delete the message from your computer.

**From:** David Shelly <dshelly@nurselectstaffing.com>
**Sent:** Friday, November 8, 2024 2:00 PM
**To:** Kaster, Bryon <BKaster@dmclaw.com>

Landmark v. Nurselect MSJ_00000488



EXHIBIT
4 11/20/24

**Subject:** Fw: Brenda L. Kling, Individually and as Administratrix of the Estate of Geraldine E. Wiggins v. Rehabilitation Center at Brethren Village, et al.

This Message Originated From Outside DMC

---

Original email.

Sincerely,

David Shelly, President
NurSelect, LLC
1829 New Holland Road
Suite 13
Reading, PA 19607
Tel. (800) 484-8572
Fax (484) 214-0055
www.nurselectstaffing.com



Disclaimer: The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

---

Landmark v. Nurselect MSJ_00000489

**From:** Linda Reidenbaugh <LLR@saxtonstump.com>
**Sent:** Thursday, January 12, 2023 4:12:49 PM
**To:** David Shelly <dshelly@nurselectstaffing.com>
**Cc:** jsnader@bv.org <jsnader@bv.org>; Kimberly A. Selemba <kas@saxtonstump.com>
**Subject:** Brenda L. Kling, Individually and as Administratrix of the Estate of Geraldine E. Wiggins v. Rehabilitation Center at Brethren Village, et al.

Hello Mr. Shelly,
On behalf of Kimberly A. Selemba, please find a copy of the attached correspondence.
Thank you.

**Linda Reidenbaugh** | Paralegal/Client Services Professional



280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Phone: 717.556.1038 | Internal: 1038
llr@saxtonstump.com
www.saxtonstump.com

# Sara Moriarty

| | |
|---|---|
| **From:** | Joan M. Gilbride |
| **Sent:** | Thursday, October 5, 2023 2:20 PM |
| **To:** | Briana A. Semenza |
| **Subject:** | FW: Wiggins v. NurSelect, RSUI Claim No. 7030187058 |
| **Attachments:** | 9402374_1.pdf |
| **Importance:** | High |

**From:** Anthony Viola <anthonyviola@libertyins.com>
**Sent:** Thursday, October 5, 2023 2:02 PM
**To:** Joan M. Gilbride <jgilbride@kbrlaw.com>; Wilson, Zach <zwilson@rsui.com>
**Cc:** David Shelly <dshelly@nurselectstaffing.com>; Steve Pcsolar <stevepcsolar@libertyins.com>; Jason Rigby <jasonrigby@libertyins.com>
**Subject:** FW: Wiggins v. NurSelect, RSUI Claim No. 7030187058
**Importance:** High

Ms. Gilbride,

We are the agent/broker for NurSelect LLC.  We are in receipt of your coverage declination letter attached above.   We strongly disagree with your coverage position and would like to take this opportunity to accurately reflect the facts and timeline of events.

The letter above indicates NurSelect and Mr. David Shelly was aware of this incident involving Mr. Wiggins as early as October 14, 2022.  Brethren Village counsel requested Ayana McDowell's contact information and statement regarding an incident involving Ms. Geraldine Wiggins that occurred on May 12, 2021.   The insured was aware of an incident but, did not believe "fingers were being pointed" at the insured or its employee Ayanna McDowell as being responsible for the incident.  Moreover, there was no indication Ms. Wiggins and/or her family were bringing forth a personal injury claim.  The request for Ms. McDowell contact information and statement was 17 months after the incident.  Mr. Shelly believed Brethren simply wanted Ms. McDowell statement on record in the event a claim was brought forth by Ms. Wiggins.  The insured was not aware of any other information that obligate them to play insurance on notice of a claim.   It should be further noted,  there is a 2-way indemnification provision within the contract between NurSelect & Brethren. Said contract suggests Brethren agrees to defend and indemnify NurSelect from claims arising out of the care, services of residents or lack thereof.  Considering Ms. McDowell was at the control and direction of Brethren coupled with the favorable contract language the insured had no reason to believe a claim was being brought forth against NurSelect.

The letter also indicates the insured received an email and **letter** dated January 12, 2023, from Brethren Village advising Brethren had been sued in the Court of Common Pleas in relation to an incident involving Mr. Geraldine Wiggins.  The letter further advises that Brethren intends to file a joinder complaint against NurSelect to invoke NurSelect contractual obligation pursuant to a staffing contract.  Let the record reflect accurately, NurSelect never received a letter via US mail or Certified Mail from Brethren Village Retirement Community or its counsel.   The only correspondence the insured (Mr. David Shelly) received was an email dated January 12, 2023.  The email was sent by Ms. Linda Reidenbaugh paralegal with Saxton & Stump Attorneys at Law.   Not recognizing the sender and/or email address, Mr. David Shelly did not open the email from Ms. Linda Reidenbaugh.  As a matter of fact,  it was not until the insured was served with the lawsuit in September that included a cover letter referencing the January 12, 2023, correspondence that Mr. Selly discovered the unopen email.

1

Landmark v. Nurselect MSJ_00000491

EXHIBIT
5 11/20/24

Based on the facts and timeline above, it is clear Mr. Shelly timely reported this matter to RSUI.   Circumstances would be different had Mr. Shelly received a certified letter from the law offices of Saxton & Stump and failed to take appropriate action. We believe the courts will agree with our position.   Before taking legal action against RSUI, we provide the opportunity to rescind the current coverage position and reinstate coverage.

Sincerely,

Anthony



**Anthony Viola**

*Claim Manager* | Liberty Insurance Agency
**P:** 412-571-5714 ext. 212 **F:** 412-571-9909
**A:** Manor Oak Two - Suite #800 1910 Cochran Road Pittsburgh PA 15220
**E:** anthonyviola@libertyins.com
**W: libertyins.com**





**Confidentiality Note:** This message from Liberty Insurance Agency and any attachments may contain legally privileged and/or confidential information. Any unauthorized disclosure, use or dissemination of this email message or its contents, either in whole or in part, is prohibited. If you are not the intended recipient of this email message, kindly notify the sender and then destroy it.

**Security Note:** Liberty Insurance Agency does not guarantee the security of emails or their contents or attachments, which could be infected, intercepted, or corrupted. It is the recipient's responsibility to check incoming emails for threats with proper software. Liberty Insurance Agency disclaims liability for any damages caused by viewing or downloading this email or its contents or attachments.

**From:** David Shelly <dshelly@nurselectstaffing.com>
**Sent:** Wednesday, October 4, 2023 11:54 AM
**To:** Anthony Viola <anthonyviola@libertyins.com>; Steve Pcsolar <stevepcsolar@libertyins.com>
**Subject:** [EXTERNAL] FW: Wiggins v. NurSelect, RSUI Claim No. 7030187058

FYI

Sincerely,

David Shelly, President
**NurSelect, LLC**
1829 New Holland Rd., Suite 13
Reading, PA 19607
Main: (800) 484-8572
Direct: (484) 663-4374
Fax (484) 214-0055
nurselectstaffing.com





CONFIDENTIALITY NOTICE: The content of this message and any files transmitted with it is a confidential and proprietary business communication, which is solely for the use of the intended recipient(s). Any use, distribution, duplication or disclosure by any other person or entity is strictly prohibited. If you are not an intended recipient or this has been received in error, please notify the sender and immediately delete all copies of this communication.

---

**From:** Briana A. Semenza
**Sent:** Wednesday, October 4, 2023 10:59 AM
**To:** David Shelly
**Cc:** Joan M. Gilbride; 'zwilson@rsui.com'
**Subject:** Wiggins v. NurSelect, RSUI Claim No. 7030187058

Greetings –

Please see the attached letter, sent on behalf of RSUI Indemnity Company.

Regards,
Briana

Briana A. Semenza  I  **KAUFMAN BORGEEST & RYAN LLP**
200 Summit Lake Drive  I  Valhalla, NY 10595
direct: 914.449.1011  I  fax: 914.449.1100
vcard  I  email  I  website

**Kaufman Borgeest & Ryan LLP requests electronic mail service for all documents. Please e-serve all legal correspondence, motions, discovery, and pleadings, in addition to any other service required by court rules. Thank you.**

This electronic message contains information that may be privileged, confidential or otherwise protected from disclosure. The information contained herein is intended for the addressee only. If you are not the addressee, any disclosure, copying, distribution or use of the contents of this message (including any attachments) is prohibited. If you have received this electronic message in error, please notify the sender and immediately destroy the original message and all copies.

Landmark v. Nurselect MSJ_00000493

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.



**SAXTON & STUMP**
LAWYERS AND CONSULTANTS

4250 Crums Mill Road, Suite 201 • Harrisburg, PA 17112
P: (717) 216-5505 • F: (717) 547-1900

**Direct Dial:** (717) 941-1214
**Email:** kas@saxtonstump.com

January 12, 2023

**VIA EMAIL (dshelly@nurselectstaffing.com)**

David Shelly, President
NurSelect, LLC
640 Freedom Business Center Dr.
Third Floor
King of Prussia, PA 19406

*Re:*   *Brenda L. Kling, Individually and as Administratrix of the Estate of Geraldine E.*
    *Wiggins v. Rehabilitation Center at Brethren Village, et al.*
    *Case No. CI-22-04128, Lancaster County Court of Common Pleas*
    *Joinder of NurSelect, LLC*

Dear Mr. Shelly:

As you know from our prior communications, this law firm represents Brethren Village Retirement Community. A lawsuit has been commenced against Brethren Village in the Court of Common Pleas of Lancaster County related to the care and treatment of one of its residents, Geraldine Wiggins. Specifically, the lawsuit alleges negligence arising out of a fall sustained by Ms. Wiggins on May 12, 2021. Our investigation has revealed that Ayanna McDowell, CNA, who was employed by NurSelect, LLC at the relevant time, had direct involvement in this alleged fall. Upon confirming that Ayanna McDowell, CNA was an employee of NurSelect and reviewing the contractual agreement between NurSelect and Brethren Village, our office did not meet with Ms. McDowell.

You are aware that Brethren Village is a party to a Staffing Agreement with NurSelect for the provision of NurSelect Personnel on contractual assignments on a per-diem or temporary basis at Brethren Village. The Staffing Agreement contains a provision for Apportionment of Liability and Damages Indemnification. Specifically, Section 5.1 of the Staffing Agreement states:

5.1    Apportionment of Liability. It is hereby stipulated and agreed between the Client and NurSelect that with respect to any claim or action arising out of the Services, each entity shall only be liable for payment of that portion of any and all liability, costs,

Philadelphia, PA • Lancaster, PA • Harrisburg, PA • Malvern, PA • Charleston, SC • Linwood, NJ
saxtonstump.com

Landmark v. Nurselect MSJ_00000495

EXHIBIT
6 11/20/24

expenses, demands, settlements or judgments resulting from negligence, actions or omissions of its own agents, officers, and employees.

Based upon this provision, Brethren Village will be filing a joinder complaint against NurSelect to invoke NurSelect's contractual agreement to indemnify Brethren Village for the alleged negligence, actions, or omissions of Ms. McDowell related the care and treatment of Ms. Wiggins.  Please provide notice of this pending joinder against NurSelect to your liability insurance provider so that counsel can be assigned to represent NurSelect's interests.

Thank you for your attention to this matter.


Sincerely,

SAXTON & STUMP

*/s/ Kimberly A. Selemba*
Kimberly A. Selemba, Esquire
Senior Counsel

cc:     John N. Snader, President/CEO, Brethren Village (via email)

Landmark v. Nurselect MSJ_00000496



# *Professional Liability Insurance*

**CLAIM OFFICE:**

**Mail claims to:**
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA  30326-1160

**Fax claims to:**
(404) 231-3755
(Attn: Claims Department)

**Email claims to:**
reportclaims@rsui.com

RSG 51029 0717

LAND000008

**EXHIBIT**

7 11/20/24



# COMMERCIAL LINES COMBINATION POLICY DECLARATIONS

## Landmark American Insurance Company
(A New Hampshire Stock Co.)
(hereinafter called "the Company")

EXECUTIVE OFFICES:    945 East Paces Ferry Road, Suite 1800, Atlanta, GA  30326-1160

**Policy Number:**    LHC801468        **RENEWAL OF:**    LHC794794 00

**Named Insured and Mailing Address:**            **Producer Name:**

NURSELECT LLC
1829 NEW HOLLAND ROAD
SUITE 13
READING, PA 19607

**Policy Period:    From:    3/1/2023        To:    3/1/2024        12:01 A.M. Standard Time at the Named Insured address as stated herein.**

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**

**Business Description:**    ALLIED HEALTHCARE STAFFING AGENCY

| COVERAGE PARTS | PREMIUM |
|---|---|
| **Commercial General Liability** | |
| COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE | $ Included |
| **Professional Liability** | |
| MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD | $ Included |

**Total Advance Policy Premium**    $ ▮▮▮▮
**Minimum Earned Premium**    $ ▮▮▮▮
Not Subject to Audit

**Forms and Endorsements made a part of this policy at time of issue:**  Please see SCHEDULE OF ATTACHMENTS.

(Omits applicable forms and endorsements if shown in specific Coverage Form Declarations.)

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY



| March 08, 2023 | By: | |
|---|---|---|
| Date | | Authorized Representative |

Landmark v. Nurselect MSJ_00000498                LAND000009

**DECLARATIONS**

**Policy Number:**    LHC801468                                    **Effective Date:**    3/1/2023

                                                                                              At 12:01 A.M. Standard Time

**LIMITS OF INSURANCE:**

**CGL and Professional Liability:**

$  See Aggregate Limits Below                Policy Aggregate Limit

**Commercial General Liability:**

$  3,000,000                General Aggregate Limit (Other than Products-Completed Operations)

$  3,000,000                Products-Completed Operations Aggregate Limit

$  1,000,000                Personal and Advertising Injury Limit

$  1,000,000                Each Occurrence

$  5,000                Medical Payments (Any One Person)

$  50,000                Damage to Premises Rented to You

**Professional Liability:**

$  1,000,000                Each Claim

$  3,000,000                Aggregate

**DEDUCTIBLE:**    $ 2,500                Each Claim

**RETROACTIVE DATE:**    Coverage                                    Date

                         Commercial General Liability                N/A

                         Professional Liability                      3/1/2020

THESE DECLARATIONS ARE PART OF THE COMMON POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

**NOTICE:**

This is a claims-made and reported policy.  Please read the policy carefully and discuss the coverage afforded by the policy with your insurance agent or broker.

Declarations Page 2 of 2        SubIdID#:        585559        BinderID#
                                                               Created By:        JML

RSG 50011 1020                                                                    Page 2 of 2

Landmark v. Nurselect MSJ_00000499

LAND000010

**LANDMARK AMERICAN INSURANCE COMPANY**

| | |
|---|---|
| Policy Number: | LHC801468 |
| Insurer: | Landmark American Insurance Company |
| Named Insured: | NURSELECT LLC |

## NOTICE - DISCLOSURE OF TERRORISM PREMIUM

This Coverage Part/Policy covers certain losses caused by terrorism. In accordance with the federal Terrorism Risk Insurance Act, as amended, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act.

As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**DISCLOSURE OF PREMIUM**

The portion of your premium for the policy term attributable to coverage for terrorist acts certified under the Act is

$   0.00                        .

In any case, if the insured rejects terrorism coverage in any scheduled underlying policy, this policy is written to exclude terrorism.

**DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 80% of that portion of the amount of such insured losses that exceeds the applicable **Insurer** retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**CAP INSURER PARTICIPATION IN PAYMENT OF TERRORISM LOSSES**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

Landmark v. Nurselect MSJ_00000500

A member of Alleghany Insurance Holdings LLC

LAND000011

**LANDMARK AMERICAN INSURANCE COMPANY**

## SCHEDULE OF POLICY ATTACHMENTS AND FORMS

| Form Number | Form Title |
| --- | --- |
| RSG 99054 0121 | Notice - Disclosure of Terrorism Premium |
| RSG 51039 1017 | Commercial General Liability Coverage Form - Occurrence |
| RSG 51044 0722 | Medical Professional Liability Coverage Part Claims Made and Reported Basis - Broad |
| RSG 51031 0522 | Common Policy Conditions |
| ENDT-01 | Additional Insured Endorsement (Blanket) - RSG 55015 0418 |
| ENDT-02 | Communicable Disease Exclusion (CGL only) - RSG 56201 0920 |
| ENDT-03 | Cross Coverage Exclusion - Medical - Broad - RSG 56136 0319 |
| ENDT-04 | Cryptocurrency Exclusion - RSG 56216 0822 |
| ENDT-05 | Deductible Liability Insurance-Comb. Policy-Multiple Ded - RSG 94016 0916 |
| ENDT-06 | Exclusion - Correctional Medicine - RSG 56203 0321 |
| ENDT-07 | Exclusion - Designated Professional Services - RSG 56114 1118 |
| ENDT-08 | Hired and Non - owned Auto Liability |
| ENDT-09 | Minimum Retained Premium - RSG 54025 0405 |
| ENDT-10 | Nuclear Energy Liability Exclusion - RSG 56058 0903 |
| ENDT-11 | Opioid and Controlled Substance Exclusion - RSG 56191 0421 |
| ENDT-12 | Pennsylvania - Notice of Cancellation & Nonrenewal - RSG 53015 0903 |
| ENDT-13 | Pennsylvania Surplus Lines Disclosure Notice - RSG 99091 0106 |
| ENDT-14 | Service Of Suit - RSG 94022 0407 |
| ENDT-15 | State Fraud Statement - RSG 99022 1022 |
| ENDT-16 | Supplementary Coverages Endorsement (Broad) - RSG 54207 1022 |
| ENDT-17 | Violation of Consumer Protection Laws Exclusion - RSG 56121 0822 |

**Policy No.:**  LHC801468

RSG 54081 0710

Landmark v. Nurselect MSJ_00000501

**LANDMARK AMERICAN INSURANCE COMPANY**

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is an Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle or defend any "claim" or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or "claim", knew that the "bodily injury" or "property damage" had occurred, in whole or in part.  If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or "claim", includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or "claim":

      (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

Landmark v. Nurselect MSJ_00000502

**(2)** Receives a written or verbal demand or "claim" for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

   **(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

   **(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

   **(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

   **(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.  For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

Landmark v. Nurselect MSJ_00000503

LAND000014

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

    **(a)** Employment by the insured; or

    **(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

    **(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

        **(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use by the building's occupants or their guests;

        **(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

        **(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

    **(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

    **(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

        **(i)** Any insured; or

        **(ii)** Any person or organization for whom you may be legally responsible;

    **(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

Landmark v. Nurselect MSJ_00000504

LAND000015

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire"; or

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** "Claim" or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such "claim" or "suit" by or on behalf of a governmental authority.

### g. Aircraft, Auto Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

Landmark v. Nurselect MSJ_00000505

LAND000016

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

Landmark v. Nurselect MSJ_00000506

LAND000017

**k.  Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l.  Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.  Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)**  A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)**  A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.  Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)**  "Your product";

**(2)**  "Your work"; or

**(3)**  "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o.  Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p.  Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)**  Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)**  The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

Landmark v. Nurselect MSJ_00000507

LAND000018

**q. Asbestos**

"Bodily injury" or "property damage" for past, present or future claims arising in whole or in part either directly or indirectly, out of the manufacture, distribution, sale, re-sale, re-branding, installation, repair, removal, encapsulation, abatement, disposal of, replacement or handling of, exposure to, testing for or failure to disclose the presence of, asbestos or products containing asbestos whether or not the asbestos is or was at any time airborne as a fiber or particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever.

It is further agreed that this insurance does not apply to "bodily injury" or "property damage" including expenses for;

**(1)** The costs of clean up or removal of asbestos or products and materials containing asbestos;

**(2)** The cost of such actions as may be necessary to monitor, assess and evaluate the release or threat of asbestos or products and material containing asbestos;

**(3)** The cost of disposal of asbestos substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result; or

**(4)** The cost of compliance with any law or regulation regarding asbestos.

**r. Biological Contaminants**

Any "claim" arising out of a "biological contaminant".

"Biological contaminant" means any biological irritant or contaminant including but not limited to any form of mold, mildew, mushroom, yeast, fungus, bacteria, virus, insect, allergen and any other type of biological agent, including any substance produced by, emanating from, or arising out of such "biological contaminant".

**s. Employment Practices**

Any "claim" arising out of or in any way related to:

**(1)** Refusal to employ;

**(2)** Termination of employment;

**(3)** Coercion, demotion, performance evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment related practices, procedures, policies, acts or omissions; or

**(4)** Consequential "bodily injury" or "personal and advertising injury" as a result of **(1)** through **(3)** above.

This exclusion applies whether the Insured may be held liable as an employer or in any other capacity and to any obligation to share "damages" with or to repay someone else who must pay "damages" because of the injury.

It is further agreed that no coverage shall apply under this policy to any "claim" brought by or against any spouse, child, parent, brother or sister of the Insured or any other person.

The Company shall not have a duty to defend any "claim", "suit", arbitration or any other form of a trial court proceeding.

**t. Lead**

"Bodily injury" or "property damage" for past, present or future claims arising in whole or in part, either directly or indirectly, out of the manufacture, distribution, sale, resale, re-branding, installation, repair, removal, encapsulation, abatement, disposal of, replacement or handling of, exposure to, ingestion of or testing for, lead or products containing lead whether or not the lead is or was at any time airborne as a particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever.

Landmark v. Nurselect MSJ_00000508

LAND000019

It is further agreed that this insurance does not apply to "bodily injury" or "property damage" including expenses for:

**(1)** The costs of clean up or removal of lead or products and materials containing lead;

**(2)** The cost of such actions as may be necessary to monitor, assess and evaluate the release or threat of same, of lead or products and material containing lead;

**(3)** The cost of disposal of lead substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result; or

**(4)** The cost of compliance with any law or regulation regarding lead.

**u. Sexual Abuse**

Any "claims" involving the use of excessive influence or power on any individual, or the actual or alleged inappropriate physical contact or contact that is deemed by or alleged by the individual to be sexual or in any way unwelcome.

**v. Prior Knowledge**

Any alleged act, error, omission, or circumstance likely to give rise to a "claim" that an Insured had knowledge of prior to the effective date of this policy. This exclusion includes, but is not limited to any prior "claim" or possible "claim" referenced in the Insured's application.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle or defend any "claim" or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

Landmark v. Nurselect MSJ_00000509

LAND000020

**c.   Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d.   Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e.   Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f.   Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g.   Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h.   Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i.   Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.  Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j.   Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)**  Advertising, broadcasting, publishing or telecasting;

**(2)**  Designing or determining content of web sites for others; or

**(3)**  An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **15.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k.   Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l.   Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

Landmark v. Nurselect MSJ_00000510

LAND000021

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** "Claim" or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. Asbestos**

"Personal and advertising injury" for past, present or future claims arising in whole or in part either directly or indirectly, out of the manufacture, distribution, sale, resale, re-branding, installation, repair, removal, encapsulation, abatement, disposal of, replacement or handling of, exposure to, testing for or failure to disclose the presence of, asbestos or products containing asbestos whether or not the asbestos is or was at any time airborne as a fiber or particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever.

It is further agreed that this insurance does not apply to "personal and advertising injury" including expenses for:

**(1)** The costs of clean up or removal of asbestos or products and materials containing asbestos;

**(2)** The cost of such actions as may be necessary to monitor, assess and evaluate the release or threat of asbestos or products and material containing asbestos;

**(3)** The cost of disposal of asbestos substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result; or

**(4)** The cost of compliance with any law or regulation regarding asbestos.

**p. Biological Contaminants**

Any "claim" arising out of a "biological contaminant".

"Biological contaminant" means any biological irritant or contaminant including but not limited to any form of mold, mildew, mushroom, yeast, fungus, bacteria, virus, insect, allergen and any other type of biological agent, including any substance produced by, emanating from, or arising out of such "biological contaminant".

**q. Employment Practices**

Any "claim" arising out of or in any way related to:

**(1)** Refusal to employ;

**(2)** Termination of employment;

**(3)** Coercion, demotion, performance evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment related practices, procedures, policies, acts or omissions; or

**(4)** Consequential "bodily injury" or "personal and advertising injury" as a result of **(1)** through **(3)** above.

This exclusion applies whether the Insured may be held liable as an employer or in any other capacity and to any obligation to share "damages" with or to repay someone else who must pay "damages" because of the injury.

Landmark v. Nurselect MSJ_00000511

It is further agreed that no coverage shall apply under this policy to any "claim" brought by or against any spouse, child, parent, brother or sister of the Insured or any other person.

The Company shall not have a duty to defend any "claim", "suit", arbitration or any other form of a trial court proceeding.

r.  **Lead**

"Personal and advertising injury" for past, present or future claims arising in whole or in part, either directly or indirectly, out of the manufacture, distribution, sale, resale, re-branding, installation, repair, removal, encapsulation, abatement, disposal of, replacement or handling of, exposure to, ingestion of or testing for, lead or products containing lead whether or not the lead is or was at any time airborne as a particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever.

It is further agreed that this insurance does not apply to "personal and advertising injury" including expenses for:

**(1)** The costs of clean up or removal of lead or products and materials containing lead;

**(2)** The cost of such actions as may be necessary to monitor, assess and evaluate the release or threat of same, of lead or products and material containing lead;

**(3)** The cost of disposal of lead substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize or mitigate damage to the public health or welfare or to the environment, which may otherwise result; or

**(4)** The cost of compliance with any law or regulation regarding lead.

s.  **Sexual Abuse**

Any "claims" involving the use of excessive influence or power on any individual, or the actual or alleged inappropriate physical contact or contact that is deemed by or alleged by the individual to be sexual or in any way unwelcome.

t.  **Prior Knowledge**

Any alleged act, error, omission, or circumstance likely to give rise to a "claim" that an Insured had knowledge of prior to the effective date of this policy.  This exclusion includes, but is not limited to any prior "claim" or possible "claim" referenced in the Insured's application.

u.  **War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

v.  **Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

Landmark v. Nurselect MSJ_00000512

LAND000023

**COVERAGE C – MEDICAL PAYMENTS**

**1. Insuring Agreement**

    **a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

        **(1)** On premises you own or rent;

        **(2)** On ways next to premises you own or rent; or

        **(3)** Because of your operations;

        provided that:

            **(a)** The accident takes place in the "coverage territory" and during the policy period;

            **(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

            **(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

    **b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

        **(1)** First aid administered at the time of an accident;

        **(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

        **(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

    **a. Any Insured**

    To any insured, except "volunteer workers".

    **b. Hired Person**

    To a person hired to do work for or on behalf of any insured or a tenant of any insured.

    **c. Injury On Normally Occupied Premises**

    To a person injured on that part of premises you own or rent that the person normally occupies.

    **d. Workers' Compensation And Similar Laws**

    To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

    **e. Athletics Activities**

    To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletics contests.

    **f. Products-Completed Operations Hazard**

    Included within the "products-completed operations hazard".

    **g. Coverage A Exclusions**

    Excluded under Coverage **A**.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

**1.** We will pay, with respect to any occurrence we investigate or any "claim" or "suit" against an insured that we settle or defend:

    **a.** All expenses we incur.

RSG 51039 1017

Landmark v. Nurselect MSJ_00000513

LAND000024

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim" or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" but will reduce the limits of insurance.

Landmark v. Nurselect MSJ_00000514

LAND000025

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

**a.** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

**b.** The conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker") or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

Landmark v. Nurselect MSJ_00000515

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** "Claims" made or "suits" brought; or

**c.** Persons or organizations making "claims" or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**b.** Damages under Coverage **B.**

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for Damages under Coverage **A** because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

### 1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

Landmark v. Nurselect MSJ_00000516

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or offense which may result in a "claim". To the extent possible, notice should include:

      **(1)** How, when and where the "occurrence" or offense took place;

      **(2)** The names and addresses of any injured persons and witnesses; and

      **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

   **b.** If a "claim" is made or "suit" is brought against any insured, you must:

      **(1)** Immediately record the specifics of the "claim" or "suit" and the date received; and

      **(2)** Notify us as soon as practicable.

      You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

   **c.** You and any other involved insured must:

      **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or a "suit";

      **(2)** Authorize us to obtain records and other information;

      **(3)** Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

      **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

   **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   **b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

   **a. Primary Insurance**

      This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

   **b. Excess Insurance**

      **(1)** This insurance is excess over:

         **(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

            **(i)** That is Fire, Extended Coverage, Builders' Risk, Installation Risk or similar coverage for "your work";

            **(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

Landmark v. Nurselect MSJ_00000517

LAND000028

    **(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

    **(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

  **(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

  **(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

  **(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

Premium for this coverage is computed in accordance with the Company's rules and rates. Any premium shown as advance premium may be a deposit premium only. If the premium is a deposit premium, at the close of each audit period, the Company will compute the earned premium for that period. Audit premiums are due and payable upon notice.

The Company may examine and audit the Insured's books and records at any time during the policy period and within three years after the final termination of this policy, as far as they relate to the subject matter of this policy.

The first Named Insured as shown in the Declarations must keep records of information the Company will need for premium computation and upon request must send the Company copies of the information.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

Landmark v. Nurselect MSJ_00000518

LAND000029

**b.** Separately to each insured against whom "claim" is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 60 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V – DEFINITIONS

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Claim" is a written demand for damages because of actual or alleged "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. "Claim" includes any "suit" as defined in this Policy.

**5.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined only by actual law suits filed and maintained within the territory described in Paragraph **a.** above. This policy does not apply to "claims" pursued elsewhere.

**6.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**7.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

Landmark v. Nurselect MSJ_00000519

LAND000030

8.  "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

9.  "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a.  It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b.  You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

10. "Insured contract" means:

   a.  A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b.  A sidetrack agreement;

   c.  Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d.  An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e.  An elevator maintenance agreement;

   f.  That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

      Paragraph **f.** does not include that part of any contract or agreement:

      (1)  That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

      (2)  That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

         (a)  Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

         (b)  Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

      (3)  Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

11. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

12. "Loading or unloading" means the handling of property:

   a.  After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   b.  While it is in or on an aircraft, watercraft or "auto"; or

   c.  While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

Landmark v. Nurselect MSJ_00000520

**13.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

    **(1)** Power cranes, shovels, loaders, diggers or drills; or

    **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

    **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

    **(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

    **(1)** Equipment designed primarily for:

        **(a)** Snow removal;

        **(b)** Road maintenance, but not construction or resurfacing; or

        **(c)** Street cleaning;

    **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**14.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**15.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** The use of another's advertising idea in your "advertisement".

**16.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Landmark v. Nurselect MSJ_00000521

                                                                           LAND000032

**17.** "Products-completed operations hazard":

    **a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

        **(1)** Products that are still in your physical possession; or

        **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

            **(a)** When all of the work called for in your contract has been completed.

            **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

            **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

        Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    **b.** Does not include "bodily injury" or "property damage" arising out of:

        **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

        **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

        **(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**18.** "Property damage" means:

    **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

    For the purposes of this insurance, electronic data is not tangible property.

    As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from, computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**19.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

    **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**20.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**21.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**22.** "Your product":

    **a.** Means:

        **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

Landmark v. Nurselect MSJ_00000522

    **(a)** You;

    **(b)** Others trading under your name; or

    **(c)** A person or organization whose business or assets you have acquired; and

  **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

  **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

  **(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**23.** "Your work":

**a.** Means:

  **(1)** Work or operations performed by you or on your behalf; and

  **(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

  **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

  **(2)** The providing of or failure to provide warnings or instructions.

Landmark v. Nurselect MSJ_00000523

LAND000034

*This Form Provides Claims-Made Coverage.*
*Please Read The Entire Form Completely.*

# MEDICAL PROFESSIONAL LIABILITY COVERAGE PART – CLAIMS MADE AND REPORTED BASIS – BROAD FORM

Throughout this document, the word "Insured" means any person or entity qualified as such under **Part I. E. Covered Persons and Entities**.  The word "Company" refers to the Company providing the insurance shown on the Declarations.

Other words and phrases that appear in **bold** have special meaning.  Refer to **Part III. Definitions**.

**Part I.    Insuring Agreement**

    **A.    Covered Services**

The Company will pay on behalf of the Insured, as shown in the Declarations, all sums that the Insured becomes legally obligated to pay as **Damages** and associated **Claim Expenses** arising out of a negligent act, error or omission, even if the **Claim** asserted is groundless, false or fraudulent, in the rendering of or failure to render professional services as described in the Business Description on the Declarations, provided that the:

    **1.**    **Claim** is first made against the Insured during the **Policy Period,** and reported to the Company no later than sixty (60) days after the end of the **Policy Period**;

    **2.**    Negligent act, error or omission took place in a covered territory;

    **3.**    Negligent act, error or omission took place after the **Retroactive Date** as shown in the Declarations.

    **B.    Defense and Settlement**

The Company will have the right and duty to defend any **Claim** against an Insured seeking **Damages** to which this policy applies, even if any of the allegations of the **Claim** are groundless, false or fraudulent. The Company's right and duty to defend any **Claim** shall end when the Company's Limit of Liability has been exhausted by payment of **Damages** and/or **Claim Expenses**, or has been tendered to the Insured or to a court of competent jurisdiction.

The Company shall not settle any **Claim** without the Insured's written consent.  The Insured shall not admit any liability for or settle any **Claim** or incur any costs, charges or expenses without the written consent of the Company.

The Company shall have the right and the duty to select legal counsel for the defense of a **Claim**. In the event the Insured is entitled by law to select independent counsel to defend the **Claim**, the **Claim Expenses** or other covered costs the Company must pay to that counsel are limited to the rates the Company actually pays to counsel retained by the Company in the defense of similar **Claims** in the community where the **Claim** is being defended. The Company may exercise the right to require that such counsel have experience in defending **Claims** similar to the one pending against the Insured. The Insured agrees that such counsel will comply with the Company's litigation guidelines and reporting requirements, timely respond to the Company's requests, and provide information regarding the **Claim** when requested.

    **C.    Policy Limits**

Regardless of the number of persons or entities insured or included in **Part I. E. Covered Persons and Entities,** or the number of claimants or **Claims** made against the Insured:

    **1.**    The maximum liability of the Company for **Damages** resulting from each **Claim** first made against the Insured during the **Policy Period** and the Extended Reporting Period, if purchased, shall not exceed the amount shown in the Declarations as each **Claim**;

    **2.**    The maximum liability of the Company for all **Damages** as a result of all **Claims** first made against

Landmark v. Nurselect MSJ_00000524

the Insured during the **Policy Period** and the Extended Reporting Period, if purchased, shall not exceed the amount shown in the Declarations as Aggregate.

The inclusion of more than one Insured, or the making of **Claims** by more than one person or organization, does not increase the Company's Limit of Liability.  All **Claims** arising out of a single negligent act, error or omission, or a series of related negligent acts, errors or omissions by one or more Insureds shall be treated as a single **Claim** for all purposes of this policy.  All **Claims** shall be deemed first made when the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period** and all such **Claims** shall be subject to the same Each Claim Limit of Liability during that **Policy Period**.

**Claim Expenses** shall be paid by the Company in addition to the applicable Limits of Liability stated in the Declarations.  The Company's obligation to pay **Claim Expenses** in addition to the applicable Limits of Liability as shown in the Declarations shall be limited to an additional **Claims Expense** Limits of Liability equal to the amount as shown in the Declarations as the Each Claim Limit of Liability.

The Company shall not be obligated to pay any **Claim** for **Damages** or defend any **Claim** after the Limit of Liability has been exhausted by payment of judgments, settlements, **Claim Expenses** or any combination thereof.

**D.  Deductible Provisions**

The deductible amount as shown in the Declarations shall be paid by the Insured and applies to each **Claim** and includes **Damages** or **Claim Expenses,** whether or not a loss payment is made.  If the deductible amount is initially paid by the Company, the Named Insured shall reimburse the amount paid within thirty (30) days, upon written request of the Company.

**E.  Covered Persons and Entities**

  **1.**  Named Insured as shown in the Declarations, and if the Named Insured is an individual, his or her spouse, or domestic partner, but only with respect to the professional services rendered by or on behalf of the Named Insured;

  **2.**  Any present or former principal, partner, officer, director, member, employee or volunteer worker of the Named Insured, but only as respects professional services rendered on behalf of the Named Insured;

  **3.**  Heirs, Executors, Administrators, and in the event of an Insured's death, incapacity or bankruptcy, legal representatives of any Insured, but only with respect to professional services rendered prior to such Insured's death, incapacity or bankruptcy;

  **4.**  Any Medical Director while acting within the scope of his/her administrative and supervisory duties for the Named Insured.  It is further agreed that coverage does not apply to the Medical Director while acting within his/her capacity as a Physician, Surgeon or Dentist in the treatment, or direction of the treatment, of any patient;

  **5.**  Any student enrolled in a training program, but only while acting within the scope of their duties as such and under the direct supervision of faculty members or educators of such training program;

  **6.**  Any faculty member or educator of a training program, but only while acting within the scope of their duties as such.

**F.  Covered Territory**

This policy applies to covered **Claims** arising out of negligent acts, errors or omissions committed anywhere in the world.  However, the policy does not provide coverage for **Claims** made against the Insured in countries where the United States of America has declared or imposed a trade embargo or sanctions, or in countries where the United States of America does not maintain diplomatic relations.

**G.  Extended Reporting Period**

If the policy is not renewed for any reason, or is cancelled for any reason other than for nonpayment of premium or deductible (whether cancelled by the Company or by the Named Insured), the Named Insured as shown on the Declarations, has the right to purchase, within sixty (60) days of policy termination, an extension of the coverage granted by this policy.  This reporting period extension shall

Landmark v. Nurselect MSJ_00000525

LAND000036

remain in force for a period of either twelve (12), twenty-four (24), or thirty-six (36) months after the policy terminates, but only for **Claims** resulting from negligent acts, errors or omissions committed before the effective date of the cancellation or nonrenewal, and otherwise covered by this policy. Increased premiums or deductibles or modifications of coverage terms or conditions upon renewal do not constitute cancellation or nonrenewal.

The premium for this Extended Reporting Period will not exceed one hundred percent (100%) for twelve months, one hundred fifty percent (150%) for twenty-four months or one hundred seventy-five percent (175%) for thirty-six months of the full annual premium set forth in the Declarations and any attached endorsements, and must be elected and paid within sixty (60) days after the effective date of the policy's termination. Such additional premium is deemed fully earned immediately upon the inception of the Extended Reporting Period.

The Extended Reporting Period is added by endorsement and, once endorsed, cannot be cancelled. The Extended Reporting Period does not reinstate or increase the Limits of Liability. The Company's Limits of Liability during the Extended Reporting Period are part of, and not in addition to, the Company's Limits of Liability stated in the Declarations.

**H.  Supplementary Coverages**

It is agreed that any and all payments made for the following is included within, and shall not be in addition to, the Policy Limits as described in this Policy.

**1.** The Company will pay **Claim Expenses** incurred in the defense of any disciplinary proceeding or investigation against an Insured by any licensing board, disciplinary board, peer review committee, or similar entity alleging professional misconduct or violation of the rules of professional conduct, provided that the alleged misconduct or violation first occurred after the **Retroactive Date** and arises out of the Insured's performance of the Named Insured's professional services as described in the Declarations. This provision applies only to disciplinary proceedings first brought against an Insured during the **Policy Period** and reported to the Company no later than sixty (60) days after the end of **Policy Period**. The Company's obligation to defend an Insured under the provision is subject to a sub-Limit of Liability of $25,000 and applies only to **Claims Expenses** incurred with the consent of the Company. **Damages** are not covered by this provision.

This sub-Limit of Liability is the maximum amount payable under this provision for the **Policy Period**, regardless of the number of disciplinary proceedings first commenced during the **Policy Period** or the number of Insureds subject to disciplinary proceedings. There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

**2.** The Company will pay reasonable expenses incurred by the Insured at the Company's request to assist in the investigation of the **Claim** or defense of the suit, including actual loss of earnings up to $500 a day for each Insured because of time off from work, subject to an aggregate amount of $5,000 for each individual Insured for each **Claim**, not to exceed an aggregate amount of $10,000 per **Policy Period**. There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

**3.** The Company will pay fines and penalties specified in the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and the Health Information Technology for Economic and Clinical Health Act (HITECH) as assessed against the Insured, or assessed against third parties who make a claim on the Insured for indemnification or contribution for such fines and penalties based on violations and breaches of the privacy and security provisions of HIPAA, and HITECH, and/or regulations promulgated under said statutes relating to Protected Health Information (PHI) and electronic Protected Health Information (ePHI), but only if such violations or breaches arise out of professional services as described in the Declarations or from the handling of PHI or ePHI of the Insured's own personnel.

For the purposes of this coverage, **Claim** shall also include the notice of investigation, audit, and/or assessment of fines or penalties by the U.S. Department of Health and Human Services or the Office of Civil Rights in connection with violations of or breaches under HIPAA and/or HITECH.

For the purposes of this coverage, **Damages** shall also include HIPAA and/or HITECH fines and

Landmark v. Nurselect MSJ_00000526

penalties.

The coverage described above is subject to a sub-Limit of Liability in an aggregate amount of $100,000. This sub-Limit of Liability is the maximum amount payable under this provision for the **Policy Period**, regardless of the number of violations and/or breaches by the Insured of the privacy and security provisions of HIPAA and HITECH and the regulations established thereunder arising from the performance of or failure to perform professional services as described in the Declarations. Any payments made under this provision are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

4.  The Company will pay **Damages** or **Claims Expenses** as a result of **Claims** arising out of circumstances involving the use of excessive influence of power on any patient, or the actual or alleged inappropriate physical contact or contact that is deemed by or alleged by any patient to be sexual or in any way unwelcomed, is limited to a sub-Limit of Liability of $250,000 each claim and $500,000 in the aggregate. This sub-limit of liability is part of and not in addition to the applicable Limits of Liability as shown in the Declarations. Payment of **Damages** or **Claim Expenses** by the Company reduces the applicable Limits of Liability as shown in the Declarations.

Once the sub-Limit of Liability is exhausted, no additional coverage shall be afforded by this coverage provision and the following Exclusion will be added to the policy:

It is agreed that no coverage shall apply under this policy to any **Claim** or **Claim Expenses** arising out of or involving the use of excessive influence or power on any patient, or the actual or alleged inappropriate physical contact or contact that is deemed by or alleged by any patient to be sexual or in any way unwelcomed.

**Part II.  Exclusions**

This policy does not apply to any **Claim** or **Claim Expenses** based upon or arising out of:

A.  **Personal and Advertising Liability**.

B.  Obligations of any Insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

C.  **Bodily Injury** to any of the following:

1.  Officers, directors, partners, employees or volunteer workers of the Insured arising out of and in the course of employment by the insured;

2.  The spouse, child, parent, or sibling of **C. (1.)** above.

D.  The insolvency or bankruptcy of an Insured or of any other person, firm or organization.

E.  Dishonest, fraudulent, criminal, malicious, or intentional acts, errors or omissions committed by or at the direction of any Insured.

F.  Any business enterprise not named in the Declarations which is owned, controlled, operated or managed by any Insured.

G.  A **Claim** by one Insured under this policy against another Insured under this policy, unless such **Claim** arises solely out of professional services performed for that party.

H.  Any obligation or liability assumed by the Insured under any contract or any oral or written agreement, unless liability would have attached in the absence of such a contract or agreement, including the Insured's decision to unilaterally terminate or otherwise alter, remove or abridge any rights, benefits or obligations under any contract or agreement.

I.  The ownership, rental, leasing, maintenance, use (including operation, loading and unloading), or repair of any real or personal property, including **Damage** to property owned, occupied or used by, rented to or leased to an Insured.

J.  The rendering or failure to render professional services by the Insured as a physician, surgeon or dentist.

K.  The performance of any service by any Insured while under the influence of intoxicants or illegal drugs.

Landmark v. Nurselect MSJ_00000527

LAND000038

**L.** The ownership, maintenance, use (including operation, loading and unloading), or entrustment to others of any aircraft, automobile, motor vehicle, mobile vehicles or watercraft owned or operated by or rented or loaned to any insured. This exclusion includes the movement of patients in and out of any motor vehicle, aircraft, automobile or watercraft.

**M.  1.** The actual, alleged or threatened presence, discharge, dispersal, seepage, migration, release or escape of **Pollutants** or asbestos;

**2.** The failure to discover or disclose the existence or amount of **Pollutants** or asbestos;

**3.** Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with **M. (1.)** or **(2.)** above;

**4.** Any request, demand or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or, in any way respond to or assess the effects of **Pollutants** or asbestos;

**5.** Any **Claim** or suit by or on behalf of a governmental authority for **Damages** because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or, in any way, responding to, or assessing the effect of **Pollutants** or asbestos.

**N.  1.** Refusal to employ;

**2.** Termination of employment;

**3.** Coercion, demotion, performance evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, retaliation or other employment related practices, procedures, policies, acts or omissions;

**4.** Consequential **Bodily Injury** or **Personal Injury** as a result of **N. (1.)** through **(3.)** above.

This exclusion applies whether the Insured may be held liable as an employer or in any other capacity and to any obligation to share **Damages** with or to repay someone else who must pay **Damages** because of the injury.

It is further agreed that no coverage shall apply under this policy to any **Claim** brought by or against any spouse, child, parent, brother or sister of the Insured or any other person. The Company shall not have a duty to defend any **Claim**, suit, arbitration or any other form of trial court proceeding.

**O.** Any alleged act, error, omission, or circumstance likely to give rise to a **Claim** that an Insured had knowledge of prior to the effective date of this policy. This exclusion includes, but is not limited to, any prior **Claim** or possible **Claim** referenced in the Insured's application.

**P.** Infringement of copyright, patent, trademark, trade name, trade dress, service mark, title or slogan.

**Q.** Experimental procedures and experimental products, including procedures using experimental products. Experimental procedures and products are those not approved by the United States Food and Drug Administration (FDA).

**R.** Obstetrical procedures, including but not limited to any emergency obstetrical procedures.

## Part III. Definitions

**A. Advertisement** means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**1.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**2.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**B. Bodily Injury** means physical or mental harm, sickness or disease sustained by a person including death resulting from any of these at any time.

**C. Claim** means a written demand for monetary or non-monetary relief received by the Insured during the **Policy Period**, including the service of suit, or the institution of an arbitration proceeding. Additionally,

Landmark v. Nurselect MSJ_00000528

LAND000039

**Claims** that arise from an incident, occurrence or offense first reported by the Insured during the **Policy Period** and accepted by the Company in accordance with **Part IV. A. Notice of Claim** will be considered a **Claim** first made during the **Policy Period**.

D. **Claim Expense** means expenses incurred by the Company or the Insured with the Company's consent in the investigation, adjustment, negotiation, arbitration, mediation and defense of covered **Claims**, whether paid by the Company or the Insured with the Company's consent, and includes:

   1. Attorney fees;

   2. Costs taxed against the Insured in any **Claim** defended by the Company;

   3. Interest on the full amount of any judgment that accrues after entry of the judgment and before the Company has paid, offered to pay or deposited in court the part of the judgment that is within the applicable Limit of Liability;

   4. The cost of appeal bonds or bonds to release attachments, but only for bond amounts within the available applicable policy limit and only if said **Claims** are covered by the policy;

   5. Reasonable expenses incurred by the Insured at the Company's request other than:

      a. Loss of earnings;

      b. Salaries or other compensation paid to the Insured or any employee of the Insured.

E. **Damages** means compensatory judgment, award or settlement, including punitive or exemplary damages, except damages for which insurance is prohibited by law. **Damages** does not include disputes over fees, deposits, commissions or charges for goods or services.

F. **Policy Period** means the period of time stated in the Declarations or any shorter period resulting from policy cancellation or amendment to the policy.

G. **Personal and Advertising injury** means injury, including consequential **Bodily Injury,** arising out of one or more of the following offenses:

   1. False arrest, detention or imprisonment;

   2. Malicious prosecution or abuse of process;

   3. Wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   4. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   5. Oral or written publication, in any manner, of material that violates a person's right of privacy;

   6. Use of another's advertising idea in your **Advertisement**; or

   7. Infringing upon another's copyright, trade dress or slogan in your **Advertisement**.

H. **Retroactive Date** means the date stated in the Declarations on or after which any alleged or actual negligent act, error or omission must have first taken place in order to be considered for coverage under this policy.

I. **Pollutants** means any solid, liquid, gaseous or thermal irritant, contaminant or toxin, whether live or inanimate; including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals, metals, silica, lead, lead compounds or materials containing lead, asbestos, asbestos compounds or materials containing asbestos, radon, waste or any like substances. Waste includes materials to be recycled, reconditioned or reclaimed.

**Part IV. General Conditions**. The following Conditions are a precedent to coverage under the Policy:

A. **Notice of Claim**

The Insured must notify the Company as soon as practicable of an incident, occurrence or offense that may reasonably be expected to result in a **Claim**. Where notice to the Company of such incidents, occurrences or offenses has been acknowledged as adequate by the Company in writing, subsequent

Landmark v. Nurselect MSJ_00000529

LAND000040

**Claims** derived from such incidents, occurrences or offenses will be deemed as first made at the time the incident, occurrence or offense giving rise to such **Claim** was first provided. The Insured also must immediately send copies to the Company of any demands, notices, summonses or legal papers received in connection with any **Claim**, and must authorize the Company to obtain records and other information. Please send all claim information to:

> Attention: **Claims** Dept.
> RSUI Group, Inc.
> 945 East Paces Ferry Road, Suite 1800
> Atlanta, Georgia 30326-1160
> Or Via Email:
> reportclaims@rsui.com

**B. Prohibition of Voluntary Payments and Settlements**

With respect to any **Claim** covered under this policy, the Insured will not make payment, admit liability, settle **Claims,** assume any obligation, agree to arbitration or any other means of resolution of any dispute, waive any rights or incur **Claim Expenses** without prior written Company approval, except at the Insured's own cost.

**C. Cooperation**

The Insured will cooperate with the Company in the conduct of a **Claim** and, upon the Company's request, submit to examination and interrogation by the Company representative, under oath if required, and will attend hearings and trials and assist in effecting settlements, securing and giving evidence, and obtaining the attendance of witnesses. The Insured shall further cooperate with the Company and do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment that the Insured may have, and the Company may exercise those rights in the name of the Insured.

**D. Nonrenewal**

The Company will give the Named Insured sixty (60) days written notice prior to nonrenewal of this policy by mailing or delivering the notice to the first Named Insured's last known mailing address as shown in the Declarations.

**E. Premium and Audit**

Premium for this coverage is computed in accordance with the Company's rules and rates. Any premium shown as advance premium may be a deposit premium only. If the premium is a deposit premium, at the close of each audit period, the Company will compute the earned premium for that period. Audit premiums are due and payable upon notice.

The Company may examine and audit the Insured's books and records at any time during the **Policy Period** and within three years after the final termination of this policy, as far as they relate to the subject matter of this policy.

The first Named Insured, as shown in the Declarations, must keep records of information the Company will need for premium computation and, upon request, must send the Company copies of the information.

**F. Authorization**

The first Named Insured listed in the Declarations agrees to act as the Named Insured with respect to giving and receiving of all notices, exercising the Extended Reporting Period option, canceling the policy, paying all premiums and deductibles and receiving any return premiums that may become due.

**G. Subrogation**

In the event of any **Claim** under this policy, the Company will be subrogated to all the Insured's rights of recovery against any person or organization, and the Insured will execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured will do nothing after the loss to prejudice such rights.

**H. Other Insurance**

This policy will be excess over, and will not contribute with, any other existing insurance, unless such

Landmark v. Nurselect MSJ_00000530

LAND000041

other insurance is specifically written to be excess of this policy.

When this insurance is excess, the Company shall have no duty under this policy to defend any **Claim** or suit that any other insurer has a duty to defend.  If such other insurer refuses to defend such **Claim** or suit, the Company shall be entitled to the Insured's rights against all such insurers for any **Claim Expenses** incurred by the Company.

If it is determined that both this insurance and other insurance or self insurance apply to any **Claim** on the same basis, whether primary, excess or contingent, the Company will not be liable under this policy for a greater proportion of the **Damages** or **Claim Expenses** than the applicable Limit of Liability under the policy for such **Damages** bears to the total applicable Limit of Liability of all other insurance or self insurance, whether or not collectible against such **Claims.**

**I.    Actions Against the Insurer**

No action will be taken against the Company unless, as a condition precedent, the Insured is in full compliance with all of the terms of this policy, and until the amount of the Insured's obligations to pay shall have been finally determined, either by judgment against the Insured after actual trial, or by written agreement of the Insured, the claimant and the Company.

**J.    Coverage in Bankruptcy**

Bankruptcy or insolvency of the Insured or of the Insured's estate does not relieve the Company of its obligations under this policy.

**K.    False or Fraudulent Claims**

If an Insured knowingly makes any **Claim** that is false or fraudulent, this insurance shall become void and entitlement to coverage for all **Claims** hereunder shall be forfeited.

**L.    Application**

The Insured agrees that the statements in the application are personal representations, that they shall be deemed material and that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between the Insured and the Company, or any of its agents, relating to this insurance.  The signed application, and any attachments thereto, submitted in connection with this Policy are incorporated herein and constitute a part of this Policy.

Landmark v. Nurselect MSJ_00000531

LAND000042

**LANDMARK AMERICAN INSURANCE COMPANY**

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. CANCELLATION**

    **1.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

    **2.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

        **a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium or deductible; or

        **b.** 60 days before the effective date of cancellation if we cancel for any other reason.

    **3.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

    **4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

    **5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

    **6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. CHANGES**

This policy contains all the agreements between you and us concerning the insurance afforded.  The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. EXAMINATION OF YOUR BOOKS AND RECORDS**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. INSPECTIONS AND SURVEYS**

We have the right but are not obligated to:

    **1.** Make inspections and surveys at any time;

    **2.** Give you reports on the conditions we find; and

    **3.** Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections.  We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

    **1.** Are safe or healthful; or

    **2.** Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**E. PREMIUMS**

The first Named Insured shown in the Declarations:

RSG 51031 0522

Landmark v. Nurselect MSJ_00000532

LAND000043

1.  Is responsible for the payment of all premiums; and

2.  Will be the payee for any return premiums we pay.

**F.  TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Landmark v. Nurselect MSJ_00000533

LAND000044



**RSUI Group, Inc.**
945 East Paces Ferry Road
Suite 1800
Atlanta, GA 30326-1160

Phone    (404) 231-2366
Fax      (404) 231-3755

ATTN:  Health Care Providers – Applicants and Policyholders

RE:      HIPAA Privacy and Security Rule Compliance

The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and associated regulations require health care providers to maintain the confidentiality of patients' protected health information ("PHI").  PHI includes, among other things, medical records and billing records relating to medical care.  As a "covered entity" under HIPAA, you are not permitted to share PHI with a "business associate" unless the business associate has provided you with a Business Associate Agreement that provides for the protection of PHI.  Although a professional liability insurer may not be deemed to be a "business associate" as defined by HIPAA, we want to assure your compliance with the regulations in the event a Business Associate Agreement is necessary.

We are committed to maintaining the confidentiality of PHI that you may provide as a part of the administration of your insurance coverage.  Enclosed you will find a Business Associate Agreement that explains how we will safeguard any PHI that you may provide to us in the process of underwriting your policy or handling a claim on your behalf.  Please review it and keep it with your professional liability policy.  You do not need to sign or return this agreement to us.  Please maintain it in your files to document our mutual obligations with respect to PHI.

If you have any questions or concerns about the Business Associate Agreement, please contact Whitney Thomas at (404)260-3795 or whitneythomas@rsui.com.

Sincerely,

Whitney Thomas
Regulatory Compliance
RSUI Group, Inc.

**BUSINESS ASSOCIATE AGREEMENT**

THIS BUSINESS ASSOCIATE AGREEMENT ("Agreement") is executed by Landmark American Insurance Company, Covington Specialty Insurance Company, RSUI Indemnity Company and RSUI Group, Inc. ("Business Associate") in favor of its insured healthcare providers (the "Provider").

**RECITALS**

WHEREAS, the Business Associate provides professional liability insurance to the Provider pursuant to a policy of insurance (the "Business Arrangement"), and in connection with the Business Arrangement the Provider discloses to the Business Associate certain individually identifiable protected health information ("PHI") that is subject to protection under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended from time to time.

WHEREAS, the parties desire to comply with the HIPAA standards for privacy of PHI of patients of the Provider, and to set forth the terms and conditions pursuant to which the parties will handle PHI that Business Associate receives in the course of performing its services for or on behalf of the Provider under the Business Arrangement.

NOW THEREFORE, for and in consideration of the recitals above, the benefits to Business Associate under the Business Arrangement and the mutual covenants and conditions herein contained, Business Associate agrees as follows:

**SECTION 1 – DEFINITIONS**

Terms used, but not otherwise defined in the Agreement shall have the same meaning as set forth in the Standards for Privacy of Individually Identifiable Health Information (the "Privacy Rules"), 45 CFR parts 160-164, as promulgated by the United States Department of Health and Human Services ("HHS"), as amended from time to time.

**SECTION II – OBLIGATIONS AND ACTIVITIES OF BUSINESS ASSOCIATE**

a.  Business Associate agrees to not use or disclose PHI other than as permitted or required by this Agreement or as required by law.

b.  Business Associate agrees to use appropriate safeguards to prevent use or disclosure of the PHI other than as provided for by this Agreement.

c.  Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of the requirements of this Agreement.

d.  Business Associate agrees to report to Provider any use or disclosure of the PHI, of which it becomes aware, and otherwise not provided for by this Agreement.

e.  Business Associate shall require its agents and subcontractors that receive PHI from Business Associate or Provider to agree to the same restrictions and conditions that apply through this Agreement to Business Associate with respect to such information.

f.  Business Associate agrees to make available and provide right of access to PHI held by the Business Associate that does not merely duplicate the information maintained by the Provider, to Provider at its request, or as directed by Provider, to an Individual.  Business Associate shall provide access within reasonable time and manner as specified by Provider.

g.  Business Associate agrees to incorporate all amendments or corrections to PHI when notified by the Provider in writing that such information is inaccurate or incomplete.  45 CFR § 164.526

h.  Business Associate agrees to make available to the Secretary of HHS (or its designee) all internal practices, books, and records relating to the use and/or disclosure of PHI received from the Provider, for purposes of determining the Provider's compliance with the Privacy Rules, subject to attorney-client and other applicable legal privileges.

i.  Business Associate agrees to provide an accounting of such disclosures of PHI to Provider or, as directed by Provider, to an Individual in accordance with 45 CFR § 164.528, as amended from time to time.  Business Associate shall provide such accounting within a reasonable time and manner as specified by the Provider.

j.  Business Associate shall comply with all applicable requirements of the HIPAA Security Rule.

k.  Business Associate shall immediately report to Covered Entity any breach of PHI, as defined by HIPAA.  Business Associate shall cooperate with Covered Entity's investigation, mitigation and response efforts related to any such breach.   Additionally, Business Associate shall be responsible for any costs, liabilities, damages, expenses, and attorney's fees incurred by Covered Entity related to such breach.

l.  In the event Business Associate undertakes any of Covered Entity's duties under HIPAA, Business Associate shall comply with all HIPAA regulations applicable to Covered Entity in the discharge of such duties.

## 2.1  PERMITTED USES AND DISCLOSURES OF PHI BY BUSINESS ASSOCIATE

a.  Business Associate, its agents and employees, may use or disclose PHI as necessary to perform its duties under the Business Arrangement and only as allowed by the terms of the Business Arrangement, this Agreement, or as required or allowed by law.

b.  Business Associate may also use and/or disclose PHI as necessary for the proper management and administration of Business Associate, and to carry out the legal responsibilities of Business Associate.

c.  Business Associate agrees that it will not use or disclose PHI in a manner that violates or would violate the Privacy Rules, or the minimum necessary policies and procedures of the Provider that are communicated to Business Associate.

d.  Business Associate may use PHI to report violations of the law to appropriate Federal and State authorities, consistent with 45 CFR § 164.502(j)(1).

## SECTION III – OBLIGATIONS OF THE PROVIDER

a.  Provider shall notify Business Associate of any limitation(s) in the Provider's notice of privacy practices in accordance with 45 CFR § 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of PHI.

b.  Provider shall notify Business Associate, in writing and in a timely manner, of any restrictions or other arrangement to which the Provider has agreed with an individual in accordance with 45 CFR § 164.522, to the extent that such changes may affect Business Associate's use or disclosure of PHI hereunder; provided however, that the Provider will not agree to, and Business Associate will not be required to comply with, any restriction that is inconsistent with the purpose or terms of the Business Arrangement.

## 3.1  PERMISSIBLE REQUESTS BY PROVIDER

Provider shall not request Business Associate to use and/or disclose PHI in any manner that would not be permissible under the Privacy Rule if done by Provider; provided however, that the Business Associate will use or disclose PHI for management and administrative activities of the Business Associate as outlined in Section 2.1.

## SECTION IV – TERM AND TERMINATION

## 4.1  TERM AND TERMINATION

This Agreement shall remain in effect for the entire term of the Business Arrangement, or until terminated as set forth herein.  This Agreement will automatically terminate without further action of the parties upon the termination or expiration of the Business Arrangement, subject to the following:

The Provider acknowledges and agrees that, due to the nature of the Business Arrangement, the Business Associate must have the ability to receive PHI from the Provider for as long as the Business Arrangement is in place, and that the Business Associate must have the ability to receive PHI from the Provider for the duration of any defense obligations arising under the Business Arrangement.  Thus, the Provider acknowledges and agrees that termination of this Agreement is not feasible as long as the Business Arrangement is in place, or as long as Business Associate has any defense obligations arising under the Business Arrangement.  Accordingly, any other provision in this Agreement notwithstanding, the parties agree that (a) any notice of termination of this Agreement will also serve as notice of termination of the Business Arrangement, (b) the termination of this Agreement will under no circumstances be effective until the termination of the Business Arrangement is effective, and (c) this Agreement may not be terminated and will remain in effect as long as Business Associate has any defense obligations arising under the Business Arrangement.

## 4.2  TERMINATION FOR MATERIAL BREACH

Subject to Section 4.1, upon Provider's knowledge of a material breach by Business Associate, Provider shall either:

a. Provide an opportunity for Business Associate to cure the breach or end the violation and terminate this Agreement and the Business Arrangement if Business Associate does not cure the breach or end the violation within a reasonable time specified by the Provider;

b. Immediately terminate this Agreement and the Business Arrangement if the Business Associate has breached a material term of this Agreement and cure is not possible; or

c. If neither termination nor cure is feasible, Provider shall report the violation to the Secretary of HHS.

## 4.3  RETURN/DESTRUCTION OF PHI

Except as provided in Section 4.4, upon termination of the Business Arrangement (and any ongoing defense obligations, if applicable), for any reason, Business Associate will, if feasible, return or destroy PHI received from, or created or received by it on behalf of the Provider that Business Associate maintains in any form, including any backup tapes.  Business Associate shall retain no copies of such information.  Business Associate further agrees to use its best efforts to recover PHI in the possession of subcontractors or agents.

Landmark v. Nurselect MSJ_00000537

**4.4  NO FEASIBLE OR PRACTICAL RETURN/DESTRUCTION OF PHI**

Business Associate has determined that returning or destroying PHI is infeasible for ongoing defense obligations (if applicable), state regulatory requirements imposed upon professional liability insurers, such as reporting, review, and audit requirements, and carrying out any necessary business responsibility of the Business Associate.  This serves as Business Associate's notification to Provider of the conditions that make return or destruction infeasible.  Business Associate shall extend the protections of this Agreement to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

**SECTION V – MISCELLANEOUS**

a.  <u>Regulatory References</u> – A reference in this Agreement to a section of the Privacy Rule means the section as in effect or as amended.

b.  <u>Amendment</u> – The parties recognize that this Agreement may need to be modified from time to time and agree to take such action as is necessary to amend this Agreement for Provider to comply with federal and state law including, but not limited to the requirements of the Privacy Rule and HIPAA.

c.  <u>Survival</u> – The respective rights and obligations of Business Associate under Section 4.3 of this Agreement shall survive the termination of this Agreement.

d.  <u>Notices</u> – All notices and other communications required or permitted pursuant to this Agreement shall be in writing, addressed to the party at the party's regular business address. All notices and other communications shall be sent by overnight courier or sent by registered or certified mail, return receipt requested.

e.  <u>Interpretation</u> – Any ambiguity in this Agreement shall be resolved to permit Provider to comply with HIPAA and the Privacy Rules.


BUSINESS ASSOCIATE:

Signed:

Michael Wayman
Senior Vice President
RSUI Group, Inc.


Address for Notice:

RSUI Group, Inc.
945 East Paces Ferry Road
Suite 1800
Atlanta, GA  30326-1160

Landmark v. Nurselect MSJ_00000538

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# ADDITIONAL INSURED ENDORSEMENT (BLANKET)

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD**

1. In consideration of the premium charged, the following is added as an Additional Insured, but solely with regard to professional services rendered or that should have been rendered by the Named Insured:

   Any person or organization to whom or to which the Named Insured is obligated by virtue of a written contract or by the issuance or existence of a written permit, to provide insurance such as is afforded by this policy.

2. It is also agreed that the policy does not apply to:

   a. **Claims** by an Additional Insured against the Named Insured;

   b. **Claims** that include allegation or facts indicating sole liability on the part of an Additional Insured.

All other terms and conditions of this policy remain unchanged.

This endorsement effective     3/1/2023
Forms part of Policy Number     LHC801468
Issued to     NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:     01

RSG 55015 0418

Landmark v. Nurselect MSJ_00000539

LAND000050

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# COMMUNICABLE DISEASE EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**A.** The following exclusion is added to Paragraph **2. Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

    **2.** **Exclusions**

        This insurance does not apply to:

        **Communicable Disease**

        "Bodily injury" or "property damage" arising out of the actual or alleged transmission of a "communicable disease".

        This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

        **a.** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a "communicable disease";

        **b.** Testing for a "communicable disease";

        **c.** Failure to prevent the spread of the disease; or

        **d.** Failure to report the disease to authorities.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

    **2.** **Exclusions**

        This insurance does not apply to:

        **Communicable Disease**

        "Personal and advertising injury" arising out of the actual or alleged transmission of a "communicable disease".

        This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

        **a.** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a "communicable disease";

        **b.** Testing for a "communicable disease";

        **c.** Failure to prevent the spread of the disease; or

        **d.** Failure to report the disease to authorities.

**C.** For the purposes of this exclusion:

    "Communicable disease" means any illness or disease caused by an infectious agent or its toxins, including but not limited to any bacteria, virus, mold, mildew, fungi, or parasite, that occurs through the direct or indirect transmission of the infectious agent or its product.

This endorsement effective    3/1/2023
Forms part of Policy Number    LHC801468
Issued to    NURSELECT LLC
by    Landmark American Insurance Company

                                  Endorsement No.:    02

RSG 56201 0920

Landmark v. Nurselect MSJ_00000540

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# CROSS COVERAGE EXCLUSION – MEDICAL BROAD FORM

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD
COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

The Medical Professional Liability coverage and the Commercial General Liability coverage provided in this Policy are mutually exclusive.

It is agreed that any claim, damages, Supplementary Payments, or any amounts covered under the Commercial General Liability Coverage Form Claims Made RSG 51030 shall not also be covered under the Medical Professional Liability Coverage Part Claims Made and Reported Basis-Broad-RSG 51044.

It is further agreed that any **Claim**, **Damages**, or **Claim Expenses** or any amounts covered under the Medical Professional Liability Coverage Part Claims Made and Reported Basis-Broad-RSG 51044 shall not also be covered under the Commercial General Liability Coverage Form Claims Made RSG 51030.  Whenever any **Claim** is determined to be covered, either wholly or in part, by the Medical Professional Liability Coverage Part Claims Made and Reported Basis-Broad-RSG 51044, the Commercial General Liability Coverage Form shall not apply and the maximum liability of the Company shall not exceed the Professional Liability Each Claim limit of liability shown in the Declarations.

All other terms and conditions of this policy remain unchanged.

This endorsement effective     3/1/2023
Forms part of Policy Number     LHC801468
Issued to     NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:     03

RSG 56136 0319

Landmark v. Nurselect MSJ_00000541

LAND000052

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# CRYPTOCURRENCY EXCLUSION

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

1.  In consideration of the premium charged, it is agreed that no coverage shall apply under this policy to any **Claim** and/or **Claim Expenses** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving **Cryptocurrency** or any **Cryptocurrency Offering**.

2.  It is agreed that the following definitions are added to **Part III. Definitions**:

    A.  **Cryptocurrency** means any actual or purported electronic, computer derived, digital or virtual instrument, asset, currency, token, coin, unit of account, store of value, funds, or medium of exchange using encryption techniques, methodologies, or technology, including blockchain or similar mechanisms, to secure, verify and/or validate the transfer of such electronic, computer derived, digital or virtual instrument, asset, currency, unit of account, store of value, funds, or medium of exchange between one or more parties.

    B.  **Cryptocurrency Offering** means any direct, indirect, actual, alleged, attempted, or proposed purchase or sale, or offer to purchase or sell, any **Cryptocurrency** issued or created by, or in connection with the Insured.

All other terms and conditions of this policy remain unchanged.

This endorsement effective       3/1/2023
Forms part of Policy Number     LHC801468
Issued to        NURSELECT LLC
by      Landmark American Insurance Company

Endorsement No.:      04

RSG 56216 0822

Landmark v. Nurselect MSJ_00000542

LAND000053

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# DEDUCTIBLE LIABILITY INSURANCE (COMBINATION POLICY – MULTIPLE DEDUCTIBLES)

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**SCHEDULE**

| Coverage | Amount and Basis of Deductible | |
|---|---|---|
| | **PER CLAIM** or | **PER OCCURRENCE** |
| 1) Bodily Injury Liability | | |
|         OR | | |
| 2) Property Damage Liability | | |
|         OR | | |
| 3) Personal and Advertising Injury Liability | | |
|         OR | | |
| 4) Bodily Injury Liability, Property Damage Liability, Personal and Advertising Injury Liability | $ 2,500 | |

**APPLICATION OF ENDORSEMENT** (Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all "Bodily Injury", "Property Damage" and "Personal and Advertising Injury" Liability, however caused):

1. Our obligation under the Bodily Injury Liability, Property Damage Liability, and Personal and Advertising Injury Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages.

2. The deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above.  The deductible amount stated in the Schedule above applies as follows:

   A. PER CLAIM BASIS.  If the deductible amount indicated in the Schedule above is on a per claim basis, that deductible applies as follows:

   1) Under Bodily Injury Liability coverage, to all damages sustained by any one person because of "Bodily Injury";

   2) Under Property Damage Liability Coverage, to all damages sustained by any one person because of "Property Damage";

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to      NURSELECT LLC
by    Landmark American Insurance Company

Endorsement No.:     05

RSG 94016 0916

Landmark v. Nurselect MSJ_00000543

3) Under Personal and Advertising Injury Liability Coverage, to all damages sustained by any one person because of "Personal and Advertising Injury".

4) Under Bodily Injury Liability, Property Damage Liability, and Personal and Advertising Injury Liability Coverages Combined, to all damages sustained by any one person because of:

   a) "Bodily Injury";

   b) "Property Damage";

   c) "Personal and Advertising Injury".

If damages are claimed for care, loss of services or death resulting at any time from "Bodily Injury", a separate deductible amount will be applied to each person making a claim for such damages.

With respects to "Property Damage" and "Personal and Advertising Injury" Liability, person includes an organization.

B. PER OCCURRENCE BASIS.  If the deductible amount indicated in the Schedule above is on a "per occurrence" basis, that deductible amount applies as follows:

1) Under Bodily Injury Liability Coverage, to all damages because of "Bodily Injury";

2) Under Property Damage Liability Coverage, to all damages because of "Property Damage";

3) Under Personal and Advertising Injury Liability Coverage, to all damages sustained by any one person because of "Personal and Advertising Injury".

4) Under Bodily Injury Liability, Property Damage Liability, and Personal and Advertising Injury Liability Coverages Combined, to all damages sustained by any one person because of:

   a) "Bodily Injury";

   b) "Property Damage";

   c) "Personal and Advertising Injury".

3. The terms of this insurance, including those with respect to:

   a) Our right and duty to defend any "suits" seeking those damages; and

   b) Your duties in the event of any "occurrence", claim, or "suit"

   apply irrespective of the application of the deductible amount.

4. We may pay any part of all of the deductible amount to effect settlement of any claims or "suit" and upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

5. When used in this endorsement, damages includes any payments made under the Supplementary Payments provisions of this policy.

6. If you do not promptly reimburse us for any deductible amount owned, then any cost incurred by us in collection of the deductible amount will be added and applied in addition to the applicable deductible amount without limitation.   These costs include, but are not limited to, collection agency fees, attorney's fees and interest.

All other terms and conditions of this policy remain unchanged.

Landmark v. Nurselect MSJ_00000544

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – CORRECTIONAL MEDICINE

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD**

In consideration of the premium charged, it is agreed no coverage shall apply under this policy to any **Claim** and/or **Claim Expenses** based upon, arising out of, or in any way involving the rendering of or failure to render services of a professional nature, including healthcare services and medical services, by the Insured or by any person or organization for whose acts, errors or omissions the Insured is legally responsible, in a correctional facility or center, detention center, jail, penal institution, prison, remand center, reformatory, or any similar center, facility, or institution.

All other terms and conditions of this policy remain unchanged.

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to      NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:      06

RSG 56203 0321

Landmark v. Nurselect MSJ_00000545

LAND000056

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – DESIGNATED PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

SCHEDULE

| Description Of Professional Services: |
|---|
| ALLIED HEALTHCARE STAFFING AGENCY |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any professional services shown in the Schedule, the following exclusion is added to Paragraph **2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability**:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" due to the rendering of or failure to render any professional service.

All other terms and conditions of this policy remain unchanged.

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to      NURSELECT LLC
by      Landmark American Insurance Company

Endorsement No.:      07

RSG 56114 1118

Landmark v. Nurselect MSJ_00000546

LAND000057

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# HIRED AND NON-OWNED AUTO LIABILITY

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

In consideration of an additional premium of $Included, it is hereby understood and agreed that the policy is amended as follows:

**A.** The declarations page is amended to include the following under **Commercial General Liability** in the **LIMITS OF INSURANCE** section:

| | |
|---|---|
| $1,000,000 | Hired Auto and Non-Owned Auto Liability Each Occurrence |
| $1,000,000 | Hired Auto and Non-Owned Auto Liability Aggregate |

**B.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A.** applies, **SECTION II – WHO IS AN INSURED** is deleted and replaced with the following:

  **1.** Each of the following is an insured to the extent set forth below.

    **a.** You.

    **b.** Any other person using a "hired auto" with your permission.

    **c.** With respect to a "non-owned auto", any partner or "executive officer" of yours, but only while such "non-owned auto" is being used in your business.

    **d.** Any other person or organization, but only with respect to their liability because of acts or omissions of an insured under paragraphs **a.**, **b.** or **c.** above.

  **2.** None of the following is an insured:

    **a.** Any partner or "executive officer" with respect to any "auto" owned by such partner or officer or a member of his or her household;

    **b.** The owner or lessee (of whom you are a sub-lessee) of a "hired auto" or the owner of a "non-owned auto" or any agent or "employee" of any such owner or lessee; or

    **c.** Any person or organization with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**C.** **SECTION I – COVERAGES**, **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, is amended by the addition of the following:

Hired Auto and Non-Owned Auto Liability:  The insurance provided under **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, shall apply to "bodily injury" and "property damage" arising out of the:

  **1.** maintenance or use of a "hired auto" by you or your "employees" in the course of your business; or

  **2.** use of a "non-owned auto" by any person other than you in the course of your business.

**D.** Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, the definition of "insured contract" in **SECTION VI – DEFINITIONS**, is deleted and replaced with the following:

This endorsement effective    3/1/2023
Forms part of Policy Number    LHC801468
Issued to    NURSELECT LLC
by    Landmark American Insurance Company

Endorsement No.:    08

Landmark v. Nurselect MSJ_00000547

LAND000058

"Insured contract" means that part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

**E.**  Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, **SECTION V – DEFINITIONS** is amended by the addition of the following:

"Hired auto" means any "auto" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent, or borrow from any of your "employees", your partners, your "executive officers", or "volunteer workers", or members of their households.

"Non-owned auto" means any "auto" you do not own, lease, hire, rent or borrow which is used in connection with your business. This includes "autos" owned by your "employees", your partners, your "executive officers", or "volunteer workers", or members of their households, but only while used in your business.

**F.**  Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, subparagraph **g.** of paragraph **2.**, **Exclusions** of **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** (Section I – Coverages) is deleted and replaced as follows:

**g.**  any "claim" based upon or arising out of "bodily injury" or "property damage" arising out of the ownership, maintenance, operation, use or entrustment to others or loading or unloading of:

**(1)**  any aircraft or watercraft owned or operated by or rented or loaned to any Insured; or

**(2)**  any other aircraft or watercraft operated by any person in the course of his/her employment or activities on behalf of the Named Insured.

**G.**  Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, subparagraph **j.** of paragraph **2.**, **Exclusions** of **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** (Section I – Coverages) is deleted and replaced as follows:

**j.**  any "claim" based upon or arising out of "property damage" to:

**(1)**  property owned or being transported by or rented or loaned to the Insured; or

**(2)**  property in the care, custody or control of the Insured.

**H.**  Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, subparagraph **c.** of paragraph **2.**, **EXCLUSIONS OF COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** (Section I – coverages) is deleted.

**I.**  Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, **SECTION III – LIMITS OF INSURANCE** is amended by the addition of the following:

The Hired Auto and Non-Owned Auto Liability Each Occurrence limit shown in paragraph **A.** of this endorsement is the most we will pay for damages because of all "bodily injury" and "property damage" with respect to Hired Auto and Non-Owned Auto Liability arising out of any one "occurrence".

The Hired Auto and Non-Owned Auto Liability Aggregate limit shown in paragraph **A.** of this endorsement is the most we will pay because of all "bodily injury" and "property damage" with respect to all Hired Auto and Non-Owned Auto Liability.

**J.**  Paragraph **2.** of **SECTION III – LIMITS OF INSURANCE** is deleted and replaced by the following:

**2.**  The General Aggregate Limit is the most we will pay for the sum of:

**a.**  Damages under Coverage **A** including Hired Auto and Non-Owned Auto Liability, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**b.**  Damages under Coverage **B**.

**K.**  Solely with respect to Hired Auto and Non-Owned Auto Liability, to which Coverage **A** applies, paragraph **4. Other Insurance** in **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS** is deleted and replaced with the following:

This insurance is excess over any primary insurance covering any "hired auto" or any "non-owned auto".

Landmark v. Nurselect MSJ_00000548

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# MINIMUM RETAINED PREMIUM

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

In the event of cancellation of this policy by the Insured, return premium shall be computed at .90 of the pro rata unearned policy premium, subject however to a retention by the company of not less than $5,625.00.

Nothing in this endorsement is deemed to affect the Company's cancellation rights which remain as indicated in the coverage form.

It is further agreed that return premium may be allowed on a pro rata basis if cancelled for non payment of premium or deductible, subject however to retention by the company of the minimum retained premium as shown above.

All other terms and conditions of this policy remain unchanged.

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to      NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:      09

RSG 54025 0405

Landmark v. Nurselect MSJ_00000549

LAND000060

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# NUCLEAR ENERGY LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

**This policy does not apply;**

**a.    Under any Liability Coverage,** to bodily injury or property damage;

    (1)    with respect to which an Insured under the policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, or Nuclear Insurance Associates of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (2)    resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization;

**b.    Under any Medical Payments Coverage** or any Supplemental Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization;

**c.    Under any Liability Coverage** to bodily injury or property damage resulting from the hazardous properties of nuclear material, if:

    (1)    the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an insured, or (b) has been discharged or dispersed therefrom;

    (2)    the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

    (3)    the bodily injury or property damage arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion (3) applies only to property damage to such nuclear facility and any property thereat;

**d.    As used in this Endorsement:**

    (1)    "Hazardous properties" include radioactive, toxic, or explosive properties;

    (2)    "Nuclear material" means source material, special nuclear material or byproduct material;

    (3)    "Source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

    (4)    "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor,

This endorsement effective        3/1/2023
Forms part of Policy Number      LHC801468
Issued to      NURSELECT LLC
by      Landmark American Insurance Company

Endorsement No.:      10

Landmark v. Nurselect MSJ_00000550

(5) "Waste" means any waste material (a) containing byproduct material and (b) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (6), (a) or (b) thereof;

(6) "Nuclear facility" means:

(a) any nuclear reactor;

(b) any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing spent fuel, or (iii) handling, processing, or packaging waste;

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste; and includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations;

(7) "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

(8) "Property damage" includes all forms of radioactive contamination of property.

All other terms and conditions of this policy remain unchanged.

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# OPIOID AND CONTROLLED SUBSTANCE EXCLUSION

This endorsement modifies insurance provided under the following:

### All Coverages without Limitation

In consideration of the premium charged, it is agreed that this Policy will not be triggered or apply and will provide no coverage for indemnity, defense, supplemental or any other exposure where **Claims**, suits, occurrences or demands of any sort, without limitation, against any Insured are:

1.  Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

    a.  Any actual or alleged abuse, misuse, illicit use, overuse, addiction, dependency, unlawful distribution, or diversion of any **Controlled Substance**;

    b.  Any supervision, instruction, training, education, recommendation, or guideline given, or which should have been given, in connection with any **Controlled Substance**; or

    c.  Inadequate or inaccurate evaluation, control or reporting of, or the failure to evaluate, control or report, the conduct or suspected conduct described in paragraph **1.a.** above.

2.  Brought by or on behalf of any state, municipality or other governmental entity or agency seeking damages, fines, penalties or any other type of relief, whether monetary or not, arising from or in any way related to any Insured manufacturing, selling, distributing, or dispensing **Controlled Substances**.

For the purposes of this exclusion, **Controlled Substances** shall mean:

a.  any opioid or narcotic drug, narcotic medication, or narcotic substance of any type, nature or kind, including, but not limited to, buprenorphine, codeine, fentanyl, hydrocodone, morphine, oxymorphone, tapentadol, oxycontin, hydromorphone, medperidine, methadone, oxycodone, or naloxone;

b.  any substance that is a controlled substance defined by or included in the Schedules of the Controlled Substance Act of the United States of America (21 U.S.C. § 801 et seq.) or any other judicial, statutory, regulatory or other legal measure of any nation, province, state, municipality or other governmental division or subdivision; or

c.  any substance that is in the future labelled or determined to be any of the substances described in **a.** or **b.** of this definition.

This exclusion applies even if the **Claims** or suits against any Insured allege negligence, including but not limited to negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by any Insured.

This exclusion also applies to any **Claim** or suit by or on behalf of any individual or entity seeking certification at any time as a class action, whether or not such action is actually certified, arising from or in any way related to any Insured manufacturing, selling, distributing, or dispensing **Controlled Substances**.

However, this exclusion shall not apply to any **Claim** by or on behalf of a patient, arising out of an actual or alleged negligent act, error or omission by the Insured in the prescribing, administering, or dispensing of a **Controlled Substance** for its intended use, or in providing counseling or treatment related to any **Controlled Substance**.

All other terms and conditions of this policy remain unchanged.

This endorsement effective      3/1/2023
Forms part of Policy Number     LHC801468
Issued to      NURSELECT LLC
by      Landmark American Insurance Company

Endorsement No.:      11

Landmark v. Nurselect MSJ_00000552

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# PENNSYLVANIA – NOTICE OF CANCELLATION AND NON-RENEWAL AMENDMENT

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

**The Notice of Cancellation and non-renewal clause as contained in this policy is deleted and replaced as follows:**

The Named Insured may cancel this policy by mailing or delivering to the Company advance notice of cancellation.

The Company may cancel this policy by:

A.  CANCELLATION OF POLICIES IN EFFECT FOR  SIXTY (60) DAYS OR LESS:

If this policy has been in effect for sixty (60) days or less, the Company may cancel this policy for any reason, by mailing thirty (30) days advance notice of cancellation to the Named Insured.

B.  CANCELLATION OF POLICIES IN EFFECT FOR MORE THAN SIXTY (60) DAYS:

If this policy has been in effect more than sixty (60) days or more, or is a renewal policy to Landmark American Insurance Company, the Company may cancel this policy only for one or more of the following reasons by mailing the following number of day advance notice to the Named Insured:

| REASON FOR CANCELLATION | NUMBER OF DAYS ADVANCE NOTICE TO BE PROVIDED NAMED INSURED |
| --- | --- |
| Non-payment of premium (failure to pay a premium when due) | Fifteen (15) days |
| If the Named Insured makes a material misrepresentation that effects the insurability of risk | Fifteen (15) days |
| A substantial change in the risk covered by this policy | Sixty (60 days |
| If the Company loses its reinsurance for this policy | Sixty (60) days |
| If the Named Insured does not comply with policy terms, conditions or duties | Sixty (60) days |
| Any other reason approved the by Insurance Commissioner | Sixty (60) days |

**This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions, or concealment of facts material to the acceptance of the risk or to the hazard assumed by the Company**

C.  NOTICE OF NON-RENEWAL:

In the event that the Company decides to non-renew this policy, The Company will mail at least sixty (60)

This endorsement effective     3/1/2023
Forms part of Policy Number     LHC801468
Issued to     NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:     12

Landmark v. Nurselect MSJ_00000553

days advance written notice of non-renewal to the Named Insured.

D.    NOTICE OF INCREASE IN PREMIUM – RENEWAL:

If the Company offers renewal terms with an increase in premium, the Company will provide the Named Insured with thirty (30) days advance notice.

The cancellation or non-renewal notice will be mailed via registered or first class mail to the Named Insured at the mailing address stated in the Declarations.  The cancellation or non-renewal notice will state the effective date of the cancellation as well as the reason(s) for cancellation or non-renewal and the policy will terminate on that date.

If coverage is cancelled by the Company, the earned premium shall be computed pro-rata.  If coverage is cancelled by the Insured, the earned premium shall be computed short rate.

All other terms and conditions of this policy remain unchanged.

# *IMPORTANT NOTICE*

## PENNSYLVANIA SURPLUS LINES DISCLOSURE NOTICE

**The insurer which has issued this insurance is not licensed by the Pennsylvania Insurance Department and is subject to limited regulation. This insurance is NOT covered by the Pennsylvania Insurance Guaranty Association.**

Landmark v. Nurselect MSJ_00000555

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# SERVICE OF SUIT

This endorsement modifies insurance provided under the following:

**ALL COVERAGE PARTS**

In the event of our failure to pay any amount claimed to be due, we, at your request, will submit to the jurisdiction of any court of competent jurisdiction within the United States of America.  Nothing in this condition constitutes or should be understood to constitute a waiver of our rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court or seek a transfer of a case to another Court as permitted by the laws of the United States or of any state in the United States, moreover, this endorsement is not an agreement that the law of a particular jurisdiction applies to any dispute under the policy.

Service of process in such suit may be made upon the Senior Claims Officer of RSUI Group, Inc. 945 East Paces Ferry Road, Suite 1800, Atlanta, GA  30326-1160, or his designee. In any suit instituted against any one of them upon this contract, we will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above named is authorized and directed to accept service of process on our behalf in any such suit and/or upon your request to give a written undertaking to you that we will enter a general appearance upon our behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States of America, which makes provision therefore, we hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for the purpose in the statute, or his successor or successors in office, as our true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by you or on your behalf or any beneficiary hereunder arising out of  this contract of insurance, and we hereby designate the above named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

All other terms and conditions of the policy remain unchanged

This endorsement effective     3/1/2023
Forms part of Policy Number     LHC801468
Issued to     NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:     14

Landmark v. Nurselect MSJ_00000556

LANDMARK AMERICAN INSURANCE COMPANY

# State Fraud Statements

(Signature Required for New York Only)

### ARKANSAS, LOUISIANA, RHODE ISLAND, TEXAS AND WEST VIRGINIA FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

### ALASKA FRAUD STATEMENT

A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

### ALABAMA FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

### ARIZONA FRAUD STATEMENT

For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

### CALIFORNIA FRAUD STATEMENT

For your protection, California law requires that you be made aware of the following: Any person who knowingly presents false or fraudulent information to obtain or amend insurance coverage or to make a claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

### COLORADO FRAUD STATEMENT

It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance within the department of regulatory agencies.

### DELAWARE FRAUD STATEMENT

Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

### DISTRICT OF COLUMBIA FRAUD STATEMENT

**WARNING:** It is a crime to provide false, or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

### FLORIDA FRAUD STATEMENT

Any person who knowingly and with intent to injure, defraud or deceive any insurer, files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

A member of Alleghany Insurance Holdings LLC

Landmark v. Nurselect MSJ_00000557

### HAWAII FRAUD STATEMENT

For your protection, Hawaii law requires you to be informed that any person who presents a fraudulent claim for payment of a loss or benefit is guilty of a crime punishable by fines or imprisonment, or both.

### IDAHO FRAUD STATEMENT

Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

### INDIANA FRAUD STATEMENT

Any person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

### KANSAS FRAUD STATEMENT

An act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto.

### KENTUCKY FRAUD STATEMENT

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

### MAINE FRAUD STATEMENT

It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

### MARYLAND FRAUD STATEMENT

Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

### MINNESOTA FRAUD STATEMENT

Any person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

### NEW HAMPSHIRE FRAUD STATEMENT

Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

### NEW JERSEY FRAUD STATEMENT

Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

A member of Alleghany Insurance Holdings LLC

Landmark v. Nurselect MSJ_00000558

### NEW MEXICO FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

### OHIO FRAUD STATEMENT

Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

### OKLAHOMA FRAUD STATEMENT

**WARNING:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

### OREGON FRAUD STATEMENT

Any person who knowingly files a claim containing a false or deceptive statement for payment of a loss or benefit or knowingly presents materially false information in an application for insurance may be guilty of a crime and may be subject to fines and confinement in prison.

### PENNSYLVANIA FRAUD STATEMENT

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

### PUERTO RICO FRAUD STATEMENT

Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances be present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

### TENNESSEE, VIRGINIA, AND WASHINGTON FRAUD STATEMENT

It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**SIGNATURE REQUIRED – NEW YORK ONLY**

**NEW YORK FRAUD STATEMENT**

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

| | |
|---|---|
| LHC801468 | NURSELECT LLC |
| Policy Number | Insured/Applicant/Claimant (Legal Entity) |
| | |
| | By (Authorized Representative) - Printed Name |
| | |
| | By (Authorized Representative) - Signature |
| | |
| | Title |
| | |
| | Date |

RSG 99022 1022

A member of Alleghany Insurance Holdings LLC
Landmark v. Nurselect MSJ_00000560

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# SUPPLEMENTARY COVERAGES ENDORSEMENT

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD**

In consideration of the premium charged, it is agreed that:

1. **Part I. Insuring Agreements, H. Supplementary Coverages** is amended to include:

   1. The Company will pay **Damages** or **Claims Expenses** as a result of **Claims** arising out of an insured's professional services performed during the rendering of emergency medical treatment without remuneration, at the scene of an accident, medical crisis or disaster.  This coverage is subject to a sub-Limit of Liability in an aggregate amount of $25,000.  There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

   2. The Company will reimburse the Insured for **Evacuation Expenses** actually incurred in connection with an **Evacuation** which first takes place during the **Policy Period** and of which is reported to the Company as soon as practicable, but in no event later than thirty (30) days after you first incur **Evacuation Expenses** for which coverage will be requested.  You are not required to obtain the Company's prior written approval or consent before incurring any **Evacuation Expenses**.

      This coverage is subject to a sub-Limit of Liability in an aggregate amount of $25,000.  There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

      No coverage will be available for **Evacuation Expenses** arising out of any:

      a. strike or bomb threat, unless the **Evacuation** was ordered by a civil authority;

      b. false fire alarm or planned evacuation drill;

      c. vacating of one or more residents because of their individual medical condition;

      d. nuclear reaction, radiation, or any radioactive contamination, however caused;

      e. seizure or destruction of property by order of a governmental authority, provided that this exclusion shall not apply to an order of evacuation by a governmental authority due to a condition described above;  or

      f. war, including undeclared or civil war, warlike action by a military force, insurrection, rebellion, or revolution.

   3. The Company will pay up to $500 for loss that is due to **Property Damage** to your patient's tangible property if resulting directly from or during the performance of professional services as described in the Declarations.  The Company will make these payments regardless of fault.  These payments will not exceed $5,000 for all such losses resulting from all professional services, regardless of the number of patients whose tangible property is injured.  There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

   4. The Company will reimburse the Insured for **Legal/Media Expenses** actually incurred in connection with a **Legal Defense Proceeding** first brought against an Insured and reported during the **Policy Period** that occurred after the Policy's **Retroactive Date** and that arises out of the Insured's performance of professional services as described in the Declarations.

This endorsement effective      3/1/2023
Forms part of Policy Number      LHC801468
Issued to      NURSELECT LLC
by      Landmark American Insurance Company

Endorsement No.:      16

Landmark v. Nurselect MSJ_00000561

This coverage is subject to a sub-Limit of Liability in an aggregate amount of $25,000. There will be no deductible for payments made under this provision, and any such payments are a part of, and not in addition to, the Company's Limits of Liability as described in the Declarations.

**2.** The following Definitions are in addition to Policy Definitions contained in **Part III.** and apply only to this endorsement:

**A. Evacuation** means the removal of all or the majority of patients from one or more of your locations or facilities in response to an actual or threatened, natural or man-made condition that is unexpected and unforeseen and causes the patients of such location or facility to be in imminent danger of loss of life or physical harm.

Such condition must be in the form of an emergency or sudden crisis requiring immediate action, and not the result of a latent or hidden condition at the location or facility.

**B. Evacuation Expenses** means reasonable costs and expenses actually incurred by you in connection with the **Evacuation**, including the costs associated with transporting and lodging patients who have been evacuated. **Evacuation Expenses** shall not include any remuneration, salaries, overhead, fees, or benefit expenses of the Named Insured or any Insured.

**C. Property Damage** means:

**1.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**2.** Loss of use of tangible property of others that is not physically injured. All such loss of use shall be deemed to occur at the time of the accident, including continuous or repeated exposure to substantially the same general harmful conditions that caused it.

For the purposes of this coverage, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**D. Legal Defense Proceeding** means:

**1.** A hearing or disciplinary action against an Insured before a state or other licensing board or governmental regulatory body;

**2.** A civil or criminal proceeding in which the Insured is not a defendant but has been ordered to offer deposition testimony regarding treatment rendered to a patient;

**3.** A civil or criminal proceeding in which the Insured is not a party but has received a subpoena for record production regarding treatment rendered to a patient; or

**4.** A HIPAA proceeding.

**E. Legal/Media Expenses** means reasonable fees and costs of attorneys, experts and consultants incurred by the Insured in the investigation and defense of a **Legal Defense Proceeding**. **Legal/Media Expenses** also includes reasonable costs incurred by the Insured in the management of public relations with respect to a **Legal Defense Proceeding**, including reasonable fees and costs of third-party media consultants. Solely with respect to a HIPAA proceeding, **Legal/Media Expenses** shall include civil fines and penalties resulting from any HIPAA proceeding. **Legal/Media Expenses** shall not include any remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of an Insured.

All other terms and conditions of this policy remain unchanged.

Landmark v. Nurselect MSJ_00000562

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# VIOLATION OF CONSUMER PROTECTION LAWS EXCLUSION

This endorsement modifies insurance provided under the following:

**MEDICAL PROFESSIONAL LIABILITY COVERAGE PART CLAIMS MADE AND REPORTED BASIS - BROAD COMMERCIAL GENERAL LIABILITY COVERAGE FORM - OCCURRENCE**

This insurance does not apply to any **Claim** based upon or arising directly, or indirectly, out of any actual or alleged violation of any federal, state or local consumer protection law(s), statute, ordinance or regulation including, but not limited to, the following:

1. The False Claims Act (FCA), including any amendment of or addition to such law;

2. The Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank), including any amendment of or addition to such law;

3. The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA);

4. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

5. The Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (CAN-SPAM Act), including any amendment of or addition to such law;

6. That addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information;

7. Any communication, distribution, publication, sending or transmission via telephone, telephone facsimile machine, computer or other telephonic or electronic devices, including claims asserted under the common law;

8. **Claims** brought by any state or federal government agency, or any person or entity on their behalf, including qui tam **claims**, seeking to enforce any consumer protection law; or

9. Actual or alleged violation of any laws, regulations or guidelines relating to the accessibility of the Insured's website.

10. Any biometric privacy law or any such similar law or statute anywhere in the world that governs or relates to the collection, use, safeguarding, handling, storage, retention or destruction of biometric identifiers, biometric data or biometric information of any kind, including but not limited to retina or iris scans, fingerprints, voiceprints, or scans of hand or face geometry.

All other terms and conditions of this policy remain unchanged.

This endorsement effective     3/1/2023
Forms part of Policy Number    LHC801468
Issued to     NURSELECT LLC
by     Landmark American Insurance Company

Endorsement No.:     17

RSG 56121 0822

Landmark v. Nurselect MSJ_00000563

LAND000074

| **RSUI Group, Inc.**<br>945 East Paces Ferry Road, Suite 1800<br>Atlanta, GA 30326-1160 | **HOME HEALTH CARE, NURSE REGISTRY, INFUSION THERAPY OR OTHER MEDICAL STAFFING SUPPLEMENTAL APPLICATION** |
|---|---|

1. Name of Applicant: _____

2. Type of Firm (check all that apply):   ☐ Home Health Care   ☐ Infusion Therapy   ☐ Visiting Nurse Agency

   ☐ Nurse Registry   ☐ Other Medical Staffing (specify): _____

3. Date Established: _____

4. Location(s) where services are provided (total must be 100%)   _____% Home   _____% Hospice

   _____% Nursing Home   _____%Assisted Living Facility   _____% Hospital   _____%Clinic/Doctors Office

   _____% Adult Day Care   _____% Correctional Facility   _____% Other Facility (specify):

5. Do you provide any of the following services:

   Pediatric Care? Describe: _____   Yes ☐   No ☐

   Pediatric Ventilator/Trach Care? Describe: _____   Yes ☐   No ☐

   Live-In Care? Describe: _____   Yes ☐   No ☐

6. Employees/Independent Contractors – Annual Staffing:

| Type of Employee/Independent Contractor | No. Full-Time | No. Part-Time | Billable hours Per Year |
|---|---|---|---|
| Employed Registered Nurse | _____ | _____ | _____ |
| Contracted Registered Nurse | _____ | _____ | _____ |
| Employed Licensed Practical Nurse | _____ | _____ | _____ |
| Contracted Licensed Practical Nurse | _____ | _____ | _____ |
| Employed Certified Nurse Assistant | _____ | _____ | _____ |
| Contracted Certified Nurse Assistant | _____ | _____ | _____ |
| Employed Nurse Practitioner/Physician Assistant | _____ | _____ | _____ |
| Contracted Nurse Practitioner/Physician Assistant | _____ | _____ | _____ |
| Employed Companion/Home Health Aide | _____ | _____ | _____ |
| Contracted Companion/Home Health Aide | _____ | _____ | _____ |
| Employed Social Worker | _____ | _____ | _____ |
| Contracted Social Worker | _____ | _____ | _____ |
| Employed Physical Therapist | _____ | _____ | _____ |
| Contracted Physical Therapist | _____ | _____ | _____ |
| Employed Other Medical (specify) | _____ | _____ | _____ |
| Contracted Other Medical (specify) | _____ | _____ | _____ |

7. Please provide a copy of the applicant's credentialing procedures and background check procedures.

8. Are drug, alcohol and sexual abuse screening or testing conducted? (Please provide full details)   Yes ☐   No ☐

RSG 50062 0222

Landmark v. Nurselect MSJ_00000564

9.    Are criminal background checks conducted in all states? (Please provide full details)    Yes ☐    No ☐

10.   Anticipated payroll amount for the next 12 months:  _____

11.   Does the Applicant warrant that all employed and contracted physicians, surgeons and dentists    Yes ☐    No ☐

maintain their own medical malpractice professional liability insurance coverage and confirm with a certificate of insurance or

declarations page? If No, please provide details.

**REPRESENTATIONS**

I understand that the information submitted herein becomes a part of my professional liability application and is subject to the same warranty and conditions.
Must be signed and dated by an Owner, Partner or Principal as duly authorized on behalf of the Applicant.

_____

Signature of the Applicant                          Title                          Date

RSG 50062 0222

Landmark v. Nurselect MSJ_00000565

LAND000076

| **RSUI Group, Inc.**<br>945 East Paces Ferry Road, Suite 1800<br>Atlanta, GA  30326-1160 | **RENEWAL APPLICATION FOR MISCELLANEOUS MEDICAL PROFESSIONAL LIABILITY INSURANCE (CLAIMS-MADE FORM)** |
|---|---|

## General Applicant Information

1.   Name of Applicant: _____

     _____

2.   Any changes in Address?        ☐ Yes ☐ No (if yes, please complete the below)

     Principal Address: _____

     _____

3.   City: _____  County: _____  State: _____  Zip Code: _____

     Website: _____

## Applicant Practice

4.   Any change in the applicant's professional activities for which coverage is desired? (if yes, please describe below)   ☐ Yes ☐ No

     _____

     _____

5.    Does the Applicant provide any Correctional Medicine Services?                    ☐ Yes ☐ No

6.   In what states is the Applicant registered and licensed to practice?   _____

     _____

7.   During the past 12 months, has the applicant acquired or been acquired by another company?   ☐ Yes ☐ No
     If yes please describe below

     _____

     _____

8.   State sources and amounts of total revenue:

| Source | Amount Last Policy Year | This Policy Year |
|---|---|---|
| a. Charitable Contributions | $ _____ | $ _____ |
| b. Government Funding | $ _____ | $ _____ |
| c. Fee for Services | $ _____ | $ _____ |
| d. _____ | $ _____ | $ _____ |
| e. _____ | $ _____ | $ _____ |
| TOTAL GROSS REVENUE: | $ _____ | $ _____ |

9.   Number of patient encounters last 12 months (_____) and/or patient tests carried out (_____).
     (NOTE: "Patient encounters" refers to number of *visits* – not number of patients.)

10.  Number of estimated patient encounters the next 12 months (_____) and/or patient tests carried out (_____).
     (NOTE: "Patient encounters" refers to number of *visits* – not number of patients.)

RSG 50090 0222

Landmark v. Nurselect MSJ_00000566

11. If applicant has a training school, complete the following.

| Specify profession for which students are being trained | Max No. of students per session | No. of sessions per year | % of time involved in clinical setting | Number of students | Qualifications of faculty (eg. MD, RN, PhD) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

12. List the number and type of employees, volunteers or independent contractors, their billable hours, and whether or not they carry individual medical malpractice coverage for their services on behalf of the entity.

| | Employees | Volunteers | Independent Contractors | Billable Hours | Insured on own Med Mal Policy |
|---|---|---|---|---|---|
| Aestheticians | | | | | ☐ Yes ☐ No |
| Chiropractors | | | | | ☐ Yes ☐ No |
| Dieticians | | | | | ☐ Yes ☐ No |
| EMT's | | | | | ☐ Yes ☐ No |
| Laboratory Technicians | | | | | ☐ Yes ☐ No |
| Nurse, Aides | | | | | ☐ Yes ☐ No |
| Nurse Anesthetists | | | | | ☐ Yes ☐ No |
| Nurses, Licensed Practical | | | | | ☐ Yes ☐ No |
| Nurse Midwives | | | | | ☐ Yes ☐ No |
| Nurse Practitioner | | | | | ☐ Yes ☐ No |
| Nurse, Registered | | | | | ☐ Yes ☐ No |
| Opticians | | | | | ☐ Yes ☐ No |
| Optometrists | | | | | ☐ Yes ☐ No |
| Paramedics | | | | | ☐ Yes ☐ No |
| Perfusionists | | | | | ☐ Yes ☐ No |
| Pharmacists | | | | | ☐ Yes ☐ No |
| Pharmacy Technicians | | | | | ☐ Yes ☐ No |
| Physical/Occupational/Speech Therapists | | | | | ☐ Yes ☐ No |
| Physical/Occupational/Speech Therapist Assistants | | | | | ☐ Yes ☐ No |
| Physician's Assistants | | | | | ☐ Yes ☐ No |
| Physicians – Minor Surgery | | | | | ☐ Yes ☐ No |
| Physicians – No Surgery | | | | | ☐ Yes ☐ No |
| Psychologists | | | | | ☐ Yes ☐ No |
| Respiratory Therapists | | | | | ☐ Yes ☐ No |
| Social Workers | | | | | ☐ Yes ☐ No |
| Other: _____ | | | | | ☐ Yes ☐ No |

RSG 50090 0222

Landmark v. Nurselect MSJ_00000567

13. Does the applicant maintain any beds for overnight occupancy? (If yes, total number): _____

   What is the average length of stay? _____

14. Does the Applicant warrant that all employed and contracted physicians, surgeons and dentists maintain their own medical malpractice professional liability insurance coverage and confirm with a certificate of insurance or declarations page? ☐ Yes ☐ No
If no, please attached explanation.

## Applicant History

15. Is the applicant currently insured under a Commercial General Liability Policy? ☐ Yes ☐ No
If yes, please give details:

| Insurance Company | Type of Coverage | Limits BI | Limits PD | From | To |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

16. In the past twelve (12) months, has any professional liability claim or suit been made against the Applicant or any of its predecessor firms? Please complete the **Claim Supplement** and provide currently valued company loss runs ☐ Yes ☐ No
If "Yes", how many? _____

17. Have all matters in Question 15. been reported to RSUI or to the Applicant's former or current insurer(s) or to the former Insurer of any predecessor firm or former insurer of a current member of the Firm? ☐ Yes ☐ No

18. Has any principal, owner, partner or employee for whom coverage is sought been the subject of a disciplinary complaint made to any court, administrative agency or regulatory body? (If "yes", provide full details and documentation) ☐ Yes ☐ No

## Representations

The Applicant declares that the above statement and representations are true and correct, and that no facts have been suppressed or misstated. All written statements and materials furnished to the Company, in conjunction with this application will be incorporated by reference into this application and made part hereof.

This application does not bind the Applicant to buy, or the Company to issue the insurance, but it is agreed that this form shall be the basis of the contract should a policy be issued, and it will be attached to and made part of the policy. The undersigned Applicant declares that if the information supplied on this application changes between the dates of this application and the time when the policy is issued, the Applicant will immediately notify the company of such changes, and the Company may withdraw or modify any outstanding quotations and/or authorization or agreement to bind the insurance.

_____   _____   _____
Signature of the Insured, Owner, Partner or Principal           Title           Date

_____
Producer

Landmark v. Nurselect MSJ_00000568

Your policy has been signed on our behalf by our President and by our Secretary.  However, your policy will not be binding on us unless it is also countersigned by one of our duly authorized agents.

President

**RSUI Indemnity Company**
**Landmark American Insurance Company**
**Covington Specialty Insurance Company**

Secretary

**RSUI Indemnity Company**
**Landmark American Insurance Company**
**Covington Specialty Insurance Company**



A member of Alleghany Insurance Holdings LLC

| **RSUI Group, Inc.**<br>945 East Paces Ferry Road, Suite 1800<br>Atlanta, GA 30326-1160 | **HOME HEALTH CARE, NURSE REGISTRY, INFUSION THERAPY OR OTHER MEDICAL STAFFING SUPPLEMENTAL APPLICATION** |
|---|---|

1.  Name of Applicant:   NurSelect, LLC

2.  Type of Firm (check all that apply):   ☐ Home Health Care   ☐ Infusion Therapy   ☐ Visiting Nurse Agency
    ☐ Nurse Registry   ☒ Other Medical Staffing (specify):   Long-Term Care Facilities

3.  Date Established:   03/12/2019

4.  Location(s) where services are provided (total must be 100%)   0 % Home   0 % Hospice
    70 % Nursing Home   30 %Assisted Living Facility   0 % Hospital   0 %Clinic/Doctors Office
    0 % Adult Day Care   0 % Correctional Facility   0 % Other Facility (specify):

5.  Do you provide any of the following services:

    Pediatric Care? Describe: _____   Yes ☐   No ☒

    Pediatric Ventilator/Trach Care? Describe: _____   Yes ☐   No ☒

    Live-In Care? Describe: _____   Yes ☐   No ☒

6.  Employees/Independent Contractors – Annual Staffing:

| Type of Employee/Independent Contractor | No. Full-Time | No. Part-Time | Billable hours Per Year |
|---|---|---|---|
| Employed Registered Nurse | 0 | 2 | 516.00 |
| Contracted Registered Nurse | | | |
| Employed Licensed Practical Nurse | 6 | 22 | 22,607.75 |
| Contracted Licensed Practical Nurse | | | |
| Employed Certified Nurse Assistant | 4 | 37 | 37,007.00 |
| Contracted Certified Nurse Assistant | | | |
| Employed Nurse Practitioner/Physician Assistant | | | |
| Contracted Nurse Practitioner/Physician Assistant | | | |
| Employed Companion/Home Health Aide | | | |
| Contracted Companion/Home Health Aide | | | |
| Employed Social Worker | | | |
| Contracted Social Worker | | | |
| Employed Physical Therapist | | | |
| Contracted Physical Therapist | | | |
| Employed Other Medical (specify)  Certified Med Tech | 0 | 1 | 500.00 |
| Contracted Other Medical (specify) | | | |

7.  Please provide a copy of the applicant's credentialing procedures and background check procedures.

8.  Are drug, alcohol and sexual abuse screening or testing conducted? (Please provide full details)   Yes ☒   No ☐

Landmark v. Nurselect MSJ_00000571

**EXHIBIT**
8 11/20/24

9.  Are criminal background checks conducted in all states? (Please provide full details)     Yes ☒     No ☐

10. Anticipated payroll amount for the next 12 months:     $2,250,000

11. Does the Applicant warrant that all employed and contracted physicians, surgeons and dentists     Yes ☐     No ☐

    maintain their own medical malpractice professional liability insurance coverage and confirm with a certificate of insurance or

    declarations page? If No, please provide details.

**REPRESENTATIONS**

I understand that the information submitted herein becomes a part of my professional liability application and is subject to the same warranty and conditions.

Must be signed and dated by an Owner, Partner or Principal as duly authorized on behalf of the Applicant.

| | | |
|---|---|---|
| Signature of the Applicant | President | 01/26/2023 |
| Signature of the Applicant | Title | Date |

RSG 50062 0222     Page 2 of 2

Landmark v. Nurselect MSJ_00000572

| **RSUI Group, Inc.**<br>945 East Paces Ferry Road, Suite 1800<br>Atlanta, GA 30326-1160 | **RENEWAL APPLICATION FOR MISCELLANEOUS MEDICAL PROFESSIONAL LIABILITY INSURANCE (CLAIMS-MADE FORM)** |
| --- | --- |

## General Applicant Information

1. Name of Applicant:  NurSelect, LLC

2. Any changes in Address?  ☐ Yes  ☐ No (if yes, please complete the below)

   Principal Address:  1829 New Holland Rd. Suite 13

3. City:  Reading    County:  Berks    State:  PA    Zip Code:  19607

   Website:  www.nurselectstaffing.com

## Applicant Practice

4. Any change in the applicant's professional activities for which coverage is desired? (if yes, please describe below)  ☐ Yes  ☒ No

5. Does the Applicant provide any Correctional Medicine Services?  ☐ Yes  ☒ No

6. In what states is the Applicant registered and licensed to practice?  Pennsylvania

7. During the past 12 months, has the applicant acquired or been acquired by another company?  ☐ Yes  ☒ No
   If yes please describe below

8. State sources and amounts of total revenue:

| Source | Amount Last Policy Year | This Policy Year |
| --- | --- | --- |
| a. Charitable Contributions | $ 0 | $ |
| b. Government Funding | $ 0 | $ |
| c. Fee for Services | $ 2,881,700.47 | $ 3,000,000.00 |
| d. _____ | $ 0 | $ 0 |
| e. _____ | $ | $ |
| TOTAL GROSS REVENUE: | $ 2,881,700.47 | $ 3,000,000.00 |

9. Number of patient encounters last 12 months ( 7542 ) and/or patient tests carried out ( 0 ).
   (NOTE: "Patient encounters" refers to number of *visits* – not number of patients.)

10. Number of estimated patient encounters the next 12 months ( 8000 ) and/or patient tests carried out ( 0 ).
    (NOTE: "Patient encounters" refers to number of *visits* – not number of patients.)

Landmark v. Nurselect MSJ_00000573

11. If applicant has a training school, complete the following.

| Specify profession for which students are being trained | Max No. of students per session | No. of sessions per year | % of time involved in clinical setting | Number of students | Qualifications of faculty (eg. MD, RN, PhD) |
|---|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |

12. List the number and type of employees, volunteers or independent contractors, their billable hours, and whether or not they carry individual medical malpractice coverage for their services on behalf of the entity.

| | Employees | Volunteers | Independent Contractors | Billable Hours | Insured on own Med Mal Policy |
|---|---|---|---|---|---|
| Aestheticians | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Chiropractors | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Dieticians | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| EMT's | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Laboratory Technicians | _____ | _____ | _____ | _____ | ☐ Yes ☒ No |
| Nurse, Aides | 40 | _____ | _____ | _____ | ☐ Yes ☐ No |
| Nurse Anesthetists | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Nurses, Licensed Practical | 29 | _____ | _____ | _____ | ☐ Yes ☒ No |
| Nurse Midwives | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Nurse Practitioner | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Nurse, Registered | 1 | _____ | _____ | _____ | ☐ Yes ☒ No |
| Opticians | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Optometrists | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Paramedics | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Perfusionists | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Pharmacists | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Pharmacy Technicians | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Physical/Occupational/Speech Therapists | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Physical/Occupational/Speech Therapist Assistants | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Physician's Assistants | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Physicians – Minor Surgery | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Physicians – No Surgery | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Psychologists | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Respiratory Therapists | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Social Workers | _____ | _____ | _____ | _____ | ☐ Yes ☐ No |
| Other: Certified Med Techs | 1 | _____ | _____ | _____ | ☐ Yes ☒ No |

RSG 50090 0222

Page 2 of 3

Landmark v. Nurselect MSJ_00000574

13. Does the applicant maintain any beds for overnight occupancy? (If yes, total number): _____

    What is the average length of stay? _____

14. Does the Applicant warrant that all employed and contracted physicians, surgeons and dentists maintain their own medical malpractice professional liability insurance coverage and confirm with a certificate of insurance or declarations page?    ☐ Yes  ☒ No
If no, please attached explanation.

## Applicant History

15. Is the applicant currently insured under a Commercial General Liability Policy?    ☐ Yes  ☒ No
If yes, please give details:

| Insurance Company | Type of Coverage | Limits BI | Limits PD | From | To |
|---|---|---|---|---|---|
| | | | | | |

16. In the past twelve (12) months, has any professional liability claim or suit been made against the Applicant or any of its predecessor firms? Please complete the **Claim Supplement** and provide currently valued company loss runs    ☐ Yes  ☒ No
If "Yes", how many? _____

17. Have all matters in Question 15. been reported to RSUI or to the Applicant's former or current insurer(s) or to the former Insurer of any predecessor firm or former insurer of a current member of the Firm?    ☐ Yes  ☐ No

18. Has any principal, owner, partner or employee for whom coverage is sought been the subject of a disciplinary complaint made to any court, administrative agency or regulatory body? (If "yes", provide full details and documentation)    ☐ Yes  ☒ No

## Representations

The Applicant declares that the above statement and representations are true and correct, and that no facts have been suppressed or misstated. All written statements and materials furnished to the Company, in conjunction with this application will be incorporated by reference into this application and made part hereof.

This application does not bind the Applicant to buy, or the Company to issue the insurance, but it is agreed that this form shall be the basis of the contract should a policy be issued, and it will be attached to and made part of the policy. The undersigned Applicant declares that if the information supplied on this application changes between the dates of this application and the time when the policy is issued, the Applicant will immediately notify the company of such changes, and the Company may withdraw or modify any outstanding quotations and/or authorization or agreement to bind the insurance.

| | | |
|---|---|---|
| Signature of the Insured, Owner, Partner or Principal | President | 01/26/2023 |
| | Title | Date |

Liberty Insurance
Producer

Landmark v. Nurselect MSJ_00000575

# EXHIBIT 7

Landmark v. Nurselect MSJ_00000576

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE  EASTERN DISTRICT OF PENNSYLVANIA**
**CIVIL DIVISION**

LANDMARK AMERICAN INSURANCE
COMPANY,                                        Civil Action No.  5:24-CV-01412

     PLAINTIFF,

     v.

NURSELECT, LLC.,

     DEFENDANT.

### DEFENDANT'S ANSWERS TO PLAINTIFF'S INTERROGATORIES

AND NOW, comes Defendant, Nurselect, LLC, by and through its counsel, Dickie, McCamey & Chilcote, P.C., by Bryon R. Kaster, Esquire, and responds to Plaintiff's Interrogatories as follows:

1. Identify the person or persons answering these Interrogatories and state, with respect to each person, the Interrogatory or Interrogatories for which that person provided information. Identify the existence, location and description of all documents consulted, examined, or referred to in the preparation of the answers to these interrogatories.

    **ANSWER:**

       **The specific language of the discovery responses is that of counsel.  In addition, any legal assertions are those of counsel.  However, the factual information disclosed in any discovery response was obtained from documents identified in the discovery response and/or from Defendant and, specifically, David Shelly.**

2.      Identify each person with knowledge or information relevant to the subject matter of this action, and state with particularity the subject matters as to which each such person has knowledge. With respect to each person, state that person's name, present or last known address, and telephone number.

**ANSWER:**

> **Counsel for defendant asserts that Pennsylvania adheres to the "four corners" rule and that coverage is afforded based only upon the language the language set forth in the policy of insurance and the allegations in underlying complaint.**

> **Regarding the allegations concerning the alleged receipt of the January 12, 2023 letter, David Shelly has knowledge of when he discovered and opened the e-mail.**

3.      Identify and describe the legal and factual basis for Your fifth affirmative defense.

**ANSWER:**

> **Counsel for defendant asserts that Pennsylvania adheres to the "four corners" rule and that coverage is afforded based only upon the language the language set forth in the policy of insurance and the allegations in underlying complaint.**

4.      Identify and describe the legal and factual basis for Your sixth affirmative defense.

**ANSWER:**

> **Upon learning of the underlying lawsuit, Defendant immediately notified Plaintiff.**

5.    Identify and describe the legal and factual basis for Your eighth affirmative defense that "plaintiff owes defendant a duty of defense and indemnity[]".

**ANSWER:**

> **Counsel for defendant asserts that Pennsylvania adheres to the "four corners" rule and that coverage is afforded based only upon the language the language set forth in the policy of insurance and the allegations in underlying complaint.**

6.    Identify and describe the legal and factual basis for Your allegations in paragraphs 9 of Your Answer to the Complaint, including the allegation that "Defendant did not receive the letter on January 12, 2023[.]"

**ANSWER:**

> **The referenced language does assert the factual basis. Moreover, Defendant did not receive the letter on January 12, 2023 because Defendant did not discover or open the e-mail on that date.**

7.    Identify the email which contained/contains the January 12, 2023 Letter ("the email"). Concerning the email, also identify and describe:

(a)    The email address of Mr. Shelly;

(b)    The sender of the email and his/her email address;

(c)    Read receipts of the email, if any;

(d)    Inbox and/or other email-box in which the email was allegedly "discovered," as stated in paragraph 19 of Your Answer and in the September 13, 2023 email communication referenced in paragraph 19 of Your Answer;

(e)    Data concerning when the email was opened, sent, received, downloaded and/or forwarded; and

(f)    Any search conducted of Mr. Shelly's emails and/or any other Nurselect emails/email servers which concerned the Underlying Action and/or the January 12, 2023 Letter.

**ANSWER:**

**The factual information responsive to (a), (b), and (d) of this interrogatory is included in the documents provided to Plaintiff's counsel via e-mail on November 8, 2024. Regarding any "read receipts", that information would need to come from the sender of the e-mail. Defendant is unaware of any such receipt, and counsel for Defendant spoke with the sender of the e-mail and was informed that there was no such receipt. Regarding any "data" or "search", it is unknown what specific information Plaintiff is looking for. Defendant is unaware of whether such data is available. As for any search, David Shelly conducted a search of the employee's name on September 12, 2023 or September 13, 2023 and discovered the e-mail containing the January 12, 2023 letter, which was previously unread. The email was forwarded to Anthony Viola, Claims Manager of Liberty Insurance Agency on October 4, 2023 and to defense counsel.**

8.    Identify and describe any and all communications, prior to the service of the Underlying Action, between You and Brethren Village and/or Ms. McDowell concerning Ms. McDowell, Ms. Wiggins and/or the allegations in the Underlying Action.

**ANSWER:**

**All such communications were included in the documents provided to Plaintiff's counsel via e-mail on November 8, 2024.**

9.    Identify and produce the full Staffing Agreement between You and Brethren Village.

**ANSWER:**

**The staffing agreement was included in the documents provided to Plaintiff's counsel via e-mail on November 8, 2024.**

10.    Identify    any    communications    concerning    indemnification/    liability apportionment between Nurselect and Brethren Village, including but not limited to indemnification or liability apportionment pursuant to the Staffing Agreement.

**ANSWER:**

**Defendant is unaware of any specific communications.**

11.    Identify all individuals whom Defendant expects to call as a witness at trial and their relevant knowledge of the claims and allegations in this action.

**ANSWER:**

**Counsel for defendant asserts that Pennsylvania adheres to the "four corners" rule and that coverage is afforded based only upon the language the language set forth in the policy of insurance and the allegations in underlying complaint.   As such, Defendant does not believe that any witnesses need to be called.  However, should the Court decide that there is a factual issue in this case, Defendant will supplement this response accordingly.**

Respectfully submitted,

**DICKIE, McCAMEY & CHILCOTE, P.C.**

Date: November 12, 2024                 By:    /s/ *Bryon R. Kaster, Esquire*
_____

Bryon R. Kaster, Esquire
Attorney I.D. No. 91707
300 Corporate Center Drive
Suite 103-D
Camp Hill, PA  17011-9927
717-731-4800
BKaster@dmclaw.com
*Attorney for Defendant, Nurselect, LLC*

Landmark v. Nurselect MSJ_00000582

## <u>VERIFICATION</u>

I, David Shelly, hereby verify that the facts set forth in Defendant's Answers to Plaintiff's Interrogatories are true and correct to the best of our knowledge, information and belief.

I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. §4904, relating to unsworn falsification to authorities.

Date:

_____
David Shelly

**CERTIFICATE OF SERVICE**

AND NOW, this 12th day of November, 2024, I, Bryon R. Kaster, hereby certify that the foregoing ***Answers to Interrogatories*** has been electronically filed and is available for viewing and downloading from the ECF system by the undersigned counsel of record.  Accordingly, service has been effectuated pursuant to I.R.5.7.

Date: November 12, 2024                    By:     /s/Bryon R. Kaster, Esquire

**IN THE UNITED STATES DISTRICT COURT
FOR THE  EASTERN DISTRICT OF PENNSYLVANIA
CIVIL DIVISION**

**LANDMARK AMERICAN INSURANCE
COMPANY,**                                          **Civil Action No.  5:24-CV-01412**

       **PLAINTIFF,**

       **v.**

**NURSELECT, LLC.,**

       **DEFENDANT.**

**DEFENDANT'S RESPONSES TO PLAINTIFF'S
<u>REQUEST FOR PRODUCTION OF DOCUMENTS</u>**

     AND NOW, comes Defendant, Nurselect, LLC, by and through its counsel, Dickie, McCamey

& Chilcote, P.C., by Bryon R. Kaster, Esquire, and responds to Plaintiff's Request for Production of

Documents as follows:

     1.     Produce any document identified, relied upon, referred to or in any way related
to Defendant's Response to Plaintiff's First Set of Interrogatories.

     **RESPONSE:   All documents responsive to this request were provided to counsel
for Plaintiff on Friday, November 8, 2024 via e-mail.**

     2.     Produce all documents or categories of documents required to be identified in Your
Rule 26 Initial Disclosures in this action.

     **RESPONSE:   In accordance with Defendant's disclosure obligations, Defendant
hereby discloses and expressly relies upon the policy of insurance and underlying
complaint.**

     3.     Produce all documents concerning, or which You contend support or refute, Your
responses, contentions, and defenses set forth in Your Answer to the Complaint.

     **RESPONSE:   All documents responsive to this request were provided to counsel
for Plaintiff on Friday, November 8, 2024 via e-mail.**

     4.     Produce all documents concerning, or which You contend support or refute, the
claims and allegations set forth in the Complaint.

1

**RESPONSE:   All documents responsive to this request were provided to counsel for Plaintiff on Friday, November 8, 2024 via e-mail.**

5.      Produce all documents concerning insurance coverage for the Underlying Action.

**RESPONSE:   It is unknown what is meant by "all documents concerning insurance coverage," but counsel for defendant asserts that Pennsylvania adheres to the "four corners" rule and that coverage is afforded based up upon the language the language set forth in the policy of insurance and the allegations in underlying complaint.**

6.      Produce all documents concerning Your contention that "Plaintiff owes Defendant a duty of defense and indemnity[]" as set forth in Your eighth affirmative defense.

**RESPONSE:   Counsel for defendant asserts that Pennsylvania adheres to the "four corners" rule and that coverage is afforded based only upon the language the language set forth in the policy of insurance and the allegations in underlying complaint.**

7.      Produce all documents concerning Your contention that "Defendant did not receive the letter on January 12, 2023 []" as set forth in paragraph 9 of Your Answer to the Complaint.

**RESPONSE: Defendant has produced the e-mail, and the referenced pleadings assert that the letter was not received on January 12, 2023.  Defendant is presently unaware of any other documents.**

8.      Produce documents in Your possession concerning the January 12, 2023 Letter, including but not limited to:

> (a) The email which contained the January 12, 2023 Letter as an attachment ("the email");
> (b)The data concerning when the email was opened, sent and received;
> (c)The data concerning what inbox and/or other email box the email was/is present in;
> (d)Any and all forwards, downloads, and/or other communications concerning the email and/or the January 12, 2023 Letter; and
> € Any search conducted on Mr. Shelly's email boxes and/or the Nurselect email server and/or any other Nurselect employee email box concerning the Underlying Action and the January 12, 2023 Letter.

**RESPONSE: Defendant has produced the e-mail, as well as the only forward of the e-mail.  As for the "data", Defendant has agreed to make the email available for a search of discoverable information, but, otherwise, Defendant has no such documents.  Defendant is unaware of any documents regarding the "search conducted...."**

9.    Produce all communications between You and Brethren Village and/or attorneys for Brethren Village concerning Ms. McDowell and/or Ms. Wiggins, before service on You of the Underlying Action.

**RESPONSE: All documents responsive to this request were provided to counsel for Plaintiff on Friday, November 8, 2024 via e-mail.**

10.    Produce all communications between You and Ms. McDowell concerning Ms. Wiggins, before service on You of the Underlying Action.

**RESPONSE:   All documents responsive to this request were provided to counsel for Plaintiff on Friday, November 8, 2024 via e-mail.**

11.    Produce the Staffing Agreement, between Brethren Village and Nurselect.

**RESPONSE: All documents responsive to this request were provided to counsel for Plaintiff on Friday, November 8, 2024 via e-mail.**

12.    Produce any communications concerning the Apportionment of Liability provision in the Staffing Agreement in relation to the Underlying Action and/or the present action.

**RESPONSE: Defendant is unaware of any communications specifically concerning the Apportionment of Liability provision of the Staffing Agreement.**

13.    Produce any and all documents, concerning any information supporting or refuting any of the allegations in the Complaint, or which Nurselect reasonably believes may be introduced into evidence or to which Nurselect intends to refer at the trial of this matter or which Nurselect intends to identify or use during any deposition taken in this action.

**RESPONSE: All documents responsive to this request were provided to counsel for Plaintiff on Friday, November 8, 2024 via e-mail.**

14.    If a privilege is being asserted with respect to any of the above requests, produce a privilege log of the documents withheld.

**RESPONSE:   N/A**

15.    Produce the digital version of any documents that fall within the scope of any request herein that do not exist in hard-copy or paper form.

**RESPONSE:   Defendant has already done so.**

Respectfully submitted,

**DICKIE, McCAMEY & CHILCOTE, P.C.**

Date: November 12, 2024

By: _/s/Bryon R. Kaster, Esquire_
Bryon R. Kaster, Esquire
Attorney I.D. No. 91707
300 Corporate Center Drive
Suite 103-D
Camp Hill, PA  17011-9927
717-731-4800
BKaster@dmclaw.com
*Attorney for Defendant, Nurselect, LLC*

Landmark v. Nurselect MSJ_00000588

## VERIFICATION

I, David Shelly, hereby verify that the facts set forth in Defendant's Answers to Plaintiff's Request for Production of Documents are true and correct to the best of our knowledge, information and belief.

I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. §4904, relating to unsworn falsification to authorities.

Date:

_____
David Shelly

## <u>CERTIFICATE OF SERVICE</u>

AND NOW, this 12th day of November, 2024, I, Bryon R. Kaster, hereby certify that the foregoing ***Answers to Request for Production of Documents*** have been served upon all counsel of record, as follows:


Date: November 12, 2024 | By:    /s/Bryon R. Kaster, Esquire
_____

Landmark v. Nurselect MSJ_00000590

# EXHIBIT 8

Landmark v. Nurselect MSJ_00000591



## SUPPLEMENTAL
## STAFFING AGREEMENT

This Supplemental Staffing Agreement ("**Agreement**") is entered into the **22nd** day of **September, 2020** by and between **Brethren Village Retirement Community**, with its physical address at **3001 Lititz Pike** in **Lititz, PA 17543** ("**Client**"); and NurSelect, LLC, a Pennsylvania business with its administrative offices located at 630 Freedom Business Center Drive, Third Floor, King of Prussia, PA 19406 ("**NurSelect**").

### RECITALS

A.     NurSelect is a health care employment service engaged in the business of recruiting and placing qualified nursing personnel, such as, certified nursing assistants, licensed practical nurses, and registered nurses (collectively, "**NurSelect Personnel**") on contractual assignments on a per-diem or temporary basis (the "**Services**").

B.     The Client desires NurSelect, and NurSelect agrees, upon the terms and conditions more fully set forth herein, to provide NurSelect Personnel to the Client to perform the Services.

NOW, THEREFORE, in consideration of the mutual promises contained herein, the parties hereto agree as follows:

### ARTICLE I – THE SERVICES; NURSELECT PERSONNEL

1.1     Staffing; Services. Upon receipt of a request by the Client for NurSelect Personnel, and according to the availability of the requested NurSelect Personnel, NurSelect will provide the NurSelect Personnel to the Client, from time to time, at the locations requested, to provide the Services in a quantity and with the qualifications specified by the Client in said request. Services will be provided by NurSelect Personnel that (a) meet the highest professional standards and principles applicable to Services; and (b) shall be provided timely in accordance with the needs of the patient receiving the Services. Services shall be provided: (x) in accordance with federal, state and local laws, rules, ordinances and regulations; and (y) consistent with the policies and procedures of Client. Neither NurSelect, nor NurSelect Personnel shall do or omit to do anything that would jeopardize the licensure of the Client or its participation in governmental health programs, including Medicare and Medicaid.

1.2     Licensure and Certification of NurSelect Personnel. All NurSelect Personnel shall, at all times while performing the Services, have the appropriate nursing licenses, certifications and/or clinical experience, background checks, reference checks and any other certification or document required by law to provide the Services. From time to time, the Client may notify NurSelect of its need for NurSelect Personnel who possess a specialized certification and/or who have particular clinical experience to provide specialized services. Subject to the terms and conditions of this Agreement, NurSelect will provide NurSelect Personnel having the appropriate licenses, certification, and/or clinical experience required by applicable law to perform such specialized services. NurSelect shall keep and make available to the Client, upon written request by the Client, all licenses, certifications and other documentation verifying clinical experience and/or such other specification needed to furnish any of the Services. NurSelect shall comply with 28 Pa. Code Section 201.21.

1.3    Immigration Documentation. NurSelect Personnel shall have proper documentation required for compliance with applicable immigration laws. NurSelect shall make available to the Client, upon written request, copies of such documentation.

1.4    Immunizations. NurSelect shall ensure that NurSelect Personnel are in compliance with the following immunization requirements: (a)    immunization for tetanus; (b) demonstration of a negative skin test or chest x-ray for tuberculosis; (c)    factual documentation of immunizations for measles, mumps, rubella and chicken pox; (d) immunization for Hepatitis B; and (e) certification for education on the blood borne pathogens standard and the TB standard. NurSelect shall make available to the Client, upon written request, copies of documentation evidencing compliance with the foregoing.

1.5    Criminal Background Checks. NurSelect conducts criminal background checks of all its employees prior to their employment with NurSelect. All NurSelect Personnel provided to the Client shall have passed a criminal background check satisfactory to the Client, and shall not have a criminal record which includes, but is not limited to, felony convictions or convictions for any crime involving moral turpitude, physical or sexual abuse, drug abuse or any other crime which would render NurSelect Personnel unfit for the Client's purposes. NurSelect shall provide the Client with copies of all criminal background checks for NurSelect Personnel upon written request.

1.6    HIPAA/Confidentiality Agreement. NurSelect will obtain require all NurSelect Personnel to execute and be bound by a HIPAA/Confidentiality Agreement and a Business Associate Agreement to endure all NurSelect Personnel observe the confidentiality and HIPAA provisions set forth in this Agreement. NurSelect will provide copies of such Agreements to Client upon request.

1.7    Anti-Kickback; Government Health Programs. NurSelect represents and warrants that it and its employees have not engage in, and during the Term, shall not engage in, any activities prohibited under the federal anti-kickback statute (Social Security Act Section 1128B, 42 U.S.C. Sections 1320a-7, 1320a-7a, 1320a-7b). NurSelect represents and warrants that it and its employees have not been excluded from the Medicare, Medicaid and/or other federal healthcare programs. In the event NurSelect or its employees is under investigation by the United States Department of Health and Human Services' Office of Inspector General for a claim or action that could result in the exclusion of NurSelect or its employees from the Medicare, Medicaid or other governmental health program, NurSelect shall promptly inform the Client but only after receiving sufficient information to substantiate the fact of the investigation.

1.8    Review of Documentation by the Client. The Client shall review documentation on the above requirements prior to the start date for NurSelect Personnel. In the event the Client is not satisfied with the said documentation, Client shall immediately inform NurSelect.

1.9    Compliance with the Client's Policies. The Client shall make available and explain to all NurSelect Personnel all applicable rules, regulations, procedures and policies pursuant to the Client's organization and operation of the Client, including, without limitation, rules, regulations, procedures and policies adopted by the Client's medical staff and nursing department (collectively, the "**Policies**"). The Client shall also be responsible to ensure that all NurSelect Personnel are promptly made aware of any updates or changes to the Policies. NurSelect Personnel providing the Services under this Agreement shall materially observe all Policies.

Landmark v. Nurselect MSJ_00000593

1.10    Replacement of NurSelect Personnel.  If at any time the Client is dissatisfied with the service provided by any NurSelect Personnel, the Client shall notify NurSelect of its dissatisfaction, at which time, and upon receipt of such notice, NurSelect will make commercially reasonable efforts to promptly provide a replacement.

1.11    Meetings, Orientation and Training.  The Client may, from time to time, require that the NurSelect Personnel attend staff meetings, receive training and/or undergo orientation related to the particular Services requested by the Client. NurSelect will bill the Client for the time NurSelect Personnel spend in staff or other Client meetings, and for time spent receiving training and orientation. Training and/or orientation shall be provided to the NurSelect Personnel at no cost to NurSelect, including, without limitation, the cost of any instructors in providing training.

1.12    Record Maintenance.  NurSelect Personnel shall provide accurate and complete written documentation on individual patient charts, including treatment and progress notes, in accordance with the Client's requirements, the requirements of applicable federal and state governmental agencies and the requirements of third-party reimbursement sources such as insurers. NurSelect Personnel shall maintain accurate records of Services provided to the Client's patients in accordance with accepted professional standards and practices and the requirements of the Client.

1.13    Exclusion Checks.  NurSelect shall, monthly during the term, check the Pennsylvania Medi-Check List maintained by the Pennsylvania Department of Public Welfare, the list of Excluded Individuals/Entities maintained by the Office of the Inspector General of the federal Department of Health and Human Services and the Excluded Parties List System maintained by the General Services Administration, to ensure that neither NurSelect, nor any NurSelect Personnel is included in any of the abovementioned lists. To the extent any NurSelect Personnel has worked in a state other than the Commonwealth of Pennsylvania, NurSelect will check state Medicaid exclusion databases (to the extent available) for such states where NurSelect Personnel worked. In the event NurSelect or any NurSelect Personnel are listed on any of the abovementioned lists, NurSelect will immediately notify the Client and remove such person or persons from providing Services to the Client.

1.14    Client Responsibilities.

        a.    Client will properly supervise NurSelect Personnel and shall be solely responsible for its business operations and practices, products, services and intellectual property.

        b.    Client will properly supervise, control and safeguard its premises, processes and systems, and shall not: (i) permit NurSelect Personnel to operate any vehicle or mobile equipment while providing Services; (ii) entrust with, or place NurSelect Personnel in charge of, unattended premises or facilities, cash, checks, keys, credit cards, merchandise or confidential or trade secret information, negotiable instruments or other valuables without NurSelect's express written consent, or unless otherwise set forth in the job description provided to NurSelect for particular Services to be provided by NurSelect Personnel.

        c.    Client shall provide NurSelect Personnel with a safe work environment and shall provide NurSelect Personnel with appropriate information, training and safety equipment with respect to any hazardous substances or conditions to which NurSelect Personnel may be exposed at the Client in connection with Services.

3

Landmark v. Nurselect MSJ_00000594

d.      Client shall not alter, modify or otherwise change the job description for any NurSelect Personnel without first informing NurSelect and receiving NurSelect's written approval.

e.      Client shall be solely responsible for billing its patients and/or their insurers or other third-party reimbursement sources for Services provided to such patients by NurSelect Personnel. NurSelect is not responsible for Client's inability to obtain payment in full or in part from its patients and/or their insurers or other third-party reimbursement sources.

f.      Client shall have primary responsibility for maintaining all patient records. To the extent reasonably necessary to accomplish Services, Client shall make available to NurSelect Personnel all patient records necessary for the proper evaluation and treatment of its patients.

g.      Client shall have the ultimate responsibility of ensuring that all Services provided hereunder: (i) shall meet applicable professional standards and principles; and (ii) be provided in a timely manner.

## ARTICLE II – PAYMENT FOR SERVICES

2.1     Invoices. NurSelect shall provide invoices to the Client on a weekly basis for the Services provided by NurSelect Personnel. The Client shall be billed at the hourly rates set forth in the Fee Schedule, attached hereto as **Exhibit A** and incorporated herein by reference. Invoices shall contain the following information: (i) the names of NurSelect Personnel providing Services; (ii) total applicable charges; (iii) dates and times worked by NurSelect Personnel; and (iv) such other information as the Client may reasonably request.

2.2     Payment for Services.  The Client shall pay NurSelect for the Services of the NurSelect Personnel as reflected on such invoice within thirty (30) days of its receipt of said invoice. If payment is not received within such time, NurSelect reserves the right to add interest in the amount of one- and one-half percent (1.5%) per month to all outstanding balances remaining unpaid. In the event that payment for any invoice is not received within thirty (30) days of the date of such invoice, NurSelect may elect to terminate this Agreement immediately, without notice to the Client. Termination by NurSelect pursuant to this Section shall not relieve the Client of any obligation to pay any outstanding invoices. The Client agrees to pay all reasonable collection fees, including attorney and court fees, related to unpaid and uncured outstanding balances.

2.3     Rate Changes. NurSelect may, upon sixty (60) days' written notice to the Client, change the rates for the Services as set forth on Exhibit A. Said rate change shall become effective beginning on the sixty-first (61st) day after the said notice is provided to the Client.

2.4     Signatures of the Client's Personnel.  The Client agrees and certifies that the signature of any of the Client's agents or employees on time slips of NurSelect Personnel is understood to be authorized by the Client and is binding upon the Client. The signature of any of the Client's agents or employees on any time slip conclusively certifies the Client's satisfaction with the Services performed and confirmation of the total number of hours worked.

Landmark v. Nurselect MSJ_00000595

2.5     Cancellation of Shifts.  The Client agrees to notify NurSelect of all cancellations of shifts of NurSelect Personnel within a minimum of two (2) hours prior to the start of the scheduled shift of the affected NurSelect Personnel. If the Client fails to notify NurSelect of a shift cancellation within two (2) hours, the Client agrees to pay NurSelect the sum of two (2) hours' pay per NurSelect Personnel that was scheduled to work the cancelled shift at the applicable rate set forth in Exhibit A.

2.6     Holidays.  NurSelect observes the following holidays: New Year's Day, Easter Sunday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Eve (2nd shift, only), Christmas Day and New Year's Eve (2nd shift, only). NurSelect will bill the Client 150% of the regular rate for all hours worked by NurSelect Personnel during any of the aforementioned holidays. For avoidance of confusion, holidays for night shift workers (typically from 11:00 PM to 7:00 AM) begin at 11:00 PM on the day immediately preceding the holiday.

2.7     Overtime.  NurSelect Personnel are presumed to be non-exempt from laws requiring premium pay for overtime, holiday work or weekend work. In the event the Client requires NurSelect Personnel to work during holidays, overtime or weekends, and to the extent that federal or state law requires a premium to be paid to such NurSelect Personnel, NurSelect will invoice the Client at such premium for such time worked. By way of example, when federal or state law requires payment of 150% of the regular wage rate for work exceeding 40 hours per week, NurSelect will invoice the Client for 150% of its rate set forth on Exhibit A for such work exceeding 40 hours per week.

## ARTICLE III - STATUS OF THE PARTIES

3.1     NurSelect Employees.  It is expressly understood and agreed that all NurSelect Personnel shall not be considered employees or agents of the Client but instead shall be considered leased employees of NurSelect. Further, it is expressly understood and agreed by the parties that nothing contained in this Agreement shall be construed to create a joint venture, partnership, association or other affiliation or like relationship between the parties hereto, it being specifically agreed that their relationship is and shall remain that of independent parties to a contractual relationship as set forth in this Agreement. NurSelect shall be solely responsible for paying NurSelect Personnel and providing NurSelect Personnel with employment benefits, if any, offered by NurSelect. NurSelect shall be solely responsible for providing unemployment insurance and workers compensation benefits to NurSelect Personnel. NurSelect shall be solely responsible to handle all unemployment and workers compensation claims involving NurSelect Personnel.

3.2     No Claims for Certain Benefits.  NurSelect and its NurSelect Personnel shall not have any claim under this Agreement or otherwise against the Client for employee benefits offered by the Client to its employees, including, without limitation, vacation pay, paid sick leave, retirement benefits, social security, workers compensation, health, disability, or professional malpractice benefits of any kind. NurSelect will indemnify and hold the Client harmless from any and all claims and liability arising from claims relating to the failure of the Client to provide any such benefits to any NurSelect Personnel.

3.3     No Claims for Withholding.  The Client shall not withhold, on behalf of NurSelect or any NurSelect Personnel, any sums for income tax, unemployment insurance, social security or other withholding pursuant to any applicable law or requirement of any governmental body. NurSelect shall solely be responsible for all required withholdings from NurSelect Personnel wages and for remitting the same to the applicable governmental and other parties. NurSelect shall indemnify and hold the Client harmless from any and all claims and/or liability arising from claims relating to the Client's failure to make any such withholdings on behalf of NurSelect or any NurSelect Personnel.

Landmark v. Nurselect MSJ_00000596

## ARTICLE IV - INSURANCE

4.1    Insurance. NurSelect will purchase and maintain: (a) comprehensive general and professional liability insurance coverage with minimum limits of $1,000,000 per occurrence and $3,000,000; and (b) workers compensation insurance providing at least the minimum amount of coverage required by the Commonwealth of Pennsylvania. All policies shall be on a claim made basis and shall be placed with insurers licensed to do business in Pennsylvania.

4.2    Proof of Insurance. NurSelect shall, upon written request from the Client, provide to the Client certificates of insurance or other appropriate evidence of satisfaction of its obligations to maintain insurance as described in this Article. NurSelect agrees that it will notify the Client at least thirty (30) days in advance of cancellation, non-renewal, or adverse change in its insurance.

## ARTICLE V - APPORTIONMENT OF LIABILITY AND DAMAGES INDEMNIFICATION

5.1    Apportionment of Liability. It is hereby stipulated and agreed between the Client and NurSelect that with respect to any claim or action arising out of the Services, each entity shall only be liable for payment of that portion of any and all liability, costs, expenses, demands, settlements or judgments resulting from negligence, actions or omissions of its own agents, officers, and employees.

5.2    Indemnification of Client. NurSelect agrees to indemnify and hold harmless the Client from and against any and all claims, demands, actions, settlements, or judgments, including reasonable attorneys' fees and litigation expenses, arising from: (a) NurSelect's breach of this Agreement; and (b) NurSelect Personnel's provision of the Services where such claims, demands, actions, settlements, or judgments arise from the negligence or willful misconduct of the NurSelect Personnel.

5.3    Indemnification of NurSelect. The Client agrees to indemnify and hold harmless NurSelect from and against any and all claims, demands, actions, settlements, or judgments, including reasonable attorneys' fees and litigation expenses where such claims, demands, actions, settlements, or judgments arise from the negligence or willful misconduct of the Client, its directors, officers, agents or employees.

## ARTICLE VI - TERM AND TERMINATION

6.1    Term. The initial term of this Agreement shall commence on the date above first written ("**Commencement Date**") and shall continue for one (1) year from the Commencement Date ("**Term**"). Except as otherwise stated herein, the Term shall be automatically extended for one (1) additional year and so on from year to year until either NurSelect or the Client give to the other no less than thirty (30) days' written notice of termination prior to the end of the then-current Term.

6.2    Termination for Specific Breaches. Except as expressly provided elsewhere in this Agreement, in the event either party shall fail to satisfy its obligations under this Agreement, this Agreement may be terminated at the discretion of the non-breaching party by providing the breaching party with thirty (30) days' written notice notifying the breaching party of its breach and providing it with the opportunity to cure said breach ("**Termination Notice**"). If the breaching party fails to cure said breach within thirty (30) days of the Termination Notice, then this Agreement may, at the option of the non-breaching party, be terminated without any further notice from the non-breaching party on the thirty-first (31st) day after the date of the Termination Notice.

6

Landmark v. Nurselect MSJ_00000597

6.3     Survival of Obligations.  Upon termination of this Agreement pursuant to the terms of this Article, neither party shall have any further obligation hereunder except for: (a) obligations accruing prior to the date of termination, and (b) obligations, promises, or covenants contained herein which are expressly made to extend beyond the date of termination. All indemnification obligations set forth herein shall survive the termination of this Agreement.

## ARTICLE VII - CONFIDENTIAL INFORMATION

7.1     Non-disclosure of NurSelect's Confidential Information.  NurSelect deems its methods and modes of operation, its performance hereunder, this Agreement and its client information to be confidential information ("**NurSelect's Confidential Information**"). The Client agrees not to disclose NurSelect's Confidential Information to outside parties except as required by law, and the Client shall disclose NurSelect's Confidential Information to Client personnel only on an as-needed basis with notice to the Client personnel of its confidential nature.

7.2     Non-disclosure of the Client's Confidential Information.  The Client deems its methods and modes of operation, its performance hereunder, this Agreement and its patient information to be confidential information ("**Client's Confidential Information**"). NurSelect agrees not to disclose Client's Confidential Information to outside parties except as required by law and subject to the provisions of Article IX, and NurSelect shall disclose Client's Confidential Information to NurSelect Personnel only on an as-needed basis and with notice to such NurSelect Personnel of its confidential nature. Information obtained by NurSelect Personnel during the course of providing Services shall not be imputed to NurSelect. The Client shall require NurSelect Personnel to execute a confidentiality agreement between the Client and NurSelect Personnel to address the non-disclosure of the Client's Confidential Information by NurSelect Personnel.

## ARTICLE VIII - NON-ENGAGEMENT COVENANT

8.1     Non-Solicitation of the Client's Employees.  During the Term of this Agreement and for a period of one (1) year after its termination, NurSelect agrees it will not knowingly or directly solicit or encourage any of the Client's employees to discontinue their employment with the Client.  NurSelect and the Client agree that any remedy at law for the breach of this Article shall be inadequate and that, in connection with such breach, the Client will be entitled, in addition to any other remedies, to temporary and permanent injunctive relief.

8.2     Non-Solicitation of NurSelect Employees.  During the Term of this Agreement and for a period of one (1) year after its termination, the Client agrees it will not knowingly, directly or indirectly, solicit or encourage any NurSelect Personnel to discontinue his or her employment with NurSelect. The Client and NurSelect agree that any remedy at law for the breach of this Article shall be inadequate and that, in connection with such breach, NurSelect will be entitled, in addition to any other remedies, to temporary and permanent injunctive relief.

8.3     Employment of NurSelect Employees with Consent.  Notwithstanding anything to the contrary herein, during the Term of this Agreement and for a period of one (1) year after its termination, the Client may hire any NurSelect Personnel with the prior written consent of NurSelect as either a "temporary-to-permanent" hire or as a "direct placement". If such consent is granted, the Client agrees to pay NurSelect the applicable amount set forth on the fee schedule attached hereto as Exhibit A within thirty (30) days from the date on which such NurSelect Personnel accepts employment with the Client.

7

Landmark v. Nurselect MSJ_00000598

## ARTICLE IX – HEALTH INSURANCE PORTABILITY AND
## ACCOUNTABILITY ACT OF 1996 PROVISIONS

9.1   Definitions.

      a.   "Disclose" and "Disclosure" shall mean, with respect to Protected Health Information (defined herein), the release, transfer, provision of access to, or divulging in any other manner of Protected Health Information outside of NurSelect's internal operations.

      b.   "Protected Health Information" or "PHI" shall mean information, including demographic information, that (i) relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; (ii) identifies the individual (or for which there is a reasonable basis for believing that the information can be used to identify the individual); and (iii) is received by NurSelect from or on behalf of the Client, or is created by NurSelect in the performance of this Agreement, or is made accessible to NurSelect by the Client.

      c.   "Use" or "Uses" shall mean, with respect to Protected Health Information, the sharing, employment, application, utilization, examination, or analysis of Protected Health Information within NurSelect's internal operations.

      d.   "Privacy Regulations" shall mean the Health Insurance Portability and Accountability Act of 1996, and regulations promulgated thereunder, including the Standards for Privacy of Individually Identifiable Health Information at 45 Code of Federal Regulations Parts 160 and 164.

9.2   Obligations of NurSelect.  NurSelect shall not Use or Disclose PHI for any purpose except as provided in this Article.  NurSelect:

      a.   shall Use and Disclose PHI as necessary or appropriate to perform the Services, as provided in this Article;

      b.   shall Disclose PHI to the Client upon request; and

      c.   may, as necessary for the proper management and administration of its business or to carry out its legal responsibilities:

         i.   Use PHI; and

         ii.   Disclose PHI if the Disclosure is required by applicable law, or NurSelect obtains reasonable assurance from the person or entity to whom the information is Disclosed that the PHI will be held confidentially and Used or Disclosed only as required by law or for the purpose for which it was Disclosed to the person or entity, and such person or entity agrees to notify NurSelect of any instances of which the person or entity is or becomes aware in which the confidentiality of the PHI has been breached.

9.3   Adequate Safeguards for PHI.  NurSelect warrants that it shall implement and maintain appropriate safeguards to prevent the Use or Disclosure of PHI in any manner other than as permitted by this Article.

8

Landmark v. Nurselect MSJ_00000599

9.4     Reporting Non-Permitted Uses or Disclosure. In the event that any Use or Disclosure is made by NurSelect, its employees, representatives, agents, or subcontractors that is not specifically permitted by this Article, NurSelect shall report such Use or Disclosure to the Client. The initial report shall be made by telephone call to such employee or agent of the Client as the Client may designate (the "Privacy Officer") within forty-eight (48) hours from the time NurSelect becomes aware of any non-permitted Use or Disclosure, followed by a full written report to the Privacy Officer no later than ten (10) business days from the date NurSelect became aware of the non-permitted Use or Disclosure.

9.5     Availability of Internal Practices, Books, and Records to Government Agencies. NurSelect agrees to make its internal practices, books, and records relating to the Use and Disclosure of PHI available to the Secretary of the Federal Department of Health and Human Services for purposes of determining the Client's compliance with the Privacy Regulations. NurSelect shall immediately notify the Client of any requests made by the Secretary and provide the Client with copies of any documents produced in response to any such request.

9.6     Access to and Amendment of PHI. NurSelect shall: (a) make the PHI specified by the Client available to the individual(s) identified by the Client as being entitled to access and copy such PHI; and (b) make PHI available to the Client for the purpose of amendment and incorporation of such amendments into PHI, in compliance with applicable law. NurSelect shall provide such access and incorporate such amendments in compliance with applicable law within the time and in the manner specified by the Client.

9.7     Accounting of Disclosures. Upon the Client's request, NurSelect shall provide to the Client an accounting of each Disclosure of PHI made by NurSelect or its employees, agents, representatives, or subcontractors. Any accounting provided by NurSelect under this Paragraph shall include:

    a.      the date of the Disclosure;

    b.      the name and address, if known, of the person or entity receiving the PHI;

    c.      a brief description of the PHI disclosed; and

    d.      a brief statement of the purpose of the Disclosure.

For each Disclosure that could require an accounting pursuant to this Paragraph, NurSelect shall document the information specified in (a) through (d) above, and shall retain securely such documentation for six (6) years from the date of such Disclosure.

9.8     Termination Upon Breach of this Article. Notwithstanding anything herein to the contrary, in the event of a breach of the provisions of this Article by NurSelect, the Client shall have the right to terminate this Agreement immediately and without penalty upon delivery of written notice to NurSelect. NurSelect's obligations under this Article shall survive the termination or expiration of this Agreement. Additionally, termination by the Client pursuant to this Section shall not relieve the Client of any obligation to pay any outstanding invoices, including those relating to work performed by NurSelect before its receipt of the Client's notice of termination hereunder.

9.9     Disposition of PHI. Upon termination of this Agreement, NurSelect shall either return or destroy, in accordance with any instructions by the Client, all PHI in the possession or control of NurSelect or its agents and subcontractors, with the exception of any information retained pursuant to the accounting of

Landmark v. Nurselect MSJ_00000600

Disclosures provisions of Section 9.7 herein. If such return or destruction of PHI is not feasible, NurSelect may retain PHI provided that NurSelect (a) continues to comply with the provisions of this Article for as long as it retains PHI, and (b) limits further Uses and Disclosures of PHI to those purposes that make the return or destruction of PHI infeasible.

9.10    Use of Subcontractors and Agents. NurSelect shall require each of its agents and subcontractors that receive PHI from NurSelect to execute a written agreement obligating the agent or subcontractor to comply with all the terms of this Article.

9.11    Relationship to Other Provisions. In the event that any provision of this Article is contrary to any provision elsewhere in this Agreement, the provisions of this Article shall control.

## ARTICLE X - OTHER TERMS AND CONDITIONS

10.1    Cooperation. The parties hereto agree to provide reasonable cooperation to each other and to provide reasonable assistance to each other in connection with the investigation and resolution of any complaints, claims, actions or proceedings that may be brought by or against NurSelect Personnel in connection with this Agreement and the provision of Services hereunder.

10.2    Non-Discrimination. All Services provided under this Agreement shall be provided without regard to the race, religion, ancestry, color, creed, sex, age, disability, handicap status, payor source or national origin of the patient requiring such Services. NurSelect and NurSelect Personnel shall comply with all applicable laws prohibiting discrimination.

10.3    Elder Justice Act. By signing this Agreement, NurSelect acknowledges its receipt of the Notice for Covered Individuals of Reporting Obligations under the Elder Justice Act, which is incorporated herein by reference. NurSelect shall be responsible to provide such Notice to all NurSelect Personnel.

10.4    Modification. This Agreement evidences the entire Agreement between the parties hereto and, except as expressly provided herein, may not be changed, altered, or modified in any manner unless such change is agreed to in writing by both the Client and NurSelect.

10.5    Choice of Law. This Agreement has been executed and delivered in, and shall be interpreted, construed, and enforced pursuant to and in accordance with, the laws and in the courts of the Commonwealth of the Pennsylvania, without regard to its conflict of law's provisions.

10.6    Non-Waiver. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provisions herein.

10.7    Force Majeure. Neither party shall be held responsible for any delay or failure in performance under this Agreement arising out of causes beyond its control or without its fault or negligence. Such causes may include, but are not limited to, fires, strikes, acts of God, acts of terrorism or national disasters.

10.8    Severability. If any term or provision of this Agreement shall to any extent be deemed to be invalid or unenforceable, the remaining terms and provisions of the Agreement shall not be affected thereby, but each term and provision of the Agreement shall be valid and enforced to the fullest extent permitted by law.

10

Landmark v. Nurselect MSJ_00000601

10.9    Assignment. This Agreement is for the provision of personal, professional services and may not be assigned or transferred by either party without the prior written consent of the other.

10.10    Entire Agreement. This Agreement supersedes all previous contracts and constitutes the entire Agreement between the parties. Oral statements or prior written material not specifically incorporated herein shall be of no force and effect and no changes in or additions to this Agreement shall be recognized unless incorporated herein by amendment and executed by the parties hereto, such amendment(s) to be effective on the date stipulated therein.

10.11    Counterparts; Signature by Facsimile and E-mail Transmission. This Agreement and any amendment, restatement, or termination of any provision of this Agreement, may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all of the parties hereto. A party's transmission by facsimile or by e-mail transmission of an Adobe Portable Document Format (also known as a PDF file) of a copy of this Agreement duly executed by that party shall constitute effective delivery by that party of an executed copy of this Agreement to the party receiving the transmission. A party that has delivered this Agreement by facsimile or e-mail transmission shall forthwith deliver an originally executed copy to the other party or parties.

10.12    Electronic Signatures. Any signature, whether it be electronic, digital or a .pdf copy of a manual signature, is intended to authenticate this Assignment and have the same effect as a manual or original signature.


        IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and date first written above.


CLIENT:                                    NURSELECT:

By: _David S Rayha_____                By: _D.E. Shely_____

Name: _DAVID S. RAYHA  NHA_                Name: _DAVID E. SHELLY_____

Title: _VP OPERATION/CEO_                  Title: _PRESIDENT_____


11

Landmark v. Nurselect MSJ_00000602

# EXHIBIT 9

Landmark v. Nurselect MSJ_00000603



KAUFMAN BORGEEST & RYAN LLP

300 SUMMIT LAKE DRIVE, VALHALLA, NY 10595
TEL 914.449.1000 | FAX 914.449.1100 | WWW.KBRLAW.COM

October 4, 2023

JOAN M. GILBRIDE
DIRECT: 212.994.6517
JGILBRIDE@KBRLAW.COM

BRIANA A. SEMENZA
DIRECT: 914.449.1011
BSEMENZA@KBRLAW.COM

<u>VIA EMAIL ONLY</u>

David Shelly
NurSelect LLC
1829 New Holland Road, Suite 13
Reading, Pa 19607
dshelly@nurseselectstaffing.com

| Re: | Named Insured | : | NurSelect LLC |
|---|---|---|---|
| | Matter | : | *Estate of Geraldine E. Wiggins* |
| | Policy No. | : | LHC801468 (March 1, 2023 to March 1, 2024) |
| | RSUI File No. | : | 7030187058 |
| | KBR File No. | : | 810.750 |

Dear Mr. Shelly:

This firm has been retained to advise and assist RSUI Indemnity Company ("RSUI), which is the authorized representative on behalf of Landmark American Insurance Company ("Landmark"). Landmark issued the above referenced Professional Liability Policy to NurSelect LLC ("NurSelect").

We are directing this letter to your attention as the representative of all Insureds under the captioned Policy with respect to insurance coverage matters. If you are not acting on behalf of the Insureds, please direct a copy of this letter to the appropriate party and advise us immediately of that party's identity. Please direct all future communications intended for Landmark with respect to coverage for these matters to the undersigned.

Landmark further acknowledges receipt of the above referenced third party complaint filed on June 13, 2023, in the Pennsylvania Court of Common Pleas, Lancaster County. The purpose of this letter is to explain the operation of the captioned policy in connection with this matter. As detailed below, and based on the information currently available to it, Landmark has determined that coverage is not available. The basis for Landmark's conclusion is detailed in this letter. To the extent the Insureds have additional information Landmark should consider, Landmark is willing to reevaluate its coverage determination.

NEW YORK            NEW JERSEY            CONNECTICUT            CALIFORNIA

9402374

Landmark v. Nurselect MSJ_00000604

*NurSelect LLC*
Page 2

Please be aware that nothing in this letter is intended to waive any rights Landmark may have under the Landmark Policy, at law or in equity, all of which are expressly reserved. If you have any questions about anything in this letter, we would be more than happy to respond to those questions to the best of our ability.

THE SUBMITTED MATTER

On January 12, 2023, counsel to Brethren Village Retirement Community sent a letter to NurSelect, LLC (via email and mail), advising that Brethren Village has been sued in the Court of Common Pleas related to the care and treatment of one of its residents, Geraldine Wiggins (the "Attorney Letter"). The Attorney Letter advises that Brethren Village is being sued for negligence arising out of a fall sustained by Ms. Wiggins on May 12, 2021, and that Brethren Village's investigation revealed that Ayanna McDowell, CNA, who was employed by NurSelect at the relevant time, had direct involvement in Ms. Wiggins' alleged fall. The Attorney Letter discusses the "Staffing Agreement" between Brethren Village and NurSelect, with specific reference to the agreement provision for "Apportionment of Liability and Damages Indemnification," which states:

> 5.1 <u>Apportionment of Liability</u>. It is hereby stipulated and agreed between the [Brethren Village] and NurSelect that with respect to any claim or action arising out of the Services, each entity shall only be liable for payment of that portion of any and all liability, costs, expenses, demands, settlements or judgments resulting from negligence, actions or omissions of its own agents, officers, and employees.

The Attorney Letter advises that based upon the foregoing provision, Brethren Village will be filing a joinder complaint against NurSelect to invoke NurSelect's contractual agreement to indemnify Brethren Village for the alleged negligence, actions, or omissions of Ms. McDowell related to the care and treatment of Ms. Wiggins. The Attorney Letter also advises NurSelect to provide notice of the pending joinder against NurSelect to its liability insurance provider so that counsel can be assigned to represent NurSelect's interests.

It is Landmark's understanding that NurSelect received the Attorney Letter via email on January 12, 2023.

On June 13, 2023, a joinder complaint was filed against NurSelect in the Pennsylvania Court of Common Pleas in Lancaster County, captioned *Brenda L. King, individually and as Administratrix of the Estate of Geraldine E. Wiggins, v. Rehabilitation Center at Brethren Village, LLC, Brethren Village, Brethren Village Realty, LLC, Lori Schoener, NHA, and John Does 1-4 v. NurSelect, LLC*, Case No. CI-22-04128 (the "Joinder Complaint").[1] The Joinder Complaint alleges the following three causes of action: (1) negligence, indemnification and contribution; (2) vicarious liability, indemnification, and contribution; and (3) contractual indemnification. The Joinder Complaint alleges that NurSelect is liable for common law and contractual indemnification and/or contribution, vicariously liable to Ms. Wiggins' estate, jointly and severally liable with Brethren Village, and liable over Brethren Village for claims asserted by Ms. Wiggins' estate and for injuries and damages alleged in originating complaint. The Joinder complaint also asserts that pursuant to the supplemental staffing agreement, NurSelect is contractually

---

[1] The fourth amended complaint (pre-joinder) alleges that Decedent Wiggins died on August 28, 2021, and that defendant Brethren Village acted negligently through its agents in the care and treatment of Ms. Wiggins beginning on April 13, 2021. On May 12, 2021, Ms. Wiggins was left alone despite the plan of care requiring assistance and records, and obtained a head injury when she fell, which allegedly led to her death.

KAUFMAN BORGEEST & RYAN LLP

9402374

*NurSelect LLC*
Page 3

obligated to indemnify and hold harmless Brethren Village for any liabilities, damages, and expenses resulting from the claims asserted by Ms. Wiggins' Estate.

It is Landmark's understanding that NurSelect was served with the Joinder Complaint and reported the Joinder Complaint to Landmark on September 12, 2023.

<u>THE POLICY</u>

Landmark issued its Professional Liability Policy No. LHC801468 to NurSelect LLC reflecting a Policy Period of March 1, 2023 to March 1, 2024 (the "Policy"). The Policy's General Liability Coverage Part is subject to a $1 million Limit of Liability per Claim and $3 million in the aggregate. The Policy's Commercial General Liability Coverage Part is subject to a $1 million Limit of Liability per Occurrence and $3 million in the aggregate.

Pursuant to the Cross Coverage Exclusion Endorsement, the Policy only affords coverage under either the General Liability Coverage part or the Professional Liability Coverage part, not both.

<u>COVERAGE DETERMINATION</u>

*Medical Professional Liability Coverage*

Part 1 of the Medical Professional Liability Coverage part provides the following:

> The Company will pay on behalf of the Insured, as shown in the Declarations, all sums that the Insured becomes legally obligated to pay as **Damages** and associated **Claim Expenses** arising out of a negligent act, error or omission, even if the **Claim** asserted is groundless, false or fraudulent, in the rendering of or failure to render professional services as described in the Business Description on the Declarations, provided that the:
>
> 1. **Claim** is first made against the Insured during the **Policy Period,** and reported to the Company no later than sixty (60) days after the end of the **Policy Period**;
> 2. Negligent act, error or omission took place in a covered territory;
> 3. Negligent act, error or omission took place after the **Retroactive Date** as shown in the Declarations.

Section III.C. of Medical Professional Liability Coverage part defines Claim to include a "Claim means a written demand for monetary or non-monetary relief received by the Insured during the Policy Period, including the service of suit, or the institution of an arbitration proceeding." The Attorney Letter qualifies as a Claim since the Attorney Letter states that Brethren Village intends to name the insured as a defendant in the suit, are seeking contractual indemnity (relief) and request NurSelect notify its insurance carrier. It is Landmark's understanding and Mr. Shelly has acknowledged that he received the Attorney Letter on January 12, 2023, via email, but he did not open the email. The Medical Professional Liability Coverage part requires that Claims be first made against the Insured during the March 1, 2023 to March 1, 2024 Policy Period. The Attorney Letter is a Claim made against the Insured that was first made on January 12, 2023, 48 days before the inception of the Policy Period, as it was received by the Insured on January 12, 2023.

Pursuant to Section C. of the Medical Professional Liability Coverage part, all "Claims arising out of a single negligent act, error or omission, or a series of related negligent acts, errors or omissions by one or more Insureds shall be treated as a single Claim for all purposes of this

*NurSelect LLC*
Page 4

policy." Section C also provides that all "Claims shall be deemed first made when the earliest of such Claims is first made, regardless of whether such date is before or during the Policy Period." The Joinder Complaint and the Attorney letter arise out of the same exact facts and allegations – the contractual indemnification and vicarious liability of NurSelect arising out of Ms. Wiggins' fall at Brethren Village. Accordingly, the Joinder Complaint and the Attorney Letter are a single Claim first made on January 12, 2023.[2] As such, coverage for the Submitted Matter is denied as a Claim first made prior to the inception of the Policy Period, failing to trigger the applicable Insuring Agreement.

The Professional Liability Coverage excludes coverage for any Claim or Claim Expenses based upon or arising out of:

> Any obligation or liability assumed by the Insured under any contract or any oral or written agreement, unless liability would have attached in the absence of such a contract or agreement, including the Insured's decision to unilaterally terminate or otherwise alter, remove or abridge any rights, benefits or obligations under any contract or agreement.

This exclusion also acts to wholly exclude coverage for the Submitted Matter based on the contract NurSelect has with Brethren Village.

Moreover, the Professional Liability Coverage part includes a Notice of Claim general condition that provides:

> The Insured must notify the Company *as soon as practicable* of an incident, occurrence or offense that may reasonably be expected to result in a **Claim**. Where notice to the Company of such incidents, occurrences or offenses has been acknowledged as adequate by the Company in writing, subsequent **Claims** derived from such incidents, occurrences or offenses will be deemed as first made at the time the incident, occurrence or offense giving rise to such **Claim** was first provided. *The Insured also must immediately send copies to the Company of any demands, notices, summonses or legal papers received in connection with any **Claim**, and must authorize the Company to obtain records and other information*.

It is Landmark's understanding that NurSelect was aware of the incident involving Ms. Wiggins as early as October 14, 2022, when Brethren Village's counsel requested Ayanna McDowell's contact information and requested Ms. McDowell's statement regarding the incident. NurSelect failed to notify Landmark as soon as practicable of the incident (in October 2022), and failed to immediately send a copy of the January 12, 2023 Attorney Letter to Landmark. As such, NurSelect failed to fulfill the foregoing condition of the Policy, resulting in another basis for a denial of coverage for the Submitted Matter.

*Commercial General Liability Coverage*

The General Liability Coverage A Insuring Agreement provides:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured

---

[2] The Attorney Letter and the Joinder Complaint will collectively be referred to herein as the "Submitted Matter".

KAUFMAN BORGEEST & RYAN LLP

9402374

*NurSelect LLC*
Page 5

against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle or defend any "claim" or "suit" that may result. But:

1.  The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and
2.  Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

Section 2. of the Commercial General Liability coverage part provides the following, in relevant part:

This Insurance does not apply to:

*        *        *

**v. Prior Knowledge**
Any alleged act, error, omission, or circumstance likely to give rise to a "claim" that an Insured had knowledge of prior to the effective date of this policy. This exclusion includes, but is not limited to any prior "claim" or possible "claim" referenced in the Insured's application.

Based on NurSelect's own admission, NurSelect was aware on October 14, 2022, of the "Occurrence" that occurred with Ms. Wiggins as it involved Ayanna McDowell (NurSelect's employee) because Ayanna McDowell's statement was requested, so NurSelect had prior knowledge of the incident and this possible claim. NurSelect also had prior knowledge of a "claim" when it received the January 12, 2023 Attorney Letter. Accordingly, coverage is wholly excluded under the Commercial General Liability part of the Policy based on the prior knowledge exclusion.

Section IV.2. of the Commercial General Liability conditions provides that in the event of occurrence, offense, claim or suit, the insured:

a.  [] must see to it that we are notified as soon as practicable of an "occurrence" or offense which may result in a "claim". To the extent possible, notice should include:
    1.  How, when and where the "occurrence" or offense took place;
    2.  The names and addresses of any injured persons and witnesses; and
    3.  The nature and location of any injury or damage arising out of the "occurrence" or offense.
b.  If a "claim" is made or "suit" is brought against any insured, you must:
    1.  Immediately record the specifics of the "claim" or "suit" and the date received; and
    2.  Notify us as soon as practicable.
    You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.
c.  You and any other involved insured must:
    1.  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or a "suit";…..

NurSelect failed to comply with its duties under Section IV.2. of the Commercial General Liability part of the Policy when it failed to immediately send Landmark a copy of the January 12, 2023 Attorney Letter, which provided notice of a "claim". It also appears that NurSelect should have advised Landmark of the occurrence, when it first learned of it on October 14, 2022. As such, coverage is denied under the Commercial General Liability Coverage part of the Policy.

KAUFMAN BORGEEST & RYAN LLP

9402374

*NurSelect LLC*
Page 6

Section 2.b. of the Commercial General Liability Coverage part exclusions provides the following:

> This Insurance does not apply to:
>
> \*       \*       \*
>
> **b. Contractual Liability**
> "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
> a. That the insured would have in the absence of the contract or agreement; or
> b. Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:
>> a. Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and
>> b. Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

Landmark reserves it rights to further exclude coverage based on the contractual indemnity exclusion in light of the "Staffing Agreement" entered into between NurSelect and Brethren Village.

Landmark also notes that NurSelect signed a Policy application on January 26, 2023, and checked no in response to the following question: "In the past twelve (12) months, has any professional liability claim or suit been made against the Applicant or any of its predecessor firms?". The application contains the following representations clause:

> The Applicant declares that the above statement and representations are true and correct, and that no facts have been suppressed or misstated. All written statements and materials furnished to the Company, in conjunction with this application will be incorporated by reference into this application and made part hereof…is agreed that this form shall be the basis of the contract should a policy be issued, and it will be attached to and made part of the policy.

At the time NurSelect signed the application on January 26, 2023, NurSelect knew about the Ms. Wiggins' incident and received the January 12, 2023 letter. Accordingly, it appears the application may have contained a misrepresentation. Landmark expressly reserves its rights in this regard.

<u>CONCLUSION</u>

In conclusion, the Policy does not afford coverage for the captioned matter. Landmark remains willing to reconsider its denial of coverage for this matter if warranted by additional information provided by the Insured. If nothing further is received by Landmark from the Insured in the next thirty days, Landmark will presume the Insured accept this coverage determination and Landmark will close its file.

KAUFMAN BORGEEST & RYAN LLP

9402374

*NurSelect LLC*
Page 7

This letter is not intended to be an exhaustive recitation of all potentially applicable terms, conditions, exclusions or endorsements of the Policy. Nothing in this letter is intended to, or does, waive any of Landmark's rights, privileges or defenses under the Policy, at law or in equity, all of which are expressly reserved. Landmark expressly reserves the right to alter, supplement, and modify this coverage statement as other and additional information may become available. Landmark's coverage determination is necessarily based upon information that has been made available to it at this point. If you have any other information that Landmark should consider, please let us know.

If you have any questions, please feel free to contact us.

Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Joan Gilbride
Briana Semenza

cc:      (via email only)

         zwilson@rsui.com

# EXHIBIT 10

Landmark v. Nurselect MSJ_00000611



April 12, 2024

JOAN M. GILBRIDE
DIRECT: 2125.994.6517
JGILBRIDE@KBRLAW.COM

BRIANA A. SEMENZA
DIRECT: 914.449.1011
BSEMENZA@KBRLAW.COM

<u>VIA EMAIL ONLY</u>

J. David Ziegler
Dickie, McCamey, Chilcote, P.C.
Two PPG Place, Suite 400
Pittsburgh, PA 15222-540
dziegler@dmclaw.com

| Re: | Named Insured | : | NurSelect LLC |
|-----|---------------|---|---------------|
| | Matter | : | *Estate of Geraldine E. Wiggins* |
| | Policy No. | : | LHC801468 (March 1, 2023 to March 1, 2024) |
| | RSUI File No. | : | 7030187058 |
| | KBR File No. | : | 810.750 |

Dear Mr. Ziegler:

As you know, this firm has been retained to advise and assist RSUI Indemnity Company ("RSUI"), which is the authorized representative on behalf of Landmark American Insurance Company ("Landmark"). Landmark issued the above referenced Professional Liability Policy to NurSelect LLC (the "Insured" or "NurSelect").[1]

Landmark acknowledges receipt of your April 4 and April 5, 2024 email communications, requesting Landmark provide NurSelect with a defense for the above captioned matter, and your prior letters contesting Landmark's coverage denial of the above captioned matter. As detailed below, Landmark has agreed to provide NurSelect with a defense for the above captioned matter, subject to the reservations of rights set forth below and pending the outcome of the declaratory judgment action pending in the U.S. District Court for the Eastern District of Pennsylvania, captioned: *Landmark American Insurance Company v. NurSelect LLC*, Case No. 5:24-cv-01412 (the "DJ Action"). Please allow this letter to supplant Landmark's prior coverage letter dated October 4, 2023, and Landmark's additional communications set forth in its October 17, 2023 and February 16, 2024 letters.

---

[1] Capitalized terms, not otherwise defined herein are intended to retain the definition found in the Landmark policy defined below.

NEW YORK            NEW JERSEY            CONNECTICUT            CALIFORNIA

10093070

Landmark v. Nurselect MSJ_00000612

*NurSelect LLC*
Page 2

THE SUBMITTED MATTER

On January 12, 2023, counsel to Brethren Village Retirement Community sent a letter to NurSelect, LLC (via email and mail), advising that Brethren Village has been sued in the Court of Common Pleas related to the care and treatment of one of its residents, Geraldine Wiggins (the "Attorney Letter"). The Attorney Letter advises that Brethren Village is being sued for negligence arising out of a fall sustained by Ms. Wiggins on May 12, 2021, and that Brethren Village's investigation revealed that Ayanna McDowell, CNA, who was employed by NurSelect at the relevant time, had direct involvement in Ms. Wiggins' alleged fall. The Attorney Letter discusses the "Staffing Agreement" between Brethren Village and NurSelect, with specific reference to the agreement provision for "Apportionment of Liability and Damages Indemnification," which states:

> 5.1 <u>Apportionment of Liability</u>. It is hereby stipulated and agreed between the [Brethren Village] and NurSelect that with respect to any claim or action arising out of the Services, each entity shall only be liable for payment of that portion of any and all liability, costs, expenses, demands, settlements or judgments resulting from negligence, actions or omissions of its own agents, officers, and employees.

The Attorney Letter advises that based upon the foregoing provision, Brethren Village will be filing a joinder complaint against NurSelect to invoke NurSelect's contractual agreement to indemnify Brethren Village for the alleged negligence, actions, or omissions of Ms. McDowell related to the care and treatment of Ms. Wiggins. The Attorney Letter also advises NurSelect to provide notice of the pending joinder against NurSelect to its liability insurance provider so that counsel can be assigned to represent NurSelect's interests. It is Landmark's understanding that NurSelect received the Attorney Letter via email on January 12, 2023.

On June 13, 2023, a joinder complaint was filed against NurSelect in the Pennsylvania Court of Common Pleas in Lancaster County, captioned *Brenda L. King, individually and as Administratrix of the Estate of Geraldine E. Wiggins, v. Rehabilitation Center at Brethren Village, LLC, Brethren Village, Brethren Village Realty, LLC, Lori Schoener, NHA, and John Does 1-4 v. NurSelect, LLC*, Case No. CI-22-04128 (the "Joinder Complaint").[2] The Joinder Complaint alleges the following three causes of action: (1) negligence, indemnification and contribution; (2) vicarious liability, indemnification, and contribution; and (3) contractual indemnification. The Joinder Complaint alleges that NurSelect is liable for common law and contractual indemnification and/or contribution, vicariously liable to Ms. Wiggins' estate, jointly and severally liable with Brethren Village, and liable over Brethren Village for claims asserted by Ms. Wiggins' estate and for injuries and damages alleged in originating complaint. The Joinder complaint also asserts that pursuant to the supplemental staffing agreement, NurSelect is contractually obligated to indemnify and hold harmless Brethren Village for any liabilities, damages, and expenses resulting from the claims asserted by Ms. Wiggins' Estate.

It is Landmark's understanding that NurSelect was served with the Joinder Complaint and reported the Joinder Complaint to Landmark on September 12, 2023.

---

[2] The fourth amended complaint (pre-joinder) alleges that Decedent Wiggins died on August 28, 2021, and that defendant Brethren Village acted negligently through its agents in the care and treatment of Ms. Wiggins beginning on April 13, 2021. On May 12, 2021, Ms. Wiggins was left alone despite the plan of care requiring assistance and records, and obtained a head injury when she fell, which allegedly led to her death.

KAUFMAN BORGEEST & RYAN LLP

Landmark v. Nurselect MSJ_00000613

*NurSelect LLC*
Page 3

<u>THE POLICY</u>

Landmark issued its Professional Liability Policy No. LHC801468 to NurSelect LLC reflecting a Policy Period of March 1, 2023 to March 1, 2024 (the "Policy"). The Policy's General Liability Coverage Part is subject to a $1 million Limit of Liability per Claim and $3 million in the aggregate. The Policy's Commercial General Liability Coverage Part is subject to a $1 million Limit of Liability per Occurrence and $3 million in the aggregate.

Pursuant to the Cross Coverage Exclusion Endorsement, the Policy only affords coverage under either the General Liability Coverage Part or the Professional Liability Coverage Part, not both.

<u>COVERAGE DETERMINATION</u>

*Medical Professional Liability Coverage*

Part 1 of the Medical Professional Liability Coverage Part provides the following:

> The Company will pay on behalf of the Insured, as shown in the Declarations, all sums that the Insured becomes legally obligated to pay as **Damages** and associated **Claim Expenses** arising out of a negligent act, error or omission, even if the **Claim** asserted is groundless, false or fraudulent, in the rendering of or failure to render professional services as described in the Business Description on the Declarations, provided that the:
>
> 1. **Claim** is first made against the Insured during the **Policy Period,** and reported to the Company no later than sixty (60) days after the end of the **Policy Period**;
> 2. Negligent act, error or omission took place in a covered territory;
> 3. Negligent act, error or omission took place after the **Retroactive Date** as shown in the Declarations.

The Joinder Complaint is a Claim first made against the Insured – NurSelect. Landmark has agreed to provide a defense to NurSelect for the Joinder Complaint subject to the outcome of the pending DJ Action and a full reservation of rights under the Policy.

Pursuant to Section I.B of the Medical Professional Liability Coverage Part of the Policy (Defense and Settlement), Landmark has the right and duty to defend any Claim against an Insured and to select legal counsel for the defense of a Claim. Based on a review of the docket, it is Landmark's understanding that Kevin Conrad of Dickie, McCamey & Chilcote, P.C. was defending NurSelect. Please be advised that Landmark has reassigned this matter to Christian Scheuerman of Marks, O'Neill, O'Brien, Doherty & Kelly, P.C. Landmark reserves all of its rights in connection with Section I.B. of the Medical Professional Liability Coverage Part of the Policy.

Notwithstanding the foregoing, and in light of the pending DJ Action, Landmark continues to expressly reserve its rights in connection with the satisfaction of the Medical Professional Liability Coverage Part Insuring Agreement. Section III.C. of Medical Professional Liability Coverage Part defines Claim to include a "Claim means a written demand for monetary or non-monetary relief received by the Insured during the Policy Period, including the service of suit, or the institution of an arbitration proceeding." The Attorney Letter qualifies as a Claim since the Attorney Letter states that Brethren Village intends to name the insured as a defendant in the suit, are seeking contractual indemnity (relief) and request NurSelect notify its insurance carrier. It is Landmark's understanding and Mr. Shelly has acknowledged that he received the Attorney Letter on January 12, 2023, via email, but he did not open the email. The Medical Professional Liability Coverage Part requires that Claims be first made against the Insured during the March 1, 2023 to March 1,

KAUFMAN BORGEEST & RYAN LLP

10093070

NurSelect LLC
Page 4

2024 Policy Period. The Attorney Letter is a Claim made against the Insured that was first made on January 12, 2023, 48 days before the inception of the Policy Period, as it was received by the Insured on January 12, 2023. Pursuant to Section C. of the Medical Professional Liability Coverage Part, all "Claims arising out of a single negligent act, error or omission, or a series of related negligent acts, errors or omissions by one or more Insureds shall be treated as a single Claim for all purposes of this policy." Section C also provides that all "Claims shall be deemed first made when the earliest of such Claims is first made, regardless of whether such date is before or during the Policy Period." The Joinder Complaint and the Attorney letter arise out of the same exact facts and allegations – the contractual indemnification and vicarious liability of NurSelect arising out of Ms. Wiggins' fall at Brethren Village. Accordingly, the Joinder Complaint and the Attorney Letter are a single Claim first made on January 12, 2023 – prior to the inception of the Policy Period, failing to trigger the applicable Insuring Agreement.

While Landmark has withdrawn its denial of coverage based on the failure to trigger the Medical Professional Liability Insuring Agreement in light of the pending DJ Action, Landmark continues to reserve its rights in connection with the satisfaction of the Insuring Agreement and Section C.

Landmark also reserves its rights in connection with the contract exclusion and the Policy's Notice of Claim general condition. The Medical Professional Liability Coverage Part excludes coverage for any Claim or Claim Expenses based upon or arising out of:

> Any obligation or liability assumed by the Insured under any contract or any oral or written agreement, unless liability would have attached in the absence of such a contract or agreement, including the Insured's decision to unilaterally terminate or otherwise alter, remove or abridge any rights, benefits or obligations under any contract or agreement.

This Joinder Complaint (and the Attorney Letter) asserts that NurSelect and Brethren Village are parties to a written contract – the "Staffing Agreement". While Landmark has withdrawn its denial of coverage based on the foregoing provision in light of the pending DJ Action, Landmark continues to reserve its rights in connection with the contract exclusion.

Moreover, the Medical Professional Liability Coverage Part includes a Notice of Claim general condition that provides:

> The Insured must notify the Company _as soon as practicable_ of an incident, occurrence or offense that may reasonably be expected to result in a **Claim**. Where notice to the Company of such incidents, occurrences or offenses has been acknowledged as adequate by the Company in writing, subsequent **Claims** derived from such incidents, occurrences or offenses will be deemed as first made at the time the incident, occurrence or offense giving rise to such **Claim** was first provided. _The Insured also must immediately send copies to the Company of any demands, notices, summonses or legal papers received in connection with any **Claim**, and must authorize the Company to obtain records and other information_.

It is Landmark's understanding that NurSelect was aware of the incident involving Ms. Wiggins as early as October 14, 2022, when Brethren Village's counsel requested Ayanna McDowell's contact information and requested Ms. McDowell's statement regarding the incident, and thus, it appears that NurSelect failed to notify Landmark as soon as practicable of the incident (in October 2022). NurSelect also failed to _immediately_ send a copy of the January 12, 2023 Attorney Letter to Landmark. As such, Landmark reserves its rights to deny coverage based on NurSelect's failure to fulfill the foregoing condition of the Policy, pending the outcome of the DJ Action.

KAUFMAN BORGEEST & RYAN LLP

Landmark v. Nurselect MSJ_00000615

10093070

NurSelect LLC
Page 5

Landmark notes that pursuant to Section IV.H. of the Professional Liability Coverage Part, the Policy applies as excess over, and will not contribute with, any other existing insurance, unless such other insurance is specifically written to be excess of the Policy.

*Commercial General Liability Coverage*

Coverage continues to be denied under the Policy's Commercial General Liability Coverage Part.

The General Liability Coverage A Insuring Agreement provides:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle or defend any "claim" or "suit" that may result. But:
>
> 1. The amount we will pay for damages is limited as described in Section **III** – Limits of Insurance; and
> 2. Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

The Insuring Agreement requires the "bodily injury" or "property damage" to have occurred during the March 1, 2023 to March 1, 2024 policy period. It is undisputed that the alleged bodily injury took place on May 12, 2021. Accordingly, the submitted matter fails to trigger the applicable Insuring Agreement under the Commercial General Liability Coverage Part.

The Commercial General Liability Coverage Part Insuring Agreement also requires, as a condition to coverage, that no Insured knew that the alleged "bodily injury" had occurred prior to the Policy inception on March 1, 2023. NurSelect knew about Ms. Wiggins' alleged incident and injury as early as October 2022. Accordingly, coverage is further denied under the Commercial General Liability Coverage Insuring Agreement based on the Insured's failure to satisfy the conditions precedent to coverage.

Landmark reserves its rights to further deny coverage under the Policy's Commercial General Liability Coverage Part based on: (1) the prior knowledge exclusion[3] because the Insured appears to have had knowledge prior to the inception of the Policy (on March 1, 2023) of an alleged act, error, omission, or circumstance likely to give rise to a "claim" as early as October 2022, when the Insured discovered that its employee was involved in Ms. Wiggins' incident; (2) the notice

---

[3] Section 2. of the Commercial General Liability Coverage Part provides the following, in relevant part:

> This Insurance does not apply to: . . .
>
> **v. Prior Knowledge**
> Any alleged act, error, omission, or circumstance likely to give rise to a "claim" that an Insured had knowledge of prior to the effective date of this policy. This exclusion includes, but is not limited to any prior "claim" or possible "claim" referenced in the Insured's application.

KAUFMAN BORGEEST & RYAN LLP

10093070

*NurSelect LLC*
Page 6

condition under the Policy set forth in Section IV.2,[4] which requires that NurSelect immediately send Landmark a copy of the January 12, 2023 Attorney Letter, which provided notice of a "claim"; (3) the contractual liability exclusion[5] in light of the "Staffing Agreement" entered into between NurSelect and Brethren Village.

Landmark also notes that NurSelect signed a Policy application on January 26, 2023, and checked no in response to the following question: "In the past twelve (12) months, has any professional liability claim or suit been made against the Applicant or any of its predecessor firms?". The application contains the following representations clause:

> The Applicant declares that the above statement and representations are true and correct, and that no facts have been suppressed or misstated. All written statements and materials furnished to the Company, in conjunction with this application will be incorporated by reference into this application and made part hereof…is agreed that this form shall be the basis of the contract should a policy be issued, and it will be attached to and made part of the policy.

At the time NurSelect signed the application on January 26, 2023, NurSelect knew about the Ms. Wiggins' incident and received the January 12, 2023 letter. Accordingly, it appears the application may have contained a misrepresentation. Landmark expressly reserves its rights in this regard.

---

[4] Section IV.2. of the Commercial General Liability conditions provides that in the event of occurrence, offense, claim or suit, the insured:

    a.  [] must see to it that we are notified as soon as practicable of an "occurrence" or offense which may result in a "claim". To the extent possible, notice should include:
        1.  How, when and where the "occurrence" or offense took place;
        2.  The names and addresses of any injured persons and witnesses; and
        3.  The nature and location of any injury or damage arising out of the "occurrence" or offense.
    b.  If a "claim" is made or "suit" is brought against any insured, you must:
        1.  Immediately record the specifics of the "claim" or "suit" and the date received; and
        2.  Notify us as soon as practicable.
        You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.
    c.  You and any other involved insured must:
        1.  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or a "suit";…..

[5] Section 2.b. of the Commercial General Liability Coverage Part exclusions provides the following:

    This Insurance does not apply to: …

    **b. Contractual Liability**
    "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
    a.  That the insured would have in the absence of the contract or agreement; or
    b.  Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:
        a.  Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and
        b.  Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

KAUFMAN BORGEEST & RYAN LLP

10093070

Landmark v. Nurselect MSJ_00000617

*NurSelect LLC*
Page 7

<u>CONCLUSION</u>

In conclusion, subject to certain reservations of rights and the outcome of the DJ Action, Landmark has agreed to provide a defense under the Policy for the captioned matter. This letter is not intended to be an exhaustive recitation of all potentially applicable terms, conditions, exclusions or endorsements of the Policy. Nothing in this letter is intended to, or does, waive any of Landmark's rights, privileges or defenses under Policy, at law or in equity, all of which are expressly reserved. Landmark expressly reserves the right to alter, supplement, and modify this coverage statement as other and additional information may become available. Landmark's coverage determination is necessarily based upon information that has been made available to it at this point. If you have any other information that Landmark should consider, please let us know.

If you have any questions, please feel free to contact us.


Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Joan Gilbride
Briana Semenza

cc:      (via email only)

         zwilson@rsui.com

KAUFMAN BORGEEST & RYAN LLP

10093070

# EXHIBIT 11

Landmark v. Nurselect MSJ_00000619

**From:** Linda Reidenbaugh <LLR@saxtonstump.com>
**Sent:** Thursday, January 12, 2023 4:12:49 PM
**To:** David Shelly <dshelly@nurselectstaffing.com>
**Cc:** jsnader@bv.org <jsnader@bv.org>; Kimberly A. Selemba <kas@saxtonstump.com>
**Subject:** Brenda L. Kling, Individually and as Administratrix of the Estate of Geraldine E. Wiggins v. Rehabilitation Center at Brethren Village, et al.

Hello Mr. Shelly,
On behalf of Kimberly A. Selemba, please find a copy of the attached correspondence.
Thank you.

**Linda Reidenbaugh** | Paralegal/Client Services Professional

**SAXTON & STUMP**
LAWYERS AND CONSULTANTS

280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Phone: 717.556.1038 | Internal: 1038
llr@saxtonstump.com

# EXHIBIT 12

Landmark v. Nurselect MSJ_00000621

# SAXTON & STUMP
## LAWYERS AND CONSULTANTS

4250 Crums Mill Road, Suite 201 • Harrisburg, PA 17112
P: (717) 216-5505 • F: (717) 547-1900

**Direct Dial:** (717) 941-1214
**Email:** kas@saxtonstump.com

January 12, 2023

**VIA EMAIL (dshelly@nurselectstaffing.com)**

David Shelly, President
NurSelect, LLC
640 Freedom Business Center Dr.
Third Floor
King of Prussia, PA 19406

**Re:     Brenda L. Kling, Individually and as Administratrix of the Estate of Geraldine E.
         Wiggins v. Rehabilitation Center at Brethren Village, et al.
         Case No. CI-22-04128, Lancaster County Court of Common Pleas
         Joinder of NurSelect, LLC**

Dear Mr. Shelly:

       As you know from our prior communications, this law firm represents Brethren Village
Retirement Community.  A lawsuit has been commenced against Brethren Village in the Court
of Common Pleas of Lancaster County related to the care and treatment of one of its residents,
Geraldine Wiggins.  Specifically, the lawsuit alleges negligence arising out of a fall sustained
by Ms. Wiggins on May 12, 2021.  Our investigation has revealed that Ayanna McDowell, CNA,
who was employed by NurSelect, LLC at the relevant time, had direct involvement in this
alleged fall.  Upon confirming that Ayanna McDowell, CNA was an employee of NurSelect and
reviewing the contractual agreement between NurSelect and Brethren Village, our office did not
meet with Ms. McDowell.

       You are aware that Brethren Village is a party to a Staffing Agreement with NurSelect
for the provision of NurSelect Personnel on contractual assignments on a per-diem or temporary
basis at Brethren Village.  The Staffing Agreement contains a provision for Apportionment of
Liability and Damages Indemnification.  Specifically, Section 5.1 of the Staffing Agreement
states:

       5.1     <u>Apportionment of Liability.</u>  It is hereby stipulated and agreed between the Client
       and NurSelect that with respect to any claim or action arising out of the Services, each
       entity shall only be liable for payment of that portion of any and all liability, costs,

Landmark v. Nurselect MSJ_00000622

expenses, demands, settlements or judgments resulting from negligence, actions or omissions of its own agents, officers, and employees.

Based upon this provision, Brethren Village will be filing a joinder complaint against NurSelect to invoke NurSelect's contractual agreement to indemnify Brethren Village for the alleged negligence, actions, or omissions of Ms. McDowell related the care and treatment of Ms. Wiggins.  Please provide notice of this pending joinder against NurSelect to your liability insurance provider so that counsel can be assigned to represent NurSelect's interests.

Thank you for your attention to this matter.

Sincerely,

SAXTON & STUMP

*/s/ Kimberly A. Selemba*
Kimberly A. Selemba, Esquire
Senior Counsel

cc:     John N. Snader, President/CEO, Brethren Village (via email)

# EXHIBIT 13

Landmark v. Nurselect MSJ_00000624

**Sara Moriarty**

| | |
|---|---|
| **From:** | Joan M. Gilbride |
| **Sent:** | Thursday, October 5, 2023 2:20 PM |
| **To:** | Briana A. Semenza |
| **Subject:** | FW: Wiggins v. NurSelect, RSUI Claim No. 7030187058 |
| **Attachments:** | 9402374_1.pdf |
| **Importance:** | High |

**From:** Anthony Viola <anthonyviola@libertyins.com>
**Sent:** Thursday, October 5, 2023 2:02 PM
**To:** Joan M. Gilbride <jgilbride@kbrlaw.com>; Wilson, Zach <zwilson@rsui.com>
**Cc:** David Shelly <dshelly@nurselectstaffing.com>; Steve Pcsolar <stevepcsolar@libertyins.com>; Jason Rigby <jasonrigby@libertyins.com>
**Subject:** FW: Wiggins v. NurSelect, RSUI Claim No. 7030187058
**Importance:** High

Ms. Gilbride,

We are the agent/broker for NurSelect LLC.  We are in receipt of your coverage declination letter attached above.   We strongly disagree with your coverage position and would like to take this opportunity to accurately reflect the facts and timeline of events.

The letter above indicates NurSelect and Mr. David Shelly was aware of this incident involving Mr. Wiggins as early as October 14, 2022.  Brethren Village counsel requested Ayana McDowell's contact information and statement regarding an incident involving Ms. Geraldine Wiggins that occurred on May 12, 2021.   The insured was aware of an incident but, did not believe "fingers were being pointed" at the insured or its employee Ayanna McDowell as being responsible for the incident.  Moreover, there was no indication Ms. Wiggins and/or her family were bringing forth a personal injury claim.  The request for Ms. McDowell contact information and statement was 17 months after the incident.  Mr. Shelly believed Brethren simply wanted Ms. McDowell statement on record in the event a claim was brought forth by Ms. Wiggins.  The insured was not aware of any other information that obligate them to play insurance on notice of a claim.   It should be further noted,  there is a 2-way indemnification provision within the contract between NurSelect & Brethren. Said contract suggests Brethren agrees to defend and indemnify NurSelect from claims arising out of the care, services of residents or lack thereof.  Considering Ms. McDowell was at the control and direction of Brethren coupled with the favorable contract language the insured had no reason to believe a claim was being brought forth against NurSelect.

The letter also indicates the insured received an email and **letter** dated January 12, 2023, from Brethren Village advising Brethren had been sued in the Court of Common Pleas in relation to an incident involving Mr. Geraldine Wiggins.  The letter further advises that Brethren intends to file a joinder complaint against NurSelect to invoke NurSelect contractual obligation pursuant to a staffing contract.  Let the record reflect accurately, NurSelect never received a letter via US mail or Certified Mail from Brethren Village Retirement Community or its counsel.   The only correspondence the insured (Mr. David Shelly) received was an email dated January 12, 2023.  The email was sent by Ms. Linda Reidenbaugh paralegal with Saxton & Stump Attorneys at Law.   Not recognizing the sender and/or email address, Mr. David Shelly did not open the email from Ms. Linda Reidenbaugh.  As a matter of fact,  it was not until the insured was served with the lawsuit in September that included a cover letter referencing the January 12, 2023, correspondence that Mr. Selly discovered the unopen email.

1

Landmark v. Nurselect MSJ_00000625

Based on the facts and timeline above, it is clear Mr. Shelly timely reported this matter to RSUI.   Circumstances would be different had Mr. Shelly received a certified letter from the law offices of Saxton & Stump and failed to take appropriate action. We believe the courts will agree with our position.   Before taking legal action against RSUI, we provide the opportunity to rescind the current coverage position and reinstate coverage.

Sincerely,

Anthony



**Anthony Viola**

*Claim Manager* | Liberty Insurance Agency
**P:** 412-571-5714 ext. 212 **F:** 412-571-9909
**A:** Manor Oak Two - Suite #800 1910 Cochran Road
Pittsburgh PA 15220
**E:** anthonyviola@libertyins.com
**W:** libertyins.com



**Confidentiality Note:** This message from Liberty Insurance Agency and any attachments may contain legally privileged and/or confidential information. Any unauthorized disclosure, use or dissemination of this email message or its contents, either in whole or in part, is prohibited. If you are not the intended recipient of this email message, kindly notify the sender and then destroy it.

**Security Note:** Liberty Insurance Agency does not guarantee the security of emails or their contents or attachments, which could be infected, intercepted, or corrupted. It is the recipient's responsibility to check incoming emails for threats with proper software. Liberty Insurance Agency disclaims liability for any damages caused by viewing or downloading this email or its contents or attachments.

**From:** David Shelly <dshelly@nurselectstaffing.com>
**Sent:** Wednesday, October 4, 2023 11:54 AM
**To:** Anthony Viola <anthonyviola@libertyins.com>; Steve Pcsolar <stevepcsolar@libertyins.com>
**Subject:** [EXTERNAL] FW: Wiggins v. NurSelect, RSUI Claim No. 7030187058

FYI

Sincerely,

David Shelly, President
**NurSelect, LLC**
1829 New Holland Rd., Suite 13
Reading, PA 19607
Main: (800) 484-8572
Direct: (484) 663-4374
Fax (484) 214-0055
nurselectstaffing.com

Landmark v. Nurselect MSJ_00000626





CONFIDENTIALITY NOTICE: The content of this message and any files transmitted with it is a confidential and proprietary business communication, which is solely for the use of the intended recipient(s). Any use, distribution, duplication or disclosure by any other person or entity is strictly prohibited. If you are not an intended recipient or this has been received in error, please notify the sender and immediately delete all copies of this communication.

---

**From:** Briana A. Semenza
**Sent:** Wednesday, October 4, 2023 10:59 AM
**To:** David Shelly
**Cc:** Joan M. Gilbride; 'zwilson@rsui.com'
**Subject:** Wiggins v. NurSelect, RSUI Claim No. 7030187058

Greetings –

Please see the attached letter, sent on behalf of RSUI Indemnity Company.

Regards,
Briana

Briana A. Semenza   |   **KAUFMAN BORGEEST & RYAN LLP**
200 Summit Lake Drive   |   Valhalla, NY 10595
direct: 914.449.1011   |   fax: 914.449.1100
vcard   |   email   |   website

**Kaufman Borgeest & Ryan LLP requests electronic mail service for all documents. Please e-serve all legal correspondence, motions, discovery, and pleadings, in addition to any other service required by court rules. Thank you.**

This electronic message contains information that may be privileged, confidential or otherwise protected from disclosure. The information contained herein is intended for the addressee only. If you are not the addressee, any disclosure, copying, distribution or use of the contents of this message (including any attachments) is prohibited. If you have received this electronic message in error, please notify the sender immediately and destroy the original message and all copies.

Landmark v. Nurselect MSJ_00000627

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more <u>Click Here</u>.

# EXHIBIT 14

Landmark v. Nurselect MSJ_00000629

## RE: Ayanna McDowell

**David Shelly**
kas@saxtonstump.com
Fri, Oct 14, 2022, 3:09 PM

Hi Kim, here is the last known contact information we have on file for Ayanna. Please let me know if you need anything else. Thank you.

Cell:          267-836-2086
Email:        ayannamcdowell@aol.com
Address:      2836 Lincoln Hwy, E-2, Ronks, PA 17572

Sincerely,

David Shelly, President
**NurSelect, LLC**
630 Freedom Business Center Dr.
Third Floor
King of Prussia, PA 19406
Main: (800) 484-8572
Direct: (484) 663-4374
Fax (484) 214-0055
nurselectstaffing.com



CONFIDENTIALITY NOTICE: The content of this message and any files transmitted with it is a confidential and proprietary business communication, which is solely for the use of the intended recipient(s). Any use, distribution, duplication or disclosure by any other person or entity is strictly prohibited. If you are not an intended recipient or this has been received in error, please notify the sender and immediately delete all copies of this communication.

Kimberly A. Selemba

1 / 2

David Shelly
Fri, Oct 14, 2022, 3:14 PM

Thank you, Dave. Can you also please send over the statement that Ayanna prepared?

Thanks again,
Kim

---

David Shelly
Kimberly A. Selemba
Thu, Oct 20, 2022, 12:41 PM
AM Statement[196247].pdf

Hi Kim, please find the requested statement attached. Thanks.

Sincerely,

David Shelly, President
**NurSelect, LLC**
630 Freedom Business Center Dr.
Third Floor
King of Prussia, PA 19406
Main: (800) 484-8572
Direct: (484) 663-4374
Fax (484) 214-0055
nurselectstaffing.com



CONFIDENTIALITY NOTICE: The content of this message and any files transmitted with it is a confidential and proprietary business communication, which is solely for the use of the intended recipient(s). Any use, distribution, duplication or disclosure by any other person or entity is strictly prohibited. If you are not an intended recipient or this has been received in error, please notify the sender and immediately delete all copies of this communication.

3 Emails

Landmark v. Nurselect MSJ_00000631

From: AYANNA MCDOWELL
Sent: Wednesday, May 12, 2021 4:10 PM
To: Melissa Reilly
Subject: Statement

I walked in and got report from the aide of her telling me the resident was on the toilet. I
went to check her because the other aide was in the resident room assisting her getting
dress. So I washed up the resident and set her up to brush her teeth and was going to be
right back just was gonna answer his bell and he needed to use the urinal. So when I gave
him the urinal I said ring the bell when you're done. As I went over to the aide cause she
was still in the resident room. I said we need to get Johanna up when you're done. So when
I was bout to go back in Geraldine room the nurse Derrick asked me to go get the resident
down the hall up and he was putting his breakfast order in and his sugar was low. So after I
did what the nurse asked me to do I walked back to Geraldine room and that's when I seen
the aide picking her up and putting her in the chair and I walked in asking what happen she
said she rang for help. And then I seen she was bleeding and told the supervisor

Sent from my iPhone

2 / 2

Landmark v. Nurselect MSJ_00000632

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| LANDMARK AMERICAN INSURANCE COMPANY, | Civil Action. No: 5:24-cv-01412 |
| Plaintiff, | Hon. John M. Gallagher, U.S.D.J. |
| v. | **Declaration of Zach Wilson** |
| NURSELECT LLC; | |
| Defendant. | |

Zach Wilson declares pursuant to 28 U.S.C. Sec. §1746 as follows:

1.      I am employed by RSUI Group, Inc. as Chief Claims Specialist. As a Chief Claims Specialist, I was responsible for administering claims submitted under Professional Liability Policy No. LHC801468 (the "Policy") issued by Landmark American Insurance Company ("Landmark") to Nurselect LLC ("Nurselect").

2.      I was responsible for administering the claim submitted by Nurselect in connection with the complaint styled *Brenda L. Kling, individually and as Administratrix of the Estate of Geraldine E. Wiggins, v. Rehabilitation Center at Brethren Village, LLC, Brethren Village, Brethren Village Realty, LLC, Lori Schoener, NHA, and John Does 1-4 v. NurSelect, LLC*, Case No. CI-22-04128, filed on June 13, 2023 in the Court of Common Pleas, Lancaster County Pennsylvania, and submitted for coverage under the Policy (the "Underlying Action").

3.      In my capacity as Chief Claims Specialist for the Underlying Action, I am familiar with the facts, circumstances and proceedings in this Declaration.

10885978

4.      I make this Declaration based on my personal knowledge in support of Landmark's Motion for Summary Judgment.

5.      Annexed hereto as Exhibit "1" is a true and correct copy of the email chain between myself and David Shelly dated September 13, 2023 regarding the claim for the Underlying Action.

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  Atlanta, Georgia
        January 15, 2025


By: _____

    Zach Wilson


10885978

Landmark v. Nurselect MSJ_00000634

# EXHIBIT 1

Landmark v. Nurselect MSJ_00000635

# Wilson, Zach

**From:**          David Shelly <dshelly@nurselectstaffing.com>
**Sent:**          Wednesday, September 13, 2023 4:10:23 PM
**To:**            Wilson, Zach <zwilson@rsui.com>;Anthony Viola <anthonyviola@libertyins.com>
**Cc:**            Steve Pcsolar <stevepcsolar@libertyins.com>
**Subject:**       Re: Claim # 7030187058 Nurse Select Staffing


Hi Zach,

The email was only discovered after receiving the complaint yesterday - during a search of the employee's name to pull all email correspondences together. The email was previously unread.


Sincerely,

David Shelly, President
NurSelect, LLC
1829 New Holland Road
Suite 13
Reading, PA 19607
Tel. (800) 484-8572
Fax (484) 214-0055
www.nurselectstaffing.com



Disclaimer: The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

**From:** Wilson, Zach <zwilson@rsui.com>
**Sent:** Wednesday, September 13, 2023 3:57 PM
**To:** David Shelly <dshelly@nurselectstaffing.com>; Anthony Viola <anthonyviola@libertyins.com>
**Cc:** Steve Pcsolar <stevepcsolar@libertyins.com>
**Subject:** RE: Claim # 7030187058 Nurse Select Staffing


Thank you David.

I see that the mailing address on the 1/12/23 letter is incorrect, but your email address appears correct. Was it sent to your email at that time? Is there a particular reason it was not discovered until yesterday?


Zach Wilson
Chief Claims Specialist
Professional Liability Claims
RSUI Group, Inc.

Landmark v. Nurselect MSJ_00000637

D: 404-682-7587　Case 5:24-cv-01412-GAW　　Document 33　　Filed 01/21/25　　Page 641 of 641
M: 470-487-6009
zwilson@rsui.com

**From:** David Shelly <dshelly@nurselectstaffing.com>
**Sent:** Wednesday, September 13, 2023 1:39 PM
**To:** Wilson, Zach <zwilson@rsui.com>; Anthony Viola <anthonyviola@libertyins.com>
**Cc:** Steve Pcsolar <stevepcsolar@libertyins.com>
**Subject:** Re: Claim # 7030187058 Nurse Select Staffing

Hi Zach,

The complaint was served yesterday, September 12, 2023 around 10:30am. On the back of the complaint there is a date of 8/25/23 that says "writ re-issued" by the prothonotary and a date of 8/28/23 when it was received by the Sheriff Dept. of Lancaster County.

Ayanna McDowell was employed by NurSelect as a W2 employee at the time of the incident. She was terminated from our employment September of 2021 as a result of excessive absenteeism.

Prior communications were as follows:
October 14, 2022 - received a phone call from Kimberly Selemba (Saxton Stump) requesting Ayanna's contact information. (Provided this to her via email)

October 14,2022 - received email requesting Ayanna's statement regarding the incident (provided this to her via email).

They appear to have had the wrong mailing address for the notice of pending joinder dated Jan. 12, 2023. This was only discovered in my email after we received the official complaint yesterday.

I will send the above mentioned written correspondences in a separate email. Please let me know if you need anything else.

Sincerely,

David Shelly, President
NurSelect, LLC
1829 New Holland Road
Suite 13
Reading, PA 19607
Tel. (800) 484-8572
Fax (484) 214-0055
www.nurselectstaffing.com